UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:12-cv-00327 (ABJ) |
| THE UNITED STATES DEPARTMENT OF EDUCATION, | ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

## <u>DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT</u>

This suit is brought by the Electronic Privacy Information Center ("EPIC"), a "public interest research organization," along with four members of its board of directors who claim to be "current or former students of educational institutions in the United States."  Compl. ¶¶ 4, 5, Feb. 29, 2012, ECF No. 1.  They challenge a final rule implementing the Family Educational Rights and Privacy Act of 1974, as amended ("FERPA"), 20 U.S.C. § 1232g.  Because the changes plaintiffs challenge have not caused, nor are likely to cause, the disclosure of personally identifiable information from their own education records, the plaintiffs have not shown a cognizable injury from the promulgation of this final rule, and they lack standing to bring these claims.  Accordingly, the complaint must be dismissed for lack of subject matter jurisdiction.

In the alternative, the Court should grant summary judgment to the Department. Plaintiffs only challenge the final rule's definition of three statutory terms, "authorized representative," "directory information," and "education program."  *See* Compl. ¶¶ 9, 12, 14-17, 19-20, 26.  They claim these three definitions are "in excess of the [Department]'s statutory authority" and are "not in accordance with law," thus violating the Administrative Procedure Act

("APA"), 5 U.S.C. § 701 *et seq.*   Compl. ¶¶ 30, 35.   Because these definitions are not contrary to FERPA but instead fall within the statute's scope, they do not violate the APA.   On the basis of the administrative record and with deference to the Department's straightforward statutory interpretation, the Court should grant summary judgment to the Department.

Defendant has filed with this motion a memorandum in support of the motion and a proposed order.

Dated:  November 30, 2012

Respectfully submitted,

STUART F. DELERY
Principal Deputy Assistant Attorney General

JOHN R. TYLER
Assistant Director

Of Counsel:

/s/ Galen N. Thorp
GALEN N. THORP (VA Bar # 75517)
DEBORAH FRIENDLY
Trial Attorney
RAHUL REDDY
United States Department of Justice
Office of the General Counsel
Civil Division, Federal Programs Branch
U.S. Department of Education
P.O. Box 883, Room 6140
Washington, D.C.
Washington, D.C. 20530
Tel: (202) 514-4781  Fax: (202) 616-8460
E-mail: galen.thorp@usdoj.gov

Attorneys for Defendant

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:12-cv-00327 (ABJ) |
| THE UNITED STATES DEPARTMENT OF EDUCATION, | ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION .......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 2

BACKGROUND .......................................................................................................... 3

I.  FAMILY EDUCATIONAL RIGHTS AND PRIVACY ACT ("FERPA") ...................... 3

    A.  Directory Information. ........................................................................... 4

    B.  The Program Evaluation Exception. ..................................................... 5

    C.  Legislative History ................................................................................. 7

II.  STATEWIDE LONGITUDINAL DATABASES .......................................................... 8

    A.  Statutory Background ............................................................................. 8

    B.  Implementation .................................................................................... 11

ARGUMENT ............................................................................................................... 13

I.  PLAINTIFFS LACK STANDING TO BRING THESE CLAIMS BECAUSE NONE OF THEM HAVE SUFFERED, NOR ARE LIKELY TO SUFFER, ANY INJURY. ................................................................................................................. 13

    A.  EPIC Lacks Standing to Sue as an Organization Because It Itself Has Not Been Injured and it Has Neither Members Nor Their Functional Equivalent. ..... 14

    B.  The Individual Plaintiffs Cannot Establish Injury in Fact. .................................. 15

        1.  None of the plaintiffs can show a concrete and particularized injury in the revised definition of "directory information." ................................. 16

        2.  None of the plaintiffs can show a concrete and particularized injury in the definitions related to the program evaluation exception. ................ 17

II.  THE FINAL RULE IS ENTITLED TO REVIEW UNDER *CHEVRON*'S DEFERENCE STANDARD. ......................................................................................... 19

    A.  Congress Delegated Rulemaking Authority Regarding FERPA to the Department, Meeting the Threshold for *Chevron* Deference. ............................. 20

    B.  The Department's Interpretation of FERPA is Entitled to Deference Because it is Not Unambiguously Forbidden by the Statute and is Reasonable. ................ 21

i

III.   NONE OF THE THREE DISPUTED DEFINITIONS EXCEED STATUTORY AUTHORITY. ........................................................................................... 21

    A.   Student ID Numbers Displayed on Badges Can Be "Directory Information" Because Such a Disclosure is Not Harmful or an Invasion of Privacy ................ 21

    B.   Federal and State Authorities May Designate "Authorized Representatives" Who Are Not Under Their Direct Control to Conduct Audits or Evaluations of Education Programs Because Neither FERPA Nor its Legislative History Requires Such a Limitation ................................................................................. 24

        1.   This Department's "reasonable methods" standard does not improperly delegate the Department's authority to non-federal entities. .................... 26

        2.   FERPA's statutory text does not unambiguously forbid the Department's interpretation. ...................................................................... 28

            i.   The ordinary meaning of "authorized representative" does not limit who may serve in that capacity. ..................................... 29

            ii.   Congress chose not to use readily available more restrictive language, and further referred to "authorized representatives" as "persons or organizations," suggesting an expectation that non-employees would serve in this capacity. ............................... 30

            iii.   The use of the word "officials" in § 1232g(b)(3)'s proviso does not prohibit non-governmental entities or other agencies from serving as authorized representatives.................................. 32

        3.   FERPA's legislative history does not require a narrower meaning of authorized representative than the plain text. ........................................... 35

        4.   The Department's interpretation is supported by the SLDS grant statutes that make clear that Congress wished to encourage the very data-sharing facilitated by this regulatory change. ................................... 39

        5.   In sum, the Department's interpretation of the term "authorized representative" is entitled to full deference under *Chevron* ..................... 41

    C.   "Early Intervention Programs" Authorized Under the Individuals With Disabilities Education Act Qualify as "Education Programs" that Can Be Evaluated Because Congress Elsewhere Defined Them as Education Programs. ..................................................................................................... 41

IV.   THE DISPUTED DEFINITIONS ARE OTHERWISE IN ACCORDANCE WITH LAW BECAUSE THEY ARE THE PRODUCT OF REASONED DECISIONMAKING. ...................................................................................... 44

CONCLUSION ............................................................................................................ 45

# TABLE OF AUTHORITIES

<u>CASES</u>

*Am. Legal Found. v. FCC*,
   808 F.2d 84 (D.C. Cir. 1987) ........................................................................... 14, 15

*Am. Soc. For Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*,
   659 F.3d 13 (D.C. Cir. 2011) ................................................................................. 13

*Armstrong v. Exec. Office of the President*,
   810 F. Supp. 2d 335 (D.D.C. 1993) ....................................................................... 23

*Ass'n of Private Sector Colleges & Univs. v. Duncan*,
   681 F.3d 427 (D.C. Cir. 2012) ........................................................... 19, 25, 44, 45

*Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005) ................................................................................................ 25

*Astrue v. Capato ex rel. B.N.C.*,
   132 S. Ct. 2021 (2012) ............................................................................................ 20

*Barnhart v. Sigmon Coal Co., Inc.*,
   534 U.S. 438 (2002) ................................................................................................ 31

*Barnhart v. Walton*,
   535 U.S. 212 (2002) ................................................................................................ 21

*Cablevision Systems Corp. v. FCC*,
   649 F.3d 695 (D.C. Cir. 2011) ............................................................................... 21

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council*,
   467 U.S. 837 (1984) ............................................................................. 2, 20, 21, 41

*City of Dania Beach v. FAA*,
   628 F.3d 581 (D.C. Cir. 2010) ............................................................................... 29

*Fox v. Clinton*,
   684 F.3d 67 (D.C. Cir. 2012) ................................................................................. 20

*Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs., Inc.*,
   528 U.S. 167 (2000) ................................................................................................ 13

*Fund Democracy, LLC v. SEC*,
   278 F.3d 21 (D.C. Cir. 2002) ................................................................................. 14

*Fund for Animals v. Kempthorne*,
 538 F.3d 124 (2d Cir. 2008) ................................................................................... 27

*Gonzaga Univ. v. Doe*,
 536 U.S 273 (2002) ............................................................................................... 3

*Gonzales v. Oregon*,
 546 U.S. 243 (2006) .............................................................................................. 20

*Hunt v. Washington State Apple Advertising Comm'n*,
 432 U .S. 333 (1977) ....................................................................................... 13, 14

*\*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992) .............................................................................................. 13

*Moore v. District of Columbia*,
 907 F.2d 165 (D.C. Cir. 1990) .............................................................................. 36

*\*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983) ................................................................................................ 44

*Nat'l Ass'n of Home Builders v. EPA*,
 667 F.3d 6 (D.C. Cir. 2011) ............................................................................ 14, 15

*Nat'l Taxpayers Union, Inc. v. United States*,
 68 F.3d 1428 (D.C. Cir. 1995) .............................................................................. 14

*Natural Res. Def. Council v. EPA*,
 489 F.3d 1250 (D.C. Cir. 2007) ............................................................................ 36

*New York v. EPA*,
 413 F.3d 3 (D.C. Cir. 2005) .................................................................................. 30

*Patterson v. School Dist. of Philadelphia*,
 No. 99-4792, 2000 WL 1020332 (E.D. Pa. July 19, 2000) ..................................... 5

*Rios v. Read*,
 73 F.R.D. 589 (E.D.N.Y. 1977) ............................................................................... 7

*S.D. Warren Co. v. Maine Bd. of Environmental Protection*,
 547 U.S. 370 (2006) .............................................................................................. 29

*Sierra Club v. EPA*,
 292 F.3d 895 (D.C. Cir. 2002) .............................................................................. 13

*Simpson v. United States*,
   435 U.S. 6 (1978)................................................................................ 36, 37

*Student Press Law Ctr. v. Alexander*,
   778 F. Supp. 1227 (D.D.C. 1991) ....................................................... 3

*Taniguchi v. Kan Pacific Saipan, Ltd.*,
   132 S. Ct. 1997 (2012)........................................................................ 29

*U.S. Postal Serv. v. Postal Regulatory Comm'n*,
   640 F.3d 1263 (D.C. Cir. 2011) .......................................................... 21

*U.S. Telecom Ass'n v. FCC*,
   359 F.3d 554 (D.C. Cir. 2004) ............................................... 26, 27, 31

*United States v. Mead Corp.*,
   533 U.S. 218 (2001)............................................................................ 20

*Virginia Dep't of Med. Assistance Servs. v. U.S. Dep't of Health & Human Servs.*,
   678 F.3d 918 (D.C. Cir. May 8, 2012)................................................ 35

*\*Washington Legal Found. v. Leavitt*,
   477 F. Supp. 2d 202 (D.D.C. 2007) .............................................. 14, 15

<u>S<small>TATUTES</small></u>

5 U.S.C. § 701 et seq.......................................................................... 1, 3

5 U.S.C. § 706(2)(A)......................................................................... 19, 44

5 U.S.C. § 706(2)(C).......................................................................... 19

19 U.S.C. § 2401(4) ........................................................................... 29

20 U.S.C. § 1003(8) ........................................................................... 43

20 U.S.C. § 1015c .............................................................. 10, 39, 40

20 U.S.C. § 1161i-1 ........................................................................... 44

20 U.S.C. § 1221e-3 ........................................................................... 20

20 U.S.C. § 1232g............................................................................ passim

   20 U.S.C. § 1232g(a)(5)................................................... 4, 5, 18, 23
   20 U.S.C. § 1232g(b)(1) .................................................... 3, 4, 31

20 U.S.C. § 1232g(b)(1)(A) ................................................................ 4, 31, 32, 34
20 U.S.C. § 1232g(b)(1)(B) ................................................................ 4, 31
20 U.S.C. § 1232g(b)(1)(C) ................................................................ passim
20 U.S.C. § 1232g(b)(1)(D) ................................................................ 4
20 U.S.C. § 1232g(b)(1)(E) ................................................................ 4, 31
20 U.S.C. § 1232g(b)(1)(F) ................................................................ 4, 31, 34, 35
20 U.S.C. § 1232g(b)(1)(G) ................................................................ 4, 31
20 U.S.C. § 1232g(b)(1)(H) ................................................................ 4
20 U.S.C. § 1232g(b)(1)(I) ................................................................ 4
20 U.S.C. § 1232g(b)(1)(J) ................................................................ 4
20 U.S.C. § 1232g(b)(1)(K) ................................................................ 4, 31, 34, 35
20 U.S.C. § 1232g(b)(2) ................................................................ 3, 4, 31
20 U.S.C. § 1232g(b)(3) ................................................................ passim
20 U.S.C. § 1232g(b)(4) ................................................................ 27, 31
20 U.S.C. § 1232g(b)(5) ................................................................ 4, 5, 6, 7, 38
20 U.S.C. § 1232g(b)(6) ................................................................ 4
20 U.S.C. § 1232g(d) ................................................................ 3
20 U.S.C. § 1232g(f) ................................................................ 3, 20, 27
20 U.S.C. § 1232g(i) ................................................................ 4
20 U.S.C. § 1232g(j) ................................................................ 4

20 U.S.C. § 1234c(a) ................................................................ 3

20 U.S.C. § 6311 ................................................................ 8, 9, 11

20 U.S.C. § 9511(b) ................................................................ 43

20 U.S.C. § 9607 ................................................................ 9, 39

20 U.S.C. § 9871 ................................................................ 9, 10, 11, 40

29 U.S.C. § 1341(c)(2)(D)(iv) ................................................................ 29

Pub. L. No. 93-380, 88 Stat. 571 (Aug. 21, 1974) ................................................................ 8, 31, 36, 37

