*May 14, 1974*  **CONGRESSIONAL RECORD — SENATE**  14579

Mr. McCLELLAN. Give us 5 or 10 minutes on the——

Mr. ROBERT C. BYRD. Mr. President, if we are not careful, we are going to get in one h-e-c-k of a fix tomorrow on the Gurney amendment. The Senator was here when we entered into this agreement. I hope we will not abuse that agreement——

Mr. JAVITS. If the Senator needs a few minutes to consider it, I would ask unanimous consent that I may yield for 10 minutes to the junior Senator from New York (Mr. BUCKLEY) to discuss whatever amendments he brings up, with leave to present this amendment and then to return to the amendment which I have pending.

The PRESIDING OFFICER. Is the Senator for yielding time from the bill?

Mr. JAVITS. I cannot yield time. He has got to do it in his own time. I ask unanimous consent, Mr. President, that I may lay aside the amendment which I have pending for 10 minutes and then return to it.

The PRESIDING OFFICER. Is there objection to the request of the Senator from New York (Mr. JAVITS)? The Chair hears none, and it is so ordered.

Mr. GRIFFIN. Mr. President, reserving the right to object, I did not understand that the Senator from New York had an amendment pending.

Mr. JAVITS. I do.

Mr. GRIFFIN. Is there a time limitation on it?

Mr. JAVITS. Yes; there is a time limit on it of 30 minutes. My time has expired but Senator McCLELLAN's time has not. I could get time from the bill, of course.

Mr. McCLELLAN. I have only 2 more minutes remaining because I yielded my time trying to get the unanimous-consent agreement.

Mr. PELL. Mr. President, I am delighted to yield 10 minutes if it will help us move along on the pending bill.

The PRESIDING OFFICER. Is there objection to the request of the Senator from New York? The Chair hears none, and it is so ordered.

The junior Senator from New York (Mr. BUCKLEY) is now recognized.

AMENDMENT NO. 1289

Mr. BUCKLEY. Mr. President, I call up my amendment No. 1289 and ask that it be stated.

The PRESIDING OFFICER. The amendment will be stated.

The legislative clerk read as follows:

On page 330, between lines 17 and 18, insert the following new section:

"PROTECTION OF THE RIGHTS AND PRIVACY OF PARENTS AND STUDENTS

"SEC. 437. (a) RIGHT OF ACCESS AND OF A HEARING.—(1) No funds shall be made available under any applicable program to any State or local educational agency, any institution of higher education, any community college, any school, preschool, or any other educational institution which has a policy of denying, or which effectively prevents the parents of students under eighteen years of age attending any school of such agency, or attending such institution of higher education, community college, school, preschool, or other educational institution, the right to inspect and review any and all official records, files, and data directly related to their children, including all material that is incorporated into each student's cumulative record folder, and intended for school use or to be available to parties outside the school or school system, and specifically including, but not necessarily limited to, identifying data, academic work completed, level of achievement (grades, standardized achievement test scores), attendance data, scores on standardized intelligence, aptitude, and psychological tests, interest inventory results, health data, family background information, teacher or counselor ratings and observations, and verified reports of serious or recurrent behavior patterns. Where such records or data include information on more than one student, the parents of any student shall be entitled to receive, or be informed of, that part of such record or data as pertains to their child. Each recipient shall establish appropriate procedures for the granting of a request by parents for access to their child's school records within a reasonable period of time, but in no case more than forty-five days after the request has been made.

"(2) Parents shall have an opportunity for a hearing to challenge the content of their child's school records, to insure that the records are not inaccurate, misleading, or otherwise in violation of the privacy or other rights of students, and to provide an opportunity for the correction or deletion of any such inaccurate, misleading, or otherwise inappropriate data contained therein.

"(b) PARENTAL CONSENT.—(1) No student shall, as a part of an applicable program, be required to undergo medical, psychological, or psychiatric examination, testing, or treatment, or immunization (except to the extent necessary to protect the public from epidemics of contagious diseases), or to reveal information about his or her personal or family life without the prior, informed, written consent of the student's parents.

"(2) No student shall, as a part of any applicable program, be required, without the prior, informed, written consent of the student's parents, to participate in any project program, or course, the primary purpose or principal effect of which is to affect or alter the personal behavior or personal values of a student, or to explore and develop teaching techniques or courses primarily intended to affect such behavior and values.

"(3) Parents shall be informed, reasonably in advance and in writing, of the intended participation of their child in any research or experimentation project which is a part of an applicable program. No child shall participate in such a project if the parents of such child object to such participation.

"(4) As used in this subsection the term 'research or experimentation project' means any project or program which is a part of an applicable program, and which is authorized by an administrative officer of an education agency, a State or local education agency, or any education institution, including preschools, for the purpose of research or experimentation, except that research or experimentation projects shall not include projects in the field of reading or bilingual education, as determined by the Commissioner.

"(c) CONDITIONS FOR THE RELEASE OF PERSONAL DATA.—(1) No funds shall be made available under any applicable program to any State or local education agency, any institution of higher education, any community college, any school, preschool, or any other educational institution which has a policy of permitting the release of records or files (or personal information contained therein) of students without the written consent of their parents to any individual, agency, or organization, other than the following—

"(A) other school officials, including teachers within the educational institution or local educational agency who have legitimate educational interests;

"(B) to officials of other schools or school systems in which the student intends to enroll, upon condition that the student's parents be notified of the transfer, receive a copy of the record if desired, and have an opportunity for a hearing to challenge the content of the record.

"(2) No funds shall be made available under any applicable program to any State or local educational agency, any institution of higher education, any community college, any school, preschool, or any other educational institution which has a policy or practice of furnishing, in any form, any information contained in personal school records, to any persons other than those listed in subsection (c) (1) unless—

"(A) there is written consent from the student's parents specifying records to be released, the reasons for such release, and to whom, and with a copy of the records to be released to the student's parents and the student if desired by the parents, or

"(B) such information is furnished in compliance with judicial order, or pursuant to any lawfully issued subpena, upon condition that parents and the students are notified of all such orders or subpenas in advance of the compliance therewith by the education institution or agency.

"(3) In any case in which the Secretary or an administrative head of an education agency is authorized under any applicable program to request or require any State or local educational agency, any institution of higher education, any community college, any school, preschool, or any other educational institution to submit to a third party (or to the Secretary or an administrative head of an education agency, as defined in section 409 of this Act) any data from personal statistics or records of students, such data shall not include the names of students or their parents (in code or otherwise) without the written consent of the student's parents, except—

"(A) in connection with a student's application for financial aid;

"(B) in compliance with any court order, or pursuant to any lawfully issued subpena, if the parents and students are notified of any such order in advance of the compliance therewith by the State or local educational agency, the institution of higher education, the community college, the school, preschool, or other educational institution.

"(4)(A) With respect to subsections (c) (1) and (c) (2) and (c) (3), all persons, agencies, or organizations desiring access to the records of a student shall be required to sign a written form which shall be kept permanently with the file of the student, but only for inspection by the parents or student, indicating specifically the legitimate educational or other interest that each person, agency, or organization has in seeking this information. Such form shall be available to parents and to the school official responsible for record maintenance as a means of auditing the operation of the system.

"(4)(B) With respect to this subsection, personal information shall only be transferred to a third party on the condition that such party will not permit any other party to have access to such information without the written consent of the parents of the student.

"(d) PROTECTION OF PERSONAL DATA.—The Secretary shall adopt appropriate regulations to protect the rights of privacy of students and their families in connection with any surveys or data-gathering activities conducted, assisted, or authorized by the Secretary or an administrative head of an

EXHIBIT A



education agency (as defined in section 409 of this Act). Regulations established under this subsection shall include provisions controlling the use, dissemination, and protection of such data. No survey or data-gathering activities shall be conducted by the Secretary, or an administrative head of an education agency have responsibilities under an applicable program unless such activities are authorized by the Act establishing such a program.

"(e) For the purposes of this section, whenever a student has attained eighteen years of age, the permission or consent required of and the rights accorded to the parents of the student shall thereafter only be required of and accorded to the student.

"(f) No funds shall be made available under any applicable program unless the recipient of such funds informs the parents of students, or the students, if they are eighteen years of age or older, of the rights accorded them by this section.

"(g) The Secretary, or an administrative head of an education agency, shall take appropriate actions to enforce provisions of this section and to deal with violations of this section, according to the provisions of this Act.

"(h) The Secretary shall establish or designate an office and review board within the Department of Health, Education, and Welfare the purpose of investigating, processing, reviewing, and adjudicating violations of the provisions of this section and complaints which may be filed concerning alleged violations of this section, according to the procedures contained in subsections (c) and (d) of section 421 of this Act.

"(i) With respect to any funds obligated prior to the effective date of this section to any State or local educational agency, any institution of higher education, any community college, any school, preschool, or any other educational institution, continued furnishing of such funds shall cease January 1, 1975, if the recipient has failed to meet the conditions for funding established by this section.

"(j) The provisions of this section shall become effective ninety days after the date of enactment of this Act.

"(k) This section may be cited as the 'Family Educational Rights and Privacy Act of 1974'."

On page 122, in the table of contents, after the item "Sec. 512" insert the following:

"Sec. 513. Protection of the rights and privacy of parents and students.".

Mr. BUCKLEY. Mr. President, I send to the desk two perfecting amendments. Through some oversight the Printing Office failed to include two provisions in the amendment.

The PRESIDING OFFICER. Does the Senator from New York ask unanimous consent that his amendment be so modified?

Mr. BUCKLEY. Mr. President, yes, I so request.

The PRESIDING OFFICER. Without objection, it is so ordered, and the amendment is so modified.

The text of the perfecting amendments is as follows:

On page 1, between lines 2 and 3, insert the following:

PROTECTION OF THE RIGHTS AND PRIVACY OF PARENTS AND STUDENTS

SEC. 513. Part C of the General Education Provisions Act is amended by adding at the end thereof the following new section:

On page 4, line 23, after the word "other" insert the word "local".

Mr. BUCKLEY. Mr. President, as more

stories come out in the media about the abuses of personal data by schools and Government agencies, the public and Congress have become increasingly aware of the problems such abuses pose. In addition, the revelations coming out of Watergate investigations have underscored the dangers of Government data gathering and the abuse of personal files, and have generated increased public demand for the control and elimination of such activities and abuses. It is appropriate, therefore, that we take this opportunity to protect the rights of students and their parents and to prevent the abuse of personal files and data in the area of federally assisted educational activities.

Many absurd and sometimes tragic examples of similar abuses exist. Let me recount one of the cases described in the recent article, "How Secret School Records Can Hurt Your Child," in Parade magazine:

The parents of a junior high student are told their daughter won't be able to attend graduation ceremonies because she's a "bad citizen." What has she done that's bad, the parents ask? Well, the principal says, the school had a whole file on her "poor citizenship," but the parents can't know what's in that file. In this Catch-22 case, one of the few to get a legal hearing, the New York State Commissioner of Education, Ewald B. Nyquist, stated flatly that the school's argument that it was acting in the best interest of the student in refusing to reveal the information to the parents—had no merit. The commissioner concluded: "It is readily apparent that no one had a greater right to such information than the parents."

When parents and students are not allowed to inspect school records and make corrections, numerous erroneous and harmful material can creep into the records. Such inaccurate materials can have devastatingly negative effects on the academic future and job prospects of an innocent, unaware student.

Many examples of abuses can be found in recent letters to the National Committee for Citizens in Education which has for a long time carried on the fight for the right of parents to have access to their children's records by alerting and assisting parents across the Nation. I would like to take this opportunity to commend that committee for its dedicated efforts, and to mention that the NCCE will very shortly publish a major study entitled "Children, Parents and School Records." It is must reading for anyone who is concerned with the issue of privacy and the schools.

Violations of the privacy of students and their parents occur daily in schools across the Nation, through courses requiring the student to reveal personal data and feelings, and by means of demands by the Federal Government for personal information on students and parents. The recent refusal of the District of Columbia School Board to refuse to administer a battery of tests, despite a threat by the Federal Office of Education to cut off nearly $6 million in Federal funds to the city's public school system, is a good case in point. The superintendent of the schools, Barbara Sizemore, charged that many items in

the tests, which are required in other school districts around the Nation, are a violation of privacy and could cause psychological damage to students.

The New York City School Board refused to comply with a similar demand. Dr. Seymour Lachman, president of the school board, said that the original demand "violated the confidentiality of student records" and that, lacking proper safeguards, the data might be misused or abused. He added that:

These kinds could have been categorized, codified, and stereo-typed for life on the basis of information put on the tape while they were in school.

In addition to being denied access to their children's school records, parents are often unable to readily review the instructional materials in various courses in which their children are enrolled. And often they are not asked to give their consent before their child is given very personal or psychological tests, or participate in experimental programs or attitude-affecting courses.

The secrecy and the denial of parental rights that seem to be a frequent feature of American education is disturbing. Some school administrators and educators seem to have forgotten that parents have the primary legal and moral responsibility for the upbringing of their children and only entrust them to the schools for basic educational purposes.

Some educators seem to feel that they know much more about the welfare and best interests of the child than do the parents, and therefore, once a child comes under their sway, they think they have the right to do what they themselves think is best for the child, without regard for values and beliefs of the parents.

The world-famous child psychiatrist, John Bowlby, noted in an interview concerning the care of young children last year, that:

The criticizing of parents and taking the children out of the home and putting them into the schools as is being commonly suggested these days actually undermines the parental confidence in the parents' own role, and in their potential role. There is entirely too much criticism. The educators are guilty of undermining the home rather than building it up.

There has been an increasing chorus of complaints from parents in the last few years about just such attitudes and actions on the part of some educators. The sense of a loss of control over one's life and destiny, which many social commentators say is growing amongst our citizens, seems to be increasingly felt by parents with respect to the upbringing of their own children.

Such elitist and paternalistic attitudes reflect the widening efforts of some, both in and out of Government, to diminish the rights and responsibilities of parents for the upbringing of their children, and to transfer such rights and functions to the State—to separate, figuratively, and in some cases, literally, the child from his parents, and to turn him over to the care of the State, as represented by schools and other arms of its administration.

My amendment seeks to restore parental rights and to protect privacy. It will:

First, help insure that parents have the right of access to their children's school records;

Second, help prevent the abuse and improper disclosure of such records and personal data on students and their parents;

Third, require parental consent before such records are disclosed to most third parties;

Fourth, require parental consent or notification before their children are made to undergo certain forms of testing or partake in certain experimental or attitude-affecting programs or activities; and

Fifth, make instructional materials used in the classroom available for review by parents upon request.

In addition, my amendment requires the Secretary of HEW to adopt appropriate safeguards to protect the rights and privacy of students and their families in regard to Government authorized surveys and other data gathering activities.

My amendment broadens the protection of civil rights to include the civil rights of parents and students vis-a-vis the schools. As a matter of fact, a recent Federal court decision has made the civil rights aspect of privacy and parental consent more explicit.

The case was Merriken against Cressman, heard in the U.S. District Court of Eastern Pennsylvania last fall. Let me quote from the summary of the case in "The United States Law Week" of October 16, 1973:

A school district proposed to use a program entitled Critical Period of Intervention (CPI) for the purpose of identifying potential drug abusers among its eighth-grade students. Additionally, the program would "prepare the necessary interventions, identify resources to train and aid the district personnel to remediate the problems and, finally, to evaluate the results." Parental consent is a prerequisite to a student's participation in the program. Such consent is solicited by a letter which is admittedly a "selling device" and "an attempt to convince the parent to allow the child to participate."

Two child psychiatrists testified without contradiction as to several * * * dangerous aspects of the CPI Program, none of which are mentioned * * * in any of the materials to be made available to parents. These dangers include the risk that the CPI Program will operate as a self-fulfilling prophecy in which a child labeled as a potential drug abuser will by virtue of a label decide to be that which people already think he or she is anyway * * * Another danger mentioned is that of scapegoating in which a child might be marked out by his peers for unpleasant treatment either because of refusal to take the CPI test or because of the result of the test." Additionally, there is a "severe loyalty conflict that might result by asking children the types of personal questions about their relationship with parents and siblings which are included in the CPI questionnaire." Finally the qualifications of the school district personnel who will administer the interventions once potential drug abusers have been identified are woefully inadequate.

The court found that the confidentiality of the program broke down when the school superintendent was informed of the potential drug abusers, who were then required to undergo attempted psychological remediation by ill-trained faculty members. But, said the Judge:

The ultimate use of this information, although possibly gained with a great deal of scientific success, is the most serious problem that faces the Court. How many children would be labeled as potential drug abusers who in actuality are not, and would be subjected to the problem of group therapy sessions conducted by inexperienced individuals?

Strict confidentiality is not maintained after evaluation and there are many opportunities for a child to suffer insurmountable harm from a labeling when the cruelty of other children is at an extreme. The seriousness of this problem is illustrated by the fact that if one child is so harmed and would be temporarily or permanently damaged by the label of "drug abuser," is this Program worth the effort to identify other actual "drug abusers."

When a program talks about labeling someone as a particular type and such a label could remain with him for the remainder of his life, the margin of error must be almost nil.

The court found that the potential for harm of this program outweighed any good that might accrue, and concluded as a matter of law that the CPI program violated the right of each student and his parents to privacy inherent in the penumbra of the Bill of Rights of the U.S. Constitution.

This case is a microcosm of the problems addressed by my amendment—the violation of privacy by personal questionnaires, violation of confidentiality and abuse of personal data—with its harm to the individual—and the dangers of ill-trained persons trying to remediate the alleged personal behavior or values of students. It describes the potential harm that can result from poorly regulated testing, inadequate provisions for the safeguarding of personal information, and ill-devised or administered behavior modification programs.

In fact, it shows that even the requirement of parental consent can be an inadequate safeguard in the face of the slick and deceptive selling techniques of some educators. Yet, at least the requirement of parental consent informs the parents, to some extent, about what is being done with and to their children in schools, and it offers the best available protection against educational abuses that I can think of. Additionally, it will encourage schools to improve these types of programs and to eliminate the potential for abuses beforehand, thereby tending to reduce the future occurrences of irate parents going to court because of shoddy and harmful programs in the schools.

If anyone doubts the seriousness of the problem, I direct their attention to a recent communication from the National Education Association (NEA) in which that organization announced its opposition to my amendment which would require school officials to obtain prior, written, informed consent whenever the school officials would have those parents' children subjected to a project, program

or course, the primary purpose or principle of which is to affect or alter the personal behavior or personal values of a student. Mr. President, I would like to point out the implication of the NEA's position. It is their position that as between the parent and the school official, the latter has the more fundamental right to determine whether the child should be subject to programs of behavior alteration and value modification.

Beneath such a position is a very serious threat to the traditional notion long respected by this Nation that it is the parents who are ultimately responsible for the welfare of their children. It borders on shocking that one of the national organizations representing educators would move to have the Senate oppose a reaffirmation of this important and real parental right. Further, the attempt to characterize the amendment as one which intends to curtail freedom of expression between child and teacher is incredible. It is more accurate to conclude that it is the NEA's position that the teacher should come between parents and child on such important matters as school programs, the primary purpose of which is behavior modification and values alteration.

I would respectfully suggest, Mr. President, that the burden to secure consent of the parent is not too great. Surely, most conscientious teachers would have no problem gaining the consent of a parent providing the teacher has demonstrated the worth of his proposal. To suggest otherwise is to insult the parent and underestimate the resources of America's educators.

Some may argue that my amendment will create too much additional work and redtape for schools and the educational bureaucracy. To that argument I must reply that I am not so much concerned about the workload or convenience of the educational bureaucracy but, rather, with the personal rights of America's children and their parents. I believe that their rights should properly take such priority in whatever educational legislation the Senate, in its wisdom, shall enact.

It has been argued that portions of my amendment would throttle innovation and virtually close down title III and other innovative educational efforts sponsored by the Federal Government. This is surely not the intent of my amendment, nor would it be the effect. My amendment simply gives individual parents the right to be informed about out-of-the-ordinary federally funded programs in which their child might participate, and assures the parents the right not to have their particular child participate if they find such a program objectionable. Granted that there will be some inconveniences and logistical problems involved in this. But what sufficient reason is there for anyone to stand up and say that parents must be denied these rights? What do the schools and the Federal agencies have to hide?

As a matter of fact, my amendment need not create undue problems. For example, the Russell Sage Foundation published a very thoughtful study in 1969

entitled, "Guidelines for the Collection, Maintenance, and Dissemination of Pupil Records," which included samples of simple forms that could be mailed to parents to obtain their permission for certain activities with regard to their children. I would also further note that many schools and a number of States already routinely require the prior consent of parents on a number of matters, including both special testing and some special programs or projects, such as drug programs or sex education.

Permit me to add, also, that many elements of my amendment follow the recommendations of the report of the Secretary's Advisory Committee on Automated Personal Data Systems at HEW, entitled "Records, Computers, and the Rights of Citizens."

Equally important as the other effects of my amendment is the likelihood that the obligation to inform parents will begin to close the gap of hostility that too often exists between parents and teachers, each distrusting the other. The increased openness and communication with parents on the part of the schools which would follow from my amendment would enhance parental interest and involvement in their children's education, and in the long run could lead to improved education and more harmonious school-community relations.

Mr. President, it is time for the U.S. Senate to take a stand in favor of, and to act to protect the rights and privacy of parents and students where the Federal Government and Federal funds are involved. Therefore, I urge the Senate to give favorable consideration to my amendment.

I reserve the remainder of my time.

Mr. MATHIAS. Mr. President, will the Senator yield?

The PRESIDING OFFICER. Under the unanimous-consent request, the Senate must return to consideration of the Javits amendment.

Mr. JAVITS. I yield myself 2 minutes on the bill.

After discussion with Senator PELL, I wish to state the following facts: One, Puerto Rico is treated as a State in the House, so the amendment will be in conference. Two, we should figure out exactly what the relationship would be of the poor children who would be covered in Puerto Rico, which we will do, compared to the other States, and see, therefore, whether my estimate of something a little more than 2 percent, but not substantially over that, is justifiable. I want to check that out. Three, I now ask the Chair to make a ruling on this: Notwithstanding the fact that a substantive question may be affected, an amendment may occur at a later part of the bill, notwithstanding the adoption, if it should be adopted, of the McClellan amendment, which may make a substantive change, provided it does not cover the same language which is contained in the McClellan amendment—whether another amendment, under the rules of the Senate, would lie at the end of the bill.

The PRESIDING OFFICER. So long as the amendment is redrafted, so long as it does not affect the text of the amendment, it would be in order.

Mr. JAVITS. Under those circumstances, Mr. President, I withdraw the amendment.

The PRESIDING OFFICER. The amendment is withdrawn.

Mr. MATHIAS. Mr. President, will the Senator yield?

Mr. PELL. Mr. President, we are on the Buckley amendment, with how much time on each side?

The PRESIDING OFFICER. The McClellan amendment is before the Senate at the moment. A unanimous-consent request would be in order to proceed to the Buckley amendment.

Mr. ROBERT C. BYRD. Mr. President, I ask unanimous consent that the Senate now proceed to the consideration of the Buckley amendment, No. 1289.

The PRESIDING OFFICER. Without objection, it is so ordered.

Who yields time?

Mr. MATHIAS. Mr. President, will the Senator from New York yield me 3 minutes?

Mr. JAVITS. Yes, in opposition.

Mr. MATHIAS. I have some questions I would like to ask the distinguished junior Senator from New York, because I salute the thrust and the purpose which I think he seeks to accomplish by this amendment.

But I do want to be perfectly certain that I understand the practical effect of it. Turning to section 437(b)(1), page 3, I am wondering what effect this provision would have in the case of a student who was the victim of an accident in the school, or the victim of an accident on a playground. Would it prevent the school from arranging to have him immediately examined and medical treatment given to him?

Mr. BUCKLEY. No, of course not. Normal medical advice and hospital procedures usually require parental consent, and in those situations where the parents could not be contacted the treatment would be available.

Mr. MATHIAS. Would it not be necessary then, to have an exception because there is an exception in the general immunization, and I think the case of emergency treatment would have to be made in an excepted case or else the school would be under some jeopardy here.

Mr. BUCKLEY. I would be glad to ask unanimous consent to amend my amendment by inserting on line 11, page 3, following the word "immunization" the words "or emergency medical treatment."

The PRESIDING OFFICER. Is there objection to the Senator from New York modifying his amendment to that effect? The Chair hears no objection, and it is so ordered.

Mr. MATHIAS. If there were a course being given which is clearly a course which is causing the student to alter his behavior for the good, let us say in the matter of grooming, as the result of a course in civics, where he has become more interested in the system, and we have a course which is a positive influence on the student's life, would the Senator's amendment require the parents' "prior, informed, written consent" for that type course?

Mr. BUCKLEY. Quite obviously in one

sense all education has an effect on attitudes, and so forth. I believe there is a tacit rule of commonsense that applies to the interpretation and application of all legislation and I speak of courses, the primary purpose of which is to modify behavior.

The PRESIDING OFFICER. The time of the Senator from Maryland has expired.

