## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. 1:12-cv-00327 (ABJ) |
| THE UNITED STATES DEPARTMENT OF EDUCATION, | ) ) ) ) |
| Defendant. | ) ) |

_____)

## PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OPPOSING DEFENDANT'S MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

The Electronic Privacy Information Center ("EPIC"), together with co-plaintiffs Grayson Barber, Pablo Garcia Molina, Peter Neumann, and Deborah Peel, challenge the Education Department's 2011 Final Rule ("Final Rule") modifying the Family Educational Rights and Privacy Act of 1974, as amended ("FERPA"), 20 U.S.C. § 1232g. The Court should deny the Education Department's motion to dismiss for lack of subject matter jurisdiction because EPIC and the co-plaintiffs have standing to bring suit against the Education Department.

Moreover, EPIC and the co-plaintiffs cross-move for summary judgment, and respectfully request that the Court deny summary judgment for the Education Department. The Final Rule's definitions of "directory information," "authorized representative," and "education program" violate the Administrative Procedure Act because they were promulgated "in excess of [the Department's] statutory authority," and are "not in accordance with law." 5 U.S.C. § 706 (2)(A), (C); Compl. ¶¶ 30, 35 Feb. 29, 2012, ECF No. 1. The Education Department is not entitled to deference concerning the disputed definitions because Congress has expressly prohibited the

Department's interpretations, and in addition, the Department's interpretations are not permissible constructions of the FERPA. For these reasons, the Court should deny the Department's motion for summary judgment, and grant EPIC's cross-motion for summary judgment.

EPIC and the co-plaintiffs have filed with this motion a memorandum in support of the motion and a proposed order.

Respectfully submitted,

By:     _/s/ _____
Marc Rotenberg (DC Bar # 422825)
Khaliah Barnes*
David Jacobs**
ELECTRONIC PRIVACY
INFORMATION CENTER
1718 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20009
(202) 483-1140 (telephone)
(202) 483-1248 (facsimile)
*Attorneys for Plaintiffs*

Dated:  January 18, 2013

*Ms. Barnes is a member in good standing of the Maryland Bar. Her admission to the D.C. Bar is pending.

** Mr. Jacobs is a member in good standing of the New York Bar.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:12-cv-00327 (ABJ) |
| THE UNITED STATES DEPARTMENT OF EDUCATION, | ) ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

### *ORAL ARGUMENT REQUESTED*

## **TABLE OF CONTENTS**

Table of Contents ....................................................................................................... i

Table of Authorities ................................................................................................. iv

SUMMARY ............................................................................................................... 1

Statement of Facts .................................................................................................... 2

Argument .................................................................................................................. 4

   **I.   Plaintiffs Satisfy the Injury-in-Fact Requirement of Article III, and Thus Have Standing to Bring Suit in This Court** ................................................................. 4

     A.   The Individual Plaintiffs have Standing to Bring Suit Because There is an Imminent Risk that their Private Education Records will be Disclosed ................................ 5

     B.   EPIC has Standing to Bring Suit on Its Own Behalf Because It has Suffered a Concrete and Demonstrable Injury to its Activities ....................................................... 8

     C.   EPIC has Standing to Bring Suit on Behalf of the Members of its Advisory Board  and Board of Directors ................................................................................. 11

   **II.   Plaintiffs' Injuries Were Caused By The Department's Unlawful FERPA Rule Revision** ............................................................................................................ 14

   **III.   The Final Rule Must Be Analyzed Under the *Chevron* Deference Standard** ........... 16

   **IV.   Each of the Challenged Definitions Exceeds Statutory Authority and Is Therefore Not Entitled to *Chevron* Deference** .................................................................. 18

     A.   The Final Rule's Definition of "Directory Information" Exceeds the Education Department's Statutory Authority Because it Removes Students' Right to Prohibit Disclosure of Directory Information .......................................................... 18

       1. Through the FERPA's Text, Purpose, and Legislative History, Congress Unambiguously Guaranteed Students the Right to Prevent Disclosure of Directory Information .................................................................................. 19

       2. The Final Rule's Directory Information Amendment is not Reasonable Because it Reveals Information that Would be Considered Harmful or an Invasion of Privacy ..... 21

     B.   The Final Rule's Definition of "Authorized Representative" Exceeds the Education Department's Statutory Authority Because the Plain Meaning and Legislative History of the FERPA Foreclose the Department's Interpretation, and the Definition is Otherwise Not a Permissible Construction of the FERPA .......................................... 24

       1. The FERPA's statutory text, taken as a whole, proscribes the Department's interpretation ................................................................................... 24

       2. Notwithstanding Congress's  statutory limitations for "authorized representatives," the Department's Definition for "Authorized Representatives" is Not a Permissible Construction of the Statute ...................................................... 29

         i. The Department's definition is not a permissible construction of the FERPA because it improperly delegates the Department's authority to non-federal entities.. 29

         ii. The Department's definition is not a permissible construction of the FERPA because by abandoning its previous interpretation that authorized representatives must be under direct control of 34 C.F.R.§99.31(a) officials, the Final Rule is unlawfully retroactive .......................................................................... 32

         iii. The Department's definition is not permissible even in light of SLDS ............... 34

C.   The Final  Rule's Expansive Definition For Education Programs Is Not a Reasonable Construction Under The FERPA ...................................................................................... 37

**V.   The Disputed Definitions Are Not in Accordance with Law Because They Are Contrary to the FERPA's Plain Meaning and Not a Permissible Construction of the Statute.................................................................................................................... 40**

**VI.   The Disputed Definitions are Arbitrary and Capricious Because They Are Not the Product of Reasoned Decisionmaking ................................................................... 40**

**CONCLUSION ............................................................................................................ 42**

**Request for oral argument ......................................................................................... 42**

## TABLE OF AUTHORITIES

C<small>ASES</small>

*Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129 (D.C. Cir. 2006) ------------------------------------------------------------------------------10, 12, 19
*Am. Bus Ass'n v. Slater*, 231 F.3d 1 (D.C. Cir. 2000) -------------------------------------------------22
*Am. Chemistry Council v. Johnson*, 406 F.3d 738 (D.C. Cir. 2005) ----------------------------------34
*Am. Petroleum Inst. v. EPA*, 52 F.3d 1113 (D.C.Cir. 1995) ----------------------------------------22
*\*Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13 (D.C. Cir. 2011) ------------------------------------------------------------------------------------------------- 5, 9
*Arkema Inc. v. E.P.A.*, 618 F.3d 1 (D.C. Cir. 2010)----------------------------------------------41, 42, 43
Ass'n of Private Sector Colleges & Universities v. Duncan, 681 F.3d 427 (D.C. Cir. 2012) -----51
*Backcountry Against Dumps v. EPA*, 100 F.3d 147 (D.C.Cir. 1996) ----------------------------------22
*Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438 (2002) --------------------------------------------33
*Bell Atlantic Tel. Cos. v. FCC*, 131 F.3d 1044 (D.C.Cir. 1997)----------------------------------------21
*\*Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984) ------------------------- 20, 21
*Consumer Federation of America v. F.C.C.*, 348 F.3d 1009 (D.C. Cir. 2003) ----------------------15
*Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59 (1978)--------------------------17
*Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136 (D.C. Cir. 2011)---------------- 9, 12, 17
*Ethyl Corp. v. EPA*, 51 F.3d 1053 (D.C.Cir. 1995)----------------------------------------------------22
*Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268 (D.C. Cir. 1994) ------------------------------------------------------------------------------------10, 12, 19
*Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826 (5th Cir. 1997) -------------------14
*Fund Democracy, LLC v. S.E.C.*, 278 F.3d 21 (D.C. Cir. 2002) --------------------------------------14
*Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794 (D.C. Cir. 1987) ------------------------------------11
*\*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)----------------------------------------------4, 19
*\*Holland v. Apfel*, 23 F. Supp. 2d 21, 27 (D.D.C. 1998) ---------------------------------------------50
*Humane Soc'y of U.S. v. U.S. Postal Serv.*, 609 F. Supp. 2d 85 (D.D.C. 2009)----------------------18
*Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333 (1977)---------------------------------14
*Krottner v. Starbucks Corp.*, 628 F.3d 1139 (9th Cir. 2010)----------------------------------------- 9
*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) --------------------------------------- 4, 17, 19
*Mingo Logan Coal Co. Inc. v. U.S. E.P.A.*, 850 F. Supp. 2d 133 (D.D.C. 2012) --------------- 20, 21
*\*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)--------------------------------------------------------------------------------------------------51
*Mountain States Legal Found. v. Glickman*, 92 F.3d 1228 (D.C. Cir. 1996)------------------------- 7
*N. Am. Catholic Educ. Programming Found., Inc. v. F.C.C.*, 437 F.3d 1206 (D.C. Cir. 2006) --45
*Nat'l Ass'n of Reg. Util. Comm'rs ("NARUC") v. FCC*, 737 F.2d 1095 (D.C.Cir. 1984) ---- 37, 38
*Nat'l Mining Ass'n v. Jackson*, 816 F. Supp. 2d 37 (D.D.C. 2011)----------------------------------22
*Nat'l Mining Ass'n v. United States Dep't of Interior*, 177 F.3d 1 (D.C.Cir. 1999)-----------------41
*Nat'l Park and Conservation Ass'n v. Stanton*, 54 F.Supp.2d 7 (D.D.C.1999)----------------------38
*Nat'l Rifle Ass'n of America v. Reno*, 216 F.3d 122 (D.C.Cir. 2000) --------------------------------34
*Nat'l Treasury Employees Union v. Seidman*, 786 F. Supp. 1041 (D.D.C. 1992) ------------------16
*Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423 (D.C. Cir. 1996)---------------11
*Nat'l Treasury Employees Union v. Whipple*, 636 F. Supp. 2d 63 (D.D.C. 2009) ------------------16
*Newdow v. Roberts*, 603 F.3d 1002 (D.C.Cir. 2010)--------------------------------------------------18

*PDK Labs., Inc. v. U.S. Drug Enforcement Admin.*, 362 F.3d 786 (D.C.Cir. 2004)----------------32
*Petit v. U.S. Dept. of Educ.*, 675 F.3d 769 (D.C. Cir. 2012) ----------------------------------------32
*Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629 (7th Cir. 2007)--------------------------------------- 8
*Printz v. United States*, 521 U.S. 898 (1997)----------------------------------------------------------38
*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279 (D.C. Cir. 2007)------- 6
*Ry. Labor Exec. Ass'n v. Nat. Mediation Bd.*, 29 F.3d 655 (D.C.Cir. 1994)------------------------21
*Serono Labs., Inc. v. Shalala*, 158 F.3d 1313 (D.C.Cir. 1998) --------------------------------- 20, 21
*Shays v. Fed. Election Comm'n*, 414 F.3d 76 (D.C. Cir. 2005)------------------------------------18
*Shook v. District of Columbia Fin. Responsibility & Mgmt. Assistance Auth.*, 132 F.3d 775
  (D.C.Cir. 1998)----------------------------------------------------------------------------------------------37
*Spann v. Colonial Village, Inc.*, 899 F.2d 24 (D.C. Cir. 1990) ------------------------------10, 12, 19
*Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978)----------------------------------------------46
*Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497 (D.C. Cir. 2010)--------------13
*\*U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554 (D.C. Cir. 2004) --------------------------------- 22, 37
*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544
  (1996)-------------------------------------------------------------------------------------------------------- 4
*United States v. Hansen*, 772 F.2d 940 (D.C. Cir. 1985) --------------------------------------------46
*Warth v. Seldin*, 422 U.S. 490 (1975) ------------------------------------------------------------------17

