UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:12-cv-00327 (ABJ) |
| THE UNITED STATES DEPARTMENT OF EDUCATION, | ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

**<u>DEFENDANT'S OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY
JUDGMENT AND REPLY IN SUPPORT OF ITS MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... iii

INTRODUCTION .......................................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

I.      PLAINTIFFS LACK STANDING TO BRING THESE CLAIMS BECAUSE
        NONE OF THEM HAVE SUFFERED, NOR ARE LIKELY TO SUFFER, ANY
        INJURY. ............................................................................................................................. 2

        A.      The Individual Plaintiffs Lack Standing. .............................................................. 2

                1.      Plaintiffs lack standing to challenge the definition of "authorized
                        representatives" in the program evaluation exception because they
                        have not shown that their alleged injuries from disclosures under the
                        exception are imminent rather than conjectural or hypothetical................. 4

                2.      Plaintiffs lack standing to challenge the definition of "authorized
                        representative" because the harm they allege is unrelated to the
                        change they dispute.................................................................................... 8

                3.      Additional defects preclude plaintiffs' standing to challenge the
                        other definitions. ..................................................................................... 11

        B.      EPIC Lacks Organizational Standing Because It Itself Has Not Been Injured. ... 12

II.     THE FINAL RULE IS ENTITLED TO REVIEW UNDER *CHEVRON*'S
        DEFERENCE STANDARD.............................................................................................. 19

III.    NONE OF THE THREE DISPUTED DEFINITIONS EXCEEDS STATUTORY
        AUTHORITY. .................................................................................................................. 20

        A.      Student ID Numbers Displayed on Badges Can Be "Directory Information"
                Because Such a Disclosure is Not Harmful or an Invasion of Privacy................ 20

                1.      FERPA does not prohibit mandatory student ID badges. ........................ 20

                2.      Student ID numbers placed on ID badges meet the requirements for
                        "directory information" because such a disclosure would not
                        generally be considered harmful or an invasion of privacy. .................... 25

B.    Federal and State Authorities May Designate "Authorized Representatives" Who Are Not Under Their Direct Control to Conduct Audits or Evaluations of Education Programs Because Neither FERPA Nor its Legislative History Requires Such a Limitation...................................................................................... 27

1.    Neither the plain text nor the legislative history of the program evaluation exception unambiguously forbids a definition of "authorized representative" broader than the "direct control" standard. .................................................................................................... 27

2.    The Department's definition of "authorized representative" is based on a permissible construction of the statute. .............................................. 32

C.    The Department's Definition of "Education Programs" Is Neither Forbidden By FERPA Nor Unreasonable............................................................. 35

IV.    THE DISPUTED DEFINITIONS ARE OTHERWISE IN ACCORDANCE WITH LAW FOR THE SAME REASONS THEY ARE NOT IN EXCESS OF STATUTORY AUTHORITY. ........................................................................................ 38

CONCLUSION.................................................................................................................... 38

# TABLE OF AUTHORITIES

<u>CASES</u>

*AF Holdings LLC v. Does 1-1,058,*
    286 F.R.D. 39 (D.D.C. 2012)..........................................................................................13

*Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach,*
    469 F.3d 129 (D.C. Cir. 2006) ...............................................................................14, 17

*Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler,*
    789 F.2d 931 (D.C. Cir. 1986) ...............................................................................15, 17

*Am. Chemistry Council v. Johnson,*
    406 F.3d 738 (D.C. Cir. 2006)......................................................................................29

*Am. Legal Foundation v. FCC,*
    808 F.2d 84 (D.C. Cir. 1987) .......................................................................................15

*Am. Soc. For Prevention of Cruelty to Animals v. Feld Entertainment, Inc.,*
    659 F.3d 13 (D.C. Cir. 2011) .......................................................................................13

*Am. Wildlands v. Kempthorne,*
    530 F.3d 991 (D.C. Cir. 2008) ...............................................................................11, 12

*Arkansas Dairy Co-op Ass'n v. U.S. Dep't of Agriculture,*
    573 F.3d 815 (D.C. Cir. 2009) .....................................................................................22

*Arkema Inc. v. EPA,*
    618 F.3d 1 (D.C. Cir. 2010) .........................................................................................33

*Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.,*
    564 F.3d 462 (D.C. Cir. 2009) .......................................................................................6

*Ass'n of Private Sector Colleges & Univs. v. Duncan,*
    681 F.3d 427 (D.C. Cir. 2012) ...............................................................................30, 33

*Barnhart v. Walton,*
    535 U.S. 212 (2002).....................................................................................................19

*Blackman v. District of Columbia,*
    456 F.3d 167 (D.C. Cir. 2006) .....................................................................................28

*\*Cablevision Systems Corp. v. FCC,*
    649 F.3d 695 (D.C. Cir. 2011) ...............................................................................19, 32

*Canning v. Nat'l Labor Relations Bd.*,
   __ F.3d __, No. 12-1115, 2013 WL 276024 (D.C. Cir. 2013)..........................................12

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council*,
   467 U.S. 837 (1984)........................................................................................ passim

*Community Nutrition Institute v. Block*,
   698 F.2d 1239 (D.C. Cir. 1983) ......................................................................17

*Consumer Fed'n of America v. FCC*,
   348 F.3d 1009 (D.C. Cir. 2003) ......................................................................12

*Craig v. District of Columbia*,
   No. 11-1200, 2012 WL 3126779 (D.D.C. Aug. 2, 2012) .................................12

*Ctr. for Law & Educ. v. Dep't of Educ.*,
   396 F.3d 1152 (D.C. Cir. 2005) ...............................................................14, 16

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ........................................................................................11

*Engine Mfrs. Ass'n v. EPA*,
   88 F.3d 1075 (D.C. Cir. 1996) ........................................................................22

*Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*,
   541 U.S. 246 (2004).........................................................................................28

*Fair Emp't Council of Greater Washington, Inc. v. BMC Marketing Corp.*,
   28 F.3d 1268 (D.C. Cir. 1994) ..................................................................18, 19

*Fox v. Clinton*,
   684 F.3d 67 (D.C. Cir. 2012) ..........................................................................19

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
   528 U.S. 167 (2000)........................................................................................12

*Gonzales v. Oregon*,
   546 U.S. 243 (2006)........................................................................................19

*Haitian Refugee Center v. Gracey*,
   809 F.2d 794 (D.C. Cir. 1987) ........................................................................18

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982).................................................................................. passim

*Holland v. Apfel,*
  23 F. Supp. 2d 21 (D.D.C. 1998) ..................................................................................38

*Holy Trinity Church v. United States,*
  143 U.S. 457 (1892) ......................................................................................................22

*Krottner v. Starbucks Corp.,*
  628 F.3d 1139 (9th Cir. 2010) .......................................................................................6

*Landstar Express America, Inc. v. FMC,*
  569 F.3d 493 (D.C. Cir. 2009) ......................................................................................24

*Long Term Care Pharmacy Alliance v. UnitedHealth Group, Inc.,*
  498 F. Supp. 2d 187 (D.D.C. 2007) ........................................................................14, 17

*\*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ....................................................................................................2, 3

*Mova Pharm. Corp. v. Shalala,*
  140 F.3d 1060 (D.C. Cir. 1998) ...............................................................................22, 24

*Muscogee (Creek) Nation v. Okla. Tax Comm'n,*
  611 F.3d 1222 (10th Cir. 2010) .....................................................................................13

*Mylan Pharm., Inc. v. Shalala,*
  81 F. Supp. 2d 30 (D.D.C. 2000) ..................................................................................27

*Nat'l Ass'n of Home Builders v. EPA,*
  667 F.3d 6 (D.C. Cir. 2011) .....................................................................................13, 16

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
  545 U.S. 967 (2005) .................................................................................................30, 33

*Nat'l Consumer League v. General Mills, Inc.,*
  680 F. Supp. 2d 132 (D.D.C. 2010) ..............................................................................16

*Nat'l Mining Ass'n v. U.S. Dep't of Interior,*
  177 F.3d 1 (D.C. Cir. 1999) ..........................................................................................33

*Nat'l Rifle Ass'n v. Reno,*
  216 F.3d 122 (D.C. Cir. 2000) ................................................................................29, 30

*\*Nat'l Taxpayers Union, Inc. v. United States,*
  68 F.3d 1428 (D.C. Cir. 1995) .................................................................................13, 16

*Nat'l Treasury Emps. Union v. United States,*
　　101 F.3d 1423 (D.C. Cir. 1996) ......................................................................14, 15, 17

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.,*
　　366 F.3d 930 (D.C. Cir. 2004) ........................................................................................13

*Owasso Indep. Sch. Dist. v. Falvo,*
　　534 U.S. 426 (2002) ....................................................................................................23, 32

*Petit v. U.S. Dep't of Educ.,*
　　675 F.3d 769 (D.C. Cir. 2012) ........................................................................................28

*Pisciotta v. Old Nat'l Bancorp,*
　　499 F.3d 629 (7th Cir. 2007) ............................................................................................6

*\*Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.,*
　　489 F.3d 1279 (D.C. Cir. 2007) ............................................................................. passim

*Sierra Club v. Morton,*
　　405 U.S. 727 (1972) ....................................................................................................13, 14

*Sierra Club v. EPA,*
　　292 F.3d 895 (D.C. Cir. 2002) ..........................................................................................2

*Simon v. E. Ky. Welfare Rights Org.,*
　　426 U.S. 26 (1976) ............................................................................................................14

*Spann v. Colonial Village, Inc.,*
　　899 F.2d 24 (D.C. Cir. 1990) ................................................................................14, 15, 18

*Spartalj-Waters v. United States,*
　　No. 87-1131, 1987 WL 19626 (D.D.C. Oct. 30, 1987) ..................................................13

*In re Trans Alaska Pipeline Rate Cases,*
　　436 U.S. 631 (1978) ..........................................................................................................22

*United States v. Cook,*
　　594 F.3d 883 (D.C. Cir. 2010) ........................................................................................24

*U.S. Women's Chamber of Commerce v. U.S. Small Business Admin.,*
　　No. 04-1889, 2005 WL 3244182 (D.D.C. Nov. 30, 2005) ..............................................17

*Whitmore v. Arkansas,*
　　495 U.S. 149 (1990) ............................................................................................................7

*Williams v. District of Columbia,*
    530 F. Supp. 2d 119 (D.D.C. 2008) ...........................................................................8


STATUTES

Fed. R. Civ. P. 56(e) ...........................................................................................................4

5 U.S.C. § 701 ....................................................................................................................1

5 U.S.C. § 706(2)(A)....................................................................................................19, 38

5 U.S.C. § 706(2)(C)........................................................................................................19

20 U.S.C. § 1232g.......................................................................................................passim

