**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. 1:12-cv-00327 (ABJ) ) |
| THE UNITED STATES DEPARTMENT OF EDUCATION, | ) ) ) |
| Defendant. | ) ) ) |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Summary ........................................................................................................................................ 1

Argument ..................................................................................................................................... 2

I.   EPIC Has Organizational Standing under *Havens Realty* ................................................... 2

II.   The Individual Plaintiffs have Standing to Bring Suit Because There is an Imminent Risk that their Private Education Records will be Disclosed ................................................................... 7

III.   EPIC has Standing to Bring Suit on Behalf of the Members of its Advisory Board and Board of Directors ..................................................................................................................................... 10

IV.   The Final Rule Is Entitled to *Chevron* Review, But Ultimately Fails to Qualify for *Chevron* Deference .................................................................................................................................... 10

V.   The Department's Reinterpretation of "Directory Information" Exceeds the Agency's Statutory Authority ..................................................................................................................................... 12

VI.   The Final Rule's Definition of "Authorized Representative" Exceeds the Education Department's Statutory Authority Because the Plain Meaning and Legislative History of the FERPA Foreclose the Department's Interpretation, and the Definition is Otherwise Not a Permissible Construction of the FERPA ......................................................................................................... 16

   A.   The FERPA's Statutory Text and Legislative History Forbid the Department's Broad Definition of "Authorized Representative" ............................................................................ 16

   B.   Notwithstanding Congress's  Statutory Limitations for "Authorized Representatives," the Department's Definition for "Authorized Representatives" is Not a Permissible Construction of the Statute ................................................................................................................................. 18

VII.   The Final  Rule's Expansive Definition For Education Programs Is Not a Reasonable Construction Under the FERPA ................................................................................................... 21

VIII.   The Disputed Definitions Are Not in Accordance with Law Because They  Are Contrary to the FERPA's Plain Meaning and Not a Permissible Construction of the Statute ...................... 22

CONCLUSION ........................................................................................................................... 22

# TABLE OF AUTHORITIES

Cases

*Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129 (D.C. Cir. 2006)...... 3, 5, 6
*Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931 (D.C. Cir. 1986) ........................3
*Am. Bus Ass'n v. Slater*, 231 F.3d 1 (D.C. Cir. 2000) ............................................................................................... 11
*Am. Chemistry Council v. Johnson*, 406 F.3d 738 (D.C. Cir. 2005) ........................................................................ 18
*Am. Petroleum Inst. v. EPA*, 52 F.3d 1113 (D.C.Cir. 1995) ...................................................................................... 11
*\*Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13 (D.C. Cir. 2011) ................. 2, 4, 6
*Arkema Inc. v. EPA*, 618 F.3d 1 (D.C. Cir. 2010) ...................................................................................................... 19
*Backcountry Against Dumps v. EPA*, 100 F.3d 147 (D.C.Cir. 1996) ........................................................................ 11
*Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438 (2002) .......................................................................................... 17
*Blackman v. District of Columbia*, 456 F.3d 167 (D.C. Cir. 2006) .......................................................................... 17
*\*Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984) ............................................................. 10
*EchoStar Satellite L.L.C. v. F.C.C.*, __ F.3d __, 04-1033, 2013 WL 149996 (D.C. Cir. Jan. 15, 2013)............... 11
*Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136 (D.C. Cir. 2011)...............................................................7
*Ethyl Corp. v. EPA*, 51 F.3d 1053 (D.C.Cir. 1995) ................................................................................................... 11
*Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268 (D.C. Cir. 1994)..... 3, 5, 6
*Gonzales v. Oregon*, 546 U.S. 243 (2006) ................................................................................................................. 10
*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ...............................................................................................2
*Krottner v. Starbucks Corp.*, 628 F.3d 1139 (9th Cir. 2010) .................................................................................... 10
*Mountain States Legal Found. v. Glickman*, 92 F.3d 1228 (D.C. Cir. 1996) ..............................................................9
*Nat'l Mining Ass'n v. Jackson*, 816 F. Supp. 2d 37 (D.D.C. 2011) ........................................................................... 11
*Nat'l Rifle Ass'n of America v. Reno*, 216 F.3d 122 (D.C.Cir. 2000) ....................................................................... 18
*Petit v. U.S. Dept. of Educ.*, 675 F.3d 769 (D.C. Cir. 2012) ..................................................................................... 17
*Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629 (7th Cir. 2007) .....................................................................................9
*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279 (D.C. Cir. 2007) .....................................8
*Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655 (D.C. Cir. 1994) ................................................ 11
*S. Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998) ........................................................................................... 20
*Serono Laboratories, Inc.*, 158 F.3d 1330 (D.C. Cir. 1998).................................................................................... 18
*Spann v. Colonial Vill., Inc.*, 899 F.2d 24 (D.C. Cir. 1990)................................................................................... 3, 6
*U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554 (D.C. Cir. 2004) ................................................................................. 12

Statutes

20 U.S.C. § 1221e-3 ..................................................................................................................................................... 10
20 U.S.C. § 1232g............................................................................................................................................................1
20 U.S.C. § 1232g(a)(5)(B) .......................................................................................................................................... 12
20 U.S.C. § 1232g(a)(6) ..................................................................................................................................................7
20 U.S.C. § 1232g(b)(5) ............................................................................................................................................... 21
20 U.S.C. § 1232g(j)...................................................................................................................................................... 13
20 U.S.C. § 9871(C)...................................................................................................................................................... 20
20 U.S.C. §1232g (b) (3) .............................................................................................................................................. 19
20 U.S.C. §1232g(a)...................................................................................................................................................... 18
20 U.S.C. §1232g(b)(1)(H)........................................................................................................................................... 13
20 U.S.C. §1232g(b)(3)................................................................................................................................................. 21
20 U.S.C. 1232g(f)......................................................................................................................................................... 18
5 U.S.C. § 706 (2)(A) ......................................................................................................................................................1
5 U.S.C. § 706(2)(C)........................................................................................................................................................1