Pub. L. No. 93-568, 88 Stat. 1858 (Dec. 31, 1974) ................................................................ 8, 31, 32, 38

Pub. L. No. 96-46, 93 Stat. 342 (Aug. 6, 1979) ................................................................ 38

Pub. L. No. 103-382, 108 Stat. 3913 (Oct. 20, 1994) ................................................................ 38

Pub. L. No. 105-244, 112 Stat. 1836 (Oct. 7, 1998) ................................................................ 38

Pub. L. No. 107-110, 115 Stat. 1444 (Jan. 8, 2002) ................................................................ 8

Pub. L. No. 107-279, 115 Stat. 1940 (Nov. 5, 2002) ................................................................ 9

Pub. L. No. 110-69, 121 Stat. 668 (Aug. 9, 2007) ........................................................ 9

Pub. L. No. 110-315, 122 Stat. 3078 (Aug. 14, 2008) ........................................... 10, 43

Pub. L. No. 111-5, 123 Stat. 115 (Feb. 17, 2009) ........................................... 10, 11, 40

Pub. L. No. 111-296, 124 Stat. 3192 (Dec. 13, 2010) ............................................... 32

<u>REGULATIONS</u>

20 C.F.R. § 656.3 ....................................................................................................... 30

25 C.F.R. § 163.1 ....................................................................................................... 29

25 C.F.R. § 20.100 ..................................................................................................... 30

26 C.F.R. § 301.6104(a)-4(d) ..................................................................................... 30

34 C.F.R. § 99.1 ...................................................................................................... 4, 28

34 C.F.R. § 99.3 .................................................................................................... passim

34 C.F.R. § 99.31(a) ...................................................................................... 6, 7, 24, 30

34 C.F.R. § 99.35 ............................................................................................. 6, 25, 28

34 C.F.R. § 99.37(d) .................................................................................................... 5

36 C.F.R. § 1121.2(f) ................................................................................................. 30

39 C.F.R. § 3007.1(a) ................................................................................................. 30

43 C.F.R. § 3160.0-5 .................................................................................................. 30

48 C.F.R. § 352.202-1(a) ............................................................................................ 30

50 C.F.R. § 1.2 ........................................................................................................... 30

53 Fed. Reg. 11942 (Apr. 11, 1988) ...................................................................... 5, 6

65 Fed. Reg. 41852 (July 6, 2000) ............................................................................. 5

73 Fed. Reg. 74806 (Dec. 9, 2008) .................................................................... passim

76 Fed. Reg. 19726 (Apr. 8, 2011) .................................................................... passim

76 Fed. Reg. 75604 (Dec. 2, 2011) .......................................................................... passim

LEGISLATIVE MATERIAL

120 Cong. Rec. 13951 (May 9, 1974) ............................................................................. 8

120 Cong. Rec. 14232 (May 13, 1974) ........................................................................... 8

120 Cong. Rec. 14579 (May 14, 1974) ..................................................................... 8, 37

120 Cong. Rec. 39863 (Dec. 13, 1974) ......................................................... 2, 36, 37, 38

125 Cong. Rec. 20085 (July 23, 1979) ........................................................................ 38

125 Cong. Rec. 20327 (July 24, 1979) ........................................................................ 38

H.R. Rep. No. 96-338 (July 13, 1979) ......................................................................... 38

H.R. Rep. No. 105-750 (Sept. 25, 1998) (Conf. Rep.) .................................................. 38

S. Rep. No. 93-1026 (July 22, 1974) (Conf. Rep.) ............................................... 8, 37, 44

S. Rep. No. 93-1409 (Dec. 18, 1974) (Conf. Rep.) .................................................. 8, 38

S. Rep. No. 111-178, 2010 WL 1816620 (May 5, 2010) ............................................ 32

**INTRODUCTION**

The Electronic Privacy Information Center ("EPIC") and four of its board members challenge the Department of Education's final rule amending the Department's regulations for the Family Educational Rights and Privacy Act of 1974, as amended ("FERPA"), 20 U.S.C. § 1232g.  That final rule, issued after a detailed notice and consideration of the public comments received in response, sought to "ensure that . . . FERPA [is implemented] in a way that protects the privacy of education records while allowing for the effective use of data."  76 Fed. Reg. 75604 (Dec. 2, 2011) (hereinafter "Final Rule"), Admin. Record ("AR") 0696.

One motivation for the Final Rule was to address the growth of statewide longitudinal data systems ("SLDS").  SLDS maintain student-level data by unique identifiers to improve the research and evaluation of the effectiveness of education methods and spending.  The Final Rule strengthened the Department's FERPA enforcement abilities and established new accountability procedures.  It also clarified "how FERPA applies to SLDS and to other requests for data on student progress."  *Id.*  Observing a "Congressional intent to expand and develop SLDS to include early childhood, postsecondary, and workforce information," *id.* at AR 0709, the Final Rule sought to "reduce barriers that have inhibited the effective use of SLDS" envisioned by two Congressional grant programs.  *Id.* at AR 0696.   The Department also addressed other issues, including clarifying that student identification ("ID") numbers could be placed on ID badges.  *Id.*

Plaintiffs challenge the regulation's definition of three statutory terms:  "directory information," "authorized representative," and "education program."  *See* Compl. ¶¶ 14-26, Feb. 29, 2012, ECF No. 1.  They claim these three definitions violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, because the definitions are "in excess of the [Department's] statutory authority" and are "not in accordance with law."  Compl. ¶¶ 30, 35.  The Court, however, should not reach the merits of these claims because plaintiffs lack standing.  EPIC is a "public interest research organization," without any personal stake in the litigation or membership on whose behalf it might invoke standing.  Compl. ¶ 4.  Nor can the other plaintiffs

show that the regulatory changes they challenge caused, or are likely to cause, the disclosure of

their education records.  Accordingly, plaintiffs have not shown a cognizable injury from the

Final Rule's promulgation, and this suit must be dismissed for lack of subject matter jurisdiction.

Even if plaintiffs were able to establish a sufficient injury-in-fact, the Court should grant

summary judgment to the Department.  The first merits issue is whether a student ID number

may be placed on an ID badge as "directory information," to support school safety.  The

remaining two issues involve the Department's revision of its regulations for one FERPA

disclosure provision to remove obstacles to the use of SLDS, as contemplated by Congress:

what "education programs" may be audited or evaluated under the relevant exception, and who

may serve as "authorized representatives" with access to student information to conduct that

evaluation?  All three definitions are reasonably within the scope of the FERPA statute in light of

its plain text and legislative history.  Furthermore, because the statute does not unambiguously

forbid the Department's interpretation of FERPA, these definitions deserve *Chevron* deference.

*See Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984).

Accordingly, because the Department has not exceeded its statutory authority or otherwise acted

contrary to law, the Court should grant summary judgment to the Department.

## STATEMENT OF FACTS

1.      On April 8, 2011, the Department issued a notice of proposed rulemaking seeking

comments on proposed changes to its FERPA regulations, including the definitions of "directory

information," "authorized representative," and "education program."  76 Fed. Reg. 19726, 19731

(Apr. 8, 2011) (hereinafter "NPRM"), AR 0001.

2.      The Department received 274 comments on the proposed regulations, including a

comment from EPIC challenging those three definitions.  EPIC Comment, AR 0515-34; Final

Rule, AR 0698.

3.      On December 2, 2011, after review of the comments and further revisions, the

Department issued the Final Rule.  Final Rule, AR 0696.

4.      On February 29, 2012, EPIC and four of its board members filed suit, challenging the Final Rule with regard to those three definitions under the APA, 5 U.S.C. § 701 *et seq.* Compl. ¶ 1.

5.      On June 29, 2012, the Department filed the administrative record underlying its decisions regarding the promulgation of the Final Rule.  Certification of Admin. R., June 29, 2012, ECF No. 10.

6.      On October 26, 2012, a thirty-two page supplement to the administrative record was filed pursuant to the Court's order of the same date.  Mem. Op. & Order, Oct. 26, 2012, ECF No. 15; Suppl. to Admin. R., Oct. 26, 2012, ECF No. 16.

## BACKGROUND

## I.      FAMILY EDUCATIONAL RIGHTS AND PRIVACY ACT ("FERPA")

Congress passed FERPA as an exercise of its spending power, "condition[ing] the receipt of federal funds on certain requirements relating to the access and disclosure of student educational records."  *Gonzaga Univ. v. Doe*, 536 U.S 273, 278 (2002).  The Act's dual purposes are "to ensure access to educational records for students and parents" and "to protect the privacy of such records from the public at large."  *Student Press Law Ctr. v. Alexander*, 778 F. Supp. 1227, 1228 (D.D.C. 1991).  To ensure privacy, FERPA generally requires written consent from parents or students[1] before "education records" or the "personally identifiable information" ("PII") in them may be released.  20 U.S.C. § 1232g(b)(1).  If a recipient of federal funds under a program administered by the Department "has a policy or practice" of violating FERPA disclosure conditions, the Department is tasked with enforcement, including termination of that funding if the recipient will not comply voluntarily.  *See id.* §§ 1232g(b)(2), 1232g(f), 1234c(a).

---

[1] FERPA generally speaks in terms of parental rights, but the rights transfer to the student upon turning 18 years old or enrolling in a postsecondary institution.  *See* 20 U.S.C. § 1232g(d).

FERPA treats educational entities with enrolled students as the primary proprietors of those students' education records.  Thus, FERPA directly applies to "educational institutions" (elementary or secondary schools and postsecondary institutions) and "educational agencies" (school districts, also known as local educational agencies ("LEAs"), and other entities that "direct and control" educational institutions).  *See* Final Rule, AR 0698; 34 C.F.R. § 99.1(a).  Entities which students do not attend, such as state educational agencies ("SEAs," e.g., the state department of education), the U.S. Department of Education and other third parties, must rely on a FERPA exception to receive PII from the records without prior consent.  *See id.*

Recognizing that many uses of student PII properly outweigh privacy concerns, Congress has specified numerous circumstances in which FERPA's prior consent requirement does not apply.  As a threshold matter, certain basic information about students—called "directory information"—generally can be released without prior consent so long as the educational agency or institution has provided notice that it releases such information.  *See* 20 U.S.C. § 1232g(a)(5).   And FERPA amendments now detail more than a dozen other exceptions to prior consent.  *See id.* §§ 1232g(b)(1)(A)-(K), (b)(2)(B), (b)(3), (b)(5), (b)(6), (i), (j).  At issue in this case is the scope of the "directory information" exception, along with the scope of one other exception to the prior consent requirement.

### A.      Directory Information.

FERPA expressly excludes "directory information" from the consent requirement.  *See* 20 U.S.C. §§ 1232g(b)(1) (applying the consent requirement to "other than directory information"); *id.* § 1232g(b)(2) (same).  This exclusion permits schools to make publically available basic information about students.  *See* 120 Cong. Rec. 39863 (Dec. 13, 1974) (hereinafter "Joint Statement"), AR 0855 (congressional sponsors addressing an interpretation of FERPA that had prevented schools from putting the names "of the cast of the school play . . . in

the program" without prior consent from every parent).  Directory information:

> includes the following:  the student's name, address, telephone listing, date and
> place of birth, major field of study, participation in officially recognized activities
> and sports, weight and height of members of athletic teams, dates of attendance,
> degrees and awards received, and the most recent previous educational agency or
> institution attended by the student.

20 U.S.C. § 1232g(a)(5)(A).  The Department has long interpreted this statutory description to be

a non-exclusive list and has further defined directory information as "information contained in an

education record of a student that would not generally be considered harmful or an invasion of

privacy if disclosed."  34 C.F.R. § 99.3; *see* 53 Fed. Reg. 11942, 11944 (Apr. 11, 1988).  Over

the years, Department regulations have recognized this to include such items as photographs,

e-mail addresses, and grade levels.  *See* 65 Fed. Reg. 41852, 41852-53 (July 6, 2000).  At issue

here is whether it should include ID numbers displayed on badges.  *See* Final Rule, AR 0719-23.

No educational agency or institution is required to release directory information.  Instead,

each educational agency or institution is free to determine what categories of  directory

information it will release and for what purposes.  *See* 20 U.S.C. § 1232g(a)(5)(B); 34 C.F.R.

§ 99.37(d).  The only prerequisite for use of the information is that the educational entity must

"give public notice of the categories of information which it has designated" as directory

information and give parents the opportunity to "inform the institution . . . [what] of the

information designated should not be released without the parent's prior consent."  *Id.*

§ 1232g(a)(5)(B).  Agencies and institutions are otherwise free to release this data at their

discretion.  *See, e.g., Patterson v. School Dist. of Philadelphia*, No. 99-4792, 2000 WL 1020332,

at *9 (E.D. Pa. July 19, 2000) ("[P]roviding the police with the plaintiffs' names and addresses . .

. was not a violation of federal law.").

### B.      The Program Evaluation Exception.

The second exception at issue (called the "program evaluation exception" hereinafter)

involves three overlapping provisions.  *See* 20 U.S.C. §§ 1232g(b)(1)(C), (b)(3), (b)(5); *cf.* 53

Fed. Reg. 11942, 11948 (Apr. 11, 1988) (treating all three provisions as one exception, codified

at 34 C.F.R. §§ 99.31(a)(3) and 99.35).  The core of the exception is found in § 1232g(b)(3),

upon which the other two provisions rely.  This core provision permits, but does not require, the

disclosure of student personally identifiable information ("PII") "in connection with the audit

and evaluation of *Federally-supported* education programs," or "in connection with the

enforcement of Federal legal requirements" related to such programs.  *See* 20 U.S.C.