Mr. MATHIAS. Will the Senator yield to me for 3 additional minutes?

Mr. PELL. I yield.

Mr. BUCKLEY. So clearly the example of the Senator from Maryland would not be covered.

Mr. MATHIAS. Of course, my concern is that the language of the amendment might cover it. That is what gives me some uncertainty.

Let us pass to section 437(c)(1). Let us assume the unhappy possibility that a student is suspected of having bombed the chemistry laboratory and the FBI or another law enforcement agency comes into the school, let us say, without a judicial order. Would they be unable to examine the records or files of the student without the "prior, informed, written consent" of the student's parents?

Mr. BUCKLEY. I believe they should get a court subpena to have access to the records.

Mr. MATHIAS. The amendment does not even provide for access with a subpena without parental consent.

Mr. BUCKLEY. I refer to page 6, where it is stated:

In compliance with any court order, or pursuant to any lawfully issued subpena, if the parents and students are notified of any such order in advance of the compliance therewith . . .

Mr. MATHIAS. The Senator is correct but also it would require the warrant or the written consent, even in the case I suggested.

Now, I wish to ask the Senator this question. Does the provision allow the use of any identification device other than the names of students or the names of parents?

Mr. BUCKLEY. No, it does not.

Mr. MATHIAS. So that would be the only possible identification, there could be no other identification of any sort?

Mr. BUCKLEY. No.

Mr. MATHIAS. And the Senator feels that that is a useful provision.

Finally, there are certain programs in which there is some testing, specifically, HEW through the National Institute of Education has made a grant to test and experiment with an educational voucher program. I am sure the Senator is familiar that such programs are now underway in California and Vermont.

Under this provision if the parents of a child object to the child's participation, then that child would not be able to take part. Is that correct?

Mr. BUCKLEY. That is correct.

Mr. MATHIAS. What will happen to a program of that sort?

The PRESIDING OFFICER. The time of the Senator from Maryland has expired.

Mr. MATHIAS. Mr. President, will the Senator yield to me for 1 additional minute?

Mr. PELL. I yield 1 additional minute to the Senator from Maryland.

Mr. MATHIAS. What will happen to that child if the entire school is involved? What happens to that child when the whole school is involved, as in the case of California and Vermont? Does the child have to be withdrawn from that school and some alternative education provided?

Mr. BUCKLEY. That child would obviously be handled in the school as if he were not—in other words, his State directly would pay for that tuition.

Mr. MATHIAS. Then, the Senator's concept is that under this provision——

Mr. BUCKLEY. It would not abort the experiment.

Mr. MATHIAS. But the child would have to have some other education provided in some other location or in some other manner.

Mr. BUCKLEY. If a parent did not want to accept the voucher the child would continue to be educated in the school he attended.

Mr. MATHIAS. But if the whole system were committed to the program, there would be no other school for him to attend. That seems to be the nub of the problem.

Mr. BUCKLEY. I disagree. I do not believe it would be interpreted in that way.

The PRESIDING OFFICER. Who yields time?

Mr. PELL. Mr. President, the junior Senator from New York and I have previously discussed this amendment. I ask unanimous consent that a letter from the National School Boards Association be inserted in the RECORD.

There being no objection, the letter was ordered to be printed in the RECORD, as follows:

NATIONAL SCHOOL BOARDS ASSOCIATION,
*Evanston, Ill., May 2, 1974.*
Hon. CLAIBORNE PELL,
*U.S. Senate, Old Senate Office Building, Washington, D.C.*

DEAR SENATOR PELL: Pursuant to his "dear colleague" letter dated April 26, 1974, Senator Buckley set forth proposed amendments to S. 1539 relating to "Protection of the Rights and Privacy of Parents and Students" (Sec. 513). In general, the National School Boards Association believes that the intent of the amendment is meritorious, but that operationally its accomplishment will generate unacceptable confusion because of the complicated legislative language and local administrative conditions associated with the approach taken in the amendment. We have been in contact with the Senator and he has some of our specific concerns under advisement. Those concerns are outlined below:

1. The amendment requires that parents have the right of access to their child's school files and that their consent be obtained prior to release of such files to third parties (with certain exceptions). However, if the rights of students are distinguishable from the rights of parents, and if the assertion of those rights should not be solely dependent upon parental willingness, the amendment should give students an independent right of access to, and consent with respect to the divulgence of, their files. At the same time, it may be advisable to impose a minimal age, such as 15 years, at which the child's independent rights would attach.

2. The amendment requires that school authorities provide parents with student files within thirty days after the request is made. In many instances, records may have to be screened in order to delete references to third persons, or the records sought may be stored in a central school district file or at the state level. Accordingly, while administrative footdragging can not be condoned, compliance in many instances will not be possible unless the time limit is extended to 45 days—and preferably 60 days.

3. Subsection (b) of the amendment provides that no student "participating in an applicable program" shall be required to undergo medical, psychological, et cetera, examinations without parental consent. This means that if a state or local agency is operating an examination program of that kind and is not receiving federal aid, consent is not required. But if the education agency is receiving ESEA II library funds, for example, then consent is required. The basis for this distinction is difficult to understand. Since the examination in question would be pursuant solely to a state program authorized and perhaps mandated by state law, federal legislation would be inappropriate in either case as a matter of policy. However, a different situation *may* arise when the education agency includes such an examination as *part* of one of its federal programs. If the latter situation is a proper area for federal involvement, then the overbreadth of subsection (b) (1) can be corrected if, after the words "no student" the words "participating in" are deleted and the words ", as a part of," are substituted in lieu thereof.

4. Subsection (b) of the amendment also prohibits the participation of any student in an applicable program which involves *any* research or experimental project without the consent of the student's parent. Research and experimental project is then defined as "includes but is not limited to, any program or project designed to explore or develop new or unproven teaching methods or techniques, or to explore or develop teaching techniques or courses affecting the social development, personal behavior, or values of the student." Given the broad brush of the above definition, quite conceivably almost any classroom effort would be subject to challenge on the grounds of "new" pedagogical style or personal impact upon particular students. But even at some point short of a literal application, the above definition will grind public education into a stultifying routine rather than the creative experience which it should present for children. And, to the extent any innovation is challenged there is some question whether the Department of Health, Education and Welfare will make nationally or community based judgments as to new techniques or definitions of student values. In either case it is also questionable whether the federal government can or ought to be involved in deciding questions relating to "social development, personal behavior, or values of the student." The requirement of individual parental consent to all programs raises other questions of federal policy. We now have federally mandated state advisory committees, local advisory committees, and even in some programs, school by school parental committees. That amendment adds yet another layer to the existing stream of administrative costs and formalities associated with school board policy implementation. One might begin to ponder the role of the taxpayer voter in our education system after one more review is added on top of the governmental structure which he elects to represent him. Although this restriction only applies to federal programs (which in itself is perplexing, inasmuch that if restrictions on experimentation is the object sought, the source of funds should be irrelevant), that too is overbroad. If such a restriction is really advisable, it should only be applied to ESEA Title III programs, which are designed for experimental purposes, and not to programs such as ESEA Title I or NDEA III, which are not intended to expose the child to innovative techniques on other than a random or incidental basis.

5. Subsection (c) requires parental consent for the release of personal data, except in certain instances, including the "order of administrative agencies having the power of subpoena." It would appear that a federal agency, which is so empowered, can by-pass the amendment merely by issuing a general order applicable to all students who, for example, attend a particular school, are involved in particular activities, etc. While investigations by federal officials may be necessary in certain circumstances, if the scope of the above exception is as broad as we suggest, then the basic purpose of the amendment is defeated.

6. Subsection (c) (4) of the amendment requires that a list of all persons or agencies desiring access to a student's records shall be maintained in that student's file. Although parents, students, and *certain* school officials should have access to that list, other persons or agencies should not—lest the student be characterized by the innuendo of previous searchers of his files.

It should be mentioned that the financial costs of producing records, implementing parental consent procedures for invasion and divulgence of information, and maintaining information requests lists are subordinate to the primary objective sought by the amendment—but should be taken into account nevertheless. Unfortunately, we do not have ample time to develop cost figures.

In summation, we urge that you withhold support for the amendment, unless the above described problems are resolved.

Sincerely,
AUGUST W. STEINHILBER,
*Assistant Executive Director, Office of Federal Relations.*

Mr. PELL. Mr. President, I am not enthusiastic about the amendment, but it does have some merit. Section (b) concerns me.

The amendment disturbs me in that it states that:

No student shall be required to undergo . . . testing without prior written consent of the student's parents in any project.

The thought I have is that if the Senator would withdraw that section (b), we could decide the fate of his amendment by voice vote, and my voice would be saying "aye" or if he insists on leaving it in, which from my side of the aisle I do not recommend, I would have to ask for a rollcall vote.

Mr. JAVITS. Mr. President, will the Senator yield?

Mr. PELL. I yield.

Mr. JAVITS. Under these circumstances the amendment could be taken to conference, but the administration has grave problems with other parts of it. Having reviewed the administration's wishes, I believe they would be susceptible to handling it in conference. However, I do not want my colleague to feel we have written letters of love that we are going to preserve all of it. I think the administration's suggestions do not change its fundamental thrust, but takes certain precautions. I hope in conference we can work it out that way.

Mr. STEVENS. Mr. President, will the Senator yield?

Mr. PELL. I yield.

Mr. STEVENS. Mr. President, I have serious questions about subsection (c) which I think runs contrary to a great many Federal policies and the best interests of the student. I intend to offer an amendment to either delete that section or to modify it substantially in sev-

CXX.——919—Part 11

eral ways. I just want to let my friend from Rhode Island realize that. I hope to have a chance to have an exchange with the Senator from New York concerning that.

As I understand subsection (c), it would prevent a high school from giving to a bank that wants to send out information about its loan program to students, the names and addresses of students without consent of the students' parents. I cannot understand this overprotectionism to the point that it could not offer to those students information about Federal loan funds. One could not get the names and addresses of students in one's State to get them the information of the opportunities available under the Federal student loan program.

Under subsection (c), if I were a probation officer, I could not sit down and talk with the teacher to get personal information from the teacher about the student who was subject to a criminal process. I do not know whether the Senator realizes how many cases go through the juvenile courts these days, but it is a fantastic number.

So I hope the Senator does not think this is going to breeze through without any debate.

Mr. BUCKLEY. Mr. President——

Mr. PELL. Mr. President, I yield to the Senator from New York, on his time.

Mr. BUCKLEY. Mr. President, I believe that argument is a paper tiger. We are talking about invasion of personal, private data. My amendment does not affect matters of public record, which may be names and addresses of people who happen to be students in a school.

Mr. STEVENS. Let me read from subsection (c):

Permitting the release of records or files (or personal information contained therein) of students without the written consent of their parents to any individual, agency, or organization . . .

Does the Senator interpret that to mean a bank could not say, "Give me the names and addresses of your graduating seniors?" Does the Senator interpret that to mean a probation officer could not get information from teachers or the files that would help a juvenile accused of a crime?

As prosecuting attorney, I can tell the Senator that probation officers need such information to help the students. I think this is a shotgun approach. I applaud the Senator's desire to protect students, but we are overprotecting in this way with regard to many activities in a school. I do not want to hurt any student, but we are not going to be able to help him with this amendment. That is the trouble with it.

Mr. BUCKLEY. I believe the parents have as much interest in protecting their child as does the Senator from Alaska, but the Senator is reading into the amendment the inclusion of the simple listing of names and addresses in a student's records and files.

Mr. STEVENS. I am happy to know that, but how does a probation officer go about getting that information? I saw a lot of probation officers as district attorney. If they were to have to go to busy juvenile court judges and subpena

that information, or if they want to talk to teachers, they are not going to get it. I do not see the necessity for subsection (c). What is the necessity for it?

Mr. BUCKLEY. I described it in my statement. The fact that this information gets leaked out all over the place is injurious to the child. It haunts children in their later lives. I think we ought to put a stop to it.

Mr. President, how much time do I have remaining?

The PRESIDING OFFICER. The Senator has 18 minutes remaining.

Mr. BIDEN. Mr. President, will the Senator yield me some time to ask the Senator from New York some questions?

Mr. BUCKLEY. Mr. President, I yield 5 minutes to the Senator from Delaware.

Mr. BIDEN. The Senator from New York, I think, should be complimented on this amendment. I think it is long overdue. I do not share the concerns of the Senator from Alaska. Having been a public defender, I do not think a probation officer should be able to sit down and talk with teachers about these matters. They think they are psychologists and psychiatrists, and they do more harm to the child than they help him. But my objection relates to subsection (b).

I am an early cosponsor of this amendment, but I think subsection (b) should be clarified so we understand what it would do. In that section it says:

No student shall, as a part of any applicable program, be required, without the prior, informed, written consent of the student's parents, to participate in any project, program, or course, the primary purpose or principal effect of which is to affect or alter the personal behavior or personal values of a student, or to explore and develop teaching techniques or courses primarily intended to affect such behavior and values.

If that were to be misread, it could be a very, very restrictive section.

I would like, for the record, to ask a few questions.

Specifically, in a school for the deaf, will a project designed to test the effectiveness of a new audiology machine be termed "research and experimentation" under this amendment?

Mr. BUCKLEY. Certainly not. This is directed toward developing new, experimental educational techniques. Certainly, new devices for helping—it is really a medical device—the deaf to hear, or new research involving such things as "new math," traditional courses—would not be affected at all by this amendment.

Mr. BIDEN. Would diagnostic tests given to students at the beginning of a course in order to gage the strengths and weaknesses of students in various academic disciplines be considered "research"?

Mr. BUCKLEY. No; this is normal research; it is not experimental. It is not research into new research activities.

Mr. BIDEN. So it is not intended to really alter the traditional academic disciplines? The Senator is not going after that?

Mr. BUCKLEY. That is correct.

Mr. ERVIN. Mr. President, will the Senator yield?

Mr. BUCKLEY. I yield.

Mr. ERVIN. This would prevent schools from making guinea pigs out of children and delving into their personal attitudes and their attitudes toward their families, as has been done in many schools throughout the United States. Is that correct?

Mr. BUCKLEY. Yes.

Mr. ERVIN. It is designed to prevent disclosure, except to those who are authorized to receive them, of personal data about these children. Is that correct?

Mr. BUCKLEY. The Senator is correct.

Mr. ERVIN. I am personally in favor of the proposal.

Mr. President, I am pleased to cosponsor the amendment concerning right to privacy and school records proposed by Senator BUCKLEY to S. 1539, the Elementary and Secondary Education Amendments of 1974. The issue of rights to privacy of public school pupils and their parents is one which has recently become highly publicized in many different circles, but it is a problem that has long been with us. The time has come to do something about it.

This amendment would accomplish several worthy objectives. It would give parents of public schoolchildren the right of access to their minor children's school records. Importantly, parents would be able to challenge any part of the contents of the records for their authenticity. The only persons having access to those records in addition to the parents would be school officials, the board of education, and officials at a school to which the pupil might be transferring. In order for any other person to have access to the records, the parents must give their written permission and the permission form would then become a part of the student's permanent record. In addition, no student could participate in any medical or psychological testing program without the prior, informed, and written consent of his parents. Parents of the pupils would be able to review any and all instructional materials that are used by their child's teacher.

One of the primary aspects of this new legislation is the provision stating that the schools, through the board of education, the principal, or the teacher, would bear the burden for informing the parents and students of their rights and for keeping them fully posted at all times of anything that would come within the scope of this legislation. The penalties for noncompliance with this act would be a loss of the Federal funds that had been made available to the school.

Much of the controversy concerning these school records centers around the use of classroom questionnaires that are financed by governmental grants, often the Department of Health, Education, and Welfare or a similar agency at the state or local levels of government. These questionnaires are thinly disguised as "research projects," although in actuality they often amount to highly objectionable invasions of the psychological privacy of schoolchildren. Oftentimes, the students are told that the responses they give are classified and will not be

*May 14, 1974*          CONGRESSIONAL RECORD — SENATE          **14585**

used for any other purpose than to gather and analyze statistical data on the educational situation in the public schools. However, it has been too often demonstrated that these data stand strong possibilities of being incorporated into computerized data banks or in other ways being disseminated to persons not connected with the educational process.

The questionnaires usually cover many aspects of the student's personal life and personality. The categories cover the student's attitudes toward his home and family, his school and teachers, his feelings about himself, and his feelings about his peers and classmates. It is my belief that no governmental agency nor any business conducting such inquiries unless the parents of the children are made fully aware of the subject matter of the inquiry and subsequently give their full consent. The situation now is that children are rarely given a free and unprejudiced choice of answering or not answering the questionnaires. In addition, parents would be able to request to review their children's school records and would have the right to challenge any adverse content.

Mr. President, I intend to ask soon for unanimous consent that some of these questionnaires and summaries of questionnaires be reprinted in the RECORD. However, I do wish to read, for purposes of emphasis, some of the more offensive questions although they are all certainly in that category. The examples that I use are from public schools in the States of Maryland and New Jersey, although there exists strong evidence that these unfortunate practices know no geographical boundaries. Practically all of the questions can be answered with a yes or no or multiple choice answer. There is no room for explaining an answer:

#### HOME AND FAMILY SITUATION

Are you an important person to your family?

Would you like to run away from home?

Are your parents strict or lenient?

Do you often argue with your parents?

What types of appliances, books, furnishings, and leisure facilities do you have in your home?

#### SELF-EVALUATION

Do you admire students who are bright?

Can you give a good talk in front of people?

Do you wish you were a different child?

Do you feel lonely very often?

Are you one of the last to be chosen for games?

Do you like being just what you are?

#### SCHOOLS AND TEACHERS

Are some students favored over others by your teachers?

Do most other students want to go to school?

Who are your three best friends (complete names)?

For what reasons have you been scolded in class?

How do you rate your teachers to other teachers at your grade level?

Do you ever miss school or a class simply because you do not wish to go?

Does a diploma from your school mean that you behaved yourself or that you really learned something?

#### PEERS AND CLASSMATES

Do you have many friends?

Does being with other school children bother you?

Is it easy for you to make friends?

Do other children get you into trouble at school?

Would you rather play with friends who are younger than you or older than you?

I certainly believe that this is most important legislation and that the Congress should act wisely and in a forthright manner to recognize the rights to privacy of public schoolchildren and their parents. I am particularly impressed by the strong bipartisan support that this amendment has received from members of Congress and from many public and private sectors of our society. I urge the Senate to adopt this Buckley amendment to the Elementary and Secondary Education Act of 1974.

In my mind school officials should not be allowed to maintain any records outside of the reach of parents, much less records of such a personal nature as those that we have seen. A parent has every right to know exactly what information is being collected concerning his children, and the provisions of this amendment constitute what I feel are minimum considerations in the protection of that right. While the measures provided for are strong, I feel the seriousness of the issue well justifies the approach. The parent must have ultimate responsibility for the well being of his children. This amendment recognizes that responsibility.

Mr. President, I ask unanimous consent that the questionnaire from the Hackensack Public Schools of Hackensack, New Jersey, be submitted for reproduction in the RECORD. In addition, I ask unanimous consent that the transcript of a press conference held on April 19, 1974, by an organization known as Parents Who Care, based in Wheaton, Md., which recounts this problem in greater detail also be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

HACKENSACK PUBLIC SCHOOLS,
*Hackensack, N.J.*

LEARNING EXPERIENCE MODULE—FANNY MEYER HILLERS SCHOOL

STUDENT ATTITUDE INVENTORY

Name _____

Boy _____Girl_____LEM_____Grade_____

Date_____

*Directions:* Listen carefully to each question and decide how you think and feel. If you don't understand a question, ask about it. Answer each question by drawing a circle around either "yes" or "no".

*Responses*

Attitude Toward Home and Family: yes, 5; no, 3.

Attitude Toward Peers: yes, 5; no, 6.

Attitude Toward Self: yes, 12; no, 9.

Attitude Toward School and Teachers: yes, 13; no, 6.

SCHOOL AND TEACHERS
(Yes or No Answers)

1. Are your teachers interested in things you do at home?

2. Do your teachers give you work that is too hard?

3. Is the LEM a happy place for you to be?

4. Do you like to read at school?

5. When you don't understand something, are you afraid to ask your teacher?

6. Do you like to paint pictures at school?

7. Do you like to write stories at school?

8. Does your teacher help you with your work when you need help?

9. Do you like doing arithmetic problems at school?

10. Do you wish you were in a different class that was not in LEM?

11. Do you like to learn about science?

12. Does the LEM have too many rules?

13. Do you always have to do what the other children want to do?

14. Do you like the other children in the LEM?

15. Do your teachers like some children better than others?

16. Do other people at school really care about you?

17. Are you proud to be in the LEM?

18. Do you often get a chance to make decisions with others in your group?

19. Do you tell people that you like the LEM?

SELF
(Yes or No Answers)

1. Do you often get sick at school?

2. Can you give a good talk in front of people?

3. Do you wish you were younger?

4. Do you wish you were older?

5. Do you often feel happy in school?

6. Are you a good reader?

7. Do you wish you were a different child?

8. Can you wait your turn easily?

9. Are you good in your schoolwork?

10. Are you a good child?

11. Are you one of the last to be chosen for games?

12. Do you feel lonely very often?

13. If you have something to say, do you usually say it?

14. Do you like the teacher to ask you questions in front of the other children?

15. Do the other children in the class think you're a good worker?

16. Do you find it hard to talk to your group?

17. Are most children able to finish their schoolwork more quickly than you?

18. Do you often act silly just so people will pay attention to you?

19. Do you like most of the people you know?

20. Can you be depended on?

21. Do you like being just what you are?

PEERS
(Yes or No Answers)

1. Do other children get you into trouble at school?

2. Do you have to do what the other children want to do?

3. Do you like the other children in the LEM?

4. Do other children in the LEM like you?

5. Do you always let other children have their way?

6. Do you have many friends?

7. Are other children often mean to you?

8. Do your friends usually do as you say?

9. Does being with other children bother you?

10. Is it easy for you to make friends?

11. Would you rather play with friends who are younger than you?

HOME AND FAMILY
(Yes or no answers)

1. Are you an important person to your family?

2. Do you have certain responsibilities at ho' ?

3. Do you tell your family when you are mad at them?

4. Would you like to run away from home?

5. Is it pleasant to stay at home on days when there is no school?

6. Do you get upset easily at home?

7. Do brothers and sisters prevent you from being happy?

8. Do your parents think school is important?

Case 1:12-cv-00327-ABJ　Document 18-2　Filed 11/30/12　Page 8 of 27

STATEMENT BY A COALITION OF CONCERNED PARENTS FROM EIGHT MARYLAND COUNTIES REPRESENTING FIVE CITIZENS ORGANIZATIONS ON INVASION OF PRIVACY BY MARYLAND PUBLIC SCHOOLS

Good Morning: My name is Malcolm Lawrence. I am Director of Public Relations for Parents Who Care, a Montgomery County citizens group founded in October 1971. In addition to the Parents Who Care group, I speak today on behalf of individuals from seven other counties in Maryland representing four other citizens organizations.

I should like to introduce the other members of the group.

Mrs. Jean Carter, from Howard County, representing Citizens Advocating Responsible Education (CARE).

Mrs. Pat Dunlap, from Prince Georges County, representing Citizens for Community Schools (CCS).

Mrs. Margaret Kuhn, from Prince Georges County, representing Guardians for Traditional Education.

The remaining individuals represent the Maryland Committee for Public Disclosure in Education; they are:

Mr. James E. English, from Allegany County.

Mrs. Gloria Donohue, from Anne Arundel County.

Mrs. Betty Fahey, from North Baltimore City.

Mrs. Isabel Fox, from West Baltimore City.

Mrs. Rita Ann Ayd, from Baltimore County.

Mrs. Jo Ann Spriggs, from Carroll County.

Mrs. Barbara M. Morris, from Howard County.

I have a statement to make, following which we shall be happy to entertain questions.

The United States Constitution guarantees to the American citizen a number of fundamental rights that can not be infringed by the federal or state governments without compelling justification. These rights include the right to marry, the right to bear children and to maintain a family, the right to control one's own body, and the right to direct the upbringing of one's children.

The essence of these rights is that they are so basic to personal liberty that they merit a high level of protection from invasions by the state. The rights we have cited are sometimes described as "fundamental" or "natural" rights inherent in American tradition or Western values; sometimes they are based upon the 14th Amendment's guarantee of liberty or the 9th Amendment's reservation of rights to the people; in other cases such rights are based on common law principles. Whatever the basis, it is clear that parents, as part of their right to raise a family, retain basic decision-making authority and responsibility concerning their children's education that cannot be abridged by the states whether by direct exclusion of the parents or by indirect exclusion through the withholding of crucial information about their children.

We have called this press conference today to express publicly our strong objections to materials and practices in the public schools of the State of Maryland which we feel constitute invasions of privacy of both students and parents. It is our view that many teachers are similarly in opposition to these materials and practices, but are unwilling to openly denounce them for fear of reprisal or dismissal from the public school system. We are urging the Governor of Maryland to take immediate steps to safeguard the rights of students, the parents, and the teachers.