## STATUTES

20 U.S.C. § 1232g(a)(5)(A)-----------------------------------------------------------------------------19
20 U.S.C. § 1232g(a)(5)(B) ------------------------------------------------------------------------- 19, 20
20 U.S.C. § 1232g(a)(6) ----------------------------------------------------------------------------------- 5
20 U.S.C. § 1232g(b)(1)-----------------------------------------------------------------------------------19
20 U.S.C. § 9871 (e)(2)(C)(i)(III) ----------------------------------------------------------------------35
20 U.S.C. § 9871(C)(i)(I) ---------------------------------------------------------------------------------35
20 U.S.C. § 9871(e)(2)(C)(i)(IV)-(VIII) ---------------------------------------------------------------35
20 U.S.C. § 9871(e)(2)(D)(iii)----------------------------------------------------------------------------35
20 U.S.C. §§ 9871(e)(2)(D)(i)-(ii) ----------------------------------------------------------------------35
20 U.S.C. §1232g (b) (3) ---------------------------------------------------------------------------------32
20 U.S.C. §1232g(b)(3)------------------------------------------------------------------------------------37
20 USC § 1232g(b)(3) -------------------------------------------------------------------------------------39
Public Law 111-5, Div. A, Title. I, § 3(a)(1)-(5), 123 Stat. 116 --------------------------------------36
Public Law 111-5, Div. A, Title. VIII, § 14005(d), 123 Stat. 282-3 ---------------------------------36
Public Law 11-5, Div. A, Title. VIII, 123 Stat. 183 -------------------------------------------------36

## REGULATIONS

34 C.F.R. § 303.12(e)(1)-(12) --------------------------------------------------------------------------39
34 C.F.R. § 99.3 -----------------------------------------------------------------------5, 18, 19, 22, 24, 38
34 C.F.R. § 99.35(a)(2)------------------------------------------------------------------------------------31
34 C.F.R. § 99.37(c)(2) -----------------------------------------------------------------------------------18
34 C.F.R. §§ 99.3------------------------------------------------------------------------------------------18

## OTHER AUTHORITIES

Carolyn A. Deverich, Brian R. Strange, David A. Holop, *Into the Breach Plaintiffs Have Been*

*Increasingly Successful in Gaining Injunctive Relief for Online Security Breaches*, 34 Feb. L.A. Law. 27 (2012)------------------------------------------------------------------------------ 8

Fida Kamal Dankar & Khaled El Emam, *A Method for Evaluating Marketer Re-identification Risk,* Proceedings of the 2010 EDBT/ICDT Workshops, ACM, Article 28 (2010)-------------23

Latanya Sweeney, *Simple Demographics Often Identify People Uniquely,* Carnegie Mellon University, Data Privacy Working Paper No. 3 (2000)----------------------------------------------22

Mary Margaret Penrose, *In the Name of Watergate: Returning FERPA to Its Original Design*, 14 N.Y.U. J. Legis. & Pub. Pol'y 75, 84-85 (2011)---------------------------------------------------29

Press Release, Elec. Privacy Info. Ctr., Anderson, Balkin, boyd, Crawford, Kahle, and Turkle Join EPIC Advisory Board (Apr. 4, 2011) -------------------------------------------------------12

Press Release, Elec. Privacy Info. Ctr., Bennett, Calo, Donohue, Dwork, Kerr, and Pasquale Join EPIC Advisory Board (Apr. 10, 2012), *available at* https://epic.org/2012/04/bennett-calo-donohue-dwork-ker.html --------------------------------------------------------------------------12

Ross J. Anderson, *Security Engineering: A Guide To Building Dependable Distributed Systems* 172 (2008) --------------------------------------------------------------------------------------------23

Ross J. Anderson, *The DeCODE Proposal for an Icelandic Health Database,* at 11 (Oct. 20, 1998)----------------------------------------------------------------------------------------------------23

Salvador Ochoa, Re-identification of Individuals in Chicago's Homicide Database: A Technical and Legal Study, Massachusetts Institute of Technology (2001) ----------------------------------23

*Understanding Consumer Attitudes About Privacy: Hearing Before the Subcomm. on Commerce, Manufacturing, and Trade of the House Comm. on Energy and Commerce* (Oct. 13, 2011) (testimony of Prof. Alessandro Acquisti)-------------------------------------------------------- 8

## SUMMARY

The FERPA prohibits the nonconsensual release of students' "educational records," including the "personally identifiable information contained therein." 20 U.S.C. § 1232g(b)(1). Congress imposed this "direct obligation" under the law "to protect the privacy of [student] records by preventing unauthorized access by third parties." 120 Cong.Rec. 39,858, 39,862-39,863 (Dec. 13, 1974); 121Cong.Rec. 7974 (May 13, 1975)). Congress directed the Department of Education to issue sanctions against those that violate the student privacy law.  The Final Rule, promulgated by the agency, transforms the meaning of "authorized representative," "education program," and "directory information," terms defined in the statute. As a consequence, the agency has removed affirmative legal duties for state and local educational facilities to protect private student data and is contrary to the Act of Congress

The Department contends that the America Creating Opportunities to Meaningfully Promote Excellence in Technology, Education, and Science Act of 2007 ("COMPETES Act") and the American Recovery and Reinvestment Act of 2009 ("ARRA") support the agency's interpretation of the FERPA. 2011 Final Rule, AR 0701-0702; 2011 Proposed Final Rule, AR 0001-0002. Def.'s Mot., 1. The Department revised the FERPA regulations to reflect what it has deemed "Congress' intent in the ARRA to have States link data across sectors." 2011 Proposed Final Rule, AR 0003. In the Notice of Proposed Rulemaking, the Department cited Titles VIII and XIV of the ARRA to justify an unprecedented expansion of statewide longitudinal data systems ("SLDS") to incorporate "workforce, health, family services, and other data." 2011 Proposed Final Rule, AR, 0004.

EPIC challenged three of the definitions, set out by the agency in the Final Rule: "directory information," "authorized representative," and "education program." *See* Compl. ¶¶

14-26. The Department violated the Administrative Procedure Act because the agency's revisions of key terms in the statute were promulgated "in excess of [the Department's] statutory authority," and are "not in accordance with law." Administrative Procedure Act, 5 U.S.C. § 706 (2)(A), (C); Compl. ¶¶ 30, 35. And contrary to the Department's argument, this Court has subject matter jurisdiction over this case because EPIC has both organizational and associational standing, as do the co-plaintiffs in this matter.

Additionally, the Court should deny the Department's motion for summary judgment, and grant EPIC's cross-motion for summary judgment. The Education Department is not entitled to *Chevron* deference concerning the disputed definitions because Congress has expressly prohibited the Department's interpretations, and where it has not, the Department's interpretations are not permissible constructions of the FERPA. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 842-43 (1984).

## STATEMENT OF FACTS

1.      On April 8, 2011, the Education Department published a notice of proposed rulemaking, proposing to amend its regulations implementing section 444 of the General Education Provisions Act, which is also known as the Family Educational Rights and Privacy Act of 1974. Family Educational Rights and Privacy Notice of Proposed Rulemaking, 76 Fed. Reg. 19,726 (Apr. 8, 2011) (hereinafter "NPRM"), AR 0001.

2.      The NPRM proposed several amendments to the FERPA regulations, including definitions for "authorized representative," "education program," and "directory information." NPRM, 76 Fed. Reg. 19,726, 19,727-30, AR 0002 – 0005.

3.      The NRPM invited public comments on the agency's proposals. NPRM, 76 Fed. Reg. 19,726, AR 0001.

4.      On May 23, 2011, EPIC filed comments with the Education Department, opposing and noting the illegality of the agency's reinterpretation of the statutory terms "authorized representative," "education program," and "directory information." EPIC Comments, AR 0515 – 34.

5.      By notice published on December 2, 2011, the Education Department issued the Final Rule implementing the proposed amendments. Family Educational Rights and Privacy Final Regulations, 76 Fed. Reg. 75,604 (Dec. 2, 2011), AR 0696.

6.      The Education Department's definitions for statutory terms "authorized representative," "education program," and "directory information" did not differ from the proposed regulations. Family Educational Rights and Privacy Final Regulations, 76 Fed. Reg. 75,604, 75,641, AR 0733.

7.      The Final Rule went into effect on January 3, 2012. Family Educational Rights and Privacy Final Regulations, 76 Fed. Reg. 75,604, AR 0696.

8.      On February 29, 2012, EPIC filed suit under the APA 5 U.S.C. § 701 *et seq*., challenging the Final Rule with regard to the Final Rule's definitions for "authorized representative," "education program," and "directory information." Compl. ¶¶ 1, 28-37, Feb. 29, 2012, ECF No.1.

9.      On May 4, 2012, the Department filed an answer to EPIC's complaint. Def.'s Answer to Compl., May 4, 2012, ECF No. 7.

10.     On June 29, 2012, the Department filed a partial administrative record in support of its promulgation of the Final Rule. Certification of Admin. R., June 29, 2012, ECF No. 10.

11.     On July 23, 2012, EPIC filed a Motion to Supplement the Administrative Record and Consider Extra-record evidence with the Court. Mot. to Supplement the Admin. R. and

Consider Extra-record Evidence, July 23, 2012, ECF No. 11.

12.     On October 26, 2012, pursuant to the Court's order, a thirty-two page supplement to the administrative record was filed. Mem. Op. & Order, Oct. 26, 2012, ECF No. 15; Suppl. to Admin. R., Oct. 26, 2012, ECF No. 16.

13.     On November 30, 2012, the Department filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. Def.'s Mot. to Dismiss or, in the Alternative, Mot. for Summ. J., Nov. 30, 2012,  ECF No. 18.