    20 U.S.C. § 1232g(a)(4).........................................................................................36
    20 U.S.C. § 1232g(a)(5).......................................................................................5, 21
    20 U.S.C. § 1232g(b)(1)......................................................................................12, 21
    20 U.S.C. § 1232g(b)(2)........................................................................................21
    20 U.S.C. § 1232g(b)(3)....................................................................................33, 35
    20 U.S.C. § 1232g(b)(4)........................................................................................32

20 U.S.C. § 1400................................................................................................................38

20 U.S.C. § 1402................................................................................................................38

20 U.S.C. § 1414................................................................................................................38

20 U.S.C. §§ 1431-1444 ....................................................................................................38

Pub. L. No. 111-5, 123 Stat. 115 (Feb. 17, 2009).........................................................34


REGULATIONS

34 C.F.R. § 99.3................................................................................................25, 35, 36

34 C.F.R. § 99.33..................................................................................................................7

34 C.F.R. § 99.35.................................................................................5, 7, 10, 33, 35

34 C.F.R. § 99.37.......................................................................................20, 21, 24

34 C.F.R. § 99.66..................................................................................................................7

53 Fed. Reg. 11942 (Apr. 11, 1988) ............................................................................25

73 Fed. Reg. 74806 (Dec. 9, 2008)..........................................................9, 23, 24, 25, 30

76 Fed. Reg. 19726 (Apr. 8, 2011) ..............................................................20, 24, 25

76 Fed. Reg. 75604 (Dec. 2, 2011) ................................................................. passim

LEGISLATIVE MATERIAL

120 Cong. Rec.13951 (May 9, 1974)...........................................................................30

120 Cong. Rec. 14579 (May 14, 1974).................................................................22, 30

120 Cong. Rec. 39863 (Dec. 13, 1974).....................................................................21

S. Rep. No. 93-1026.....................................................................................................31

S. Rep. No. 93-1409.................................................................................................23, 31

## INTRODUCTION

The Electronic Privacy Information Center ("EPIC") and four of its board members challenge the Department of Education's definition of three statutory terms in a final rule amending the Department's regulations for the Family Educational Rights and Privacy Act of 1974, as amended ("FERPA"), 20 U.S.C. § 1232g.  *See* 76 Fed. Reg. 75604 (Dec. 2, 2011) (hereinafter "Final Rule"), Admin. Record ("AR") 0696.  Plaintiffs argue that the meaning given to these statutory terms by the Department's final rule does not comport with the Department's statutory authority and is otherwise contrary to law in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*

The case must be dismissed at the outset because plaintiffs have failed to carry their burden of demonstrating Article III standing.  EPIC is a "public interest research organization," without any personal stake in the litigation.  Compl. ¶ 4.  The individual plaintiffs suing in their own behalf, all but one of whom completed their graduate education prior to 1991, cannot show that the regulatory changes they challenge caused, or are likely to cause, the disclosure of their education records.  Accordingly, plaintiffs have not shown a cognizable injury from the Final Rule's promulgation, and this suit must be dismissed.

Even if plaintiffs were able to establish standing, the Court should grant summary judgment to the Department.  The Department's reasoned interpretation of each of the three disputed statutory terms are entitled to deference under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984).  Plaintiffs have not shown that the Final Rule's interpretation of "directory information," "authorized representative," and "education program" are unambiguously foreclosed by Congress or unreasonable.  To the contrary, plaintiffs have failed almost entirely to engage and respond to the detailed textual and legislative history arguments

laid out in the Department's opening brief.  Instead, plaintiffs resort to generalities about the

purpose of FERPA as they perceive it.  Having shown that the definitions are reasonably within

the scope of the statute in light of its plain text and legislative history, the Department's

interpretation of FERPA deserves *Chevron* deference.  Accordingly, the Court should grant

summary judgment to the Department.

## ARGUMENT

**I.  PLAINTIFFS LACK STANDING TO BRING THESE CLAIMS BECAUSE NONE
OF THEM HAVE SUFFERED, NOR ARE LIKELY TO SUFFER, ANY INJURY.**

In order to establish standing under Article III, a claimant must show:  (1) it has suffered

an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not

conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the

defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed

by a favorable decision.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Sierra

Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).  Plaintiffs in this case have not identified how

each of the challenged definitions would cause them injury-in-fact and instead rely on two

generalities:  1) that the Final Rule allegedly "makes each plaintiff's personally identifiable

information more readily available to third party entities" which might lead to "consequential

harms, such as identity theft"; and 2) that EPIC's self-defined mission to lobby and litigate for its

views regarding information privacy has purportedly been harmed.  *See* Pls.' Cross-Mot. for

Summ. J. at 5-7, 9-10 (hereinafter, "Pls.' Cross-Mot."), ECF No. 20.  Both justifications fall far

short of Article III's requirement of an actual "case or controversy."

### A.     The Individual Plaintiffs Lack Standing.

Plaintiffs characterize their theory of injury as an "increased-risk-of-harm case."  Pls.'

Cross-Mot. at 6.  They acknowledge that the controlling standard for such cases requires

showing "at least *both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account." *Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1295 (D.C. Cir. 2007) (emphasis original).  The D.C. Circuit noted that where the "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*," standing "is substantially more difficult to establish." *Id.* at 1291 (quoting *Lujan*, 504 U.S. at 562).  Plaintiffs here face the same predicament because they argue only that the three disputed definitions "increase[] the risk that plaintiffs' [own education] records will be disclosed without their consent to a host of unregulated entities."  Pls.' Cross-Mot. at 6.

The declarations provided by the four individual plaintiffs confirm Defendant's observation that three of the four are far removed in time from their days as students and are therefore very unlikely to be affected by the rule they challenge.  Specifically, Peter Neumann relies on education records from 1961,[1] Deborah Peel relies on education records from 1970 and 1977,[2] and Grayson Barber relies on education records from 1991.[3]  Only Pablo Molina, the secretary of EPIC's board of directors, has provided evidence of recent enrollment as a student,

---

[1]  Dr. Neumann completed his Ph.D. at Harvard University in 1961.  *See* Neumann Decl. ¶¶ 4, 6.

[2]  Dr. Peel completed a bachelor's degree at the University of Texas at Austin in 1970, an M.D. at the University of Texas Medical Branch in 1974, and a residency at the same institution in 1977.  *See* Peel Decl. ¶ 4.  While she describes other training in the 1990s, she relies exclusively on her attendance at these two institutions for her standing argument.  *See id.* ¶ 6.

[3]  Ms. Barber completed her J.D. at Rutgers in 1991, and attended an unspecified two month course at its School of Communicate and Information in 2010.  Barber Decl. ¶ 4.  She has not provided sufficient detail to determine whether she was treated as a student for purposes of the 2010 course, whether it was in the undergraduate or graduate field of study, or any other details relevant to her alleged injury.  *See id.*

stating that he plans to complete a doctorate at Georgetown University this year.[4] But even he cannot carry his burden of showing that the Final Rule subjects him to an imminent, non-conjectural injury.

> 1.    *Plaintiffs lack standing to challenge the definition of "authorized representatives" in the program evaluation exception because they have not shown that their alleged injuries from disclosures under the exception are imminent rather than conjectural or hypothetical.*

Guidance for examining whether an "increased-risk-of-harm case" meets standing requirements is found in this Circuit's decision, *Public Citizen*.  In that case, plaintiffs argued that a tire pressure monitor regulation "designed to reduce the risk of [car] accidents from the status quo" was insufficient because the statute required the agency "to reduce the risk even further."  489 F.3d at 1296.  Plaintiffs argued that, as a result, "some Public Citizen members allegedly will suffer car accidents in the future that otherwise would be prevented."  *Id.* at 1291.  The D.C. Circuit determined first that the proposed injury was concrete because "[i]njuries from car accidents—including death, physical injuries, and property damage—are plainly concrete harms," and second that it was particularized because "each person who is in an accident is harmed personally and distinctly."  *Id.* at 1292.  The sticking point was the requirement that injury be "actual or imminent" because "[f]or any particular individual, the odds of such an accident occurring are extremely remote and speculative, and the time (if ever) when any such accident would occur is entirely uncertain."  *Id.* at 1293-94.

Like the possible car accidents in *Public Citizen*, the alleged injury here appears to be concrete and particularized—tangible costs resulting from misuse of the individual plaintiffs'

---

[4]  Mr. Molina completed his M.B.A. at Saint Louis University in 1995, and took graduate engineering courses at Washington University in 1998.  *See* Molina Decl. ¶¶ 4, 6.  Until 2012, he was Georgetown's chief information officer and associate vice president of information technologies, and he remains an adjunct professor there.  *See id.* ¶ 2.

education records for commercial or illegal purposes.[5]  Each plaintiff identically describes their

concern that, upon being "re-disclosed to non-governmental actors for purposes I cannot

discern," their information could enter databases used for employee background checks, credit

score computations, commercial consumer profiling, or any commercial database.  *See, e.g.*,

Neumann Decl. ¶¶ 9-12; *see also* Pls.' Cross-Mot. at 7 (adding concern about identity theft that

is unmentioned in the declarations).

But plaintiffs have not carried their burden to demonstrate that the educational

institutions which they attended still maintain education records that could be disclosed.  While it

may be safe to assume that each institution still maintains directory information regarding its

students from the 1960s or 1990s, e.g., "name, address, . . . date and place of birth, major field of

study, participation in officially recognized activities and sports, . . . dates of attendance, degrees

and awards received," 20 U.S.C. § 1232g(a)(5)(A), this information has always been disclosable

and plaintiffs cannot show injury unless other personally identifiable information ("PII") has

been maintained and might be disclosed.  *See* Def.'s Mot. Dismiss or Alternatively Summ. J. at

18 (hereinafter, "Def.'s Mot."), ECF No. 18.  There is no evidence in the record that any of the

education institutions retain such non-directory information regarding these plaintiffs.  The

plaintiffs' generic assertion that each school "continues to maintain education records about me,"

is woefully nonspecific and could entirely refer to directory information.  *See* Neumann Decl. ¶

6; Peel Decl. ¶ 6; Barber Decl. ¶ 6; Molina Decl. ¶ 6.  Moreover, none of the plaintiffs provide

any basis for this alleged knowledge.  *See* Fed. R. Civ. P. 56(e) (declaration "must be made on

---

[5]  Plaintiffs do not argue that disclosure to an "authorized representative" of which they
disapprove is itself an injury.  Nor could they claim to be injured by mere disclosure to an entity
evaluating an education program and using the information for no other purpose, *see* 34 C.F.R. §
99.35(a)(2)(i) & (a)(3)(v).

personal knowledge . . . and show that the [declarant] is competent to testify on the matters stated"); *Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transportation*, 564 F.3d 462, 466 (D.C. Cir. 2009) (refusing to rely on statement in affidavit that "provides no factual support . . . to suppose that [the affiant] had personal knowledge of the cause or was otherwise competent to testify as to its nature").