Other Authorities

34 C.F.R. § 99.3............................................................................................................................. 7, 12, 15, 16, 22
34 C.F.R. § 99.35(a)(2) ................................................................................................................................................. 19

*Statewide Longitudinal Data Systems Grant Program, Grantee State – District of Columbia*, U.S. Dep't of Educ., Nat'l Ctr. For Educ. Statistics..............................................................................................................................8

*Statewide Longitudinal Data Systems Grant Program, Grantee State – Massachusetts*, U.S. Dep't of Educ., Nat'l Ctr. For Educ. Statistics .........................................................................................................................8

*Statewide Longitudinal Data Systems Grant Program, Grantee State – Missouri*, US Dep't of Educ., Nat'l Ctr. For Educ. Statistics ...................................................................................................................................8

*Statewide Longitudinal Data Systems Grant Program, Grantee State – Texas,* U.S. Dep't of Educ., Nat'l Ctr. For Educ. Statistics ...................................................................................................................................8

**SUMMARY**

The Electronic Privacy Information Center ("EPIC"), together with co-plaintiffs Grayson Barber, Pablo Garcia Molina, Peter Neumann, and Deborah Peel, submits the following reply in support of their motion for summary judgment against Defendant the U.S. Department of Education ("Department"). EPIC and co-plaintiffs challenge the Education Department's 2011 Final Rule ("Final Rule") modifying the Family Educational Rights and Privacy Act of 1974, as amended ("FERPA"), 20 U.S.C. § 1232g. The Final Rule's definitions of "directory information," "authorized representative," and "education program" violate the Administrative Procedure Act because they were promulgated "in excess of [the Department's] statutory authority," and are "not in accordance with law." 5 U.S.C. § 706 (2)(A), (C); Compl. ¶¶ 30, 35 Feb. 29, 2012, ECF No. 1.

By repeatedly claiming that Congress did not foreclose its interpretations, the Department concedes that Congress did not authorize the agency to transform the FERPA's fundamental definitions. The Department conceded in its notice of proposed rulemaking, the Final Rule, and throughout its dispositive briefs that it acted unilaterally, without Congressional approval, to remove what the agency perceived as barriers to implementing statewide longitudinal data systems ("SLDS"). Notwithstanding the agency's repeated attempts to infer authority where this is none, the Department's interpretations are unreasonable under the FERPA, and are therefore not entitled to *Chevron* deference.

For the foregoing reasons, and the discussion below, the Court should grant EPIC's cross-motion for summary judgment and deny the Department's motion to dismiss or, in the alternative, for summary judgment.

## ARGUMENT

**I.   EPIC Has Organizational Standing under *Havens Realty***

The test for organizational standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), has been clearly set forth by this Circuit. First, the Court must "ask[] whether the defendant's allegedly unlawful activities injured the plaintiff's interest in promoting its mission." *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (citing *Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011)). Second, the Court must "then ask whether the plaintiff used its resources to counteract that injury." *Id*. A plaintiff who satisfies both parts of the inquiry has suffered a "concrete and demonstrable injury" sufficient to establish standing under Article III. *Id.* at 25 (quoting *Havens Realty Corp.*, 455 U.S. at 379). [1]

EPIC has made such a showing in this case: there is a clear conflict between EPIC's mission, which is to "to preserve the privacy safeguards established by Congress in laws such as the FERPA," EPIC Opp'n and Cross-Mot. 9, and the Department's Final Rule, which undermines the privacy safeguards established by the FERPA. Additionally, EPIC has expended resources to combat the injury inflicted by the Department's rulemaking. As the declarations of Mr. Rotenberg and Ms. Barnes explain, the rulemaking has caused EPIC to increase the amount of resources devoted to investigation and education regarding the privacy risks and lawfulness of the Department's actions. *See* Decl. of Khaliah Barnes ¶¶ 12-16; Decl. of Marc Rotenberg ¶¶ 9-

---

[1] The Department states that EPIC has "failed to *plead* organizational standing." Defs. Opp. and Reply 13 n.13. EPIC's Complaint identified EPIC as an organizational plaintiff, Compl. ¶2, and alleged that it had "suffered a legal wrong and ha[s] been adversely affected and aggrieved by the ED's final agency action." *Id.* ¶¶ 31, 36. The declarations supporting EPIC's Cross-Motion for Summary Judgment, and the Motion itself, further explain this organizational injury. This Court "may properly consider affidavits submitted by the parties, in addition to the complaint, to resolve the standing question." *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 28 n.1 (D.C. Cir.

12. Those declarations describe responses to inquiries from education activists and members of the press and public, in-person meetings, administrative comments, publications, and other public education efforts—all of which represent resource expenditures designed to counteract the effects of the Department's rulemaking.[2] *See Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) ("*Havens* makes clear, however, that an organization establishes Article III injury if it alleges that purportedly illegal action increases the resources the group must devote to programs independent of its suit challenging the action."). Importantly, there is no quantitative threshold, other than zero, that these expenditures must pass, for "an 'identifiable trifle,' . . . is sufficient to meet the constitutional minimum." *See Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931, 937 (D.C. Cir. 1986) (quoting *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973).