§ 1232g(b)(3) (emphasis added).[2]  A second provision ensures that the exception also includes

"any . . . *State supported* education program."  *Id.* § 1232g(b)(5) (emphasis added).[3]  And the

third provision, in conjunction with the first two, permits these disclosures only to the

"authorized representatives" of four entities:  (1) the Comptroller General of the United States,

(2) the Secretary of Education, (3) State and local educational authorities, and (4) the Attorney

---

[2]  This paragraph provides:

> Nothing contained in this section shall preclude authorized representatives of (A) the Comptroller General of the United States, (B) the Secretary, or (C) State educational authorities from having access to student or other records which may be necessary in connection with the audit and evaluation of Federally-supported education programs, or in connection with the enforcement of the Federal legal requirements which relate to such programs:  *Provided,* That except when collection of personally identifiable information is specifically authorized by Federal law, any data collected by such officials shall be protected in a manner which will not permit the personal identification of students and their parents by other than those officials, and such personally identifiable data shall be destroyed when no longer needed for such audit, evaluation, and enforcement of Federal legal requirements.

[3]  This paragraph provides:

> Nothing in this section shall be construed to prohibit State and local educational officials from having access to student or other records which may be necessary in connection with the audit and evaluation of any federally or State supported education program or in connection with the enforcement of the Federal legal requirements which relate to any such program, subject to the conditions specified in the proviso in paragraph (3).

General "for law enforcement purposes." *Id.* § 1232g(b)(1)(C);[4] *see also id.* §§ (b)(3), (b)(5).

The term "state and local educational authorities," as used by the Department,[5] has a distinct scope that includes both SEAs and LEAs.  *See* Final Rule, AR 0698-99 (defining term as "an SEA, a State postsecondary commission, . . . or any other entity [authorized] to supervise, plan, coordinate, advise, audit, or evaluate elementary, secondary, or postsecondary Federal- or State- supported education programs and services in the State").  The longitudinal data systems that maintain student-level data for analysis are generally "maintained by an SEA or other State educational authorities."  *See* 73 Fed.  Reg. 74806, 74815 (Dec. 9, 2008) (hereinafter "2008 Final Rule"), AR 0762.  Accordingly, it is the program evaluation exception that permits school districts and colleges to disclose that student-level data to their state's SLDS.

### C.    Legislative History

Interpretation of FERPA depends almost exclusively on the statutory text.  The available legislative history provides "little guidance."  *Rios v. Read*, 73 F.R.D. 589, 597 (E.D.N.Y. 1977). "The entire 1974 Act itself, also known as the Buckley Amendment, after its principal sponsor, was offered as an amendment on the Senate floor to the bill extending the Elementary and Secondary Education Act of 1965."  *Id.*  It was not the subject of hearings or committee reports. *Id.*  The legislative history is limited to the Senate floor debates, which primarily concern a

---

[4]  This paragraph provides:

> [Funding is prohibited where education records are released without prior written consent] to any individual, agency, or organization, other than to the following— . . . (C) (i) authorized representatives of (I) the Comptroller General of the United States, (II) the Secretary, or (III) State educational authorities, under the conditions set forth in paragraph (3), or (ii) authorized representatives of the Attorney General for law enforcement purposes under the same conditions as apply to the Secretary under paragraph (3)[.]

[5]  The Department uses the term "state and local educational authorities," *see* 34 C.F.R. § 99.31(a)(3)(iv), because the reference to "State educational authorities" in 20 U.S.C. §§ 1232g(b)(1)(C) and (b)(3) was expanded by § 1232g(b)(5)'s reference to "State and local educational officials" to include local educational authorities as well.

provision of the amendment that was not enacted, *see* 120 Cong. Rec. 13951-56 (May 9, 1974), *id.* 14232-35 (May 13, 1974), *id.* 14579-605 (May 14, 1974) (attached as Exhibit A), and the conference report, which briefly describes provisions added to the Senate amendment either from the House bill or directly by the conferees.  *See* S. Rep. No. 93-1026, at 186-187 (July 22, 1974) (Conf. Rep.) (attached as Exhibit B).

The original version of FERPA stood for only four months.  *See* Pub. L. No. 93-568, § 2 (a), 88 Stat. 1858 (Dec. 31, 1974) (attached as Exhibit E); Pub. L. No. 93-380, Title V § 513(a), 88 Stat. 571 (Aug. 21, 1974) (attached as Exhibit C).  The original sponsor, Senator James Buckley, joined by Senator Claiborne Pell, soon sought to amend it, acknowledging "certain ambiguities" in the original version that were in need of "clarifications."  *See* Joint Statement, AR 0854.  The amendment was attached to an appropriations bill, and its legislative history includes only a brief Senate floor debate, *see id.*, AR 0852-58, and the conference report.  *See* S. Rep. No. 93-1409, at 10-12 (Dec. 18, 1974) (Conf. Rep.) (attached as Exhibit D).  The sponsors entered their "Joint Statement in Explanation of the Buckley/Pell Amendment" into the record to provide "a narrative and explanation of the meaning and intent of the various provisions."  Joint Statement, AR 0854-55.  Subsequent amendments over the years have added and altered various exceptions, but have not fundamentally changed FERPA's main outline.

## II.    STATEWIDE LONGITUDINAL DATABASES

### A.    Statutory Background

Beginning with the No Child Left Behind Act of 2001, Congress has encouraged the creation of statewide longitudinal data systems, commonly identified by the acronym "SLDS."  *See* Pub. L. No. 107-110, Title I § 101, 115 Stat. 1444 (Jan. 8, 2002).  That Act required states, in exchange for education funds, to "implement[] a set of high-quality, yearly student academic assessments that include, at a minimum, academic assessments in mathematics, reading or language arts, and science," and permitted "[e]ach State educational agency [to] incorporate the data from the assessments . . . into a State-developed longitudinal data system that links student

test scores, length of enrollment, and graduation records over time." 20 U.S.C. § 6311(b)(3)(A)-(B). At the same time, it did not authorize "the development of a nationwide database of [PII] on individuals involved in studies or other collections of data under this chapter." *Id.* § 7911.

A few months later, Congress created a grant program "to enable [state educational] agencies to design, develop, and implement statewide, longitudinal data systems to efficiently and accurately manage, analyze, disaggregate, and use individual student data." Educational Technical Assistance Act of 2002, Pub. L. No. 107-279, Title II § 208, 116 Stat. 1940 (Nov. 5, 2002) (codified at 20 U.S.C. § 9607). This SLDS Grant Program was initially funded for five years. *See id.* § 209. Two of the goals of the grants are "promot[ing] linkages across States" and "facilitat[ing] research to improve student academic achievement and close achievement gaps." 20 U.S.C. §§ 9607(c)(1), (c)(2)(B).

In 2007, Congress passed the America Creating Opportunities to Meaningfully Promote Excellence in Technology, Education and Science Act, or "COMPETES Act." *See* Pub. L. No. 110-69, Title VI § 6401, 121 Stat. 668 (Aug. 9, 2007). This Act authorized new grants to "support the establishment or improvement of statewide P-16[6] education data systems" so that states could "improv[e] . . . academic content standards and assessments," "ensure students are prepared to succeed in" higher education, the 21st century workforce, and the Armed Forces, and "have valid and reliable information to inform education policy and practice." 20 U.S.C. § 9871(a)(2)-(3). One of the COMPETES Act's innovations was requiring assignment of a unique identifier that follows each student throughout his or her participation in that state's P-16 system. *See id.* § 9871(e)(2)(A). It also specified elements to appear in the data systems, including: "student-level enrollment, demographic, and program participation information"; "student-level information about the points at which students exit, transfer in, transfer out, drop

---

[6] "P-16" refers to "the educational system from preschool through the conferring of a baccalaureate degree." *Id.* § 9871(b)(1).

out, or complete P-16 education programs"; and data "necessary to address . . . adequate preparation for success in post-secondary education." *Id.* § 9871(e)(2)(D)(i), (D)(iii). To protect the data from misuse, Congress required states to "limit the use of information in the statewide P-16 education data system" to "the activities set forth in paragraph (1)" [i.e., "promot[ing] more accountability with respect to preparation for higher education, the 21st century workforce, and the Armed Forces"] or "the activities set forth in . . . State law regarding education, consistent with the purposes of this subchapter." *Id.* § 9871(e)(2)(C)(i)(II).

In 2008, Congress again reaffirmed the creation and linking of state databases. While restating that a federal database of student information was generally not authorized, including "any . . . system that tracks individual students over time," Congress reaffirmed the permissibility of SLDS:

> Nothing in this Act shall prohibit a State or a consortium of States from developing, implementing, or maintaining State-developed databases that track individuals over time, including student unit record systems that contain information related to enrollment, attendance, graduation and retention rates, student financial assistance, and graduate employment outcomes.

*See* Higher Education Opportunity Act, Pub. L. No. 110-315, Title I § 113, 122 Stat. 3078 (Aug. 14, 2008) (codified at 20 U.S.C. § 1015c).

Most recently, in the American Recovery and Reinvestment Act of 2009 ("ARRA"), Congress reinforced its commitment to the priorities of both SLDS grant programs. *See* Pub. L. No. 111-5, 123 Stat. 115 (Feb. 17, 2009). This omnibus statute asserted general purposes related to economic recovery, infrastructure, and state and local government budgets, focusing on "commencing expenditures and activities as quickly as possible." *Id.* Title VIII § 3(a)-(b). Two of its many provisions address SLDS. First, it appropriated $250 million to continue the 2002 SLDS grant program (because its initial appropriation had expired in 2008), specifying that the funds "may be used for Statewide data systems that include postsecondary and workforce information" and that up to $5 million "may be used for State data coordinators and for awards

to public or private organizations or agencies to improve data coordination."  *See id.* Title VIII, Dep't of Educ., Inst. of Educ. Sci., 123 Stat. 183-84.  Second, the Act requires any governor who applies to receive education money under ARRA's $53.6 billion "State Fiscal Stabilization Fund" to assure the Secretary of Education that "[t]he State will establish a longitudinal data system that includes the elements described in section 6401(e)(2)(D) of the America COMPETES Act (20 U.S.C. 9871)."  *Id.* Title XIV § 14005(d), 123 Stat. at 283.

While these statutes acknowledge the privacy concerns associated with SLDS in various ways, Congress has taken the position that there is no conflict between FERPA and the creation and use of SLDS for the priorities laid out in these statutes and grant programs.  For example, the No Child Left Behind Act required the information to "be collected and disseminated in a manner that protects the privacy of individuals." 20 U.S.C. § 6311(i).  And the Educational Technical Assistance Act and COMPETES Act, after describing the broad research purposes of the SLDS grants, applied FERPA's requirements to the systems.  *See id.* § 9573 ("ensure that all [PII] about students, their academic achievements, their families, and information with respect to individual schools shall remain confidential in accordance with" FERPA and other privacy statutes); *id.* § 9871(e)(2)(C)(i) (requiring, *inter alia*, that states "ensure that the . . . . data system meets the requirements of [FERPA]").

### B.   Implementation

Before 2002, few states had longitudinal data systems.  *See* Declaration of Sean P. "Jack" Buckley ("Buckley Decl.") ¶ 5 (attached as Exhibit H).  Most states education departments asked for and received aggregate statistics instead of student-level data from their school districts.  *Id.* The Department's SLDS Grant Program's first awards were made in November 2005 to 14 states.  *Id.* ¶ 6.  In June 2007, grants were awarded to 12 additional states and the District of Columbia ("DC").  *Id.* ¶ 7.  After subsequent rounds of grants, including those made in May 2012, all states except Alabama, Wyoming,  and New Mexico have received at least one SLDS grant.  *Id.* ¶¶ 8-10.  These grants have assisted states to create SLDS that meet or exceed the

standards set out in federal law.  *Id.*  ¶ 11.  In addition, the SLDS Grant Program offers support

resources to help SLDS operators with various issues related to SLDS, such as data governance,

interoperability, data sharing, external evaluations, and research.  *Id.*

      For example, when the DC Office of the State Superintendent of Education ("OSSE")

submitted its first grant application in March 2007, DC had no longitudinal data system, nor the

ability to "track[] individual student movement across publicly funded education programs in the

District of Columbia."  *Id.* ¶ 13 & Ex. 1, Abstract.  Its then-current system for identifying

students in the D.C. Public School system did not ensure that the unique identifier followed the

student through the system.  *See id.* ¶ 14 & Ex. 1, Project Narrative at 3.  Charter schools were

not required to report student-level data.  *See id.* ¶ 15 & Ex. 1 at 3-4.  Further, there was no

system for tracking students at the postsecondary level.  Instead, DC was "investigating an

automated, electronic follow-up system . . . which would allow for tracking the movement of DC

students into postsecondary education and the labor market."  *See id.* ¶ 16 & Ex. 1 at 5.  In the

meantime, DC tracked the postsecondary success of DC students using directory information

from an agreement with the nonprofit National Student Clearinghouse.  *See id.* ¶ 17 & Ex. 1 at 2.