Our leading candidate for removal from Maryland public schools is an extensive questionnaire which has just been given to more than 7,000 students in Howard County. The questionnaire was given as part of a research project administered by the Center for the Social Organization of Schools at Johns Hopkins University, funded by a $200,000 grant

from the National Institute of Education of the Department of Health, Education and Welfare (Contract No. NE-C-00-3-0114). Last year 7,200 students in grades 4, 5, 6, 8, and 11 were surveyed. This year, between February 1 and March 15, the same students were given a follow-up survey. For each class tested, a team of trained administrators from Johns Hopkins University marched in; the teacher was asked to leave the class; and the students were handed a 17-page questionnaire and told, "This is not a test. There are no right or wrong answers. Your answers will not be given to your teachers or anyone who knows you."

According to a December 1973 report of the Center for Social Organization of Schools, the Johns Hopkins study is designed to "investigate the effects of open environment schools on student reactions to school life, student self-reliance, student ability to make realistic judgments, and student achievement on standard tests of academic performance." A January 14, 1974 memorandum from the Howard County Superintendent of Schools to Directors, Supervisors, and Principals reported that three evaluating teams will operate in Howard County schools this year: the fifth year of a program being conducted by the University of Maryland, the project of Johns Hopkins University, and a study of the entire school system to be undertaken by the Institute of Field Studies of Columbia University. The Columbia study was described as a survey of data produced by the Maryland and Hopkins surveys, with the purpose of synthesizing these and other findings to come up with "recommendations for future development of the school system."

Three weeks ago, representatives from our groups called on the National Institute of Education to obtain more information on the scope of these projects and to learn where else these programs were either being undertaken or envisaged. The spokesman for the NIE did not shed any further light on the Johns Hopkins survey and refused to respond to the question as to whether NIE was also financing the University of Maryland and Columbia University projects.

I should like at this point to give the substance of a number of questions from the Johns Hopkins University survey. We have divided the questions into three general categories: 1) Family Situation, 2) Self-Evaluation, and 3) Feelings and Attitudes toward the School and Teachers.

First, Family Situation:

The student is asked how most decisions about him are made in the family.

How much a part he plays in the decisions.

How far in school his father went.

How far in school his mother went.

Whether his parents are strict or lenient.

If his parents want him to follow their directions even if he disagrees with their reasons.

Whether his parents often worry that he is up to something they won't like.

Whether his parents disapprove when he disagrees with them in the presence of their friends.

The student is asked whether he knows why he is supposed to do what his parents tell him to do.

Whether he has a lot of loud arguments with his parents about their rules and decisions regarding his activities.

And whether his parents treat him more like a little kid than an adult.

The student is asked if his parents have definite rules relating to the following activities:

The time to be in at night on weekends;
The time to be in on school nights;
Time spent watching television;
Going around with certain boys;
Going around with certain girls;
Eating dinner with the family;
Using the telephone;
Clothing;

Hairstyle;
Church attendance;
Household chores;
Returning home from school;
Smoking;
Age for starting to date;
Going steady; and
Frequency of dating.

The student is asked to answer YES or NO as to whether the following items are in his home:

Telephone;
Two telephones;
Vacuum cleaner;
Stereo hi-fi Record player;
Air conditioner;
Electric dishwasher;
Your own family washing machine;
Your own family clothes dryer;
Dictionary;
Encyclopedia;
Daily newspaper;
Three or more magazine subscriptions;
Black and white TV;
Color TV;
Car;
Second car;
Two bathrooms;
Tape recorder;
Home movie projector;
Home slide projector;
Typewriter;
Piano; and
Skis or golf clubs.

The organizations represented here today consider these questions on the family situation to be clear invasions of privacy of the student and of the home by the school system. Whatever the purpose of the Johns Hopkins University questionnaire, we strongly protest against this type of probing into the personal affairs of the student and his family life.

Let us turn next to the category of self-evaluation in the Johns Hopkins questionnaire:

Here, the student is asked whether he pretends to be busy in class when he is really just wasting time.

Whether being popular with other people his age is more important than anything else to him.

If someone often has to tell him what to do.

If he admires students who are very bright.

When he doesn't know the answer, if he will try to fake it rather than say he doesn't know.

Whether he will usually give in because he doesn't want to upset his friends.

If he is known as a person who will dare to be different.

If he knew the teacher was not going to collect his homework, whether he would not do his best.

Whether he gets blamed for things that are not really his fault.

The student is asked if the best way to get ahead in life is to be nice to all people.

Whether he likes to be by himself because he has a lot of things he likes to do alone.

Whether he feels uncomfortable if he disagrees with what his friends think.

If the student sometimes feels angry when he doesn't get his way.

If it would be hard for him to face the "cold, cruel world."

If he can say "No" when his friends call him to do something with them.

He is asked whether he will put off leaving his home and friends for as long as possible.

If he didn't like the way things were going in a group, whether he would hesitate to tell the leader.

Whether he really cares if some people don't want to be friends with him.

Whether he tries to get out of doing work and hopes no one will find out.

If he prefers to let other people in a group make the decisions.

It is our view that this line of self-evaluation, self-analysis, self-criticism, and confession is pure and simple an invasion of psychological privacy of the child. Students of all ages are asked to direct their thoughts to introspection and unwittingly lay bare their inner-most feelings to the data collector for whatever purpose he may wish to make use of them.

Our third and final category of the Johns Hopkins test deals with feelings and attitudes toward the school and teachers:

The student is asked if he feels lost in school.

If he feels the tension build up in him when he is in school.

If he often does not know what he is supposed to do.

Whether most of his teachers want him to do things their way and not his own way.

Whether his teachers tolerate a lot of questions during a lesson.

If certain students in his classes are favored by the teachers more than the rest.

If the teachers in his school often act as if they are always right and he is wrong.

Whether he is considered weird when he gets involved and excited in his classwork.

If he daydreams a lot in class.

Whether he wants to go to school.

Whether he ever does anything exciting in class.

If he counts the minutes until the class ends.

Whether he sits on the floor in many of his classes.

Whether most other students want to go to school.

If a diploma from his school means more that you behaved yourself than that you really learned something.

He is asked if he and his teachers are: (1) on the same wave length, (2) on the same planet, (3) somewhere in the same solar system, or (4) in two different worlds.

If his classwork is: (1) great stuff, (2) good stuff, (3) OK, or (4) dull stuff.

How he would rate the ability of most of his teachers compared to teachers in other schools at his grade level: (1) far above average, (2) above average, (3) average, (4) below average, or (5) far below average.

If he and the school are: (1) good friends, (2) friends, (3) distant relatives, (4) strangers, or (5) enemies.

The student is asked to provide the full names of his three best friends.

And also the full names of students in the following categories:

Very popular with other students;

Independent;

Hard to fool; and

Fools around in class instead of working.

The student is queried as to whether he was ever scolded in class for:

Fooling around;

Not paying attention;

Fighting in class

Talking back to teachers

Not handing in enough work;

Telling off a teacher; and

Shouting or laughing out loud.

If he ever stayed away from school just because he didn't want to go: (1) never, (2) 1 or 2 days, (3) 3 to 5 days, or (4) more than 5 days.

Whether he has ever cut classes just because he didn't want to go to them: (1) never, (2) 1 or 2 classes, (3) 3 to 5 classes, or (4) more than 5 classes.

A lot of the questions in the Johns Hopkins survey relating to student feelings and attitudes toward school and teachers are simply absurd and a sheer waste of time and resources. Perhaps the most ridiculous question is the one asking students to rate teachers in other schools at the same grade level. Leaving aside the ability of a young student to evaluate his teachers, how could he be expected to compare them with teachers in other schools whom he has

neither seen nor heard? A good many of the queries are negative in tone; in our judgment they foment inner frustrations in the students and create student animosity toward the teachers and the particular school attended. As I have indicated, the regular classroom teacher is not involved in this test and is therefore unable to respond or even know about the criticisms by the students. But the most damaging questions in this category are those which extract self-incriminating information from the students themselves on truancy, insolence, and other improper activities in school. Self-confessions by students on such things as fighting in class and telling off the teacher provide an evaluation team with data to be entered into a permanent personality record classifying students as maladaptive, aggressive, antisocial, emotionally disturbed, and predelinquent.

The Johns Hopkins test may have run its course for this year with the students, but the survey continues for teachers and parents. We are asking that this project be withdrawn forthwith and prevented from spreading to other counties in the State of Maryland.

Our second candidate for removal from Maryland public schools is a questionnaire currently being administered to 50 classes in 26 elementary schools in Montgomery County. This survey, which is being financed by the Spencer Foundation, is designed to gain insight into students' motives and goals and likes and dislikes. In addition, assessment of the children's educational growth, with both standard academic measures and some non-academic measures, will be made toward the end of the school year. According to an explanatory letter to parents by a psychologist with the Psychological Services Department of the Montgomery County Public Schools system, "characteristics of the classroom environment will be assessed by observers in a series of several visits during the year." The information gained by this project will be sent out of State and fed into computer data banks for use in diagnosing and prescribing the handling of students.

Some sample questions from the Spencer Foundation survey are:

If your parents tell you you're acting silly and not thinking clearly, it is more likely to be: (a) because of something you did or (b) because they happen to be feeling cranky?

Suppose your parents say you aren't doing well in your school work. Is this likely to happen to you: (a) because your work isn't very good or (b) because they are feeling cranky?

If your parents tell you that you are bright and clever, is it more likely: (a) because they are feeling good or (b) because of something you did?

The students are asked to answer a number of "I think I am" questions, circling the appropriate degree to which they are:

Able to get along with other kids;

Not able to figure things out in school;

Scared to take chances;

A good worker in school;

Happy with myself;

Not as smart as other kids in school;

Trying my best in school;

Not the way I would like to be;

Sure of myself;

Doing poorly in school; and

Angry with myself.

The complaints and concerns of the organizations represented here today are by no means limited to specific surveys, such as those financed by the National Institute of Education and the Spencer Foundation. We are opposed to all abuses by the schools of the right to privacy, the right to be left alone. It so happens that the school administrative personnel and the social researchers

in the State of Maryland have found a veritable gold mine in grants, contracts, and techniques that are turning public school children into a collection of guinea pigs who are constantly being battered with questionnaires, personality tests and a variety of other inquisitions which are clearly invasions of privacy of both the student and the home.

To cite one widespread example, the Maryland State Board of Education By-laws call for a compulsory treatment of subject matter known as Interpersonal Relationships. No child in public schools in the State of Maryland may be excused from these discussions and classroom activities, which are interspersed throughout the curriculum from kindergarten through the 12th grade. Under this program, children must be subjected to all types of probes into their psyches and family situations. Here in Montgomery County, for example, elementary school children are forced to participate in the following material and questions:

Discuss family size, pointing out advantages of both large and small families.

Role play the family at dinner.

Role play an increase in conflicts with parents.

Role play other meaningful family situations.

Have children keep records of their activities; note those children who seem to be overburdened with responsibilities.

Have children write paragraph about being afraid; encourage them to verbalize their fears due to dark places, being hurt, dreams or nightmares, personal loss, experience with death, punishment, and the unknown.

Have children observe their family for a week; have them jot down notes on the way love was shown.

Have children write examples of times when they felt angry, afraid, shy.

Have role playing situations based on these experiences.

Here are some sample questions:

What kind of things make you angry?

What do you like to do when you are alone?

Should you expect to be paid for chores done at home?

Whom does your family entertain at your house?

How do you cooperate with your family?

What happens when and if you refuse to cooperate?

Do you think you are being treated fairly?

Do you think you would like to live and work alone?

What do you expect of your father and mother?

Under what circumstances have you felt unloved, unwanted, lonely, shy, or fearful?

As these examples from the K-through-6 curriculum demonstrate, the Interpersonal Relationships approach emphasizes negative attitudes; it dwells on fears, death, sorrows, anxieties, and other personal feelings and the inter-relationship of these factors with parents and the home situation. The student—particularly the younger child—has a weak defense against such techniques and can easily be induced to yield to classroom pressure or forced to work his imagination overtime for the sake of satisfying the teacher's demands.

Such prying by the schools into the home and into parental authority can be a most dangerous business. In Montgomery County, the School Board recently (August 27, 1973) approved an expanded definition of child abuse, under which teachers are asked to make official reports to the police and the social services authorities on children who have been "denied normal experiences that produce feelings of being loved, wanted, and secure." These are labelled as children who have been subjected to so-called "emotional neglect." Moreover, teachers are required to submit a report on any child who is "overworked" by his parents or exposed to "continuous friction in the home." Whatever the

charge, the school system policy stipulates "if there is any doubt or question in reporting such cases, it should be resolved in favor of the child."

It can, of course, readily be appreciated by one and all that the questions in the compulsory Interpersonal Relationships curriculum as well as a good many of the questions in the Johns Hopkins survey could provide data which may well be diagnosed incorrectly or misinterpreted by the social scientists as child abuse or child neglect cases. Moreover, many children could be labelled as what the social engineers like to call "disadvantaged children." We parents are most disturbed over this kind of role being assumed by the public schools. The schools were established in the United States to provide a service to the parents and taxpayers. The schools, therefore, work for us; not the other way around. The teachers, who in our view are thrust into and trapped in the middle of the situation, have an equally valid and justifiable complaint.

Whatever the stated goal of the educators and the social planners, the whole question of labelling children and predicting their behavior on the basis of questionnaires and classroom confessions is being challenged by parents and legal authorities throughout the United States. An important question is: Who has access to the data? Another, how will the data be used? An even more important question might be: What are the values and attitudes of the evaluators? The Congress of the United States is very much concerned with all of these questions. And we here today, who speak for five citizens organizations with representation from eight Maryland counties, feel that the Maryland State public officials should be similarly concerned.

Therefore, by letter of April 19, 1974, we are strongly urging the Governor of Maryland to take steps to remove the Johns Hopkins University survey, the Spencer Foundation survey, and all similar tests and activities from the public schools of Maryland and to charge the Maryland State Board of Education with the task of reviewing all curriculum and practices in the classrooms for the purpose of removing those parts which violate the rights of the students and their parents as guaranteed by the Constitution of the United States of America. We are saying to the Governor "Enough is enough." We are asking him to remove the inquisitions of the master social planners from our public schools and to ensure us that our educators will concentrate, instead, on the basic concepts of education which our tax dollars were intended to finance, and education that will assist and prepare our children to face a mature, real world.

Mr. BIDEN. Mr. President, is the parliamentary situation such that I still have a few minutes of the time yielded to me by the Senator from New York?

The PRESIDING OFFICER. The Senator was yielded 5 minutes. One and a half minutes of that time still remain.

Mr. BUCKLEY. Mr. President, I yield 2½ minutes to the Senator.

Mr. BIDEN. I have one question. In subsection (b)(2), does the Senator have any objection to removing the words "or principal effect" on line 19, page 3, where it reads "the primary purpose or principal effect of which ° ° °"?

Mr. BUCKLEY. No, I do not. I think that would be very helpful. I thank the Senator from Delaware for suggesting it.

Mr. President, I ask unanimous consent that the three words at the end of line 19 on page 3 be eliminated.

The PRESIDING OFFICER. Is there

objection? Without objection, the amendment is so modified.

Mr. BIDEN. I have no further questions of the Senator. He has indicated to me, in private and in the colloquy, that this is intended to go only to those programs which would be considered experimental. I think the single most burning issue before the country is the invasion of privacy at all levels. School records are private. No one should have access to them unless it is with the consent of the parents.

I am glad to be a cosponsor of the amendment.

Mr. HART. Mr. President, would the Senator yield for 1 minute?

The PRESIDING OFFICER. Who yields time to the Senator from Michigan?

Mr. PELL. I yield 1 minute. Which side is he on?

Mr. HART. I guess my honest answer is that I do not know which side I am on. I wish we had had a study or report on it. To say that the programs for research and experimentation are to be prevented unless the parents say OK is something unique and not really in the nature and order of the evolving educational techniques, when, on page 4 it is stated:

> As used in this subsection, the term "research or experimentation project" means any project or program which is a part of an applicable program and which is authorized by an administrative officer of an education agency, a State or local education agency, or an educational institution, including preschools, except that research or experimentation projects shall not include projects in the field of reading . . .

Maybe that is visual education. I do not know.

It seems to me that the definitions excludes experimentation on anything except speech and language. However, this is but one example of the difficulty I have and that other Senators have in considering and understanding the reach of the bill without hearings. Of course, everyone is for protecting privacy; that is great. However, what do we do with experimentation?

Mr. BUCKLEY. Mr. President, I should like to address myself to the remarks just made. First of all, the amendment explicitly excludes reading and bilingual education. However, some parents might choose to have their child take those subjects. They do not destroy the educational apparatus of this program. They do not destroy the ability to develop a program with cooperative parents. If a program is so alarming to the average parent that no parent will cooperate, then we should examine the program to see whether that program should be in effect. I do not believe that the remarks dealing with such affairs would be justified.

Mr. HART. Mr. President, what about the new math, which I still do not understand, but to which my children have been exposed? Could I say "no" if we were to adopt this amendment?

Mr. BUCKLEY. That is not at all the situation. A normal person would agree to experimentation with new math.

We are not talking about educational

disciplines or perhaps new textbooks or new apparatus, or anything else along that line. We are talking about new departures from teaching methodology.

Mr. MATHIAS. Mr. President, if the Senator would yield me a minute to pursue that line of inquiry, as much as I want to share that concept, I share with the Senator from Michigan some lack of comprehension as to whether it will do this. The Senator from Michigan raises a question about new math or any other method of teaching a new subject. What about the question I asked earlier as to whether this amendment would prevent any identification symbol? If students cannot be identified in a statistical sense, how can we make any kind of longitudinal studies as to whether a new teaching program on any subject is successful? How do we evaluate programs? How do we make any judgments beyond the isolated case of one student at a time?

Mr. BUCKLEY. Mr. President, schools are quite capable of evaluating the experience with students which they have in their own classes. I see no difficulty at all. Again, I think the Senator is emphasizing that the amendment is not destroying the ability of programs or research to go forward in the case of experimental programs.

All the amendment requires is no identification, and then the parent has the right to withdraw the child. He does not need to consent in advance. In general, the premise is that parents are generally responsible adults, having prime responsibility for their children. I have no doubt that they would act responsibly.

The PRESIDING OFFICER. Who yields time?

Mr. PELL. Mr. President, I yield myself 5 minutes.

I think the junior Senator from New York knows of the regard and high respect I hold for him. As much as I would like to see the Senator succeed in his proposal as he explains it, we are concerned here not with what the Senator from New York intends the language he proposes to accomplish. It is what the language would do.

This is what bureaucrats in future years will rely on, what the language in the bill is.

They will not look up the debate on the floor at the time of passage of the bill. However, the language of the bill reads specifically:

> Parents should be informed in advance and in writing of the participation of their child in any research program which is part of a school program ° ° ° parents of such child objects to participation.

I believe that this language says that if there is to be a new experimental program of learning new math, or a psychological program, or something of that sort, every parent must be informed in writing. We should consider the postage and redtape involved. It would kill most new programs.

I hope the Senator from New York might be willing to withdraw at least subsection (b). I wonder what the wishes of the Senator might be in that regard.

Mr. BUCKLEY. Mr. President, a parliamentary inquiry.

The PRESIDING OFFICER. The Senator will state it.

Mr. BUCKLEY. Mr. President, is it not possible to have a division ordered so that we could vote on section (b) alone?

The PRESIDING OFFICER. If it is in the pending provision, the answer is yes.

Mr. BUCKLEY. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. On whose time?

Mr. DOMINICK. Mr. President, will the Senator withhold that request for just a moment?

Mr. BUCKLEY. Mr. President, I withhold my suggestion of the absence of a quorum.

Mr. DOMINICK. Mr. President, I want to ask the Senator, not about section (b), because I must say that I share my compatriot's concern over that. But on section (c) I have been very active since I became a member of the Education Subcommittee in trying to make the program available for children who are going from high school to college or graduate school.

It looks to me as though what we have done under subsection (c) is to prevent whatever institution might be seeking the records of a youngster concerning his personality to determine whether he is eligible (a) either for a loan, or (b) for a work-study program, or (c) for a well deserved and perhaps not fully qualified minority student, as to his ability to get this background without the consent of the child's parents. He may be trying to get away from the parents, who may be lushes, and he may be trained to get away from them.

Mr. BUCKLEY. I would point out that the amendment states that—

Whenever a student has attained eighteen years of age, the permission or consent required of and the rights accorded to the parents of the student shall thereafter only be required of and accorded to the student.

Mr. DOMINICK. Mr. President, I understand that. However, I would presume that the Senator from New York or any Senator, as well as the Senator from Colorado, went to college when he was 17. A great number of children go to college when they are 17.

All I can say is that I think this is just a roadblock. It is something which I do not think the Senator from New York wants to do, in which we are trying to promote this subject and are not trying to restrict it.

I think that what the Senator is driving at in section (c) is the relief of a group of people who are trying to make some kind of psychiatric research program, totally devoid of the educational process in order to get their master's thesis or write something for the Brookings Institution, or something of that kind.

I am afraid that the language goes much further than that kind of restriction.

Mr. BUCKLEY. I find it implausible that parents would not cooperate in helping a child qualify for financial help.

Mr. DOMINICK. Well, they would not hesitate if he were going to be bringing the financial help back home, but I know a great number of people who do not give a whoop whether their children go to college, graduate school, or anything else; in fact, they would prefer they did not, and if he is trying to get a loan all of a sudden which they may ultimately be called on to repay, they may say no.

Mr. BUCKLEY. I point out to the Senator from Colorado that on page 6, line 12, we make an exception for financial aid.

Mr. DOMINICK. That is true. I had not seen that. Does that apply to all of subsection (c)?

Mr. BUCKLEY. Yes, it does.

Mr. DOMINICK. That helps materially. I will go back to the drawing board.

Mr. BUCKLEY. I thank the Senator.

Mr. President, in an attempt to make this amendment as acceptable as possible, I would make at this time, in response to some of the concerns expressed by the Senator from Maryland and the Senator from Michigan, the following modification: On page 4, line 13, to add in, as an exception in the definition of experimental programs, after the words "bilingual education", the words "or for the development of new techniques for the teaching of traditional disciplines". I ask unanimous consent that I may so modify my amendment.

The PRESIDING OFFICER. Without objection, the amendment will be so modified.

Mr. PELL. Mr. President, reserving the right to object, I could not hear. What was the modification?

Mr. BUCKLEY. On page 4, line 13, after the word "education," I insert the words "or for the development of new techniques for the teaching of traditional disciplines."

The PRESIDING OFFICER. Without objection, the amendment is so modified.

Mr. PELL. Mr. President, I will not object to the modification, but this will be the fourth modification made on the floor. I really think this matter should be considered in the committee. I shall be compelled to vote against it, but I do not object to the modification.

Mr. BUCKLEY. May I now ask the Presiding Officer whether the Parliamentarian has made a determination as to whether section (b) would stand on its own?

The PRESIDING OFFICER. (Mr. TUNNEY). Section (b) is written in such a way that it is independent and is divisible.

Mr. BUCKLEY. Under those circumstances, Mr. President, and on condition that the sponsor will accept the balance of the sections—Mr. President, if I may have the attention of the distinguished manager of the bill—I am willing to ask for a division, so that we may vote separately on section (b), provided the manager will accept the remainder of the amendment.

Mr. PELL. I would ask for a rollcall vote on subsection (b), and as far as section (c) goes, I would ask my colleague from Alaska whether he has any objection.

Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. On whose time?

Mr. PELL. To be equally divided.

The PRESIDING OFFICER. Without objection, it is so ordered. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. PELL. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. PELL. This procedure would be acceptable, and I am perfectly willing to have either a voice or a division vote or sections (a), (c), and (d).

Mr. BUCKLEY. Mr. President, before asking for a division, I ask unanimous consent to have printed in the RECORD a statement prepared by the Senator from Arizona (Mr. GOLDWATER) in support of this amendment.

The PRESIDING OFFICER. Without objection, it is so ordered.

### STATEMENT BY SENATOR GOLDWATER

#### PARENTAL AND STUDENT RIGHTS

Mr. President, it gives me great pleasure to join with my good friend from New York, Senator Buckley, and others of my colleagues, in sponsoring an amendment to protect the right of privacy of school children and their parents. I have a particular interest in the amendment because it would legislate in the education field certain, basic safeguards for the right of personal privacy which I have been trying to get enacted for over a decade.

Subsection (a) of our amendment would provide statutory confirmation of the right of parents to see the contents of their own children's school records. Parents would also be guaranteed a right to challenge information in their child's school records and to correct any inaccurate or misleading data. This is identical to the safeguards standards which are included in S. 2810, a bill which I have introduced regarding the privacy and accuracy of personal data systems of all types.

Subsection (b) of our amendment would create a system of parental consent which would give parents a right of control over "personality" tests given to their children in the public schools. This provision is identical to legislation which I first introduced thirteen years ago, in 1961. In the early '60's, I was concerned that the new Federal authorities for direct funding of educational programs, which were just getting underway, would allow Federal monies to be spent for testing programs in which school children could be used as involuntary "guinea pigs" in experimental programs unrelated to the true purposes of education.