## ARGUMENT

### I.   Plaintiffs Satisfy the Injury-in-Fact Requirement of Article III, and Thus Have Standing to Bring Suit in This Court

Article III limits the federal judicial power to actual "Cases" and "Controversies." U.S. Const. art. III, § 2. To satisfy the standing requirements that follow from this limitation, a plaintiff must have suffered an injury that is (1) concrete, particularized, and actual or imminent; (2) fairly traceable to the defendant's conduct; and (3) likely to be redressed by a favorable decision of this court.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Where the entity bringing suit is an organization, standing may be premised on an injury to either the organization itself or to its members. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378-79 (1982) (standing established on the basis of harm to the organization itself); *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 553 (1996) (standing established on the basis of harm to the organization's members). An organization claiming injury to itself must satisfy the same injury-in-fact requirement applicable to individuals. *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 24-27 (D.C. Cir. 2011). An organization asserting associational standing must establish "that at least one identified member had suffered or would suffer harm" from the allegedly illegal activity. *Summers v. Earth Island*

4

*Inst.*, 555 U.S. 488, 498 (2009).

Individual plaintiffs Grayson Barber, Pablo Garcia Molina, Peter Neumann, and Deborah Peel have standing to bring this case because the Final Rule removed FERPA safeguards from their education records that currently exist in educational institutions subject to the statute. Further, EPIC has standing to bring this case both on its own behalf and on behalf of the members of the EPIC Advisory Board and the EPIC Board of Directors. EPIC itself has standing because the Department's Final Rule has caused EPIC to devote resources to counteracting the effects of the Department's activities, thus creating a concrete injury to EPIC's resources. Furthermore, members of the EPIC Advisory Board and EPIC Board of Directors are "members" for associational standing purposes, and thus EPIC may properly bring a claim on their behalf.

### A.   The Individual Plaintiffs have Standing to Bring Suit Because There is an Imminent Risk that their Private Education Records will be Disclosed

The FERPA protects education records of students, who are defined as "any person[s] with respect to whom an educational agency or institution maintains education records or personally identifiable information, but does not include . . . person[s] who [have] not been in attendance at such agency or institution." 20 U.S.C. § 1232g(a)(6). Students also include individuals who formerly attended an educational agency or institution, and about whom the agency or institution still maintains education records. 34 C.F.R. § 99.3. As plaintiffs' declarations discuss, each individual formerly attended at least one educational institution that is subject to the FERPA, and each of these institutions currently maintains each plaintiff's education records and other personally identifiable information. *See* Ex. A – D. The agency's promulgation of the Final Rule makes each plaintiff's personally identifiable information more readily available to third-party entities that are encouraged—but not mandated— to safeguard the

information. 2011 Final Rule, AR 0712-0715; 2011 Final Rule, Appendix A, AR 0737-0745. The Final Rule, therefore, increases the risk that plaintiffs' records will be disclosed without their consent to a host of unregulated entities. Importantly, this Circuit "has not closed the door to all increased-risk-of-harm cases. [It has] allowed standing when there was at least *both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account." *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin*., 489 F.3d 1279, 1295 (D.C. Cir. 2007). Both factors are present here. There is a substantial increase that plaintiffs' records will be disclosed to unregulated parties because the Final Rule permits "any [designated] entity or individual" that will audit or evaluate "Federal-or State-supported education program." 2011 Final Rule, AR 0733. Pursuant to the Final Rule, there is literally no limit on the number of individuals who can access plaintiffs' information. Thus, there is a substantial increase risk that plaintiffs' education records will be released to unregulated third-party entities.

Further, each plaintiff maintains education records in a state that receives SLDS funds. *See Statewide Longitudinal Data Systems Grant Program, Grantee State – District of Columbia*, U.S. Dep't of Educ., Nat'l Ctr. For Educ. Statistics;[1] *Statewide Longitudinal Data Systems Grant Program, Grantee State – Massachusetts,* U.S. Dep't of Educ., Nat'l Ctr. For Educ. Statistics;[2] *Statewide Longitudinal Data Systems Grant Program, Grantee State – Missouri*, US Dep't of Educ., Nat'l Ctr. For Educ. Statistics;[3] *Statewide Longitudinal Data Systems Grant Program, Grantee State – Texas,* U.S. Dep't of Educ., Nat'l Ctr. For Educ. Statistics.[4]   A prominent report on student record privacy concluded that "most states collected information in excess of what is

---

[1] http://nces.ed.gov/programs/slds/state.asp?stateabbr=DC (last visited Jan. 17, 2013).

[2] http://nces.ed.gov/programs/slds/state.asp?stateabbr=MA (last visited Jan. 17, 2013).

[3] http://nces.ed.gov/programs/slds/state.asp?stateabbr=MO (last visited Jan. 17, 2013).

needed" for SLDS compliance. *Children's Educational Records and Privacy: A Study of Elementary and Secondary School State Reporting Systems*, Fordham Law School Center on Law and Information Policy (2009). Because states collect excessive information, there is a substantial probability that pursuant to the Final Rule, plaintiffs' personally identifiable information will be disclosed to unregulated SLDS entities. Thus, despite the Department's characterization that plaintiffs' injuries are merely "speculative," the probabilities of plaintiffs' injuries are "sufficient to create a case or controversy – to take a suit out of the category of the hypothetical" because "the relief sought would, if granted, reduce the probability." *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1235 (D.C. Cir. 1996) (quoting *Village of Elk Grove Village v. Evans*, 997 F.2d 328, 329 (7th Cir. 1993)).

Finally in analyzing standing, this Court should consider the impact that an overly-restrictive interpretation of standing doctrine is likely to have on other privacy cases. The Department appears to suggest that the individual plaintiffs must demonstrate some consequential harm in addition to the privacy risks created by the expanded disclosure authorized by the Department's unlawful rulemaking. *See* Def's Mot. at 16 ("None of the plaintiffs can show . . . that their education records will be released *and cause them injury*.") (emphasis added); *id.* at 18 (arguing that plaintiffs would have to show "that injury to plaintiffs would likely result from the disclosure to the auditors or evaluators."); *id.* at 19 (arguing that Pablo Molina's records "are not likely to ever be shared in a way that harms Mr. Molina."). Requiring a further showing of consequential harms in addition to the violation of a privacy right would put plaintiffs in privacy cases in an especially difficult situation. As EPIC explained in comments to the Department, many of these consequential harms, such as identity theft, are quite severe. *See* EPIC

---

[4] http://nces.ed.gov/programs/slds/state.asp?stateabbr=TX (last visited Jan. 17, 2013).

Comments, AR 0515 – 34. Plaintiffs should not have to wait for the consequential harms of privacy invasions to materialize before being allowed to seek judicial relief. Indeed, courts have shown an increased willingness to find standing for privacy violations in data breach cases where future, consequential harms have not yet occurred. *See Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 634 (7th Cir. 2007) (holding that once the plaintiffs established that a breach occurred, "the fact that the plaintiffs anticipate that some greater potential harm might follow the defendant's act does not affect the standing inquiry."); *Krottner v. Starbucks Corp.*, 628 F.3d 1139. 1142-43 (9th Cir. 2010) (holding that plaintiffs had standing as a result of a privacy invasion even though they had not yet suffered identity theft or fraudulent purchases).

### B.     EPIC has Standing to Bring Suit on Its Own Behalf Because It has Suffered a Concrete and Demonstrable Injury to its Activities

In *Havens Realty*, the Supreme Court held that an organization suffered an injury sufficient to create standing where "the defendant's actions cause[d] a 'concrete and demonstrable injury to the organization's activities' that [was] 'more than simply a setback to the organization's abstract social interests.'" *Am. Soc. for Prevention of Cruelty to Animals,* 659 F.3d at 24 (quoting *Havens Realty Corp*, 455 U.S. at 379). In the D.C. Circuit, an inquiry into *Havens* standing proceeds in two parts. First, the court asked "whether the defendant's allegedly unlawful activities injured the plaintiff's interest in promoting its mission." *Id.* at 25. "If the answer is yes, [the court] then ask[s] whether the plaintiff used its resources to counteract that injury." *Id.* The expenditure of resources must have been undertaken "in response to, and to counteract, the effects of the defendants' alleged [violations] rather than in anticipation of litigation." *Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011). The D.C. Circuit "has applied *Havens Realty* to justify organizational standing in a wide range of circumstances."

*Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006).

The first part of the *Havens* standing inquiry focuses on the conflict between the mission of the organization and the actions of the defendant. This Circuit has found such a conflict in cases where an organization dedicated to promoting access to developmental drugs challenged the FDA's prohibition on the sale of those drugs, *id*. at 132-33; where an organization dedicated to promoting equal employment opportunity challenged the racially discriminatory practices of an employment agency, *Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268 (D.C. Cir. 1994); where an organization dedicated to promoting equal housing opportunity challenged the racially discriminatory advertisements of an advertising agency and condominium, *Spann v. Colonial Village, Inc.*, 899 F.2d 24 (D.C. Cir. 1990); and where an organization dedicated to promoting the well-being of Haitian refugees challenged a Coast Guard interdiction program, *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794 (D.C. Cir. 1987). Here, as in *Abigail Alliance*, *Fair Employment Council*, *Spann*, and *Haitian Refugee Center*, EPIC's mission is "at loggerheads," with the substance of the Department's actions. *See Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1429 (D.C. Cir. 1996). EPIC is a public interest research center dedicated to protecting civil liberties and privacy. Compl. ¶ 4. EPIC works to preserve the privacy safeguards established by Congress in laws such as the FERPA and advocating for improved privacy protections for individuals, including current and former students. EPIC routinely testifies before Congress and files *amicus briefs* in federal courts concerning the protection of privacy by means of statute. *See* Decl. of Marc Rotenberg ¶ 2 (attached as Exhibit E). The Department's rule harms privacy by undermining the safeguards established by the FERPA and exposing students to new and unnecessary privacy risks. *See*

Compl. ¶ 5; EPIC Comment, AR 0515-34. Thus, the Department's actions conflict directly with the mission of EPIC.

EPIC satisfies the second part of the D.C. Circuit's *Havens* test because the Department's actions have caused EPIC to expend resources in an effort to counteract the unlawful FERPA revision. EPIC pursues policy research, public education, conferences, publications, and advocacy on a wide variety of privacy issues. As a result of the Department's actions, a portion of these efforts had to be diverted to address the privacy risks created by the new FERPA Rule. EPIC has attempted to counteract the effects of the Department's Rule by investigating and educating the public about the invalidity of the Department's Rule, the privacy risks created by the Rule, and the options for mitigating those risks. *See* Decl. of Khaliah Barnes ¶¶ 12-16 (attached as Exhibit F). These public education efforts have occurred through EPIC's website and publications, through meetings with public officials, and through telephone and in-person responses to inquiries from the press and from concerned citizens. *Id*. These endeavors are virtually identical to the resource diversions that have conferred *Havens* standing on organizations in other D.C. Circuit cases. *See Abigail Alliance*, 469 F.3d at 132-33 (plaintiff "had to divert significant time and resources from [counseling, referral, advocacy, and educational services] toward helping its members and the public address the unduly burdensome requirements that the FDA imposes on experimental treatments."); *Fair Employment Council,* 28 F.3d at 1276 (defendant's activities could have forced plaintiff to expend resources on "'community outreach and public education, counseling, and research projects'"); *Spann*, 899 F.2d at 27 (Defendant's activities required plaintiff to expend additional resources "to educate not only black home buyers and renters, but the D.C. area real estate industry and the public that racial preference in housing is indeed illegal."). The activities described above are independent of

EPIC's expenditures in relation to this lawsuit. S*ee Equal Rights Ctr.,* 633 F.3d at 1140. These resources would not have been spent, or could have been diverted to other uses, if the Department had not promulgated its unlawful FERPA Rule. Decl. of Khaliah Barnes ¶ 17 (attached as Exhibit F).