But even if this factual deficiency could be overlooked, plaintiffs' injury argument further stumbles at the "actual or imminent" inquiry, just as in *Public Citizen*.[6] Their ultimate theorized injuries—costs from using education records for commercial or illegal purposes—are actually very remote. First, as discussed above, education records must have been maintained. Second, PII from their education records (not directory information or anonymous data) would have to be disclosed under the program evaluation exception to an entity that would *not* have been eligible to receive the information prior to the Final Rule.[7] Third, that authorized

---

[6] Plaintiffs argue that they should be able to establish an imminent injury before consequential harms actually occur. *See* Pls.' Cross-Mot. at 7-8. This is undisputed, but plaintiffs cannot evade *Public Citizen*'s requirement of proving imminence by showing how likely it is that the harm will occur and how much that likelihood has increased. In the cases cited by plaintiffs an action had already occurred that made identity theft very likely. *See Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1140 (9th Cir. 2010) (finding standing for plaintiffs because stolen "laptop contained the unencrypted names, addresses, and social security numbers of approximately 97,000 Starbucks employees"); *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 631, 634 (7th Cir. 2007) (finding standing for "plaintiffs whose data has been compromised, but not yet misused" based on allegation that "third-party computer 'hacker' . . . obtain[ed] access to the confidential information of tens of thousands of [bank website] users"). Here, in significant contrast, disclosure to authorized entities would not itself make identity theft imminent.

[7] This step is very unlikely to occur with antiquated data. To be useful, the education records would need to be a format that can plausibly be shared with an outside entity as part of an evaluation or audit. It is, in fact, unlikely that auditors or evaluators beginning in 2011 or later would have the interest or the will to collect or review paper records from decades ago, or even electronic information preserved in outdated file formats. *See* Buckley Decl. ¶ 27, ECF No. 18-9. On this basis alone, three of the individual plaintiffs' claims should be dismissed as utterly conjectural and hypothetical.

representative must misuse the information in one of the three ways imagined by plaintiffs:  (i) using the PII for purposes other than the evaluation or audit, (ii) improperly disclosing the PII to still another entity that might misuse the information, or (iii) failing to safeguard the PII and permitting it to be stolen.  Each of these three alternatives is prohibited by Department regulations, and subject to various penalties.[8]  Finally, each of these possible misuses is still at least one step removed from the tangible costs that would be "actual" harm to the plaintiff.

"[T]he constitutional requirement of imminence articulated by the Supreme Court . . . necessarily compels a very strict understanding of what increase in risk and overall risk levels can count as 'substantial.'"  *Public Citizen*, 489 F.3d at 1296; *see Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) ("Allegations of possible future injury do not satisfy the requirements of Art. III.  A threatened injury must be certainly impending to constitute injury in fact").  The numerous steps necessary for injury to occur here suggest that plaintiffs are "attempting to assert remote and speculative claims of possible future harm."  *Public Citizen*, 489 F.3d at 1294.  Compounding plaintiffs' failure is the fact that they have not shown that any of these steps are likely.  Indeed, plaintiffs have made no effort to quantify either the amount by which their risk of these harms increased or the total probability of harm.  *Cf. Public Citizen*, 489 F.3d at 1293 (alleging that several hundred U.S. citizens, including some of the organization's 130,000 members, would be injured as a result of the insufficient policy).  In fact, the *only* evidence cited by plaintiffs is a 2009 survey of "elementary and secondary school state reporting systems," *see* AR 0793; Pls. Cross-Mot. at 6-7, which does not document any actual harms and, regardless, cannot establish any substantial probabilities regarding plaintiffs' *graduate school* records

---

[8]  *See, e.g.*, 34 C.F.R. § 99.35(a)(2)(i) (prohibiting other uses); *id.* § 99.33(a)(1) (prohibiting redisclosure except as permitted by FERPA); *id.* § 99.35(a)(2)(ii)-(iii) (requiring protection of the information and destruction when no longer needed); *id.* § 99.66 (describing enforcement).

(plaintiffs' only education records created since 1990).  Finally, plaintiffs identify no evidence

that anyone's education records have been used for the commercial or illegal purposes that

plaintiffs fear.  This utter lack of evidence is particularly significant because, unlike the

organizational standing at issue in *Public Citizen*, the individual plaintiffs here must prove the

probability of harm individually.  *See Williams v. District of Columbia*, 530 F. Supp. 2d 119, 127

(D.D.C. 2008) (holding that necessary showing for individual standing is different than what was

at issue in *Public Citizen* because the individual plaintiff "must show that he personally has

standing—that he has both (i) a substantially increased risk of harm and (ii) a substantial

probability of harm with that increase taken into account").

In sum, "[t]he potential future injury asserted by [plaintiffs] is too remote and speculative

to support standing in this case."  *Williams*, 530 F. Supp. 2d at 127 (rejecting standing based

merely on generalized evidence about an increased likelihood of disease in the population at the

D.C. Jail).  Neither the three individual plaintiffs whose education records are decades old, nor

the one plaintiff whose recent student records are very unlikely to be disclosed through D.C.'s

statewide longitudinal data system,[9] can show either that the Final Rule caused a substantial

increase in the risks about which they are concerned or that the overall probability of the harm is

sufficient, let alone both.  Accordingly, the individual plaintiffs should be dismissed for lack of

standing.

> 2.  *Plaintiffs lack standing to challenge the definition of "authorized*
> *representative" because the harm they allege is unrelated to the change*
> *they dispute.*

To the extent that plaintiffs arguments can be understood, it appears that they object to

---

[9]  Plaintiffs have made no attempt to refute the Department's evidence that Mr. Molina's
information is unlikely to become part of the District of Columbia's SLDS database.  *See* Def.'s
Mot. at 18-19; Buckley Decl. ¶¶ 12-27, ECF No. 18-9.  Even if it did, he would still be far short
of a substantial risk of harm as discussed above.

the Department's new definition of "authorized representative" because they fear that it permits more disclosures to "non-governmental actors."  In reality, the new definition leaves unchanged the existing permission to make disclosures to non-governmental entities and instead permits disclosures to non-educational *government* entities (e.g., a state unemployment office evaluating an education program based on its workforce results).  Accordingly, because the results plaintiffs fear are unaffected by the Final Rule, plaintiffs lack standing to challenge this definition.

Plaintiffs dispute the Department's definition of "authorized representative" because they believe that the Department's rejection of its prior "direct control standard" as a limitation on who could be selected as an "authorized representative" improperly expanded the number of entities to which disclosures might be made in the first instance.  *See* Pls.' Cross-Mot.  at 25. Their individual declarations are very specific about the harm they fear:  "I do not want the information I disclosed to [my university] to be re-disclosed to *non-governmental actors* for purposes I cannot discern, without my authorization."  *See* Neumann Decl. ¶ 8 (emphasis added); *see also* Barber Decl. ¶ 8 (same); Peel Decl. ¶ 8 (same); Molina Decl. ¶ 8 (same).  Taking these declarations at face value, standing must be rejected.

The Final Rule neither permitted for the first time, nor expanded the access of non-governmental third parties to student information under the program evaluation exception.  To the contrary, the "direct control standard" plaintiffs believe should be controlling itself permits disclosure to such third parties.  *See* 73 Fed. Reg. 74806, 74815 (Dec. 9, 2008) (hereinafter "2008 Final Rule"), AR 0772 (stating that authorized representative "includes contractors, consultants, volunteers, and other outside parties (i.e., nonemployees) used to conduct . . . services or functions for which the official or agency would otherwise use its own employees").  As the Department explained in its brief—and to which plaintiffs provided no response—the

only meaningful effect of abandoning the direct control standard was to permit *other government entities* who were not educational authorities to receive information from educational agencies and institutions.  *See* Def.'s Mot. at 33-34; *cf.* Winston Mem. (Jan. 19, 2001), AR 0839 (pre-Hansen Memorandum guidance regarding disclosures to other state government entities that was specifically rescinded by the Hansen Memorandum).  It is these entities that cannot be described as "under the control" of some coequal, inferior, or out-of-state governmental or educational entity.  *See* Hansen Mem., AR 0833 (arguing that a "State department of labor" cannot receive disclosures because it "is not under the educational agency's direct control").  By contrast, every non-governmental entity who receives information pursuant to a written contract or agreement effectively fits within the prior definition of "direct control" as a contractor.  *See id.* (concluding that a "contractor" inherently meets the direct control standard).[10]

In sum, the new definition of "authorized representative" left the access of non-governmental third parties unchanged.  Under the standard plaintiffs prefer, they could receive access as "contractors."  Under the new rule, they may receive access only upon being designated pursuant to a written agreement that specifies the purposes and for which the information will be used and the limitations on its use—i.e., as contractors.  In sum, because the only injury identified by the plaintiffs existed prior to the Final Rule and was unchanged by it, plaintiffs have failed to establish causation and lack standing to challenge the definition of

---

[10]  Indeed, plaintiffs' objection is difficult to understand.  Whereas, before, the Department used the term "contractor" but provided little guidance regarding the establishment of a contract with such non-governmental entities for purposes of the program evaluation exception, the Final Rule requires a written agreement specifying numerous details and requires the educational entity establishing the agreement to "ensure to the greatest extent practicable that any entity or individual designated as its authorized representative" complies with FERPA.  *See* 34 C.F.R. § 99.35(a)(2); Final Rule, AR 0734.  Thus, the Final Rule requires at least as much government control over "non-governmental entities" as the Department's prior guidance.

"authorized representative."

        *3.*     *Additional defects preclude plaintiffs' standing to challenge the other definitions.*

Plaintiffs nowhere explain how it is substantially probable that each of the three

challenged definitions in the Final Rule harm them. *See DaimlerChrysler Corp. v. Cuno*, 547

U.S. 332, 352 (2006) ("[A] plaintiff must demonstrate standing for each claim he seeks to

press."). In particular, they provide no evidence showing how they would be affected by the

clarification that "directory information" permits educational agencies and institutions to require

student ID numbers to be displayed on ID badges. They provide no response to the

Department's argument that they could not be affected because either they do not have student

ID badges or they are required to display their ID number as faculty members. *See* Def.'s Mot.

at 16-17.

Similarly, plaintiffs have provided no evidence that they would be affected by the

definition of "education program" which includes programs plaintiffs believe should be excluded

from evaluation using FERPA-protected data. It is difficult to conceive how this definition could

affect plaintiffs unless they had participated in one of the program they believe should not be

subject to evaluation. But plaintiffs have identified no such program, making any such injury

highly speculative. Moreover, to support standing, any such program must not have been

encompassed by the Department's regulations or guidance prior to the Final Rule.