Furthermore, because resources diverted to addressing the rulemaking would have been spent on other EPIC activities, Decl. of Khaliah Barnes ¶ 17; Decl. of Marc Rotenberg ¶ 13, these other activities suffered as a result of the Department's actions. *Cf. Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006) (defendant's conduct "frustrated" organization's efforts to assist its members and the public in accessing developmental drugs); *Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (defendant's conduct made the organization's "overall task more difficult" by "reduc[ing] the effectiveness" of its activities); *Spann*, 899 F.2d 24, 28 (D.C. Cir. 1990) (defendant's conduct "interfered with [organizational plaintiffs'] efforts

---

1990). Furthermore, EPIC is willing to file an amended complaint if this Court requires it.

[2] The Department argues that "resources EPIC spent prior to the issuance of the Final Rule" could not have been caused by the Final Rule, and thus "can be dismissed out of hand." Defs Opp. and Reply 15 n.15. But these resources were not expended prior to the Department's *rulemaking*. Because the Department proposed the rule before adopting it, EPIC and the public

3

and programs").

To be sure, the caselaw of this Circuit constrains *Havens* standing through several limiting principles. First, there must be a true conflict between the challenged conduct and the organization's mission. Second, costs associated with litigation are insufficient to create standing. EPIC, however, has avoided these pitfalls. As argued above and explained in detail in EPIC's Cross Motion and Opposition, the Department's rule is "clearly 'at loggerheads' with [EPIC]'s mission." *ASPCA*, 659 F.3d 13, 27 (D.C. Cir. 2011) (citation omitted). And although the Department alleges that EPIC seeks to claim litigation costs as an injury, *see* Def.'s. Oppn and Reply 15 n.15, Ms. Barnes' declaration describes such activities only to set them apart from the expenditures designed to counteract the Department's actions, and to provide context for Ms. Barnes' involvement in this case and her role in the organization. *See* Decl. of Khaliah Barnes ¶¶ 7-10.

More importantly, the Department's argument against EPIC's organizational standing suffers from at least three fundamental flaws. First, the Department mischaracterizes both this Circuit's *Havens* standard and EPIC's application of that standard. Second, the Department attempts to force a false conflict between expenditures on "advocacy" and expenditures on "activities." Finally, the Department's understanding of what constitutes a noncognizable, "self-inflicted" injury has been clearly rejected by the D.C. Circuit.

The Department describes this Circuit's opinions in *ASPCA* and *Equal Rights Center* as targeted toward ensuring that a direct conflict exists between an organization's mission and the challenged actions, and accuses EPIC of "twist[ing] the ambiguity of this recent phrasing to suggest that conflict with EPIC's abstract interests in promoting its views regarding privacy is

---

had knowledge of the rule's imminence and of its substance.

sufficient." Def.'s. Opp'n and Reply 14 n.14. There are many problems with this argument, the least of which is that EPIC nowhere claimed that such a conflict *alone* created standing. *See* EPIC Opp'n and Cross-Mot. 9-10. More troubling is the Department's apparent refusal to accept that an injury under *Havens* may take at least *two* forms: either the defendant's actions impede the plaintiff's activities by making them less effective, *see Abigail Alliance*, 469 F.3d at 132; *Fair Employment Council*, 28 F.3d at 1276; *Spann*, 899 F.2d at 28, or the defendant's actions force the plaintiff to spend resources counteracting the challenged conduct. *See Abigail Alliance*, 469 F.3d at 132-33; *Fair Employment Council*, 28 F.3d at 1276; *Spann*, 899 F.2d at 27. The Department's reply focuses almost entirely on the first form. *See* Def.'s Opp'n and Reply 14 (plaintiff must show that defendant "directly 'impedes the plaintiff organization's activities'"); *id.* at 15 ("[N]o EPIC activities have been impeded"); *id.* at 17 (arguing against standing where "the sole organization activity alleged to be 'impeded' is advocacy."). But in focusing only on the impairment to EPIC's activities, the Department ignores EPIC's other argument: that "the Department's actions have caused EPIC to expend resources in an effort to counteract the unlawful FERPA revision." EPIC Opp'n and Cross-Mot. 10.

The Department also attempts to distinguish EPIC's expenditures—which it sees as abstract "advocacy" insufficient to support standing—from other, more concrete "activities." *See* Def.'s. Opp'n and Reply 17 (arguing that EPIC's injury is "nothing more than an abstract conflict between the Department's action and EPIC's mission[,]" and no cases "found standing where the sole organization activity alleged to be 'impeded' is advocacy."); *id.* at 15 ("EPIC has not alleged that the Department's actions have impeded its ability to serve clients or otherwise harmed its interactions with any third party[,]" and "no EPIC activities have been impeded."). But this is exactly the kind of distinction that the D.C. Circuit confronted and found

unconvincing in *ASPCA*, 659 F.3d at 26 ("[Defendant] thus draws a sharp distinction between advocacy and other activities, arguing that this case falls on the wrong side of the line. We are unpersuaded that *Center for Law & Education* [396 F.3d 1152 (D.C. Cir 2005)] so easily ends the inquiry."). Indeed, the *ASPCA* court stated, "many of our cases finding *Havens* standing involved activities that could just as easily be characterized as advocacy—and, indeed, sometimes are." *Id*. (citing *Equal Rights Center*, 633 F.3d at 1140, and *Abigail Alliance*, 469 F.3d at 133).

Even assuming that the Department's distinction is correct, EPIC has listed activities that plainly do not constitute mere abstract advocacy. For example, the Department's actions have caused EPIC to provide information to individual activists, citizens, and members of the press, *see* Decl. of Khaliah Barnes ¶¶ 12-14; Decl. of Marc Rotenberg ¶¶ 11, and EPIC has published educational blog posts, newsletter items, and web pages. *See* Decl. of Khaliah Barnes ¶¶ 15-16. These educational activities are distinct from advocacy, and sufficient to confer standing. *See Abigail Alliance*, 469 F.3d at 133 (finding standing for an organization that "actively engages in counseling, referral, advocacy, and educational services"); *Fair Employment Council*, 28 F.3d at 1276 (finding standing for an organization that conducts "community outreach and public education, counseling, and research projects"); *Spann*, 899 F.2d at 28 (finding standing for organizations that had to increase their educational efforts "to counteract the influence of defendants' discriminatory ads.").