      In its December 2011 application, OSSE explained that its Statewide Longitudinal

Education Data System ("SLED"), currently included only pre-kindergarten through twelfth

grade ("P-12") information.  *See id.* ¶ 21 & Ex. 2 at e14.  The grant application describes plans to

link SLED to "postsecondary and workforce legacy databases" to create "P-20W SLED."  *Id.*

¶ 22 & Ex. 2 at e20.  This would involve linking to three existing postsecondary databases:  DC

OneApp (https://dconeapp.dc.gov), which includes information from DC residents who apply for

DC's three postsecondary grant programs; AspirePath, which includes information on adult

literacy students at DC's community college; and the Banner student database used by DC's

community college and public university and other postsecondary institutions.  *Id.* ¶ 23 & Ex. 2

at e21-22.  The application proposed to begin implementation and training on the new

connections in September 2013.  *Id.* ¶ 24 & Ex. 2 at e32.

**ARGUMENT**

## I.   PLAINTIFFS LACK STANDING TO BRING THESE CLAIMS BECAUSE NONE OF THEM HAVE SUFFERED, NOR ARE LIKELY TO SUFFER, ANY INJURY.

Plaintiffs' complaint fails to establish that any of the plaintiffs have met the injury-in-fact requirement to support standing.  In order to establish standing under Article III, a claimant must show: (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).  "An organization may assert standing on its own behalf or on behalf of its members." *Am. Soc. For Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011).  If asserting standing on its own behalf, it must make the same showing required of individuals.  *See id.*  If asserting standing on behalf of its members, it must show that "its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs., Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U .S. 333, 343 (1977)).

Plaintiffs rely exclusively on the allegation that the individual plaintiffs are "current or former students," claiming that their education records "would be exposed to new privacy risks if the agency rule is not set aside."  Compl. ¶ 5.  The complaint, however, identifies no way that the Final Rule will harm plaintiffs.  Nor can they establish a concrete, non-conjectural injury under the undisputed facts here.  All but one plaintiff ceased being students more than ten years ago, and not one has not shown that the educational institutions they attended retain or might plausibly release non-directory information about them.  Nor is it likely that any of their non-directory information will be placed in any longitudinal data system or otherwise provided to a

third party.  Accordingly, the complaint must be dismissed for lack of subject matter jurisdiction.

### A. EPIC Lacks Standing to Sue as an Organization Because It Itself Has Not Been Injured and It Has Neither Members Nor Their Functional Equivalent.

Because only students and parents come within the scope of FERPA's protection, EPIC cannot establish standing on its own behalf.  It cannot show that it has "such a personal stake in the outcome of the controversy as to warrant the invocation of federal jurisdiction." *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011) (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)).  It is insufficient to rely on, as EPIC appears to do here, "simply a setback to the organization's abstract social interests."  *Id.* at 12.

Accordingly, EPIC's standing depends on whether it can assert membership claims, variously called "organizational," "associational," or "representational" standing.  *Id.*  EPIC does not have members.  *See* About EPIC, http://epic.org/epic/about.html (EPIC "ha[s] no clients, no customers, and no shareholders").  Accordingly, because EPIC "has no members in the traditional sense" the inquiry turns to "whether the organization is the functional equivalent of a traditional membership organization."  *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 25 (D.C. Cir. 2002).  Under this standard, a state commission had standing on behalf of apple growers and dealers where those entities were the "primary beneficiar[ies] of its activity" and those entities possessed "all of the indicia of membership" such as electing the commission and financing its activities.  *See Hunt*, 432 U.S. at 342-45.  In contrast, a media watchdog group lacked standing on behalf of members of the public who regularly watch the news because the group did not serve a "discrete, stable group of persons with a definable set of common interests" and could not show that its "supporters" played any role in selecting its leadership or guiding and financing its activities.  *See Am. Legal Found. v. FCC*, 808 F.2d 84, 89-90 (D.C. Cir. 1987).  Similarly, a public interest law firm lacked standing on behalf of individuals on its mailing list because the organization was "not a representative of a special group," the individuals lacked the "indicia of membership," the decision to file suit was made before permission was obtained from the

individuals, and its "fortunes [were not] tied closely to those of any members." *Washington Legal Found. v. Leavitt*, 477 F. Supp. 2d 202, 209-12 (D.D.C. 2007)

As a "public interest research organization," Compl. ¶ 4, EPIC is in the same position as the media watchdog group in *American Legal Foundation* and the public interest law firm in *Washington Legal Foundation*.  With "no clients, no customers, and no shareholders," EPIC publishes and litigates "about privacy, open government, free speech, and other important topics related to civil liberties."  *See* About EPIC, http://epic.org/epic/about.html.  Thus, it cannot claim any general group of FERPA beneficiaries—students or parents—as its "members."  Such a group is not a stable constituency of EPIC, nor does such a group have any indicia of membership, nor are the fortunes of students and parents tied with EPIC's.  Accordingly, EPIC has no standing, and the Court's jurisdiction depends on the individual plaintiffs' standing.[7]

**B.      The Individual Plaintiffs Cannot Establish Injury in Fact.**

The available evidence indicates that none of the plaintiffs are currently students and that only one was a student at the time the complaint was filed.  Instead, plaintiffs are EPIC board members whose time as grade school or college students has long passed—Peter Neumann[8] has not been a student since 1961, and Grayson Barber[9] and Deborah Peel[10] completed their

---

[7]  If EPIC were to claim that its 70 member advisory board or its 14 member board of directors give it "membership" for standing purposes, this should be rejected.  *See* 2012 EPIC Brochure at 2, http://epic.org/epic/EPIC-2012-Cloud-Brochure.pdf (attached as Exhibit I).  These are not the sort of "members" contemplated under the case law.  Their only "definable set of common interests," *Am. Legal Found.*, 808 F.2d at 89-90, collapses into "the organization's abstract social interests," which does not create standing.  *Nat'l Ass'n of Home Builders*, 667 F.3d at 12.

[8]  Peter Neumann is a member of the SRI International Computer Science Laboratory.  He maintains a webpage at that organization, where he has served since 1971.  *See* http://www.csl.sri.com/users/neumann/ (attached as Exhibit J).  According to the detailed educational information provided on that page, he received his Ph.D. from Harvard in 1961.  *See id.*  There is no indication that Dr. Neumann has been a student in any capacity since that time.

[9]  Grayson Barber maintains a professional website, holding herself out as an "attorney and privacy advocate."  *See* http://graysonbarber.com.  According to the curriculum vitae published

(Cont'd)

15

education in the 1990s.  Only Pablo Molina, the secretary of EPIC's board of directors, attended an educational institution in the last decade, completing a doctorate at Georgetown University in 2012.[11]  None of the plaintiffs can show that the challenged regulatory revisions give rise to any non-speculative likelihood that their education records will be released and cause them injury.

        *1.*     *None of the plaintiffs can show a concrete and particularized injury in the revised definition of "directory information."*

With regard to the revisions made to the definition of "directory information," plaintiffs claim only that permitting student ID numbers to be included on student ID cards or badges that must be publically displayed "insufficiently safeguard[s] students from the risks of re-identification."  Compl. ¶ 24.  This regulatory clarification could not have had any effect on the three individuals who completed their education prior to 2000 because any ID cards they used as students could not have been affected by the Final Rule, issued more than a decade later.  Nor can Mr. Molina show any injury from this clarification.  As chief information officer and a twelve year Georgetown University employee, he is aware that the university has long employed

---

on that website, she received her J.D. from Rutgers Law School in 1991.  *See* Curriculum Vitae, http://graysonbarber.com (attached as Exhibit K).  No subsequent student status is noted.

[10]  Deborah Peel is a physician and a member of the board of directors for Patient Privacy Rights, a consumer advocacy organization.  *See* http://patientprivacyrights.org/board-of-directors/.  Her resume is posted on the networking site LinkedIn.com.  *See* http://www.linkedin.com/in/deborahcpeelmd (attached as Exhibit L).  This resume states that she completed a medical degree in 1974 and graduate work at the Dallas Psychoanalytic Institute in 1999.  *See id.*  There is no indication that Dr. Peel has been a student in any capacity since that time.

[11]  Until June 2012, Pablo Molina was Georgetown University's chief information officer ("CIO") and associate vice president of information technologies.  He remains an adjunct professor and, until recently, maintained a resume on a university webpage.  *See* http://www.law.georgetown.edu/molina/resume.html (attached as Exhibit M).  This resume indicates that he moved from Spain to the United States after 1989 to attend college, receiving bachelor's and master's degrees before going on to do some postgraduate work in 1998 and 1999.  *See id.*  He also posted a current resume on LinkedIn.com.  *See* http://www.linkedin.com/pub/pablo-molina/4/430/903 (attached as Exhibit N).  In the last decade, he attended seminars at Georgetown University Law Center between 2000 and 2008 and completed a doctorate at Georgetown University in 2012.  *See id.*

the same identification card for both employees and students, the Georgetown One Card or "GOCard." *See, e.g.*, Georgetown Law GOCard Office, http://www.law.georgetown.edu/gocard/ ("All students, faculty and staff affiliated with the University need to carry the GOCard for identification."). This card displays an individual's "University ID Number," along with their name and photograph. *See* Georgetown One Card, What are the components of the GOCard?, http://gocard.georgetown.edu/6062.html; *see also id.*, What is the University ID number?, http://gocard.georgetown.edu/6065.html (explaining that the ID number is "used to identify you in a variety of on-campus systems"). Thus, apart from his student status, Mr. Molina's role as an employee and faculty member required that his ID card display his ID number. He may even have served in a policy or advisory capacity concerning the contents and use of these ID cards. For all of these reasons, Mr. Molina cannot show that the December 2011 revision subjected him to any additional risk of a breach of privacy during his last six months as a student. Any allegations he could make would be highly conjectural and suffer deep causation problems.

> 2. *None of the plaintiffs can show a concrete and particularized injury in the disputed definitions related to the program evaluation exception.*

Plaintiffs' other claims challenge the Final Rule's definition of two statutory terms that appear in the program evaluation exception, alleging that these changes "expose[]" them to "new privacy risks." Compl. ¶ 5. Essentially, they object to permitting student information to be made available to auditors and evaluators who are "authorized representatives" of state educational authorities but not under their direct control, and further object to the linking of such information to data from programs "principally engaged in the provision of education" but not "administered by an education authority." *See id.* ¶¶ 22-23; EPIC Comment, AR 0526-30. Plaintiffs cannot show that they are harmed by these changes.

To demonstrate a concrete injury, plaintiffs would need to make four showings: 1) that the educational institutions they attended maintain non-directory information about plaintiffs in a

form that is accessible for disclosure,[12] 2) that a state or local educational authority (or one of the three federal entities listed in the exception) has authorized or will likely authorize auditors or evaluators to collect plaintiffs' student-level non-directory information from these institutions, 3) that these auditors or evaluators are not under the direct control of the relevant authorizing entity or that the program being evaluated is not administered by an education authority, and 4) that injury to plaintiffs would likely result from the disclosure to the auditors or evaluators.

It is unlikely that non-directory information about the plaintiffs who ceased being students before 2000 has been retained by their educational institutions, and still less plausible that such data would find its way into SLDS or other evaluation systems.  The sharing of student-level data generally began only during the last decade and was primarily forward looking.  *See supra*, Background (II)(B).  And postsecondary and advanced degree information would not likely be backfilled.  *Id.*  Plaintiffs' standing thus rests on Mr. Molina's studies at Georgetown University.  But even this recent education cannot provide plaintiffs a non-speculative injury.

The records Georgetown University maintains regarding Mr. Molina's doctoral work and the seminars he attended at the university's Law Center, *see* Ex. M, can give rise to standing only if plaintiffs can first show that the non-directory information in these records has been, or is likely to be disclosed by the university pursuant to the program evaluation exception.  *See* 20 U.S.C. § 1232g(b)(3).  Thus, he must show that information other than the "dates of attendance," the "degrees, honors, and awards received," etc., would be disclosed.[13]  *See id.* § 1232g(a)(5)(A); 34 C.F.R. § 99.3.  But DC's most recent grant application makes clear that DC's SLDS, known

---

[12]  Alternatively, if plaintiffs showed that they had opted out of their educational institutions' directory information policy, they would not be limited to alleging and proving that non-directory information was shared in a way that caused them harm.  Plaintiffs, however, have not alleged that they opted out of the sharing of directory information.

[13]  This directory information is already available through the National Student Clearinghouse, in which Georgetown University participates.  *See* Georgetown Univ. Registrar, Nat'l Student Clearinghouse, http://registrar.georgetown.edu/records/clearinghouse/.

as SLED, does not yet include postsecondary data.  *See* Buckley Decl. ¶ 21 & Ex. 2 at e14.  Nor

does any other existing database accessible to DC include student-level data for Georgetown's

graduate students.  *See id.* ¶ 26 & Ex. 2 at e21-22.  If Georgetown has entered into any relevant

data-sharing arrangements, Mr. Molina, as Georgetown's CIO until earlier this year, should be

well aware of them.  Moreover, even if postsecondary information begins to be linked to DC

SLED in September 2013 as proposed in DC's most recent grant application, and even if

Georgetown participates in that linkage, there is no information suggesting that SLED will be

backfilled with advanced degree data from prior years.  *See* Buckley Decl. ¶ 27.

Finally, even if it could be assumed that non-directory information from Mr. Molina's

education records will end up in DC's SLED, he must further show that this data would likely be

shared with auditors or evaluators not under the direct control of one of the four federal or state

entities and, further, that this disclosure of his data would cause him a concrete nonconjectural

injury.  The number of speculative steps required to reach an injury here demonstrates that Mr.