Needless to say, Mr. President, I was shocked to learn of the existence of surveys being conducted in our public schools which probed the most intimate personal aspects of the lives of school children and their relationships with their parents and families. I was especially surprised to discover one survey, financed with Federal funds, which consisted of some two hundred questions being asked of Junior High School students ranging in age from 11 to 14 years.

These questions inquired of the student:
"Is your father fairer about punishment than your mother?"

Did you "steal more than $2 from your parents?"

Did you "fight physically and bodily with an adult relative?"

The student was also asked to reveal to the school whether he or she had "gone further

than petting with a person of the opposite sex."

In addition, the student was asked to rate his or her own family. The student was required to give a yes or no answer, for example, to these questions:

"I wish my family had nearly as much money as the families of many of my classmates."

"Are the children in your family punished more severely than in other families?"

"I wish my father and mother were better educated, like the parents of many of my classmates."

Mr. President, these questions were just a few of the two hundred questions that were actually being asked of American school children in a questionnaire financed in part by Federal funds granted by the Department of HEW.

Yet, I was told it wasn't done. I was told it couldn't be done. On the one hand, I was informed that such questions were not permitted under the administrative interpretations of the Department. On the other, I was advised that leading "experts" believed that my amendment "would greatly inhibit much-needed educational research. . . ."

So there you have it, Mr. President. The agency told me that my amendment was not needed because it would duplicate their own policy interpretations; but that if it was put into law, it would impair research that the bureaucrats wanted to allow to go on. I never could make sense out of this, but the Department's view prevailed and the Senate rejected my amendment.

Mr. President, perhaps the climate of this country has caught up with the wishes of ordinary parents and ordinary school children. Perhaps the concept of the personal freedom of the average citizen and his family has grown to the point where Congress is willing to be the guardian of his privacy against prying and inquisitive minions of the bureaucracy.

Mr. President, our public schools have no compelling need for psychological and personality tests which pry into the private lives of a captive audience of school children. Even if the child is not specifically told that he is required to answer these tests, it would be a rare and unusual child who would dare to defy the authority of a school by refusing on his or her own initiative.

Questions of this kind are an intolerable invasion of the right of privacy. They exemplify the ever-watchful eye of "Big Brother" spying into the most personal thoughts and habits of American families, and doing it, by abusing the trust of innocent school children.

Moreover, Mr. President, these types of questions are calculated to raise doubts, suspicions, and hostility in the minds of our children toward their own parents and a skepticism about the basic moral principles of our society. In this sense, these tests could be used by governmental planners for purposes of influencing or conditioning the social and political thinking of our youth, and through them, American society.

Mr. President, the time to preserve what is left of our personal privacy is now. Sufficient thought and action must be given to the problem while there is still some measure of personal liberty left to cherish. It is for us today to determine just how much freedom shall remain for the individual in the future. I implore my colleagues to vote for the Parental and Student Rights Amendment.

Mr. President, I include the junior high school student survey which was conducted in the early 1960's, in part with Federal grants:

JUNIOR HIGH SCHOOL SURVEY SUPPORTED BY GRANTS FROM THE U.S. PUBLIC HEALTH SERVICE AND THE UNIVERSITY OF KANSAS (1961)

FACTS ABOUT YOURSELF

Please answer all questions completely.
5. How old are you? (Check only one answer.)
(1)—11 years or younger.
(2)—12 years old.
(3)—13 years old.
(4)—14 years old.
(5)—15 years old.
(6)—16 years old or older.
6. Sex:
(1)—Boy.
(2)—Girl.
7. What grade in school are you now in?
(7)—Seventh grade.
(8)—Eighth grade.
(9)—Ninth grade.
8. Are you (check only one answer)—
(1)—An only child?
(2)—The youngest child in your family?
(3)—The oldest child in your family?
(4)—Neither the youngest nor the oldest child?
9. How many living brothers and sisters do you have?
(0)—None.
(1)—One.
(2)—Two.
(3)—Three.
(4)—Four.
(5)—Five or more.
10. What was the highest grade your father finished in school?
(1)—Eighth grade or less.
(2)—Some high school.
(3)—Finished high school.

PART I. RULES WE ALL BREAK

The questions in part I are about more personal things concerning you and your friends. Do you put your name or address on this questionnaire. We want to assure you that your answers will be kept completely *secret* and *confidential*. No one will ever know how you answered any of the following questions. We encourage you to be completely honest with your answers.

For the purpose of this study, we are interested in the things you have done during the *last 2 years only.*
11. Damage or disfigure furniture in schools, such as chairs, tables, and desks:
(1) — No.
(2) — Yes.
12. Steal goods from warehouses or storage-houses:
(1) — No.
(2) — Yes.
13. Damage cemetery property:
(2) — Yes.
(1) — No.
14. Damage or destroy public signs or road markers:
(1) — No.
(2) — Yes.
15. Steal automobile parts such as hubcaps, mirrors, ornaments, etc.
(1) — No.
(2) — Yes.
16. Kicked, bit or scratched a student of about your own age:
(3) — Three or more times.
(2) — Twice.
(1) — Once.
(0) — Never.
17. Get out of going to school by writing a fake excuse for yourself:
(2) — Yes.
(1) — No.
18. Steal or siphon gasoline from cars, trucks, or other kinds of vehicle equipment:
(2) — Yes.
(1) — No.
19. Damage or destroy mailboxes:
(1) — No.
(2) — Yes.

20. Steal more than $2 (money) from your parents:
(2) — Yes.
(1) — No.
21. Puncture or cut automobile tires, bike tires:
(1) — No.
(2) — Yes.
22. Steal materials or equipment from buildings that are being constructed:
(2) — Yes.
(1) — No.
23. Kicked, scratched or bit an adult relative (mother, father, guardian, or uncle, for example):
(0) — Never.
(1) — Once.
(2) — Twice.
(3) — Three or more times.
24. Damage or destroy toys or games that belonged to persons your own age:
(1)—No.
(2)—Yes.
25. Steal from buildings that are being torn down:
(1)—No.
(2)—Yes.
26. Tied a person up with rope, string, or wire to a tree or similar object and then left them that way:
(0)—Never.
(1)—Alone.
(2)—With one or more others.
(3)—Both alone and with others.
27. Steal things from your parents that were worth more than $2:
(2)—Yes.
(1)—No.
28. Teased severely, hurt or killed a cat or dog:
(1)—Alone.
(2)—With one or more others.
(0)—Never.
(3)—Both alone and with others.
29. Scratch the paint on someone's car on purpose:
(2)—Yes.
(1)—No.
30. Steal more than $2 (money) from your brothers or sisters:
(2)—Yes.
(1)—No.
31. Skip school with one or more friends or classmates:
(2)—Yes.
(1)—No.
32. Steal articles of clothing worth more than $5 from clothing or department stores:
(1)—No.
(2)—Yes.
33. Become so mad or angry that you threw things at or hit a teacher or principal or other school official:
(3)—Both alone and with others.
(0)—Never.
(1)—Alone.
(2)—With one or more others.
34. Steal a bicycle from anyplace other than a place that sells bicycles (like from neighborhoods, school grounds, or public places where bikes may be parked):
(2)—Yes.
(1)—No.
35. Remove spark plugs or wires from cars:
(1)—No.
(2)—Yes.
36. Steal a car for joyride without the owner's knowledge or permission:
(2)—Yes.
(1)—No.
37. Break or crack windows in automobiles:
(1)—No.
(2)—Yes.
38. Skip school with three or more friends or classmates:
(2)—Yes.
(1)—No.
39. Steal articles of clothing worth less than $5 from clothing store or department store:

(1)—No.
(2)—Yes.
40. Damage flowerbeds or gardens on purpose:
(2)—Yes.
(1)—No.
41. Steal gasoline from gas stations, farms, or other private places:
(1)—No.
(2)—Yes.
42. Taken part in fights where knives or switchblades were used:
(1)—No.
(2)—Yes.
43. Steal a bicycle from a store that sells or repairs bikes:
(2)—Yes.
(1)—No.
44. Skip out of certain class periods, but not the whole day, without permission (like gym class or student assemblies):
(2)—Yes.
(1)—No.
45. Fought physically and bodily with an adult relative such as mother, father, or aunt (that is, fought in anger or fear, not in sheer fun):
(0)—Never.
(1)—Alone.
(3)—Both alone and with others.
(2)—With one or more others.
46. Steal things (not money) from your brothers or sisters that were worth more than $2:
(2)—Yes.
(1)—No.
47. Get out of school early by pretending to your teacher that you were sick or not feeling well:
(2)—Yes.
(1)—No.
48. Steal anything because an adult asked you to steal it:
(1)—No.
(2)—Yes.
49. Beat up a person much older than yourself in a fight:
(0)—Never.
(2)—With one or more others.
(1)—Alone.
(3)—Both alone and with others.
50. Steal more than $2 (money) from your friends or classmates:
(2)—Yes.
(1)—No.
51. Damage parking meters on purpose (break glass, jam slot):
(1)—No.
(2)—Yes.
52 Steal jewelry worth more than $2 from jewelry, department, dime or drug stores:
(2)—Yes.
(1)—No.
53. Skipped school or stayed out of school without a genuine excuse for more than 1 day:
(1)—No.
(2)—Yes.
54. Damage or break coin machines of any kind on purpose:
(1)—No.
(2)—Yes.
55. Damage or ruin personal clothing of classmates or other schoolchildren:
(1)—No.
(2)—Yes.
56. Get out of going to school by pretending to your parents that you were sick:
(2)—Yes.
(1)—No.
57. Steal more than $2 (money) from candy, coke, or cigarette machines:
(2)—Yes.
(1)—No.
58. Leave home with intention of going to school, but just never making it to school (without a good reason):
(1)—No.
(2)—Yes.
59. Injured or hurt someone not in your

family, but arranged matters so that someone else got the blame:
(1)— Alone.
(2)— With one or more others.
(3)— Both alone and with others.
(0)— Never.
60. Steal more than $2 from school:
(2)— Yes.
(1)— No.
61. Leave school early without permission:
(2)— Yes.
(1)— No.
62. Try to "get by" without paying the bill in restaurants, cafes, soda fountains:
(1)— No.
(2)— Yes.
63. Skip school by yourself without good excuse from parents:
(2)— Yes.
(1)— No.
64. Taken part in a gang fight against another gang or against one or two other persons:
(1)— Once.
(2)— Twice.
(3)— Three or more times.
(0)— Never.
65. Steal things from inside of parked cars:
(1)— No.
(2)— Yes.
66. Break windows on purpose in vacant homes, garages, or other buildings:
(1)— No.
(2)— Yes.
67. Damage or destroy anything because someone "dared" you to do it:
(1)— No.
(2)— Yes.
68. Steal things worth more than $2 from foodstores:
(2)—Yes.
(1)—No.
69. Damage school property other than chairs, tables, and desks:
(1)—No.
(2)—Yes.
70. Curse or use obscene language in speaking to a teacher or other school official:
(2)—Yes.
(1)—No.
71. Steal anything and then sell it to an older teenager or adult:
(1)—No.
(2)—Yes.
72. Damage or destroy anything that belonged to another person, in order to "get even" with that person:
(1)—No.
(2)—Yes.
73. Steal money from public telephones or parking meters:
(1)—No.
(2)—Yes.
74. Hit or strike a teacher, coach, or other school official:
(2)—Yes.
(1)—No.
75. Take part in fights where BB guns, airpellet guns, or slingshots were used:
(1)—No.
(2)—Yes.
76. Tease or embarrass someone by stripping or taking his or her clothes off?
(2)—Yes.
(1)—No.
77. Damage or destroy anything "just for the heck of it":
(1)—No.
(2)—Yes.
78. Steal less than $2 (money) from candy, coke, or cigarette machines:
(2)—Yes.
(1)—No.

**PART II. ALONE OR WITH OTHERS**

*Instructions.*—We are interested in how certain rules are broken. Some people break rules only when they are with others, some break rules only when they are alone, and other persons. For each item, *check the box that applies to you.* If it does not apply to you, leave that item blank.
In the last 2 years, did you:

| | Only when alone (1) | Only when with other persons (2) | Both alone and with other persons (3) |
|---|---|---|---|
| 11. Steal hubcaps, mirrors, etc. from cars | | | |
| 12. Puncture or cut tires, convertible tops, scratch the paint on cars | | | |
| 13. Tie a person up with rope or string and left them that way | | | |
| 14. Tease, hurt, kill harmless animals | | | |
| 15. Steal clothing worth less than $5 | | | |
| 16. Steal a car for a joyride | | | |
| 17. Beat up a person much older than you | | | |
| 18. Damage or break coin machines | | | |
| 19. "Get by" without paying the bill in cafes, soda shops, movies, other events | | | |
| 20. Damage school property on purpose | | | |
| 21. Steal things in order to sell them | | | |
| 22. Damage or destroy road markers, signs, mailboxes, street lights | | | |
| 23. Steal anything worth more than $5 but less than $50 | | | |
| 24. Beat up an adult for his money | | | |
| 25. Steal anything worth $50 or more | | | |
| 26. Break into and enter a locked store, gas station, or other buildings | | | |

**PART III. YOUR SOCIAL ACTIVITIES**

*Instructions.*—In this section are statements about what some boys and girls do most of the time in their time after school and on weekends. Read each statement and decide whether it fits you or does not fit you as you are right now or during this year. If the statement is true of you, that is, if you would say "Yes" to the statement, put a No. 1 next to it. If the statement is not true of you, that is, if you would say "No" to the statement, put a No. 2 next to it.
Be sure to read and to answer each statement with a 1 or a 2. If it fits you fairly well but not exactly, put a 1.
*Answers.*—Put 1 for a "Yes." Put 2 for a "No."

27. I spend a lot of time with one special friend who is not a member of my family.—
28. I stick pretty much to myself.—
29. I never disobey my parents.—
30. I spend a lot of time with one friend at a time, although I have several close friends.—
31. I spend a lot of time with two or three friends. The group of us play together.—
32. I do some talking about or listening to talk about sexual matters when I am with my friends.—
33. I play with a large group of four or more children in or near my home neighborhood.—
34. I mostly play alone or with my brothers or sisters.—
35. I belong to a group that is often chased after by some adults such as storekeepers, police, or homeowners.—
36. I never catch cold in the winter or spring.—
37. I play with friends my parents do not like.—
38. I never tell lies.—
39. I often share secrets and ideas or hopes with my friends.—
40. I have taken part in kissing and necking while on a date or while alone with a person of the opposite sex.—
41. Most of my friends are my own age or between 11 and 14.—
42. I have never spent a night in a detention home or jail.—

14592    CONGRESSIONAL RECORD — SENATE    *May 14, 1974*

43. Most of my friends are 2 or 3 years older than I am.—

44. I have petted with a person of the opposite sex while on dates or when we were alone.—

45. Most other boys and girls like me.

46. I try to get other boys and girls to like me.—

47. I have gone further than petting with a person of the opposite sex.—

48. I care a great deal about what other boys (or girls) think of me.—

49. I want to be different somehow from others in my own age group.

50. I have answered ads in comic books or other magazines which advertised pictures, photographs, or stories about sexual matters.—

51. I like most of all to spend my free time alone.—

52. Some of my friends do not like the way I act.—

PART IV. LEISURE ACTIVITY AND FAMILY LIFE

*Instructions.*—The statements in this section are like those in the section you just completed. But these have to do with *how* you spend your spare time and how you are treated by your parents.

Read each statement. If it applies to you as you are right now or have been during this year, mark the statement with a 1 for a *"Yes."* If it does not apply to you, mark it with a 2 for a *"No."*

*The statements.*—Write 1 for a Yes, and 2 for a No.

53. Do you spend more of your free time with your friends than with your family?—

54. Do you go to dances more than once a month?—

55. Do you go out with your mother or father more than once a month? (Movies, dining, social events, etc.) —

56. Is your father fairer about punishment than your mother?—

57. Do you study schoolwork at home less than five times a week?—

58. Is your mother fairer about punishment than your father?—

59. Do you work at a part-time job once or more a week?—

60. When you do something extra, do your parents reward you with praise or special privileges or with money?—

61. Do you help around the house doing chores almost every day?—

62. When you have done something wrong or "bad" do your parents try to reason with you?—

63. Do you usually attend at least one movie a week?—

64. Are some children in your family punished more severely than others?—

65. Do you spend time after supper at a local hangout (drugstore, soda shop, bowling alley, etc.) at least two times a month?—

66. Do your parents get all the facts before they punish you?—

67. Do you usually have one or two dates a month or more?—

68. Are the children in your family punished more severely than in other families?—

69. Do you think that your friends have better ideas than your parents do about what a young person should do in his spare time?—

70. Do you usually spend three or more evenings a week away from home?—

71. Are the children in your family ever punished when they do not need it?—

72. Does your father punish you when your mother does not think you should be punished?—

73. Would you like to spend more of your free time with your friends than your parents now allow?—

74. Does your mother punish you when your father does not think you should be punished?—

75. Do you feel your mother punishes you fairly?—

76. Do you feel your father punishes you fairly?—

77. Below is a line that stands for your *grades* or *marks* in school this *year,* thinking of them lumped together. Make only one check (√) where you best fit.

"A" or best possible, 100.
"B" or high, 90.
"C" or average, 80.
"D" or below average, 70.
"F" or failing, 60.

PART V. GUESSING CAUSES

*Instructions.*—Reprinted below is a news story that appeared not long ago in the Kansas City Star. After you read the story carefully, pretend that you are talking the story over with some school friends. None of you knew the boy in the story directly or indirectly, but you are all *guessing* about why he did what the police claim he did. Then the questions that follow the story, indicating what your guesses would probably be. (Names and places in the story have been added or changed.)

*The story*

The Kansas City Police last night arrested Walter Stevens, age 13, who was caught by Police Sergeant Daniels. Daniels charged the boy with stealing coins from the coin machine and washing machines in the Whirl-away Laundromat. The policeman said he saw Stevens pry open the coin slots on the machines and remove quarters and dimes. He had $15 in coins in his pocket when arrested.

The boy's mother, Mrs. William Stevens, said she thought her son was at work at his part-time job in the nearby Roll Em Bowling Alley. He had worked there 2 nights a week for 2 months, she said, and had been earning about 60 cents an hour. The boy's father, William Stevens, 48, is a clerk in the central post office. He works the night shift and was away at the time of the arrest.

Walter Stevens is a seventh grade student at Wiltmore Junior High School. The Wiltmore principal, Mr. John Savage, reported that young Stevens had been doing very poorly in school for several months, and said that he had been expelled once for breaking school property and had often skipped school.

When interviewed, young Stevens told this reporter that his father had to work such long hours that he was very seldom home and that his mother was often ill and had to remain in bed. He claimed, "Nobody at school understands me or tries to help me."

*Instructions.*—Now check the statements below that you think provide the best possible explanations for why Walter Stevens did what he did. Remember that these are guesses and that all of them may be true or all may be false.

Put a 1 if you agree, and a 2 if you disagree.

11. Walter wanted to get more money than he could earn at his job in order to help his poor parents.—

12. Walter was lonely and unhappy at school, where no one understood him.

13. Walter was raised by bad standards and had not been taught properly what was right and wrong.

14. Walter had everything against him. He was bound to get into trouble when everything at school and at home went wrong.

15. Walter was fired from his job at the bowling alley but didn't want to worry his mother, who needed the money he had been giving her.—

16. A gang of young boys managed by a professional thief had organized stealing from laundromats and other service stores, and Walter had fallen in with this gang through his acquaintances at the bowling alley.—

17. Walter liked to steal and had probably been stealing one thing and another for several years before he was caught.—

18. Walter was sick, mentally or physically,

but no one at school or at home understood this and helped him.—

19. Other children at school had been selfish and unkind in the past and had kept Walter from building any friendships. His loneliness led him to steal.—

20. Older boys in a gang really broke the coin machines and did the stealing, but they left Walter, who thought they were his friends, when they heard the police car and dumped the coins into his pocket.—

21. Walter's parents had never taken him to Sunday School, where he could have learned what is right and wrong.—

22. Walter wanted to find a way to get decent clothes and money for an allowance. His parents could not give him these things, but he needed them to try to make friends at school.—

PART VI. WISHES

Below are listed some wishes that have been expressed by boys and girls in other junior high schools. Read each wish carefully. Then check the wish with an X if you feel it is a wish that you have made or thought about any time during this year. If the wish does not fit you, leave it blank.

*Check (X) here*

23. I wish I could buy my lunch in the cafeteria more often.—

24. I wish I could afford to go to the movies as often as many of the others in my school.—

25. I wish my family could take me on vacation trips like those that many of the persons in my school have enjoyed.—

26. I wish I were able to dress as well as most or many of the persons in my school.—

27. Many of the students in my class will get to go to college some day, but I probably won't get the chance.—

28. I wish I were physically better built or more attractive.—

29. I wish I were as attractive to the opposite sex as many of my schoolmates.—

30. I wish I could join the Boy or Girl Scouts like many of my classmates.—

31. I wish my parents were more understanding, like the mothers and fathers of many of my classmates.—

32. I wish my family had nearly as much money as the families of many of my classmates.—

33. I might like to be an engineer or a scientist when I grow up, but I probably will not get the chance.—

34. I won't have as good opportunities when I grow up as many of my classmates.—

35. I wish my parents were not so strict with me, and more like the parents of many of my classmates in this way.—

36. I wish my parents were a little more strict with me, like the parents of many of my classmates.—

37. I wish my father and mother were better educated, like the parents of many of my classmates.—

38. I wish my father had as good a job as many of my classmate's fathers.—

39. I wish I could go on dates the way many of my classmates do.—

Now write down one wish that you have felt strongly about this past year.

------------------------------------------
------------------------------------------
------------------------------------------

PART VII. SOCIAL VALUES AND FEELINGS

Please answer each question by making a check in the space next to agree or disagree. There are no right or wrong answers. Just report your opinion.

40. Watching television programs such as "Sugarfoot" and the "Donna Reed Show" and "Doble Gillis" is boring or dull and a waste of time:

(0)—Agree.
(1)—Disagree.

41. Having a coke in a drugstore with other boys and girls after school or on a week end is dull and a waste of time:

(0)—Agree.
(1)—Disagree.
42. Watching school athletic contests is boring and a waste of time:
(0)—Agree.
(1)—Disagree.
43. Watching school basketball or football games is fun:
(1)—Agree.
(0)—Disagree.
44. Television programs such as "Cheyenne" and "National Velvet" and "Lassie" are fun to watch:
(1)—Agree.
(2)—Disagree.
45. The people who get the best jobs when they grow up are usually the people who have friends who do favors for them, rather than the people who are best trained or educated:
(0)—Agree.
(1)—Disagree.
46. Teachers give their praise and recognition to the students who find a way to become their special favorites, whether these students are good workers in school or not:
(0)—Agree.
(1)—Disagree.
47. Most teachers do not really like to help students:
(0)—Agree.
(1)—Disagree.
48. Teachers give their praise and recognition to the students who work the hardest and learn the most:
(1)—Agree.
(0)—Disagree.
49. The popular children in any school are the ones who have earned the respect and admiration of other students:
(1)—Agree.
(0)—Disagree.
50. Teachers have such different ideas about what you are supposed to learn in school that it is impossible to get a clear idea of what is best:
(0)—Agree.
(1)—Disagree.
51. People have such different ideas about what is right and wrong that you can't ever get clear ideas on this question:
(0)—Agree.
(1)—Disagree.
52. Once some teachers decide that a certain boy or girl is "bad" or a "troublemaker," there is nothing you can do to change their minds:
(0)—Agree.
(1)—Disagree.
53. Teachers can usually tell quite well who is learning a lesson and who is not:
(1)—Agree.
(0)—Disagree.
54. Most parents have very clear ideas about how their children should act on dates and about matters like kissing:
(1)—Agree.
(0)—Disagree.
55. People in any town have a lot to say about how their town government is run:
(1)—Agree.
(0)—Disagree.
56. The children and adults in any town can help the police do a good job of enforcing the law:
(1)—Agree.
(0)—Disagree.
57. Students in junior high schools never have any say or influence in what they are taught in their classes.
(0)—Agree.
(1)—Disagree.
58. So many other people voted in the national election last fall that it didn't matter to me whether my parents voted or not.
(0)—Agree.
(1)—Disagree.
59. If a group of children decide they do not like you, there is nothing much you can do to change their minds.
(0)—Agree.
(1)—Disagree.

PART VIII. WAYS OF DISCIPLINING YOUNG PEOPLE

Below are various ways by which many parents discipline children and young people. *Please answer each question by checking the choice which best tells how your parents have disciplined you during the last 2 years.* Answer each question for your mother and your father separately.