### C.    EPIC has Standing to Bring Suit on Behalf of the Members of its Advisory Board and Board of Directors

An organization has standing to sue on behalf of its members where "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 507 (D.C. Cir. 2010) (quoting *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002)).

As an initial matter, the members of EPIC's Advisory Board and Board of Directors qualify as "members" for the purposes of associational standing. All of these individuals are formally identified as "members" of the organization. Decl. of Marc Rotenberg ¶ 16 (attached as Exhibit E); *see also* Press Release, Elec. Privacy Info. Ctr., Bennett, Calo, Donohue, Dwork, Kerr, and Pasquale Join EPIC Advisory Board (Apr. 10, 2012), *available at* https://epic.org/2012/04/bennett-calo-donohue-dwork-ker.html ("EPIC has announced the 2012 *members* of the EPIC Advisory Board.") (emphasis added); Press Release, Elec. Privacy Info. Ctr., Anderson, Balkin, boyd, Crawford, Kahle, and Turkle Join EPIC Advisory Board (Apr. 4, 2011), *available at* https://epic.org/2011/04/anderson-balkin-boyd-crawford.html ("EPIC has announced the 2011 *members* of the EPIC Advisory Board.") (emphasis added). More importantly, they play a functional role in "selecting [EPIC's] leadership, guiding its activities, [and] financing those activities." *Fund Democracy, LLC v. S.E.C.*, 278 F.3d 21, 26 (D.C. Cir.

2002); *see also Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333 (1977) (holding that the Washington State Apple Advertising Commission had standing to file suit on behalf of apple growers and dealers because it was "the "functional equivalent of a traditional membership organization."). *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826 (5th Cir. 1997) (holding that nonprofit environmental protection corporation with no legal members under the corporate laws of the District of Columbia had standing to file suit on behalf of individuals who voluntarily identified as "members" and played a role in funding and selecting the corporation's leadership). Here, the members of the EPIC Advisory Board commit to the mission of the organization, participate in the work of the organization, and provide financial support to the organization. Decl. of Marc Rotenberg ¶¶ 14-19 (attached as Exhibit E). Similarly the members of the EPIC Board of Directors engage in all of these activities, as well as the fiduciary responsibility for the management of the organization and the selection of officers and other board members. *See id.*

Moreover, in *Consumer Federation of America v. F.C.C.*, the D.C. Circuit held that a consumer organization had standing to sue on behalf of its research director, Mark Cooper. 348 F.3d 1009, 1011-12 (D.C. Cir. 2003). As research director, Cooper would have contributed substantively to the direction and work of the organization in a manner similar to that of the EPIC Advisory Board members. Thus, this Court should follow the D.C. Circuit in *Consumer Federation of America* by treating EPIC's Advisory Board and Board of Directors as "members" of the organization.

EPIC satisfies the first prong of the associational standing test. As explained in detail above, each of the named plaintiffs, Grayson Barber, Pablo Garcia Molina, Peter Neumann, and Deborah Peel, all of whom are members of both the Board of Directors and Advisory Board,

have standing to challenge the FERPA Rule. The Department's rule has injured the plaintiffs by removing protections on their educational data and subjecting it to new uses and disclosures.

Second, there can be no question that the interests EPIC seeks to protect are germane to its mission. EPIC has a longstanding interest in student privacy and in agency rulemakings affecting privacy, such as the Department's FERPA rule. Since 1997, EPIC has filed over 100 comments before agencies on matters regarding privacy. *See* Elec. Privacy Info. Ctr., *EPIC Administrative Procedure Act (APA) Comments.*[5] Recently, two of these comments have been filed before the Department of Education. *See id.* The first concerned the Rule that is now the subject of this suit; the second concerned a proposal to create a research database to facilitate the study of teacher effectiveness. *See id.* EPIC also maintains an extensive website on student privacy. *See* Elec. Privacy Info. Ctr.,  *Student Privacy.*[6]

Finally, this case does not require the participation of any individual EPIC members. An injunction requires no individual participation. *Nat'l Treasury Employees Union v. Whipple*, 636 F. Supp. 2d 63, 75 (D.D.C. 2009) ("NTEU seeks declaratory and injunctive relief, which does not require individual participation."); *Nat'l Treasury Employees Union v. Seidman*, 786 F. Supp. 1041, 1045 (D.D.C. 1992) (because the "plaintiffs limit their requests to injunctive and declaratory relief, . . . no individual participation is required as would be the case if the Court needed to measure specific individual damages"). Here, Plaintiffs are seeking injunctive relief. Specifically, EPIC is asking this Court to "hold unlawful and set aside the [Education Department]'s December 2, 2011 Final Regulations amending the FERPA." Compl. ¶ 1. Thus, EPIC satisfies the third prong of the associational standing test.

---

[5] https://epic.org/apa/comments/ (last visited Dec. 21, 2012).

[6] https://epic.org/privacy/student/ (last visited Dec. 21, 2012).

## II. Plaintiffs' Injuries Were Caused By The Department's Unlawful FERPA Rule Revision

Causation is an essential element of the Article III standing inquiry, requiring plaintiffs to "show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011) (internal quotations and citation omitted). Where the injury involves the choices of a third party, plaintiffs must "adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 566. Establishing causation for the purposes of standing does not require showing "but for" causation. *See Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 77-78 (1978); *Warth v. Seldin*, 422 U.S. 490, 505 (1975). "Causation and redressability are, in essence, 'two facets' of a single requirement.'" *Newdow v. Roberts*, 603 F.3d 1002, 1012 (D.C. Cir. 2010) (citing *Allen*, 468 U.S. at 753 n. 19).

The individual plaintiffs, particular members of the EPIC Board of Directors, have satisfied the causation prong in this case. It is black letter law that "a plaintiff satisfies the causation prong of constitutional standing by establishing that the challenged agency rule permitted the activity that allegedly injured her, when that activity would allegedly have been illegal otherwise." S*hays v. Fed. Election Comm'n*, 414 F.3d 76, 93 (D.C. Cir. 2005) (quoting *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 440 (D.C. Cir. 1998)); *see also Humane Soc'y of U.S. v. U.S. Postal Serv.*, 609 F. Supp. 2d 85, 92 (D.D.C. 2009) ("Standing to challenge government conduct that allegedly causes a third party to injure the plaintiff can exist . . .where the challenged government action authorized conduct that would otherwise have been

illegal.") (internal quotation and citation omitted). The co-plaintiffs find themselves in precisely this position: the Department's Final Rule authorized new disclosures of their education records, and such disclosures would not have been permitted absent the regulation. Thus, the Members' injuries are "fairly traceable" to the Department's unlawful Rule, and would be redressed by a favorable decision of this Court.

EPIC's organizational injury is also fairly traceable to the Department's Final Rule. The particular organizational injury present in this case—an expenditure of resources designed to counteract unlawful conduct—has been repeatedly held to satisfy the causal component of the standing requirement. *See Havens*; *Abigail Alliance*; *Spann*; *Fair Employment Council*. Here, third parties—namely, education activists, media organizations, and the public generally—were the beneficiaries of, and often the initiators of, EPIC's resource expenditures. *See* Decl. of Marc Rotenberg ¶¶ 9-12 (attached as Exhibit E); Decl. of Khaliah Barnes ¶¶ 12-16 (attached as Exhibit F). Although the presence of third parties in the causal chain can make causation more difficult to establish, *see Lujan*, 504 U.S. at 560, EPIC's expenditures are still fairly traceable to the Department's actions. In *Havens, Abigail Alliance, Spann,* and *Fair Employment Council*, the objects of the plaintiff organizations' expenditures were, respectively, "low-and moderate-income homeseekers," 455 U.S. at 379, "[Abigail Alliance's] members and the public," 469 F.3d at 133, "black home buyers and renters, . . . the D.C. area real estate industry and the public," 899 F.2d at 27,  and members of the public who sought employment counseling or referral services from the Fair Employment Council, or were otherwise impacted by the Council's outreach efforts. 28 F.3d at 1276. In all of these cases, third parties acted as necessary links in the causal chain, as the plaintiff organizations would not have diverted resources in the absence of their existence.

### III. The Final Rule Must Be Analyzed Under the *Chevron* Deference Standard

Courts analyze agency statutory authority, and deference afforded therein, "by following the two-step procedure set forth in *Chevron*. . ." *Mingo Logan Coal Co. Inc. v. U.S. E.P.A.*, 850 F. Supp. 2d 133, 138 (D.D.C. 2012). Under *Chevron*, courts must first determine "whether Congress has directly spoken to the precise questions at issue." *Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 842 (1984). Courts "use 'traditional tools of statutory construction' to determine whether Congress has unambiguously expressed its intent." *Serono Labs., Inc. v. Shalala,* 158 F.3d 1313, 1319 (D.C. Cir. 1998) (quoting *Chevron,* 467 U.S. at 843 n. 9). These traditional tools include "an examination of the statute's text, structure, purpose, and legislative history." *Mingo Logan Coal Co. Inc.*, 850 F. Supp. at 138*; see also Bell Atlantic Tel. Cos. v. FCC,* 131 F.3d 1044, 1047 (D.C. Cir. 1997).

If Congress has directly addresses the precise question before the Court, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43. If, however, Congress has not addressed the issue before the Court because "the statute is either silent or ambiguous," the Court  must then determine "whether the interpretation proffered by the agency is 'based on a permissible construction of the statute.'" *Mingo Logan Coal Co. Inc.,* 850 F.Supp. at 139 (quoting *Chevron*, 467 U.S. at 843). *See also Serono Laboratories, Inc.,* 158 F.3d at 1320 (D.C. Cir. 1998) ("Turning to the second *Chevron* inquiry, we ask whether the agency's definition is 'based on a permissible construction of the statute,' *Chevron,* 467 U.S. at 843, which requires only that its construction be a 'reasonable' one." (quoting *Chevron*, 467 U.S. at 843-44)).