Finally, allegations in the individual plaintiffs' declarations which plaintiffs do not

present as grounds for standing in their opening brief should not be the basis of subsequent

argument or be permitted to serve as separate bases for standing.[11] *See Am. Wildlands v.*

---

[11] For example, Ms. Barber's declaration includes statements regarding her minor child enrolled in public school. *See* Barber Decl. ¶ 9. Plaintiffs make no argument based on these statements.

(Cont'd)

*Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) ("We need not consider this argument because plaintiffs have forfeited it on appeal, having raised it for the first time in their reply brief."); *see also Craig v. District of Columbia*, No. 11-1200, 2012 WL 3126779, at *7 n.8 (D.D.C. Aug. 2, 2012).

### B.     EPIC Lacks Organizational Standing Because It Itself Has Not Been Injured.

EPIC asserts standing on its own behalf as a "public interest research center dedicated to protecting civil liberties and privacy." Pls.' Cross-Mot. at 9.[12] It believes it has established

---

*See* Pls.' Cross-Mot. at 5-13. Nor should plaintiffs be permitted to assert injuries of non-plaintiffs. The minor child is not a party to this case, and the Complaint seeks jurisdiction based exclusively on the individual plaintiffs' own student status. *See* Compl. ¶ 5.

Dr. Peel's declaration includes allegations regarding her fingerprints that were collected in 1971 when she entered medical school. *See* Peel Decl. ¶ 6. Even if this record were retained by the school, it is difficult to imagine how it might possibly be shared with an authorized representative evaluating a program. Moreover, her fear that the fingerprints might be shared with law enforcement, *id.* at 9, is controlled by FERPA exceptions not at issue in this case. *See, e.g.*, 20 U.S.C. § 1232g(b)(1)(J) (pursuant to a grand jury subpoena or other subpoena issued for a law enforcement purpose).

[12] EPIC also asserts "associational standing" on behalf of its board of directors as "members." Pls.' Cross-Mot. at 11-13. The Court need not address the question of whether board members of a "public interest research organization," Compl. ¶ 4, can give rise to associational standing. Notably, EPIC cites no case in which an organization's board are treated as "members" for purposes of associational standing. *See Consumer Fed'n of Am. v. FCC*, 348 F.3d 1009, 1011-12 (D.C. Cir. 2003) (only holding that a staff member who was both "its research director (and member)" had sufficient individual injuries to give organization standing). But resolving this issue is unnecessary because plaintiffs admit that their associational standing argument depends exclusively on the standing of the four individual plaintiffs. *See* Pls.' Cross-Mot. at 12-13 (relying on the alleged standing of the named plaintiffs to satisfy the requirement that "at least one of its members would have standing to sue in its own right"); *Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs., Inc.*, 528 U.S. 167, 180-81 (2000). Accordingly, the associational standing argument is redundant. If one individual plaintiff has standing, then EPIC will not be dismissed. *See Canning v. Nat'l Labor Relations Bd.*, __ F.3d __, No. 12-1115, 2013 WL 276024, at * 24 (D.C. Cir. Jan. 25, 2013) ("[I]f one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits of the case." (quotation marks omitted)). And if no individual plaintiff has standing, as argued above, then EPIC has failed to establish associational standing.

injury-in-fact because it has spent time and money "educating the public on the privacy risks created by the Final Rule."  Decl. of Khaliah Barnes ¶ 11, ECF No. 20-7.  EPIC, however, fundamentally misunderstands the requirements of organizational standing.  Because the efforts to which EPIC points have exclusively been directed to oppose and change the law, they have not established organizational standing.[13]

An organization asserting standing on its own behalf is not exempt from the injury-in-fact requirement; it must allege "such a personal stake in the outcome of the controversy as to warrant the invocation of federal jurisdiction."  *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011) (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)).  This requires demonstrating that "the defendant's actions cause a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'"  *Am. Soc. For Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

As the D.C. Circuit makes clear, "organizations 'who seek to do no more than vindicate their own value preferences through the judicial process' generally cannot establish standing."  Am. Soc. For Prevention, 659 F.3d at 25 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972)).  Thus, it has long been clear that "pure issue-advocacy" provides no more basis for an

---

[13]  EPIC has furthermore failed to *plead* organizational standing.  Under Rule 8(a)(1), plaintiffs are required to plead "a short and plain statement of the grounds for the court's jurisdiction," and this includes the essential facts of standing.  *See Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F3d 1222, 1227 n.1 (10th Cir. 2010); *AF Holdings LLC v. Does 1-1,058*, 286 F.R.D. 39, 56-57 (D.D.C. 2012); *Spartalj-Waters v. United States*, No. 87-1131, 1987 WL 19626, at *1 (D.D.C. Oct. 30, 1987).  In this case, the Complaint identifies no injury incurred by EPIC, stating only that it submitted a public comment in response to the NPRM.  *See* Compl. ¶ 4.  For the reasons discussed in this section, amendment would be futile and should not be granted.  *See National Wrestling Coaches Ass'n. v. Dep't of Educ.*, 366 F.3d 930, 945 (D.C. Cir. 2004).

organization's standing than "generalized grievances about the conduct of Government" do for

individual standing.  *See Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir.

2005); *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990).  "[A]n organization's

abstract concern with a subject . . . does not substitute for the concrete injury required by Art.

III."  *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976).  Otherwise, "there would

appear to be no objective basis upon which to disallow a suit by any other bona fide 'special

interest' organization however small or short-lived."  *Sierra Club*, 405 U.S. at 738 (refusing to

"confer[] standing upon [respected] organizations that have demonstrated 'an organizational

interest in the problem' of environmental or consumer protection").

Instead, a plaintiff must show that the defendant's action directly "impedes the plaintiff

organization's activities."[14]  *Long Term Care Pharmacy Alliance v. UnitedHealth Group, Inc.*,

498 F. Supp. 2d 187, 191-92 (D.D.C. 2007).  *See Havens Realty*, 455 U.S. at 379 ("concrete and

demonstrable injury to the organization's activities"); *Abigail Alliance for Better Access to

Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) ("The court has

distinguished between organizations that allege that their activities have been impeded from

those that merely allege that their mission has been compromised."); *Nat'l Treasury Emps. Union*

---

[14]  Plaintiffs lean heavily on another formulation of this same requirement set out in *American Society for Prevention of Cruelty to Animals*: "whether the defendant's alleged unlawful activities injured the plaintiff's interest in promoting its mission."  *See* 659 F.3d at 24; Pls. Cross-Mot. at 8-10.  This formulation in isolation is underinclusive.  It is targeted toward excluding "conduct [that] affects an organization's activities, but is neutral with respect to its substantive mission."  *Am. Society*, 659 F.3d at 24 (citing *Nat'l Treasury Emps. Union*, 101 F.3d at 1430).  It is not intended to alter the established inquiry "whether the challenged practice will actually impair the organization's activities."  *Id.*  EPIC twists the ambiguity of this recent phrasing to suggest that conflict with EPIC's abstract interests in promoting its views regarding privacy is sufficient.  *See* Pls. Cross-Mot. at 8-10.  But such a position has been consistently rejected from *Havens Realty* to the present.  *See Am. Society*, 659 F.3d at 24 (requiring "more than simply a setback to the organization's abstract social interests" (quoting *Havens Realty*, 455 U.S. at 379)).

14

*v. United States*, 101 F.3d 1423, 1429-30 (D.C. Cir. 1996) ("whether the defendant's conduct is

impeding the organization's activities"); *Am. Legal Found. v. FCC*, 808 F.2d 84, 91 (D.C. Cir.

1987) ("The organization must allege that discrete programmatic concerns are being directly and

adversely affected by the defendant's actions."); *Action Alliance of Senior Citizens of Greater*

*Philadelphia v. Heckler*, 789 F.2d 931, 938 (D.C. Cir. 1986) ("[T]he AASC organizations have

alleged inhibition of their daily operations, an injury both concrete and specific to the work in

which they are engaged.").  Thus an organization most frequently has standing when the

defendant's action makes it harder for the organization to serve its clients.  For example, in

*Havens Realty*, the Supreme Court relied on the allegation that defendants' "practices have

perceptibly impaired [plaintiff's] ability to provide counseling and referral services for low-and

moderate-income homeseekers." 455 U.S. at 379.

Here, EPIC has not alleged that the Department's actions have impeded its ability to

serve clients or otherwise harmed its interactions with any third party.  Instead, in its two

declarations, it sets out only one relevant alleged injury:  the resources EPIC has spent

"educating the public on the privacy risks created by the Final Rule" after its issuance, which

could have instead been turned to "researching and submitting administrative agency comments

on [other] proposed federal agency privacy regulations." *See* Barnes Decl. ¶¶ 11-16.[15]  It is

apparent from these allegations that no EPIC activities have been impeded.  Instead, like other

advocacy or lobbying organizations, the expenditures to which EPIC points constitute an

---

[15]  EPIC's declarations set out two other categories of costs:  1) the resources EPIC spent prior to
the issuance of the Final Rule, *see* Rotenberg Decl. ¶¶ 8-12; and 2) the resources EPIC spent on
the litigation itself, *see* Barnes Decl. ¶¶ 7-10.  Both of these can be dismissed out of hand.
Resources expended prior to the issuance of a regulation cannot have been "caused" by the
regulation.  And EPIC concedes that litigation expenses cannot create organizational standing.
*See* Pls.' Cross-Mot. at 8; *Spann*, 899 F.2d at 27 ("[Plaintiff] cannot, of course, manufacture the
injury necessary to maintain a suit from its expenditure of resources on that very suit.").

ordinary part of EPIC's business and mission.  *Cf. Nat'l Consumer League v. General Mills, Inc.*, 680 F. Supp. 2d 132, 136 (D.D.C. 2010) ("Challenging conduct like General Mills' alleged mislabeling is the very purpose of consumer advocacy organizations. As such, General Mills' alleged conduct does not hamper NCL's advocacy effort; if anything it gives NCL an opportunity to carry out its mission.").  The mere existence of such public interest organizations cannot inherently provide them with standing to challenge regulations with which they disagree as being contrary to their interests.  *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011) ("As for the other expenditures claimed, NAHB has not shown they were for 'operational costs beyond those normally expended' to carry out its advocacy mission." (quoting *Nat'l Taxpayers Union*, 68 F.3d at 1434)); *Ctr. for Law & Education*, 396 F.3d 1152, 1161 (D.C. Cir. 2005) ("This Court has not found standing when the only "injury" arises from the effect of the regulations on the organizations' lobbying activities.").

Indeed, EPIC's argument is most parallel to the argument advanced by the National Taxpayers Union in a 1995 case decided by the D.C. Circuit:

> [Plaintiff]'s self-serving observation that it has expended resources to educate its members and others regarding Section 13208 does not present an injury in fact. There is no evidence that Section 13208 has subjected [plaintiff] to operational costs beyond those normally expended to review, challenge, and educate the public about revenue-related legislation. Unlike the injury alleged in *Havens Realty*, . . . Section 13208 has not forced [plaintiff] to expend resources in a manner that keeps [plaintiff] from pursuing its true purpose of monitoring the government's revenue practices.  [Plaintiff] cannot convert its ordinary program costs into an injury in fact from Section 13208.

*Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (citations omitted).  As Ms. Barnes' declaration makes clear, if EPIC were not expending resources on disseminating its views about this Final Rule, it would be disseminating its views about some other federal agency regulation.  *See* Barnes Decl. ¶ 17.  As such, its alleged injury amounts to

nothing more than an abstract conflict between the Department's action and EPIC's mission.  *See Nat'l Treasury Emps. Union*, 101 F.3d at 1429 ("[C]onflict between a defendant's conduct and an organization's mission is alone insufficient to establish Article III standing. Frustration of an organization's objectives is the type of abstract concern that does not impart standing."); *Community Nutrition Institute v. Block*, 698 F.2d 1239, 1253-54 (D.C. Cir. 1983), *rev'd on other grounds*, 467 U.S. 340 (1984), ("[Plaintiff] claims it has an interest in "seeing" that consumers receive dairy products at the lowest possible price.  It does not allege that it assists them in doing this, nor does it allege that the contested regulation impedes it from assisting consumers. . . . Such an [abstract interest] is not sufficiently concrete to establish standing."); *Long Term Care Pharmacy Alliance*, 498 F. Supp. 2d at 192 ("The law is clear that actions contrary to an organization's mission do not create an injury if the organization's activities are not somehow impeded."); *U.S. Women's Chamber of Commerce v. U.S. Small Business Admin.*, No. 04-1889, 2005 WL 3244182, at *7 (D.D.C. Nov. 30, 2005) ("[B]ecause plaintiff has not shown that it provides services that are in direct conflict with the defendants' obligations under the Act, this Court finds that plaintiff does not have organizational standing[.]").

        None of the cases cited by plaintiffs found standing where the sole organization activity alleged to be "impeded" is advocacy.  *See, e.g.*, *Havens Realty*, 455 U.S. at 379 (defendants' practice "perceptibly impaired [plaintiff's] ability to provide counseling and referral services for low- and moderate-income home-seekers"); *Abigail Alliance*, 469 F.3d at 132-33 (plaintiff "assist[ed] its members and the public in accessing potentially life-saving drugs and its other activities, including counseling, referral, advocacy, and educational services" and had to "divert significant time and resources from these activities toward helping its members and the public address the [new FDA requirements]"); *Action Alliance*, 789 F.2d at 937-38 (plaintiffs' "daily

operations" were inhibited because "the challenged regulations deny [them] access to information and avenues of redress they wish to use in their routine information-dispensing, counseling, and referral activities"); *Haitian Refugee Center v. Gracey*, 809 F.2d 794, 799, 806 (D.C. Cir. 1987) (plaintiffs "promote[d] the well-being of Haitian refugees through appropriate programs and activities, including legal representation of Haitian refugees, education regarding legal and civil rights, orientation, acculturation, and social and referral services," and "[t]he injury claimed by the Center is its inability to counsel and represent the interdicted Haitians" because of the interdiction program).[16]  Moreover, if standing were allowed merely because the organization disagreed with the defendant's action within the sphere of the organization's interests, then the *Havens* rule would no longer assure a sufficient "personal stake in the outcome of the controversy."

Because EPIC cannot show that its activities were impaired in any way, its explanation of how it chose to spend its resources is just as unavailing as Fair Employment Council's choice to employ discrimination testers:

> The diversion of resources to testing might well harm [plaintiff's] other programs, for money spent on testing is money that is not spent on other things. But this particular harm is self-inflicted; it results *not from any actions taken by [defendant]*, but rather from [plaintiff's] own budgetary choices. Indeed, it is not really a harm at all; . . . [plaintiff] and its programs would have been totally

---

[16]  *See also Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276-77 (D.C. Cir. 1994) (plaintiff "promot[es] equal opportunity" in employment through a testing program and "community outreach and public education, counseling, and research projects" and "[a]ny harm to the Council's programs . . . flows from [defendant's] refusal to refer genuine job-seekers for employment"); *Spann*, 899 F.2d at 26, 27-29 (plaintiffs were "dedicated to ensuring equality of housing opportunity through education and other efforts"; they alleged their actions were impeded by "defendants' preferential advertising [that] tended to steer black home buyers and renters away from the advertised complexes," which required "increased education and counseling . . . to identify and inform minorities, steered away from defendants' complexes by the challenged ads, that defendants' housing is by law open to all" and to "rebut any [incorrect] public impression the advertisements might generate").

unaffected if it had simply refrained from making the re-allocation. One can hardly say that [defendant] has injured [plaintiff] merely because [plaintiff] has decided that its money would be better spent by testing [defendant] than by counseling or researching.

*Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.*, 28 F.3d 1268,

1276-77 (D.C. Cir. 1994) (emphasis added).

## II.   THE FINAL RULE IS ENTITLED TO REVIEW UNDER *CHEVRON*'S DEFERENCE STANDARD.

Even if plaintiffs could establish standing, their claims fail on the merits. Plaintiffs

challenge three definitions in the Final Rule, claiming that they are "in excess of statutory

jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), or are "otherwise not in accordance

with law." *Id.* § 706(2)(A). Compl. ¶¶ 1, 30, 35. Plaintiffs do not dispute that the Final Rule

meets the threshold *Chevron* requirement of falling within the statute the Department

administers. *See* Def.'s Mot. at 20; *Gonzales v. Oregon*, 546 U.S. 243, 255-56 (2006).

Accordingly, "[a]s a general matter, an agency's interpretation of the statute which that agency

administers is entitled to *Chevron* deference." *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012)

(citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).

Plaintiffs instead dispute both steps of the traditional *Chevron* analysis. They argue both

that "Congress unambiguously limited the agency's ability to revise the disputed definitions"

and, alternatively, that "to the extent that the FERPA is silent or ambiguous, the Final Rule is not

a permissible construction of the statute." Pls.' Cross-Mot. at 17. These challenges should be

resolved under the D.C. Circuit's recent formulation of the dual inquiry: "[I]f Congress has not

unambiguously foreclosed the agency's construction of the statute, we defer to the agency

provided its construction is reasonable." *Cablevision Systems Corp. v. FCC*, 649 F.3d 695, 704

(D.C. Cir. 2011); *see also Barnhart v. Walton*, 535 U.S. 212, 218 (2002).

III.   **NONE OF THE THREE DISPUTED DEFINITIONS EXCEEDS STATUTORY AUTHORITY.**

A.   **Student ID Numbers Displayed on Badges Can Be "Directory Information" Because Such a Disclosure is Not Harmful or an Invasion of Privacy.**

1.   *FERPA does not prohibit mandatory student ID badges.*

Plaintiffs argue first that the Department lacks statutory authority to conclude that

[a] parent or eligible student *may not . . . opt out* of directory information disclosures to— . . . [p]revent an educational agency or institution from requiring a student to wear, to display publicly, or to disclose a student ID card or badge that exhibits information that may be designated as directory information[.]

34 C.F.R. § 99.37(c)(2) (emphasis added).  As the Department has explained, this provision

arose from recognition of the importance that identification cards can have for school safety.  *See*

76 Fed. Reg. 19726, 19731-32 (Apr. 8, 2011) (hereinafter "NPRM"), AR 0006-07 ("An

increased awareness of school safety and security has prompted some [entities], especially

school districts, to require students to wear and openly display a student ID badge that contains

identifying information (typically, name, photo, and student ID number)."); *see also* Suppl. to

Admin. R. at 2, ECF No. 16 (Chicago Public Schools official stating that "[t]he IDs themselves

serve as a very important school building access control instrument"); *id.* (Philadelphia Chief

Safety Executive stating that the high schools "use the student IDs with their picture for security

reasons and for attendance tracking"); *id.* at 5 (Denver Public School official stating that

"[s]tudent ID's are essential to maintaining control over who is a student at a particular school

and who is not [which] . . . is directly related to school safety"); *id.* at 17 (Wisconsin school

district required "student, staff, and visitor ID's in order to maintain a safe educational

environment").

Plaintiffs take a crabbed view of the directory information exception, arguing that it

should be construed narrowly and strictly.  *See* Pls.' Cross-Mot. at 19-21.  They disregard the

fact that the directory information exception itself was created to address an oppressively strict reading of FERPA's requirements. *See* 120 Cong. Rec. 39863 (Dec. 13, 1974) (hereinafter "Joint Statement"), AR 0855 (proposing "directory information" in response to "narrow reading of the law [that] is not what its author intended to achieve," a "literal interpretation" that had prevented schools from putting the names "of the cast of the school play . . . in the program" without prior consent from every parent). Accordingly, the directory information exception is intended to be a common sense provision that allows schools to function normally. Construing the exception's opt-out provision with the absoluteness plaintiffs suggest would have absurd results.

Pursuant to the December 1974 amendments, "directory information" does not require prior consent before disclosure. *See* 20 U.S.C. §§ 1232g(b)(1); *id.* § 1232g(b)(2). No educational agency or institution is required to release directory information. Instead, each educational agency or institution is free to determine what categories of directory information it will release and for what purposes. *See* 20 U.S.C. § 1232g(a)(5)(B); 34 C.F.R. § 99.37(d). The only prerequisite for use of the information is that the educational entity must "give public notice of the categories of information which it has designated" as directory information and give parents the opportunity to "inform the institution . . . [what] of the information designated should not be released without the parent's prior consent." 20 U.S.C. § 1232g(a)(5)(B).

It has long been clear that FERPA cannot have intended to give parents or adult students the right to opt out of all public uses of directory information. Because "the student's name" is the first item of directory information included in the statute, *see id.* § 1232g(a)(5)(A), an aggressive parent or student might argue that the student cannot be required to put his name at the top of tests, or have his name called during the attendance roll, or give his name to a campus

security officer upon request.  But such arguments must be rejected as an absurd reading of the
statute.  "It is a familiar rule, that a thing may be within the letter of the statute and yet not within
the statute, because not within its spirit nor within the intention of its makers. . . .  If a literal
construction of the words of a statute be absurd, the act must be so construed as to avoid the
absurdity."  *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998) (quoting *Holy
Trinity Church v. United States*, 143 U.S. 457, 459–60 (1892)); *see also Arkansas Dairy Co-op
Ass'n v. U.S. Dep't of Agriculture*, 573 F.3d 815, 829 (D.C. Cir. 2009) ("[I]n interpreting the
words of a statute, [courts have] some scope for adopting a restricted rather than a literal or usual
meaning of its words where acceptance of that meaning would lead to absurd results . . . or
would thwart the obvious purpose of the statute" (quoting *In re Trans Alaska Pipeline Rate
Cases*, 436 U.S. 631, 643 (1978)) (internal quotation marks omitted)).