Lastly, the Department argues that the diversion of EPIC's resources caused by the FERPA Rule was not a real injury because it was the product of a choice by EPIC. Def.'s. Opp'n and Reply 18. The Department cites *Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, which held that a program that tested for discriminatory employment

practices represented a "diversion of resources" that was "self-inflicted" because it resulted "from [plaintiff's] own budgetary choices" and was thus "not really a harm at all." 28 F.3d at 1276-77. But the D.C. Circuit subsequently clarified that standing does not "depend on the voluntariness or the involuntariness of the plaintiffs' expenditures." *Equal Rights Ctr.*, 633 F.3d at 1140. And for good reason: *every* expenditure is the product of a choice. *See id.* ("In both *BMC* and *Spann*, the plaintiff organizations chose to redirect their resources to counteract the effects of the defendants' allegedly unlawful acts; they could have chosen instead not to respond."). Instead, the crucial factor distinguishing self-inflicted harms from those sufficient to create standing was "whether [plaintiffs] undertook the expenditures in response to, and to counteract, the effects of the defendants' alleged discrimination rather than in anticipation of litigation." *Id*. Here, EPIC has clearly distinguished its litigation-related activities from those designed to counteract the Rule. *See* Decl. of Khaliah Barnes ¶¶ 7-10; EPIC Opp'n and Cross Mot. 10-11.

## II. The Individual Plaintiffs have Standing to Bring Suit Because There is an Imminent Risk that their Private Education Records will be Disclosed

The FERPA protects education records of students, who are defined as "any person[s] with respect to whom an educational agency or institution maintains education records or personally identifiable information, but does not include . . . person[s] who [have] not been in attendance at such agency or institution." 20 U.S.C. § 1232g(a)(6). Students also include individuals who formerly attended an educational agency or institution, and about whom the agency or institution still maintains education records. 34 C.F.R. § 99.3. As plaintiffs' supplemental declarations discuss, each plaintiff's former educational institution currently maintains non-directory information about each plaintiff. *See* Decls. of Grayson Barber, Pablo Garcia Molina, Peter Neumann, and Deborah Peel, Ex.s A-D. As discussed in EPIC's cross-

7

motion, the Final Rule increases the risk that plaintiffs' records will be disclosed without their consent to a host of unregulated entities. Importantly, this Circuit "has not closed the door to all increased-risk-of-harm cases. [It has] allowed standing when there was at least *both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account." *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1295 (D.C. Cir. 2007). Both factors are present here. There is a substantial increase that plaintiffs' records will be disclosed to unregulated parties because the Final Rule permits countless individuals to access plaintiffs' records ("authorized representatives" are "any [designated] entity or individual" that will audit or evaluate "Federal-or State-supported education program") 2011 Final Rule, AR 0733. Pursuant to the Final Rule, there is literally no limit on the number of individuals who can access plaintiffs' information. Thus, there is a substantial increase risk that plaintiffs' education records will be released to unregulated third-party entities.

Further, each plaintiff maintains education records in a state that receives SLDS funds. *See Statewide Longitudinal Data Systems Grant Program, Grantee State – District of Columbia*, U.S. Dep't of Educ., Nat'l Ctr. For Educ. Statistics;[3] *Statewide Longitudinal Data Systems Grant Program, Grantee State – Massachusetts,* U.S. Dep't of Educ., Nat'l Ctr. For Educ. Statistics;[4] *Statewide Longitudinal Data Systems Grant Program, Grantee State – Missouri*, US Dep't of Educ., Nat'l Ctr. For Educ. Statistics;[5] *Statewide Longitudinal Data Systems Grant Program, Grantee State – Texas,* U.S. Dep't of Educ., Nat'l Ctr. For Educ. Statistics.[6] There is a strong presumption that each plaintiff's non-directory information will be included in the SLDS without

---

[3] http://nces.ed.gov/programs/slds/state.asp?stateabbr=DC (last visited Jan. 17, 2013).
[4] http://nces.ed.gov/programs/slds/state.asp?stateabbr=MA (last visited Jan. 17, 2013).
[5] http://nces.ed.gov/programs/slds/state.asp?stateabbr=MO (last visited Jan. 17, 2013).

sufficient privacy safeguards. Thus, despite the Department's claim that plaintiffs' injuries are merely "speculative," the probabilities of plaintiffs' injuries are "sufficient to create a case or controversy – to take a suit out of the category of the hypothetical" because "the relief sought would, if granted, reduce the probability." *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1235 (D.C. Cir. 1996) (quoting *Village of Elk Grove Village v. Evans*, 997 F.2d 328, 329 (7th Cir. 1993)).