Molina litigates a hypothetical injury, not a real one.  The fact of the matter is that his records are

not currently being shared and are not likely to ever be shared in a way that harms Mr. Molina.

Accordingly, plaintiffs lack standing to sue regarding this provision.

## II.     THE FINAL RULE IS ENTITLED TO REVIEW UNDER *CHEVRON*'S DEFERENCE STANDARD.

Assuming, arguendo, that plaintiffs can establish standing, their claims fail on the merits.

Plaintiffs dispute three definitions in the Final Rule, claiming that they violate two APA

provisions.  Compl. ¶¶ 1, 30, 35.  These APA provisions prohibit agencies from acting "in excess

of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), or in a way that is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.*

§ 706(2)(A).  The statutory authority claim is "reviewed under the well-known *Chevron*

framework."  *Ass'n of Private Sector Colleges & Univs. v. Duncan*, 681 F.3d 427, 441 (D.C. Cir.

2012).  The arbitrary and capricious claim requires a determination "whether the regulations are

the product of reasoned decisionmaking," a "fundamentally deferential" standard. *Id.* The

Department's regulations meet all the requirements for *Chevron* deference and are reasonable.

Accordingly, plaintiffs' challenges under both APA provisions fail.

> **A.      Congress Delegated Rulemaking Authority Regarding FERPA to the Department, Meeting the Threshold for *Chevron* Deference.**

"As a general matter, an agency's interpretation of the statute which that agency

administers is entitled to *Chevron* deference."  *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012)

(citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).  The

threshold requirements for *Chevron* review are (1) that "it appears that Congress delegated

authority to the agency generally to make rules carrying the force of law," and (2) "that the

agency interpretation claiming deference was promulgated in the exercise of that authority."

*Gonzales v. Oregon*, 546 U.S. 243, 255-56 (2006) (quoting *United States v. Mead Corp.*, 533

U.S. 218, 226–27 (2001)); these requirements are met here.

Congress expressly delegated implementation of FERPA to the Department.  *See* 20

U.S.C. § 1232g(f) ("The Secretary shall take appropriate actions to enforce this section and to

deal with violations of this section[.]"); *see also id.* § 3474 (broadly authorizing "such rules and

regulations as the Secretary determines necessary or appropriate to administer and manage the

[Secretary's] functions").  Furthermore, the General Education Provisions Act, in which FERPA

appears, specifically grants the Department rulemaking authority.  *See* 20 U.S.C. § 1221e-3

("The Secretary . . . is authorized to make, promulgate, issue, rescind, and amend rules and

regulations governing the manner of operation of, and governing the applicable programs

administered by, the Department.").  This satisfies the delegation requirement.  *See, e.g.*, *Astrue

v. Capato ex rel. B.N.C.*, 132 S. Ct. 2021, 2034 (2012) (finding authority where Congress gave

agency "authority to promulgate rules 'necessary or appropriate to carry out' the agency's

functions and the relevant statutory provisions").  The Final Rule expressly relies on this

authority here.  *See* Final Rule, AR 0701-02, 0733-36 (discussing basis for authority).

**B.    The Department's Interpretation of FERPA is Entitled to Deference Because it is Not Unambiguously Forbidden by the Statute and is Reasonable.**

Having passed the threshold, the Department's definitions of the three disputed statutory terms are entitled to deference under the two step *Chevron* test:

> Under *Chevron* step 1, if the "Congress has directly spoken to the precise question at issue . . . . , that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Under *Chevron* step 2, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."

*U.S. Postal Serv. v. Postal Regulatory Comm'n*, 640 F.3d 1263, 1266 (D.C. Cir. 2011) (quoting *Chevron*, 467 U.S. at 842–43).  Thus, the Court "must decide (1) whether the statute unambiguously forbids the [a]gency's interpretation, and, if not, (2) whether the interpretation, for other reasons, exceeds the bounds of the permissible."  *Barnhart v. Walton*, 535 U.S. 212, 218 (2002); *see Cablevision Systems Corp. v. FCC*, 649 F.3d 695, 704 (D.C. Cir. 2011) ("[I]f Congress has not unambiguously foreclosed the agency's construction of the statute, we defer to the agency provided its construction is reasonable.").  As discussed below, Congress has not foreclosed the Department's interpretations, and the disputed definitions deserve deference.

**III.   NONE OF THE THREE DISPUTED DEFINITIONS EXCEEDS STATUTORY AUTHORITY.**

**A.    Student ID Numbers Displayed on Badges Can Be "Directory Information" Because Such a Disclosure is Not Harmful or an Invasion of Privacy.**

Plaintiffs challenge the Department's clarification that student ID numbers can appear on student ID badges without prior consent from parents or students.  *See* Final Rule, AR 0733

(amending 34 C.F.R. § 99.3).[14]  The Department first addressed student ID numbers in 2008,

specifying that neither a student's social security number nor the student's ID number could be

directory information, with one exception.  *See* 34 C.F.R. § 99.3; 2008 Final Rule, AR 0798.

The exception permitted "a student ID number, user ID, or other unique personal identifier used

by the student for the purpose of accessing or communicating in electronic systems" to be

directory information if "the identifier cannot be used to gain access to education records except

when used in conjunction with [other authenticators] such as a . . . password."  *See* 34 C.F.R. §

99.3; 2008 Final Rule, AR 0798.  In other words, if the identifier "cannot be used *by itself* to gain

access to education records," it is being "used like a name" and would not be harmful to disclose.

*Id.*, AR 0790 (emphasis added).

Here, the Department adopted a second, similar exception, clarifying that, under the same

conditions implemented in 2008 for electronic communications, students' ID numbers could also

be placed on their ID badges.  *See* Final Rule, AR 0733 (amending 34 C.F.R. § 99.3).  The

Department observed that "[a]n increased awareness of school safety and security has prompted

some [entities], especially school districts, to require students to wear and openly display a

student ID badge that contains identifying information (typically, name, photo, and student ID

number)."  NPRM, AR 0006-07.  The Department concluded that placing student ID numbers

along with the name and photograph "typically displayed" on a student ID badge could be

directory information so long as "the student ID number cannot be used to gain access to

education records" by itself without other "factors that authenticate the user's identity."  *Id.*, AR

---

[14]  Section 99.3(c)(2) provides:

> (c) In accordance with paragraphs (a) and (b) of this definition, directory
> information includes— . . . (2) A student ID number or other unique personal
> identifier that is displayed on a student ID badge, but only if the identifier cannot
> be used to gain access to education records except when used in conjunction with
> one or more factors that authenticate the user's identity, such as a PIN, password,
> or other factor known or possessed only by the authorized user.

0004; *see also* Final Rule, AR 0721.

Plaintiffs allege that this clarification "insufficiently safeguard[s] students from the risks of re-identification." Compl. ¶ 25; *see also* EPIC Public Comment, AR 0531-33. Plaintiffs fear that the regulation will "facilitate unaccountable and unlawful third-party access to education records" because the "single" safeguard in the regulation "is insufficient" and its "implementation would be impracticable." EPIC Comment, AR 0531-33; *see also* Compl. ¶ 24. Their prescriptions suggest they believe that FERPA permits student ID numbers to be used on student ID badges, but that there should be stricter requirements for other uses of the ID numbers. *See* EPIC Comment, AR 0532-33. Thus, they appear to dispute not the Department's statutory authority, but instead the wisdom of the regulation—which is beyond the scope of APA review. *See Armstrong v. Exec. Office of the President*, 810 F. Supp. 2d 335, 341 (D.D.C. 1993).

To whatever extent plaintiffs actually claim that placing ID numbers on ID badges does not meet FERPA's definition of directory information, their argument fails. Nothing in the plain text of the statute forbids the Department's interpretation. *See* 20 U.S.C. § 1232g(a)(5)(A). Furthermore, plaintiffs do not dispute the Department's longstanding definition of "directory information" as encompassing "information contained in an education record of a student that would not generally be considered harmful or an invasion of privacy if disclosed." 34 C.F.R. § 99.3; EPIC Comment, AR 0531. Thus, the question is simply whether ID numbers displayed on badges would "not generally be considered harmful or an invasion of privacy"?

When displayed on an ID badge, a student ID number functions much like a student's name and photograph, which are undisputedly directory information. *See* 34 C.F.R. § 99.3. They assist in confirming the student's identity and are part of educational agencies' and institutions' efforts to improve safety. *See* NPRM, AR 0006-07. Because the Department permits student ID numbers to be publically disclosed without prior consent *only* for electronic communications (e.g., a user name) and on ID badges, they do not expose private information about the student or anything else that "would . . . generally be considered harmful or an invasion

23

of privacy."[15]  *See* 34 C.F.R. § 99.3.  Thanks to the authentication requirement, the display of an ID number on an ID badge makes it no easier to break into an electronic records depository than the display of the student's name.  And plaintiffs have identified no basis for construing FERPA to require more protection for an ID number than for a student's name.

In sum, because plaintiffs cannot show that placing ID numbers on badges falls outside the scope of directory information, the Final Rule does not exceed FERPA's statutory authority.

> **B.      Federal and State Authorities May Designate "Authorized Representatives" Who Are Not Under Their Direct Control to Conduct Audits or Evaluations of Education Programs Because Neither FERPA Nor its Legislative History Requires Such a Limitation.**

In the Final Rule, the Department for the first time issued a regulatory definition of "authorized representative" for purposes of the program evaluation exception:

> *Authorized representative* means any entity or individual designated by a State or local educational authority or an agency headed by an official listed in § 99.31(a)(3) to conduct—with respect to Federal- or State-supported education programs—any audit or evaluation, or any compliance or enforcement activity in connection with Federal legal requirements that relate to these programs.

34 C.F.R. § 99.3; Final Rule, AR 0733.  This definition is consistent with the Department's position prior to 2003, but differs from the "Hansen Memorandum," a 2003 guidance letter that rescinded prior memoranda and concluded that an authorized representative "must be under the

---

[15]  Plaintiffs' fear that third parties will "glean[] from unique identifiers . . . sensitive and potentially embarrassing reports," EPIC Comment, AR 0532, depends on a fundamental misunderstanding of the Final Rule.  Plaintiffs apparently read the statement that "directory information includes . . . [a] student ID number . . . that is displayed on a student ID badge," 34 C.F.R. § 99.3, to mean that, so long as a school places the ID number on the student's badge, the school may also use the ID number as an anonymous stand-in for the student's name in other circumstances—for example, posting all of the students' grades on the wall by ID number so that each student can learn his or her score, ostensibly without revealing the information to others.  To the contrary, section (b) of the relevant regulatory definition bars generally using ID numbers as directory information, releasable without consent, and section (c) provides the only two exceptions:  when used "for purposes of accessing or communicating in electronic systems," and when "displayed on a student ID badge."  Final Rule, AR 0733.  Because they are not used as anonymous identifiers, such ID numbers do not risk unexpected "re-identification."

direct control of that [state educational] authority, *e.g.*, an employee or a contractor of the authority." *Compare* Hansen Mem., AR 0833; *with* Winston Mem. (Jan. 19, 2001), AR 0837; McNeil Mem. (Jan. 18, 2001), AR 0841; Ctrs. For Disease Control Agreement (Dec. 11, 2000), AR 0849.[16]  Plaintiffs seek to require the 2003 interpretation.  *See* EPIC Comment, AR 0525-26.

In the Final Rule, the Department rejected as unpersuasive the Hansen Memorandum's exclusive dependence on the supposed significance of two words in the statute and a single clause in the legislative history.  *See* Final Rule, AR 0709-10.  Because "the direct control requirement is not found in FERPA" and because that requirement had "resulted in State and local educational authorities engaging in convoluted processes to conduct [evaluations] that may serve only to increase costs and lessen privacy protection," the Department decided to adopt a different approach that would better protect privacy and be more consistent with Congressional priorities expressed in the SLDS grant programs.  *See id.*  Thus, the Final Rule, while allowing "any entity or individual" to be designated as an authorized representative, adopts specific requirements for both the designating and designated entities.  A non-employee authorized representative must be designated by a written agreement that includes specific provisions regarding, *inter alia*, the purpose and use of the data, protections against further disclosure, and the destruction of data no longer needed.  *See* 34 C.F.R. § 99.35(a)(3); Final Rule, AR 0734.  Further, the designator "is responsible for using reasonable methods to ensure to the greatest extent practicable that any entity or individual designated" uses the information only for the purposes permitted by the program evaluation exception, protects the information from further disclosures, and destroys the information when it is no longer being used.  *See id.* § 99.35(a)(2).

---

[16]  The Department's reversal of positions does not affect the *Chevron* analysis. *See Ass'n of Private Sector Colleges & Univs.*, 681 F.3d at 441 ("The fact that some of the challenged regulations are inconsistent with the Department's past practice 'is not a basis for declining to analyze the agency's interpretation[s] under the *Chevron* framework.'" (quoting *Nat'l Cable & Telecoms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).  "[I]n *Chevron* itself, [the Supreme] Court deferred to an agency interpretation that was a recent reversal of agency policy."  *Nat'l Cable*, 545 U.S. at 982.

Contrary to plaintiffs' argument, the Department has not improperly delegated any authority to non-federal entities through this regulation.  Nor does FERPA unambiguously forbid the Department's interpretation.  The legislative history, taken as a whole, supports the Department's approach to authorized representatives.  Plaintiffs and commenters make no statutory or legislative history arguments different from those in the Hansen Memorandum, which remains unpersuasive.  The regulation is also consistent with the priorities expressed in Congress' recent SLDS grant programs.  For all of these reasons, the Court should defer to the Department's reasonable interpretation of the statutory term.