Do your parents take away your allowance?
61. Father:
(0)—Never.
(1)—Very seldom.
(2)—Sometimes.
(3)—Frequently.
62. Mother:
(0)—Never.
(1)—Very seldom.
(2)—Sometimes.
(3)—Frequently.
Do your parents refuse to speak to you?
63. Mother:
(1)—Very seldom.
(2)—Sometimes.
(3)—Frequently.
(0)—Never.
64. Father:
(2)—Sometimes.
(0)—Never.
(3)—Frequently.
(1)—Very seldom.
Have your parents slapped you or given you spankings?
65. Mother:
(3)—Frequently.
(2)—Sometimes.
(0)—Never.
(1)—Very seldom.
66. Father:
(2)—Sometimes.
(3)—Frequently.
(1)—Very seldom.
(0)—Never.
Do your parents forbid you to do something that you were especially planning on doing?
67. Father:
(3)—Frequently.
(2)—Sometimes.
(0)—Never.
(1)—Very seldom.
68. Mother:
(3)—Frequently.
(2)—Sometimes.
(0)—Never.
(1)—Very seldom.
Do your parents tell you to leave home, or to find a new home if you can't be better?
69. Mother:
(1)—Very seldom.
(2)—Sometimes.
(0)—Never.
(3)—Frequently.
70. Father:
(2)—Sometimes.
(0)—Never.
(3)—Frequently.
(1)—Very seldom.
Do your parents spank you with a stick, belt, hairbrush, or things other than their hands?
71. Mother:
(1)—Very seldom.
(0)—Never.
(3)—Frequently.
(2)—Sometimes.
72. Father:
(0)—Never.
(3)—Frequently.
(2)—Sometimes.
(1)—Very seldom.
Do your parents take away some special privileges?
73. Mother:
(2)—Sometimes.
(3)—Frequently.
(0)—Never.
(1)—Very seldom.
74. Father:
(2)—Sometimes.
(3)—Frequently.

(0)—Never.
(1)—Very seldom.
Do your parents say they don't love you or warn you that they will stop loving you?
75. Father:
(3)—Frequently.
(2)—Sometimes.
(0)—Never.
(1)—Very seldom.
76. Mother:
(2)—Sometimes.
(3)—Frequently.
(1)—Very seldom.
(0)—Never.
Have your parents beat you up (using their fists, etc.)?
77. Father:
(2)—Sometimes.
(0)—Never.
(3)—Frequently.
(1)—Very seldom.
78. Mother:
(3)—Frequently.
(2)—Sometimes.
(1)—Very seldom.
(0)—Never.

Mr. PELL. Mr. President, I ask for the yeas and nays on section (b).

The yeas and nays were ordered.

The PRESIDING OFFICER. Do Senators yield back their time?

Mr. STEVENS. Mr. President, a parliamentary inquiry.

The PRESIDING OFFICER. The Senator will state it.

Mr. STEVENS. Is this amendment still open to amendment?

The PRESIDING OFFICER. Is the amendment open to amendment?

Mr. STEVENS. Yes.

The PRESIDING OFFICER. The Senator from New York has requested the division of his amendment, and section (b) will be voted on separately. All the rest will be voted on by voice vote first.

Mr. STEVENS. Is it in order to submit an amendment to delete subsection (c) at this time.

The PRESIDING OFFICER. That would be in order now.

Mr. STEVENS. I send such an amendment to the desk.

The PRESIDING OFFICER. Have the Senator from New York and the Senator from Rhode Island yielded back their time?

Mr. PELL. My recollection is not acute on that. What does the RECORD show?

The PRESIDING OFFICER. Does the Senator yield back his time?

Mr. PELL. I yield it back.

Mr. BUCKLEY. I yield back the remainder of my time.

The PRESIDING OFFICER. The clerk will state the amendment of the Senator from Alaska.

The assistant legislative clerk read as follows:

On page 4, line 14, delete subsection (c).

Mr. STEVENS. Mr. President, I again applaud what the Senator from New York is trying to do, but I think any proposal that has to have so many amendments on the floor to try to perfect the original intent is a measure that should not be passed.

Subsection (a) is a good subsection. Subsection (d), as I read it, on protection of personal data, gives the Secretary and the schools the right to protect personal data under any regulations that are nec-

essary to control the use, dissemination, or protection of such data.

Subsection (c) is not necessary, and what is more, again I point out that it would harm the students. It would prevent those with legitimate interests from going to a school and getting the information that is necessary. It would prevent the Senator from New York from deciding to recommend a student for some national award without going and telling him, if he was over 18. One would have to have his consent to get any information from his record.

It would prevent a probation officer—notwithstanding the argument of my good friend from Delaware, I still have faith in the probation system, and I think the probation officer ought to be able to go in and get the information necessary not only when a student is subject to a juvenile proceeding, but in order to continue the work that he has to do during the period before a juvenile is sentenced. Many times they have to keep up with what they are doing. It is a probation officer's duty to find out what he is doing in school, or whether he is attending school. This would even prevent a probation officer from getting attendance data. I cannot understand us putting such a cloak of secrecy around a student.

On the other hand, subsection (c), as I understand it, gives the school authorities complete authority to adopt appropriate regulations. That would be subject to the Administrative Procedures Act. Everyone concerned would be involved in a hearing.

This has not been the subject of hearings by committee, and I do not think it is the kind of thing that ought to be passed on the floor of the Senate without further consideration. Therefore, to save time, I ask the deletion of that section.

I yield back the remainder of my time.

Mr. PELL. Mr. President, I think there is merit in what the Senator from Alaska says, and I would vote the same way. I yield back the remainder of my time.

Mr. BUCKLEY. Mr. President, I ask for the yeas and nays.

The yeas and nays were ordered.

The PRESIDING OFFICER. Does the Senator from Rhode Island yield back his time?

Mr. PELL. Mr. President, I yield back the remainder of my time.

The PRESIDING OFFICER (Mr. NUNN). All time has now been yielded back——

Mr. ERVIN. Mr. President, a parliamentary inquiry. What are we voting on?

The PRESIDING OFFICER. On the amendment of the Senator from Alaska (Mr. STEVENS) to strike section (c).

Mr. BUCKLEY. Mr. President, I do not believe I yielded back my time yet.

The PRESIDING OFFICER. On the Stevens amendment, the Senator from New York does not have any time.

Mr. STEVENS. Mr. President, I ask unanimous consent that the Senator from New York (Mr. BUCKLEY) may have 5 minutes to respond. I think that is only fair.

The PRESIDING OFFICER. Is there

objection to the unanimous-consent request of the Senator from Alaska? The Chair hears none, and it is so ordered.

Mr. BUCKLEY. Mr. President, if the distinguished Senator from North Carolina (Mr. ERVIN) wants to address himself to that point, I yield to him to do so.

Mr. President, I would merely say that the area addressed by the Senator from Alaska (Mr. STEVENS) is but one area. Probation reports have also been leaked to the FBI, and other files as well. This is an area of extreme sensitivity. I do not believe that, absent appropriate court orders, this information should be made available.

Mr. ERVIN. Mr. President, section (d), as I understand it, provides that—

The Secretary shall adopt appropriate regulations to protect the rights of privacy of students and their families in connection with any surveys or data-gathering activities conducted, assisted, or authorized by the Secretary . . .

I do not see any objection to protecting the privacy of children. I do not see that they should be made guinea pigs by social scientists. That is why I support the bill.

Mr. STEVENS. Mr. President, with all due respect to the distinguished Senator from North Carolina, my amendment is to delete section (c), not (d).

Mr. BUCKLEY. Mr. President, I yield back the remainder of my time.

The PRESIDING OFFICER. All time on this amendment has now been yielded back.

The question is on agreeing to the amendment of the Senator from Alaska (Mr. STEVENS) to strike section (c).

On this question the yeas and nays have been ordered, and the clerk will call the roll.

The assistant legislative clerk called the roll.

Mr. ROBERT C. BYRD. I announce that the Senator from Arkansas (Mr. FULBRIGHT), the Senator from Alaska (Mr. GRAVEL), the Senator from South Carolina (Mr. HOLLINGS), the Senator from Hawaii (Mr. INOUYE), the Senator from Utah (Mr. MOSS), the Senator from West Virginia (Mr. RANDOLPH), the Senator from Alabama (Mr. SPARKMAN), the Senator from Texas (Mr. BENTSEN), and the Senator from Missouri (Mr. SYMINGTON) are necessarily absent.

I further announce that, if present and voting, the Senator from West Virginia (Mr. RANDOLPH) would vote "yea."

Mr. GRIFFIN. I announce that the Senator from Utah (Mr. BENNETT), the Senator from Kentucky (Mr. COOK), the Senator from Florida (Mr. GURNEY), the Senator from New York (Mr. JAVITS), and the Senator from Illinois (Mr. PERCY) are necessarily absent.

I also announce that the Senator from Nebraska (Mr. CURTIS), and the Senator from Arizona (Mr. GOLDWATER) are absent on official business.

I further announce that, if present and voting, the Senator from Nebraska (Mr. CURTIS) would vote "nay."

The result was announced—yeas 35, nays 49, as follows:

[No. 194 Leg.]

**YEAS—35**

| | | |
|---|---|---|
| Aiken | Haskell | Nunn |
| Bayh | Hathaway | Packwood |
| Bible | Huddleston | Pell |
| Byrd, Robert C. | Jackson | Proxmire |
| Cannon | Kennedy | Ribicoff |
| Clark | Magnuson | Stennis |
| Cotton | McGee | Stevens |
| Dominick | McGovern | Stevenson |
| Eagleton | McIntyre | Taft |
| Griffin | Metcalf | Talmadge |
| Hart | Metzenbaum | Williams |
| Hartke | Nelson | |

**NAYS—49**

| | | |
|---|---|---|
| Abourezk | Dole | McClure |
| Allen | Domenici | Mondale |
| Baker | Eastland | Montoya |
| Bartlett | Ervin | Muskie |
| Beall | Fannin | Pastore |
| Bellmon | Fong | Pearson |
| Biden | Hansen | Roth |
| Brock | Hatfield | Schweiker |
| Brooke | Helms | Scott, Hugh |
| Buckley | Hruska | Scott, |
| Burdick | Hughes | William L. |
| Byrd, | Humphrey | Stafford |
| Harry F., Jr. | Johnston | Thurmond |
| Case | Long | Tower |
| Chiles | Mansfield | Tunney |
| Church | Mathias | Weicker |
| Cranston | McClellan | Young |

**NOT VOTING—16**

| | | |
|---|---|---|
| Bennett | Gravel | Percy |
| Bentsen | Gurney | Randolph |
| Cook | Hollings | Sparkman |
| Curtis | Inouye | Symington |
| Fulbright | Javits | |
| Goldwater | Moss | |

So Mr. STEVENS' amendment was rejected.

Mr. CRANSTON. Mr. President, the Senator from New York (Mr. BUCKLEY) has proposed an amendment regarding the confidentiality of student records and requiring parental consent for certain school activities that causes me some concern.

The first portion of the amendment seeks to guarantee the right of access and review of a students school records, by parents and by students—if 18 years of age or over—and prevent the disclosure of such records to most third parties without parental or student consent.

I would wholeheartedly support this portion of the Senator's amendment. It seems to me that it seeks to preserve a right to confidentiality of records of student academic and personal performance that should be guaranteed. I would point out, however, that in my State of California, this right of access and review is presently guaranteed under the California Public Records Act.

The section of the amendment that deals with "parental consent," however, causes me serious concern.

First, I question the advisability of the Congress enacting legislation that, in effect, would thwart a State's compulsory attendance laws. Under this amendment, a parent may refuse to have his child attend a class if, after notification, the parent finds the content of the course or activity to be objectionable. While I do not object to "parental consent," I do question Federal interference in what I believe to be a question that should be decided by locally elected school officials, rather than the Federal Government.

Second, subsection (b)(2) of the amendment would require parental consent for students—and I quote:

To participate in any project, program, or course, the primary purpose or principal effect of which is to affect or alter the personal behavior or personal values of a student, or to explore and develop teaching techniques or courses primarily intended to affect such behavior and values.

Mr. President, this language is breathtaking in its sweeping generalities. How do you determine in advance, and provide notification to the parent, of classroom activities that might bear on the values of a student? A course in American history, for example, that discusses contemporary American ethics in the light of Watergate could be construed as tending to "affect the personal values" of a student. Or, how do you go about discouraging violent or overly aggressive behavior without tending to "alter the personal behavior" of a student?

These are serious questions, Mr. President, that we cannot take lightly. Because the penalty for even accidental transgression of these Federal directives is the total loss of Federal funding to any educational institution—public or private, preschool through postsecondary—that is found "out of compliance."

Finally, Mr. President, the amendment directs the Secretary of Health, Education, and Welfare with the responsibility for—and again, I quote:

Investigating, processing, reviewing, and adjudicating violations of the provisions of this section and complaints.

Frankly, I question the wisdom of charging a Federal agency with the power to probe the questions that would have to be probed in order to investigate complaints of alleged violations of the act. Such questions could include:

Was the purpose of the course to affect the values of the child, or were they affected accidentally, or at all?

Even if the purpose of the course was not to alter the values of the child, did it have the effect or altering the values of the child?

What were the values of the child before they were "altered"?

Mr. President, I believe my point is obvious: This section of the Senator's amendment brings the Federal Government and its agencies dangerously close to deciding issues of academic and personal freedom that should be in the hands of local and State school officials, and the people who elected them, not the Federal Government.

I do not believe the Senate of the United States should take any action that could be legitimately construed as having the primary effect of circumventing local control of curriculum and school practices, discouraging innovation, or stifling educational reform.

For these reasons, and because I support the major premise of the Senator's amendment, I would hope he would consider deleting the section of the amendment to which I have referred.

The PRESIDING OFFICER. The question now occurs on the first part of the amendment of the Senator from New York.

Mr. PELL. The vote is now on section (b), is it not? What is the parliamentary situation?

The PRESIDING OFFICER. The question now occurs on all of the amendment except section (b).

The amendment was agreed to.

The PRESIDING OFFICER. The question now occurs on section (b) of the amendment. On this question, the yeas and nays have been ordered, and the clerk will call the roll.

Mr. MANSFIELD. Mr. President, what are we voting on?

The PRESIDING OFFICER. On section (b) of the Buckley amendment.

The second assistant legislative clerk proceeded to call the roll.

Mr. ERVIN. Mr. President, precisely what is this?

The PRESIDING OFFICER. The roll-call is now in progress.

Mr. HUMPHREY. Mr. President, a parliamentary inquiry.

The PRESIDING OFFICER. The question is on the adoption of section (b) of the Buckley amendment.

Mr. HUMPHREY. Up and down on section (b)?

The PRESIDING OFFICER. That is correct.

The question is on the adoption of section (b) of the Buckley amendment.

The clerk will call the roll.

The second assistant legislative clerk resumed and concluded the call of the roll.

Mr. ROBERT C. BYRD. I announce that the Senator from Texas (Mr. BENTSEN), the Senator from Arkansas (Mr. FULBRIGHT), the Senator from Alaska (Mr. GRAVEL), the Senator from South Carolina (Mr. HOLLINGS), the Senator from Hawaii (Mr. INOUYE), the Senator from Utah (Mr. MOSS), the Senator from West Virginia (Mr. RANDOLPH), the Senator from Alabama (Mr. SPARKMAN), and the Senator from Missouri (Mr. SYMINGTON) are necessarily absent.

I further announce that, if present and voting, the Senator from West Virginia (Mr. RANDOLPH) would vote "nay."

Mr. GRIFFIN. I announce that the Senator from Utah (Mr. BENNETT), the Senator from Kentucky (Mr. COOK), the Senator from Florida (Mr. GURNEY), the Senator from New York (Mr. JAVITS), the Senator from Oregon (Mr. PACKWOOD), and the Senator from Illinois (Mr. PERCY) are necessarily absent.

I also announce that the Senator from Nebraska (Mr. CURTIS) and the Senator from Arizona (Mr. GOLDWATER) are absent on official business.

I further announce that, if present and voting, the Senator from Nebraska (Mr. CURTIS) would vote "yea."

The result was announced—yeas 40, nays 43, as follows:

[No. 195 Leg.]

YEAS—40

| | | |
|---|---|---|
| Baker | Ervin | Nelson |
| Bartlett | Fannin | Pastore |
| Beall | Fong | Pearson |
| Bellmon | Griffin | Proxmire |
| Brock | Hansen | Roth |
| Buckley | Helms | Scott, Hugh |
| Byrd, | Hruska | Scott, |
| Harry F., Jr. | Huddleston | William L. |
| Byrd, Robert C. | Johnston | Stennis |
| Chiles | Mansfield | Taft |
| Church | McClellan | Thurmond |
| Dole | McClure | Tower |
| Domenici | Metcalf | Weicker |
| Eastland | Montoya | Young |

NAYS—43

| | | |
|---|---|---|
| Abourezk | Hart | Metzenbaum |
| Aiken | Hartke | Mondale |
| Allen | Haskell | Muskie |
| Bayh | Hatfield | Nunn |
| Bible | Hathaway | Pell |
| Biden | Hughes | Ribicoff |
| Brooke | Humphrey | Schweiker |
| Burdick | Jackson | Stafford |
| Cannon | Kennedy | Stevens |
| Case | Long | Stevenson |
| Clark | Magnuson | Talmadge |
| Cotton | Mathias | Tunney |
| Cranston | McGee | Williams |
| Dominick | McGovern | |
| Eagleton | McIntyre | |

NOT VOTING—17

| | | |
|---|---|---|
| Bennett | Gravel | Packwood |
| Bentsen | Gurney | Percy |
| Cook | Hollings | Randolph |
| Curtis | Inouye | Sparkman |
| Fulbright | Javits | Symington |
| Goldwater | Moss | |

So section (b) of Mr. BUCKLEY'S amendment (No. 1289) was rejected.

Mr. PELL. Mr. President, I move to reconsider the vote by which the amendment was rejected.

Mr. EAGLETON. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Several Senators addressed the Chair.

The PRESIDING OFFICER. The Senator from Colorado is recognized.

Mr. DOMINICK. I yield to the Senator from California.

The PRESIDING OFFICER. The Senator from California is recognized.

Mr. DOMINICK. Mr. President, I yield to the Senator from Missouri.

Mr. EAGLETON. Mr. President, I ask unanimous consent that James Murphy and Marsha McCord be accorded the privileges of the floor during consideration of the education bill.

The PRESIDING OFFICER. Without objection, it is so ordered.

THE 200TH ANNIVERSARY OF THE FIRST CONTINENTAL CONGRESS

Mr. HUGH SCOTT. Mr. President, I ask unanimous consent that action on Senate Concurrent Resolution 85 taken this morning be reconsidered, and that it be amended in three respects.

I send the amendments to the desk and ask the clerk to read the concurrent resolution as it would be so modified.

The PRESIDING OFFICER. Is there objection? Without objection, it is so ordered.

The clerk will read the concurrent resolution, as modified.

The assistant legislative clerk read the concurrent resolution, as modified, together with its preamble, as follows:

S. CON. RES. 85

Whereas the meeting at Carpenters' Hall in the City of Philadelphia in the Colony of Pennsylvania from September 5 to October 26, 1774, which has become known as the First Continental Congress, will have observed during 1974 its two hundredth anniversary; and

Whereas the actions of that Congress in uniting, for the first time, the thirteen disparate American Colonies to seek redress of their many grievances against the Parliament and King of England, set in motion a series of events leading to the meeting of the Second Continental Congress which produced the Declaration of Independence and guided the new Nation through the American War for Independence; and

Whereas the precedents set by the meeting of the first Congress in 1774 form the foundation upon which rests the principles and practices of the existing Congress of the United States of America; and

Whereas October 14, 1974, was the date on which the delegates to the first Congress adopted the Declaration and Resolves, expressing to the King of England their rights as Englishmen and their determination to achieve those rights, and is therefore, in itself, an historic date; and

Whereas on October 14, 1974, special ceremonies, sponsored by the City of Philadelphia, the National Park Service of the Department of the Interior and the American Revolution Bicentennial Administration, will be held at Carpenters' Hall in Philadelphia, Pennsylvania, to properly and appropriately observe for the Nation the two hundredth anniversary of the First Continental Congress; and

Whereas the two hundredth anniversary of the First Continental Congress marks one of the first historic commemorative events of the American Revolution Bicentennial celebration: Now, therefore, be it

*Resolved by the Senate (the House of Representatives concurring),* That it is the sense of Congress that October 14, 1974, be proclaimed a Day of National Observance for the 200th Anniversary of the First Continental Congress and calls upon the people of our Nation to fittingly observe and honor this important date in our country's history.

SEC. 2. That the President pro tempore of the Senate and the Speaker of the House be authorized to select, upon the recommendation of the respective majority and minority leaders, four Members of each House to represent the Congress of the United States of America at ceremonies in Carpenters' Hall, Philadelphia, on October 14, 1974, and to present at said ceremonies to a representative of the City of Philadelphia a copy of this resolution.

SEC. 3. That the Expenses of the Members are authorized to be paid from the contingency funds of the Senate and House of Representatives as approved, respectively, by the Committee on Rules and Administration and the Committee on House Administration.

The Senate proceeded to consider the concurrent resolution.

The PRESIDING OFFICER. Without objection, the three amendments are agreed to.

Without objection, the resolution as amended is agreed to.

Without objection, the preamble is agreed to.

---

## EDUCATION AMENDMENTS OF 1974

The Senate continued with the consideration of the bill (S. 1539) to amend and extend certain acts, relating to elementary and secondary education programs, and for other purposes.

Mr. DOMINICK. Mr. President, I had an amendment to the McClellan amendment earlier today to part '(b)', which I added, and which was adopted, and I ask unanimous consent that the Secretary may make a technical correction in it which will extend it for as long as the bill presently extends, instead of cutting it off shorter.

The PRESIDING OFFICER. Is there objection? Without objection, it is so ordered.

Mr. BUCKLEY. Mr. President, I call up my amendments No. 1306.

The PRESIDING OFFICER. The clerk will read the amendments.

The assistant legislative clerk proceeded to read the amendments.

Amendments No. 1306 are as follows:

On page 330, between lines 17 and 18, insert the following new section:

"LIMITATION ON WITHHOLDING OF FEDERAL FUNDS

"SEC. 513. Part C of the General Education Provisions Act is amended by adding at the end thereof the following new section:

"'LIMITATION ON WITHHOLDING OF FEDERAL FUNDS

"'SEC. 437. The refusal of a State or local education agency and institution of higher education, community college, a school, preschool, or any other educational institution, to administer a test or project or to provide personally identifiable data on students or their families, as a part of an applicable program, to any Federal office, agency, department, or other third party, on the grounds that it constitutes a violation of the right to privacy and confidentiality of students, their parents, or is an unacceptable research or experimentation project, or is for the purpose of altering the personal behavior or values of a student, or is potentially psychologically or otherwise harmful to students or their families, shall not constitute sufficient grounds for the suspension or termination of Federal assistance. Further, such a refusal shall not constitute sufficient grounds for a denial of, a refusal to consider, or a delay in the consideration of funding in succeeding fiscal years for such a recipient.'"

On page 122, in the Table of Contents after item "Sec. 512." insert the following:

"Sec. 513. Limitation on withholding of Federal funds.".

Mr. BUCKLEY. Mr. President, for the benefit of Senators present, I understand the managers of the bill will accept the amendment.

I think I can best illustrate its purpose by quoting one article that appeared in the New York Times on November 21, 1973, relating to a questionnaire that HEW was demanding the New York City Board of Education circulate among its students:

The "New York" city's Board of Education accused the United States Department of Health, Education and Welfare yesterday of directing a number of schools here to administer pupil questionnaires.

Mr. President, has the other amendment been voted on?

The PRESIDING OFFICER. The amendment was in two parts, and has been disposed of.

Mr. BUCKLEY. I thank the Chair.

Mr. CRANSTON. Mr. President, I want to state my firm support for the amendment offered by the distinguished Senator from New York (Mr. BUCKLEY) which would protect schools from the loss of Federal funds if they choose not to administer tests prescribed by the Federal Government.

Sadly, we seem to live in an age of sophisticated snoops, both electronic and human. It seems to me that Senator BUCKLEY's amendment protects the right of schools to reject testing instruments that these local officials find to be objectionable.

Mr. ERVIN. Mr. President, a point of order.

The PRESIDING OFFICER. Does the Senator from New York yield for a preliminary inquiry?

Mr. BUCKLEY. I yield.

Mr. ERVIN. Mr. President, a point of order. The Senate had a vote on the motion of the Senator from Alaska to delete section (c). Then we had a separate vote on section (b), did we not?

The PRESIDING OFFICER. By voice vote, the Senate agreed to all parts of the amendment with the exception of section (b).

Mr. ERVIN. I beg the Chair's pardon. I never heard it.

The PRESIDING OFFICER. The voice vote was taken on all parts of the amendment with the exception of section (b), which was a rollcall vote. The voice vote was on all other parts.

Mr. BROCK. Mr. President, a parliamentary inquiry.

The PRESIDING OFFICER. The Senator will state it.

Mr. BROCK. Was not the voice vote taken prior to the vote on the amendment of the Senator from Alaska on section (c)?