Contrary to the Defendant's claim that the Final Rule deserves deference, the D.C. Circuit hesitates to "*presume* a delegation of power absent an express *withholding* of such power,

[because] agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well." *Ry. Labor Exec. Ass'n v. Nat. Mediation Bd.,* 29 F.3d 655, 671 (D.C. Cir. 1994) (emphasis in original). Def.'s Mot. to Dismiss, 21; *see also Nat'l Mining Ass'n v. Jackson*, 816 F. Supp. 2d 37, 42-43 (D.D.C. 2011); *Am. Bus Ass'n v. Slater*, 231 F.3d 1, 8 (D.C. Cir. 2000); *Backcountry Against Dumps v. EPA,* 100 F.3d 147, 150 (D.C.Cir.1996) (rejecting EPA's argument "that, since section 6945(c) is silent as to its application to Indian tribes, the statute is 'ambiguous' "); *Am. Petroleum Inst. v. EPA,* 52 F.3d 1113, 1120 (D.C. Cir. 1995); *Ethyl Corp. v. EPA,* 51 F.3d 1053, 1060 (D.C. Cir. 1995) ("We refuse, once again, to presume a delegation of power merely because Congress has not expressly withheld such power."). "Statutory 'silence' simply leaves that lack of authority untouched . . . the failure of Congress to use 'Thou Shalt Not' language doesn't create a statutory ambiguity of the sort that triggers Chevron deference." *U.S. Telecom Ass'n v. F.C.C.,* 359 F.3d 554, 566 (D.C. Cir. 2004).

The Final Rule is entitled to deference under *Chevron* only if: (1) the FERPA expressly permits the Education Department to define the disputed terms in the way that it does in the Final Rule; or (2) the Education Department's interpretation is a permissible construction under the FERPA.  For the reasons discussed below, through the FERPA's statutory text and legislative history, Congress unambiguously limited the agency's ability to revise the disputed definitions, and, to the extent that the FERPA is silent or ambiguous, the Final Rule is not a permissible construction of the statute. The Final Rule is therefore not entitled to *Chevron* deference.

**IV. Each of the Challenged Definitions Exceeds Statutory Authority and Is Therefore Not Entitled to *Chevron* Deference**

    **A.**    **The Final Rule's Definition of "Directory Information" Exceeds the Education Department's Statutory Authority Because it Removes Students' Right to Prohibit Disclosure of Directory Information**

The 2008 agency revision to the definition of "directory information" provides:

> Directory information includes a student ID number, user ID, or other unique personal identifier used by the student for purposes of accessing of communicating in electronic systems, but only if the identifier cannot be used to gain access to education records except when used in conjunction with one or more factors that authenticate the user's identity, such as a personal identification number (PIN), password, or other factor known or possessed only by the authorized user.

2008 Final Rule, AR 0798; 34 C.F.R. § 99.3. The 2011 Final Rule further amended the definition of "directory information" so that student ID numbers could be displayed on student badges as directory information:

> . . . In accordance with paragraphs (a) and (b) of this definition, directory information includes – . . .
> (2) A student ID number or other unique personal identifier that is displayed on a student ID badge , but only if the identifier cannot be used to gain access to education records except when used in conjunction with one or more factors that authenticate the user's identity, such as a PIN, password, or other factor know or possessed only by the authorized user.

2011 Final Rule, AR 0733; 34 C.F.R. § 99.3.

According the agency's Final Rule, Student ID numbers may be displayed on student badges as directory information "*even if the parent or the eligible student opted out of directory information.*" 2011 Final Rule, AR 0720 (emphasis added)*; see also* 34 C.F.R. §§ 99.3, 99.37(c)(2). Essentially, the 2011 Final Rule makes directory information more readily available by placing it on student badges. This change removes the explicit FERPA's privacy protections that allow eligible students to opt out of directory information disclosure. 20 U.S.C. § 1232g(a)(5)(B). Unlike other directory information such as name and major field of study,

18

student ID numbers used in conjunction with other readily available directory information provide access to education records in violation of the FERPA. Applying *Chevron* analysis step one, Congress's intention is clear: the FERPA's text and legislative history show that students should be able to prevent disclosure of directory information. Further, the Department's interpretation is not reasonable under the FERPA because publicly available unique student identifiers expose personal information that places at risk the privacy of students, the precise concern of Congress in enacting the statute.

> 1. *Through the FERPA's Text, Purpose, and Legislative History, Congress Unambiguously Guaranteed Students the Right to Prevent Disclosure of Directory Information*

The FERPA applies varying levels of privacy protection for student personally identifiable information. Specifically, under the FERPA, "[n]o funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of releasing, or providing access to, any personally identifiable information in education records *other than* directory information . . ." 20 U.S.C. § 1232g(b)(1) (emphasis added). Directory information is "information contained in an education record of a student that would not generally be considered harmful or an invasion of privacy if disclosed." Final Rule, AR 0733; 34 C.F.R. § 99.3. Under the statute, directory information includes:

> The student's name, address, telephone listing, date and place of birth, major field of study, participation in officially recognized activities and sports, weight and height of members of athletic teams, dates of attendance, degrees and awards received, and the most recent previous educational agency or institution attended by the student.

20 U.S.C. § 1232g(a)(5)(A). *See also* Final Rule, AR 0733; 34 C.F.R. § 99.3. Additionally, as discussed above, the Department considers student unique identifiers as directory information if they "cannot be used to access records or communicate electronically without one or more

additional factors to authenticate the user's identity. . ." 2008 Final Rule, AR 0755. Importantly, the FERPA's catalog of directory information does not list unique student identifiers created by schools for students. This is because Congress did not envision unique student IDs created by the education institution as directory information, and it especially did not envision publicly disclosing unique student ID numbers via badges. But even more, the text clearly provides parents or their eligible students the opportunity to withhold directory information from public disclosure:

> Any educational agency or institution making public directory information shall give public notice of the categories of information which it has designated as such information with respect to each student attending the institution or agency and shall allow a reasonable period of time after such notice has been given for a parent to inform the institution or agency that any or all of the information designated should not be released without the parent's prior consent.

20 U.S.C. § 1232g(a)(5)(B). The Final Rule removes students' statutory right to withhold directory information in violation of the FERPA's plain text provision guaranteeing that right. This provision is particularly important in the context of the student privacy interests that FERPA advances. Even though education institutions may disclose directory information, they must first notify students and provide an opportunity for students to prohibit disclosure of their information. Through this provision, Congress recognized that students should control who obtains information about them. The Final rule, however, directly contravenes the plaint text that permits students to protect their directory information and thus is an impermissible construction under the statute.

Additionally, the FERPA's legislative history shows that Congress intended students to be able to prevent disclosure of their directory information. In the Buckley-Pell Amendment, Congress addressed ambiguity surrounding when educational institutions were permitted to disclose certain personally identifiable information without first obtaining student or parental

consent: "these amendments specifically provide that a school may safely provide what is termed 'directory information'—such personal facts as name, address, and telephone number—to third parties without fear of having its Federal funds withdrawn." Joint Statement in Explanation of Buckley/Pell Amendment, AR 0855. The amendment further states that "institutions providing such directory information would be required to give public notice of the information [they] planned to make available to the general public, and to allow parents time to notify the institution that any or all of that information *should not be released*." Joint Statement in Explanation of Buckley/Pell Amendment, AR 0855 (emphasis added). Therefore, the legislative history shows that Congress created a right to prevent directory information from being disclosed. By permitting student ID numbers, which are directory information, to be displayed on student badges, and expressly prohibiting students from opting out of this disclosure, the Final Rule denies students the right to prevent their directory information from being disclosed. The FERPA's legislative history regarding directory information is clear: Congress intended that students would have the right to prohibit release of directory information. Because the Final Rule denies students this right, the Final Rule contravenes the FERPA's legislative history, and cannot be granted deference.

Traditional tools of statutory interpretation, such as plain text meaning and legislative history, indicate Congress's clear intent: students should be able to proscribe disclosure of their directory information. The Education Department therefore exceeded its statutory authority when it prevented students from opting out of directory information disclosure.

        2. *The Final Rule's Directory Information Amendment is not Reasonable Because it Reveals Information that Would be Considered Harmful or an Invasion of Privacy*

Directory information is "information contained in an education record of a student that

would not generally be considered harmful or an invasion of privacy if disclosed." Final Rule, AR 0733; 34 C.F.R. § 99.3. As addressed above, the Final Rule expressly permits student ID numbers to be displayed on student ID badges "if the identifier cannot be used to gain access to education records except when used in conjunction with one or more factors that authenticate the user's identity, such as a PIN, password, or other factor known or possessed only by the authorized user." 2011 NPRM, AR 0004. *See also* 2011 Final Rule, AR 0733; 34 C.F.R. § 99.3. The Final Rule therefore makes student ID numbers more accessible because they are publicly displayed on student badges.

As EPIC stated in comments on the proposed Final Rule, the information gleaned from unique identifiers can provide sensitive and potentially embarrassing reports, which would amount to a privacy invasion. This information can also be used for business purposes, employment decisions, educational assessment, and even identity theft. Re-identification using student's unique ID numbers is relatively simple. Moreover, many schools provide access to education records by using ID numbers and other directory information, such as birthdates and email addresses. *See, e.g.*, Latanya Sweeney, *Simple Demographics Often Identify People Uniquely,* Carnegie Mellon University, Data Privacy Working Paper No. 3 (2000); Ross J. Anderson, *The DeCODE Proposal for an Icelandic Health Database,* at 11 (Oct. 20, 1998); Ross J. Anderson, *Security Engineering: A Guide To Building Dependable Distributed Systems* 172 (2008); Fida Kamal Dankar & Khaled El Emam, *A Method for Evaluating Marketer Re-identification Risk,* Proceedings of the 2010 EDBT/ICDT Workshops, ACM, Article 28 (2010). Salvador Ochoa, Re-identification of Individuals in Chicago's Homicide Database: A Technical and Legal Study, Massachusetts Institute of Technology (2001). The Final Rule provides access to student ID numbers by permitting them to be publicly displayed, and reflects a fundamental

misunderstanding of how student unique identifiers are used. As Exhibit G shows, student ID numbers are used in conjunction with other directory information to gain access to student records. Therefore, even though the Final Rule provides that student ID numbers displayed on badges are directory information *only if* those numbers cannot be used to gain access to education records, student ID numbers are increasingly used to gain access to the records. The exception swallows the rule. The Final Rule permits publication of directory information in such a way that use of directory information can reveal education records in violation of the core purpose of the Act.

Contrary to the Department's argument, student ID numbers do not function like names and photographs when displayed on an ID badge, because student ID numbers provide access to student education records. As Exhibit G shows, schools do not request names, photographs, or even other directory information such as height and weight, to authenticate student identification for access to electronic databases. They do, however, request the unique student identifier to gain access to education records. Public disclosure of student ID numbers, is therefore, an invasion of privacy because, even more so than directory information, student ID numbers can easily be used to gain access to education records.

In sum, the FERPA's plain language, purpose, and legislative history unequivocally prohibit the Final Rule provision that forces students to disclose their student ID directory information without the opportunity to opt out of this disclosure. Additionally, the Final Rule is an unreasonable construction under the FERPA because it permits directory information—unique student ID numbers displayed on student badges—to be used to provide access to information "generally considered harmful or an invasion of privacy." And for these reasons, the Final Rule is not entitled to deference under *Chevron*.