Here, the Department can readily meet the relevant standard.  "[F]or the [agency] to
avoid a literal interpretation at *Chevron* step one, it must show either that, as a matter of
historical fact, Congress did not mean what it appears to have said, or that, as a matter of logic
and statutory structure, it almost surely could not have meant it."  *Engine Mfrs. Ass'n v. EPA*, 88
F.3d 1075, 1089 (D.C. Cir. 1996).  First, the legislative history suggests that Congress did not
mean to prohibit routine uses of students' names.  Senator James Buckley, the sponsor of
FERPA's original language, argued that the proposed law did not prohibit disclosure of "matters
of public record, which may be names and addresses of people who happen to be students in a
school."  120 Cong. Rec. 14579, 14584 (May 14, 1974), ECF No. 18-2 (attached as Ex. D to
Def.'s Mot.); *see also id.* at 14582 (indicating that "the names of students or the names of
parents" could still be disclosed without prior consent).  When, to his surprise, FERPA was
interpreted to prohibit just that, Senator Buckley introduced the category of "directory

information" to address the defect.  *See* Joint Statement, AR 0855.  His brief statement regarding

the new opt-out provision for "directory information" illustrates his purpose well:  the provision

would permit "parents . . . to notify the institution that any or all of that information should not

be released.  This would allow parents with unlisted telephone numbers, for example, to have the

right to keep such numbers unlisted."  Joint Statement, AR 0855.  It would put utterly undue

weight on Senator Buckley's use of the phrase "any or all," however, to suggest that he intended

the new text proposed only a few months later to prohibit what he had intended to permit all

along—the use of a student's name without prior consent.  Nor does the conference report, a

more definitive piece of legislative history, require such an interpretation.  *See* S. Rep. No. 93-

1409 at 10 (Dec. 18, 1974) (Conf. Rep.), ECF No. 18-5 (describing the provision only as "a

parent [being] given the opportunity to object to [directory information's] release").

      Second, logic and statutory structure also suggest that plaintiffs' reading would create

absurdity.  As discussed above, it would make little sense for a student to be able to withhold his

name while inside the school building or prohibit its use on a classroom roster.  *Cf. Owasso*

*Indep. Sch. Dist. v. Falvo*, 534 U.S. 426, 432 (2002) ("We doubt Congress meant to intervene in

this drastic fashion with traditional state functions," in response to theory that FERPA prohibited

other students from seeing a gold star placed by a teacher on a student's classroom assignment);

*Owasso*, Arg. Trans. 36:4-39:22 (expressing deep skepticism that under FERPA teachers could

be prevented from taking attendance), available at http://www.supremecourt.gov/oral_

arguments/argument_transcripts/00-1073.pdf.  The Department concluded in 2008 that "the right

to opt out of directory information disclosures may not be used to allow a student to remain

anonymous in class."  2008 Final Rule, AR 0755; *see also id.* (concluding that FERPA does not

"require educational agencies and institutions to ensure that students can remain anonymous to

others in the school community").  On this basis, the Department concluded that parents may not

opt-out of "disclosure of a student's name, identifier, or institutional e-mail address in a class in

which the student is enrolled."  34 C.F.R. § 99.37(c) (2008); 2008 Final Rule, AR 0755, 0801.

Plaintiffs offer no rejoinder to this logic, and their reference to FERPA's general goals of

protecting students' privacy is not to the contrary.

 Accordingly, all that remains is the question whether a student ID badge fits within this

logic that FERPA does not allow "students [to] remain anonymous to others in the school

community."[17]  Here, the absurd results of plaintiffs' highly literal interpretation is brought home

because student ID badges with names, photographs and ID numbers are required by educational

institutions throughout the country for security reasons.  *See* NPRM, AR 0006-07; Suppl. to

Admin. R. at 2-8, 17, ECF No. 16.  Construing FERPA to permit opting out of directory

information in an absolute way would not only prohibit mandatory student ID cards, but also

implicate whether campus law enforcement could demand a student's name on a sign-in sheet.

The absurdity canon is satisfied if the plain reading "creates 'an outcome so contrary to

perceived social values that Congress could not have intended it.'"  *United States v. Cook*, 594

F.3d 883, 891 (D.C. Cir. 2010) (quoting *Landstar Express Am., Inc. v. FMC*, 569 F.3d 493, 498-

99 (D.C. Cir. 2009)); *see also Mova Pharm. Corp.*, 140 F.3d at 1068 (considering "not only

whether that result is contrary to common sense, but also whether it is inconsistent with the clear

intentions of the statute's drafters—that is, whether the result is absurd when considered in the

particular statutory context").  Such an unintended interference with efforts to protect students is

---

[17]  Plaintiffs' possible argument that student ID numbers are different than names, such that any
limitations on the opt out provision should not apply to ID numbers, is really an argument about
whether student ID numbers qualify for "directory information" status at all.  Accordingly it will
be addressed in the following section.

entirely contrary to our nation's "social values," making it clear that Congress could not have intended it.

   2.   *Student ID numbers placed on ID badges meet the requirements for "directory information" because such a disclosure would not generally be considered harmful or an invasion of privacy.*

Plaintiffs' alternative argument is that student ID numbers do not meet the standard for "directory information" because "student ID numbers can easily be used to gain access to education records." Pls.' Cross-Mot. at 23. They do not dispute that the information meets the definition of "directory information" if it "would not generally be considered harmful or an invasion of privacy if disclosed." 34 C.F.R. § 99.3; *see* 53 Fed. Reg. 11942, 11944 (Apr. 11, 1988); *see* Pls.' Cross-Mot. at 19, 21-22.

Plaintiffs' argument is utterly unsupported. The Department carefully considered whether disclosure of a student ID number or other unique identifier could be harmful, both in 2008 and in 2011. It determined that in two limited contexts—an online user name and an ID badge—the disclosure would not be considered harmful or invasive of privacy. This is because the Department further required that such an identifier "cannot be used to gain access to education records except when used in conjunction with [other authenticators] such as a . . . password." *See* 34 C.F.R. § 99.3; 2008 Final Rule, AR 0798. In other words, if the identifier "cannot be used by itself to gain access to education records," it is being "used like a name" and would not be harmful to disclose. *Id.*, AR 0790 (emphasis added); *see also* NPRM, AR 0004; Final Rule, AR 0721.

Plaintiffs' own exhibit illustrates this. *See* Pls.' Exhibit G at 3, 5-6, ECF No. 20-8 (several university websites that provide the student access to her own information only upon

entering both a student ID number and a unique identifier such as a password or PIN).[18]

Educational agencies or institutions could just as easily require a name and a password to log in

to the student's online records.  It is for this reason that the Department has determined that in

these two contexts—an online user name and an ID badge—a unique identifier raises no more

concerns than the student's name.  Plaintiffs provide neither evidence nor logic that such use of

"factors known or possessed only by the authorized user" to "authenticate the user's identity" is

insufficient to protect their privacy.  Their reidentification argument has been fully addressed,

*see* Def.'s Mot. at 24 n. 15, and the evidence upon which they rely for it is outside the

administrative record and should not be considered.[19]  All that is left are their own bald

assertions.  *See* Pls.' Cross-Mot. at 22-23.

---

[18]  The five university webpages that plaintiffs appear to have selected at random were not considered by the Department and thus fall outside the administrative record.  However, because they visually illustrate two factor authentication, the Department does not oppose their use for this limited purpose.  The documents are otherwise utterly lacking in context and are not eligible for reliance here.  *See* Mem. Op. & Order at 4, Oct. 26, 2012, ECF No. 15 ("[R]eview is limited to the administrative record that was before the agency at the time it made its decision.").  For example, plaintiffs claim that these documents prove that "many schools" use "information, such as birthdates and email addresses" as the authenticating factor.  Pls.' Cross-Mot. at 22.  The Department believes that the universities are merely providing a convenient initial authenticating factor that will be changed to something "known or possessed only by the authorized user" at the first login.  *See, e.g.*, Pls.' Ex. G at 3 ("After logging in; you will be asked to create a new PIN and create security questions.").  If, on the other hand, it turned out that the university did continuously use other directory information as the authenticating factor, the Department may take enforcement actions against the educational institution if voluntary compliance could not be secured.

[19]  The five books or articles plaintiffs cite were not considered by the Department and appear in the record only as a string of citations in EPIC's public comment.  *See* EPIC comment, AR 0532.  EPIC did not choose to attach any of these articles to its comment and cannot rely on them now.  Even if plaintiffs could, the articles' titles suggest that they have little to do with the issue here and are instead concerned with whether anonymized databases can still allow the identification of unique individuals because of the sorts of data included.  *See* Pls.' Cross-Mot. at 22.

**B.      Federal and State Authorities May Designate "Authorized Representatives"
Who Are Not Under Their Direct Control to Conduct Audits or Evaluations
of Education Programs Because Neither FERPA Nor its Legislative History
Requires Such a Limitation.**

In the Final Rule, the Department defined "authorized representative" to mean "any

entity or individual designated by [one of the statutory authorities] to conduct—with respect to

Federal- or State-supported education programs—any audit or evaluation, or any compliance or

enforcement activity."  34 C.F.R. § 99.3; Final Rule, AR 0733.  This definition is consistent with

the Department's position prior to 2003, but differs from the "Hansen Memorandum," a 2003

guidance letter that rescinded prior memoranda and concluded that an authorized representative

"must be under the direct control of that [state educational] authority, *e.g.*, an employee or a

contractor of the authority."  *Compare* Hansen Mem., AR 0833; *with* Winston Mem. (Jan. 19,

2001), AR 0837; McNeil Mem. (Jan. 18, 2001), AR 0841; Ctrs. For Disease Control Agreement

(Dec. 11, 2000), AR 0849.  Plaintiffs believe the 2003 interpretation is statutorily required.  *See*

Pls.' Cross-Mot. at 25-28.

>    1.      *Neither the plain text nor the legislative history of the program evaluation
>             exception unambiguously forbids a definition of "authorized
>             representative" broader than the "direct control" standard.*

In its opening brief, the Department advanced three arguments regarding the plain

meaning of the statutory text.  Plaintiffs provide no persuasive response to any of the arguments,

arguing that the Court should not look closely at the terms Congress used or the way they relate

to each other but instead should rely almost exclusively on FERPA's overarching goal:  "to limit

public access to student personally identifiable information."  Pls.' Cross-Mot. at 26.  Contrary to

plaintiffs' wishes, Chevron analysis requires a thorough examination of the text of the provision

and other language of the statute in question.  *See, e.g.*, *Mylan Pharm., Inc. v. Shalala*, 81 F.

Supp. 2d 30, 37-42 (D.D.C. 2000).