The Department concedes that plaintiffs should be able to establish an imminent injury before consequential harms actually occur. Def.'s Opp'n 6, n. 6. Here, the imminent injury is that plaintiffs' non-directory information can be disclosed to an array of entities not under the direct control of local, state, or federal educational institutions. Requiring a further showing of consequential harms in addition to the violation of a privacy right would put plaintiffs in privacy cases in an especially difficult situation. As EPIC explained in comments to the Department, many of these consequential harms, such as identity theft, are quite severe though establishing a causal link is difficult. Privacy statutes, such as the FERPA, seek to mitigate this risk by limiting disclosure of personal data to that which is necessary to accomplish the legislative aim. *See* EPIC Comments, AR 0515 – 34. Plaintiffs should not have to wait for the consequential harms of privacy invasions to materialize before being allowed to seek judicial relief. Indeed, courts have shown an increased willingness to find standing for privacy violations in data breach cases where future, consequential harms have not yet occurred. *See Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 634 (7th Cir. 2007) (holding that once the plaintiffs established that a breach occurred, "the fact that the plaintiffs anticipate that some greater potential harm might follow the defendant's act does not affect the standing inquiry."); *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1142-43

---

[6] http://nces.ed.gov/programs/slds/state.asp?stateabbr=TX (last visited Jan. 17, 2013).

(9th Cir. 2010) (holding that plaintiffs had standing as a result of a privacy invasion even though they had not yet suffered identity theft or fraudulent purchases).

### III.   EPIC has Standing to Bring Suit on Behalf of the Members of its Advisory Board and Board of Directors

The Department did not rebut EPIC's argument that it has standing to bring suit on behalf of the Members of its Advisory Board and Board of Directors. Accordingly, the Department concedes that because EPIC's co-plaintiffs, who are members of EPIC's Advisory Board and Board of Directors, have standing, EPIC has associational standing.

### IV.   The Final Rule Is Entitled to *Chevron* Review, But Ultimately Fails to Qualify for *Chevron* Deference

Agency final action is entitled to review under *Chevron* review "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority," *Gonzales v. Oregon*, 546 U.S. 243, 244 (2006) (quoting *United States v. Mead Corp.*, 533 U.S. 281, 226-27 (2001). In this case, Congress has delegated to the Education Secretary authority to promulgate rules carrying the force of law. 20 U.S.C. § 1221e-3. And the agency's Final Rule was promulgated within its authority to issues rules relating to the FERPA. Thus, the Final Rule is entitled to *Chevron* review. The Final Rule, however, is not entitled to *Chevron* deference because it fails to meet either prong of the *Chevron* standard. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984).

Indeed, Congress explicitly foreclosed the agency's interpretation of "directory information," "authorized representative," and "education program." Additionally, the agency's interpretation of these terms is not a reasonable construction of the FERPA. Because the

agency's Final Rule fails to meet the well-established standard for agency deference, the Final Rule must be vacated.

The agency's argument that the Final Rule is entitled to deference because Congress does not explicitly prohibit the agency's interpretation is unconvincing for a few reasons. First, Congress has explicitly prohibited the agency's interpretation. Through analyzing "traditional tools of statutory construction," as EPIC's brief did in great detail, it is clear that Congress had no intention to remove privacy safeguards in the way that the Final Rule did. Second, this Circuit has repeatedly rejected the Department's argument that unless a statute explicitly forbids a certain action, agencies are entitled to deference. *See Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 659 (D.C. Cir. 1994) ("Instead, the Board would have us *presume* a delegation of power from Congress absent an express *withholding* of such power. This comes close to saying that the Board has the power to do whatever it pleases merely by virtue of its existence, a suggestion that we view to be incredible.") (emphasis in original). *See also EchoStar Satellite L.L.C. v. F.C.C.*, ___ F.3d ___, 04-1033, 2013 WL 149996 (D.C. Cir. Jan. 15, 2013) ("we refuse to interpret ancillary authority as a proxy for omnibus powers."). *See also Nat'l Mining Ass'n v. Jackson*, 816 F. Supp. 2d 37, 42-43 (D.D.C. 2011); *Am. Bus Ass'n v. Slater*, 231 F.3d 1, 8 (D.C. Cir. 2000); *Backcountry Against Dumps v. EPA*, 100 F.3d 147, 150 (D.C.Cir.1996) (rejecting EPA's argument "that, since section 6945(c) is silent as to its application to Indian tribes, the statute is 'ambiguous' "); *Am. Petroleum Inst. v. EPA*, 52 F.3d 1113, 1120 (D.C. Cir. 1995); *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995) ("We refuse, once again, to presume a delegation of power merely because Congress has not expressly withheld such power."). "Statutory 'silence' simply leaves that lack of authority untouched . . . the failure of Congress to use 'Thou Shalt Not' language doesn't create a statutory ambiguity of

the sort that triggers Chevron deference." *U.S. Telecom Ass'n v. F.C.C.,* 359 F.3d 554, 566 (D.C. Cir. 2004).

Thus, for the following reasons, the Department's interpretation fails to warrant *Chevron* deference.

### V.  The Department's Reinterpretation of "Directory Information" Exceeds the Agency's Statutory Authority

The FERPA requires educational agencies or institutions to "allow a reasonable period of time . . . for a parent to inform the institution or agency that any or all of the [directory] information designated should not be released with the parent's prior consent." 20 U.S.C. § 1232g(a)(5)(B). The Department's Final Rule amended the definition directory information to include student ID numbers displayed on student badges. 2011 Final Rule, AR 0733; 34 C.F.R. § 99.3. Further, the Final Rule prohibits parents and eligible students from opting out of this directory information: "we proposed to modify the definition of 'directory information' only to clarify that . . . .an educational agency or institution may require students to wear or display ID badges or identity cards that display directory information, even if the parent or the eligible student opted out of directory information." 2011 Final Rule, AR 0720.  By prohibiting behavior that Congress explicitly authorized under the FERPA, the Education Department exceeded its statutory authority. The Department claims that this prohibition "arose from recognition of the importance that identification cards can have for school safety." See Def.'s Opp'n 20. *See also* 76 Fed. Reg. 19726. 19731-32 9 (Apr. 8, 2011), AR 0006-07 ("An increased awareness of school safety and security has prompted some educational agencies and institutions, especially school districts, to require students to wear and openly display a student ID badge that contains identifying information (typically, name, photo, and student ID number) when the student is on