        *1.*      *This Department's "reasonable methods" standard does not improperly delegate the Department's authority to non-federal entities.*

Plaintiffs challenge the regulation's failure to specify a "mandatory set of 'reasonable' measures" by which the designating entities must monitor compliance by their authorized representatives.  EPIC Comment, AR 0526.  Plaintiffs argue that requiring that designators to use "reasonable methods to ensure" compliance without specifying what methods are reasonable improperly "delegates the interpretation of federal law to non-federal entities." *Id.* (citing *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 564-66 (D.C. Cir. 2004)); *see also* Compl. ¶ 22.

Plaintiffs' argument is misplaced.  The case plaintiffs cite addressed a federal agency's "delegate[ion] to another actor almost the entire determination of whether a specific statutory requirement . . . has been satisfied."  *U.S. Telecom Ass'n*, 359 F.3d at 567.  In that context, the Court affirmed that it is "presumptively permissible" for a federal officer or agency to "subdelegat[e] to a subordinate federal officer or agency" but that such "subdelegations to outside parties are assumed to be improper absent an affirmative showing of congressional authorization." *Id.* at 565.  This doctrine has no application here because the Department has not delegated the decision whether "a specific statutory requirement . . . has been satisfied."  Instead, the Final Rule merely implements the direct statutory grant of authority to non-federal actors.

FERPA directly empowers "state educational authorities" and "State and local

educational officials" to identify "authorized representatives" to receive access to students' education records. *See* 20 U.S.C. §§ 1232g(b)(1)(C), 1232g(b)(3), 1232g(b)(5). FERPA also tasks the "educational agency or institution" that provides students' education records to a third party (such as these officials and their authorized representatives) with "condition[ing]" access on an agreement not to redisclose the information. *See id.* § 1232g(b)(4)(B). An improper disclosure by the third party bars the "educational agency or institution" from providing access to that third party for at least five years. *See id.* And enforcement of any noncompliance by the educational agency or institution lies in the hands of the Department. *See id.* § 1232g(f).

Thus, the Department's choice to leave "flexibility" to the designator to determine the best means of ensuring compliance from the representative rather than attempting a "one-size-fits-all solution," *see* Final Rule, AR 0712, is not an improper delegation because that responsibility already lay with the designators and the educational agencies and institutions that provide the information for evaluation. Furthermore, the Department's own responsibility to generally enforce FERPA is met by its requirement that the designators "us[e] reasonable methods to ensure [compliance] to the greatest extent practicable," along with the Department's non-regulatory guidance on best practices provided in the preface and Appendix A to the Final Rule. *See id.*, AR 0712-16. This situation is entirely dissimilar to the decision relied on by plaintiffs, where Congress had specified that "the [federal agency] shall consider, at a minimum, whether . . . the failure to provide access . . . would impair" telecommunications carriers, but the agency expressly "delegate[d] to state commissions the authority to determine whether [the carriers] are impaired." *U.S. Telecom Ass'n*, 359 F.3d at 568. Here, the Department is fulfilling its statutory authority, and the non-federal entities are statutorily authorized to designate representatives and statutorily required to monitor the representatives. No subdelegation has occurred. *Cf. Fund for Animals v. Kempthorne*, 538 F.3d 124, 133-34 (2d Cir. 2008).

>    2.    *FERPA's statutory text does not unambiguously forbid the Department's interpretation.*

The Department interprets the term "authorized representative" broadly, to include "any entity or individual designated" by a written agreement "to conduct . . . any audit or evaluation, or any compliance or enforcement activity" regarding relevant education programs.  34 C.F.R. § 99.3; Final Rule, AR 0733.  Plaintiffs maintain that FERPA forbids this interpretation and instead requires that an authorized representative should "be under the direct control of the educational authorities."  EPIC Comment, AR 0526.  Under this "direct control" approach "an employee or a contractor" would be permitted to serve as a representative, but "other State agencies" (such as the state unemployment office) could not serve as a representative because, even if authorized for a specific purpose, such agencies would not be "under the educational agency's direct control."  Hansen Mem., AR 0833.  Plaintiffs also claim that FERPA does not permit "non-governmental actors" to be designated as representatives.[17]  EPIC Comment, AR 0526.  Contrary to plaintiffs' position, the plain text of FERPA does not forbid the broader reading of the term "authorized representative."[18]

---

[17]  This objection has nothing to do with the changes made in the Final Rule.  In 2008, the Department made clear that, even under the Hansen Memorandum's approach, the term authorized representative "includes contractors, consultants, volunteers, and other outside parties (i.e., nonemployees) used to conduct . . . services or functions for which the official or agency would otherwise use its own employees."  2008 Final Rule, AR 0772.

[18]  Plaintiffs' advocacy for the direct control standard appears driven by fear that the Department's approach will permit education records to be used for non-educational purposes or will lead to other abuses which the Department and the authorizing entities will be helpless to prevent.  *See, e.g.*, EPIC Comment, AR 0525-26.  These concerns, even if valid, could provide no basis for forcing a non-textual constraint on the definition of "authorized representative."  Regardless, they are unwarranted.  The Department has not permitted any uses of data outside of the purposes approved by FERPA.  *See, e.g.*, 34 C.F.R. § 99.1 (defining as representatives only those designated "to conduct—with respect to Federal- or State-supported education programs— any audit or evaluation, or any compliance or enforcement activity in connection with Federal legal requirements that relate to these programs"); *id.* § 99.35(a)(2) (requiring the designating entity to ensure that its representative "[u]ses personally identifiable information only to carry out an audit or evaluation of Federal- or State-supported education programs," and "[p]rotects the personally identifiable information from . . . other uses"); *id.* § 99.35(a)(3)(v) (requiring the

(Cont'd)

> i.   *The ordinary meaning of "authorized representative" does not limit who may serve in that capacity.*

When a term is "neither defined in the statute nor a term of art, [courts] are left to construe it in accordance with its ordinary or natural meaning." *S.D. Warren Co. v. Maine Bd. of Environmental Protection*, 547 U.S. 370, 376 (2006) (quotation marks omitted). This generally begins with consulting a dictionary. *See, e.g.*, *Taniguchi v. Kan Pacific Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012) (citing numerous dictionaries, including Black's Law Dictionary); *City of Dania Beach v. FAA*, 628 F.3d 581, 594 (D.C. Cir. 2010) (citing Merriam-Webster's Collegiate Dictionary). By common usage "authorize" means "[t]o give legal authority; to empower," and "representative" means "[o]ne who stands for or acts on behalf of another." *See* Black's Law Dictionary (9th ed. 2009); *see also* Final Rule, AR 0708 (citing Merriam-Webster's Collegiate Dictionary's similar definitions). Taken together, the term "authorized representative" has a broad ordinary meaning focusing on the representative's action on the authorizer's behalf.

Nothing in the common usage of the term "authorized representative" limits who may serve as a representative. This is illustrated by how the term is defined in other statutes and regulations. Its use is so pervasive that statutes themselves seldom define it unless they need to narrow the term's natural breadth.[19] Regulations interpreting the term generally adopt that full scope. *See, e.g.*, 25 C.F.R. § 163.1 ("Authorized representative means an individual or entity

_____

written agreement with the representative to "limit[] use of personally identifiable information from education records to only authorized representatives with legitimate interests in the audit or evaluation of a Federal- or State-supported education program"). And the Department has instituted all of the enforcement ability that FERPA provides. *Compare id.* §§ 99.66, 99.67 with 20 U.S.C. §§ 1232g(b)(4)(B), 1232g(f), 1234c.

[19] *See, e.g.*, 19 U.S.C. § 2401(4) (defining "duly authorized representative" narrowly as "an association of agricultural commodity producers" for purposes of provision permitting "a group of agricultural commodity producers or by their duly authorized representative" to seek "certification of eligibility to apply for adjustment assistance"); 29 U.S.C. § 1341(c)(2)(D)(iv) ("'authorized representative' means any employee organization representing participants in the pension plan" in regulations regarding employee retirement income security program).

duly empowered to make decisions under a direct, clear, and specific delegation of authority.");
43 C.F.R. § 3160.0-5 ("Authorized representative means any entity or individual authorized by
the Secretary to perform duties by cooperative agreement, delegation or contract.").[20]  Much less
frequently do regulations define the term more narrowly, such as limiting it to employees or
subordinates.  *See, e.g.*, 20 C.F.R. § 656.3 ("'authorized representative' means an employee of
the employer whose position or legal status authorizes the employee to act for the employer in
labor certification matters").[21]  Thus, ordinary meaning and common usage do not limit who may
serve as an "authorized representative."

> ii.     *Congress chose not to use readily available more restrictive
> language, and further referred to "authorized representatives" as
> "persons or organizations," suggesting an expectation that non-
> employees would serve in this capacity.*

If Congress had intended to provide access only to officers or employees of the federal

and state entities listed in § 1232g(b)(1)(C) and § 1232g(b)(3), it easily could have done so.  *See*

*New York v. EPA*, 413 F.3d 3, 40 (D.C. Cir. 2005) (noting what Congress could have specified

but did not and concluding that "[t]he absence of such a reference must be given effect").  The

simplest way would have been to refer only to the heads of the federal and state entities, knowing

---

[20]  *See also* 25 C.F.R. § 20.100 ("a parent or other caretaker relative, conservator, legal guardian,
foster parent, attorney, paralegal acting under the supervision of an attorney, friend or other
spokesperson duly authorized and acting on behalf or representing the applicant or recipient");
*id.* § 571.2 ("any persons [sic] who is authorized to act on behalf of the Commission for the
purpose of implementing the Act"); 26 C.F.R. § 301.6104(a)-4(d) ("the representative of a plan
participant designated by the participant in writing to inspect material described in [certain
subsections]"); 36 C.F.R. § 1121.2(f) ("a person who acts on an individual's behalf for purposes
of these regulations, pursuant to written, signed instructions from the individual"); 48 C.F.R.
§ 352.202-1(a) ("any person, persons, or board authorized to act for the Secretary").

[21]  *See also* 39 C.F.R. § 3007.1(a) ("any Commissioner designated by the Chairman, any
administrative law judge appointed by the Commission . . . , and any employee of the
Commission designated by the Commission"); 50 C.F.R. § 1.2 ("the subordinate official to
which a principal official has delegated authority to act on a particular matter or a class of
matters").

that internal delegation is inherently implied.  *See, e.g.*, *U.S. Telecom Ass'n*, 359 F.3d at 567

("presumptively permissible" to "subdelegat[e] to a subordinate federal officer or agency").

Barring that, Congress could have used the phrase "officers or employees," or something similar,

rather than the more expansive "authorized representatives."  Indeed, the 1974 versions of

FERPA—when this exception was established—are filled with the specification of government

and educational entities.  *See, e.g.*, Ex. C, 88 Stat. at 572-73 ("school officials,"

§ 1232g(b)(1)(A), "officials of other schools," § 1232g(b)(1)(B), "State or local educational

agency," §§ 1232g(b)(1), (b)(2)); Ex. E, 88 Stat at 1858-62 ("educational agency or institution,"

§§ 1232g(b)(1), (b)(2), (b)(4), "State and local officials or authorities," § 1232g(b)(1)(E),

"school official and his assistants," § 1232g(b)(4)(A)).  *Cf. Barnhart v. Sigmon Coal Co., Inc.*,

534 U.S. 438, 452 (2002) ("[W]hen Congress includes particular language in one section of a

statute but omits it in another section of the same Act, it is generally presumed that Congress acts

intentionally and purposely in the disparate inclusion or exclusion." (quotation marks omitted)).

Yet Congress chose not to use such specific phrases here.

Furthermore, Congress used other descriptions of these "authorized representatives" that

are broad enough to permit the designation of non-governmental or non-educational entities.

FERPA uses the phrase "individual, agency, or organization" to encompass the entities listed in

§ 1232g(b)(1)'s disclosure exceptions, which originally included only four exceptions.  *See* Ex.

C, 88 Stat. at 572 ("other school officials," "officials of other schools," "authorized

representatives," and "in connection with . . . financial aid"); *see also id.* at 573 (using the

parallel phrase "persons, agencies, or organizations desiring access to the records" in

§ 1232g(b)(4)(A) to refer back to the same entities).  In particular, this use of the word

"organizations" suggests that non-educational entities were expected to be among the

representatives.  *Cf.* Ex. E, 88 Stat. at 1861 (adding § 1232g(b)(1)(F) regarding "organizations

conducting studies" and § 1232g(b)(1)(G) regarding "accrediting organizations").  The

December 1974 amendment made this connection between "authorized representatives" and

"organizations" explicit, amending § 1232g(b)(4)(A) to provide that the access log for a student's education records should be available "to persons or organizations authorized in, and under the conditions of, clauses (A) and (C) of paragraph (1) as a means of auditing the operation of the system."  *See* Ex. E, 88 Stat. at 1862.  Because § 1232g(b)(1)(A) only encompasses "school officials," who are described as "individuals," the term "organizations" expressly refers to the "authorized representatives" in § 1232g(b)(1)(C).  This suggests that "authorized representatives" were expected to include non-governmental and non-educational entities.