The PRESIDING OFFICER. The Senator from Alaska's motion to strike was first of all voted on, and then there was a voice vote, and then there was a vote on section (b).

Mr. BUCKLEY. Mr. President, I was reading from an article in the New York Times in which the following was stated:

The (New York) city's Board of Education accused the United States Department of Health, Education and Welfare yesterday of directing a number of schools here to administer pupil questionnaires that the board said were "racist," "highly inflammatory," and "polarizing."

Dr. Seymour P. Lachman, the president of the board, said the Federal department had "once more shown its callous insensitivity to the needs of children and good intergroup relation."

A statement by Dr. Lachman noted that the preface to the 23-item Federal questionnaire said: "To the student: These questions are to find out how you feel about students who are different from you. If you are Black, we want to know how you feel about students who are not Black. If you are White, we want to know how you feel about students who are not White. If you are Brown, we want to know how you feel about students who are not Brown. Whatever you are, we want to know how you feel about students who are different from you."

Dr. Lachman said that the form then asked such questions as the following:

"How do you think your parents feel about Black and White (or Brown and White or Black and Brown) students going to the same school together.

"Do you think that Black (or White or Brown) students in this school cause more trouble than other kinds of students?" "How do you think your principle feels about all different kinds of students going to the same school together?"

Dr. Lachman said that it was inconceivable to him how such a questionnaire "could be administered in good faith to fourth- and fifth-grade students."

I would now like to quote two brief paragraphs of an article that appeared in the Washington Post on May 7 of this year. The headline was "Schools Balking at Pupil Quiz":

District of Columbia school officials announced yesterday they will risk cancellation of $3.4 million in federal funds for educationally disadvantaged children rather than ask students and teachers 24 questions they consider "sociologically or psychologically damaging."

The questions, part of a battery of tests one-and-a-half inch thick to be administered to 720 students and teachers, concern the students' home lives and expectations in school.

My amendment simply limits the ability of HEW to withhold funds from school districts that refuse to circulate questionnaires of this kind or which believe them to be harmful or potentially pose psychological harm to their students.

I understand the managers of the bill are willing to accept the amendment.

Mr. PELL. Mr. President, the Senator is correct. We look favorably at this amendment, especially on the majority side. There seems to be no great objection to it. I would recommend to my colleagues that we adopt it.

Mr. DOMINICK. Mr. President, if the Senator will yield, I agree. It is a good amendment, except it should have been done a long time ago.

Mr. HART. Mr. President, will the Senator yield?

Mr. PELL. I am glad to yield.

Mr. HART. I, of course, do not wish to ask for a rollcall. I rise to express concern again that the Senate, at 20 minutes to 7 tonight, is adopting language at least some of which is unclear to anybody, particularly to reserve to a school board the right to continue to receive Federal money even though it rejects a project if the project is for the purpose of altering the personal behavior or values of a student.

Again, I suggest that that really is the meat and potatoes of education, and I just continue to think we would have been much better off if the committee had been able to evaluate exactly what would happen under this. I am sure that concern will be voiced with respect to it.

Mr. BUCKLEY. Mr. President, a parliamentary inquiry.

The PRESIDING OFFICER. The Senator will state it.

Mr. BUCKLEY. Mr. President, has all time been yielded back?

The PRESIDING OFFICER. Has all time been yielded back?

Mr. ROBERT C. BYRD. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The second assistant legislative clerk proceeded to call the roll.

Mr. MUSKIE. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. MUSKIE. Mr. President, I ask unanimous consent that Rick Bayard and Reid Feldman be granted the privilege of the floor during the debate on the education bill.

The PRESIDING OFFICER. Without objection, it is so ordered.

**CHANGE OF VOTE ON VOTE NO. 194**

Mr. HUMPHREY. Mr. President, I ask unanimous consent that on the Stevens amendment, on which I voted "yea," I be recorded as voting "nay."

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. MUSKIE. Mr. President, I suggest the absence of a quorum.

---

The PRESIDING OFFICER. The clerk will call the roll.

The second assistant legislative clerk proceeded to call the roll.

Mr. PELL. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. PELL. Mr. President, what is the pending question?

The PRESIDING OFFICER. The question is on agreeing to the amendment of the Senator from New York. All time has been yielded back.

The amendment was agreed to.

Mr. McCLURE. Mr. President, I move that the Senate reconsider the vote by which the amendment was agreed to.

Mr. BUCKLEY. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. HATHAWAY. Mr. President, there is one point with regard to the McClellan amendment which should be made about the overall effect of the McClellan amendment. That is the substantial shifts in title I funds which will take place within States, even States which gain, under the amendment. For example, although the State of Virginia would gain overall, the city of Richmond would lose, along with 20 Virginia counties. Omaha is another major example. In all, more than 600 counties nationwide will lose—and many of these counties are in States which show an overall gain under the McClellan amendment.

These are not speculative losses. These are actual dollar losses which will affect these school districts this fall. I hope that Senators from those States which appear to gain under this amendment will consider the problems they are still going to have when the county-level effect of the amendment manifests itself in their States.

Mr. President, I ask unanimous consent that a table showing the number of counties which will lose under this amendment—broken down by States—be printed at this point in the RECORD. I would also call the attention of Senators to Senator PELL's information contained in the May 13 RECORD at pages 14334–37.

There being no objection, the table was ordered to be printed in the RECORD, as follows:

*Number of counties per State receiving a decreased allocation under the McClellan amendment*

| State | |
|---|---|
| Alabama | 17 |
| Alaska | 7 |
| Arizona | 0 |
| Arkansas | 12 |
| California | 2 |
| Colorado | 5 |
| Connecticut | 0 |
| Delaware | 0 |
| Florida | 1 |
| Georgia | 48 |
| Hawaii | 0 |
| Idaho | 6 |
| Illinois | 12 |
| Indiana | 4 |
| Iowa | 41 |
| Kansas | 21 |
| Kentucky | 42 |
| Louisiana | 2 |
| Maine | 2 |

---

| State | |
|---|---|
| Maryland | 0 |
| Massachusetts | 2 |
| Michigan | 2 |
| Minnesota | 10 |
| Mississippi | 27 |
| Missouri | 27 |
| Montana | 5 |
| Nebraska | 18 |
| Nevada | 1 |
| New Hampshire | 0 |
| New Jersey | 10 |
| New Mexico | 1 |
| New York | 19 |
| North Carolina | 54 |
| North Dakota | 15 |
| Ohio | 3 |
| Oklahoma | 14 |
| Oregon | 1 |
| Pennsylvania | 1 |
| Rhode Island | 0 |
| South Carolina | 19 |
| South Dakota | 27 |
| Tennessee | 35 |
| Texas | 32 |
| Utah | 1 |
| Vermont | 0 |
| Virginia | 20 |
| Washington | 0 |
| West Virginia | 24 |
| Wisconsin | 2 |
| Wyoming | 1 |
| District of Columbia | 1 |
| **Total** | **600** |

## BUSING TO DESEGREGATE SCHOOLS: THE PERSPECTIVE FROM CONGRESS

Mr. PEARSON. Mr. President, in view of the legislation pending before the Senate, and in view of the ongoing debate on the issue of busing, I am inserting a timely article written by our distinguished minority leader, the Senator from Pennsylvania. Entitled "Busing To Desegregate Schools: The Perspective From Congress." This University of Richmond Law Review article offers a calm perspective in the face of growing controversy on busing. I ask unanimous consent that this article be printed at this point in the RECORD.

There being no objection, the article is ordered to be printed in the RECORD, as follows:

BUSING TO DESEGREGATE SCHOOLS: THE PERSPECTIVE FROM CONGRESS

(By HUGH SCOTT) *

In the end, I expect that the courts will solve the problem—not Congress.[1]

This controversy over transporting pupils to desegregate schools or "busing" as the issue popularly is known, is the narrowest and perhaps most limited aspect of school desegregation. Yet, it threatens to undo school desegregation completely unless the issue is resolved in a way which will permit continued desegregation of schools accompanied by the understanding and support of the majority of people of all races.

A year ago it seemed virtually assured that Congress would pass a major anti-busing law. That event was averted in the Senate when the anti-busing forces were unable to force cloture of the debate on the "Equal Educational Opportunities Act of 1972"[2] and failed to defeat a subsequent motion to proceed to other business.[3]

This turn of events resulted from several factors. First, Congress earlier in the year had enacted important guidelines on the use of pupil transportation as a means of school desegregation.[4] Second, many members of Congress had confidence in the discretion of the

Footnotes at end of article.

Supreme Court to limit excessive busing on a case by case basis, while at the same time formulating well-reasoned and appropriate guidelines for the lower courts to follow in asserting decrees. Third, the legislative proposals to limit busing went far beyond what was reasonable or necessary. Instead, the proposed "Equal Educational Opportunity Act," as passed by the House of Representatives, virtually repealed substantial portions of the Civil Rights Acts and guaranteed that desegregation would never occur in some metropolitan areas.[5] The bill actually made possible re-segregation in those cities and towns found to have racially segregated neighborhoods. Fourth, many of the members of Congress were convinced that anti-busing legislation was not only unwise but unconstitutional as well.

In this article it is suggested that we now have established principles, through legislation by Congress and decisions of the courts, within which we can resolve the complexities of limiting pupil transportation in a fair and practical manner without resegregating schools.

The greatest single reason for the impasse between opposing groups in the debate over school desegregation has been the adamant and mutual refusal of both sides to recognize and respect what has been accomplished in school desegregation and the nature of the problems yet unresolved. Those who oppose pupil transportation to desegregate schools often give the impression that they have conveniently forgotten the recent history of schemes to evade Constitutional mandates. On the other hand, the proponents of busing often appear blind to the fact that desegregation is accepted today by an overwhelming majority of people, including many who once vehemently opposed it.[6]

The point has been reached where the issue of good faith should no longer be a major element of any debate about a remedy. Congress, the courts and the executive have demonstrated repeatedly that they find another era of segregation constitutionally unacceptable. Happily, there are indications that the country may be able to reason its way through some of the knotty and complex problems of desegregation without becoming embroiled in accusations of bad faith and the accompanying recriminations.

In devising remedies which will be fair and which will be supported by the majority of people, it must be kept in mind that we are no longer dealing with modest rural school districts, but with major school systems such as those in the metropolitan areas of Richmond, Atlanta, Denver and Detroit.[7] National policy must continue to be committed to integration, but the implementation of that policy must be fair and flexible and must have the broad based support of the people. The potential for devising a fair and flexible means of implementing desegregation is available, but building understanding and support among people generally appears to be the greatest challenge. This can be accomplished, however, if, as a first step, confrontations are avoided and reasoned debate is employed in order to achieve the national goal of a desegregated society.

Twenty years ago this May 17 the Supreme Court announced its historic decision in *Brown* v. *Board of Education.*[8] It is a mark of the passage of time that only one justice who was a member of that Court, Justice William O. Douglas, is still a member of the Supreme Court; it is a mark of what we have accomplished that the man who argued the cause of the black plaintiffs in *Brown* sits today as the first black justice of the Court. That justice is Justice Thurgood Marshall, who was appointed by a Southern President.

Shortly after the decision in *Brown*, the Commonwealth of Virginia vowed "massive resistance." Today, Virginia's schools for the most part are desegregated. A distinguished Virginian, Lewis F. Powell, Jr., is an Associate Justice of the Supreme Court, and has contributed valuable insights and great intellect to solving the problems of desegregation since his recent appointment to the Court.

The progress of the past twenty years has not been easy. Prior to *Brown*, racial segregation under law was the accepted way of life in the southern states. All schools and public facilities were segregated by race. Public transportation was segregated, and the law required the private businessman to operate segregated places of accommodation. The masses of black citizens were denied the right to vote. Where the law did not require segregation, racial discrimination and custom imposed an equal effect. Discrimination against blacks in employment and housing was the rule everywhere.

The legacy and effect of de jure segregation spilled over into the north where racial discrimination was practiced openly and often in defiance of state laws prohibiting discriminatory practices. In the year 1954, the black man, ninety years after Emancipation, was confronted with social policies that were in many respects as degrading as involuntary servitude. *Brown* v. *Board of Education* overruled this epitaph. Since that decision, this nation has been headed steadily on a course toward full equality of opportunity for every citizen and toward the elimination of the vestiges of segregation from every aspect of our lives. I doubt if there are many today who would vote to overturn *Brown* and return to a "separate but equal" society.

Ten years after *Brown* little progress had been made to desegregate schools except in the border states and the District of Columbia.[9] The spectacle of United States Army troops surrounding Central High School in Little Rock, Arkansas forced this country to realize that desegregation on a case by case basis would be a long term and tumultuous proposition. It was clear that unless voluntary compliance with the letter and spirit of *Brown* was forthcoming, and that did not appear to be likely, little was going to happen until Congress acted.

Effective congressional action did not come easy. From Reconstruction until 1957 no general action had been taken by the Congress to require implementation of the fourteenth amendment. The first steps by Congress toward enacting guarantees of full and equal citizenship were taken during the Eisenhower-Nixon Administration in 1966 and 1957. The initial actions taken by Congress seemed timid to critics, but in reality they were precedent-shattering moves which cleared away several time-encrusted procedural obstacles to the passage of civil rights legislation. The first procedural move was the decision by Senate Majority Leader Lyndon B. Johnson to use a relatively weak civil rights bill as the vehicle for breaking the traditional southern filibuster against civil rights legislation. At that time, many did not realize the true proportions of this procedural victory, but without it, the great civil rights acts of the 1960's would have been virtually impossible to enact.

The 1957 Civil Rights Act,[10] modest in dimensions and ambitions, has proven to be the base on which a large part of the federal civil rights effort has been founded. The Act created the United States Commission on Civil Rights to study civil rights problems and to report to the nation, the Congress and the President. The Commission is still serving the nation and will continue to so serve through its current extension until 1978.

Title II of the Act of 1957 also created the Civil Rights Division of the Department of Justice. This is perhaps the most substantial

achievement of the Act. Title IV authorized the Attorney General to go into court to enforce the right of all citizens to vote under the fifteenth amendment. This brought the federal government into court on the side of civil rights plaintiffs. No longer would the government be a powerless or neutral observer on the sidelines. It now was actively committed to securing the civil rights of all citizens.

Obviously, this development did not go unchallenged by those states and localities which felt threatened by the use of federal power to protect and secure the rights of citizens under the fourteenth and fifteenth amendments. "Massive resistance" in Virginia and elsewhere was the most organized challenge to federal authority. Violence and confrontation, often incited by demagoguery, occurred throughout the south while the north looked on, all too complacently, from the sidelines. During this period a growing awareness, sharpened by the reports of the United States Commission on Civil Rights, developed that desegregation of schools was only one part of a struggle for equal opportunity which was taking place on several fronts simultaneously. The first report of the Civil Rights Commission in 1959 dealt with voting, education and housing. The report made it clear that progress in each area was dependent upon progress being made in the other areas as well. To attempt to find a priority target was to search for the beginning of a circle. It was against such a background that Congress moved to consider the major civil rights acts of the 1960's.

Overall, the Civil Rights Act of 1960[11] was a disappointment.[12] The strong recommendations of the Civil Rights Commission, which had provided the impetus for the legislation, were systematically weakened and replaced until few of substance remained. The Act was generally viewed as a failure.

Despite increased national focus on the civil rights movement, the first two years of the Kennedy Administration passed without any civil rights action by Congress. Litigation became the chosen weapon of the Administration for achieving civil rights. Since the only source of effective civil authority possessed by the Attorney General was in the field of voting, the belief was that school desegregation and other gains would come about through an expansion of the political process resulting from greater enfranchisement of Negroes.

Despite heroic and dedicated efforts by outstanding lawyers in the Civil Rights Division, the Department of Justice was not successful in vindicating civil rights for Negro citizens through the judicial process. At the end of 1962, the additional number of black citizens who could vote as a result of cases brought by the Department was small.[13] Equally small was the amount of school desegregation achieved through private litigation.[14]

At the start of the 88th Congress, the Kennedy Administration had virtually no civil rights legislative program. The Administration's civil rights bill in early 1963 consisted of a modest proposal to extend the life of the Commission on Civil Rights and to expand the Commission's jurisdiction to provide clearinghouse services.[15] Liberal Republicans in the House and the Senate joined with Democrats in seizing the initiative with strong civil rights proposals pointing the way for major civil rights enactments. Elsewhere in the nation the civil rights movement increased in momentum.

Events in Birmingham, Alabama in April, 1963 suddenly ignited the conscience of the nation. Police Commissioner Eugene "Bull" Connor, his dogs and fire hoses, and the bombings, riotings and rage of the inner city shocked the people of America. On June 12, 1963 Medgar Evers was ambushed and killed in front of his home in Jackson, Mississippi.

---

Footnotes at end of article.

On June 19, the Kennedy Administration finally sent a major new civil rights bill to Congress. During a summer-long consideration of the bill, the great march on Washington took place. There, Dr. Martin Luther King intoned his greatest speech, "I Have a Dream," but Congress did not act.

In the autumn of 1963, the President was assassinated in Dallas. The death of President Kennedy may not have been responsible for the Civil Rights Act of 1964, but it did cause many people to realize that the time for making the ideal of social justice a reality was long overdue. Against a somber, more responsible background, Congress duly considered and enacted that monumental charter of civil rights, the Civil Rights Act of 1964.[14]

The Act carried forward the concept of making basic gains in equal opportunity simultaneously on several fronts, notably in public accommodations, education, employment and nondiscrimination in federal programs. The work of the 1964 Act subsequently was completed by passage of the Voting Rights Act of 1965[17] and the Fair Housing Act of 1968.[18]

The 1964 Civil Rights Act also provided for double-barreled implementation of desegregation of schools and of federal programs in the states. One implementation was administrative sanctions imposed by the secretaries and heads of agencies charged with enforcing the nondiscriminatory requirements of Title VI.[19] The other implementation was the power of the Attorney General to bring suit to desegregate schools.[20] With the enactment of substantial assistance programs for education, school administrators and officials were faced with hard choices: to forego federal financial assistance only to face the Department of Justice in Court in the end, or to give assurances of nondiscrimination, follow desegregation guidelines and take the money. The majority of school boards decided to take steps toward compliance.

Education was not the only sector of society required to accept desegregation. The 1964 Act achieved quick desegregation of places of public accommodation, and other sectors of society also began to desegregate. Additionally, employers were required to eliminate discriminatory business practices. The pervasive impact of the Voting Rights Act of 1965 also made itself felt as black voters joined with white moderates to oust from office those public officials who had counseled and led resistance to desegregation.[21]

What had been accomplished through legislation was a complete reversal of the legalized segregation which had prevailed only ten years earlier. Yet, even at the height of the civil rights tide, when Congress was debating the Civil Rights Act of 1964, issues were arising which would turn congressional efforts away from implementing school desegregation toward directly opposing it.

In large part the development of these issues stemmed from the growing realization that school desegregation would be determined by the answers to definitional problems. What is school desegregation? For example, if the racially segregated schools that existed in the south had to be dismantled and replaced by "unitary" systems, what, in fact, constitutes a "unitary" system? Practical and mechanical problems also were involved: are we going to transport children to integrate schools if they live in racially segregated neighborhoods? Finally, while the Supreme Court in *Brown* was concerned with racially segregated school systems resulting from the enactment of laws requiring or expressly sanctioning them (de jure segregation) what of school segregation

resulting from factors other than state or local laws?

What if school segregation results from administrative decisions of school officials such as the location of school attendance lines, selection sites for new schools and the size of particular schools, made with the purpose and effect of maintaining racial separation, but in the absence of any law requiring it?

What if school segregation results not from administrative decisions of school officials, but from residential segregation for which other state or local governmental bodies, such as local public housing authorities, urban renewal agencies, zoning boards and city councils are responsible?

And what of school segregation that results from fortuitous factors, such as population shifts and other changes, in which government officials have played no part? Does this form of de facto segregation violate the Constitution?

These questions were present in some minds during the 1964 debates, but with only 2.25 percent of the Negro children in the deep South attending integrated schools (i.e., any school with less than 100 percent black enrollment), the focus of concern was on eliminating the blatant defiance of the Supreme Court which was evident in the continuation of dual and racially-separate school systems. This concern prepared the way for amendments to Title IV of the Civil Rights Act of 1964 which closed off federal efforts to deal with de facto and other forms of segregation brought about by means other than de jure (as narrowly defined).

The strategy of those opposed in fact to desegregation but who recognized the futility of a direct attack on the principles of *Brown v. Board of Education* has been built around the thesis that *Brown* merely commands racial neutrality in school admissions policies, no more and no less. Once the pupil by pupil, case by case approach fell, the opponents of desegregation recognized that the next line of defense was to prevent the courts from examining whether or not desegregation policies of school boards had in fact achieved any desegregation at all. Their principal hope was pinned on the "freedom of choice" plans for desegregating schools. Under such plans children were free to attend the school of their choice. Of course, no whites freely chose to go to black schools which were publicly acknowledged to be inferior. In many areas, only a handful of black families were willing to risk the very real dangers of retaliations involving loss of life, limb and employment of the breadwinner, to send a child to white schools.[22]

A strong buttress of this strategy was the firmly held belief by its champions in Congress that if northern school districts could be forced to deal with their de facto segregated school districts, the south would have a generous supply of allies who would assist in defeating efforts to implement school desegregation and eventually enact a rollback of desegregation altogether. The first fruit of this alliance was the famous racial balance language found in the definition of "desegregation"[23] and in the limitations on the power of the Attorney General to bring suit to desegregate schools in Title IV.[24] This joinder of northern and southern concerns is explicit in the explanation of the amendment given by its sponsor in the House, Representative Cramer (R-Fla.):

"The purpose is to prevent any semblance of congressional acceptance or approval of the concept of "defacto" [sic] segregation or to include in the definition of "desegregation" any balancing of school attendance by moving students across school district lines to level off percentages where one race outweighs another."[25]

A series of incisive opinions by the courts have deprived the amendment's southern supporters of their home that it would effectively bar desegregation of schools by plans

other than freedom of choice plans and similar token efforts.[26] It is my view that these decisions were necessary in order to uphold the constitutionality of the racial balance language of Title IV. Had the language of Title IV been applied as Congressman Cramer had hoped it would, the Civil Rights Act of 1964 would have been rendered a nullity as far as school desegregation is concerned. Such a decision would have been a complete misreading of the hope and intent of Congress that the schools of the land be desegregated through the Act.

For a number of years, efforts were made in Congress to restate the limitations contained in Title IV in a way that would stop desegregation.[27] The legal effect of these efforts, and to a large extent their practical results, had little or no impact on school desegregation, other than to encourage the north to continue to do nothing about segregation of schools caused by state action in its own precincts. The political effect, however, has been considerable.

The racial balance language of Title IV, the decisions limiting its application, futile efforts in Congress to undo what has been accomplished have nourished an unfortunate myth in certain regions of the country that judges sitting in federal courthouses have cheated the people out of their legislative victories. This has kept alive sparks of resistance to desegregation in many pockets throughout the south, and, as unconstitutional aspects of school segregation in the north became increasingly apparent, it has fed flames of violent resistance in such communities as Pontiac and Denver. Far worse, it has prevented the possibility of rational discussion of how to achieve desegregation fairly, without unduly interrupting the education of young children. Instead, we seem to be wasting our time by debating whether we will have desegregation at all. Out of this ferment came the antibusing campaign of 1972.

*Swann v. Charlotte-Mecklenberg Board of Education*[28] is credited with feeding the emotional storm that swept many sections of the country concerning busing.[29] Yet, *Swann* also contained the formulation for the practical and common sense limitation of busing, even though few would, or could, listen to what the Court actually was saying.[30]

The formulation of Chief Justice Burger[31] became the basic building block in the pupil transportation amendments to the General Education Amendments of 1972 offered by myself and Senator Mansfield. Basically, the amendment states that Congress believes the objections to busing stated in *Swann* could not be awarded where effectiveness of the educational process would be impeded by the time or distance of travel.

In my view, Title VIII of the Education Amendments of 1972[32] sets the limits on how far Congress can responsibly go in placing restrictions on pupil transportation to desegregate schools. The simple scheme of the amendment ensures that federal officials cannot circumvent the reasonable standards for busing established by the Supreme Court in *Swann*. It is aimed at preventing the sort of extreme busing that critics fear can occur; it is not directed at limiting the powers of the Court. It leaves open the "flexibility" and "balance" necessary to implement desegregation in an equitable manner.

The defeat of the anti-busing legislation in the Senate in 1972 and the virtually complete disestablishment of the separate school systems of the south marks the entrance of the country into a new era in school desegregation which has been most clearly signalled by the Court's decisions in *Bradley v. School Board of City of Richmond*[33] and *Keyes v. School District No. 1. Denver, Colo.*[34] The era we are in is the era of large city desegregation and of remedying segregation of schools brought about by unconstitutional state action.

Footnotes at end of article.