**B.      The Final Rule's Definition of "Authorized Representative" Exceeds the Education Department's Statutory Authority Because the Plain Meaning and Legislative History of the FERPA Foreclose the Department's Interpretation, and the Definition is Otherwise Not a Permissible Construction of the FERPA**

In the Final Rule, for the first time since the enactment of the FERPA, the Department issued a definition of "authorized representative" for the purposes of the FERPA's education program auditing and evaluation exception:

> *Authorized representative* means any entity or individual designated by a State or local educational authority or an agency headed by an official listed in §99.31(a)(3) to conduct—with respect to Federal-or State-supported education programs—any audit or evaluation, or any compliance or enforcement activity in connection with Federal legal requirements that relate to these programs.

34 C.F.R. § 99.3; Final Rule, AR 0733. Importantly, the agency's Final Rule removes Congress's express intent that authorized representatives are under the direct control of the Comptroller General of the United States, the Secretary of Education, or State educational authorities. Proposed Final Rule, AR 0003; Final Rule, AR 0708-0711.

Under step one of the *Chevron* analysis, in analyzing the ordinary meaning of "authorized representatives," the context and purpose of the FERPA, as well as its legislative history, it is clear Congress limited "authorized representatives" to entities under the direct control of the Education Department. And even under step two, the Department's interpretation of "authorized representatives" is not permissible under the FERPA. For these reasons, discussed in detail below, the Final Rule is not entitled to *Chevron* deference, and the Final Rule must be vacated.

> 1. *The FERPA's statutory text, taken as a whole, proscribes the Department's interpretation*

The FERPA expressly restricts access to education records to a limited number of third

parties, under narrow exceptional circumstances. Certain third-party access to educational records, such as by a "school official" or "authorized representative, is conditioned on direct control over the third party of the entity disclosing the records. The Department argues that because Congress did not "unambiguously" forbid its interpretation of authorized representative, the Department's interpretation should be granted *Chevron* deference. But as discussed above in detail, this Circuit has continuously found that argument unpersuasive because of the insurmountable deference the argument would bestow upon agencies. In applying traditional tools of statutory interpretation, such as ordinary meaning, context and purpose, and legislative history, Congress's intent under the FERPA is clear: authorized representatives must be under the direct control of designating officials for purposes of access education records.

  *i.*  *The ordinary meaning of "authorized representative" limits who may serve in that capacity*

  In the absence of an express statutory definition, "[courts] must give a term its ordinary meaning." *Petit v. U.S. Dept. of Educ.,* 675 F.3d 769, 781 (D.C. Cir. 2012). To "authorize" means "[t]o give legal authority; to empower." Black's Law Dictionary (9th ed. 2009). A "representative" is "[o]ne who stands for or acts on behalf of another." *Id.* Put together, the simple textual meaning of "authorized representative" is an entity or individual who has been given the legal authority to act on the behalf of another person or entity. Moreover, the meaning courts "ascribe to statutory text must reflect the statute's 'context.'" *Petit,* 675 F.3d at 781 (quoting *Bell Atl. Tel. Cos.,* 131 F.3d at 1047; *see also PDK Labs., Inc. v. U.S. Drug Enforcement Admin.,* 362 F.3d 786, 794 n. 1 (D.C. Cir. 2004) ("[O]ne cannot understand a statute merely by understanding the words in it."). Therefore, to interpret "authorized representatives," this Court must consider not only the ordinary meaning of this term, but also

"the problem Congress sought to solve" in enacting the statute in the first place. *PDK Labs., Inc.,* 362 F.3d at 796.  By enacting the FERPA, Congress sought to limit public access to student personally identifiable information. To this end, Congress placed limits on who could access personal student records, and under what circumstances. The references to "officials" in 20 USC § 1232g (b) (3)'s proviso illustrate that Congress intended to limit access to authorized representatives only under the direct control of the designating entities. It would be contrary to the plain text and the purpose of the statute if "authorized representatives" could be *any* third party entity; and it would be explicitly contrary to the structure of the Act if the third party was one which neither the Comptroller General, Education Secretary, or state educational authorities could exercise control in fact. But that is exactly the Department's contention. In fact, according to the agency's final rule, "nothing in the [Final Rule] specifically prohibits a State politician or private company, for example, from being designated as an authorized representative . . ." 2011 Final Rule, AR 0708. This interpretation allows a limitless number of entities auditing or evaluating "education programs"—another term the Department seeks to redefine under the Final Rule—rendering meaningless the concept of an "authorized representative."

Also, the agency's argument that Congress's use of "authorized representative" instead of other terms used throughout the FERPA suggests an "expectation that non-employees would serve in this capacity [as authorized representatives]" is unpersuasive. Def.'s Mot., 30 – 31. Even though when "'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the separate inclusion or exclusion'," this presumption has limits. *Barnhart v. Sigmon Coal Co., Inc*., 534 U.S. 438, 452 (2002) (quoting *Russello v. United States,* 464 U.S. 16, 23 (1983). Specifically the "[*Barnhart*] principle has little purchase when . . . the overall scope of

a statute is clearly limited by a requirement that is not explicitly mentioned in every subsection." *Am. Chemistry Council v. Johnson*, 406 F.3d 738, 741 (D.C. Cir. 2005); *see also Nat'l Rifle Ass'n of America v. Reno,* 216 F.3d 122, 127 (D.C. Cir. 2000). Here, the overall scope of the FERPA is to limit the number of entities that have access to student education records. Congress, therefore, was not required to choose a specific phrase to clarify that which is explicit both in the meaning of "authorized representative" and throughout the FERPA's scope: only a limited number of partiers are granted access to education records.

Accordingly, when "authorized representatives" is analyzed in context of the FERPA and the risks to student privacy that the statute was intended to prevent, authorized representatives does not encompass a boundless number of individuals that may access education records.

ii.   *The Final Rule's definition for authorized representative conflicts with both the  FERPA's legislative history, and the Education Department's own interpretation of legislative history*

In 2008, the Department stated, " . . . there is no other legislative history to indicate that Congress intended that FERPA be interpreted to permit educational agencies and institutions, or State and local educational authorities or Federal official and agencies listed in t §99.31(a)(3), to share students' education records with non-educational State officials." 2008 Final Rule, AR 0775. The Department also stated that "[a]ny further expansion of the list of officials and entities in FERPA that may receive education records without the consent of the parent or eligible student must be authorized by legislation enacted by Congress." AR 0775; Final Rule, AR 0709. But now, the Department argues that, pursuant to the FERPA's legislative history, it has the authority to expand the list of entities that may receive education records. This interpretation is inconsistent with the Department's 2008 interpretation of the Act, as well as Congressional record discussion of auditors.

27

As discussed in the Hansen Memorandum, the interpretation that authorized representatives are under the direct control of the designating officials stems directly from the Buckley-Pell Joint Statement. The Joint Statement describes restrictions on the transfer of student personally identifiable information, without consent, to "other educational agencies, or institutions, other school officials, auditors from the General Accounting Office and the Department of Health, Education and Welfare, . . ." Joint Statement, AR 0855. The legislative history envisioned auditors and evaluators representing—and under the direct control—of specified agencies. It would be counter to the purpose of the law if just any individual or organization could gain access to education records. The Department recognized this in 2008 when it acknowledged that a further expansion of officials and entities that may receive education records would need explicit Congressional authorization.

Moreover, Congress itself made clear the specific reasons for preventing non-educational state agencies from accessing, altering, or storing records containing the personally identifiable information of students. The law's chief sponsor Senator James L. Buckley specifically intended that FERPA would prevent linking academic data to non-academic data for the purpose of measuring schools' impact. Senator Buckley's statement in the Congressional Record describes FERPA as a safeguard against "the dangers of ill-trained persons trying to remediate the alleged personal behavior or values of students," which include "poorly regulated testing, inadequate provisions for the safeguarding of personal information, and ill-devised or administered behavior modification programs." 120 Cong. Rec. at 14580-81 (1974). In support of his concern, Senator Buckley entered into the Congressional Record a magazine article decrying "welfare and health department workers" accessing student records that included "soft data" such as "family, . . . psychological, social and academic development . . . personality rating profile, reports on

28

interviews with parents and 'high security' psychological, disciplinary and delinquency reports." Mary Margaret Penrose, *In the Name of Watergate: Returning FERPA to Its Original Design*, 14 N.Y.U. J. Legis. & Pub. Pol'y 75, 84-85 (2011) (citing Diane Divoky, *How Secret School Records Can Hurt Your Child*, PARADE, Mar. 31, 1974, at 14).

Congress has yet to alter its stance on the FERPA legislative safeguards, a prerequisite for the agency's tracking of 'soft data' and other non-academic characteristics, charting them with SLDS, and sharing the results with non-academic institutions. In sum, the Final Rule's definition for "authorized representative" should not be granted any deference because: (1) it is an unlawful subdelegation of the Department's duties under the FERPA; (2) it is impermissibly retroactive; and (3) the FERPA's statutory text, analyzed as a whole, proscribes the Department's interpretation.

> ### 2. Notwithstanding Congress's statutory limitations for "authorized representatives," the Department's Definition for "Authorized Representatives" is Not a Permissible Construction of the Statute

Putting aside Congress's limitations on "authorized representatives" under the FERPA, the Department's definition is otherwise not a reasonable construction of the statute because it: (1) improperly delegates the Department's authority to non-federal entities; (2) is unlawfully retroactive; and (3) is not permissible even in light of SLDS.

> ### i. The Department's definition is not a permissible construction of the FERPA because it improperly delegates the Department's authority to non-federal entities

"When a statute delegates authority to a federal officer or agency, subdelegation to a subordinate federal officer or agency is presumptively permissible . . . There is no such presumption covering subdelegations to outside parties." *U.S. Telecom Ass'n v. F.C.C., 359 F.3d*

*554, 565* (D.C. Cir. 2004). Further, this Circuit has held that "subdelegations to outside parties are assumed to be improper absent affirmative showing of congressional authorization." *Id. See Shook v. District of Columbia Fin. Responsibility & Mgmt. Assistance Auth.*, 132 F.3d 775, 783–84 & n. 6 (D.C. Cir. 1998)*; see also Nat'l Ass'n of Reg. Util. Comm'rs ("NARUC") v. FCC*, 737 F.2d 1095, 1143–44 & n. 41 (D.C. Cir. 1984); *Nat'l Park and Conservation Ass'n v. Stanton*, 54 F.Supp.2d 7, 18–20 (D.D.C.1999). As explained in EPIC's comments to the agency, the Final Rule unlawfully delegates its duties under the FERPA to entities and individuals not under the direct control of the educational authorities that provide them with access to private student data. EPIC Comment, AR 0526.