27

First, the Department demonstrated that the ordinary meaning of "authorized representative" does not limit who may be selected to serve in that capacity. *See* Def.'s Mot. at 29-30 (surveying definitions in dictionaries, other statutes, and regulations). Plaintiffs largely accept the Department's version of the ordinary meaning. *Compare id.* at 29 ("a broad ordinary meaning focusing on the representative's action on the authorizer's behalf") *with* Pls.' Cross-Mot. at 25 ("an entity or individual who has been given the legal authority to act on the behalf of another person or entity"). They argue simply that more important than the ordinary meaning is the provision's "context," "the problem Congress sought to solve." *See Petit v. U.S. Dep't of Education*, 675 F.3d 769, 781 (D.C. Cir. 2012). While context will be discussed in greater detail when addressing the legislative history below, plaintiffs' primary error is disregarding the purpose of the exception within which the definition occurs. *See Blackman v. District of Columbia*, 456 F.3d 167, 176 (D.C. Cir. 2006) ("We start with the plain meaning of the text, looking to the language itself, *the specific context in which that language is used*, and the broader context of the statute as a whole." (emphasis added, quotation marks omitted)). Regardless, possible arguments about context do not diminish the breadth or significance of the ordinary meaning here. *See Engine Mfrs. Ass'n v. South Coast Air Quality Management Dist.*, 541 U.S. 246, 252 (2004) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.").

Second, Congress chose not to use a more naturally restrictive term than "authorized representative," and the statutory cross-references that encompass the term are very broad, such as "persons or organizations." *See* Def.'s Mot. at 30-32. Again, plaintiffs do not dispute any of the numerous details the Department highlighted. Instead, they argue that no implications should

be drawn from these details because "the overall scope of the FERPA is to limit the number of entities that have access to student education records." Pls.' Cross-Mot. at 27. Plaintiffs ask the Court to thus disregard the text based on the alleged theme they infer. Neither of the cases they cite support this reasoning. *See Am. Chemistry Council v. Johnson*, 406 F.3d 738, 741 (D.C. Cir. 2006) (observing that meaning should not be inferred from absence of a word when "the overall scope of a statute is clearly limited by a requirement that is not explicitly mentioned in every subsection" where word was used 38 times in the statute and the subsections were organized to reflect specific aspects of the term); *Nat'l Rifle Ass'n v. Reno*, 216 F.3d 122, 127-28 (D.C. Cir. 2000) (concluding that because Congress used the word "destroy" but not the word "immediately," the absence indicates that "immediate destruction" was not unambiguously required). Plaintiffs here rely neither on common terms, nor on statutory structure, but instead on broad generalities about the statute's purpose.

Third, the Department addressed the sole textual argument for limiting who may serve as an "authorized representative"—the program evaluation exception's use of the word "officials." *See* Def.'s Mot. at 32-35. The Department demonstrated that a natural reading of the exception's proviso clause suggests that the words "such officials" and "those officials" simply refer back to the official entities doing the authorizing, that authorized representatives can reasonably be considered "officials," and that parallel conditional clauses in other FERPA exceptions strongly suggest that their terms are not intended to expand or contract the definition of the entities granted access. *See id.* Plaintiffs provide no response to these arguments. Instead, they simply repeat the perfunctory conclusion of the Hansen Memorandum that the word "officials" must somehow mean being "under the direct control of the designating entities." Pls.' Cross-Mot. at 26. As the D.C. Circuit noted in another context, "[t]hat is certainly one possible interpretation"

of the term, but plaintiffs have fallen far short of the *Chevron* step one question of "whether the

statute *unambiguously* requires" that interpretation. *See Nat'l Rifle Ass'n*, 216 F.3d at 127.

Without an meaningful textual argument, we are left with nothing more than a "direct control"

standard created out of thin air.

Finally, the Department provided a thorough examination of the legislative history,

concluding that that it does not provide  the "very rare situation where the legislative history of a

statute is more probative of congressional intent than the plain text."  Def.'s Mot. at 35-39

(quoting *Virginia Dep't of Med. Assistance Servs. v. U.S. Dep't of Health & Human Servs.*, 678

F.3d 918, 923 (D.C. Cir. 2012)).  Plaintiffs' three arguments in response can be quickly

dispatched.  They identify no support for the notion that much of the legislative history should be

disregarded because the Department did not identify it in 2008.[20]  The comments by Senator

Buckley which they quote primarily relate to Section (b) of his original proposal regarding

invasive questionnaires, which was soundly defeated and never became law.  *See* 120 Cong. Rec.

14579, 14581 (May 14, 1974), ECF No. 18-2; *see also id.* 14595 (rejecting Section (b)).[21]  More

---

[20]  The passage from the 2008 Final Rule that plaintiffs quote addressed whether education
records could be shared with "non-educational State agencies, such as State health or labor
agencies" for purposes other than "audit, evaluation, or compliance and enforcement" of
education programs.  *See* 2008 Final Rule, AR 0775.  It addressed the fact that the legislative
history of a 1979 provision clearly intended to permit sharing with state auditors, and that there
was no similar legislative history for the 1974 enactments.  Even if this passage were in some
way inconsistent with the Department's current arguments, that does not affect the merits of the
arguments or the facts of the legislative history.  *See Ass'n of Private Sector Colleges & Univs. v.
Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012) ("The fact that some of the challenged regulations
are inconsistent with the Department's past practice 'is not a basis for declining to analyze the
agency's interpretation[s] under the *Chevron* framework.'" (quoting *Nat'l Cable & Telecomms.
Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

[21]  Still less persuasive are passages from a magazine article that Senator Buckley entered into
the record the day he introduced FERPA but which passages he did not single out for attention
on the floor.  *See* 120 Cong. Rec.13951, 13953-54 (May 9, 1974).  The 2011 law review article

(Cont'd)

significantly, the program evaluation exception was not Senator Buckley's idea, but was instead created by the conference committee and did not reach its present form until four months later, so these early general comments cannot be probative of the scope of that exception.  *See* Def.'s Mot. at 37-38.  Lastly, plaintiffs seek to place conclusive weight on a single sentence in a joint statement by Senators Buckley and Pell during the December 1974 amendment of FERPA.  *See* Pls.' Cross-Mot. at 28.  But plaintiffs provide no response to the Department's explanation that this statement was a brief, incomplete summary of the exception and shows no intent to narrow the meaning of "authorized representative," and further that the conference committee again adopted a broader version of the exception than had been proposed by Senator Buckley.  *See* Def.'s Mot. at 36-38.  In sum, nothing in the legislative history mandates the "direct control" standard or unambiguously limits the natural breadth of the term "authorized representative."

It is clear from the text and the legislative history that the program evaluation exception was intended to balance "[t]he need to protect students' rights . . . against legitimate Federal needs for information" to "carry out the evaluations,"  S. Rep. No. 93-1026, at 187 (July 22, 1974) (Conf. Rep.), ECF No. 18-3, and to "permit longitudinal studies."  S. Rep. No. 93-1409, at 12, ECF No. 18-5.  The context provided by the purpose of the exception does not suggest that "authorized representative" must be government personnel, *see, e.g*., *id.* (describing exception as "Third Party Access"), nor does the overall purpose of FERPA preclude an interpretation of "authorized representative" broader than the "direct control" standard.  Plaintiffs cannot show that Congress unambiguously forbade the Department's interpretation of the term here.

---

that plaintiffs chose to quote instead of the legislative record falls outside the administrative record and should not be considered.  *See* Pls.' Cross-Mot. at 28-29.

2.      *The Department's definition of "authorized representative" is based on a permissible construction of the statute.*

Having failed to undermine the Department's interpretation at *Chevron* step one, plaintiffs seek to show that the definition of "authorized representative" is impermissible under *Chevron* step two.  The Department need only show that its interpretation does not "exceed[] the bounds of the permissible."  *Barnhart v. Walton*, 535 U.S. 212, 218 (2002); *see also Cablevision Systems Corp. v. FCC*, 649 F.3d 695, 704 (D.C. Cir. 2011) ("provided its construction is reasonable").  None of plaintiffs' hodgepodge of arguments undermine the Department's demonstration that it has met this standard.

First, plaintiffs recite the argument made in EPIC's public comment that the Final Rule impermissibly delegates the Department's authority to non-federal entities.  *See* Pls.' Cross-Mot. at 29-32.  This argument is entirely misplaced because, as the Department explained, FERPA itself grants authority to non-federal actors.  *See* Def.'s Mot. at 26-27 (addressing argument based on *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 564-66 (D.C. Cir. 2004)).  *Cf. Owasso Indep. Sch. Dist. v. Falvo*, 534 U.S. 426, 432 (2002) (finding guidance for interpreting FERPA from the conclusion that Congress would not "effect a drastic alteration of the existing allocation of responsibilities between States and the National Government in the operation of the Nation's schools" without making that purpose clear).  The "duty to protect education records" with which plaintiffs are concerned, *see* Pls.' Cross-Mot. at 31, is a duty that FERPA imposes in the first instance on state and local educational agencies and institutions.  *See, e.g.*, 20 U.S.C. § 1232g(b)(4)(B) (tasking the "educational agency or institution" with "condition[ing]" access on an agreement not to redisclose the information).  Accordingly, the Department's regulations implementing those requirements raise no subdelegation problems.  Plaintiffs make this especially clear when they assert that "FERPA mandates specific privacy safeguards for

32

authorized representatives." Pls.' Cross-Mot. at 31. The Department has implemented each of these safeguards required by FERPA in its regulations. *Compare* 20 U.S.C. § 1232g(b)(3) *with* 34 C.F.R. § 99.35. Leaving a certain "flexibility" to the designator to determine the best means of ensuring compliance from the representative rather than prescribing a "one-size-fits-all solution," *see* Final Rule, AR 0712, does not delegate any decisionmaking FERPA requires of the Department.

Second, plaintiffs argue that the Final Rule "retroactively removed vested privacy rights under FERPA," Pls.' Cross-Mot. at 33, relying on the D.C. Circuit's decision in *Arkema Inc. v. EPA*, 618 F.3d 1 (D.C. Cir. 2010).[22] *Arkema* is entirely dissimilar from this case. In *Arkema*, the EPA had issued a final rule in 2003 that "approved permanent changes to the baseline" and the Court considered these to be "completed transactions" that could not be undone without "Congress' express authorization." *Id.* at 9. The Court noted that the EPA's reasons for the policy change could "shield the Agency's *prospective* application of the Final Rule" from APA challenges, but it could not use a new final rule to change past transactions. *Id.* Plaintiffs, by contrast, have identified no relevant past transactions. *See Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 177 F.3d 1, 8 (D.C. Cir. 1999) ("transactions or considerations already past"). Indeed, plaintiffs were involved in no transactions with the Department, the Hansen Memorandum was a guidance letter that did not become a final rule, and the Department only seeks to apply its Final Rule prospectively. Accordingly, this argument entirely lacks merit.