school property or participates in extracurricular activities."). The FERPA currently permits disclosure of education records to protect school safety, but unlike the Final Rule, the disclosure is for narrowly tailored circumstances. For example, educational agencies or institutions are permitted to disclose education records without first obtaining consent "subject to the regulations of the [Education] Secretary, in connection with an emergency, [to] appropriate persons if the knowledge of such information is necessary to protect the health or safety of the student or other persons." 20 U.S.C. §1232g(b)(1)(H). See also 20 U.S.C. § 1232g(j) ("the Attorney General . . . may submit a written application to a court of competent jurisdiction for an *ex parte* order requiring an educational agency or institution to permit the Attorney General . . . to collect education records . . . that are relevant to an authorized investigation or prosecution of . . .an act of domestic or international terrorism."). The difference between these provisions and the Final Rule is that the Final Rule, for school security purposes, permits unbridled disclosure of unique student identifiers, which allow access to education records. Just as the provisions that currently allow education record disclosure for school safety have limits, so too must this directory information provision that mandates students disclose that their unique identifiers.

Further, having the unique student identification on display is not necessary for school safety. Campus law enforcement and other school officials would still be able to verify that a student attended solely by comparing the student ID photo and name listing with a school roster. Listing the unique school identifier on the badge does not provide any additional assurance that the student attends the educational institution.

Next, contrary to the Department's assertions, permitting students to opt out of having their student ID numbers on display is not a literal and absurd reading of the FERPA. To support its claims, the Department relies on student names, a type of directory information. But as

discussed in EPIC's opening brief, the comparison of student names to unique student identifiers is completely inapposite because practically speaking, student names, like student weight, height, or other directory information, are not used in the same way as student ID numbers to gain access to other education records. *See* EPIC Opp'n and Cross-Mot, Ex. G. EPIC's argument is consistent with the Department's 2008 conclusion that parents may not opt out of "disclosure of a student's name, identifier, or institutional e-mail address in a class in which the student is enrolled." Clearly, a student identifier within the context of a specific class and for the purpose of facilitating instruction and record keeping is not outside of the FERPA's scope. Mandating, however, that students must display that number—which can easily be used to provide access to education records—outside of the classroom, to other students, faculty, and staff is a clear violation of student privacy.

Contrary to the Department's argument, permitting students to opt-out of having their ID numbers on display would neither "prohibit mandatory student ID cards," nor "implicate whether campus law enforcement could demand a student's name on a sign-in sheet." Def.'s Opp'n 24. As discussed above, schools would still be able to mandate student ID cards, but students could opt out of having their unique student ID number displayed on the badge. Further, law enforcement could still "demand a student's name on a sign-in sheet" because that would not implicate the public display of the student ID number. Def.'s Opp'n 24. The Department offers no support for its argument that permitting students to opt out would prohibit mandatory student ID cards. Accordingly, this argument, like the Final Rule, is not entitled to deference.

Finally, the Department does not dispute that in practice universities provide access to education records by using "two factor authentication," including student ID numbers and other directory information. Although the rule provides examples of authentication factors that are

only known by the authorized user, that is not mandatory:

> . . . In accordance with paragraphs (a) and (b) of this definition, directory information includes – . . .
> (2) A student ID number or other unique personal identifier that is displayed on a student ID badge, but only if the identifier cannot be used to gain access to education records except when used in conjunction with one or more factors that authenticate the user's identity, such as a PIN, password, or other factor know or possessed only by the authorized user.

2011 Final Rule, AR 0733; 34 C.F.R. § 99.3. Therefore, schools like the ones EPIC referenced in its cross-motion that authenticate student identification using only the student ID and other directory information are FERPA compliant. The Department's assertion that student ID numbers and other directory information "merely provid[e] a convenient initial authentication factor that will be changed to something 'known or possessed only by the authorized user'" reveal that the Department does not fully appreciate the privacy threats that arise from publicly displaying student ID numbers. *See* Def.'s Opp'n 26, n. 18. Specifically, if an individual obtains a student ID number that is displayed publicly, that individual can use the ID number, and other publicly available directory information, to gain unauthorized access to a student's online account and education records. Further, after having obtained access to the student's online profile, the malefactor can enter erroneous information and create a false student profile. It is therefore an impermissible construction of the FERPA for the Department to insufficiently safeguard students from privacy risks.

For these reasons, and all of the arguments advanced in EPIC's cross-motion, the Department's interpretation is not entitled to *Chevron* deference.

15

**VI. The Final Rule's Definition of "Authorized Representative" Exceeds the Education Department's Statutory Authority Because the Plain Meaning and Legislative History of the FERPA Foreclose the Department's Interpretation, and the Definition is Otherwise Not a Permissible Construction of the FERPA**

In the Final Rule, the agency defined "authorized representative" as "any entity or individual designated by a State or local educational authority or an agency headed by an official listed in §99.31(a)(3) to conduct—with respect to Federal-or State-supported education programs—any audit or evaluation, or any compliance or enforcement activity [.]" 34 C.F.R. § 99.3; Final Rule, AR 0733. This definition is not entitled to deference under step one of the *Chevron* analysis because the through the FERPA's statutory text and legislative history, Congress proscribed the Department's interpretation. And the definition is not entitled to deference under step two of *Chevron* analysis because it improperly delegates the Department's authority to non-federal entities, is impermissibly retroactive, and is otherwise not permissible even in light of the statewide longitudinal data system. Importantly, the Department concedes that the agency's previous interpretation of the FERPA's legislative history foreclosed the Department's current expansion of authorized representatives. Def.'s Opp'n 30, n.1. For the following reasons, the agency's definition for "authorized representative" must be vacated because it is not entitled to *Chevron* deference.