Congress' choice not to limit who may serve as an "authorized representative" for purposes of the program evaluation exception is driven home by comparison to another FERPA exception where Congress did choose to narrowly limit the scope of access.  In a 2010 amendment, Congress limited the reach of that exception to "the Secretary of Agriculture, or authorized representative from the Food and Nutrition Service or contractors acting on behalf of the Food and Nutrition Service."  20 U.S.C. § 1232g(b)(1)(K).[22]  This language, especially with the limiting preposition "from," clearly limits access to employees from a specific office or their contractors.  No such language is used in the program evaluation exception, and it would be incongruous to require such a limit where Congress chose not to adopt one.

> iii.   *The use of the word "officials" in § 1232g(b)(3)'s proviso does not prohibit non-governmental entities or other agencies from serving as authorized representatives.*

Neither plaintiffs nor any of the public comments have made any new textual arguments regarding the scope of the term "authorized representative."  Instead, they simply repeat the perfunctory reasoning of the Hansen Memorandum, which the Department rejected after careful

---

[22]  Exception K was added in 2010 by the Healthy, Hunger-Free Kids Act of 2010.  *See* Pub. L. No. 111-296, Title I, § 103(d), 124 Stat. 3192 (Dec. 13, 2010); *see also* S. Rep. No. 111-178, at 32, 2010 WL 1816620 (May 5, 2010) ("This section also provides the Secretary [of Agriculture] with access to the educational and other records of State and local educational and other agencies receiving funds or providing benefits under the Richard B. Russell National School Lunch Act or the Child Nutrition Act of 1966 . . . to carry out the demonstration project.").

review.  *See Final Rule*, AR 0708-10.  That reasoning was simply that the word "officials" in

§ 1232g(b)(3) "reflect[s] a Congressional concern that the authorized representatives of a State

educational authority be under the direct control of that authority."  Hansen Mem., AR 0833.  No

such conclusion can reasonably be derived from the two occurrences of the word "officials" in

the program evaluation exception's proviso.  Paragraph (b)(3) provides:

> Nothing contained in this section shall preclude authorized representatives of (A)
> the Comptroller General of the United States, (B) the Secretary, or (C) State
> educational authorities from having access to student or other records . . . .
> *Provided,* That . . . any data collected by such officials shall be protected in a
> manner which will not permit the personal identification of students and their
> parents by other than those officials, and such personally identifiable data shall be
> destroyed when no longer needed . . . .

20 U.S.C. § 1232g(b)(3).  A natural reading of the proviso does not suggest that the words "such

officials" and "those officials" are intended to limit who may serve as an "authorized

representatives," but instead suggests that they simply refer back to the official entities doing the

authorizing.  *See Final Rule*, AR 0709 ("[W]e interpret the word 'officials' in paragraph (b)(3) of

FERPA as simply a reference back to the four officials who are listed in the exception[.]").  It is

logical for the proviso's limitations to target the named officials, because this by implication

includes the representatives acting pursuant to those official entities' authority.

Furthermore, even if a stricter reading would require the representatives themselves to fit

into the category of "officials," such a reading does not lead to the "direct control" standard.  An

entity can become "official" by virtue of being authorized to act on behalf of one of the named

government entities.  *Cf.* Hansen Mem., AR 0833 (acknowledging that, even under its reading, a

contractor could be a representative).  Otherwise only the named agency heads, or perhaps their

employees, would qualify.  But if it is authorization that makes an "official," what difference

does it make whether the representative acting on behalf of the named government entity

happens to be a private company serving as a contractor or another government agency?  Both

would be "authorized" and "official" within the meaning of FERPA only for the specified

purpose of auditing or evaluating the education program.  *Cf.* 2008 Final Rule, AR 0763 (explaining that "direct control" under a different FERPA provision "appl[ied] only to the outside party's provision of specific institutional services or functions that have been outsourced and the education records provided to that outside party to perform the service or function" and did not affect the party's "status as an independent contractor").[23]  Thus the only meaningful distinction created by the "direct control" standard—permitting third party contractors but prohibiting other government agencies—does not correlate with any statutory text or purpose.

Moreover, context demonstrates that the term "officials" in § 1232g(b)(3)'s proviso should not be freighted with such meaning.  Two other FERPA exceptions contain parallel clauses that likewise forbid disclosures that would "permit the personal identification of students and their parents by other[s]" and require the destruction of the data when no longer needed:

> [Disclosure to] *organizations* conducting studies for, or on behalf of, educational agencies or institutions . . . [permitted] if such studies are conducted in such a manner as will not permit the personal identification of students and their parents by persons other than *representatives of such organizations* and such information will be destroyed when no longer needed for the purpose for which it is conducted.

20 U.S.C. § 1232g(b)(1)(F) (emphasis added).

> [Disclosure to] the *Secretary* of Agriculture, or *authorized representative* from the Food and Nutrition Service or c*ontractors* acting on behalf of the Food and Nutrition Service . . . on the conditions that—(i) any data collected . . . shall be protected in a manner that will not permit the personal identification of students and their parents by other than the *authorized representatives of the Secretary*; and (ii) any personally identifiable data shall be destroyed when the data is no longer needed[.]

*Id.* § 1232g(b)(1)(K) (emphasis added).  The intentional parallels between the program

---

[23]  In 2008, the Department adopted a similar "direct control" standard to define a different term, "school officials," for purposes of a different exception, 20 U.S.C. § 1232g(b)(1)(A).  *See* 34 C.F.R. § 99.31(a)(1)(i)(B); 2008 Final Rule, AR 0799.  The appropriateness of the "direct control" standard in that context is not disputed by either party here.

evaluation exception's proviso and these two other exceptions suggest that Congress did not intend the condition clauses in any of these three exceptions to expand or contract the definition of the entities granted access earlier in the exception.  Section (b)(1)(F)'s reference to "representatives of such organizations" should not be read to create a new authorized representative category, nor should Section (b)(1)(K)'s failure to repeat the term "contractors" preclude them from receiving access.  Considering the parallel purpose of these three provisions, this variation of terms within each exception is no more meaningful than the fact that one exception speaks of studies being "conducted" in a manner that does not allow identification of students or parents, while the other exceptions speak of data being "protected" in a manner that has the same effect.  In precisely the same way, the program evaluation exception's use of "officials" where the other exceptions speak of "representatives" should be read to include all the entities granted access at the beginning of the provision, not to limit their definition.

In sum, FERPA's text does not unambiguously limit who may serve as an "authorized representative" of one of the four named entities.  Congress did not choose to use language limiting the designation to officers or employees of those entities.  And the inclusion of the word "officials" in the exception's proviso is at most ambiguous, but should reasonably be read to provide no additional limitation.

> 3. *FERPA's legislative history does not require a narrower meaning of authorized representative than the plain text.*

Opponents of the Department's interpretation frequently claim that legislative history requires that "authorized representative" be read narrowly, citing a single sentence in a joint statement by Senators Buckley and Pell during the December 1974 amendment of FERPA.  *See, e.g.*, Public Comments, AR 0249, 0386.  Neither this sentence, nor the fuller legislative history of the program evaluation exception provide the "very rare situation where the legislative history of a statute is more probative of congressional intent than the plain text."  *Virginia Dep't of Med. Assistance Servs. v. U.S. Dep't of Health & Human Servs.*, 678 F.3d 918, 923 (D.C. Cir. May 8,

2012) (quotation marks omitted); *see also Natural Res. Def. Council v. EPA*, 489 F.3d 1250, 1259 (D.C. Cir. 2007) ("[T]he bar is high" to "rel[y] on legislative history to constrict the otherwise broad application of a statute indicated by its text." (alterations and quotation marks omitted)).  To the contrary, the legislative history simply evinces Congress' intent to permit access broad enough to conduct "longitudinal studies."

The Buckley/Pell Joint Statement provides a brief, incomplete summary of the program evaluation exception and shows no intent to narrow the meaning of "authorized representative." In their statement, the two senators briefly summarized the four original exceptions:

> Section [1232g(b)(1)] of existing law restricts transfer, without the consent of parents or students, of personally identifiable information concerning a student to [i] other educational agencies, or institutions, [ii] other school officials, [iii] auditors from the General Accounting Office and the Department of Health, Education, and Welfare, and [iv] in connection with the application for or receipt of student financial aid under certain specified conditions.

Joint Statement, AR 0855 (numerals added for clarity).  This description of the program evaluation exception as permitting disclosures to "auditors" from the GAO and the Department of Education's predecessor could not have been intended to define the exception's scope.  The senators mentioned "audits" but failed to mention "evaluations" and "enforcement of Federal legal requirements."  *Cf.* Ex. C, 88 Stat. at 573.  Further, they referenced only two of the four entities permitted to designate representatives to receive access to the data—ignoring both "the administrative head of an education agency" and "State educational authorities."  *See id.*; *see also* Final Rule, AR 0710 (discussing Joint Statement).  Thus, this clause must be taken as an illustration of the uses for the exception rather than a description of its outer limits.

Far more probative of the scope of the exception than the floor statement of two senators are the conference reports.  *See Moore v. District of Columbia*, 907 F.2d 165, 173 (D.C. Cir. 1990) ("It is well established that the remarks of individual congressmen on the floor are entitled to less weight than are committee reports."); *Simpson v. United States*, 435 U.S. 6, 17-18 (1978)

(Rehnquist, dissenting) ("The report of a joint conference committee of both Houses of Congress, for example, . . . is accorded a good deal more weight than the remarks even of the sponsor of a particular portion of a bill on the floor of the chamber.").  Indeed, the program evaluation exception was primarily drafted by two successive conference committees and their conference reports demonstrate much greater recognition of the need for data-sharing than anything envisioned by the two sponsoring senators.

When faced with Senator Buckley's original proposal, which almost universally forbade providing PII to third parties,[24] the conference committee entirely rewrote § (b)(3) to create the program evaluation exception—albeit with a proviso much narrower than current law:

> *Provided.* That, except when collection of personally identifiable data is specifically authorized by Federal law, any data collected by such officials with respect to individual students shall not include information (including social security numbers) which would permit the personal identification of such students or their parents after the data so obtained has been collected.

Ex. C, 88 Stat. at 573.  The committee summarized this exception to mean "that nothing in [FERPA] shall preclude official audits of federally supported education programs, but that data so collected shall not be personally identifiable."  Ex. B, S. Rep. No. 93-1026, at 187.  The committee further explained that "[t]he need to protect students' rights must be balanced against legitimate Federal needs for information," and that FERPA "is not meant to deny the Federal government the information it needs to carry out the evaluations."  *See id.*

The Buckley/Pell FERPA amendments proposed four months later suggested one small clarification.[25]  But the conference committee took a different view, rewriting the proviso to

---

[24]  As proposed, § (c)(3) would have prohibited "the Secretary or an administrative head of an education agency" from "includ[ing] the names of students or their parents (in code or otherwise)" in any "submi[ssion] to a third party" without written parental consent in *all* cases except financial aid applications and court orders.  *See* Ex. A, 120 Cong. Rec. at 14579 (May 14, 1974); *see also id.* at 14595 (rejecting § (b), thus making § (c) the final § (b)).

[25]  *See* 120 Cong. Rec. 39865, AR 0857 ("shall not include information . . . . which would

(Cont'd)

clearly reverse the prohibition on providing PII to those conducting the audit or evaluation:

> *Provided.* That except when collection of personally identifiable information is specifically authorized by Federal law, any data collected by such officials shall be protected in a manner which will not permit the personal identification of students and their parents by other than those officials, and such personally identifiable data shall be destroyed when no longer needed for such audit, evaluation, and enforcement of Federal legal requirements.

20 U.S.C. § 1232g(b)(3); *see* Ex. E, 88 Stat at 1862.   The terse conference report, in a section titled "Minor Clarifying Amendments Relating to Third Party Access to Education Records," noted that the Senate proposed "language intended to permit longitudinal studies," and that the House agreed but added "language clarifying the provisions relating to longitudinal studies."  Ex. D, S. Rep. No. 93-1409, at 12.   Thus, Congress realized that auditors and evaluators need student-level data—including PII—to conduct their analyses and approved of such longitudinal studies.   It also expected "third parties" to receive access under this exception.  *Id.* Although the exception was amended three more times, these later changes provide no further illumination.[26]  In sum, the legislative history provides no additional guidance regarding who

---

permit the personal identification of such students or their parents *by such officials or agencies*").

[26]  First, in 1979, § 1232g(b)(5) was added to ensure that the exception included state-funded programs and local educational authorities.  *See* H.R. Rep. No. 96-338, at 10 (July 13, 1979) (attached as Exhibit F) (seeking to "correct an anomaly" in FERPA that "preclude[ed] State auditors from requesting records on students in order to conduct State audits of local and State-supported programs"); Pub. L. No. 96-46, § 4(c), 93 Stat. 342 (Aug. 6, 1979).  There was no meaningful debate.  *See* 125 Cong. Rec. 20085 (July 23, 1979); 125 Cong. Rec. 20327 (July 24, 1979).  Second, in 1994, the phrase "an administrative head of an education agency" was deleted throughout the statute, and "education  program" was made plural: "education programs."  *See* Pub. L. No. 103-382, Title II § 261(h), 108 Stat. 3913, 3928 (Oct. 20, 1994) (as a "technical and conforming amendment").  Third, in 1998, the list of representatives in § 1232g(b)(1)(C) was expanded to include "authorized representatives of the Attorney General for law enforcement purposes under the same conditions as apply to the Secretary under [§ 1232g(b)(3)]."  *See* Pub. L. No. 105-244, Title IX § 951, 112 Stat. 1836 (Oct. 7, 1998).  Again, the terse legislative history provides no new guidance about the scope of the exception.  *See* H.R. Rep. No. 105-750, at 407 (1998) (Conf. Rep.) (attached as Exhibit G) ("[A]uthorized representatives of the Attorney General would be exempted from the general prohibition against the release of education records.  Such exemption would be provided only for law enforcement purposes.").

may serve as an authorized representatives of the federal officials and state authorities under this exception, but this history makes clear that the exception was intended to remove barriers to longitudinal studies and to permit the third-party representatives to access PII.