CXX——920—Part 11

The constitutional problems of finding state action in northern school de facto segregation are not difficult in my opinion, but devising a remedy is. In fact, it is the difficulty of developing an acceptable and effective remedy that may be staying the Court's hand more than the conceptual difficulties in defining the wrong.

Justice Powell's concurring opinion in *Keyes* [32] is interesting and hopeful, not because I necessarily agree with all of it, but because it demonstrates fresh and major innovative thinking on the Court about the problems of desegregation. Although the suspicious may find many pitfalls in Justice Powell's opinion, its significance is in the desegregation guidelines it establishes.

First, Justice Powell would obliterate the distinction between de jure and de facto segregation on the grounds that state action always is present in the operation of a segregated school system. In this view he has the distinguished company of Justice Douglas [38] and the United States Commission on Civil Rights.[37]

Second, Justice Powell defines the concept of "integrated school system" in a way which allows continuance of all-black and all-white schools under certain conditions. Presumably, we must look to previous opinions of the Court to determine under what conditions an all-white or an all-black school is constitutionally permissible.[38] But Justice Powell leaves no doubt that in his view the Constitution does not require the elimination of individual schools which have all-white or all-black or all-Chicano enrollments. An "integrated school system" is one in which the following conditions are present:

(1) faculties and administrative staff are integrated;

(2) equality of facilities and of education program exists;

(3) school attendance zones have been drawn to promote integration;

(4) new schools are located, old ones closed, and regrouped by size and grade categories to promote integration;

(5) if a district transports pupils, transportation must be carried out with integration in mind.[39]

If a school district is found to be operating a segregated school system, then it has an affirmative duty to achieve the above with busing a possible remedy. In devising remedies courts would be guided by equitable principles. As Justice Powell stated:

"This would result . . . in no prohibition on court-ordered student transportation in furtherance of desegregation. But it would also require that the legitimate community interests in neighborhood school systems be accorded far greater respect." [40]

In developing remedies, courts would be asked to balance various competing consideration. Justice Powell pleads that courts should give greater weight to the values of the neighborhood, to the parental interest of children and to their children, to the rights of children and to the economic and social consequences of extensive pupil transportation plans.[41]

Justice Powell's suggestion that age per se should be a factor in limiting busing warrants careful review. Ironically, integrated education is more successful among the young, i.e., those under 12 years of age, than among children of high school age.[42] Experienced educators report that somewhere after the ninth grade, adolescents not only segregate themselves by race, but by class and social background as well, these latter factors perhaps being more determinative than race or color.

Special consideration is warranted where neighborhoods are already racially integrated. A priority exemption should be given to such neighborhoods from any plan of desegregation which required pupil transportation. Although neighborhoods are an integral part of our urban life, we should keep in mind that the neighborhood easily can be transmuted into "territory" or "turf" to be protected at all costs, some of them too horrible to contemplate. Not all of the best of our national character is expressed in the concept of "neighborhood." One example is the tragic burning of a young woman in Roxbury, Massachusetts, simply because she happened to be of the wrong color at the wrong place at the wrong time. However, Justice Powell's concurrence in *Keyes* strengthens my confidence that we can look to the courts to develop intelligent, fair and effective remedies for desegregating schools. Justice Powell sets forth our duty under the fourteenth amendment in positive terms—to operate integrated school systems.

It should be remembered that school desegregation has not yet reached the large numbers of minority group persons living in cities, North, West and South.[43] A new minority group, Mexican Americans, is also involved as *Keyes* indicates. Its problems cannot be equated automatically with those of the black-white desegregation context of the south.[44] An enormous task is involved which, if it is not approached in a spirit of humility, will be overwhelming. Justice Powell suggest some manageable guidelines by which lasting desegregation standards may be evolved.

We have breached the "massive resistance" of the Old South. During the first Nixon Administration we completed the job of disestablishing the former dual and segregated school systems of the past. What we now face is the challenge of operating integrated school systems and of remedying school segregation wherever it exists.

While I may not agree with every particular in Justice Powell's opinion, I believe that it offers a path which will enable us to achieve desegregation without extreme social upheaval. If the movement toward integration begun twenty years ago is not to be lost or set back by reactionary backlash movements, then Justice Powell's counsel should be heeded:

"It is time to return to a more balanced evaluation of the recognized interests of our society in achieving desegregation with other educational and societal interests a community may legitimately assert. This will help assure that integrated school systems will be established and maintained by rational action, will be better understood and supported by parents and children of both races, and will promote the enduring qualities of an integrated society so essential to its genuine success." [45]

The progress that has been made toward the goal of a just and free society has been substantial. The tools for further advances in achieving social justice can be formulated to produce rational and flexible remedies to the complex problems that remain.

FOOTNOTES

*United States Senator from Pennsylvania; Member of the Senate Judiciary Committee; LL.B. University of Virginia, 1922.

[1] Birmingham News, Feb. 21, 1972, at 8, col. 8.

[2] H.R. 13915, 92d Cong., 2d Sess., introduced on March 20, 1972; reported from the General Subcommittee on Education of the Committee on Education and Labor, July 25, 1972; reported from Committee on August 14, 1972, H.R. Rep. No. 92-1335; considered and passed the House of Representatives with amendment, August 17 and 18, 1972.

H.R. 13915 and the accompanying measure, the Student Transportation Moratorium Act of 1972, H.R. 13916, were the subjects of extensive hearings in both the House Committee on the Judiciary and the Committee on Education and Labor.

[3] CONGRESSIONAL RECORD, vol. 118, pt. 26, pp. 33996, 34262, 34410, 34488, 34856, and pt. 27, p. 35231.

[4] Pub. L. No. 92-318, 86 Stat. 372.

Title VIII of the General Education Amendments of 1972 provides essentially:

Section 810 states that no provision of the Act "shall be construed to require the assignment or transportation of students or teachers in order to overcome racial imbalance."

Section 802(a) prohibits the use of federal funds—

To transport students or to buy buses in order to overcome racial imbalance;

For busing to carry out a plan of desegregation "except on the express written voluntary request of appropriate local school officials;"

To provide for transportation if the time or distance is so great as to threaten the health or impinge on the educational process of children;

To provide transportation, if such transportation would result in children being assigned to a school substantially inferior to the one they would be assigned to under a non-discriminatory geographic zone assignment plan.

Section 802(b) prohibits Federal officials from requiring the use of non-federal funds for busing to correct racial imbalance or achieve desegregation or to condition a grant of Federal funds on student transportation plans "unless constitutionally required."

Section 803 postpones the effectiveness of any district court order "which requires the transfer or transportation of any student or students . . . for the purpose of achieving a balance among students with respect to race, sex, religion, or socioeconomic status" until all appeals have been exhausted or until January 1, 1974.

Section 804 gives parents the right to intervene in desegregation suits if busing standards violate *Swann* v. *Charlotte-Mecklenberg Bd. of Educ.*, 402 U.S. 1 (1971).

Section 805 requires rules of evidence in desegregation cases to be uniform throughout the United States.

Section 806 expresses the intent that Section 407(a) of the Civil Rights Act of 1964 shall be applied uniformly.

[5] H.R. 13915, as passed by the House of Representatives, August 18, 1972, Senate Calendar No. 1042.

[6] An opinion poll analysed by the U.S. Commission on Civil Rights shows that sixty-seven percent of the public support integration as a national objective. U.S. COMMISSION ON CIVIL RIGHTS, PUBLIC KNOWLEDGE AND BUSING OPPOSITION: AN INTERPRETATION OF A NEW NATIONAL SURVEY (1973).

[7] The analysis of the poll prepared by the Commission, *supra* note 6, indicates that among those who support integration as a national goal only twenty-seven percent support busing to achieve integration.

[8] 347 U.S. 483 (1954).

[9] The U.S. Commission on Civil Rights in its 1961 Report, Vol. 2, Education, reported that in May 1961, 775 out of 2,837 biracial school districts in 17 states and the District of Columbia had reported some desegregation. The overall increase since the Commission's 1959 report was said to be only 1.5 percent. 1961 U.S. Commission on Civil Rights Report, Education Book 2, at 39, app. IV.

In 1964, only 2.25 percent of the Negro children in the 11 states of the old Confederacy and 10.9 percent in the entire region encompassing the southern and border states attended school with white children. Over 3 million Negro children in 1964 were attending segregated schools in the south. U.S. Commission on Civil Rights, Survey of School Desegregation in the Southern and Border States 1965-1966, at 1 (1966).

[10] Act of September 9, 1957, Pub. L. No. 85-315, 71 Stat. 634.

[11] Act of May 6, 1960, Pub. L. No. 86-449, 74 Stat. 86.

[12] For an excellent account of the legislative history of the 1960 Civil Rights Bill, see Berman, How A Bill Became Law (1962).

¹³ U.S. Commission on Civil Rights, Political Participation 10 (1968).

¹⁴ U.S. Commission on Civil Rights, Southern School Desegregation 1966–67, at 5 (1967).

¹⁵ Civil Rights Message of the President, Feb. 28, 1963.

¹⁶ Act of July 2, 1964, Pub. L. No. 88–352, 78 Stat. 241.

¹⁷ Act of August 6, 1965, Pub. L. No. 89–110, 79 Stat. 437.

¹⁸ Act of April 11, 1968, Pub. L. No. 90–284, 82 Stat. 73.

¹⁹ 42 U.S.C. § 2000d (1970).

²⁰ 42 U.S.C. § 2000c–6 (1970)

²¹ POLITICAL PARTICIPATION, *supra* note 13.

²² For an excellent account of the experience under freedom of choice plans, see U.S. COMMISSION ON CIVIL RIGHTS, SOUTHERN SCHOOL DESEGREGATION 1966–67, at 45–70 (1967).

²³ U.S.C. § 2000c (b) (1970):

"Desegregation" means the assignment of students to public schools and within such schools without regard to their race, color, religion, or national origin, but "desegregation" shall not mean the assignment of students to public schools in order to overcome racial imbalance.

²⁴ 42 U.S.C. § 2000c–6(a) (1970):

Provided that nothing herein shall empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance, or otherwise enlarge the existing power of the court to insure compliance with constitutional standards.

²⁵ CONG. REC. 2280 (1964).

²⁶ The key decision was United States v. Jefferson County Bd. of Educ., 372 F. 2d 836 (5th Cir. 1966), aff'd on rehearing, 380 F. 2d 385 (5th Cir. 1967), cert. denied, Caddo Parrish School Bd. v. United States, 389 U.S. 840 (1967).

²⁷ These efforts were the so-called "Whitten Amendments" attached to appropriations bills in the House of Representatives and which forbade the use of federal funds to require assignment or transportation of pupils. These proposals inevitably would be amended in the Senate so that the limitations only prohibited officials from carrying out unconstitutional directives.

²⁸ 402 U.S. 1 (1971).

²⁹ "Busing" meant only one thing, school desegregation, even though 20 million children were bused to school daily in 1971 and buses traveled 2.2 billion miles, virtually all of it totally unrelated to desegregation purposes. See U.S. Commission on Civil Rights, Your Child and Busing (1972).

³⁰ Eventually, the real meaning of Swann began to become apparent, and I believe helped ·to defeat the anti-busing bill in the 92d Congress.

³¹ The by-now classic statement reads:

An objection to transportation of students may have validity when the time or distance of travel is so great as to either risk the health of children or significantly impinge on the educational process.

Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 30–31 (1971).

³² Pub. L. No. 92–313, 86 Stat. 372.

³³ 93 S. Ct. 2773 (1973).

³⁴ 93 S. Ct. 2686 (1973).

³⁵ Id. at 2701–20.

³⁶ Id. at 2700.

³⁷ U.S. COMMISSION ON CIVIL RIGHTS, RACIAL ISOLATION IN THE PUBLIC SCHOOLS (1967).

³⁸ Keyes v. School Dist. No. 1, Denver, Colo. 93 S. Ct. 2686, 2706–07 (1973).

³⁹ Id. at 2706.

⁴⁰ Id. at 2718.

⁴¹ Keyes v. School Dist. No. 1, Denver, Colo. 93 S. Ct. 2686, 2711–19 (1973).

⁴² DENMARK, GUTTENTAG & RILEY, COMMUNICATION PATTERNS AND INTEGRATED CLASSROOMS AND PRE-INTEGRATION SUBJECT VARIABLES AS THEY AFFECT THE ACADEMIC ACHIEVEMENT AND SELF-CONCEPT OF PREVIOUSLY SEGREGATED CHILDREN (1967); U.S. COMMISSION ON CIVIL RIGHTS, THE DIMINISHING BARRIER, A STUDY OF SCHOOL DESEGREGATION IN TEN CITIES (1972).

⁴³ The U.S. Bureau of the Census reports that nearly half the nation's population of blacks is concentrated in 50 cities and at least one third of the total is in 15 cities. The top 15 cities are New York, Chicago, Detroit, Philadelphia, Washington, Los Angeles, Baltimore, Cleveland, New Orleans, Atlanta, St. Louis, Memphis, Dallas, Newark and Indianapolis.

⁴⁴ On the subject of Mexican-American education see the five volume series of reports, U.S. COMMISSION ON CIVIL RIGHTS, MEXICAN AMERICAN EDUCATION (1972).

⁴⁵ Keyes v. School Dist. No. 1, Denver, Colo., 93 S. Ct. 2686, 2719–20 (1973).

## ANTIBUSING AMENDMENTS

Mr. JAVITS. Mr. President, tomorrow, the Senate will consider a number of amendments to this bill concerned with busing. Foremost among these is the amendment to be offered by the Senator from Florida (Mr. GURNEY) which is identical to the House-passed Esch amendment.

So that my colleagues may have everything bearing on the legal and constitutional implications of this proposal I ask unanimous consent that a memorandum of law on the constitutionality of the Esch-Gurney amendment be printed at this point in the RECORD. I also ask unanimous consent for the printing of two additional documents: the views of the U.S. Civil Rights Commission, prepared at my request, and signed personally by every member of the Commission; and a statement issued today by the black caucus of the House of Representatives.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

MEMORANDUM OF LAW—THE CONSTITUTIONALITY OF ESCH-GURNEY AMENDMENT TO THE ELEMENTARY AND SECONDARY EDUCATION AMENDMENTS OF 1974

The regressive, anti-desegregation legislation now before the Congress was offered in the House of Representatives as Title II "Equal Educational Opportunities" of H.R. 69—The Elementary and Secondary Education Act of 1974. It is very similar to H.R. 13915 (92nd Congress), the so-called Equal Educational Opportunities Act of 1972 which was offered by the President for consideration in 1972. The amendment was sponsored by Representative Marvin Esch in the House and Senator Edward Gurney, in the Senate. It seeks to limit the authority of federal courts transportation of students beyond the closest or next closest school.

But the proposal is even more than prospective legislation. One section permits the reopening of court ordered desegregation plans, and plans under Title VI of the Civil Rights Act of 1964, to conform them with the provisions of the bill, even though many of those cases do not involve busing. As the Committees on Federal Legislation and Civil Rights of the New York City Bar Association concluded after its analysis of this proposal:

"While this is arguably permissible under the usual doctrine that equity decrees are always subject to review because of change of circumstances, this is in fact an invitation to reverse the school desegregation of the past eighteen years, particularly in the school district where desegregation has long been achieved. Presumably in such districts, the alleged disadvantages of pupil transportation have long since been overcome. It is cynical in the extreme, therefore, to permit new rounds of litigation where successful adjustment to constitutional order exists."⁹

This section raises then important questions of policy. Principally, however, this Memorandum questions the constitutionality of the direct and arbitrary prohibition of busing as a judicial remedy. The reasons are as follows:

I. The Esch/Gurney amendments will prevent the Federal courts and school authorities from implementing the constitutional requirements established by Brown v. Board of Education and subsequent cases.

Eighteen years ago, Brown v. Board of Education, 347 U.S. 483 (1954) established that State-imposed segregation by race in public schools denies equal protection of the laws under the Fourteenth Amendment. To correct such violations, the Fourteenth Amendment commands that the discriminating authority take whatever steps are necessary to convert to a racially, nondiscriminatory school system. Brown v. Board of Education, 349 U.S. 294, 301 (1955) (Brown II); Green v. County School Board of New Kent County, 391 U.S. 430 437–38 (1968). If school authorities fall in fulfilling their affirmative constitutional obligations, "judicial authority may be invoked." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, at 15 (1971). The court's power in fashioning an appropriate and truly effective remedy is broad, for "breadth and flexibility are inherent in equitable remedies." Swann at 15. Brown II.

Busing is only one of many techniques available for use in desegregating dual school systems. But sometimes busing is found to be the only effective remedy for the speedy desegregation plans mandated by the Court in Green v. County School Board of New Kent County, supra. Thus, the Supreme Court has recognized busing as an "integral part of the public education system for years," and as a "normal and accepted tool of educational policy." Swann at 29 (emphasis added). In Swann, the Court found "no basis for holding that the local school authorities may not be required to employ bus transportation as one tool of school desegregation." It added, "Desegregation plans cannot be limited to the walk-in school." Swann, supra 402 U.S. at p. 30.

If these amendments are adopted the legislation will overrule the principles of Swann, supra, North Carolina State Board of Education v. Swann, 402 U.S. 43 (1971) and Brown v. Board of Education (II), supra. It will prohibit the use of busing in any meaningful manner, by school authorities and federal district courts, as a remedial tool for school desegregation. It will prohibit busing in every case, for every child of school age, regardless of time and distance or number of children involved.

II. Congress, as well as the States, may not enact legislation which obstructs the Federal courts from fulfilling the mandate of the fourteenth amendment's equal protection clause.

The Supreme Court has declared that no State enactment may frustrate the constitutional mandate of the Fourteenth Amendment. North Carolina State Board of Education v. Swann, 402 U.S. 43 (1971). "An absolute prohibition against transportation of students," the Supreme Court said, "will . . . hamper the ability of local authorities to ef-

⁹ (See Congressional Record, vol. 118, pt. 21, pp. 27463–65 at p. 27464.)

fectively remedy constitutional violations," *Id.* at 46. Thus, the Court declared North Carolina's antibusing law to be unconstitutional are held:

"If a state-imposed limitation on a school authority's discretion operates to inhibit or obstruct the operation of a unitary school system or impede the disestablishing of a dual school system, it must fall; state policy must give way when it operates to hinder vindication of federal constitutional guarantees." *Id.* at 45.

*See also Goss v. Board of Education of City of Knoxville, Tennessee,* 444 F. 2d 632, 637 (6th Cir. 1971); *Clark v. Board of Directors of Little Rock School District,* 328 F. Supp. 1205, 1212 (E.D. Ark. 1971); and *Taylor v. Coahoma County School District,* 330 F. Supp. 174 176, 183 (N.D. Miss. 1970) *aff'd* 444 F. 2d 221 (5th Cir. 1971).

Congress has a no less stringent constitutional duty in this regard than any state agency. Yet, if Congress were to enact the Esch/Gurney Amendment it would be implicating itself in exactly the kind of segregatory activity prohibited for school boards, state legislatures and governors. Congressional action would be the direct cause of continuing denial of equal protection, where a constitutional violation has already been found and where busing has been decreed a necessary part of the effective remedy. In short, by staying implementation of an effective remedy, Congress would be acting in aid of racial discrimination, and therefore in violation of the due process clause of the Fifth Amendment. *Bolling v. Sharpe,* 347 U.S. 497 (1954); *Gautreaux v. Romney,* 448 F. 2d 731 (7th Cir. 1971). See *Green v. Kennedy,* 309 F. Supp. 1127, 1136 (D.C. 1970), *dismissed for want of juris., sub nom., Coit v. Green,* 400 U.S. 986 (1971). *Cf. Battaglia v. General Motors Corporation,* 169 F. 2d 254, 257 (2d Cir.), *cert. denied,* 335 U.S. 887 (1948). And as *Kelley v. Metropolitan County Board of Education of Nashville and Davidson County, — F. 2d —* (No. 71–1178–79) (6th Cir. May 30, 1972) emphatically suggests: ". . . no one may forbid a school board (or a federal court) from employing any of the tools of modern life in carrying out a constitutional mandate. *Davis v. Board of Commissioners of Mobile County,* 402 U.S. 33, 37–38 (1971)" [emphasis added].

III. Neither Congress' authority to regulate the jurisdiction of federal courts nor its authority to enforce the fourteenth amendment authorizes legislation which would prevent Federal courts from effectuating a constitutional mandate.

Although Article III of the Constitution authorizes Congress to regulate the jurisdiction of Federal courts, the principle of separation of powers precludes Congress from limiting the authority of the courts in interpreting the Constitution and effectuating Constitutional rights. *Marbury v. Madison,* 5 U.S. (1 Cranch) 137 (1803), *Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat) 304 (1816). Congress, in the guise of a jurisdictional statute, cannot deprive a party either of a right created by the Constitution or of any remedy the courts deem essential to enforce that right.

Nor can Congress enact legislation which prescribes a particular result in a case. In United States v. Klein, 80 U.S. (13 Wall.) 128 (1972) the Court held that the statutory limitation of the Federal courts' jurisdiction—offered by a Congress anxious to correct what it thought was an erroneous line of cases—was unconstitutional:

"We are directed"—said the Supreme Court—"to dismiss the appeal, if we find that the judgment must be affirmed. . . . Can we do so without allowing one party to the controversy [the Congress] to decide it in its own favor? Can we do so without allowing that the legislature may prescribe rules of decision to the Judicial Department of government in cases pending before it?

"We think not. . . . We must think that Congress has inadvertently passed the limit which separated the legislative from the judicial power." *Id.* at 146–47

The Klein case was decided after *Ex parte McCardle,* 74 U.S. (7 Wall) 506 (1868), which upheld a post-Civil War Act of Congress that deprived the Supreme Court of appellate jurisdiction over lower federal court decisions in habeas corpus cases. But it is clear from this case that the Court was not sanctioning unrestricted Congressional power to deprive it of jurisdiction to consider Constitutional claims. Despite the act of Congress which it sustained, the Court still had original habeas corpus jurisdiction as well as power to review lower court habeas corpus decisions by writ of certiorari. *Ex parte Yerger,* 75 U.S. (8 Wall) 85 (1868). Professor Alexander Bickel, moreover, has described the *McCardle* case as "aberrational" and has noted that, in common with Professor Henry M. Hart, Jr., he reads it "as a fairly narrow holding." (See Bickel, "What's Wrong with Nixon's Busing Bills?"

Nor do Congressional restrictions on the jurisdiction of courts found in the Emergency Price Control Act of 1942 and the Norris-LaGuardia Act justify the busing limitations contained in Esch/Gurney. The structure under the former statute preserved a full remedy in Federal courts. See *Yakus v. United States,* 321 U.S. 414 (1944) and *Lockerty v. Phillips,* 319 U.S. 182 (1943) and the latter statute did not restrict constitutional rights because a businessman does not have a constitutional right to have a federal court enjoin a strike growing out of a labor dispute. In fact the Norris-LaGuardia statute served to implement the First Amendment right to peaceful, non-coercive picketing. See *Thornhill v. Alabama,* 310 U.S. 88 (1940).

Finally, Section 5 of the Fourteenth Amendment, which authorizes Congress to enforce that Amendment "by appropriate legislation," provides no basis for sustaining the legislation in question.

Section 5 does not authorize Congress to contract the scope of protection guaranteed by the Fourteenth Amendment. The Equal Protection Clause of the Fourteenth Amendment was designed to expand and to extend constitutional protection to those who had previously been denied such rights. Congress may not thwart this purpose.

The Court spoke specifically to this point in *Katzenbach v. Morgan,* 384 U.S. 641, 651 n. 10 (1966) when it stated: "§ 5 does not grant Congress power to exercise discretion in the other direction and to enact 'statutes so as in effect to dilute equal protection and due process decisions of this Court.' We emphasize the Congress' power under § 5 is limited to adopting measures to enforce the guarantees of the Amendment; § 5 grants Congress no power to restrict, abrogate, or dilute these guarantees."

Section 5, moreover, cannot be used as a basis for regulating the jurisdiction of the Federal courts. That Section concerns only questions of federalism—the Federal Government's relations with the states—not issues of checks and balances between Congress and the Federal Judiciary. The history of Section 5 plainly demonstrates that its purpose was simply to enable "Congress, in case the States shall enact laws in conflict with the principles of the Amendment, to correct that legislation by a formal Congressional enactment." Remarks of Senator Howard, who reported the Fourteenth Amendment to the Senate from the Joint Committee on Reconstruction, *Cong. Globe,* 39th Cong., 1st Sess., 2766, 2768 (1866). Section 5 was not intended to give Congress greater power than the Federal Courts to define Constitutional rights.

The legal impact of this proposal will be to eliminate busing as a viable tool for school desegregation. Though the bill's language states "except to the closest or next closest

school," busing restricted to these conditions will prove ineffectual in countervailing the impact of residential segregation upon school attendance patterns of children. Where busing is an indispensable and effective method of desegregation, federal courts will find themselves constrained to render less than effective remedies.

For these reasons, this bill contracts the scope of constitutional guarantees afforded by the Fourteenth Amendment. It cannot be sustained upon a reading of Section 5.