In its analysis of unlawful subdelegation, the D.C. Circuit noted that the F.C.C. "gave the states virtually unlimited discretion" in interpreting federal-law requirements. *U.S. Telecom Ass'n*, 359 F.3d at 564 and that "[w]hen an agency delegates authority to its subordinate, responsibility—and thus accountability—clearly remain with the federal agency." *U.S. Telecom Ass'n,* F.3d at 565. But in the present case, when the Department delegates its power to comply with the FERPA to public and private entities not under direct control, "lines of accountability may blur, undermining an important democratic check on government decision-making." *Id.; see NARUC*, 737 F.2d at 1143 n. 41; *cf. Printz v. United States*, 521 U.S. 898, 922–23 (1997). Thus, the Department's subdelegation "to outside entities aggravates the risk of policy drift inherent in any principal-agent relationship" by "increas[ing] the risk that these parties will not share the agency's 'national vision and perspective,' and this may pursue goals inconsistent with those of the agency and the underlying statutory scheme." *U.S. Telecom Ass'n*, 359 F.3d at 566 (quoting *Nat'l Park and Conservation Ass'n v. Stanton*, 54 F.Supp.2d 7, 20 (D.D.C. 1999)).

The Department is correct when it states that "the Final Rule . . . implements the direct

statutory grant of authority to non-federal actors." Def.'s Mot., 26. Put another way, the Final

Rule grants the authority to implement the FERPA to non-federal actors, without permission

from Congress. The Final Rule is an improper delegation because it removes any duties under the

FERPA for the authorized representatives, and therefore risks that these authorized

representatives may pursue goals inconsistent with the Education Department and FERPA. The

Department has delegated its duty to protect education records to authorized representatives, who

in turn are not required to adhere to any regulatory scheme detailing how to protect education

records. The Department's "flexibility" given to the authorized representatives by the designators

is no more than a carte blanche for these authorized representatives to protect education records

how, or if, they see fit.

Here, as in *U.S. Telecom,* the Final Rule's "non-regulatory guidance" fails to adequately

legally bind the state and local educational institutions that would be tasked with ensuring

FERPA compliance. And although "non-employee authorized representatives must be designated

by a written agreement that includes specific provisions," the designator is only required to use

"reasonable," unenforceable, "non-regulatory" methods to ensure that the authorized

representatives uphold student privacy protections under the FERPA. 34 C.F.R. § 99.35(a)(2);

Final Rule, AR 0712-0715; 0737-0745. The Department explicitly declined to "impose specific

requirements for reasonable methods," and instead issued a "non-regulatory guidance on best

practices for reasonable methods." Final Rule, AR 0712. Thus, contrary to the Department's

argument, the Final Rule improperly delegates authority to non-federal entities. The statutory text

forbids the Department's interpretation because the FERPA mandates specific privacy safeguards

for authorized representatives, and the Final Rule simply encourages non-binding, "non-

regulatory" reasonable methods to adhere to the FERPA. 20 U.S.C. §1232g (b) (3); Final Rule,

AR 0712.

The *U.S. Telecom* court also highlighted that parties aggrieved by state utility commission decisions had no assurance "when, or even whether, the [federal agency] might respond." *U.S. Telecom Ass'n.*, 359 F.3d at 564. Here, the Education Department has rarely used the broad statutory power Congress granted the agency to "issue cease and desist orders and to take any other action authorized by law." *United States v. Miami Univ.*, 91 F. Supp. 2d 1132, 1145 (S.D. Ohio 2000) *aff'd*, 294 F.3d 797 (6th Cir. 2002). Nor does the agency use its power to withhold federal funding. Nor has the agency ever applied the specific sanctions Congress designed to enforce FERPA, namely withholding federal funding. 20 U.S.C. §§ 1232g(a)-(b). The ED has premised its proposed regulations on state and local educational institutions' legal authority to ensure FERPA compliance under state and local laws. The agency would unlawfully remove the most fundamental safeguard standing between bad actors and private student data: the threat of federal agency enforcement actions.

Congress's intent in drafting FERPA was anything but "an affirmative showing of congressional authorization for such a subdelegation." *U.S. Telecom Ass'n* at 565. Because the Final Rule is an unauthorized and unlawful subdelegation of the Education Department's responsibilities under the FERPA, it is not a permissible construction of the FERPA, and cannot be granted *Chevron* deference.

> ii. *The Department's definition is not a permissible construction of the FERPA because by abandoning its previous interpretation that authorized representatives must be under direct control of 34 C.F.R.§99.31(a) officials, the Final Rule is unlawfully retroactive.*

Almost a decade ago, the Hansen Memorandum established the Department's longstanding interpretation that "authorized representatives" evaluating or auditing federally or

state-supported education programs had to be under the direct control of the designating officials. Hansen Memorandum, AR 0832-0835. The direct control provision was "intended to harmonize program evaluation requirements . . . while protecting the privacy of students." Hansen Memorandum, AR 0832. By mandating that authorized representatives be under the direct control of designated officials, the department limited access to education records, and in so doing, afforded students distinct privacy protections under the FERPA. By removing the direct control requirement and corresponding privacy protections that had been in place for almost a decade, the final rule retroactively removed vested privacy rights under the FERPA. *Arkema Inc. v. E.P.A.*, 618 F.3d 1, 7 (D.C. Cir. 2010); *see Nat'l Mining Ass'n v. United States Dep't of Interior*, 177 F.3d 1, 8 (D.C. Cir. 1999) (quoting *Ass'n of Accredited Cosmetology Sch. v. Alexander*, 979 F.2d 859, 864 (D.C. Cir. 1992)). "The critical question [in determining whether a rule operates retroactively]is whether the interpretation established by the new rule 'changes the legal landscape.' *Arkema Inc*., 618 F.3d at 7 (quoting *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 423–24 (D.C.Cir.1994)). A rule is retroactive and changes the legal landscape "[i]f a new rule is "substantively inconsistent" with a prior agency practice and attaches new legal consequences to events completed before its enactment," *Arkema*, 618 F.3d at 7.

In the legal landscape before the Final Rule, only a limited number of entities—entities under direct control—were considered to be "authorized representatives." After the Final Rule, "any entity or individual" can be designated as an "authorized representative." 2011 Final Rule, AR 0733.  The ultimate takeaway of the Department's action is that in the legal landscape before the Final Rule, educational institutions could not disclose education records for the purpose of evaluating federal education programs to individuals not under the institution's direct control. If the individuals or entities were not under the institution's direct control, the institution would not

be able to disclose education records pursuant to 20 U.S.C. § 1232g(b)(3), and would otherwise be required to obtain student consent before disclosing. But after the Final Rule, that is no longer the case. The Final Rule is thus "substantively inconsistent" with its agency practice of almost a decade. *Arkema Inc.*, 618 F.3d at 7. The Final Rule also attaches "new legal consequences" to education records gathered before the Final Rule—these records can now be disclosed to an expansive list of individuals, not under the direct control of designating officials, without student or parental consent. *Id*. Of equal importance, these new authorized representatives are only required to use nonbinding, non-regulatory guidelines to safeguard student information.

In sum, because the Final Rule is substantively inconsistent with a prior, well-established agency practice, it is impermissibly retroactive. Furthermore, the Final Rule's retroactivity is not a reasonable construction of the FERPA, and therefore it is not entitled to *Chevron* deference.

### iii. The Department's definition is not permissible even in light of SLDS

Contrary to the agency's assertions, Congress has not expressed an intention to expand the use of SLDS beyond rudimentary academic data. As discussed in EPIC's comments before the agency, the statutory framework Congress designed to establish SLDS is far less sweeping than the Department argues. The COMPETES Act authorized grants for establishing and improving education data systems that meet the requirements of FERPA. *See* 20 U.S.C. § 9871(C)(i)(I) (2011). Congress stipulated that grants should be used to track three sets of data pertaining to elementary and secondary school students: first, "student level enrollment, demographic, and program participation information;" second, "student-level information about the points at which students exit, transfer in, transfer out, drop out, or complete P-16 education programs;" and third, "yearly test records of individual students," "information on students not tested by grade and

subject," "student-level transcript information, including information on courses completed and grades earned," and "student-level college readiness test scores." 20 U.S.C. §§ 9871(e)(2)(D)(i)-(ii) (2011).   For postsecondary students, the COMPETES Act authorizes grants for states to collect "information regarding the extent to which students transition successfully from secondary school to postsecondary education, including whether students enroll in remedial coursework," and "other information determined necessary to address alignment and adequate preparation for success in postsecondary education." 20 U.S.C. § 9871(e)(2)(D)(iii) (2011). The COMPETES Act prohibits the disclosure of Personally Identifiable Information ("PII") except as permitted under FERPA. 20 U.S.C. § 9871 (e)(2)(C)(i)(III). The Act also requires states to keep an accurate account of any disclosures of student PII, to require data-use agreements for all third parties who access PII, to adopt adequate security measures, and to protect student records from any unique identifiers that heighten the risk of nonconsensual disclosures of PII. 20 U.S.C. § 9871(e)(2)(C)(i)(IV)-(VIII).

Given the expansive nature of the American Recovery and Reinvestment Act, it is impossible to project congressional intent onto the Act beyond its plain text. The stated purposes of the Act include "stabilizing state budgets," "preserving and creating jobs," and "providing investments in infrastructure and economic efficiency," but nothing is said of revising current law to permit non-academic uses of student data. Public Law 111-5, Div. A, Title. I, § 3(a)(1)-(5), 123 Stat. 116. In its 1,073 pages, the ARRA made no mention of FERPA, nor agency regulations implementing the FERPA's protection of student data. Public Law 111-5, Div. A, Title. I, § 3(a)(1)-(5), 123 Stat. 116. Still, the Department cited the ARRA seven different times in the first two pages of its NPRM to justify reinterpreting Congress's clear intent in the FERPA to safeguard student privacy. Only two provisions of the ARRA explicitly reference SLDS. The

first, under Title VIII, provides $250,000,000 to "carry out section 208 of the Educational Technical Assistance Act . . . which may be used for Statewide data systems that include postsecondary and workforce information." Public Law 11-5, Div. A, Title. VIII, 123 Stat. 183. The second, under Title XIV, requires governors whose states receive educational money under the ARRA to assure the Secretary of Education that the state "will establish a longitudinal data system that includes the elements described in section 6401(e)(2)(D) of the America COMPETES Act." Public Law 111-5, Div. A, Title. VIII, § 14005(d), 123 Stat. 282-3. Neither of these provisions contemplates linking of non-academic data. Still, the agency asserts that the most cursory mention of SLDS in the ARRA constitutes "intent . . . to have States link data across sectors." This approach violates elemental rules of statutory interpretation. First, "[i]t is a commonplace of statutory construction that the specific governs the general." *N. Am. Catholic Educ. Programming Found, Inc. v. F.C.C.*, 437 F.3d 1206, 1209 (D.C. Cir. 2006) (quoting *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374 (1992)). Congress's specific and explicit decision in FERPA to protect student data from non-academic initiatives takes precedence over Congress's general intention to track student data in the ARRA. Second, "repeals by implication are not favored." *United States v. Hansen*, 772 F.2d 940, 944 (D.C. Cir. 1985) (citing the risks that "the legislative process would become distorted by a sort of blind gamesmanship, in which Members of Congress vote for or against a particular measure according to their varying estimations of whether its implications will be held to suspend the effects of an earlier law that they favor or oppose."). The Supreme Court has explained that this rule is particularly applicable when the implication derives from appropriations legislation:

> The doctrine disfavoring repeals by implication "applies with full vigor when . . . the subsequent legislation is an *appropriations* measure." . . . . This is perhaps an understatement since it would be more accurate to say that the policy applies with even *greater* force when the claimed repeal rests solely on an Appropriations Act.