---

[22] We reiterate that the Department's reversal of positions does not affect the *Chevron* analysis. *See Ass'n of Private Sector Colleges & Univs.*, 681 F.3d at 441 ("The fact that some of the challenged regulations are inconsistent with the Department's past practice 'is not a basis for declining to analyze the agency's interpretation[s] under the *Chevron* framework.'" (quoting *Nat'l Cable*, 545 U.S. at 981). "[I]n *Chevron* itself, [the Supreme] Court deferred to an agency interpretation that was a recent reversal of agency policy." *Nat'l Cable*, 545 U.S. at 982.

Third, plaintiffs argue that the Department has read too much into the recent legislation passed by Congress that encourages the creation and expansion of SLDS, especially the appropriations bills.  *See* Pls.' Cross-Mot. at 34-37.  The Department has explained that it sought to remedy a variety of conflicts between its own prior guidance and Congress' intent for SLDS.  *See* Def.'s Mot. at 39.  In acting to lower the barriers to Congress' goals, the Department did not interpret any of these statutes as amending FERPA.  Instead, it simply re-examined what FERPA itself required.  Accordingly, the cases plaintiffs cite disfavoring "repeals by implication" are inapposite.  Even if plaintiffs could show that the statutes in question were irrelevant, this would not make the definition of "authorized representative" unreasonable.[23]  More significantly, plaintiffs primary concern appears to be driven by a misconception.  Plaintiffs repeatedly express concern about "non-academic uses of student data."  Pls.' Cross-Mot. at 35-37.  While the Department understands Congress to encourage the linking of certain non-academic *data* in SLDS (e.g., placement in the workforce or military), the Department has repeatedly emphasized that SLDS may only be *used* for educational purposes.  *See* Final Rule, AR 0707 (noting that "[i]f PII from education records related to a student's health is necessary to evaluate an education program, this information may be disclosed," but "the same information would not be permitted to be disclosed . . . to evaluate the effectiveness of a health program"); *see also id.*, AR 0710 ("Paragraph (b)(3) of FERPA, however, does not allow . . . expansion of the purposes for which PII from education records may be used by authorized representatives.").  FERPA makes clear

---

[23]  Plaintiffs baldly assert that "Congress has not expressed an intention to expand the use of SLDS beyond rudimentary academic data."  Pls.' Cross-Mot. 34.  The falsity of this assertion is belied by their acknowledgement two pages later that Congress provided funds to be used for "Statewide data systems that include postsecondary and *workforce* information."  *Id.* at 36 (quoting Pub. L. No. 111-5, Title VIII, Dep't of Educ., Inst. of Educ. Sci., 123 Stat. 183-84 (Feb. 17, 2009) (emphasis added)); *see also* Def.'s Mot. at 39-40.

that data-sharing under the program evaluation exception is limited to "the audit and evaluation of Federally-supported education programs, or in connection with the enforcement of the Federal legal requirements which relate to such programs." *See* 20 U.S.C. § 1232g(b)(3). And the Department has fully incorporated these requirements into its regulations.[24] Plaintiffs' fear that the Department's regulations permit other uses for education records is utterly unfounded.

### C.    The Department's Definition of "Education Programs" Is Neither Forbidden By FERPA Nor Unreasonable.

Plaintiffs' criticism of the Department's definition of "education program" remains incoherent and must fail. FERPA only uses the term "education program" in the program evaluation exception. *See, e.g.*, 20 U.S.C. § 1232g(b)(3) (permitting access only "in connection with the audit and evaluation of Federally-supported *education programs*, or in connection with the enforcement of the Federal legal requirements which relate to *such programs*" (emphasis added)). The Final Rule interpreted the term for the first time, adopting a bifurcated definition. First, it "means any program that is principally engaged in the provision of education"; and

---

[24] *See, e.g.*, 34 C.F.R. § 99.3 (authorized representative must be designated to conduct "with respect to Federal- or State-supported education programs—any audit or evaluation or any compliance or enforcement activity in connection with Federal legal requirements that relate to these programs"); *id.* § 99.35(a)(1) (access for authorized representatives only "in connection with an audit or evaluation of Federal or State supported education programs, or for the enforcement of or compliance with Federal legal requirements that relate to those programs"); *id.* § 99.35(a)(2)(i) (designating agency or authority must "us[e] reasonable methods to ensure to the greatest extent practicable" that their authorized representative "[u]ses personally identifiable information only to carry out an audit or evaluation of Federal- or State-supported education programs, or for the enforcement of or compliance with Federal legal requirements related to these programs"); *id.* § 99.35(a)(3)(ii)(B) & (v) (the written agreement with the authorized representative must specify that "the purpose for which the [PII] from education records is disclosed to the authorized representative is to carry out an audit or evaluation of Federal- or State-supported education programs, or to enforce or to comply with Federal legal requirements that relate to those programs" and establish policies and procedures to limit use of the PII to "only authorized representatives with legitimate interests in the audit or evaluation of a Federal- or State-supported education program or for compliance or enforcement of Federal legal requirements related to these programs").

second it means "any program that is administered by an educational agency or institution."  34

C.F.R. § 99.3; Final Rule, AR 0733.

Plaintiffs do not explain how it is a violation of FERPA for the Department to conclude

that any program administered by an educational agency or institution should come within the

definition of "education program."  The Department considered and rejected the notion that the

term should be limited to "programs dedicated to improving academic outcomes."  Final Rule,

AR 0706.  FERPA's definition of "education record" encompasses a wide swath of "information

directly related to the student" that is "maintained by an educational agency or institution"

regardless of the purpose or program to which it is related.  *See* 20 U.S.C. § 1232g(a)(4).

Accordingly, if the agency or institution wishes to evaluate any of its own programs using those

records, it must employ one of the FERPA exceptions.  There is little reason to believe that

FERPA intended such agencies or institutions to be permitted to evaluate some of their own

programs but not others.  Moreover, as a matter of ordinary meaning, it is quite plausible to

conclude that "education program" means "any program of an educational institution."  Thus,

while plaintiffs single out "substance abuse and violence prevention," for skepticism, they offer

no meaningful argument that the Department's interpretation should not be entitled to *Chevron*

deference.  *See* Pls.' Cross-Mot. at 38-39 (quoting Final Rule, AR 0733).

The other prong of the definition includes "any program that is principally engaged in the

provision of education."  34 C.F.R. § 99.3; Final Rule, AR 0733.  The Department explained that

this determination "should be based on the totality of the program" and would exclude a program

that merely contains an "incidental educational or training activity within a broader non-

educational program."  Final Rule, AR 0706.  Thus, for example, hunting or swimming programs

and direct marketing programs would be excluded, but college test tutoring services and high

school equivalency programs would be included.  *See id.*  This definition seems unobjectionable.  EPIC itself has acknowledged that "education programs" are not only found in educational agencies or institutions.  *See* EPIC Comment, AR 0529-30 (acknowledging the "fact" that "education may begin before kindergarten and may involve learning outside of postsecondary institutions").  It appears that much of plaintiffs' objection is driven by failure to understand the bifurcated definition.  *See, e.g.*, Pls.' Cross-Mot. at 39 (arguing that "substance abuse and violence prevention" are not "principally engaged in the provision of education," missing the fact that these programs are included only under the other half of the definition).  Further, while plaintiffs believe that the definition's language is contradicted by examples the Department provides, this objection stems from an unwillingness to give "program" its ordinary meaning.  For example, they assert that anything "administered by a correctional or juvenile justice facility or hospital is clearly 'incidental educational or training activity' with the 'broader non-education' . . . context of juvenile justice."  Pls.' Cross-Mot. at 38.  Thus, they appear to suggest that "program" should mean "agency" and require an analysis of the overall activities of the entity.  Plaintiffs identify no support for such a reading, let alone prove that the Department's alternative interpretation is unambiguously precluded.

Finally, plaintiffs argue that the Department's inclusion of Part C of the Individuals with Disabilities Education Act ("IDEA") "illustrate[s] just how [improperly] expansive the definition" is.  *See* Pls.' Cross-Mot. at 38.  Yet plaintiffs disregard the Department's explanation that it was entirely reasonable to include the IDEA and early childhood education programs within the definition because Congress both expressly defined them as "education programs" in other statutes and tasked the Department with evaluating their effectiveness.  *See* Def.'s Mot. at 42-44.  Moreover, Congress tasked the Department with administering the IDEA, which it does

through its Office of Special Education Programs. *See* 20 U.S.C. § 1402.[25]  While plaintiffs

highlight the medical interventions that are available under Part C, these early intervention

services are provided to assist children under the age of three with developmental delays or

disabilities to ensure that they have the skills necessary to become successful learners and enter

preschool and kindergarten ready to learn.  *See* 20 U.S.C. §§ 1431-1444.  Accordingly, there is

simply no basis for concluding that IDEA programs, including Part C should be excluded from

"education programs" that may be evaluated under FERPA's program evaluation exception.

## IV.  THE DISPUTED DEFINITIONS ARE OTHERWISE IN ACCORDANCE WITH LAW FOR THE SAME REASONS THEY ARE NOT IN EXCESS OF STATUTORY AUTHORITY.

Plaintiffs effectively concede that their claim that the definitions are not "otherwise in

accordance with law" under 5 U.S.C. § 706(2)(A) is entirely redundant with their statutory

authority claim.  *See* Pls.' Cross-Mot. at 40 (quoting *Holland v. Apfel*, 23 F. Supp. 2d 21, 27

(D.D.C. 1998), for the proposition that this claim is governed by the same *Chevron* standard).

They further declare that their "complaint does not allege that the Department's Final Rule is

arbitrary or capricious."  Pls.' Cross-Mot. at 40.  Accordingly, no separate analysis of either the

"not otherwise in accordance with law" or the "arbitrary and capricious" standards is required.

In any event, any challenge under these standards to the three disputed terms at issue would fail

for the reasons demonstrated above.  *See also* Def.'s Mot. at 44-45.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to the Department.

---

[25]  The IDEA makes funding available to States to ensure that children with disabilities throughout the nation are identified, evaluated, and, if eligible, provided appropriate services. *See* 20 U.S.C. § 1400.  IDEA Part B provides special education and related services to children and youth, while IDEA Part C provides early intervention services infants and toddlers with disabilities and their families.  *See¸ e.g.*, 20 U.S.C. §§ 1414, 1431.

Dated:  February 1, 2013

Of Counsel:

DEBORAH FRIENDLY
RAHUL REDDY
Office of the General Counsel
U.S. Department of Education
Washington, D.C.

Respectfully submitted,

STUART F. DELERY
Principal Deputy Assistant Attorney General

JOHN R. TYLER
Assistant Director

/s/ Galen N. Thorp_____

GALEN N. THORP (VA Bar # 75517)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883, Room 6140
Washington, D.C. 20530
Tel: (202) 514-4781  Fax: (202) 616-8460
E-mail: galen.thorp@usdoj.gov

Attorneys for Defendant