A.    The FERPA's Statutory Text and Legislative History Forbid the Department's Broad Definition of "Authorized Representative"

EPIC's opposition engaged and rebutted the Department's arguments supporting the agency's expansive definition of "authorized representative." Both EPIC and the Department agree that in parsing the definition of "authorize" and "representative," the simple textual meaning of "authorized representative" is an entity or individual who has been given the legal authority to act on the behalf of another person or entity. *See* EPIC Opp'n and Cross Mot. 25;

16

Def.'s Mot. 29-30. The Department, however, wishes to curtail the full analysis in which courts' interpretation of text "must reflect the statute's context.'" *Petit v. U.S. Dept. of Educ.,* 675 F.3d 769, 781 (D.C. Cir. 2012) (quoting *Bell Atl. Tel. Cos. v. F.C.C.,* 131 F.3d 1044, 1047 (D.C. Cir. 1997)). Interestingly, to support its argument, the agency relies on *Blackman v. District of Columbia,* 456 F.3d 167, 176 (D.C. Cir. 2006), a case that supports EPIC's proposition that context is key in plaint text interpretation ("We start with the plain meaning of the text, looking to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."). As EPIC discussed in great detail, it would be contrary to the plain text and purpose of the FERPA if, as the Department argues, an "authorized representative" could be *any* third party entity; and it would be explicitly contrary to the structure of the Act if the third party was one over which neither the Comptroller General, Education Secretary, or state educational authorities could exercise control in fact. The Department's argument that EPIC disregards the purpose of the audit and evaluation exception is unfounded. EPIC acknowledges the purpose of the exception but, as EPIC described in its cross-motion, by permitting a limitless number of entities to audit or evaluate "education programs"—another expansive term under the Final Rule—the exception becomes meaningless due to its large scope. EPIC Opp'n and Cross-Mot 26. Because the agency has declined to limit who can serve as an authorized representative, and has declined to limit the type of programs that qualify as education programs, the audit and program evaluation exception alone can release troves of education records.

Second, the Department overstates the importance of Congress not selecting another term besides "authorized representative." The presumption that "Congress acts intentionally and purposely" in selecting specific language is limited. *Barnhart v. Sigmon Coal Co., Inc.,* 534 U.S. 438, 452 (2002) (quoting *Russello v. United States,* 464 U.S. 16, 23 (1983). EPIC aptly relied on

both *Am. Chemistry Council v. Johnson*, 406 F.3d 738, 741 (D.C. Cir. 2005) and *Nat'l Rifle Ass'n of America v. Reno,* 216 F.3d 122, 127 (D.C. Cir. 2000) to support its claims that Congress was not required to choose a specific phrase to clarify that which is explicit both in the meaning of "authorized representative" and throughout the FERPA's scope: only a limited number of parties are granted access to education records.

      **B.**      **Notwithstanding Congress's Statutory Limitations for "Authorized Representatives," the Department's Definition for "Authorized Representatives" is Not a Permissible Construction of the Statute**

As with *Chevron* step one, the Department's Final Rule is not entitled to deference under *Chevron* step two, which simply requires that "the agency's definition is 'based on a permissible construction of the statute,' *Chevron,* 467 U.S. at 843, which requires only that its construction be a 'reasonable' one." *Serono Laboratories, Inc.,* 158 F.3d 1330, 1320 (D.C. Cir. 1998) (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 843-44)).

As explained in detail in both EPIC's comments and EPIC's cross-motion, the Final Rule unlawfully delegates its duties under the FERPA to entities and individuals not under the direct control of the educational authorities that provide them with access to private student data. EPIC Comment, AR 0526. *See also* EPIC Opp'n and Cross-Mot. 29-32. The Department is correct that FERPA imposes duties on state and local educational agencies and institutions to safeguard student records in exchange for federal funding. 20 U.S.C. §1232g(a). But that scenario is distinct from the Education Department delegating duties to authorized representatives over which the agency does not have control. In delegating to states pursuant to the FERPA, the Department has promulgated binding regulations that, if abrogated, the Department can terminate financial assistance to state and local educational agencies and institutions. 20 U.S.C. 1232g(f).

The Final Rule is an improper delegation because it removes any duties under the FERPA for the authorized representatives, and therefore risks that these authorized representatives may pursue goals inconsistent with the Education Department and the FERPA. Here, as in *U.S. Telecom,* the Final Rule's "non-regulatory guidance" fails to adequately and legally bind the state and local educational institutions that would be tasked with ensuring FERPA compliance. And although "non-employee authorized representatives must be designated by a written agreement that includes specific provisions," the designator is only required to use "reasonable," unenforceable, "non-regulatory" methods to ensure that the authorized representatives uphold student privacy protections under the FERPA. 34 C.F.R. § 99.35(a)(2); Final Rule, AR 0712-0715; 0737-0745. The Department explicitly declined to "impose specific requirements for reasonable methods," and instead issued a "non-regulatory guidance on best practices for reasonable methods." Final Rule, AR 0712. Thus, contrary to the Department's argument, the Final Rule improperly delegates authority to non-federal entities. The statutory text forbids the Department's interpretation because the FERPA mandates specific privacy safeguards for authorized representatives, and the Final Rule simply encourages non-binding, "non-regulatory" reasonable methods to adhere to the FERPA. 20 U.S.C. §1232g (b) (3); Final Rule, AR 0712.