> 4. *The Department's interpretation is supported by the SLDS grant statutes that make clear that Congress wished to encourage the very data-sharing facilitated by this regulatory change.*

Finally, the Department's definition of "authorized representative" gains further support from the fact that it harmonizes the Department's interpretation of FERPA with more recent Congressional actions encouraging the use of SLDS. *See* Final Rule, AR 0696, 0701-02, 0705, 0709 (discussing implications of these Congressional priorities); NPRM, AR 0001-04 (same).

Because there is no FERPA exception "for the specific purpose of establishing and operating consolidated databases and data sharing systems," such data systems generally depend on the program evaluation exception. *See* 2008 Final Rule, AR 0769. It is under this exception that school districts and colleges "typically disclose information from students' education records to a longitudinal data system maintained by an SEA or other State educational authorities." *Id*, AR 0762. Significantly, the Department's prior interpretation of the term "authorized representative" created "barriers that have inhibited the effective use of SLDS as envisioned" by Congress. *See* Final Rule, AR 0696. When an agency's past interpretation is "inconsistent with requirements" of more recent laws, *see id.*, AR 0709, it is reasonable for the agency to scrutinize the issue and search for ways to harmonize its regulations with both statutes.

The "direct control" requirement conflicts with the Congress' intentions for the SLDS grant programs. For example, it would prohibit sharing of data between agencies in two different states because neither entity can be subject to the other. But Congress has repeatedly encouraged such coordination. *See* 20 U.S.C. § 9607(c)(1) (grants must "promote[] linkages across States"); 20 U.S.C. § 1015c(c) (clarifying that "[n]othing in this Act shall prohibit . . . a consortium of States from developing, implementing, or maintaining State-developed databases

that track individuals over time"). Similarly, the requirement makes it very difficult to collect workforce information from state unemployment offices, because it forbids those non-education agencies from ever receiving the student PII necessary to identify relevant records. *See* Final Rule, AR 0710 (noting that working around such problems involves "convoluted processes . . . that may serve only to increase costs and lessen privacy protection").[27] Yet Congress has repeatedly requested that workforce data be analyzed to test the success of education programs. *See* 20 U.S.C. § 9871(a)(2)-(3) (seeking to provide "valid and reliable information to inform education policy and practice" to "ensure students are prepared to succeed in . . . the 21st century workforce"); 20 U.S.C. § 1015c(c) (clarifying that "[n]othing in this Act shall prohibit . . . State-developed databases that track individuals over time, including . . . graduate employment outcomes"); *see also* Pub. L. No. 111-5, Title VIII, Dep't of Educ., Inst. of Educ. Sci., 123 Stat. 183-84 (Feb. 17, 2009) (specifying that the funds "may be used for Statewide data systems that include postsecondary and workforce information"). The direct control requirement would even complicate coordination for those states that house their K-12 data systems and postsecondary data systems in different state agencies. *See* 2008 Final Rule, AR 0768-69. Congress obviously wanted primary, secondary, and postsecondary information linked together. *See, e.g.*, 20 U.S.C. §§ 9871(a)(2), (b)(1) (supporting "statewide P-16 education data systems" that run "from preschool through the conferring of a baccalaureate degree").

---

[27] To collect data within the strictures of this requirement, the evaluator would have to "collaborate with other State agencies [only] by importing data from those sources and conducting the necessary matches" internally, without disclosing any "[PII] from students' education records to [those] non-educational State agencies." 2008 Final Rule, AR 0775. For example, an employee of the Washington State Board for Community and Technical Colleges had to drive to Oregon, Idaho, and Montana to personally oversee the importation of employment data from those states' labor agencies regarding graduates of Washington colleges. *See* U.S. Gov't Accountability Office, GAO-10-927 Postsecondary Education 16-17 (Sept. 2010), AR 0942-43. Similarly, an SEA seeking to track employment outcomes of its graduates might "have to import the entire [state] workforce database and do the match itself," NPRM, AR 0009, thus unnecessarily collecting PII about many irrelevant individuals.

Accordingly, the Department properly reconsidered its prior interpretation and selected a definition within the scope of FERPA which better harmonized with Congressional priorities.

> 5. *In sum, the Department's interpretation of the term "authorized representative" is entitled to full deference under* Chevron.

Because Congress has not directly spoken to the question of the scope of "authorized representative" and because the other descriptors used to refer to that term do not unambiguously foreclose the Department's interpretation, the Final Rule is entitled to full deference. The Department's interpretation has not exceeded a permissible construction of the statutory term, as demonstrated by the broad reaches of the term in other contexts. Nor does the legislative history shine any light on the term that limits it further than the plain meaning of the text. Instead, the Department has adopted a reasonable interpretation of the term that harmonizes FERPA's protections with other statutes and Congressional grant programs. The Final Rule should stand.

**C.     "Early Intervention Programs" Authorized Under the Individuals With Disabilities Education Act Qualify as "Education Programs" that Can Be Evaluated Because Congress Elsewhere Defined Them as Education Programs.**

Within FERPA, the term "education program" appears only in the program evaluation exception, permitting access only "in connection with the audit and evaluation of Federally-supported *education programs*, or in connection with the enforcement of the Federal legal requirements which relate to *such programs*." 20 U.S.C. § 1232g(b)(3) (emphasis added); *see also id.* § 1232g(b)(5) ("any federally or state supported education program"). FERPA does not define this term, nor did prior Department regulations. The Final Rule provides as follows:

> Education program means any program that is principally engaged in the provision of education, including, but not limited to, early childhood education, elementary and secondary education, postsecondary education, special education, job training, career and technical education, and adult education, and any program that is administered by an educational agency or institution.

34 C.F.R. § 99.3; Final Rule, AR 0733. In the regulation's preamble, the Department explained that this definition excludes a "program [that] contains a specific incidental educational or

41

training activity within a broader non-education program," and that qualification determinations "should be based on the totality of the program."  Final Rule, AR 0706.

Plaintiffs' objection to this definition is ambiguous.  *See* Compl. ¶ 23 (providing no explanation of their objection, but simply quoting a heading from their public comment claiming the definition would "expose troves of sensitive non-academic data").  The version of the definition quoted in their complaint matches neither the proposed rule nor the Final Rule.  *See* Compl. ¶ 16; *see also id.* ¶ 23.  In its public comment, EPIC expressed little concern about the definition itself, acknowledging the "fact" that "education may begin before kindergarten and may involve learning outside of postsecondary institutions," and focusing instead on potential "lax enforcement."  *See* EPIC Comment, AR 0529-30.  It singled out only one item it believed should be excluded from the definition:  "early intervention programs authorized under Part C of the Individuals with Disabilities Education Act."  *Id.* at AR 0529.  Thus, plaintiffs in effect attack one clause of the Department's subsidiary definition of "early childhood education program":

> Early childhood education program means . . . (c) A program that--
> (1) Serves children from birth through age six that addresses the children's cognitive (including language, early literacy, and early mathematics), social, emotional, and physical development; and
> (2) Is . . .
> > (ii) *A program authorized under section 619 or part C of the Individuals with Disabilities Education Act*[.]

34 C.F.R. § 99.3 (emphasis added); Final Rule, AR 0733.

This challenge to the inclusion of "early intervention programs" within the definition of "education program" fails.  First, plaintiffs appear to have little objection to the Department's conclusion that "early childhood education programs" properly belong within the scope of "education programs."  *See* EPIC Comment, AR 0530 (treating as "fact" the Department's statement that "education may begin before kindergarten").  Even if plaintiffs did object, Congress has expressly provided for the analysis of data regarding "early childhood education,"

tasking the Department's Institute of Education Science to:

> [P]rovide national leadership in expanding fundamental knowledge and understanding of education *from early childhood* through postsecondary study, in order to provide parents, educators, students, researchers, policymakers, and the general public with reliable information about--
>> (A) the condition and progress of education in the United States, including *early childhood education* and special education;
>> (B) educational practices that support learning and improve academic achievement and access to educational opportunities for all students; and
>> (C) the effectiveness of Federal and other education programs.

20 U.S.C. § 9511(b)(1) (emphasis added).  In carrying out this mission, "the Institute shall compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need."  *Id.* § 9511(b)(2).[28]  Thus, the program evaluation exception, which gives the Department the authority to conduct audits and evaluations of education programs, must logically cover "early childhood education" as well.

Second, plaintiffs' specific objection to the clause regarding Part C programs must be rejected because there can be no doubt that Congress considers these programs to be "education programs."  The Final Rule's entire definition of "early childhood education program"— including the clause plaintiffs challenge—is Congress' own definition of the term.  The Department, prompted by public comments, simply incorporated the definition of "early childhood education program" set forth in the Higher Education Act of 1965, as amended.  *See* Final Rule, AR 0697, 0706; Higher Education Opportunity Act, Pub. L. No. 110-315, Title I § 103(a)(1) (Aug. 14, 2008) (codified at 20 U.S.C. § 1003(8)); *see also id.*, Title VIII § 801

---

[28]  Other statutory provisions also contemplate analyzing data regarding such programs.  *See, e.g.*, *id.* § 1022a(b)(6)(K) (requiring applications for Teacher Quality Partnership Grants to describe "how the partnership will collect, analyze, and use data on the retention of all teachers . . . in schools and early childhood education programs . . . to evaluate the effectiveness of the partnership's teacher and educator support system"); *id.* §§ 6651(e)(1), (e)(6)(A) (requiring Department to develop achievement indicators designed "to measure the impact of that professional development on the early childhood education provided by the individuals who receive the professional development" for grant program seeking to "improve[e] the knowledge and skills of early childhood educators").

(adopting similar definition for Early Childhood Education Professional Development and

Career Task Force, codified at 20 U.S.C. § 1161i-1).

Nothing in the text of FERPA suggests that "education program" should be defined to

exclude any portion of Congress' own definition of "early childhood education program."  Given

Congress' instructions to the Department to "compile statistics . . . and conduct research [and]

evaluations" regarding "the condition and progress of . . . early childhood education," 20 U.S.C.

§ 9511(b), it is entirely reasonable for the program evaluation exception to reach the full scope of

the terms as Congress has defined them elsewhere in the education title of the U.S. Code.

Accordingly, the Department's decision is entitled to full deference.

## IV. THE DISPUTED DEFINITIONS ARE OTHERWISE IN ACCORDANCE WITH LAW BECAUSE THEY ARE THE PRODUCT OF REASONED DECISIONMAKING.

To the extent that plaintiffs seek to make claims under 5 U.S.C. § 706(2)(A) that differ

from their statutory authority claim, their claims must fail.  The "arbitrary and capricious"

inquiry looks merely to "whether the regulations are the product of reasoned decisionmaking,"

and is "fundamentally deferential."  *Ass'n of Private Sector Colleges & Univs.*, 681 F.3d at 441.

> Normally, an agency rule would be arbitrary and capricious if the agency has
> relied on factors which Congress has not intended it to consider, entirely failed to
> consider an important aspect of the problem, offered an explanation for its
> decision that runs counter to the evidence before the agency, or is so implausible
> that it could not be ascribed to a difference in view or the product of agency
> expertise.

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Plaintiffs have not alleged that the Department has made any of these errors.  The factors

considered by the Department—balancing productive use of the data against protecting student

privacy—were expressly contemplated by Congress.  *See, e.g.*, Ex. B, S. Rep. No. 93-1026, at

187 ("The need to protect students' rights must be balanced against legitimate Federal needs for

information.").  There can be no doubt that the Department considered plaintiffs' legal

arguments, which were made at length in EPIC's public comment and addressed in the Final Rule. *See* EPIC Comment, AR 0515-34; Final Rule, AR 0701-12; *id.* AR 0719-21; *see Ass'n of Private Sector Colleges & Univs.*, 681 F.3d at 441 (obligation to " address significant comments raised during the rulemaking" is "not particularly demanding"). Nor are the Department's explanations implausible or contrary to the evidence before the agency. *See supra* Section III. Finally, the Final Rule is a "logical outgrowth of the agency's proposed regulations." *Ass'n of Private Sector Colleges & Univs.*, 681 F.3d at 442. *Compare* NPRM, AR 0001-14; *with* Final Rule, AR 0753-802.

Accordingly, for all of the reasons discussed in the statutory authority section, the definitions must be upheld as a legitimate exercise of the Department's rulemaking authority.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to the Department.

Dated:  November 30, 2012                           Respectfully submitted,

                                                    STUART F. DELERY
                                                    Principal Deputy Assistant Attorney General

                                                    JOHN R. TYLER
                                                    Assistant Director

Of Counsel:                                         /s/ Galen N. Thorp_____

DEBORAH FRIENDLY                                    GALEN N. THORP (VA Bar # 75517)
RAHUL REDDY                                         Trial Attorney
Office of the General Counsel                       United States Department of Justice
U.S. Department of Education                        Civil Division, Federal Programs Branch
Washington, D.C.                                    P.O. Box 883, Room 6140
                                                    Washington, D.C. 20530
                                                    Tel: (202) 514-4781  Fax: (202) 616-8460
                                                    E-mail: galen.thorp@usdoj.gov

                                                    Attorneys for Defendant