U.S. COMMISSION ON CIVIL RIGHTS,
*Washington, D.C., May 6, 1974.*
Hon. JACOB K. JAVITS,
*U.S. Senator, Washington, D.C.*

DEAR SENATOR JAVITS: We have received your request for our findings and recommendations relative to the Gurney, Ervin, and Scott-Mansfield Amendments to the Elementary and Secondary Education Act of 1974. We are pleased to comply.

The most extensive of these Amendments is the Gurney Amendment. The major thrust of the Gurney Amendment is to prohibit student transportation to promote school desegregation. In its place, the Amendment would require the acceptance of the neighborhood school as the appropriate basis for determining public school assignments. The Amendment makes several findings: (1) Large amounts of funds have been spent by local educational agencies on student transportation for desegregation; (2) Such transportation has created "serious risks" to the health and safety of students and has been excessive; and (3) Court guidelines have not been "clear, rational and uniform" on the question of reassigning and transporting students to effect desegregation.

The Amendment defines as unlawful various practices if taken on account of race, color, sex, or national origin—for example, "deliberate segregation" and faculty or staff employment discrimination. It would also prohibit the assignment of students to schools other than the one closest to their residence if such assignment resulted in a greater degree of segregation. The Amendment would permit a court in its discretion to award costs and attorneys' fees to the prevailing party. In addition, the Amendment prohibits the busing of students as a desegregation remedy unless the busing is to the school closest or next closest to the student's place of residence. Another of its provisions would permit school authorities to "reopen" all court orders and Title IV desegregation plans now in effect.

The United States Commission on Civil Rights has appeared before Congressional Committees on five occasions during the 92nd and 93rd Congresses to testify on the so-called "busing" issue. On all five occasions we have opposed efforts which would prevent a court, department or agency of the United States from utilizing transportation in order to achieve the objective of desegregating the schools of our Nation. We have consistently opposed all legislation which would weaken the constitutional prohibition against governmentally-sanctioned segregation of public schools.

Our opposition to these proposals has been based on three principles:

First, that public education next to the family is the Nation's most important social institution. In the words of the Supreme Court, it is "the principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment."

Second, that governmentally-segregated public schools are "inherently unequal" and are therefore violative of the 14th Amendment right to equal protection of the laws.

Third, that participation in the educational programs of desegregated schools is

the best way to prepare students to live under and to help implement the principles embodied in the Constitution.

In addition, our opposition to these proposals has been based on evidence, growing out of studies conducted by the Commission, which point conclusively to the fact that there are situations where pupil transportation is the only method that will effectively prevent students from being forced to attend segregated schools.

We are fully aware of the complex problems that have confronted and do confront communities in the nation that are providing transportation so as to prevent students from being forced to attend segregated schools. We have found that many of these problems have been resolved in a constructive manner.

Nevertheless we understand that persons living in communities that confront the necessity of inaugurating pupil transportation programs in order to prevent students from being forced to attend segregated schools ask in good faith whether the price that we must pay should be paid. Our response must be that constitutional rights designed to open doors of opportunity for all of our people must be treated as absolutes. We cannot afford to turn our back on them because of difficulty of implementation. Any other course of action undermines our constitutional form of government.

It is in the light of these principles and considerations, Commission research, and our analysis of the legislation that we are now presenting the following findings and recommendation relative to the Gurney, Ervin, Scott-Mansfield Amendments. In most instances we are stating our findings and only briefly summarizing the evidence on which each finding is based. In all instances, however, we are prepared to support our findings with evidence based on studies and legal analyses conducted by the Commission and by others working in this field.

THE GURNEY AMENDMENT

1. The Gurney Amendment would deny to Federal Courts or administrative agencies the right to prevent students from being forced to attend segregated schools where pupil transportation is the method necessary to achieve actual desegregation.

Congress by adopting such an Amendment would be attempting to overrule the Supreme Court's decision in *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U.S. 1 (1971) that transportation is one of a number of viable techniques by which schools can be desegregated. In some school districts, transportation either alone or in conjunction with other desegregation techniques is a "must" if the constitutional mandate eliminating state-imposed segregation is to be carried out.

It is recognized that any attempt by Congress to legislate a dual school system would be unconstitutional. The Supreme Court has found in *North Carolina State Board of Education* v. *Swann*, 402 U.S. 43, 45 (1971) that legislation which attempts to reach the same result through indirect means is just as unconstitutional.

The Gurney Amendment would lead to such a result by denying the courts one of their most potent weapons namely, pupil transportation. In essence, while the Amendment recognizes and endorses the rights of children to be free from governmentally established segregated schools, it would take away the means to assure that right.

2. The provision in the Gurney Amendment which would permit the reopening in the courts of desegregation plans now in effect because of their alleged conflict with the transportation provisions of the Gurney Amendment would re-open old wounds in many communities, bring to a halt the steps that are being taken to achieve genuine desegregation, and would undermine efforts of conscientious officials who under extremely difficult circumstances have obeyed the Constitution.

In addition to unitary school districts already existing, there are roughly 1,500 school districts which are and have been desegregating their school systems since 1954 pursuant to court orders or plans accepted by the Department of Health, Education, and Welfare. Students in these schools are in the process of having their constitutional guarantee of equal protection of the laws fulfilled.

The Gurney Amendment, however, seeks to stop this process while the courts are asked to determine whether some of the students in these formerly *de jure* districts should be returned to segregated schools. This backward step would be an indefensible expenditure of time, energy and money.

3. The provisions of the Gurney Amendment establishing the so-called "neighborhood school" as the appropriate basis for student assignment would in fact cause many students to attend *de jure* segregated schools.

There is nothing about a neighborhood school that compensates for the denial of a constitutional right. We, therefore, see no point in entering into a discussion of the pros and cons of neighborhood schools. In passing, however, it should be pointed out that the argument for neighborhood schools has been advanced vigorously only since the advent of desegregation. In connection with our responsibilities under the Civil Rights Act of 1957, as amended, it is sufficient for us to point out that the Gurney Amendment is in direct conflict with the declaration of the Supreme Court of the United States in *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 30 (1971) that "desegregation plans cannot be limited to the walk-in schools."

4. The provision in the Amendment that no unitary school system shall be required to formulate or implement a desegregation plan because of "residential shifts in population . . . which result in school population changes in any school within such a desegregated school system . . ." is misleading and unnecessary.

Since the *Brown* decision, the courts have distinguished between *de facto* school segregation caused by residential change or population movement and *de jure* school segregation resulting from the official actions of educational authorities. Every school desegregation order that has ever been supported by the Supreme Court has been based upon a factual finding of *de jure* segregation. This provision is therefore misleading in that it creates the impression that action is required in an area in which it is not required.

5. The provision of the Amendment that failure to "attain a balance, on the basis of race, color, sex, or national origin, of students" within a school district "shall not constitute a denial of equal educational opportunity, or equal protection of the laws" is misleading and unnecessary.

The federal courts have never required such a balance of students. As the Supreme Court stated in Swann, "the constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole . . . ." (at 24)

6. The provision of the Gurney Amendment that could result in the parents of children being compelled to pay the legal expenses of the defendant educational agency, as well as their own, places an indefensible obstacle in the path of parents who attempt to vindicate their constitutional rights in this area.

This finding speaks for itself.

7. The flexibility which the Supreme Court has demonstrated in the development of guidelines for desegregation by the courts, departments and agencies of the United States has encouraged the development of desegregation plans which are responsive to varied local situations.

The Gurney Amendment adopts the opposite point of view. In so doing the authors and sponsors reflect a lack of confidence in a process which gives full recognition to local conditions and yet, at the same time, achieves the objective of implementing constitutional rights.

In the *Swann* case, for example, the Supreme Court stated that "no rigid guidelines as to student transportation can be given for application to the infinite variety of problems presented in thousands of situations." (at 29)

The flexibility which the Supreme Court has encouraged permits local school districts to design their own plans, in close consultation with the local district court or other federal agencies if necessary, and to choose from a wide range of tools those best suited to deal with the situation as it exists in their own districts. In this way local desegregation plans may be fashioned in the most practical and reasonable manner and yet still meet current constitutional and statutory standards.

8. The provision of the Amendment which would make it an "unlawful practice" to "assign a student to a school other than the one closest to his or her place of residence . . . if such an assignment results in a greater degree of segregation of students on the basis of race, color, sex, or national origin . . ." would be an administrative nightmare for school officials and governmental authorities.

Local school officials who conscientiously wished not to violate the law would be thrust upon the horns of a virtually impossible dilemma by this section of the Amendment. One way that a school district could be sure that it was not engaging in the "unlawful practice" would be to assign all children to the school closest to their homes. This would compel school officials to compute the precise distance between the homes of all children and the surrounding schools, and based on these computations, to engage in the wholesale transfer of thousands of children who presently do not attend the closest school. Moreover, school authorities would have to update the school-home distance computations to account for the construction of new schools, new residences, and the closing of obsolete facilities, and transfer countless additional children annually.

The other means by which local school officials could insure their full compliance with the law created by the Amendment is even more administratively complex and mind-boggling. So that school officials could continue the often-necessary administrative practice of assigning children to schools other than the one closest to their residence, they would be compelled to compute annually the precise student ratios for all schools in the district "on the basis of race, color, sex, and national origin." Then school officials would have to determine that the assignment of a child to a school other than the closest one would not contribute to an increased level of segregation.

It is ironic that a constitutionally defective Amendment is, in addition, administratively onerous. Needless to say, should the Amendment be made administratively feasible, its unconstitutionality should preclude legislative enactment.

9. The portion of the Gurney Amendment which provides for the elimination of excessive transportation of students when necessitated by desegregation which allegedly "creates risks to their health and safety" and "disrupts the educational process" is unnecessary and misleading.

The Supreme Court in *Swann* forbade the use of transportation in school desegregation plans "when the time or distance of travel is so great as to risk either the health of the child or significantly impinge on the educational process." (at 30-31)

Statistics of the U.S. Department of Transportation show that approximately one percent of the increase in public school transportation from the period 1954 to 1972 can be attributed to school desegregation.

### THE ASHBROOK AMENDMENT

In the event the Ashbrook Amendment, which was adopted by the House of Representatives, is offered during the Senate debate, we are providing our comments on it.

The Ashbrook Amendment would prohibit the use of Federal education funds for transportation costs involved in school desegregation plans.

10. The Ashbrook Amendment seeks to erect a roadblock to the granting of equal educational opportunity by denying the use of Federal funds for any plan, voluntary or otherwise, which seeks to implement those rights by spending money on pupil transportation.

Like the Gurney Amendment it seeks to accomplish indirectly what the authors and sponsors know cannot be accomplished directly; namely, the denial of rights of students to attend schools which are not segregated.

### THE ERVIN AMENDMENT

The Ervin Amendment would prohibit federal officials from using federal funds for the purpose of inducing school boards operating dual schools to convert to unitary systems. It would permit such school systems to implement "freedom of choice" plans regardless of the resulting racial composition of the system's schools.

11. The Ervin Amendment if adopted would effectively repeal Title VI of the Civil Rights Act of 1954 as it applies to education and seeks to overrule the decision of the Supreme Court in Green v. County School Board of New Kent County, 391 U.S. 430 (1968) which ruled that if freedom of choice plans are to be found constitutional they must be effective in that they achieve actual desegregation. In Green the court found that the plan before it was ineffective.

In support of the Commission's position on this Amendment we enclose a copy of our testimony presented before the Senate subcommittee on Constitutional Rights on February 21, 1974.

### THE SCOTT/MANSFIELD AMENDMENT

The Scott/Mansfield Amendment would prohibit the use of appropriated funds for the transportation of students in connection with court ordered desegregation, make illegal the assignment of pupils to overcome "racial imbalance," and postpone the implementation of district court orders which require the transportation of pupils until all appeals are exhausted.

12. The provisions of this amendment would slow down the process of implementing the constitutional rights set forth in Brown.

These provisions were included as Sections 801 and 802 of the General Education Amendments of 1972 (P.L. 92–318) and incorporate certain decisions by the United States Supreme Court related to transportation distances and the provisions in Section 407(a) of the 1964 Civil Rights Act related to so-called busing for racial balance.

### RECOMMENDATION

On the basis of these findings there is just one recommendation that we can make; namely, that the Senate reject the Gurney, Ervin, Scott-Mansfield and Ashbrook Amendments.

### CONCLUSION

On May 17 this nation will commemorate the 20th anniversary of the unanimous decision of the Supreme Court of the United States to strike down the major legal barrier to racial equality—the "separate but equal" doctrine. This event was second only to the Emancipation Proclamation from the point of view of its potential contribution to the long struggle, both inside and outside the minority communities, to implement the civil rights guaranteed by the Constitution.

The passage of any legislation which would deny to the Federal Courts or administrative agencies the right to prevent students from being forced to attend segregated schools where pupil transportation is the method necessary to achieve actual desegregation would turn the celebrations planned for the 20th anniversary of the Brown v. Board of Education Supreme Court decision into a dirge. Such an action would convey the following message to the parents of all children—

"If you live in a location where your children can walk to a desegregated school, your children can benefit from the constitutional prohibition against governmentally segregated schools and participate in the educational opportunities provided by a desegregated school.

"If, on the other hand, you live in a location where your children need transportation to a desegregated school, your children will be denied the benefits of the constitutional prohibition against state sanctioned segregated schools and will be unable to participate in the educational opportunities provided by desegregated schools."

Once again hope will be replaced by despair.

We believe that the Report of the National Advisory Commission on Civil Disorders was right when in 1968 it pointed to the danger of our Nation moving toward two societies, one black, one white—separate and unequal. The enactment of the proposed amendments on which we have commented in this letter would contribute to such a tragic development. We hope that instead of moving in this direction the Congress will hold fast to the sure promise of a more united and peaceful Nation under desegregated institutions.

Respectfully yours,

ARTHUR S. FLEMMING, Chairman; STEPHEN HORN, Vice Chairman; FRANKIE M. FREEMAN, ROBERT S. RANKIN, MANUEL RUIZ, JR., JOHN A. BUGGS, Staff Director.

CONGRESSIONAL BLACK CAUCUS INC.,
*Washington, D.C., May 14, 1974.*
Senator PHILIP A. HART,
*Washington, D.C.*

DEAR SENATORS HART, JAVITS, KENNEDY, MONDALE: The Congressional Black Caucus is extremely concerned over the anti-busing amendments which will be offered when the Senate considers S. 1539, a bill to extend the Elementary and Secondary Education Act for three more years. The sixteen black members of the House voted against the anti-busing amendments to H.R. 69, which was passed in the House.

Of major concern to the members of the Caucus is the fact that the Esch amendment represents an assault against the independence and the integrity of the judicial system. The Esch amendment which is clearly unconstitutional, also presents the grave danger of the legislative body trying to usurp the powers of the judicial branch of the government.

The addition of anti-busing amendments to S. 1539 will be an enormous setback to the school desegregation and civil rights gains achieved over the last 20 years. The Congressional Black Caucus is urging members of the Senate to defeat all anti-busing amendments to S. 1539.

Sincerely,

Yvonne Braithwaite Burke, Shirley Chisholm, William Clay, Cardiss Collins, John Conyers, Jr., Ronald V. Dellums, Charles C. Diggs, Jr., Walter E. Fauntroy, Augustus F. Hawkins, Barbara Jordan, Ralph H. Metcalfe, Parren J. Mitchell, Robert N. C. Nix, Charles B. Rangel, Louis Stokes, Andrew Young.

## EDUCATION PROGRAMS FOR HANDICAPPED CHILDREN

Mr. MATHIAS. Mr. President, in my introductory remarks on amendment No. 1305 for aid to the handicapped, I referred to the recent court decree in the State of Maryland to highlight the critical need to expand and improve education programs for handicapped children. In the context of this urgent need, I have received several communications in support of my amendment from various Maryland school superintendents. I ask unanimous consent that the text of these communications be included in the RECORD.

There being no objection, the communications were ordered to be printed in the RECORD, as follows:

BOARD OF EDUCATION
OF SAINT MARYS COUNTY,
*Leonardtown, Md.*
Hon. CHARLES MATHIAS, JR.,
*Capitol Hill,*
*Washington, D.C.*

Please support the proposed amendment to S. 1539 for Federal aid for handicapped. Saint Marys County would benefit by about 180,000 dollars for use with handicapped children. This aid would contribute greatly to our expanding handicapped program.

ROBERT E. KING, JR.,
*Superintendent of Schools.*

PRINCE GEORGE'S COUNTY PUBLIC
SCHOOLS,
*Upper Marlboro, Md., April 30, 1974.*
Hon. CHARLES MCC. MATHIAS, JR.,
*U.S. Senate,*
*Washington, D.C.*

DEAR SENATOR MATHIAS: It has come to my attention that you plan to introduce legislation, on or about May 2, 1974, which promotes the national commitment to improving programs for handicapped children. This encouraging prospect prompted my desire to express support for your efforts.

In the recent decade, the State of Maryland has been in the forefront of educational programs for its handicapped children. Recent legislation passed in the '73 Legislature (106-D of Article 77, Public Schools Laws of Maryland) provides that all children 0-20 shall have the advantage of programs of education regardless of the nature and severity of their handicap. Programs that will address themselves to preschool children will come into being throughout the state and be fully implemented by 1980. Current costs of educating children continue to soar.

Presently, programs in special education receive funding from both educational agencies and the State Department of Education. The situation in Prince George's County is about a 50-50 proposition. With increased pressures to decrease property taxes and, indeed, state taxes, it is going to be more and more difficult for counties and states to sufficiently fund programs for their handicapped children and youth. A special subsidy provided by the federal government would ease the burden of local governments and, at least, make the federal government a partial partner in the responsibility of educating the handicapped in order that they may become fully participating and contributing members of society in the future.

We, in Prince George's County, are most grateful for your continuing efforts to improve the quality of public education in the state and nation.

Very truly yours,

CARL W. HASSEL,
*Superintendent of Schools.*

[TELEGRAM]
CHESTERTOWN, MD.

Senator CHARLES MAC. MATHIAS,
*Senate Office Building,*
*Washington, D.C.*

Urge you support amendment to SB1539 which will provide $15.00 per pupil for improved programs for the handicapped.
RICHARD L. HOLLE,
*Superintendent of Schools.*

BOARD OF EDUCATION OF GARRETT COUNTY,
*Oakland, Md., May 1, 1974.*

Hon. CHARLES MCC. MATHIAS, Jr.,
*Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR MATHIAS: Let me begin by thanking you for the interest shown to education in the State of Maryland. The superintendents of the State, and I am sure, the public, respect the leadership that you are exerting in federal aid legislation for education.

Please lend your support to Senate Bill 1539—Federal Aid for the Handicapped. We in Garrett Country are trying to double our services to these students over the next three years and this legislation will be a small step in helping to move us in that direction. Many thanks for your support in this matter.

Sincerely yours,
WILLIAM H. BUSER,
*Superintendent of Schools.*

ROCKVILLE, MD., *April 30, 1974.*

Hon. CHARLES MCC. MATHIAS, Jr.,
*Old Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR MATHIAS: We want you to know of our strong support for your intention to offer an amendment to the extension of the Elementary and Secondary Education Act (S. 1539), which would provide $15 per pupil enrolled child to be designated for programs and services for handicapped students.

The school system's responsibility for the education of all children, regardless of need, has been given a high priority by our Board of Education. The Maryland General Assembly has mandated a comprehensive educational program for handicapped pupils, and a recent Maryland Circuit Court decision has affirmed the right of handicapped pupils to equal educational opportunities. This undertaking, however, will be extraordinarily expensive; and Federal aid, such as you propose, will be essential to speedy implementation of these programs.

We have aggressively pursued all available state and federal support to supplement local funds on behalf of our handicapped students. However, in spite of these efforts, additional support is necessary to provide appropriate educational programs offered by staff and specialists adequately trained to offer the very specialized services required by our seriously handicapped school-age population.

While we believe that S. 6 and H.R. 70 provide the proper long-range approach, it appears that these bills will not be passed in the near future. Since we feel that our need is immediate, we appreciate your efforts in assisting us to meet our responsibility for the education of handicapped pupils.

Sincerely,
DONALD MIEDEMA,
*Deputy Superintendent of Schools.*
HOMER O. ELSEROAD,
*Superintendent of Schools.*

BOARD OF EDUCATION OF SOMERSET COUNTY,
*Princess Anne, Md., May 1, 1974.*

Hon. CHARLES MCC. MATHIAS, Jr.,
*U.S. Senate,*
*Washington, D.C.*

MY DEAR SENATOR MATHIAS: Senate Bill 1539, Federal Aid for the Handicapped, upon enactment would greatly assist this County and the State.

Please be aware of this County's strong support of this piece of legislation. Your efforts regarding its Senate passage would be greatly appreciated.

Kindest personal regards,
Sincerely yours,
JACK B. KUSSMAUL,
*Superintendent of Schools.*

[Telegram]
MONTGOMERY COUNTY PUBLIC SCHOOLS,
*Rockville, Md.*

Hon. CHARLES MCC. MATHIAS, Jr.,
*Washington, D.C.*

We strongly support the legislation you plan to introduce on behalf of handicapped children. The Maryland General Assembly has mandated a comprehensive educational program for handicapped pupils, and a recent Maryland circuit court decision has affirmed the right of handicapped pupils to equal educational opportunities.

Provision of appropriate services to all of our seriously handicapped school age population will be extraordinarily expensive. Federal aid, such as you propose, is urgently needed to supplement State and local resources for speedy implementation of these programs.

HOMER O. ELSEROAD,
*Superintendent of Schools.*

Mr. PELL. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. On whose time?

Mr. PELL. Mr. President, I ask unanimous consent that the time for the quorum call be charged to neither side.

The PRESIDING OFFICER. Without objection, it is so ordered. The clerk will call the roll.

The second assistant legislative clerk proceeded to call the roll.

Mr. ROBERT C. BYRD. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

## REMOVAL OF INJUNCTION OF SECRECY FROM THE INTERNATIONAL WHEAT AGREEMENT, 1971 (EX. C, 93D CONG., 2D SESS.)

Mr. ROBERT C. BYRD. Mr. President, as in executive session, I ask unanimous consent that the injunction of secrecy be removed from the Protocols for the Extension of the Wheat Trade Convention and the Food Aid Convention constituting the International Wheat Agreement, 1971, open for signature in Washington from April 2 through April 22, 1974— Executive C, 93d Congress, 2d session—transmitted to the Senate today by the President of the United States, and that the protocols with accompanying papers be referred to the Committee on Foreign Relations and ordered to be printed, and that the President's message be printed in the RECORD.

The PRESIDING OFFICER (Mr. NUNN). Without objection, it is so ordered.

The message is as follows:

*To the Senate of the United States:*

For the advice and consent of the Senate to ratification, I transmit herewith the Protocols for the Extension of the Wheat Trade Convention and the Food Aid Convention constituting the International Wheat Agreement, 1971, open for signature in Washington from April 2 through April 22, 1974. The Protocols were formulated by a Conference of Governments which met in London on February 22, 1974.

I transmit also, for the information of the Senate, the report of the Department of State with respect to the Protocols.

The Protocol for the Extension of the Wheat Trade Convention, 1971, extends the Convention until June 30, 1975, and maintains the framework for international cooperation in wheat trade matters. It also continues the existence of the International Wheat Council.

The Protocol for the Extension of the Food Aid Convention, 1971, also extends until June 30, 1975, commitments of parties to provide certain minimum annual quantities of food aid to developing countries. The United States intends not to deposit ratification of this Protocol, unless the European Economic Community remains a party. This intention was formally recorded by the United States in a written declaration made at the time the Protocols were signed.

Both Protocols provide that instruments of ratification shall be deposited no later than June 18, 1974. The Wheat Council may, however, grant an extension of time to any signatory government that has not deposited an instrument of ratification by that date.

It is my hope that the Senate will give favorable consideration to the two Protocols so that, subject to the European Economic Community remaining a party to the Food Aid Convention, ratification by the United States can be effected and instruments of ratification for the Wheat Trade Convention and the Food Aid Convention can be deposited without undue delay.

RICHARD NIXON.
THE WHITE HOUSE, *May 14, 1974.*

## ORDER FOR CONSIDERATION OF UNFINISHED BUSINESS TOMORROW

Mr. ROBERT C. BYRD. Mr. President, I ask unanimous consent that after the two leaders or their designees have been recognized on tomorrow, without any morning business occurring at that time, the Senate proceed to the consideration of the unfinished business.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. ROBERT C. BYRD. Now, Mr. President, is it automatic that the question at that time would be on the adoption of the amendment by Mr. GURNEY?

The PRESIDING OFFICER. That will be laid before the Senate as the pending question under the agreement.

Mr. ROBERT C. BYRD. After the two leaders or their designees have been recognized?

The PRESIDING OFFICER. The Senator is correct.

## PROGRAM

Mr. ROBERT C. BYRD. Mr. President, the program for tomorrow is as follows:

The Senate will convene at the hour of 9 a.m. After the two leaders or their designees have been recognized under the