> We recognize that both substantive enactments and appropriations measures are "Acts of Congress," but the latter have the limited and specific purpose of providing funds for authorized programs.(emphasis in original).

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978). The Department cites appropriations legislation for the contention that Congress implicitly intended to amend a previously enacted statute never actually mentioned in the appropriations legislation. This is a fundamental misconstruction, which underlies a failure to properly implement Congress's actual intent to protect private student data from non-academic uses.

In sum, if Congress wanted the FERPA to be altered to implement SLDS, it could have done so. It chose not to, and therefore the Final Rule is not a permissible construction of the FERPA.

### C.     The Final  Rule's Expansive Definition For Education Programs Is Not a Reasonable Construction Under The FERPA

The FERPA grants access to education records "in connection with the audit and evaluation of Federally-supported education programs, or in connection with the enforcement of the Federal legal requirements which relate to such programs." 20 U.S.C. §1232g(b)(3); *see also id*. § 1232g(b)(5). Prior to the Final Rule, "education programs" under the FERPA were undefined. The Final Rule created an expansive definition for "education programs":

> Education program means any program that is principally engaged in the provision of education, including but not limited to, early childhood education, elementary and secondary education, postsecondary education, special education, job training, career and technical education, and adult education, and any program that is administered by an educational agency or institution.

34 C.F.R. § 99.3.; 2011 Final Rule, AR 0733. And despite the definition's alleged limitations that "education programs" exclude "incidental educational or training activity within a broader non-education program" and will be evaluated "on the totality of the program," the Department's discussion of the Final Rule plainly states otherwise. Final Rule, AR 0706; Def's Opposition 41-

42. In fact, "[i]t is the Department's intent that the following types of programs, regardless of where or by whom they are administered, fall under the new definition of 'education program':

> The educational programs conducted by correctional and juvenile justice facilities or alternative long-term facilities such as hospitals, dropout prevention and recovery programs, afterschool programs dedicated to enhancing the academic achievement of its enrollees,, schools for the hearing and visually impaired, college test tutoring services, and high school equivalency programs."

2011 Final Rule, AR 0706. Additionally, education programs was defined "to ensure that, in addition to programs dedicated to improving academic outcomes, this definition includes programs, such as bullying prevention, cyber-security education, and substance abuse and violence prevention, when administered by an educational agency or institution." Final Rule, AR 0706. "Education program" administered by a correctional or juvenile justice facility or hospital is clearly "incidental educational or training activity" within the "broader non-education" program or context of juvenile justice.

Further, contrary to the Department's argument that EPIC "expressed little concern" about the definition of "education programs," and instead focused on enforcement and early childhood education program, EPIC used the Department's own example of early childhood education programs, which include "early intervention programs authorized under Part C of the Individuals with Disabilities Education Act (IDEA)," to illustrate just how expansive the definition of education program is. EPIC noted that Part C of IDEA "is principally engaged in non-academic services provided by: "Audiologists; Family therapists; Nurses; Nutritionists; Occupational therapists; Orientation and mobility specialists; Pediatricians and other physicians; Physical therapists; Psychologists; Social workers; Special educators; and Speech and language pathologists." EPIC Comment, AR 0529. *See also* 34 C.F.R. § 303.12(e)(1)-(12). And further, these non-academic services collect information that does not pertain to education, such as

"catheterization, tracheotomy care, tube feeding, the changing of dressings or colostomy collection bags, and other health services"; "[a]dministration of medications, treatments, and regimens prescribed by a licensed physician"; "[f]eeding skills and feeding problems; and . . . [f]ood habits and food preferences"; "psychological and developmental tests and other assessment procedures"; and "problems in a child's and family's living situation (home, community, and any center where early intervention services are provided) that affect the child's maximum utilization of early intervention services." EPIC Comment, AR 0529-30. *See also* 34 C.F.R. § 303.13(1); 34 C.F.R. § 303.12(iii); 34 C.F.R. § 303.12(C)-(D); 34 C.F.R. § 303.12(10)(1); 34 C.F.R. § 303.12(iv).

And this expansive definition matters because authorized representatives can only gain access to education records in "connection with the audit and evaluation" of federally and State-supported education programs. 20 USC § 1232g(b)(3); (b)(5). By broadening the definition of "education programs" to encompass these IDEA's non-academic services and other programs like "substance abuse and violence prevention," which that are not "principally engaged in the provision of education," auditors and evaluation can have virtually limitless access to education records in order to evaluate these "education" programs. 2011 Final Rule, AR 0706. As EPIC discussed in its comments, this new definition forces many individuals to choose between keeping their education records private, or obtaining much needed social services. EPIC Comment, AR 0530. It is not a permissible construction of the FERPA to release education records to evaluate and audit programs that do not relate to education. Therefore, the Department's decision to define education programs to include social services, violence prevent and other "incidental educational or training activity within a broader non-education program" is not entitled to *Chevron* deference.

**V. The Disputed Definitions Are Not in Accordance with Law Because They Are Contrary to the FERPA's Plain Meaning and Not a Permissible Construction of the Statute**

The Final Rule is also not in accordance with law under the APA. The D.C. Circuit has "long recognized the subtle, yet fundamental differences between arbitrary or capricious review and the APA's 'not in accordance with law'." *Holland v. Apfel*, 23 F. Supp. 2d 21, 27 (D.D.C. 1998) *aff'd sub nom. Holland v. Nat'l Mining Ass'n*, 309 F.3d 808 (D.C. Cir. 2002). "*Chevron* governs whether an agency interpretation is in accordance with law," and therefore "the question for the reviewing court is whether the agency's construction of the statute is faithful to its plain meaning, or, if the statute has no plain meaning, whether the agency's interpretation 'is based on a permissible construction of the statute.' " *Id.* at 28 (D.D.C. 1998), *aff'd sub nom. Holland v. Nat'l Mining Ass'n*, 309 F.3d 808 (D.C. Cir. 2002) (quoting *Arent v. Shalala*, 70 F.3d 610, 615 (D.C. Cir. 1995)).

As described in detail above, the Department's interpretation of "directory information," authorized representative," and "education program" in the Final Rule are not faithful to a plain reading of the FERPA, nor is the construction permissible.

**VI. The Disputed Definitions are Arbitrary and Capricious Because They Are Not the Product of Reasoned Decisionmaking**

As discussed above, agency action "not in accordance with law" is distinct from agency action that is "arbitrary and capricious." *See* discussion *supra* Part V. EPIC and its co-plaintiffs allege that the Department's Final Rule is "not in accordance with law." Compl. ¶¶ 1, 28-32. EPIC's complaint does not allege that the Department's Final Rule is arbitrary or capricious. Compl. ¶¶ 1- 37. However the Department analyzed EPIC's "not in accordance with law" claims under "arbitrary and capricious" review. Def.'s Mot. 44-45. To the extent that this Court considers the Department's arbitrary and capricious analysis, the Department's promulgation of

the Final Rule is still unlawful because it is not the product of reasoned decisionsmaking.

Courts analyze "arbitrary and capricious" APA claims by determining "whether the regulations

are the product of reasoned decisionmaking." *Ass'n of Private Sector Colleges & Universities v.*

*Duncan,* 681 F.3d 427, 441 (D.C. Cir. 2012).  More specifically,

> Normally, an agency rule would be arbitrary and capricious if the agency has
> relied on factors which Congress has not intended it to consider, entirely failed to
> consider an important aspect of the problem, offered an explanation for its
> decision that runs counter to the evidence before the agency, or is so implausible
> that it could not be ascribed to a difference in view or the product of agency
> expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43,

(1983).

In issuing the three definitions at issue, the agency both "entirely failed to consider an

important aspect of the problem" and "offered an explanation for its decision that runs counter to

the evidence before the agency."  *Motor Vehicle Mfrs. Ass'n of the U.S,* 463 U.S. at 43. As

discussed above, the Department entirely failed to consider that by using directory information,

including student ID numbers, individuals can easily gain access to education records. *See*

discussion *supra* Part IV, A. The Final Rule's proviso that student ID numbers displayed on

badges are directory information only if the numbers cannot be used to access education records

simply fails to consider how student ID numbers are used in practice. Even a cursory Internet

search would have shown the Department how easily individuals can access education records

using student ID numbers and other directory information. Therefore the agency entirely failed to

consider the risks to student privacy that it created by removing the FERPA's guarantee that

students could decline public disclosure of directory information, including student ID numbers.

Additionally, in reinterpreting the three definitions, the agency offered an explanation that was counter to evidence before the agency. Specifically, the Department's NPRM states that in defining "education programs," the agency considered "State-level health and human services departments [that] administer early childhood education programs" and non-state education agencies that "administer career and technical education or adult education programs." 2011 NPRM, AR0005. However, the Department later admitted that when it proposed to define "education programs," it did not rely on factual evidence, but rather a "general knowledge" of "non-state education agencies ('SEAs') that "administer career and technical education or adult education programs" and "State-level health and human services departments" that administer " early childhood education programs." Def.'s Opp'n at 8. *see also* Declaration of Kathleen M. Styles ("Styles Decl.") ¶¶ 6,8. Thus, the agency had no evidence to support its decision, yet it issued an expansive rule that removed privacy protections for millions of student. That is the very definition of arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the Court should vacate the Final Rule's definitions for "education program," "authorized representative," and "directory information," and deny the Department's motion to dismiss and motion for summary judgment, and grant EPIC's motion for summary judgment.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7(f), EPIC and its co-plaintiffs request that the Court hear oral argument on their motion.

Respectfully submitted,

By:    <u> /s/ _____</u>
Marc Rotenberg (DC Bar # 422825)
Khaliah Barnes*
David Jacobs**
ELECTRONIC PRIVACY
INFORMATION CENTER
1718 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20009
(202) 483-1140 (telephone)
(202) 483-1248 (facsimile)
*Attorneys for Plaintiffs*

Dated:  January 18, 2013


*Ms. Barnes is a member in good standing of the Maryland Bar. Her admission to the D.C. Bar is pending.

** Mr. Jacobs is a member in good standing of the New York Bar.