Second, the Department's interpretation of "authorized representatives" is impermissibly retroactive because it removes vested privacy rights under the FERPA. The D.C. Circuit's decision in *Arkema Inc. v. EPA*, 618 F.3d 1 (D.C. Cir. 2010) is instructive. "The critical question [in determining whether a rule operates retroactively] is whether the interpretation established by the new rule 'changes the legal landscape.' *Arkema Inc*, 618 F.3d at 7 (quoting *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 423–24 (D.C.Cir.1994)). A rule is retroactive and changes the legal landscape "[i]f a new rule is 'substantively inconsistent' with a prior agency practice

19

and attaches new legal consequences to events completed before its enactment," *Arkema*, 618 F. 3d at 7  (quoting *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 860 (D.C.Cir.2002). In the legal landscape before the Final Rule, only a limited number of entities—entities under direct control—were considered to be "authorized representatives." After the Final Rule, "any entity or individual" can be designated as an "authorized representative." 2011 Final Rule, AR 0733. The Department argues that *Arkema* is dissimilar from the present case because "plaintiffs were involved in no transactions with the Department." Def.'s Opp'n 33. But the individual co-plaintiffs did, however, provide their sensitive education records to their educational institutions with the understanding that the institutions would safeguard their information in compliance with the FERPA. The Department's Final Rule removed these safeguards, and now the individual co-plaintiffs' information is subject to disclosure. The co-plaintiffs provided their information under the belief that there would be limitations under the FERPA for their information disclosure, and with the Final Rule, the Department removed all of those expectations.

Third, the Department's interpretation is not permissible even in light of Congress's expansion of SLDS. The COMPETES Act explicitly states that the SLDS must "meet the requirements of" the FERPA. 20 U.S.C. § 9871(C). And although the ARRA does not mention the FERPA and students privacy rights under the statute, courts "assume that Congress is aware of existing law when it passes legislation," *S. Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998) (quoting *Miles v. Apex Marine Corp.,* 498 U.S. 19, 32 (1990)). Therefore, there is a strong presumption that Congress was well aware of the FERPA when it enacted both the COMPETES ACT and ARRA, and could have amended the FERPA if Congress felt that the three statutes were not in harmony. But Congress did not. Contrary to the Department's argument that it "simple re-examined what FERPA itself required," the Department issued

regulations amending the FERPA to lower what it perceived as "barriers to Congress' goals." Def.'s Opp'n 34.

Fourth, even setting aside the COMPETES Act and ARRA, the Department's definition for "authorized representative" is unreasonable because, as discussed in EPIC's cross-motion, the definition insufficiently protects student privacy by not requiring a regulatory framework for authorized representations to protect student information. And the Department's argument that it has "incorporated these [nonbinding] requirements into its regulations" is of little to no significance because the nonbinding guidelines do not have the force of law like other Department regulations. EPIC's argument that the regulations will permit non-academic uses for student data is not unfounded because by failing to establish binding guidelines and precautions that authorized representatives must take to safeguard student information, the Department has increased the risk that student information will be used for non-academic purposes. In sum, it is not a permissible construction of the federal student privacy statute to propose instead non-binding, unenforceable guidelines to safeguard sensitive student information.

For the foregoing reasons, the Department's interpretation of "authorized representative" is an impermissible construction of the FERPA and is not entitled to deference under *Chevron*.

**VII.      The Final  Rule's Expansive Definition For "Education Programs" Is Not a Reasonable Construction Under the FERPA**

The FERPA grants access to education records "in connection with the audit and evaluation of Federally-supported education programs, or in connection with the enforcement of the Federal legal requirements which relate to such programs." 20 U.S.C. §1232g(b)(3); *see also id*. § 1232g(b)(5). Prior to the Final Rule, "education programs" under the FERPA were undefined. The Final Rule created an expansive definition for "education programs":

Education program means any program that is principally engaged in the

21

provision of education, including but not limited to, early childhood education, elementary and secondary education, postsecondary education, special education, job training, career and technical education, and adult education, and any program that is administered by an educational agency or institution.

34 C.F.R. § 99.3.; 2011 Final Rule, AR 0733.

The Department claims that EPIC's objection to the definition is "driven by failure to understand the bifurcated definition." Def.'s Opp'n 37. EPIC fully understands the bifurcated definition, but notes that the definition is too expansive, and that analyzed in the context of the "education program" auditing and evaluating exception, the Department's interpretation will permit a large number of individuals to have access to student data. For this reason and the reasons discussed in EPIC's cross-motion, the Department's interpretation of "education programs" is not entitled to *Chevron* deference.

**VIII.     The Disputed Definitions Are Not in Accordance with Law Because They Are Contrary to the FERPA's Plain Meaning and Not a Permissible Construction of the Statute**

EPIC advances its claims that the Department's interpretation of "directory information," authorized representative," and "education program" are not in accordance with law because they are not faithful to a plain reading of the FERPA, nor is the Department's interpretation a permissible construction of the statute.

## CONCLUSION

For the foregoing reasons, the Court should vacate the Department's Final Rule definitions for "education program," "authorized representative," and "directory information," and deny the Department's motion to dismiss and motion for summary judgment, and grant EPIC's motion for summary judgment.

Respectfully submitted,

By:     __/s/_____

Marc Rotenberg (DC Bar # 422825)
Khaliah Barnes*
David Jacobs**
ELECTRONIC PRIVACY
INFORMATION CENTER
1718 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20009
(202) 483-1140 (telephone)
(202) 483-1248 (facsimile)
*Attorneys for Plaintiffs*

Dated:  February 15, 2013

*Ms. Barnes is a member in good standing of the Maryland Bar. Her admission to the D.C. Bar is pending.

** Mr. Jacobs is a member in good standing of the New York Bar.