**19726** Federal Register / Vol. 76, No. 68 / Friday, April 8, 2011 / Proposed Rules

In accordance with 14 CFR 39.19, send your request to your principal inspector or local Flight Standards District Office, as appropriate. If sending information directly to the International Branch, send it to ATTN: Dan Rodina, Aerospace Engineer, International Branch, ANM–116, Transport Airplane Directorate, FAA, 1601 Lind Avenue, SW., Renton, Washington 98057–3356; telephone (425) 227–2125; fax (425) 227–1149. Information may be e-mailed to: *9-ANM-116-AMOC-REQUESTS@faa.gov.* Before using any approved AMOC, notify your appropriate principal inspector, or lacking a principal inspector, the manager of the local flight standards district office/certificate holding district office. The AMOC approval letter must specifically reference this AD.

(2) *Airworthy Product:* For any requirement in this AD to obtain corrective actions from a manufacturer or other source, use these actions if they are FAA-approved. Corrective actions are considered FAA-approved if they are approved by the State of Design Authority (or their delegated agent). You are required to assure the product is airworthy before it is returned to service.

**Related Information**

(i) Refer to MCAI European Aviation Safety Agency (EASA) Airworthiness Directive 2010–0224, dated November 4, 2010; and Airbus Mandatory Service Bulletins A300–27–6066 and A310–27–2103, both dated June 10, 2010.

Issued in Renton, Washington, on March 31, 2011.

**Kalene C. Yanamura,**

*Acting Manager, Transport Airplane Directorate, Aircraft Certification Service.*

[FR Doc. 2011–8416 Filed 4–7–11; 8:45 am]

BILLING CODE 4910–13–P

---

## DEPARTMENT OF EDUCATION

### 34 CFR Part 99

**RIN 1880–AA86**

**[Docket ID ED–2011–OM–0002]**

### Family Educational Rights and Privacy

**AGENCY:** Office of Management, Department of Education.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Secretary proposes to amend the regulations implementing section 444 of the General Education Provisions Act, which is also known as the Family Educational Rights and Privacy Act of 1974, as amended (FERPA). These proposed amendments are necessary to ensure that the Department's implementation of FERPA continues to protect the privacy of education records, as intended by Congress, while allowing for the effective use of data in statewide longitudinal data systems (SLDS) as

envisioned in the America Creating Opportunities to Meaningfully Promote Excellence in Technology, Education, and Science Act (COMPETES Act) and furthermore supported under the American Recovery and Reinvestment Act of 2009 (ARRA). Improved access to data contained within an SLDS will facilitate States' ability to evaluate education programs, to build upon what works and discard what does not, to increase accountability and transparency, and to contribute to a culture of innovation and continuous improvement in education. These proposed amendments would enable authorized representatives of State and local educational authorities, and organizations conducting studies, to use SLDS data to achieve these important outcomes while protecting privacy under FERPA through an expansion of the requirements for written agreements and the Department's enforcement mechanisms.

**DATES:** We must receive your comments on or before May 23, 2011. Comments received after this date will not be considered.

**ADDRESSES:** Submit your comments through the Federal eRulemaking Portal or via postal mail, commercial delivery, or hand delivery. We will not accept comments by fax or by e-mail. Please submit your comments only one time, in order to ensure that we do not receive duplicate copies. In addition, please include the Docket ID at the top of your comments.

• *Federal eRulemaking Portal:* Go to *http://www.regulations.gov* to submit your comments electronically. Information on using Regulations.gov, including instructions for accessing agency documents, submitting comments, and viewing the docket, is available on the site under "How To Use This Site."

• *Postal Mail, Commercial Delivery, or Hand Delivery.* If you mail or deliver your comments about these proposed regulations, address them to Regina Miles, U.S. Department of Education, 400 Maryland Avenue, SW., Washington, DC 20202.

Privacy Note: The Department's policy for comments received from members of the public (including those comments submitted by mail, commercial delivery, or hand delivery) is to make these submissions available for public viewing in their entirety on the Federal eRulemaking Portal at *http://www.regulations.gov.* Therefore, commenters should be careful to include in their comments only information that they wish to make publicly available on the Internet.

**FOR FURTHER INFORMATION CONTACT:** Ellen Campbell, U.S. Department of Education, 400 Maryland Avenue, SW., Washington, DC 20202. Telephone: (202) 260–3887 or via Internet: *FERPA@ed.gov.*

If you use a telecommunications device for the deaf, call the Federal Relay Service (FRS), toll free, at 1–800–877–8339.

Individuals with disabilities can obtain this document in an accessible format (*e.g.,* braille, large print, audiotape, or computer diskette) on request to the contact person listed under **FOR FURTHER INFORMATION CONTACT.**

**SUPPLEMENTARY INFORMATION:**

**Invitation to Comment**

We invite you to submit comments regarding these proposed regulations. To ensure that your comments have maximum effect in developing the final regulations, we urge you to identify clearly the specific section or sections of the proposed regulations that each of your comments addresses and to arrange your comments in the same order as the proposed regulations.

We invite you to assist us in complying with the specific requirements of Executive Order 12866 and its overall requirement of reducing regulatory burden that might result from these proposed regulations. Please let us know of any further opportunities we should take to reduce potential costs or increase potential benefits while preserving the effective and efficient administration of the program.

During and after the comment period, you may inspect all public comments about these proposed regulations by accessing *http://www.regulations.gov.* You may also inspect the comments in person in room 6W243, 400 Maryland Avenue, SW., Washington, DC, 20202 between the hours of 8:30 a.m. and 4 p.m. Eastern time, Monday through Friday of each week except Federal holidays.

**Assistance to Individuals With Disabilities in Reviewing the Rulemaking Record**

On request, we will supply an appropriate aid, such as a reader or print magnifier, to an individual with a disability who needs assistance to review the comments or other documents in the public rulemaking record for these proposed regulations. If you want to schedule an appointment for this type of aid, please contact the person listed under **FOR FURTHER INFORMATION CONTACT.**

*Background:* On February 17, 2009, the President signed the ARRA (Pub. L.

111–5) into law. The ARRA includes significant provisions relating to the expansion and development of SLDS. Under title XIV of the ARRA, in order for a State to receive funding under the State Fiscal Stabilization Fund program (SFSF), the State's Governor must provide an assurance in the State's application for SFSF funding that the State will establish an SLDS that meets the requirements of section 6401(e)(2)(D) of the COMPETES Act (20 U.S.C. 9871(e)(2)(D)).

With respect to public preschool through grade 12 and postsecondary education, COMPETES requires that the SLDS include: (a) A unique statewide student identifier that, by itself, does not permit a student to be individually identified by users of the system; (b) student-level enrollment, demographic, and program participation information; (c) student-level information about the points at which students exit, transfer in, transfer out, drop out, or complete P–16 education programs; (d) the capacity to communicate with higher education data systems; and (e) a State data audit system assessing data quality, validity, and reliability.

With respect to public preschool through grade 12 education, COMPETES requires that the SLDS include: (a) Yearly test records of individual students with respect to assessments under section 1111(b) of the Elementary and Secondary Education Act of 1965, as amended (20 U.S.C. 6311(b)); (b) information on students not tested by grade and subject; (c) a teacher identifier system with the ability to match teachers to students; (d) student-level transcript information, including information on courses completed and grades earned; and (e) student-level college readiness test scores.

With respect to postsecondary education, COMPETES requires that the SLDS include: (a) Information regarding the extent to which students transition successfully from secondary school to postsecondary education, including whether students enroll in remedial coursework; and (b) other information determined necessary to address alignment and adequate preparation for success in postsecondary education.

Separate provisions in title VIII of the ARRA appropriated $250 million for additional grants to State educational agencies (SEAs) under the Statewide Longitudinal Data Systems program, authorized under section 208 of the Educational Technical Assistance Act of 2002 (20 U.S.C. 9601, *et seq.*) to support the expansion of SLDS to include postsecondary and workforce information.

The extent of data sharing contemplated by these and other Federal initiatives prompted the Department to review the impact that its FERPA regulations could have on the development and use of SLDS. FERPA is a Federal law that protects student privacy by prohibiting educational agencies and institutions from having a practice or policy of disclosing personally identifiable information in student education records ("PII") unless a parent or eligible student provides prior written consent or a statutory exception applies. In those circumstances in which educational agencies and institutions may disclose PII to third parties without consent, FERPA and its implementing regulations limit the redisclosure of PII by the recipients, except as set forth in §§ 99.33(c) and (d) and 99.35(c)(2) (*see* 20 U.S.C. 1232g(b)(3) and (b)(4)(B) and §§ 99.33 and 99.35(c)(2)). For example, State and local educational authorities that receive PII without consent from the parent or eligible student under the "audit or evaluation" exception may not make further disclosures of the PII on behalf of the educational agency or institution unless prior written consent from the parent or eligible student is obtained, Federal law specifically authorized the collection of the PII, or a statutory exception applies and the redisclosure and recordation requirements are met (*see* 20 U.S.C. 1232g(b)(3) and (b)(4) and §§ 99.32(b)(2), 99.33(b)(1)), and 99.35(c)).

In light of the ARRA, the Department has conducted a review of its FERPA regulations in 34 CFR part 99, including changes reflected in the final regulations published on December 9, 2008 (73 FR 74806). Further, the Department has reviewed its guidance interpreting FERPA, including statements made in the preamble discussion to the final regulations published on December 9, 2008 (73 FR 74806).

Based on its review, the Department has determined that the Department's December 2008 changes to the FERPA regulations promote the development and expansion of robust SLDS in the following ways:

• Expanding the redisclosure authority in FERPA by amending § 99.35 to permit State and local educational authorities and other officials listed in § 99.31(a)(3) to make further disclosures of personally identifiable information from education records, without the consent of parents or eligible students, on behalf of the educational agency or institution from which the PII was obtained under specified conditions (*see* §§ 99.33(b)(1) and 99.35(b)(1)).

• Permitting SEAs and other State educational authorities, as well as the other officials listed in § 99.31(a)(3), to record their redisclosures at the time they are made and by groups (*i.e.*, by the student's class, school district, or other appropriate grouping rather than by the name of each student whose record was redisclosed); and only requiring them to send these records of redisclosure to the educational agencies or institutions from which the PII was obtained upon the request of an educational agency or institution (*see* § 99.32(b)(2)).

Notwithstanding these provisions in the Department's FERPA regulations and the preamble discussion relating to the December 2008 changes to the regulations, the Department's review indicates that there are a small number of other regulatory provisions and policy statements that unnecessarily hinder the development and expansion of SLDS consistent with the ARRA. Because the Department has determined that these regulatory provisions and policies are not necessary to ensure privacy protections for PII, it proposes to amend 34 CFR part 99 to make the changes described in the following section.

**Significant Proposed Regulations**

We discuss substantive issues under the sections of the proposed regulations to which they pertain. Generally, we do not address proposed regulatory provisions that are technical or otherwise minor in effect.

**Definitions (§ 99.3)**

*Authorized Representative (§§ 99.3, 99.35)*

*Statute:* Sections (b)(1)(C), (b)(3) and (b)(5) of FERPA (20 U.S.C. 1232g(b)(1)(C), (b)(3) and (b)(5)) permit educational agencies and institutions nonconsensually to disclose PII to "authorized representatives" of State and local educational authorities, the Secretary, the Attorney General of the United States, and the Comptroller General of the United States, as may be necessary in connection with the audit, evaluation, or the enforcement of Federal legal requirements related to Federal or State supported education programs. The statute does not define the term *authorized representative.*

*Current Regulations:* The term *authorized representative,* which is used in current §§ 99.31(a)(3) and 99.35(a)(1), is not defined in the current regulations. Current §§ 99.31(a)(3) and 99.35(a)(1), together, implement sections (b)(1)(C), (b)(3) and (b)(5) of FERPA (20 U.S.C. 1232g(b)(1)(C), (b)(3) and (b)(5)).

*Proposed Regulations:* We propose to amend § 99.3 to add a definition of the term *authorized representative.* Under the proposed definition, an authorized representative would mean any entity or individual designated by a State or local educational authority or agency headed by an official listed in § 99.31(a)(3) to conduct—with respect to Federal or State supported education programs— any audit, evaluation, or compliance or enforcement activity in connection with Federal legal requirements that relate to those programs.

In order to help ensure proper implementation of FERPA requirements that protect student privacy, we also propose to amend § 99.35 (What conditions apply to disclosure of information for Federal or State program purposes?). Specifically, we would provide, in proposed § 99.35(a)(2), that responsibility remains with the State or local educational authority or agency headed by an official listed in § 99.31(a)(3) to use reasonable methods to ensure that any entity designated as its authorized representative remains compliant with FERPA. We are not proposing to define "reasonable methods" in the proposed regulations in order to provide flexibility for a State or local educational authority or an agency headed by an official listed in § 99.31(a)(3) to make these determinations. However, we are interested in receiving comments on what would be considered reasonable methods. The Department anticipates issuing non-regulatory guidance on this and other related matters when we issue the final regulations or soon thereafter.

We also would amend § 99.35 to require written agreements between a State or local educational authority or agency headed by an official listed in § 99.31(a)(3) and its authorized representative, other than an employee (*see* proposed § 99.35(a)(3)). We propose that these agreements: designate the individual or entity as an authorized representative; specify the information to be disclosed and that the purpose for which the PII is disclosed to the authorized representative is only to carry out an audit or evaluation of Federal or State supported education programs, or to enforce or to comply with Federal legal requirements that relate to those programs; require the return or destruction of the PII when no longer needed for the specified purpose in accordance with the requirements of § 99.35(b)(2); specify the time period in which the PII must be returned or destroyed; and establish policies and procedures (consistent with FERPA and other Federal and State confidentiality and privacy provisions) to protect the

PII from further disclosure (except back to the disclosing entity) and unauthorized use, including limiting the use of PII to only those authorized representatives with legitimate interests (*see* proposed § 99.35(a)(3)).

We would propose a minor change to § 99.35(b) to clarify that the requirement to protect PII from disclosure applies to authorized representatives.

Finally, proposed § 99.35(d) would clarify that if the Department's Family Policy Compliance Office (FPCO) finds that a State or local educational authority, an agency headed by an official listed in § 99.31(a)(3), or an authorized representative of a State or local educational authority or agency headed by an official listed in § 99.31(a)(3) improperly rediscloses PII in violation of FERPA, the educational agency or institution from which the PII originated would be prohibited from permitting the entity responsible for the improper redisclosure (*i.e.,* the authorized representative, or the State or local educational authority or the agency headed by an officials listed in § 99.31(a)(3), or both) access to the PII for at least five years (*see* 20 U.S.C. 1232g(b)(4)(B) and § 99.33(e)).

*Reasons:* Under current §§ 99.31(a)(3) and 99.35(a)(1) and 20 U.S.C. 1232g(b)(1)(C), (b)(3), and (b)(5), an educational agency or institution may disclose PII to an authorized representative of a State or local educational authority or an agency headed by an official listed in § 99.31(a)(3), without prior written consent, for the purposes of conducting—with respect to Federal or State supported education programs— any audit, evaluation, or compliance or enforcement activity in connection with Federal legal requirements that relate to those education programs, provided that such disclosures are subject to the applicable privacy protections in FERPA. Although the term *authorized representative* is not defined in FERPA or the current regulations, the Department's longstanding interpretation of this term has been that it does not include other State or Federal agencies because these agencies are not under the direct control (*e.g.,* they are not employees or contractors) of a State educational authority (or other agencies headed by officials listed in § 99.31(a)(3)). (Memorandum from William D. Hansen, Deputy Secretary of Education, to State officials, January 30, 2003, ("Hansen memorandum")). Under this interpretation of the term *authorized representative,* as it is used in current §§ 99.31(a)(3) and 99.35(a)(1) (and 1232g(b)(1)(C), (b)(3), and (b)(5)), an SEA or other State educational

authority may not make further disclosures of PII to other State agencies, such as State health and human services departments, because these agencies are not employees or contractors to which the State educational authority has outsourced the audit or evaluation of education programs (or other institutional services or functions). (This interpretation was later incorporated in the preamble to the final FERPA regulations published on December 9, 2008 (73 FR 74806, 74825).)

As explained in further detail in the following paragraphs, the Department has concluded that FERPA does not require that an authorized representative be under the educational authority's direct control in order to receive PII for purposes of audit or evaluation. We also do not believe such a restrictive interpretation is warranted given Congress' intent in the ARRA to have States link data across sectors. Through these regulations, therefore, we are proposing to rescind the policy established in the January 30, 2003, Hansen memorandum and the preamble to the final FERPA regulations published on December 9, 2008 (73 FR 74806, 74825). These proposed regulations also would expressly permit State and local educational authorities and other agencies headed by officials listed in § 99.31(a)(3) to exercise the flexibility and discretion to designate other individuals and entities, including other governmental agencies, as their authorized representatives for evaluation, audit, or legal enforcement or compliance purposes of a Federal or State-supported education program, subject to the requirements in FERPA and its implementing regulations.

We first note that nothing in FERPA prescribes which agencies, organizations, or individuals may serve as an authorized representative of a State or local educational authority or an agency headed by an official listed in § 99.31(a)(3), or whether an authorized representative must be a public or private entity or official. Moreover, the Department believes that it is unnecessarily restrictive to interpret FERPA as prohibiting an individual or entity who is not an employee or contractor under the "direct control" of a State or local educational authority or agency headed by an official listed in § 99.31(a)(3) from serving as an authorized representative.

One of the key purposes of FERPA is to ensure the privacy of personally identifiable information in student education records. Therefore, the determination of who can serve as an

made in light of that purpose. Accordingly, we believe it is appropriate to require that any State or local educational authority or agency headed by an official listed in § 99.31(a)(3) that designates an individual or entity as an authorized representative—

• Be responsible for using reasonable methods to ensure that the designated individual or entity—

○ Uses PII only for purposes of the audit, evaluation, or compliance or enforcement activity in question;

○ Destroys or returns PII when no longer needed for these purposes; and

○ Protects PII from redisclosure (and use by any other third party), except as permitted in § 99.35(b)(1) (*i.e.*, back to the disclosing entity) (*see* proposed § 99.35(a)(2)); and

• Use a written agreement that designates any authorized representative other than an employee and includes the privacy protections set forth in proposed § 99.35(a)(3) (*i.e.*, to use reasonable methods to limit its authorized representative's use of PII for these purposes, to require the return or destruction of PII when it is no longer needed for these purposes, and to establish policies and procedures consistent with FERPA and other Federal and State confidentiality and privacy provisions) to protect PII from further disclosure (except back to the disclosing entity). If a State or local educational authority or agency headed by an official listed in § 99.31(a)(3) is able to comply with these requirements (*i.e.*, to use reasonable methods to limit its authorized representative's use of PII for these purposes, to establish policies and procedures to protect PII from further disclosure and to require the return or destruction of PII when it is no longer needed for these purposes), then there is no reason why a State health and human services or labor department, for example, should be precluded from serving as the authority's authorized representative and receiving non-consensual disclosures of PII to link education, workforce, health, family services, and other data for the purpose of evaluating, auditing, or enforcing Federal legal requirements related to, Federal or State supported education programs.

Furthermore, under proposed § 99.35(d), we would clarify that in the event that the Family Policy Compliance Office finds an improper redisclosure, the Department would prohibit the educational agency or institution from which the PII originated from permitting the party responsible for the improper redisclosure (*i.e.*, the authorized representative, or the State

or local educational authority or agency headed by an official listed in § 99.31(a)(3), or both) access to the PII for at least five years.

With these proposed changes to the privacy provisions in § 99.35, we believe that PII, including PII in SLDS, will be appropriately protected while giving each State the needed flexibility to house information in a SLDS that best meets the needs of the particular State. FERPA does not constrain State administrative choices regarding the data system architecture, data strategy, or technology for SLDS as long as the required designation, purpose, and privacy protections are in place. The proposed amendments to § 99.35 would require that these protections are in place.

**Directory Information (§ 99.3)**

*Statute:* Sections (a)(5)(A), (b)(1), and (b)(2) of FERPA (20 U.S.C. 1232g(a)(5), (b)(1), and (b)(2)) permit educational agencies and institutions nonconsensually to disclose information defined as directory information, such as a student's name and address, telephone listing, date and place of birth, and major field of study, provided that specified public notice and opt out conditions have been met.

*Current Regulations: Directory information* is defined in current § 99.3 as information contained in an education record of a student that would not generally be considered harmful or an invasion of privacy if disclosed, and includes information listed in section (a)(5)(A) of FERPA (20 U.S.C. 1232g(a)(5)(A)) (*e.g.*, a student's name and address, telephone listing) as well as other information, such as a student's electronic mail (e-mail) address, enrollment status, and photograph. Current regulations also specify that a student's Social Security Number (SSN) or student identification (ID) number may not be designated and disclosed as directory information. However, the current regulations state that a student ID number, user ID, or other unique personal identifier used by the student for purposes of accessing or communicating in electronic systems may be designated and disclosed as directory information if the identifier cannot be used to gain access to education records except when used in conjunction with one or more factors to authenticate the user's identity.

*Proposed Regulations:* The proposed regulations would modify the definition of *directory information* to clarify that an educational agency or institution may designate as directory information and nonconsensually disclose a student ID number or other unique personal

identifier that is displayed on a student ID card or badge if the identifier cannot be used to gain access to education records except when used in conjunction with one or more factors that authenticate the user's identity, such as a PIN, password, or other factor known or possessed only by the authorized user.

*Reasons:* Directory information items, such as name, photograph, and student ID number, are the types of information that are typically displayed on a student ID card or badge. For the reasons outlined in our discussion later in this notice regarding the proposed changes in § 99.37(c), the proposed change to the definition of *directory information* is needed to clarify that FERPA permits educational agencies and institutions to designate student ID numbers as directory information in the public notice provided to parents and eligible students in attendance at the agency or institution under § 99.37(a)(1). Including the designation of student ID numbers as a directory information item will permit schools to disclose as directory information a student ID number on a student ID card or badge if the student ID number cannot be used to gain access to education records except when used in conjunction with one or more factors that authenticate the user's identity. In situations where a student's social security number is used as the student's ID number, that number may not be designated as directory information, even for purposes of a student's ID card or badge.

**Education Program (§§ 99.3, 99.35)**

*Statute:* The statute does not define the term *education program.*

*Current Regulations:* The term *education program,* which is used in current § 99.35(a)(1), is not defined in the current regulations. Current § 99.35(a)(1) provides that authorized representatives of the officials or agencies headed by officials listed in § 99.31(a)(3) may have non-consensual access to personally identifiable information from education records in connection with an audit or evaluation of Federal or State supported "education programs", or for the enforcement of or compliance with Federal legal requirements that relate to those programs.

*Proposed Regulations:* We propose to define the term *education program* to mean any program that is principally engaged in the provision of education, including, but not limited to early childhood education, elementary and secondary education, postsecondary education, special education, job training, career and technical education,

and adult education, regardless of whether the program is administered by an educational authority.

*Reasons:* The proposed definition of *education program* in § 99.3 is intended to establish that a program need not be administered by an educational agency or institution in order for it to be considered an education program for purposes of § 99.35(a)(1) and 20 U.S.C. 1232g(b)(1). The Secretary recognizes that education may begin before kindergarten and may involve learning outside of postsecondary institutions. However, in many States, programs that the Secretary would regard as education programs are not administered by SEAs or LEAs. For example, in many States, State-level health and human services departments administer early childhood education programs, including early intervention programs authorized under Part C of the Individuals with Disabilities Education Act (IDEA). Similarly, agencies other than SEAs may administer career and technical education or adult education programs. Because all of these programs could benefit from the type of rigorous data-driven evaluation that SLDS will facilitate, we are proposing to define the term *education program* to include these programs that are not administered by education agencies. This proposed change would provide greater access to information on students before entering or exiting the P–16 programs. The information could be used to evaluate these education programs and provide increased opportunities to build upon successful ones and improve less successful ones. In order to accomplish these objectives, and to give States the flexibility needed to develop and expand the SLDS contemplated under the ARRA, the Department proposes to interpret the term *education program,* as used in FERPA and its implementing regulations, to mean any program that is principally engaged in the provision of education, including, but not limited to, early childhood education, elementary and secondary education, postsecondary education, special education, job training, career and technical education, and adult education, even when agencies other than SEAs administer such a program.[1] Thus, as an example, under the proposed definitions of the terms, *authorized representative* and *education program,* FERPA would permit a State educational authority to

designate a State health and human services agency as its authorized representative in order to conduct an audit or an evaluation of any Federal or State supported education program, such as the Head Start program.

**Research Studies (§ 99.31(a)(6))**

*Statute:* Section (b)(1)(F) of FERPA permits educational agencies and institutions non-consensually to disclose PII to organizations conducting studies for, or on behalf of, educational agencies and institutions to improve instruction, to administer student aid programs, or to develop, validate, or administer predictive tests.

*Current Regulations:* Current § 99.31(a)(6)(ii)(C) requires that an educational agency or institution enter into a written agreement with the organization conducting the study that specifies the purpose, scope, and duration of the study and the information to be disclosed and meets certain other requirements. Current regulations do not indicate whether State and local educational authorities and agencies headed by officials listed in § 99.31(a)(3) that may redisclose PII on behalf of educational agencies and institutions under § 99.33(b) may also enter into this type of written agreement.

*Proposed Regulations:* The Secretary proposes to amend § 99.31 by redesignating paragraphs (a)(6)(ii) through (a)(6)(v) as paragraphs (a)(6)(iii) through (a)(6)(vi) and adding a new paragraph (a)(6)(ii). This new paragraph would clarify that nothing in FERPA or its implementing regulations prevents a State or local educational authority or agency headed by an official listed in § 99.31(a)(3) from entering into agreements with organizations conducting studies under § 99.31(a)(6)(i) and redisclosing PII on behalf of the educational agencies and institutions that provided the information in accordance with the requirements of § 99.33(b). We also propose to amend § 99.31(a)(6) to require written agreements between a State or local educational authority or agency headed by an official listed in § 99.31(a)(3) and any organization conducting studies with redisclosed PII under this exception (*see* proposed § 99.31(a)(6)(iii)(C)). Under this amended regulatory provision, these agreements would need to contain the specific provisions currently required in agreements between educational agencies or institutions and such organizations under current § 99.31(a)(6)(ii)(C). Thus, the only differences between proposed § 99.31(a)(6)(iii)(C) and current

§ 99.31(a)(6)(ii)(C) would be to make the written agreement requirements apply to State or local educational authorities or agencies headed by an official listed in § 99.31(a)(3) as well as educational agencies and institutions. Finally, newly redesignated § 99.31(a)(6)(iv) and (a)(6)(v) would be revised to ensure that these provisions apply to State and local educational authorities or agencies headed by an official listed in § 99.31(a)(3)—not only educational agencies and institutions.

*Reasons:* In the preamble to the FERPA regulations published in the **Federal Register** on December 9, 2008 (73 FR 74806, 74826), the Department explained that an SEA or other State educational authority that has legal authority to enter into agreements for LEAs or postsecondary institutions under its jurisdiction may enter into an agreement with an organization conducting a study for the LEA or institution under the studies exception in § 99.31(a)(6). The preamble explained further that if the SEA or other State educational authority does not have the legal authority to act for or on behalf of an LEA or institution, then the SEA or other State educational authority would not be permitted to enter into an agreement with an organization under this exception. The changes reflected in proposed § 99.31(a)(6)(ii) are necessary to clarify that while FERPA does not confer legal authority on State and Federal agencies to enter into agreements and act on behalf of or in place of LEAs and postsecondary institutions, nothing in FERPA prevents them from entering into these agreements and redisclosing PII on behalf of LEAs and postsecondary institutions to organizations conducting studies under § 99.31(a)(6) in accordance with the redisclosure requirements in § 99.33(b).

As explained in the preamble to the December 2008 regulations (*see* 73 FR 74806, 74821), the Department recognizes that the State and local educational authorities and Federal officials that receive PII without consent under § 99.31(a)(3) are generally responsible for supervising and monitoring LEAs and postsecondary institutions. SEAs and State higher educational agencies, in particular, typically have the role and responsibility to perform and support research and evaluation of publicly funded education programs for the benefit of multiple educational agencies and institutions in their States. We understand further that these relationships generally provide sufficient authority for a State educational authority to enter into an

---

[1] We intend for the proposed definition of the term *education program* to include, but not be limited to, any applicable program, as that term is defined in section 400 of the General Education Provisions Act (20 U.S.C. 1221).

agreement with an organization conducting a study and to redisclose PII received from educational agencies and institutions that provided the information in accordance with § 99.33(b). The proposed regulations, therefore, would clarify that studies supported by these State and Federal authorities of publicly funded education programs generally may be conducted, while simultaneously ensuring that any PII disclosed is appropriately protected by the organizations conducting the studies.

In the event that an educational agency or institution objects to the redisclosure of PII it has provided, the State or local educational authority or agency headed by an official listed in § 99.31(a)(3) may rely instead on any independent authority it has to further disclose the information on behalf of the agency or institution. The Department recognizes that this authority may be implied and need not be explicitly granted.

**Authority To Audit or Evaluate (§ 99.35)**

*Statute:* Sections (b)(1)(C), (b)(3) and (b)(5) of FERPA (20 U.S.C. 1232g(b)(1)(C), (b)(3) and (b)(5)) permit educational agencies and institutions non-consensually to disclose PII to authorized representatives of State and local educational authorities, the Secretary, the Attorney General of the United States, and the Comptroller General of the United States, as may be necessary in connection with the audit, evaluation, or the enforcement of Federal legal requirements related to Federal or State supported education programs.

*Current Regulations:* Current § 99.35(a)(2) provides that in order for a State or local educational authority or other agency headed by an official listed in § 99.31(a)(3) to conduct an audit, evaluation, or compliance or enforcement activity, its authority to do so must be established under other Federal, State, or local authority because that authority is not conferred by FERPA.

*Proposed Regulations:* The Secretary proposes to amend § 99.35(a)(2) by removing the provision that a State or local educational authority or other agency headed by an official listed in § 99.31(a)(3) must establish legal authority under other Federal, State or local law to conduct an audit, evaluation, or compliance or enforcement activity.

*Reasons:* Current §§ 99.33(b)(1) and 99.35(b)(1) permit State and local educational authorities and agencies headed by officials listed in § 99.31(a)(3)

to further disclose PII from education records on behalf of educational agencies or institutions to other authorized recipients under § 99.31, including separate State educational authorities at different levels of education, provided that the rediscovere meets the requirements of § 99.33(b)(1) and the recordkeeping requirements in § 99.32(b). However, we believe that our prior guidance and statements made in the preambles to the notice of proposed rulemaking published on March 24, 2008 (73 FR 15574), and the final regulations published on December 9, 2008 (73 FR 74806), may have created some confusion about whether a State or local educational authority or agency headed by an official listed in § 99.31(a)(3) that receives PII under the audit and evaluation exception must be authorized to conduct an audit or evaluation of a Federal or State supported education program, or enforcement or compliance activity in connection with Federal legal requirements related to the education program of the disclosing educational agency or institution or whether the PII may be disclosed in order for the recipient to conduct an audit, evaluation, or enforcement or compliance activity with respect to the recipient's own Federal or State supported education programs.

By removing the language concerning legal authority from current § 99.35(a)(2), the Department would clarify two things to eliminate this confusion. First, the Department would clarify that the authority for a State or local educational authority or Federal agency headed by an official listed in § 99.31(a)(3) to conduct an audit, evaluation, enforcement or compliance activity may be express or implied. And, second, the Department would clarify that FERPA permits non-consensual disclosure of PII to a State or local educational authority or agency headed by an official listed in § 99.31(a)(3) to conduct an audit, evaluation, or compliance or enforcement activity with respect to the Federal or State supported education programs of the recipient's own Federal or State supported education programs as well as those of the disclosing educational agency or the institution.

The Department intends these clarifications to promote Federal initiatives to support the robust use of data by State and local educational authorities to evaluate the effectiveness of Federal or State supported education programs. The provision of postsecondary student data to P–12 data systems is vital to evaluating whether

P–12 schools are effectively preparing students for college. This proposed clarification would, for example, establish that FERPA does not prohibit a private postsecondary institution from non-consensually disclosing to an LEA PII on the LEA's former students who are now in attendance at the private postsecondary institution, as may be necessary for the LEA to evaluate the Federal or State supported education programs that the LEA administers. This proposed clarification similarly would establish that FERPA does not prohibit a postsecondary data system from non-consensually redisclosing PII to an SEA in connection with the SEA's evaluation of whether the State's LEAs effectively prepared their graduates to enroll, persist, and succeed in postsecondary education.

**Directory Information (§ 99.37)**

*Section 99.37(c) (Student ID Cards and ID Badges)*

*Statute:* The statute does not address whether parents and eligible students may use their right to opt out of directory information disclosures to prevent school officials from requiring students to disclose ID cards or to wear ID badges.

*Current Regulations:* Current regulations do not address whether parents and eligible students may use their right to opt out of directory information disclosures to prevent school officials from requiring students to disclose ID cards or to wear ID badges.

*Proposed Regulations:* The proposed regulations would provide in § 99.37(c) that parents or eligible students may not use their right to opt out of directory information disclosures to prevent an educational agency or institution from requiring students to wear or otherwise disclose student ID cards or badges that display information that may be designated as directory information under § 99.3 and that has been properly designated by the educational agency or institution as directory information under § 99.37(a)(1).

*Reasons:* An increased awareness of school safety and security has prompted some educational agencies and institutions, especially school districts, to require students to wear and openly display a student ID badge that contains identifying information (typically, name, photo, and student ID number) when the student is on school property or participates in extracurricular activities. We have received inquiries about this issue, as well as complaints that the mandatory public display of identifying information on a student ID

badge violates the FERPA rights of parents and eligible students who have opted out of directory information disclosures. The proposed regulations are needed to clarify that the right to opt out of directory information disclosures is not a mechanism for students, when in school or at school functions, to refuse to wear student ID badges or to display student ID cards that display information that may be designated as directory information under § 99.3 and that has been properly designated by the educational agency or institution as directory information under § 99.37(a)(1). Because we recognize that the types of ID cards and badges that postsecondary institutions require may differ significantly from those required by elementary and secondary schools, we are requesting comments from postsecondary officials on whether this proposed change raises any particularized concerns for their institutions.

The directory information exception is intended to facilitate communication among school officials, parents, students, alumni, and others, and permits schools to publicize and promote institutional activities to the general public. Many schools do so by publishing paper or electronic directories that contain student names, addresses, telephone listings, e-mail addresses, and other information the institution has designated as directory information. Some schools do not publish a directory but do release directory information on a more selective basis. FERPA allows a parent or eligible student to opt out of these disclosures (under the conditions specified in § 99.37(a)), whether the information is made available to the general public, limited to members of the school community, or released only to specified individuals.

The Secretary believes, however, that the need for schools and college campuses to implement measures to ensure the safety and security of students is of the utmost importance and that FERPA should not be used as an impediment to achieving student safety. Thus, the right to opt out of the disclosure of directory information does not include the right to refuse to wear or otherwise disclose a student ID card or badge that displays directory information and, therefore, may not be used to impede a school's ability to monitor and control who is in school buildings or on school grounds or whether a student is where he or she should be. This proposed change would mean that, even when a parent or eligible student opts out of the disclosure of directory information, an

educational agency or institution may nevertheless require the student to wear and otherwise disclose a student ID card or badge that displays information that may be designated as directory information under § 99.3 and that has been properly designated by the educational agency or institution as directory information under § 99.37(a)(1).

**Section 99.37(d) (Limited Directory Information Policy)**

*Statute:* Under sections (a)(5), (b)(1), and (b)(2) of FERPA (20 U.S.C. 1232g(a)(5), (b)(1), and (b)(2)), an educational agency or institution may disclose directory information without meeting FERPA's written consent requirements provided that it first notifies the parents or eligible students of the types of information that may be disclosed and allows them to opt out of the disclosure. The statute lists a number of items in the definition of directory information, including a student's name, address, and telephone listing. The statute does not otherwise address whether an educational agency or institution may have a limited directory information policy in which it specifies the exact parties who may receive directory information, the specific purposes for which the directory information may be disclosed, or both.

*Current Regulations:* Section 99.37(a) requires an educational agency or institution to provide public notice to parents of students in attendance and eligible students in attendance of the types of directory information that may be disclosed and the parent's or eligible student's right to opt out.

*Proposed Regulations:* Proposed § 99.37(d) would clarify that an educational agency or institution may specify in the public notice it provides to parents and eligible students in attendance provided under § 99.37(a) that disclosure of directory information will be limited to specific parties, for specific purposes, or both. We also propose to clarify that an educational agency or institution that adopts a limited directory information policy must limit its directory information disclosures only to those parties and purposes that were specified in the public notice provided under § 99.37(a).

*Reasons:* Some school officials have advised us that their educational agencies and institutions do not have a directory information policy under FERPA, due to concerns about the potential misuse by members of the public of personally identifiable information about students, including potential identity theft. Clarifying that

the regulations permit educational agencies and institutions to have a limited directory information policy would give educational agencies and institutions greater discretion in protecting student privacy by permitting them to limit the release of directory information for specific purposes, to specific parties, or both. This proposed change also would provide a regulatory authority for FPCO to investigate and enforce a violation of a limited directory information policy by an educational agency or institution.

However, in order not to impose additional administrative burdens on educational agencies and institutions, the Department is not proposing changes to the recordkeeping requirement in § 99.32(d)(4), which currently excepts educational agencies and institutions from having to record the disclosure of directory information. For similar reasons, the Department is not proposing to amend the redisclosure provisions in § 99.33(c), which except the redisclosure of directory information from the general prohibition on redisclosure of personally identifiable information. While the Department is not proposing to regulate on the redisclosure of directory information by third parties that receive directory information from educational agencies or institutions under a limited directory information policy, we nevertheless strongly recommend that educational agencies and institutions that choose to adopt a limited directory information policy assess the need to protect the directory information from further disclosure by the third parties to which they disclose directory information; when a need to protect the information from further disclosure is identified, educational agencies and institutions should enter into non-disclosure agreements with the third parties.

**Enforcement Procedures With Respect to Any Recipient of Department Funds That Students Do Not Attend (§ 99.60)**

*Statute:* Sections (f) and (g) of FERPA (20 U.S.C. 1232g(f) and (g)) authorize the Secretary to take appropriate actions to enforce and address violations of FERPA in accordance with part D of the General Education Provisions Act (20 U.S.C. 1234 through 1234i) and to establish or designate an office and review board within the Department for the purpose of investigating, processing, reviewing, and adjudicating alleged violations of FERPA.

*Current Regulations:* Current § 99.60(b) designates the FPCO as the office within the Department responsible for investigating, processing, and reviewing alleged

violations of FERPA. Current subpart E of the FERPA regulations (§§ 99.60 through 99.67), however, only addresses alleged violations of FERPA committed by an educational agency or institution.

*Proposed Regulations:* Proposed § 99.60(a)(2) would provide that, solely for purposes of subpart E of the FERPA regulations, which addresses enforcement procedures, an "educational agency or institution" includes any public or private agency or institution to which FERPA applies under § 99.1(a)(2), as well as any State educational authority (*e.g.,* SEAs or postsecondary agency) or local educational authority or any other recipient to which funds have been made available under any program administered by the Secretary (*e.g.,* a nonprofit organization, student loan guaranty agency, or a student loan lender), including funds provided by grant, cooperative agreement, contract, subgrant, or subcontract.

*Reasons:* With the advent of SLDS, it is necessary for the Department to update our enforcement regulations to clearly set forth the Department's authority to investigate and enforce alleged violations of FERPA by State and local educational authorities or any other recipients of Department funds under a program administered by the Secretary. Current §§ 99.60 through 99.67 only apply the enforcement provisions in FERPA to an "educational agency or institution." Although the statute and the regulations broadly define the term "educational agency or institution," the Department generally has not interpreted the term to include entities that students do not attend. The Department's interpretation is based upon the fact that FERPA defines "education records" as information directly related to a "student," and that "student" is, in turn, defined as excluding a person who has not been in attendance at the educational agency or institution. 20 U.S.C. 1232g(a)(4) and (a)(6). Because students do not attend non-school types of entities the Department has generally not viewed these recipients of Department funds as being "educational agencies or institutions" under FERPA.

Consequently, the current regulations do not clearly authorize FPCO to investigate, review, and process an alleged violation committed by recipients of Department funds under a program administered by the Secretary in which students do not attend. In addition, the regulations do not clearly authorize the Secretary to bring an enforcement action against these recipients. Further, it would not be fair to hold an LEA or institution of higher

education (IHE) that originally disclosed the PII to a State or local educational authority responsible for violation of FERPA by the State or local educational authority because the LEA or IHE generally would not have an effective means to prevent such an improper redisclosure by a State or local educational authority.

Therefore, the Department proposes to add a new § 99.60(a)(2) that would clearly authorize the Department to hold State educational authorities(*e.g.,* SEAs and State postsecondary agencies), local educational authorities, as well as other recipients of Department funds under any program administered by the Secretary (*e.g.,* nonprofit organizations, student loan guaranty agencies, and student loan lenders), accountable for compliance with FERPA. The Department believes that this authority is especially important given the disclosures of PII needed to implement SLDS.

Because the Department has generally not viewed these entities as being "educational agencies or institutions" under FERPA and consequently has not viewed most FERPA provisions as applying to them (*e.g.,* the requirement in § 99.7 to annually notify parents and eligible students of their rights under FERPA, and the requirement in § 99.37 to give public notice to parents and eligible students about directory information, if it has a policy of disclosing directory information), we anticipate that most FERPA compliance issues will concern whether they have complied with FERPA's redisclosure provision in § 99.33.

We expect that we will face few issues concerning these entities' compliance with the few additional FERPA provisions that may be applicable to them. For example, the FERPA requirements, in addition to those in § 99.33, that may be applicable to entities that are not "educational agencies or institutions" under FERPA include, but are not limited to, the right to inspect and review education records maintained by an SEA or any of its components under § 99.10(a)(2), the requirement that organizations conducting studies under § 99.31(a)(6) must not permit the personal identification of parents and students by anyone other than representatives of that organization with legitimate interests in the information and must destroy or return personally identifiable information from education records when the information is no longer needed for the purposes for which the study was conducted, and the requirement in § 99.35(b)(2) that

personally identifiable information from education records that is collected by a State or local educational authority or agency headed by an official listed in § 99.31(a)(3) in connection with an audit or evaluation of Federal or State supported education programs, or to enforce Federal legal requirements related to Federal or State supported education programs, must be destroyed when no longer needed for these purposes.

**Executive Order 12866**

Under Executive Order 12866, the Secretary must determine whether this regulatory action is "significant" and therefore subject to the requirements of the Executive Order and subject to review by the Office of Management and Budget (OMB). Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action likely to result in a rule that may: (1) Have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local or Tribal governments or communities in a material way (also referred to as an "economically significant" rule); (2) create serious inconsistency or otherwise interfere with an action taken or planned by another agency; (3) materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order. The Secretary has determined that this regulatory action is significant under section 3(f) of the Executive order.

In accordance with Executive Order 12866, the Secretary has assessed potential costs and benefits of this regulatory action and determined that the benefits justify the costs.

**Need for Federal Regulatory Action**

These proposed regulations are needed to ensure that the Department's implementation of FERPA continues to protect the privacy of student education records, while allowing for the effective use of data in education records, particularly data in statewide longitudinal data systems.

**Summary of Costs and Benefits**

Following is an analysis of the costs and benefits of the proposed changes to the FERPA regulations, which would make changes to facilitate the disclosure, without written consent, of education records, particularly data in

AR 0008

**19734**    **Federal Register** / Vol. 76, No. 68 / Friday, April 8, 2011 / Proposed Rules

statewide longitudinal data systems, for the purposes of evaluating education programs and ensuring compliance with Federal and State requirements. In conducting this analysis, the Department examined the extent to which the proposed changes would add to or reduce the costs of educational agencies, other agencies, and institutions in complying with the FERPA regulations prior to these changes, and the extent to which the proposed changes are likely to provide educational benefit. Allowing data-sharing across agencies, because it increases the number of individuals who have access to personally identifiable information, may increase the risk of unauthorized disclosure. However, we do not believe that the staff in the additional agencies who will have access to the data are any more likely to violate FERPA than existing users, and the strengthened accountability and enforcement mechanisms will help to ensure better compliance overall. While there will be administrative costs associated with implementing data-sharing protocols, we believe that the relatively minimal administrative costs of establishing data-sharing protocols would be off-set by potential analytic benefits. Based on this analysis, the Secretary has concluded that the proposed modifications would result in savings to entities and have the potential to benefit the Nation by improving capacity to conduct analyses that will provide information needed to improve education.

**Authorized Representative**

The proposed regulations would amend § 99.3 by adding a definition of the term *authorized representative* that would include any individual or entity designated by an educational authority or certain other officials to carry out audits, evaluations, or enforcement or compliance activities relating to education programs. Under the current regulations, educational authorities may provide to authorized representatives PII for the purposes of conducting audits, evaluations, or enforcement and compliance activities relating to Federal and State supported education programs. The term "authorized representative" is not defined, but the Department's position has been that educational authorities may only disclose education records to entities over which they have direct control, such as an employee or a contractor of the authority. Therefore, SEAs have not been able to disclose PII to other State agencies, even for the purpose of evaluating education programs under

the purview of the SEAs. For example, an SEA or LEA could not disclose PII to a State employment agency for the purpose of obtaining data on post-school outcomes such as employment for its former students. Thus, if an SEA or LEA wanted to match education records with State employment records for purposes of evaluating its secondary education programs, it would have to import the entire workforce database and do the match itself (or contract with a third party to do the same analysis). Similarly, if a State workforce agency wanted to use PII maintained by the SEA in its longitudinal educational data system, in combination with data it had on employment outcomes, to evaluate secondary vocational education programs, it would not be able to obtain the SEA's educational data in order to conduct the analyses. It would have to provide the workforce data to the SEA to conduct the analyses or to a third party (*e.g.,* an entity under the direct control of the SEA) to construct the needed longitudinal administrative data systems. While feasible, these strategies force agencies to outsource their analyses to other agencies or entities, adding administrative cost, burden, and complexity. Moreover, preventing agencies from using data directly for conducting their own analytical work increases the likelihood that the work will not meet their expectations or get done at all. Finally, the current interpretation of the regulations exposes greater amounts of PII to risk of disclosure as a result of greater quantities of PII moving across organizations (*e.g.,* the entire workforce database) than would be the case with a more targeted data request (*e.g.,* graduates from a given year who appear in the workforce database). The proposed regulatory changes would permit educational agencies (and other entities listed in § 99.31(a)(3)) to non-consensually disclose PII to other State agencies or to house data in a common State data system, such as a data warehouse administered by a central State authority for the purposes of conducting audits or evaluations of Federal or State supported education programs, or for enforcement of and compliance with Federal legal requirements relating to Federal and State supported education programs (consistent with FERPA and other Federal and State confidentiality and privacy provisions).

The Department also proposes to amend § 99.35 to require that written agreements require PII to be used only to carry out an audit or an evaluation of Federal or State supported education

program or for an enforcement or compliance activity in connection with Federal legal requirements that relate to those programs and protect PII from unauthorized disclosure. The cost of entering into such agreements should be minimal in relation to the benefits of being able to share data.

**Education Program**

The proposed regulations would amend § 99.3 by providing a definition of the term *education program* to clarify that an education program can include a program administered by a non-educational agency, *e.g.,* an early childhood program administered by a human services agency or a career or technical training program administered by a workforce or labor agency. This proposed change, in combination with the proposed definition of the term *authorized representative,* would allow non-educational agencies to have easier access to PII in student education records that they could use to evaluate the education programs they administer. For example, this proposed change would permit nonconsensual disclosures of PII in elementary and secondary school education records to a non-educational agency that is administering an early childhood education program in order to evaluate the impact of its early childhood education program on its students' long-term educational outcomes. The potential benefits of this proposed change are substantial, including the benefits of non-educational agencies that are administering "education programs" being able to conduct their own analyses without incurring the prohibitive costs of obtaining consent for access to individual student records.

**Research Studies**

Section (b)(1)(F) of FERPA permits educational agencies and institutions non-consensually to disclose PII to organizations conducting research studies for, or on behalf of, educational agencies or institutions that provided the PII, for statutorily-specified purposes. The proposed amendment to § 99.31(a)(6) would permit any of the authorities listed in § 99.31(a)(3), including SEAs, to enter into written agreements that provide for the disclosure of PII to research organizations for studies that would benefit the educational agencies or institutions that provided the PII to the SEA or other educational authorities, whether or not the educational authority has explicit authority to act on behalf of those agencies or institutions. The preamble to the final FERPA regulations published in the **Federal Register** on

December 9, 2008 (73 FR 74806, 74826) took the position that an SEA, for example, cannot re-disclose PII obtained from LEAs to a research organization unless the SEA had separate legal authority to act on an LEA's (or other educational institution's) behalf. Because, in practice, this authority may not be explicit in all States, we propose to amend § 99.31 to specifically allow State educational authorities to enter into agreements with research organizations for studies that are for enumerated purposes under FERPA, such as studies to improve instruction (*see* proposed § 99.31(a)(6)(ii)). The Department believes that this change will have benefits for education because it would reduce the administrative costs of, and reduce the barriers to, using student data, including data in SLDS, in order to conduct studies to improve education programs.

**Authority to Evaluate**

Under current § 99.35(a)(2), the authority for an SEA or LEA to conduct an audit, evaluation, or compliance or enforcement activity is not conferred by FERPA, but "must be established under other Federal, State, or local authority." Lack of such explicit State or local authority has hindered the use of data in some States. The proposed amendments would remove the discussion of legal authority in order to clarify that FERPA and its implementing regulations do not require that a State or local educational authority have express legal authority to conduct audits, evaluations, or compliance or enforcement activities, but instead may obtain PII when they have implied authority to conduct evaluation, audit, and compliance activities of their own programs.

This proposed change also would allow an SEA to receive PII from postsecondary institutions as needed to evaluate its own programs and determine whether its schools are adequately preparing students for higher education. The preamble to the final FERPA regulations published in the **Federal Register** on December 9, 2008 (73 FR 74806, 74822) suggested that PII in the records of postsecondary institutions could only be disclosed to an SEA if the SEA has legal authority to evaluate postsecondary institutions. This interpretation restricts SEAs from conducting analyses to determine how effectively they are preparing students for higher education and from identifying effective programs, and thus has hindered efforts to improve education. The primary benefit of this proposed change is that it would allow SEAs to conduct analyses (consistent

with FERPA and other Federal and State confidentiality and privacy provisions) that they previously were unable to undertake, without incurring the prohibitive costs of obtaining consent from students or parents in order to obtain, without prior, written consent, PII for the purpose of program evaluations.

**Educational Agency or Institution**

Sections (f) and (g) of FERPA authorize the Secretary to take appropriate actions to enforce and deal with FERPA violations, but subpart E of the FERPA regulations only addresses alleged violations of FERPA by an "educational agency or institution." Because the Department has not interpreted that term to include agencies or institutions that students do not attend, the current FERPA regulations do not specifically permit the Secretary to bring an enforcement action against an SEA or other State or local educational authority that does not meet the definition of an "educational agency or institution" under FERPA. Thus, for example, if an SEA improperly redisclosed PII obtained from its LEAs, the Department would pursue enforcement actions against each of the LEAs, and not the SEA. Proposed § 99.60(a)(2), which would define an "educational agency or institution" to include any State or local educational authority or other recipient that has received Department of Education funds, would allow the Department to pursue enforcement against a State agency or other recipient of Department funds that had allegedly disclosed the PII, rather than against the agency or institution that had provided the PII to the State agency or other recipient of Department funds.

This change would result in some administrative savings and improve the efficiency of the enforcement process. Under the current regulations, if, for example, an SEA with 500 LEAs improperly redisclosed PII from its SLDS to an unauthorized party, the Department would need to investigate each of the 500 LEAs, which are unlikely to have knowledge relating to the disclosure. Under the proposed change, the LEAs would be relieved of any administrative costs associated with responding to the Department's request for information about the disclosure and the Department could immediately direct the focus of its investigation on the SEA, the agency most likely to have information on and bear responsibility for the disclosure of PII, without having to waste time and resources contacting the LEAs.

We welcome public input and data to further inform and allow us to quantify the costs and benefits of these proposed changes. We particularly welcome information on the costs encountered by State agencies using education data maintained by SEAs and the impediments to using postsecondary education data.

*2. Clarity of the Regulations*

Executive Order 12866 and the Presidential memorandum on "Plain Language in Government Writing" require each agency to write regulations that are easy to understand.

The Secretary invites comments on how to make these proposed regulations easier to understand, including answers to questions such as the following:

• Are the requirements in the proposed regulations clearly stated?

• Do the proposed regulations contain technical terms or other wording that interferes with their clarity?

• Does the format of the proposed regulations (grouping and order of sections, use of headings, paragraphing, *etc.*) aid or reduce their clarity?

• Would the proposed regulations be easier to understand if we divided them into more (but shorter) sections? (A "section" is preceded by the symbol "§" and a numbered heading; for example, § 99.35.)

• Could the description of the proposed regulations in the SUPPLEMENTARY INFORMATION section of this preamble be more helpful in making the proposed regulations easier to understand? If so, how?

• What else could we do to make the proposed regulations easier to understand?

To send any comments that concern how the Department could make these proposed regulations easier to understand, *see* the instructions in the ADDRESSES section of this preamble.

**Regulatory Flexibility Act Certification**

The Secretary certifies that this regulatory action will not have a significant economic impact on a substantial number of small entities.

The small entities that this final regulatory action will affect are small LEAs. The Secretary believes that the costs imposed on applicants by these regulations would be limited to paperwork burden related to requirements concerning data-sharing agreements and that the benefits from ensuring that data from education records are collected, stored, and shared appropriately outweigh any costs incurred by applicants.

The U.S. Small Business Administration Size Standards define as

"small entities" for-profit or nonprofit institutions with total annual revenue below $7,000,000 or, if they are institutions controlled by small governmental jurisdictions (that are comprised of cities, counties, towns, townships, villages, school districts, or special districts), with a population of less than 50,000.

According to estimates from the U.S. Census Bureau's Small Area Income and Poverty Estimates programs that were based on school district boundaries for the 2007–8 school year, there are 12,484 LEAs in the country that include fewer than 50,000 individuals within their boundaries and for which there is estimated to be at least one school-age child. In its 1997 publication, *Characteristics of Small and Rural School Districts,* the National Center for Education Statistics defined a small school district as "one having fewer students in membership than the sum of (a) 25 students per grade in the elementary grades it offers (usually K–8) and (b) 100 students per grade in the secondary grades it offers (usually 9–12)." Using this definition, a district would be considered small if it had fewer than 625 students in membership. The Secretary believes that the 4,800 very small LEAs that meet this second definition are highly unlikely to enter into data-sharing agreements directly with outside entities.

The Department does not have reliable data with which to estimate how many of the remaining 7,684 small LEAs would enter into data-sharing agreements. For small LEAs that enter into data-sharing agreements, we estimate that they would spend approximately 4 hours executing each agreement, using a standard data-sharing protocol. Thus, we assume the impact on the entities would be minimal. However, we invite comment from entities familiar with data-sharing in small districts on the number of entities likely to enter into agreements each year, the number of such agreements, and number of hours required to execute each agreement.

**Federalism**

Executive Order 13132 requires us to ensure meaningful and timely input by State and local elected officials in the development of regulatory policies that have federalism implications.

"Federalism implications" means substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. The proposed regulations in §§ 99.3, 99.31(a)(6), and

99.35 may have federalism implications, as defined in Executive Order 13132, in that they will have some effect on the States and the operation of educational agencies and institutions subject to FERPA. We encourage State and local elected officials to review and provide comments on these proposed regulations. To facilitate review and comment by appropriate State and local officials, the Department will, aside from publication in the **Federal Register**, post the NPRM to the FPCO Web site and to the Privacy Technical Assistance Center (PTAC) Web site and make a specific e-mail posting via a special listserv that is sent to each State department of education superintendent and higher education commission director.

**Paperwork Reduction Act of 1995**

Proposed §§ 99.31(a)(6)(ii) and 99.35(a)(3) contain information collection requirements. Under the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)), the Department of Education has submitted a copy of these sections to the Office of Management and Budget (OMB) for its review. (OMB Control Number 1875–0246.)

The proposed regulations modify the information collection requirements in § 99.31(a)(6)(ii) and § 99.32(b)(2); however, the Department does not believe the proposed changes add any new burden to State or local educational authorities. Burdens associated with §§ 99.31(a)(6)(ii) and 99.32(b)(2) were approved under OMB Control Number 1875–0246 when the December 9, 2008 regulations were published. The proposed change that would clarify that nothing in FERPA prevents a State or local educational authority or Federal agencies and officials listed in § 99.31(a)(3) from entering into written agreements with organizations conducting studies, for or on behalf of educational agencies and institutions does not constitute a change or an increase in burden. This is because the provision would permit an organization conducting a study to enter into one written agreement with a State or local educational authority or Federal agency or official listed in § 99.31(a)(3), rather than making the organization enter into many more written agreements with each school district or school that provided the data to the State or local educational authority or Federal agency or official listed in § 99.31(a)(3). The addition of the definition of the term *authorized representative,* which would permit a State or local educational authority, the Secretary, the Comptroller General of the United States, or the Attorney General of the United States to

designate any entity or individual to conduct—with respect to Federal or State supported education programs— any audit, evaluation, or compliance or enforcement activity in connection with Federal legal requirements that related to those programs also does not constitute a change or an increase in burden because these entities are already required to record disclosures, pursuant to § 99.32(b)(2).

Section 99.35(a)(3) would be a new requirement that requires the agency headed by an official listed in § 99.31(a)(3) to use a written agreement to designate any authorized representative other than an agency employee. Under the proposed regulations, the agreement would need to: (1) Designate the individual or entity as an authorized representative; (2) specify the information to be disclosed and the purpose for which the information is disclosed to the authorized representative (*i.e.,* to carry out an audit or evaluation of Federal or State supported education programs, or for the enforcement of or compliance with Federal legal requirements that relate to those programs); (3) require the authorized representative to destroy or return to the State or local educational authority or agency headed by an official listed in § 99.31(a)(3) personally identifiable information from education records when the information is no longer needed for the purpose specified; (4) specify the time period in which the information must be returned or destroyed; and (5) establish policies and procedures consistent with FERPA and other Federal and State privacy and confidentiality provisions to protect personally identifiable information from education records from further disclosure (except back to the disclosing entity) and unauthorized use, included limiting use of information by only those authorized representatives of the entity with legitimate interested. The burden for States under this provision is estimated at 40 hours annually for each educational authority (one for K–12 and one for postsecondary).

If you want to comment on the proposed information collection requirements in these proposed regulations, please send your comments to the Office of Information and Regulatory Affairs, OMB, Attention: Desk Officer for the U.S. Department of Education. Send these comments by e-mail to *OIRA_DOCKET@omb.eop.gov* or by fax to (202) 395–6974. Commenters need only submit comments via one submission medium. You may also send a copy of these comments to the Department contact

named in the **ADDRESSES** section of this preamble.

We consider your comments on these proposed collections of information in—

• Deciding whether the proposed collections are necessary for the proper performance of our functions, including whether the information will have practical use;

• Evaluating the accuracy of our estimate of the burden of the proposed collections, including the validity of our methodology and assumptions;

• Enhancing the quality, usefulness, and clarity of the information we collect; and

• Minimizing the burden on those who must respond. This includes exploring the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology; *e.g.,* permitting electronic submission of responses.

OMB is required to make a decision concerning the collection of information contained in these proposed regulations between 30 and 60 days after publication of this document in the **Federal Register**. Therefore, to ensure that OMB gives your comments full consideration, it is important that OMB receives the comments within 30 days of publication. This does not affect the deadline for your comments to us on the proposed regulations.

**Intergovernmental Review**

This program is not subject to Executive Order 12372 and the regulations in 34 CFR part 79.

**Assessment of Educational Impact**

In accordance with section 411 of the General Education Provisions Act, 20 U.S.C. 1221e–4, the Secretary particularly requests comments on whether these proposed regulations would require transmission of information that any other agency or authority of the United States gathers or makes available.

**Electronic Access to This Document**

You may view this document, as well as all other Department of Education documents published in the **Federal Register**, in text or Adobe Portable Document Format (PDF) on the Internet at the following site: *http://www.ed.gov/news/fedregister.*

To use PDF, you must have Adobe Acrobat Reader, which is available free at this site.

**Note:** The official version of this document is the document published in the **Federal Register**. Free Internet access to the official edition of the **Federal Register** and the Code

of Federal Regulations is available via the Federal Digital System at *http://www.gpo.gov/fdsys.*

(Category of Federal Domestic Assistance Number does not apply.)

**List of Subjects in 34 CFR Part 99**

Administrative practice and procedure, Education records, Education research, Information, Personally identifiable information, Privacy, Records, Statewide longitudinal data systems.

Dated: April 1, 2011.

**Arne Duncan,**

*Secretary of Education.*

For the reasons discussed in the preamble, the Secretary proposes to amend part 99 of title 34 of the Code of Federal Regulations as follows:

**PART 99—FAMILY EDUCATIONAL RIGHTS AND PRIVACY**

1. The authority citation for part 99 continues to read as follows:

**Authority:** 20 U.S.C. 1232g, unless otherwise noted.

2. Section 99.3 is amended by:
A. Adding, in alphabetical order, definitions for "authorized representative" and "education program".
B. Revising the definition of "directory information".

The additions and revision read as follows:

**§ 99.3   What definitions apply to these regulations?**

\*    \*    \*    \*    \*

*Authorized representative* means any entity or individual designated by a State or local educational authority or an agency headed by an official listed in § 99.31(a)(3) to conduct—with respect to Federal or State supported education programs—any audit, evaluation, or compliance or enforcement activity in connection with Federal legal requirements that relate to those programs.

(Authority: 20 U.S.C. 1232g(b)(1)(C), (3), and (5))

\*    \*    \*    \*    \*

*Directory information* means information contained in an education record of a student that would not generally be considered harmful or an invasion of privacy if disclosed.

(a) Directory information includes, but is not limited to, the student's name; address; telephone listing; electronic mail address; photograph; date and place of birth; major field of study; grade level; enrollment status (*e.g.,* undergraduate or graduate, full-time or part-time); dates of attendance;

participation in officially recognized activities and sports; weight and height of members of athletic teams; degrees, honors, and awards received; and the most recent educational agency or institution attended.

(b) Directory information does not include a student's—

(1) Social security number; or

(2) Student identification (ID) number, except as provided in paragraph (c) of this section.

(c) Directory information includes—

(1) A student ID number, user ID, or other unique personal identifier used by a student for purposes of accessing or communicating in electronic systems, but only if the identifier cannot be used to gain access to education records except when used in conjunction with one or more factors that authenticate the user's identity, such as a personal identification number (PIN), password or other factor known or possessed only by the authorized user; and

(2) A student ID number or other unique personal identifier that is displayed on a student ID badge, but only if the identifier cannot be used to gain access to education records except when used in conjunction with one or more factors that authenticate the user's identity, such as a PIN, password, or other factor known or possessed only by the authorized user.

(Authority: 20 U.S.C. 1232g(a)(5)(A))

\*    \*    \*    \*    \*

*Education program* means any program that is principally engaged in the provision of education, including, but not limited to, early childhood education, elementary and secondary education, postsecondary education, special education, job training, career and technical education, and adult education.

(Authority: 20 U.S.C. 1232g(b)(3), (5))

\*    \*    \*    \*    \*

3. Section 99.31 is amended by:
A. Redesignating paragraphs (a)(6)(ii) through (v) as paragraphs (a)(6)(iii) through (vi), respectively.
B. Adding a new paragraph (a)(6)(ii).
C. Revising the introductory text of newly redesignated paragraph (a)(6)(iii).
D. Revising the introductory text of newly redesignated paragraph (a)(6)(iii)(C).
E. Revising newly redesignated paragraph (a)(6)(iii)(C)(*4*).
F. Revising newly redesignated paragraph (a)(6)(iv).
G. Revising newly redesignated paragraph (a)(6)(v).

The addition and revisions read as follows:

**§ 99.31   Under what conditions is prior consent not required to disclose information?**

(a) * * *

(6) * * *

(ii) Nothing in the Act or this part prevents a State or local educational authority or agency headed by an official listed in paragraph (a)(3) of this section from entering into agreements with organizations conducting studies under paragraph (a)(6)(i) of this section and redisclosing personally identifiable information from education records on behalf of educational agencies and institutions that disclosed the information to the State or local educational authority or agency headed by an official listed in paragraph (a)(3) of this section in accordance with the requirements of § 99.33(b).

(iii) An educational agency or institution may disclose personally identifiable information under paragraph (a)(6)(i) of this section, and a State or local educational authority or agency headed by an official listed in paragraph (a)(3) of this section may redisclose personally identifiable information under paragraph (a)(6)(i) and (a)(6)(ii) of this section, only if—

*       *       *       *       *

(C) The educational agency or institution or the State or local educational authority or agency headed by an official listed in paragraph (a)(3) of this section enters into a written agreement with the organization that—

*       *       *       *       *

(4) Requires the organization to destroy or return to the educational agency or institution or the State or local educational authority or agency headed by an official listed in paragraph (a)(3) of this section all personally identifiable information when the information is no longer needed for the purposes for which the study was conducted and specifies the time period in which the information must be returned or destroyed.

(iv) An educational agency or institution or State or local educational authority or agency headed by an official listed in paragraph (a)(3) of this section is not required to initiate a study or agree with or endorse the conclusions or results of the study.

(v) If the Family Policy Compliance Office determines that a third party, outside the educational agency or institution, or the State or local educational authority or agency headed by an official listed in paragraph (a)(3) of this section to which personally identifiable information is disclosed under paragraph (a)(6) of this section, violates paragraph (a)(6)(iii)(B) of this

section, then the educational agency or institution, or the State or local educational authority or agency listed in paragraph (a)(3) of this section from which the personally identifiable information originated may not allow the third party responsible for the violation of paragraph (a)(6)(iii)(B) of this section access to personally identifiable information from education records for at least five years.

*       *       *       *       *

4. Section 99.35 is amended by:

A. Revising paragraph (a)(2).

B. Adding a new paragraph (a)(3).

C. Revising paragraph (b).

D. Adding a new paragraph (d).

E. Revising the authority citation at the end of the section.

The additions and revisions read as follows:

**§ 99.35   What conditions apply to disclosure of information for Federal or State program purposes?**

(a) * * *

(2) The State or local educational authority or agency headed by an official listed in § 99.31(a)(3) is responsible for using reasonable methods to ensure that any entity or individual designated as its authorized representative—

(i) Uses personally identifiable information from education records only to carry out an audit, evaluation, or an activity for the purpose of enforcement of, or ensuring compliance with, Federal legal requirements related to Federal or State supported education programs;

(ii) Protects the personally identifiable information from further disclosures or other uses, except as authorized in paragraph (b)(1) of this section; and

(iii) Destroys the personally identifiable information in accordance with the requirements of paragraphs (b) and (c) of this section.

(3) The State or local educational authority or agency headed by an official listed in § 99.31(a)(3) must use a written agreement to designate any authorized representative, other than an employee. The written agreement must—

(i) Designate the individual or entity as an authorized representative;

(ii) Specify the information to be disclosed and that the purpose for which the information is disclosed to the authorized representative is to carry out an audit or evaluation of Federal or State supported education programs, or to enforce or to comply with Federal legal requirements that relate to those programs;

(iii) Require the authorized representative to destroy or return to the

State or local educational authority or agency headed by an official listed in § 99.31(a)(3) personally identifiable information from education records when the information is no longer needed for the purpose specified;

(iv) Specify the time period in which the information must be returned or destroyed; and

(v) Establish policies and procedures, consistent with FERPA and other Federal and State confidentiality and privacy provisions, to protect personally identifiable information from education records from further disclosure (except back to the disclosing entity) and unauthorized use, including limiting use of personally identifiable information to only authorized representatives with legitimate interests.

(b) Information that is collected under paragraph (a) of this section must—

(1) Be protected in a manner that does not permit personal identification of individuals by anyone other than the authorities or agencies headed by officials referred to in paragraph (a) of this section and their authorized representatives, except that those authorities and agencies may make further disclosures of personally identifiable information from education records on behalf of the educational agency or institution in accordance with the requirements of § 99.33(b); and

(2) Be destroyed when no longer needed for the purposes listed in paragraph (a) of this section.

*       *       *       *       *

(d) If the Family Policy Compliance Office finds that a State or local educational authority, an agency headed by an official listed in § 99.31(a)(3), or an authorized representative of a State or local educational authority or an agency headed by an official listed in § 99.31(a)(3), improperly rediscloses personally identifiable information from education records, the educational agency or institution from which the personally identifiable information originated may not allow the authorized representative, or the State or local educational authority or the agency headed by an official listed in § 99.31(a)(3), or both, access to personally identifiable information from education records for at least five years.

(Authority: 20 U.S.C. 1232g(b)(1)(C), (3), and (5))

5. Section 99.37 is amended by:

A. Revising paragraph (c).

B. Redesignating paragraph (d) as paragraph (e) and adding a new paragraph (d).

The additions and revisions read as follows:

AR 0013

## § 99.37 What conditions apply to disclosing directory information?

\* \* \* \* \*

(c) A parent or eligible student may not use the right under paragraph (a)(2) of this section to opt out of directory information disclosures to—

(1) Prevent an educational agency or institution from disclosing or requiring a student to disclose the student's name, identifier, or institutional e-mail address in a class in which the student is enrolled; or

(2) Prevent an educational agency or institution from requiring a student to wear, to display publicly, or to disclose a student ID card or badge that exhibits information that may be designated as directory information under § 99.3 and that has been properly designated by the educational agency or institution as directory information in the public notice provided under paragraph (a)(1) of this section.

(d) In its public notice to parents and eligible students in attendance at the agency or institution that is described in paragraph (a) of this section, an educational agency or institution may specify that disclosure of directory information will be limited to specific parties, for specific purposes, or both. When an educational agency or institution specifies that disclosure of directory information will be limited to specific parties, for specific purposes, or both, the educational agency or institution must limit its directory information disclosures to those specified in its public notice that is described in paragraph (a) of this section.

\* \* \* \* \*

6. Section 99.60 is amended by redesignating paragraph (a) as paragraph (a)(1) and adding a new paragraph (a)(2) to read as follows:

## § 99.60 What functions has the Secretary delegated to the Office and to the Office of Administrative Law Judges?

(a) \* \* \*

(2) Solely for the purposes of this subpart, an "educational agency or institution" includes any public or private agency or institution to which this part applies under § 99.1(a)(2), as well as any State or local educational authority or any other recipient to which funds have been made available under any program administered by the Secretary, including funds provided by grant, cooperative agreement, contract, subgrant, or subcontract.

\* \* \* \* \*

[FR Doc. 2011–8205 Filed 4–7–11; 8:45 am]

**BILLING CODE 4000–01–P**

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

[EPA–R06–OAR–2005–TX–0013; FRL–9290–1]

## Approval and Promulgation of Implementation Plans; Texas; System Cap Trading Program

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Withdrawal of proposed rule.

**SUMMARY:** On November 18, 2010 (75 FR 70654), EPA published a proposed rule to disapprove severable portions of two revisions to the Texas State Implementation Plan (SIP) submitted by the State of Texas on May 1, 2001, and August 16, 2007, that create and amend the System Cap Trading (SCT) Program at Title 30 Texas Administrative Code, Chapter 101—General Air Quality, Subchapter H—Emissions Banking and Trading, Division 5, sections 101.380, 101.382, 101.383, and 101.385. We proposed disapproval because the SCT Program lacks several necessary

components for emissions trading programs as outlined in EPA's Economic Incentive Program Guidance. Subsequent to our proposed disapproval, EPA received a letter dated March 4, 2011, from the Texas Commission on Environmental Quality (TCEQ) stating that the May 1, 2001, and August 16, 2007, SCT Program SIP submissions have been withdrawn from our consideration as revisions to the Texas SIP. Therefore, EPA is withdrawing our proposed disapproval and finds that no further action is necessary on the SCT Program. The State's action also withdraws from EPA's review the SCT Program component of the January 22, 2010 Consent Decree between EPA and the BCCA Appeal Group, Texas Association of Business, and Texas Oil and Gas Association. This withdrawal is being taken under section 110 and parts C and D of the Federal Clean Air Act.

**DATES:** The proposed rule published on November 18, 2010 (75 FR 70654), is withdrawn as of April 8, 2011.

**FOR FURTHER INFORMATION CONTACT:** Ms. Adina Wiley (6PD–R), Air Permits Section, Environmental Protection Agency, Region 6, 1445 Ross Avenue (6PD–R), Suite 1200, Dallas, TX 75202–2733. The telephone number is (214) 665–2115. Ms. Wiley can also be reached via electronic mail at *wiley.adina@epa.gov.*

### List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Intergovernmental relations, Nitrogen dioxide, Ozone, Reporting and recordkeeping requirements.

Dated: March 25, 2011.

*Al Armendariz,*

*Regional Administrator, EPA Region 6.*

[FR Doc. 2011–8427 Filed 4–7–11; 8:45 am]

**BILLING CODE 6560–50–P**

# PUBLIC SUBMISSION

**As of:** March 27, 2012
**Received:** May 23, 2011
**Status:** Posted
**Posted:** May 23, 2011
**Category:** Academic/Think Tank
**Tracking No.** 80e30834
**Comments Due:** May 23, 2011
**Submission Type:** Web

**Docket:** ED-2011-OM-0002
Family Educational Rights and Privacy

**Comment On:** ED-2011-OM-0002-0001
Family Educational Rights and Privacy

**Document:** ED-2011-OM-0002-0128
Comment on FR Doc # 2011-08205

## Submitter Information

**Address:**
   New York,  NY,
**Email:** jreidenberg@law.fordham.edu
**Submitter's Representative:** Joel R. Reidenberg
**Organization:** The Center on Law & Information Policy, Fordham University School of Law

## General Comment

The Center on Law and Information Policy of the Fordham University School of Law is grateful for the opportunity to comment on the proposed amendments to the regulations of the Department of Education implementing the Family Educational Rights and Privacy Act as published at 76 Federal Register 19726 (April 8, 2011). Our comments are provided in the attached document.

## Attachments

Comment on FR Doc # 2011-08205



U.S. Department of Education Docket ID:  ED-2011-OM-0002


The Center on Law and Information Policy of the Fordham University School of Law ("CLIP") is grateful for the opportunity to comment on the proposed amendments to the regulations of the Department of Education (the "Department") implementing the Family Educational Rights and Privacy Act as published at 76 Federal Register 19726 (April 8, 2011).


**About CLIP and its Research on Longitudinal Databases of Educational Records**

CLIP was founded at Fordham in 2005 as an academic research center to address the emerging field of information law.  Among its activities, CLIP seeks to advance solutions to legal and policy problems in the field, including information privacy law and policy, through independent, scholarly research.   CLIP is staffed by an academic director, Professor Joel R. Reidenberg, an executive director, Jamela Debelak, and student research fellows.

Of particular relevance to this docket, CLIP has researched publicly available information regarding state longitudinal databases of children's educational records from all 50 states and assessed the privacy protections for those databases.  CLIP published the findings of this research in an extensive report: "Children's Educational Records and Privacy: A Study of Elementary and Secondary School State Reporting Systems" (October 2009) available at http://law.fordham.edu/childrensprivacy (hereinafter "Fordham CLIP Study").

While the Fordham CLIP Study does not challenge the desirability or policy need to create longitudinal databases of educational records, the study demonstrates that the privacy implications of these databases have not been properly addressed.   The Fordham CLIP Study found that the majority of states failed to adopt and implement basic privacy protections for longitudinal databases of K-12 children.  CLIP found that that the majority of longitudinal databases hold detailed information about each child that is identifiable to the individual children.  The study found that most states collect excessive and intrusive information about children such the birth weight of a teen mother's baby (e.g. Florida), social security numbers (e.g. Tennessee) lead test results (e.g. New Jersey) and the use of foul language in school (Louisiana).   CLIP further found that the state databases generally did not have clear access and use rules and that a majority of the states failed to have data retention policies.  Most troubling, CLIP discovered that the flow of information from local educational agencies to the respective state department of education was often not in compliance with the legal requirements of FERPA.

These privacy deficiencies are profoundly troubling and the amendments to the regulations proposed by the Department would exacerbate many of the critical deficiencies in the protection of children's privacy that the Fordham CLIP Study identified.

**The Proposed Amendments to the FERPA Regulations contradict Congressional Mandates**

As demonstrated through the legislative history of FERPA, Congress has long valued the educational privacy rights of students and FERPA was designed explicitly to restrict when students' personal information could be shared.  More recently, the privacy provisions of the newly passed education statutes, particularly the America Creating Opportunities in Technology, Education, and Science Act (the "COMPETES Act"), explicitly require longitudinal databases to comply fully with FERPA.[1] Statements by members of Congress further underscore that Congress seeks strong protection of educational record privacy.  Indeed, in 2010, at a hearing before the House Committee on Education and Labor considering the renewal of Elementary and Secondary Education Act, Representative John Kline, then the ranking member and now chair of the Committee, stated that "[n]o conversation about educational data systems would be complete without a discussion of student privacy [and] research indicates not nearly enough is being done to safeguard our students' records."[2]

It is, thus, very surprising and disturbing that the Department is proposing changes to the FERPA regulations that dramatically expand the disclosure exceptions thereby authorizing the increased sharing of personally identifiable students' data without addressing significant privacy safeguards and the Congressional policy and specific legislative mandates to protect students' privacy.  In essence, the changes significantly weaken privacy protection for children's educational records and contravene Congress' stated intent in FERPA, the COMPETES Act and the American Recovery and Reinvestment Act of 2009 (the "ARRA").

**Impermissible expansion of "Authorized representative" proposed in §99.3**

The Department proposes to redefine the term "authorized representative" to allow disclosure of educational records to individuals or entities who are not under the direct control of control of state, local or federal educational agencies and who are not performing educational audits or evaluations on behalf of state, local or federal education agencies.  This new overbroad definition, in connection with the Department's proposed definition for "education program" (which is discussed below), will expand the disclosures under the audit and evaluation exception far beyond the intent and mandate of Congress and allow promiscuous data sharing that undermines accountability for privacy violations.

As the Department has made clear on several occasions, its previous definition of the term "authorized representative" was dictated by the text and legislative history of FERPA.  In the 2003 Memorandum from the Deputy Secretary of Education, the Department found that "[t]he multiple references to 'officials' in paragraph (b)(3) reflect a Congressional concern that the authorized representatives of a State educational authority be under the direct control of that authority."[3]  In the legislative history introducing early amendments to FERPA, the bill's sponsors explained

---

[1] 20 U.S.C. § 9871(e)(2)

[2] Hearing on *How Data Can be Used to Inform Educational Outcomes* before the House Committee on Education and Labor, 111th Cong.  2nd Sess. (April 14, 2010).

[3] Memorandum from William D. Hansen, Deputy Sec'y of Educ. to the Chief State Sch. Officials (Jan. 30, 2003), *available at* http://www.ed.gov/policy/gen/guid/secletter/030130.html

specifically that "[s]ection...(b)(1) of existing law restricts transfer, without the consent of parents or students, of personally identifiable information concerning a student to ... auditors from the General Accounting Office and the Department of Health, Education, and Welfare."[4]  While these early amendments provided many of the disclosure exceptions we know today, including the audit and evaluation exception, this explanation from the legislative history demonstrates that Congress intended to prevent disclosures to other non-educational agencies.   The Department recognized the "plain" meaning of this history, stating in the 2003 Memorandum that "the sponsors of FERPA did not view the concept of 'authorized representatives' in an expansive manner; rather, their vision was closely tied to employees and officials of, for example, the Comptroller General and the Secretary."[5]  Until now, the Department has long followed this mandate to exclude other federal or state agencies because such agencies are not under the direct control of state educational agencies.[6]

Analogously, the Department was clear in all of its previous guidance that outside parties could be treated as "officials" for purposes of another exception only when they are performing "institutional services or functions for which the official or agency would otherwise use its own employees."[7] The Department previously found strong support for this position in the statutory text and history.[8] This conformed to the clear Congressional intent for the disclosure exceptions to remain closely tied to needs of local, state and federal educational agencies.   As the Department has previously noted, the requirement of a formal outsourcing relationship for purposes of the school official exception would "ensure that the...exception does not expand into a general exception to the consent requirement in FERPA that would allow disclosure any time a vendor or other outside party wants access to education records."[9]

This new proposed definition is, thus, a significant and impermissible departure from the Congressional mandate as well as the Department's previous position that non-educational individuals and entities must be contractors or consultants of a state educational agency in order to qualify as "authorized representatives."  Further, as a policy matter, by expanding the entities and individuals who will gain access to educational records and by allowing educational authority officials to deputize others as "authorized representatives," the proposal undermines accountability for privacy.   As the Fordham CLIP Study found, many states already fail to define clearly the access

---

[4] 120 S. Con. Rec. 39862, 39863 (1974).

[5] Memorandum from William D. Hansen, Deputy Sec'y of Educ. to the Chief State Sch. Officials (Jan. 30, 2003), *available at* http://www.ed.gov/policy/gen/guid/secletter/030130.html

[6] Family Educational Rights and Privacy, 73 Fed. Reg. 74806, 74828 (Dec. 9, 2008); Memorandum from William D. Hansen, Deputy Sec'y of Educ. to the Chief State Sch. Officials (Jan. 30, 2003), *available at* http://www.ed.gov/policy/gen/guid/secletter/030130.html

[7] Family Educational Rights and Privacy, 73 Fed. Reg. 74806, 74825 (Dec. 9, 2008).

[8] *Id*.

[9] *Id*.

and use authority of recipients of student data.[10]  This proposal, if adopted, would significantly exacerbate the problem.

The Department's explanation that the passage of the COMPETES Act and the ARRA reflects a new Congressional intent that justifies creating ever more attenuated responsibility for educational record privacy is patently wrong.   As previously discussed, the COMPETES Act explicitly requires compliance with FERPA.  If Congress had intended for different privacy and disclosure standards to apply to the new databases, it would have provided new authority.  The Department even confirmed that Congress did not intend the COMPETES Act to change FERPA's requirements.  In the Department's 2008 rulemaking (one year after the enactment of the Act), the Department found no support for the changes it now proposes, specifically stating:

> "there is no other legislative history to indicate that Congress intended that FERPA be interpreted to permit education agencies and institutions, or State and local educational authorities or Federal officials and agencies listed in 99.31(a)(3), to share students' education records with non-educational State officials,"[11] and

> "[w]e believe that any further expansion of the list of officials and entities in FERPA that may receive education records without consent of the parent or eligible student must be authorized by legislation enacted by Congress."[12]

With respect to the ARRA, the stimulus law provides additional funding for the databases encouraged by the COMPETES Act, but does not suggest any shift in Congressional intent regarding information sharing or the disclosure of student educational records.  Congress' choice to rely on the pre-existing FERPA rules when enacting both the COMPETES Act and the ARRA indicate that Congress understood the term "authorized representative" as the Department had previously interpreted the term.

Finally, the Department's new interpretation of "authorized representative" stretches the meaning of the term "representative" beyond its standard use.  The re-interpretation alongside the Department's new definition of the term "education program," demonstrates that authorized representatives will now be external agencies or institutions conducting independent reviews and evaluations of programs unrelated to the Department and school based education.  This construction of a "representative" is a significant departure from the ordinary usage of the term.  A representative is typically considered one who stands in the shoes of another or operates on behalf of another.  The new representatives that the Department proposes will not be acting on behalf of or under the direction of anyone.  They will be independent actors with independent concerns and interests.  If Congress had intended to permit disclosures to independent entities, it would have selected a term other than "representative" to reflect that intent.

---

[10] Fordham Center on Law and Information Policy, *Children's Educational Records and Privacy: A Study of Elementary and Secondary School State Reporting Systems* (October 2009), p. 39 *available at* http://law.fordham.edu/childrensprivacy

[11] Family Educational Rights and Privacy, 73 Fed. Reg. 74806, 74828 (Dec. 9, 2008).

[12] *Id*.

***Problematic expansion of "directory information" proposed in §99.3***

The Department proposes to add student ID numbers to the list of items defined as "directory information."  While this change helps facilitate safety requirements at schools where students must wear ID badges to gain access to school facilities, the Department does not seem to have considered some of the risks associated with the public disclosure of student ID numbers.

The Fordham CLIP Study found that many states did a poor job implementing basic access and use restrictions on personally identifiable information.   Some states, however, used technical architectures for their databases to anonymize student records so that the risk of disclosure of personally identifiable information would be minimized.   These systems used unique IDs at the local level that were decoupled from the ID numbers used in the state longitudinal databases and state officials were barred from linking the ID number used in the database back to an individual student.  Such a system allows school officials to have access to all personally identifiable information needed for instruction but would restrict the state's access to personally identifiable information.

By seeking to include in the definition of directory information any "student ID number, user ID, or other unique personal identifier used by a student for purposes of accessing of communicating in electronic systems," the Department undermines the ability of states and local schools to preserve the anonymity of student ID numbers used in the state databases.  This new, expanded definition of "directory information" would include an otherwise anonymous ID number used in a longitudinal database.  The disclosure of such a number as directory information would negate the steps taken by states to protect the anonymity of the student in the state database.

## Impermissible redefinition of *"Education program"* proposed in §99.35

The Department proposes to redefine the term "education program" to include programs run by non-educational agencies such as "early childhood education…job training, career and technical education, and adult education."  The Department states as a goal the desire to have a broad definition in order to permit local educational agencies to share personally identifiable education records with non-educational agencies and entities.   The Department would, in effect, be including private college test tutoring services, workforce training programs such as courses on bartending and flooring installation, and adventure playground programs within the definition of "educational program" and thus make them eligible to receive detailed educational records from kindergarten onward without student or parental consent.  This redefinition of "educational program" contradicts the Department's enabling mandate in FERPA and would indeed result in the sharing of educational records to organizations not covered by FERPA at all.

When Congress included the term "education program" in the original statute, the meaning was quite narrow. The legislative history explicitly rejected the proposed broad definition now made by the Department, stating: "there has been some question as to whether the Amendment's provisions should be applied to other HEW education-related programs such as Headstart or the educational research programs of the National Institute of Education.  As rewritten, the limited nature of the Act's coverage should be clear."[13]  HEW education-related programs and NIE programs were excluded from the definition of "education program."   The Department has also previously

---

[13] *Id.*

confirmed the Congressional mandate for a restricted definition and has stated that the term refers to agencies subject to FERPA and has defined the agencies as those:

> to which funds have been made available under any program administered by the Secretary, if—
> (1) The educational institution provides educational services or instruction, or both, to students; or
> (2) The educational agency is authorized to direct and control public elementary or secondary, or postsecondary educational institutions.[14]

Elsewhere in FERPA, Congress explicitly tied terms relating to education to traditional elementary and secondary education programs under the authority of the Secretary.  In particular, "education records" and "educational agency or institution" are both defined to refer to traditional school based education funded by the Department. The term "education records," for example, is defined as "records...which (i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution."[15]  Likewise, "educational agency or institution" is defined as "any public or private agency or institution which is the recipient of funds under any applicable program."[16]  The legislative history for this definition provides that "by explicitly limiting the definition to those institutions participating in applicable programs, the amendment makes it clear that the Family Educational Rights and Privacy Act applies only to Office of Education programs and those programs delegated to the Commissioner of Education for administration."[17]  Congress could not have intended to use the term "education" narrowly when referring to records or agencies and then broadly to refer to programs.

The broad expansion of "education program" would undermine the Congressional goal of limiting access to educational records to those programs directly supervised by state and federal educational agencies.   FERPA was very carefully crafted to preserve confidentiality of student records and allow through exceptions the use of students' personal information for the provision and improvement of the educational programs provided by traditional local education agencies. For example, the exceptions set forth in sections (b)(1)(A-H) of FERPA generally permit disclosures that will help in the execution, review or improvement of Department funded educational programs, such as (a) disclosures to "other schools officials" with "legitimate educational interests,"[18] (b) disclosures to organizations performing studies on educational programs at the specific request of a local educational agency,[19] or (c) disclosures to State agencies or the Department for the purposes of evaluating an educational program funded by the Department.[20]

---

[14] 34 C.F.R. § 99.1 (2008).

[15] 20 U.S.C. § 1232g(a)(4)(A).

[16] 20 U.S.C. § 1232g(a)(3).

[17] 120 S. Con. Rec. 39862 (1974).

[18] 20 U.S.C. § 1232g(b)(1)(A).

[19] 20 U.S.C. § 1232g(b)(1)(F).

[20] 20 U.S.C. § 1232g(b)(1)(C).

The Department should be guided by this narrow focus in the legislation when it defines the term "education program."

Furthermore, the legislative history also indicates that Congress did not intend the audit and evaluation exception to include disclosures to non-educational agencies and entities. The proponents of the bill introducing FERPA stated that "Section…(b)(1) of existing law restricts transfer, without the consent of parents or students, of personally identifiable information concerning a student to … auditors from the General Accounting Office and the Department of Health, Education, and Welfare."[21] If Congress wanted educational records to be used in the audit and evaluation of non-educational agency programs it would not have sought to restrict the disclosures to those other agencies. Thus, the adoption of the proposed definition covering entities other than traditional educational agencies would contradict Congress.

### Impermissible expansion of the "audit and evaluation" provision proposed in § 99.35(a)(2)

The proposed regulations would expand the "audit and evaluation" exception to allow local educational agencies to share personally identifiable information without parental consent to non-educational agencies and institutions for the evaluation of programs which are not under the authority of Department. The audit and evaluation exception provides that "[n]othing in this section shall preclude authorized representatives of (A) the Comptroller General of the United States (B) the Secretary, or (C) State educational authorities from having access to student or other records which may be necessary in connection with the audit and evaluation of Federally-supported education programs."[22] Since the passage of FERPA in 1974, this exception has been commonly understood to allow local educational agencies to share educational records with State and federal educational agencies in order to allow those agencies to evaluate Department funded and authorized educational programs. The Department now seeks to expand the exception to allow broad sharing of personally identifiable information with unlimited third parties so long as those parties can identify some type of educational services they provide.

While the Department claims that it may expand the disclosure exceptions set forth in FERPA because the COMPETES Act and the ARRA encourage the development of and provide funding for statewide P-16 educational data systems, this claim misstates the legal requirements of the statutes. The Department has failed to account for Congress' declaration in the COMPETES Act that statewide educational data systems must comply with FERPA.[23]

In the COMPETES Act, Congress authorized the award of grants to states "to establish or improve a statewide P-16 education data system,"[24] but it expressly conditioned those awards on, among other things, (a) compliance with FERPA and other privacy protections and (b) use of the longitudinal databases for evaluation and improvement of Department funded educational

---

[21] 120 S. Con. Rec. 39862 (1974).

[22] 20 U.S.C. § 1232g(b)(3).

[23] 20 U.S.C. § 9871(e)(2)

[24] 20 U.S.C. § 9871(c)(2).

AR 0253

programming.[25]   The first condition is significant because it demonstrates that Congress considers privacy a priority in the development of longitudinal databases.  In fact, the majority of the text in the COMPETES Act devoted to state databases is focused on the privacy protections and access restrictions required of the systems.  In two places Congress specifically states that the databases must comply with FERPA and the statute also provides for additional privacy requirements.  This focus on privacy demonstrates that Congress thought disclosures associated with the longitudinal databases should be limited and monitored carefully, not expanded.

The second condition in the COMPETES Act is also significant because it provides that the information in the longitudinal databases should be used for specific limited educational purposes. The use restriction in the statute provides that recipients of grants "limit the use of information in the statewide P-16 education data system by institutions of higher education and State or local educational agencies or institutions to the activities set forth in paragraph (1)."[26] The paragraph referenced provides a list of ways states can use federal funds to improve elementary and secondary education.  The list includes adjusting school curricula so that students are better prepared for the future, implementing new activities to ensure coursework is rigorous and convening with various stakeholders to determine how education can be improved.[27]  These activities demonstrate a focus on state run elementary and secondary education programs and noticeably absent are any activities or programs organized by other State agencies.  Outside parties may, of course, be consulted in order to help improve educational programming, but the programs contemplated are not outside programs run by other agencies.  Sharing with non-educational agencies was not authorized by Congress.   In addition, the provisions in the COMPETES Act focus solely on local, state and federal educational agencies and officials.  Congress never mentions use of the information by other agencies.  It is clear from the text of the statute that the databases promoted in the COMPETES Act are educational databases used by educational officials for internal audits and the sharing of student records with other agencies is not expressly authorized.

In terms of the ARRA, this statute provides additional funding for statewide longitudinal databases, but does not remove or limit any of the requirements previously provided in the COMPETES Act. The ARRA is simply an allocation of funds to further support the development of the databases. Nothing in the ARRA suggests that the applicable privacy protections from FERPA as incorporated by reference in the COMPETES Act are supplanted for the databases funded by the appropriation. Similarly, nothing in the ARRA suggests that Congress intended a new set of privacy protections to apply to the longitudinal databases.   If new protections were desired, Congress would have been the proper legal entity to articulate the new standards.

Under FERPA, the "audit and evaluation" exception is narrowly drawn and its expansion exceeds the Department's legal authority.  FERPA is a privacy statute that has the primary purpose of protecting the privacy and confidentiality of children's education records.  Some disclosure exceptions are built into the statute's general prohibition on sharing, but these exceptions are narrowly tailored.  An examination of language, structure and legislative history of FERPA demonstrates that the proposed changes exceed the Department's authority.

---

[25] 20 U.S.C. § 9871(e)(2).

[26] 20 U.S.C § 9871(e)(2)(c)(i)(II).

[27] 20 U.S.C § 9871(e)(1).

FERPA starts with the fundamental rule that student educational records should not be disclosed from a school or local educational agency without parental consent.  It was the intent of Congress that "the moral and legal rights of parents shall not be usurped."[28]  Congress began with a basic rule that parents should have the initial authority to determine when identifiable information about their children may be disclosed.  Therefore, when promulgating regulations, the Department should start with the presumption that parental consent for disclosure is the preferred method and exceptions to that rule should be narrowly constructed and closely track clearly articulated Congressional intent.

Congress then built in a few carefully crafted exceptions to this blanket rule to allow some limited sharing for delivering and improving federally funded school-based education programs and for ensuring safety and security.  A first category of exceptions is tied directly to the provision and improvement of the educational programs provided by traditional local education agencies.  For example, the exceptions set forth in sections (b)(1)(A-H) of FERPA generally permit disclosures that will help in the execution, review or improvement of Department funded educational programs, such as (a) disclosures to "other schools officials" with "legitimate educational interests,"[29] (b) disclosures to organizations performing studies on educational programs at the specific request of a local educational agency,[30] or (c) disclosures to State agencies or the Department for the purposes of evaluating an educational program funded by the Department.[31]  Each of these is tied specifically to the provision of education services by a traditional elementary or secondary school.  The second category of disclosure exceptions focuses on ensuring safety and security.  These exceptions, for example, permit disclosure if it "is necessary to protect the health or safety of students or other persons"[32] or permit disclosure for certain types of legal proceedings.[33]

The exceptions provided in the statute reflect Congressional intent to allow some sharing when it will aid or improve federally funded elementary and secondary educational programs, but deny non-consensual sharing to other state agencies for non-traditional educational programs, social services programs or other non-educational purposes.  The legislative history makes clear, for example, that the act was intended "to [apply] only to Office of Education programs and those programs delegated to the Commissioner of Education for administration."[34]  In addition, in crafting the exception for the audit and evaluation of education programs, Congress was "very concerned to assure that requests for information associated with evaluations of Federal education programs do not invade the privacy of students or pose any threat of psychological damage to them."[35]  An expansion of the audit and evaluation exception to include disclosures to non-educational agencies

---

[28] S. CONF. REP. 93-1026, at 47 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4206, 4250.

[29] 20 U.S.C. § 1232g(b)(1)(A).

[30] 20 U.S.C. § 1232g(b)(1)(F).

[31] 20 U.S.C. § 1232g(b)(1)(C).

[32] 20 U.S.C. § 1232g(b)(1)(I).

[33] 20 U.S.C. § 1232g(b)(1)(J).

[34] 120 S. Con. Rec. 39862 (1974).

[35] S. CONF. REP. 93-1026, at 48 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4206, 4251.

for evaluations of programs that are unrelated to the provision of elementary and secondary education poses a threat to student privacy and does not reflect the intentions of Congress.

The Congressional intent to protect educational records from disclosure to external non-educational entities and agencies is also strongly reflected in each of the more recent statutes that the Department mischaracterizes to support its proposed changes.

Notwithstanding the proposed changes, the Department has acknowledged and clearly stated that "there is no provision in FERPA that allows disclosure or re-disclosure of education records, without consent, for the specific purpose of establishing and operating consolidated databases and data sharing systems, and, therefore, we are without authority to establish one in these regulations."[36]  The Department also commented specifically on whether disclosures could be made to non-educational agencies, stating that "there is no other legislative history to indicate that Congress intended that FERPA be interpreted to permit education agencies and institutions, or State and local educational authorities or Federal officials and agencies listed in 99.31(a)(3), to share students' education records with non-educational State officials."[37]  In addition, the Department has previously recognized that it did not have the authority to enact the regulations it now proposes, stating:  "We believe that any further expansion of the list of officials and entities in FERPA that may receive education records without consent of the parent or eligible student must be authorized by legislation enacted by Congress."[38]

Lastly, the expansion would also allow disclosures where the recipient had no explicitly authorized "audit and evaluation" purpose.[39]  As demonstrated in the Fordham CLIP Study, the rampant failure by states to articulate the purposes for disclosure violates privacy principles.  This approach, weakening the controls on "audit and evaluation" purposes, contradicts basic principles of privacy and Congressional intent.

By contrast, the Department has proposed the requirement for a written agreement that designates any authorized representative (third party) and the specified purpose for the disclosure of student information along with data deletion obligations.  This is a step in the right direction.  However, the proposed changes relieve data recipients of responsibility for actually implementing protections as the agreements would only have to "establish policies and procedures" to avoid unauthorized disclosures and use.   Agreements for third party processing must be comprehensive and must not relieve any of the parties from strict privacy obligations.


## Questionable Enforcement proposed in §99.35

The Department's proposed changes to §99.35 create a number of risks that information may be disclosed unlawfully without providing an adequate remedy for such privacy violations.   In conjunction with the proposed authorization for disclosures of personally identifiable information

---

[36] Family Educational Rights and Privacy, 73 Fed. Reg. 74806, 74822 (Dec. 9, 2008).

[37] Family Educational Rights and Privacy, 73 Fed. Reg. 74806, 74828 (Dec. 9, 2008).

[38] *Id.*

[39] 76 Fed. Reg. 19726, 19731 (Apr. 8. 2011)

to non-educational agencies and institutions for the audit and evaluation of external programs, the Department is trying to extend enforcement authority beyond its statutory mandate.

The remedies available for a violation of FERPA are significantly limited.  In *Doe v. Gonzaga*, the Supreme Court made clear that there is no private right of action under FERPA.[40]  The sole remedy available for a violation, therefore, is the withholding of Federal funds by the Department.[41]  If the Department finds there has been a violation of FERPA by a State or local educational agency, it may withhold funds from the State.  This penalty is severe and, as a result, has never in the history of FERPA been used by the Department.

The Department's proposed regulation expands the sharing of personally identifiable information in a way that is risky considering the limited remedy available under FERPA.   The new regulation permits outside sharing and limits penalties for improper disclosures as long as a local educational agency uses "reasonable methods" to prevent the disclosure.  The "reasonable methods" requirement is vague and, without a proper enforcement mechanism, it does not adequately protect the privacy interests of students.  The new regulations would allow State and local educational agencies to share personally identifiable information with external non-educational third parties as long as they use "reasonable methods" to ensure the information is protected from further disclosure.  Under this proposal, there would be no FERPA violation if information was disclosed by the third party as long as the state educational agency used "reasonable methods" to limit the disclosure.  The Department does not define reasonable methods and plans only to issue non-regulatory guidelines about what steps agencies should take to ensure additional disclosure is restricted.  This vague standard will make violations difficult to judge.  Arguably, as long as the agency takes some measures, even if they are not effective, there will be no FERPA violation and no remedy for the parties harmed by a disclosure.  A poorly defined standard without an effective method of enforcement provides little incentive for local educational agencies to take privacy seriously.

The proposed regulation also creates a penalty provision for improper re-disclosures of information by third-party recipients.   Agencies and organizations found to have improperly disclosed personally identifiable information will be restricted from receiving information for at least five years after the violation. This debarment remedy is not found in FERPA and the Supreme Court held in Doe v. Gonzaga that withholding of federal funds is the sole remedy available under FERPA.[42]   Since the Family Policy Compliance Office ("FPCO") does not have authority over the non-educational third party agencies or institutions, the FPCO has no direct way to penalize the outside parties and additionally no authority to enforce a ruling that an educational agency may not disclose information to third party who has been penalized.

Although FERPA only contains a limited enforcement remedy, the expansion of sharing as contemplated by the proposed regulations will be likely to result in significant litigation at the state level under various state rights.   Security breaches and improper use of the data increase in likelihood with the centralization of educational records in longitudinal databases and wider sharing.   These events will take place at the local and state levels and will be likely to involve large

---

[40] 563 U.S. 273 (2002).

[41] 20 U.S.C. § 1232g(a)(1)(A).

[42] 563 U.S. 273 (2002).

numbers of families like the exposure of the educational records of all the students in the Nashville, Tennessee public schools during 2009.   State tort doctrines and, in some states, state constitutional rights of privacy will be available for aggrieved families to initiate litigation against schools, state agencies and those responsible for the processing of student data.   The permissiveness encouraged by the proposed regulations is, thus, likely to lead to extensive litigation and privacy liability for states and their partners.

**Conclusion**

While the Department's initiative to address privacy in longitudinal educational databases is critically important and laudable, the issues with FERPA cannot be resolved through regulation as they go to the heart of the statutes mandate.   The trade-offs between privacy and the sharing of educational records for data analysis are policy decisions that belong to Congress.   The Department should be seeking legislative reform to address:

1) any new statutorily authorized recipients of educational records;
2) any new statutorily permitted purposes for disclosures; and
3) the creation of effective enforcement rights, powers and remedies.

# PUBLIC SUBMISSION

**As of:** March 27, 2012
**Received:** May 23, 2011
**Status:** Posted
**Posted:** May 24, 2011
**Category:** Association/Organization
**Tracking No.** 80e30afb
**Comments Due:** May 23, 2011
**Submission Type:** Web

**Docket:** ED-2011-OM-0002
Family Educational Rights and Privacy

**Comment On:** ED-2011-OM-0002-0001
Family Educational Rights and Privacy

**Document:** ED-2011-OM-0002-0184
Comment on FR Doc # 2011-08205

## Submitter Information

**Name:** Jerome H. Sullivan
**Address:**
    Washington,  DC,
**Email:** Sullivanj@aacrao.org
**Submitter's Representative:** Barmak Nassirian
**Organization:** American Association of Collegiate Registrars and Admissions Officers (AACRAO)

## General Comment

Enclosed please find comments on the FERPA NPRM of April 8, 2011 from AACRAO.

## Attachments

Comment on FR Doc # 2011-08205

AR 0383



**American Association of Collegiate Registrars and Admissions Officers**

One Dupont Circle, NW, Suite 520 / Washington, DC 20036-1135
(202) 293-9161 Main / (202) 872-8857 Fax
www.aacrao.org

May 23, 2011

Ms. Regina Miles
U.S. Department of Education
400 Maryland Avenue, SW.
Washington, DC 20202

**Re:    April 8, 2011 Notice of Proposed Rulemaking**
**Family Education Rights and Privacy Act of 1974, as amended**
**Docket ID ED-2011-OM-0002**

Dear Ms. Miles:

On behalf of the American Association of Collegiate Registrars and Admissions Officers
(AACRAO), I write to respectfully submit our comments on the Notice of Proposed
Rulemaking (NPRM) published in the April 8, 2010 *Federal Register*.

AACRAO is a nonprofit association of more than 2,600 institutions of higher education
and more than 10,000 campus enrollment officials.  By far the vast majority of our
individual members are campus officials with direct responsibility for admissions,
recruiting, academic records, and registration functions.

Because they serve as custodians of educational records for current and former students,
our members are particularly knowledgeable about privacy issues in general, and about
information security and privacy requirements of Federal and State laws. Compliance
with the Family Educational Rights and Privacy Act of 1974, as amended (FERPA), has
long been a primary area of professional jurisdiction for AACRAO members, who are
often the leading FERPA experts on their campuses. Because they are so central to the
interests and priorities of our members, data security, privacy, and FERPA have also been
top priorities for AACRAO, and we devote considerable attention and resources to them
as primary policy issues of concern.

Since its original enactment in 1974, and through the numerous amendments, court
decisions, and administrative policy revisions that have further refined that original
construct over the years, AACRAO has been constructively engaged with the U.S.
Department of Education (Department) to promote FERPA compliance and achieve the
right balance between individual educational privacy rights and the rights of third-parties
to obtain access to data for appropriate purposes. We recognize that judgments about

AR 0384

where to strike that balance are ever evolving, and we have always been open to discussions about changes to FERPA. Examples of our receptivity to change include past modifications to FERPA necessitated by campus security concerns, the needs of military recruiters, and governmental access to records for anti-terrorism purposes. In keeping with that tradition of accommodating reasonable evolutionary changes to FERPA, we remain open to any regulatory or legislative modifications that might be needed to accommodate legitimate and well-articulated policy goals.

In reviewing the regulatory changes proposed by the Department, we are alarmed by several striking facts.

First, the proposed changes represent a wholesale repudiation of fair information practices. Well-settled principles of notice, consent, access, participation, data minimization, and data retention are all undermined by the new paradigm promoted by this proposal.

Second, the substantive goals that the Department cites as motivating these changes could be just as effectively achieved through much more artfully crafted modifications that would avoid the proposed regulations' *de facto* nullification of individual privacy rights.

Third, we believe that the Department has shortsightedly avoided a sufficiently inclusive policy development process, and that the proposed regulations have been overwhelmingly influenced by the single-issue lobbying of a well-financed campaign to promote a data free-for-all in the name of educational reform. Lost in the frenzied rush to do good with other people's education data is FERPA's underlying purpose. We sincerely believe that reasonable compromises can be made to accommodate legitimate policy goals, but the Department has instead chosen to facilitate an unconditional surrender of educational privacy rights of American families and students.

Finally, most of the radical changes proposed by the Department require legislative amendments to FERPA, and the Department lacks legal authority to implement them through regulatory action. As our section-by-section analysis and commentary below indicates, the Department seems to grasp at straws and appears to be manufacturing statutory authority out of thin air to justify these changes, several of which clearly conflict with congressional intent.

We offer comments on each section of the proposed regulations, in the order issues are presented in the NPRM.


I.      **Definitions**

        A.      **Authorized Representative (§§99.3, 99.35)**

Section (b)(1) of FERPA conditions receipt of any Department funds to any educational agency or institution having a policy or practice of permitting the release of education

AR 0385

records (or personally identifiable information (PII) other than directory information) of students without first obtaining written consent, except under very specific circumstances.  One exception to this requirement is for release of education records to "authorized representatives" of the Comptroller General of the United States, the Secretary, State educational authorities, or (for law enforcement purposes) the Attorney General.  20 U.S.C. 1232g (b)(1)(C).  Redisclosure of information obtained by "authorized representatives" of State educational agencies may only occur under the conditions set forth in Section (b)(3):

> Provided, that except when collection of personally identifiable information is specifically authorized by Federal law, any data collected by such officials shall be protected in a manner which will not permit the personal identification of students and their parents by other than those officials….

20 U.S.C. 1232g (b)(3).  The statutory language makes clear that Congress intended to restrict redisclosures by such official recipients of personally identifiable information from student education records.  In addition, the use of the word "officials" twice to signify who was collecting the data and releasing such data on behalf of the State educational agencies demonstrates that Congress envisioned "authorized representatives" to be employees of the State educational agencies or agents under the direct control of such employees.  This legal position is supported in the Joint Statement included in the Congressional Record in 1974 when Congress amended FERPA.  120 Cong. Rec. at 39863 (December 13, 1974) (stating that existing law at Section (b)(1) "restricts transfer, without the consent of parents or students, of personally identifiable information concerning a student to…auditors from the General Accounting Office and the Department of Health, Education, and Welfare").

In direct conflict with that longstanding and well-settled interpretation of the law, the NPRM rescinds the guidance issued by U.S. Deputy Secretary of Education William D. Hansen, dated January 30, 2003, which clarified that for purposes of FERPA, an "authorized representative" of a State educational authority must be under the direct control of that authority (in other words, either an employee or contractor).  Instead, the proposed regulation advances a novel and counterintuitive definition of "authorized representative," which would allow "*any entity or individual* designated by a State or local educational authority or agency headed by an official listed in §99.31(a)(3) to conduct—with respect to Federal or State supported education programs—any audit, evaluation, or compliance or enforcement activity in connection with Federal legal requirements that relate to these program."  (Emphasis added.)  The State or local education authority or agency headed by an official listed in §99.31(a)(3) would be required "to use reasonable methods" to ensure that any entity designated as its authorized representative remains compliant with FERPA.  Future non-regulatory guidance may be issued on what would be considered "reasonable" methods by the Department.

3

The effect of this extraordinarily overbroad definition is to expand the scope of who can be designated as an "authorized representative" of a State or local educational agency to entities and individuals well outside its direct control.  Virtually any State or local employee could be designated an authorized representative under the proposed regulations, no matter how remote or dubious their actual standing as an educational functionary. What's worse, nongovernmental entities, including non-profits, religious organizations, foundations, independent researchers, and for-profit companies, as well as individuals, could be granted access to personally identifiable information without notice or consent.  While this information free-for-all may be conducive to the Department's policy goal of simplifying State compliance with the requirements of the American Recovery and Reinvestment Act of 2009 (ARRA) and the America Creating Opportunities to Meaningfully Promote Excellence in Technology, Education, and Science Act (America COMPETES Act), it is unnecessarily and unjustifiably overbroad.

In addition, the Department lacks the legal authority for abandoning its longstanding interpretation that an authorized representative must be under the direct control of the State or local agency.  In so narrowly enumerating, by title, the officials who may access personally identifiable records without the student's consent, Congress surely meant "authorized representative" to be tightly linked to those positions. The Department, however, would eviscerate that intent by allowing literally *anyone* (presumably even including representatives of foreign governments) to exercise that authority, if they are so designated. In justifying this radical shift, the Department merely asserts that the current interpretation is "restrictive" given "Congress' intent in the ARRA to have States link data across sectors."  Nothing in the ARRA explicitly amended FERPA, however.  In fact, ARRA did not amend a preexisting statutory requirement in the America COMPETES Act that explicitly requires States developing state longitudinal data systems (SLDS) to comply with FERPA.  Congress could easily have provided a different standard for release and protection of data by States linking education records across sectors, but it did not do so.  The Department's reference to ARRA, therefore, can hardly justify the dangerous experiment with the sensitive information contained in Americans' education records that this proposal would promote.

Under the proposed definition, a chief state school officer or higher education authority could authorize as its representatives nonprofit organizations, independent researchers, or other state agencies, which would enter into a written agreement with the State or local educational authority to make sure that student records and personally identifiable information would be protected.  Such agreements, however, will be virtually useless in stopping an authorized representative who is not under the direct control of the State or local agency from misusing the data for other purposes or redisclosing the data to others. Under the proposed regulations, the written agreements may be required to spell out how nonconsensually redisclosed data should be used and released, but without the element of direct control, the State or local educational agencies will have no ability to enforce them. A chief state school officer could call over to her colleague heading the State labor or health department and beg the colleague to crack down on a rogue authorized representative working under the colleague's direct control, but there would be no regulatory assurance that the improper activity would stop, or could be stopped.

4

Similarly, a researcher conducting an independent higher education evaluation could not easily be stopped from using student records for purposes other than those envisioned when she was made an authorized representative for a legitimate evaluation.

Without retaining the element of meaningful direct control, the proposed definition of an authorized representative invites mischief and creates predictable data disclosure problems that Congress was clearly seeking to prevent by enacting FERPA in the first place.  This novel definition of authorized representative, as proposed, would take control of education records away from parents and students, and hand it over to entities and individuals over whom State and local authorities would have no control.

### B.      Directory Information (§§99.3)

The NPRM would modify the definition of "directory information," as defined in current 34 CFR 99.3, to clarify that

> an educational agency or institution may designate as directory information and nonconsensually disclose a student ID number or other unique personal identifier that is displayed on a student ID card or badge if the identifier cannot be used to gain access to education records except when used in conjunction with one or more factors that authenticate the user's identity….

76 Fed. Reg. 19729 (Apr. 8, 2001).  AACRAO supports the clarification that institutions may require students to carry ID cards or display badges.  See additional discussion below at IV.A., analyzing proposed regulations at Section 99.37(c) (Student ID Cards and ID Badges).

### C.      Education Program (§§99.3, 99.35)

For the first time, the Department proposes a definition for the term "education program," which is used in current 34 CFR 99.35(a)(1).  That subsection provides that authorized representatives of the officials or agencies headed by officials listed in §99.31(a)(3) may have nonconsensual access to personally identifiable information from education records in connection with an audit or evaluation of Federal or State-supported education programs, or for the enforcement of or compliance with Federal legal requirements relating to those programs.  The proposed definition defines "education program" as

> any program that is principally engaged in the provision of education, including, but not limited to early childhood education, elementary and secondary education, postsecondary education, special education, job training, career and technical education, and adult education, *regardless of whether the program is administered by an education authority.*

(Emphasis added.)  76 Fed. Reg. 19729-19730 (Apr. 8, 2001).  The Department's rationale for including programs not administered by an education agency include: (1)

AR 0388

education may begin before kindergarten and may involve learning outside of postsecondary institutions, and not all of these programs are administered by State or local educational agencies; (2) agencies other than State educational agencies may administer career and technical education or adult education programs;  (3) the Department believes all these programs could benefit from the type of rigorous data-driven evaluation that SLDS will facilitate; and (4) greater access to information on students before entering or exiting the P-16 programs could be used to evaluate these education programs and provide increased opportunities to build upon successful ones and improve less successful ones.

The rationale articulated by the Department in support of this astonishing definition strains credulity. First, Congress never intended such a broad sweep in terms of the kinds of audits or evaluations for which nonconsensual access to personally identifiable information from education records may be provided.  Second, even accepting, *arguendo*, that the policy purposes articulated in the preamble are sufficiently compelling, the proposed definition is unnecessarily overbroad and recklessly imprecise. Finally, completely missing in the rationale is any shred of legal authority for such a wholesale weakening of the legal protections of personally identifiable information provided under the statute.  The proposed definition, when combined with the proposed definition of "authorized representative," could permit every federal or state-supported county recreation program to be considered an education program eligible for evaluation using personally identifiable information from education records, without the evaluator needing to obtain consent from the parents or student.   The proposed definition would provide virtually unlimited access to education records in the name of evaluating program outcomes to any program evaluators that can convince an authorized representative that they are reviewing an education program, as loosely defined by the proposed definition.

## II.      Research Studies (§99.31(a)(6))

Section (b)(1)(F) of FERPA permits educational agencies and institutions nonconsensually to disclose personally identifiable information to organizations conducting studies "for, or on behalf of" educational agencies and institutions to improve instruction, administer student aid programs, or develop, validate, or administer predictive tests.  20 U.S.C. 1232g (b)(1)(F).  Current regulations in 34 C.F.R. 99.31(a)(6)(ii)(C) require that an educational agency or institution enter into a written agreement with the organization conducting the study that specifies the purpose, scope, and duration of the study and the information to be disclosed and meets certain other requirements.  The proposed regulations would circumvent the statutory requirement that any disclosures of personally identifiable information under the studies exception be done "for, or on behalf of" educational agencies or institutions by allowing State or local educational authorities (or agencies headed by an official listed in 34 CFR 99.31(a)(3)) to enter into agreements with organizations conducting studies under 34 C.F.R. 99.31(a)(6)(i) and to redisclose personally identifiable information on behalf of educational agencies and institutions that provided the information in accordance with other FERPA regulatory requirements.  The proposed regulations would also make the written agreement requirements and other provisions in 34 CFR 99.31(a)(6) apply to

6

State and local educational authorities or agencies headed by an official listed in 34 CFR 99.31(a)(3), as well as educational agencies and institutions.

The Department claims that these changes to existing regulations

> are necessary to clarify that while FERPA does not confer legal authority on State and Federal agencies to enter into agreements and act on behalf of or in place of LEAs and postsecondary institutions, nothing in FERPA prevents them from entering into these agreements and redisclosing PII on behalf of LEAs and postsecondary institutions to organizations conducting studies under §99.31(a)(6)….

76 Fed. Reg. 19730 (Apr. 8, 2001).  The Department notes that State educational authorities, and State higher educational agencies in particular, typically have the role and responsibility to perform and support research and evaluation of publicly funded education programs for the benefit of multiple educational agencies and institutions in their States.

While deferring to the Department's policy goals of enhancing the ability of State educational authorities to enter into research agreements with institutions of higher education and then redisclose the information they gather, AACRAO is very concerned that the Department is expansively broadening the scope of both access to and redisclosures of personally identifiable information without statutory authority to do so. In particular, in the event that an educational agency or institution objects to the redisclosure of personally identifiable information it has provided to the State educational authority for other purposes, under the proposed regulations, the State educational authority need only play its new trump card—that it has *implied* authority to do whatever it wants with the personally identifiable information in the name of supporting research and evaluation efforts.

This represents a disturbing erosion of educational privacy rights and a renunciation of the Department's historic role as the protector of educational privacy rights of American students and families.  Particularly because the Department fails to mandate compliance with the most basic fair information practices by such recipients of personally identifiable information, students and families would not even be aware that various and sundry data repositories of education records may have redisclosed their information to other third parties.

This ill-advised proposal also makes FERPA compliance a nightmarishly impossible task for institutions. Educational institutions would be unable to verify the extent to which and the parties to whom personally identifiable information they have previously disclosed has been redisclosed.  Institutions would be realistically unable to provide students who request records of what items of their personally identifiable information have been released and to whom with complete records under FERPA's regulatory recordation requirements.   Currently, an institution of higher education has control over disclosures of student education records and personally identifiable information.  Under the proposed

AR 0390

regulations, the State educational authority will be required to record redisclosures, but need not send those recordations back to the institution, or, for that matter, to the students and families.  Only on specific request to the State educational authority would an institution or student be able to determine what redisclosures have been made of a student's education records and personally identifiable information and to whom.  At a minimum, the State educational authority considering the redisclosure of student education records and personally identifiable information should be required to notify the student and institution of the redisclosure and provide an avenue for the student to opt out of the redisclosure.  As written, the proposed regulations are unnecessarily overbroad and do great violence to the underlying privacy tenets of FERPA.

## III.   Authority to Audit or Evaluate (§99.35)

Current regulations in 34 CFR 99.35(a)(2) provide that in order for a State or local educational authority or other agency headed by an official listed in §99.31(a)(3) to conduct an audit, evaluation, or compliance or enforcement activity, its authority to do so must be established under other Federal, State, or local authority because that authority is not conferred by FERPA.  The proposed regulations seek to remove the requirement to establish legal authority under other Federal, State, or local law to conduct an audit, evaluation, or compliance or enforcement activity. The Department's stated purposes are (1) to clarify that the authority for a State or local educational authority or Federal agency headed by an official listed in 34 CFR 99.31(a)(3) to conduct an audit, evaluation, enforcement or compliance activity may be express or implied, and (2) to promote Federal initiatives to support the robust use of data by State and local education authorities to evaluate the effectiveness of Federal or State-supported education programs, in particular by providing postsecondary student data to P-12 data systems in order to permit the evaluation of whether P-12 schools are effectively preparing students for college.

The proposed change, therefore, would substitute the mere invocation of an audit or evaluation for actual authority.  This extraordinary proposal thus turns another narrow consent exception into a magic incantation by which entities with no legal authority and no intention of actually conducting audits or studies can circumvent congressional intent, violate the privacy rights of students and families, and obtain unfettered access to personally identifiable information.

This breathtaking new approach, which would make the Department an accomplice in facilitating false, evasive, or dubious assertions of audit or evaluation authority, is not only ill-advised, it is unnecessary.  Third parties with real legal authority to engage in auditing or evaluating programs have always had access to data.  Once again, in attempting to facilitate somewhat broader access, the Department is proposing an overbroad remedy that would result in predictably unfortunate outcomes that we doubt it truly intends to enable.

In addition, the amorphous expansion of this exception to entities that the Department suggests may have "implied authority" to conduct audits will result in confusion and

8

noncompliance as institutions struggle to separate real claims of authority from frivolous ones. Finally, the Department does not have legal authority to eviscerate the clear statutory limitations imposed by Congress through linguistic equivocations and euphemistic redefinitions.

## IV.     Directory Information (§99.37)

### A.     Section 99.37(c) (Student ID Cards and ID Badges)

The proposed regulations for 34 CFR 99.3(c) clarify that the right to opt out of directory information disclosures is not a mechanism for students, when in school or at school functions, to refuse to wear student badges or to display student ID cards that display information that may be designated as directory information under 34 CFR 99.3 and that has been properly designated by the educational agency or institution as directory information under 34 CFR 99.37(a)(1).  This proposed regulation responds to the need for school and college campuses to implement measures to ensure the safety and security of students and is intended to ensure that FERPA is not used as an impediment to achieving school safety.

AACRAO supports and welcomes the additional flexibility offered by the proposed regulation on this topic.

### B.     Section 99.37(d) (Limited Directory Information Policy)

The proposed regulations would clarify that an educational agency or institution may specify in the public notice it provides to parents and eligible students in attendance provided under 34 CFR 99.37(a) that disclosure of directory information will be limited to specific parties, for specific purposes, or both.  The proposed regulations also clarify that an educational agency or institution that adopts a limited directory information policy must limit its directory information disclosures only to those parties and purposes that were specified in the public notice provided under 34 CFR 99.37(a).  The purpose of these regulations is to give educational agencies and institutions greater discretion in protecting student privacy by permitting them to limit the release of directory information for specific purposes, to specific parties, or both, and to provide a regulatory authority for the Department to investigate and enforce a violation of a limited directory information policy by an educational agency or institution.

We note that the ability to limit directory information to specific parties or purposes currently exists under FERPA.  The proposed regulations require an institution that includes such restrictions in its notice of directory information to abide by the policy specified in its public notice.

The Department does not propose changes to the recordkeeping requirement in 34 CFR 99.32(d)(4) or the redisclosure provisions in 34 CFR 99.33(c), instead recommending that educational agencies and institutions that choose to adopt a limited directory information policy assess the need to protect the directory information from further disclosure by the

AR 0392

third parties to which they disclose directory information. When a need to protect the information from further disclosure is identified, the Department recommends that educational agencies and institutions should enter into non-disclosure agreements with the third parties.

AACRAO supports this proposed regulation.

## V.      Enforcement Procedures with Respect to Any Recipient of Department Funds that Students Do Not Attend (§99.60)

Current regulations in 34 CFR 99.60 designate the Family Policy Compliance Office (FPCO) as the office within the Department responsible for investigating, processing, and reviewing alleged violations of FERPA.  Current FERPA regulations addressing enforcement procedures (subpart E, at 34 CFR 99.60 through 99.67) only address alleged violations of FERPA committed by an educational agency or institution.  The proposed regulations would provide that, solely for purposes of subpart E of the FERPA regulations, an "educational agency or institution" includes any public or private agency or institution to which FERPA applies under 34 CFR 99.1(a)(2), as well as any State educational authority or local educational authority or any other recipient (for example, a nonprofit organization, student loan guaranty agency, or a student loan lender) to which funds have been made available under any program administered by the Secretary.  The proposed regulations update the Department's authority to investigate and enforce alleged violations of FERPA by the expanded range of State and local educational authorities and other recipients of Department funds that may come into possession of student records and PII.  The proposed regulations also clearly authorize FPCO to investigate, review, and process an alleged violation committed by recipients of Department funds under a program administered by the Secretary in which students do not attend.  The Department states that it believes that these enhanced enforcement procedures are especially important given the disclosure of personally identifiable information needed to implement SLDS.

Given the vast expansion of entities that would gain access to and maintain education records, AACRAO would certainly understand and support greater enforcement authority for the Department should the proposed regulations be adopted. Desirable and necessary as such expanded authority would be, it cannot be unilaterally manufactured by the Secretary. Nothing in the underlying statute even remotely hints at the Secretary having any authority to treat entities enumerated in the preamble discussion of this section as educational agencies or institutions. This lack of statutory enforcement authority, in fact, should give the Department some pause with regard to its expansive approach to the sharing of personally identifiable information with entities with remote or questionable educational interest in the records they would access under the new regulations.   We note, in addition, that it is not clear which enforcement tools legally available to the Secretary would be utilized in actions against State education authorities and other entities.

10

It is also quite puzzling that the Secretary is not using this putative authority to subject these entities to other critical FERPA compliance requirements such as the right to inspect or the right to correct or amend education records. We strongly believe that extending these requirements to the new actors would be just as legally justifiable as what has been proposed, and that it would provide an important tool for parents and students to at least have awareness and minimal access *to their own records.*

Indeed, we believe that the Department is confounding privacy and security in this proposal. The dire need to manufacture new enforcement authority out of whole cloth is the direct consequence of the overbroad and ill-thought-through access and disclosures that would be permitted under the proposed regulations. A much wiser approach would be to limit nonconsensual data disclosures to compelling cases where a specific and articulable need can be demonstrated, and focus enforcement attention on the much smaller universe of entities maintaining these data. The Department is, instead, proposing a rule under which data are released to the custody of a vastly expanded number of entities, which the Department lacks legal authority and resources to adequately police.

While each of the changes discussed above might, by itself, do limited damage to privacy rights, we are all the more alarmed at the interactive effects of so many ill-conceived and legally unsupportable changes. The Department is arbitrarily expanding the number of entities that can gain access to personally identifiable information from education records, the reasons why they get access, and what they may do with the information they collect, even over the objections of the custodians of those records. We are dismayed by the Department's disregard for privacy rights, as well as its failure to consider the impossible compliance environment these proposed regulations would create. In addition, given the radical abandonment of historical interpretation, we find the short comment period quite insufficient and inadequate for purposes of eliciting broad community input.

We thank you for your consideration of our views and stand ready to work with you in addressing changes to the Family Educational Rights and Privacy Act within the framework of the statute.

Sincerely,

Jerome H. Sullivan
Executive Director

11

AR 0394

# PUBLIC SUBMISSION

**As of:** March 27, 2012
**Received:** May 23, 2011
**Status:** Posted
**Posted:** May 24, 2011
**Category:** National Advocacy Organization
**Tracking No.** 80e30b39
**Comments Due:** May 23, 2011
**Submission Type:** Web

**Docket:** ED-2011-OM-0002
Family Educational Rights and Privacy

**Comment On:** ED-2011-OM-0002-0001
Family Educational Rights and Privacy

**Document:** ED-2011-OM-0002-0228
Comment on FR Doc # 2011-08205

---

## Submitter Information

**Address:**
   Washington,  DC,
**Email:** rulemaking@epic.org
**Organization:** Electronic Privacy Information Center

---

## General Comment

See attached file(s)

---

## Attachments

Comment on FR Doc # 2011-08205

COMMENTS OF ELECTRONIC PRIVACY INFORMATION CENTER

to

THE DEPARTMENT OF EDUCATION

"Notice of Proposed Rulemaking"

RIN 1880-AA86

May 23, 2011

---

By notice published on April 8, 2011, the Department of Education ("ED") has proposed to amend the regulations that implement the Family Educational Rights and Privacy Act of 1974 ("FERPA").  EPIC opposes the proposed changes.  The Notice of Proposed Rulemaking ("NPRM") sets out agency recommendations that would undermine privacy safeguards set out in the statute and would unnecessarily expose students to new privacy risks.  Pursuant to the ED notice in the Federal Register, the Electronic Privacy Information Center ("EPIC") submits these comments and recommendations to address the substantial privacy risks raised by the agency's proposal.

EPIC is a public interest research center in Washington, D.C., established in 1994 to focus public attention on emerging civil liberties issues and to protect constitutional values and the rule of law. EPIC has a particular interest in preserving privacy safeguards established by Congress, including the Privacy Act of 1974,[1] and ensuring that new information systems developed and operated by the federal government comply with all applicable laws.[2]

---

[1] 5 U.S.C. § 552a (2011).

[2] *See* EPIC: Student Privacy, http://epic.org/privacy/student/; EPIC: Children's Online Privacy Protection Act, http://epic.org/privacy/kids/default.html; EPIC: Re-identification, http://epic.org/privacy/reidentification/; Letter from Lillie Coney, EPIC Associate Director, to

**I. The Agency Proposes an Unprecedented and Unlawful Release of Confidential Student Information Otherwise Protected by the FERPA**

FERPA prohibits the nonconsensual release of students' "educational records," including the "personally identifiable information contained therein."[3]  Congress imposed this "direct obligation" under the law "to protect the privacy of [student] records by preventing unauthorized access by third parties."[4]  Congress also provided specific exemptions in FERPA.[5]  The ED's proposals expand a number of FERPA's exemptions, reinterpreting the statutory terms "authorized representative," "education program," and "directory information."[6]  These proposals remove affirmative legal duties for state and local educational facilities to protect private student data.

---

the Social Security Administration (Sept. 3, 2004), *available at* http://epic.org/privacy/ssn/voter_reg_comments.pdf; Comments of the Electronic Privacy Information Center to the Dep't of Homeland Security, *Notice of Proposed Rulemaking: Implementation of Exemptions; Secure Flight Records*, 72 Fed. Reg. 48,397 (Sept. 24, 2007), *available at* http://epic.org/privacy/airtravel/sf_092407.pdf; Comments of the Electronic Privacy Information Center to the Federal Trade Comm'n, *Privacy Act of 1974: System of Records: Proposed Routine Use: Request For Public Comment*, 72 Fed. Reg. 14,814 (Apr. 30, 2007), *available at* http://epic.org/privacy/idtheft/ftc_comm_043007.pdf; Comments of the Electronic Privacy Information Center to the Office of the Director of National Intelligence, Privacy Act of 1974, 75 Fed. Reg. 63, 16698 (May 12, 2010), *available at* http://epic.org/privacy/ODNI_Comments_2010-05-12.pdf; Comments of the Electronic Privacy Information Center to the Dep't of Homeland Security, *Privacy Act of 1974: Department of Homeland Security Office of Operations Coordination and Planning – 003 Operations Collection, Planning, Coordination, Reporting, Analysis, and Fusion System of Records*, 75 Fed. Reg. 69,689 (Dec. 15, 2010); Comments of the Electronic Privacy Information Center to the Dep't of Homeland Security, *Privacy Act of 1974; Department of Homeland Security Office Operations Coordination and Planning – 004 Publicly Available Social Media Monitoring and Situational Awareness Initiative System of Records*, 76 Fed. Reg. 5603 (Mar. 3, 2011).
[3] 20 U.S.C. § 1232g(b)(1) (2011).
[4] *United States v. Miami Univ.*, 91 F. Supp. 2d 1132, 1140-46 (S.D. Ohio 2000) *aff'd*, 294 F.3d 797 (6th Cir. 2002) (citing 120 Cong.Rec. 39,858, 39,862-39,863 (Dec. 13, 1974); 121 Cong.Rec. 7974 (May 13, 1975)).
[5] NPRM at 19728.
[6] *Id.*

Congress exempted "authorized representatives of (I) the Comptroller General of the United States, (II) the Secretary, or (III) State educational authorities" from FERPA's default prohibition against sharing student data.[7]  Congress narrowed this exemption, specifying that "authorized representatives" of state educational authorities were permitted to "audit and evaluat[e] . . . Federally-supported education programs."[8]  Before the current proposal, the Department's "longstanding interpretation [of the term "authorized representative"] has been that it does not include other State or Federal agencies because these agencies are not under the direct control (*e.g.,* they are not employees or contractors) of a State educational authority."[9]  Under that interpretation, "SEA or other State educational authority may not [disclose student data] to other State agencies, such as State health and human services departments."[10]  The agency proposal contemplates withdrawing the current interpretation of "authorized representatives" in order to exempt from FERPA's privacy requirements "any entity or individual designated by a State or local education authority or agency . . . to conduct . . . any audit, evaluation, or compliance or enforcement activity."[11]

Similarly, the agency proposes to expand an exemption for audits of "education programs."  As discussed above, Congress specifically exempted "authorized representatives" to "audit and evaluat[e] . . . Federally-supported education programs."[12]  At present, the term "education programs" has no definition, but the agency proposes to include "any program that is principally engaged in the provision of education."[13]  This includes "early childhood education,

---

[7] 20 U.S.C. § 1232g(b)(1)(C).
[8] 20 U.S.C. § 1232g(b)(3).
[9] NPRM at 19728.
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.* at 19729.

elementary and secondary education, postsecondary education, special education, job training,

career and technical education, and adult education, regardless of whether the program is

administered by an educational authority."[14]  The agency includes examples of "education" that

are principally administered by doctors and social workers rather than educators.[15]

Finally, the agency proposes to include student ID numbers as "directory information," a

narrow category of information which is exempted from FERPA protections that otherwise apply

to student data.  The proposal would allow schools to publicly disclose student ID numbers that

are displayed on student ID cards or badges.[16]  The current definition of "directory information"

is "information contained in an education record of a student that would not generally be

considered harmful or an invasion of privacy if disclosed."[17]  Congress has explicitly limited

"directory information" to:

> the student's name, address, telephone listing, date and place of birth, major field
> of study, participation in officially recognized activities and sports, weight and
> height of members of athletic teams, dates of attendance, degrees and awards
> received, and the most recent previous educational agency or institution attended
> by the student.[18]

The agency proposes to add student ID numbers to regulations that interpret this statutory

provision.

## II. The Agency Ignores the Purpose of FERPA and Relies on a Fundamental Misreading of Appropriations Legislation

The Department of Education contends that the America Creating Opportunities to

Meaningfully Promote Excellence in Technology, Education, and Science Act of 2007

("COMPETES Act") and the American Recovery and Reinvestment Act of 2009 ("ARRA")

---

[14] *Id.* at 19729-30.
[15] *Id*. at 19730.
[16] *Id*. at 19729
[17] 34 C.F.R. § 99.3.
[18] 20 U.S.C. § 1232g(a)(5)(A).

should influence the agency's interpretation of a Family Educational Rights and Privacy Act of 1974.[19]  The Department intends to revise FERPA regulations to reflect what it has deemed "Congress' intent in the ARRA to have States link data across sectors."[20]  Specifically, the NPRM the Department issued on April 8, 2011 cites Titles VIII and XIV of the ARRA to justify an unprecedented expansion of statewide longitudinal data systems ("SLDS") to incorporate "workforce, health, family services, and other data."[21]  Contrary to the agency's assertions, Congress has not expressed an intention to expand the use of SLDS beyond rudimentary academic data.

The statutory framework Congress designed to establish SLDS is far less sweeping than the ED implies in its Notice of Proposed Rulemaking.[22]  Congress has passed the Elementary and Secondary Education Act of 1965,[23] the Educational Technical Assistance Act of 2002,[24] the Competes Act of 2007,[25] and the American Recovery and Reinvestment Act of 2009.[26]  The Elementary and Secondary Education Act requires states to develop "longitudinal data system[s] that link[] student test scores, length of enrollment, and graduation records over time."[27]  The Educational Technical Assistance Act authorized grants for states to develop "longitudinal data systems to efficiently and accurately manage, analyze, disaggregate, and use individual student data, consistent with the Elementary and Secondary Education Act of 1965."[28]

---

[19] Family Educational Rights and Privacy, 76 Fed. Reg. 19726 (Apr. 8, 2011) [hereinafter *NPRM*]
[20] *Id.* at 19728.
[21] *Id.* at 19729.
[22] *Id.*
[23] Pub.L.No. 107-110, 115 Stat. 1444 (2002).
[24] Pub.L.No. 107-279, 116 Stat 1940 (2002).
[25] Pub.L.No. 110-69, 121 Stat 572 (2007).
[26] Pub.L.No. 111-5, 123 Stat 115 (2009).
[27] 20 U.S.C. § 6311(b)(2)(K)(3)(B) (2011).
[28] 20 U.S.C. § 9607 (2011).

The COMPETES Act authorized grants for establishing and improving education data systems that meet the requirements of FERPA.[29] Congress stipulated that grants should be used to track three sets of data pertaining to elementary and secondary school students: first, "student-level enrollment, demographic, and program participation information;" second, "student-level information about the points at which students exit, transfer in, transfer out, drop out, or complete P-16 education programs;" and third, "yearly test records of individual students," "information on students not tested by grade and subject," "student-level transcript information, including information on courses completed and grades earned," and "student-level college readiness test scores."[30] For postsecondary students, the COMPETES Act authorizes grants for states to collect "information regarding the extent to which students transition successfully from secondary school to postsecondary education, including whether students enroll in remedial coursework," and "other information determined necessary to address alignment and adequate preparation for success in postsecondary education."[31] The COMPETES Act prohibits the disclosure of Personally Identifiable Information ("PII") except as permitted under FERPA.[32] The Act also requires states to keep an accurate account of any disclosures of student PII, to require data-use agreements for all third parties who access PII, to adopt adequate security measures, and to protect student records from any unique identifiers that heighten the risk of nonconsensual disclosures of PII.[33]

Given the omnibus nature of the American Recovery and Reinvestment Act, it is impossible to project congressional intent onto the Act beyond its plain text. The stated purposes

---

[29] *See* 20 U.S.C. § 9871(C)(i)(I) (2011).
[30] 20 U.S.C. §§ 9871(e)(2)(D)(i)-(ii) (2011).
[31] 20 U.S.C. § 9871(e)(2)(D)(iii) (2011).
[32] 20 U.S.C. § 9871 (e)(2)(C)(i)(III) (2011).
[33] 20 U.S.C. § 9871(e)(2)(C)(i)(IV)-(VIII) (2011).

of the Act included "stabilizing state budgets," "preserving and creating jobs," and "providing investments in infrastructure and economic efficiency," but stated nothing of eroding statutory privacy protections for the sake of expanding non-academic uses of student data.[34]  In its 1,073 pages, the ARRA made no mention of FERPA, nor agency regulations implementing FERPA's protection of student data.[35]  Still, the Department cites the ARRA seven different times in the first two pages of its NPRM to justify reinterpreting Congress's clear intent in FERPA to safeguard student privacy.  Only two provisions of the ARRA explicitly reference SLDS.  The first, under Title VIII, provides $250,000,000 to "carry out section 208 of the Educational Technical Assistance Act . . . which may be used for Statewide data systems that include postsecondary and workforce information."[36] The second, under Title XIV, requires governors whose states receive educational money under the ARRA to assure the Secretary of Education that the state "will establish a longitudinal data system that includes the elements described in section 6401(e)(2)(D) of the America COMPETES Act."[37]  Neither of these provisions contemplate linking of non-academic data.

Expanding third party access to student data is contrary to FERPA, given the purpose of the Act. FERPA prohibits the nonconsensual release of "educational records," including the "personally identifiable information contained therein."[38] Congress imposed a "direct obligation" on regulated agencies in order "to protect the privacy of [student] records by preventing

---

[34] Public Law 111-5, Div. A, tit. I, § 3(a)(1)-(5), 123 Stat. 116.
[35] *Id*.
[36] Public Law 11-5, Div. A, tit. VIII, 123 Stat. 183.
[37] Public Law 111-5, Div. A, tit. VIII, § 14005(d), 123 Stat. 282-3.
[38] 20 U.S.C. § 1232g(b)(1) (2011).

unauthorized access by third parties."[39]  Contrary to the agency's contentions, Congress itself

articulated specific reasons for precluding non-educational state agencies from accessing,

altering, or storing records containing the personally identifiable information of students.  The

law's chief sponsor Senator James L. Buckley specifically intended that FERPA would prevent

linking academic data to non-academic data for the purpose of measuring schools' impact.

Senator Buckley's statement in the Congressional Record describes FERPA as a safeguard

against "the dangers of ill-trained persons trying to remediate the alleged personal behavior or

values of students," which include "poorly regulated testing, inadequate provisions for the

safeguarding of personal information, and ill-devised or administered behavior modification

programs."[40]  In support of his concern, Senator Buckley entered into the Congressional Record

a *Parade* magazine article decrying "welfare and health department workers" accessing student

records that included "soft data" such as "family, . . . psychological, social and academic

development . . . personality rating profile, reports on interviews with parents and 'high security'

psychological, disciplinary and delinquency reports."[41]

Congress has yet to alter its stance on FERPA legislative safeguards, a prerequisite for

the agency's tracking of 'soft data' and other non-academic characteristics, charting them with

SLDS, and sharing the results with non-academic institutions.  Still, the agency asserts that the

most cursory mention of SLDS in the ARRA constitutes "intent . . . to have States link data

---

[39] *United States v. Miami Univ.*, 91 F. Supp. 2d 1132, 1140-1146 (S.D. Ohio 2000) *aff'd*, 294
F.3d 797 (6th Cir. 2002) (citing 120 Cong.Rec. 39,858, 39,862-63 (Dec. 13, 1974); 121
Cong.Rec. 7974 (May 13, 1975)).
[40] 120 Cong.Rec. at 14580-81 (1974).
[41] Mary Margaret Penrose, *In the Name of Watergate: Returning FERPA to Its Original Design*,
14 N.Y.U. J. Legis. & Pub. Pol'y 75, 84-85 (2011) (citing Diane Divoky, *How Secret School
Records Can Hurt Your Child*, PARADE, Mar. 31, 1974, at 14).

across sectors."[42]  This approach violates elemental rules of statutory interpretation.  First, "[i]t is

a commonplace of statutory construction that the specific governs the general."[43]  Congress's

specific and explicit decision in FERPA to protect student data from non-academic initiatives

takes precedence over Congress's general intention to track student data in the ARRA.  Second,

"repeals by implication are not favored."[44]  The Supreme Court has explained that this rule is

particularly applicable when the implication derives from appropriations legislation:

> The doctrine disfavoring repeals by implication "applies with full vigor when . . .
> the subsequent legislation is an *appropriations* measure." . . . . This is perhaps an
> understatement since it would be more accurate to say that the policy applies with
> even *greater* force when the claimed repeal rests solely on an Appropriations Act.
> We recognize that both substantive enactments and appropriations measures are
> "Acts of Congress," but the latter have the limited and specific purpose of
> providing funds for authorized programs.[45] (emphasis in original)

The ED has cited appropriations legislation seven separate times for the contention that Congress

implicitly intended to amend a previously enacted statute never actually mentioned in the

appropriations legislation.[46]  This is a fundamental misconstruction, which underlies a failure to

properly implement Congress's actual intent to protect private student data from non-academic

uses.

The disconnect between the ED's proposed rule and the Act of Congress exists because

the Secretary of Education has embraced the very "soft data" approach Congress designed

---

[42] NPRM at 19728

[43] *N. Am. Catholic Educ. Programming Found., Inc. v. F.C.C.*, 437 F.3d 1206, 1209 (D.C. Cir. 2006) (quoting *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374 (1992)).

[44] *United States v. Hansen*, 772 F.2d 940, 944 (D.C. Cir. 1985) (citing the risks that "the legislative process would become distorted by a sort of blind gamesmanship, in which Members of Congress vote for or against a particular measure according to their varying estimations of whether its implications will be held to suspend the effects of an earlier law that they favor or oppose.").

[45] *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978).

[46] *See* NPRM at 19726-29.

FERPA to prevent.[47]  Previously in 2010, the Department published the following guidance for

"Race to the Top" education grant applicants in the Federal Register:

> The Secretary is particularly interested in applications in which the State plans to
> expand statewide longitudinal data systems to include or integrate special
> education programs, English language learner programs, early childhood
> programs, at-risk and dropout prevention programs, and school climate and
> culture programs as well as information on . . . student mobility, . . . student
> health, postsecondary education, and other relevant areas.[48]

Now, the Department has designed yet another proposal to accommodate the Secretary's interests

in non-academic tracking and data sharing prohibited by FERPA.  What follows is a

comprehensive review of each significant amendment the Department has proposed to achieve

the unauthorized end of "link[ing] education, workforce, health, family services, and other data

for the purpose of evaluating, auditing, or enforcing Federal legal requirements related to,

Federal or State supported education programs."[49]

### III. Expanding "Authorized Representatives": The Agency Proposes an Unauthorized, Unlawful Sub-Delegation of Its Own Authority

The agency has proposed to ease its own previous restrictions on third party access to

personally identifiable student data.  By statute, Congress has commanded the ED to ensure that

state and local educational institutions do not release student records without the written consent

of parents, providing a limited number of narrow exceptions to this general rule.  One such

exception is for "authorized representatives of the Comptroller General of the United States, the

Secretary, or State educational authorities."[50]  The agency aims to stretch the term "authorized

---

[47] *See* Mary Margaret Penrose, *In the Name of Watergate: Returning FERPA to Its Original Design*, 14 N.Y.U. J. Legis. & Pub. Pol'y 75, 84-85 (2011) (citing Diane Divoky, *How Secret School Records Can Hurt Your Child*, PARADE, Mar. 31, 1974, at 14).
[48] Overview Information; Race to the Top Fund; Notice Inviting Applications for New Awards for Fiscal Year (FY) 2010, 74 Fed. Reg. 59836 (Nov. 18, 2009).
[49] NPRM at 19729.
[50] 20 U.S.C. 1232g(b)(1)(C) (2011).

representatives" past its breaking point, designating non-governmental actors as

"representatives" of state educational institutions.[51]  Under the proposed regulations, these

authorized representatives would not be under the direct control of the educational authorities

that provide them access to private student data.[52]  To compensate for blurring the lines of

authority, the Department proposes a single requirement that educational entities "use reasonable

methods to ensure any entity designated as its authorized representative remains compliant with

FERPA."[53]  The agency contemplates publishing non-binding, "non-regulatory guidance" to

suggest the "reasonable" measures educational entities should adopt.[54]

The term "reasonable" is an unnecessarily vague term of art.  The agency designed the

standard to "provide flexibility for a State or local educational authority or [the Comptroller, the

Attorney General, or the Secretary of Education, or their agency staff] to make these

determinations."[55]  At the very least, the Department should promulgate a robust, specific,

mandatory set of "reasonable" measures, with input from the public, including credentialed

security experts, and then bring enforcement actions against any regulated entities that fail to

adopt them.

To reasonably reflect Congressional intent, however, the Department should retract

completely its proposed expansion of the class of "authorized representatives."  Just as when

Congress delegates powers to agencies, FERPA contemplates limiting the power to make those

determinations to entities with commensurate responsibility to ensure full compliance.  The

model the ED is adopting delegates the interpretation of federal law to non-federal entities.  The

---

[51] NPRM at 19727-29.
[52] *Id*.
[53] *Id.* at 19728.
[54] *Id*.
[55] *Id*.

FCC once attempted to adopt a similar model by delegating authority to state utility commissions to make "more 'nuanced' and 'granular'" decisions about telecommunications infrastructure that market incumbents had to share with competitors under federal law.[56]  The United States Court of Appeals for the D.C. Circuit, which also has direct authority to review the ED's decision in this administrative proceeding, struck down the "subdelegation" model as unlawful.[57]  In *U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554, 564 (D.C. Cir. 2004), the D.C. Circuit held that "subdelegations to outside parties are assumed to be improper absent an affirmative showing of congressional authorization."[58]  The same presumption applies to the Department's proposal here, and the proposal fails to demonstrate any such affirmative showing.

The factors that first persuaded the D.C. Circuit that "subdelegation" models are unlawful are present here as well.  The *U.S. Telecom* court noted that the FCC "gave the states virtually unlimited discretion" in interpreting federal-law requirements.[59]  Here, the proposed regulations' "non-regulatory guidance" fails to adequately legally bind the state and local educational institutions that would be tasked with ensuring FERPA compliance.  The *U.S. Telecom* court also highlighted that parties aggrieved by state utility commission decisions had no assurance "when, or even whether, the [federal agency] might respond."[60]  Here, the Department of Education has rarely used the broad statutory power Congress granted the agency to "issue cease and desist orders and to take any other action authorized by law."[61]  Nor has the agency ever applied the specific sanctions Congress designed to enforce FERPA, namely withholding federal funding

---

[56] *U.S. Telecom Ass'n v. F.C.C.,* 359 F.3d 554, 564 (D.C. Cir. 2004)

[57] *Id*.

[58] *Id*. at 565.

[59] *Id.* at 564.

[60] *Id*.

[61] *United States v. Miami Univ*., 91 F. Supp. 2d 1132, 1145 (S.D. Ohio 2000) *aff'd,* 294 F.3d 797 (6th Cir. 2002).

from universities found to violate students' privacy rights.[62]  The Department routinely fails to

use its power and rein in the institutions directly accountable to it.   It is unlikely that the agency

would be more stringent on institutions outside its direct control.

The D.C. Circuit also discussed the following policy concerns about "subdelegation":

[W]hen an agency delegates power to outside parties, lines of accountability may
blur, undermining an important democratic check on government decision-
making . . . . Also, delegation to outside entities increases the risk that these
parties will not share the agency's "national vision and perspective," . . . and thus
may pursue goals inconsistent with those of the agency and the underlying
statutory scheme.  In short, subdelegation to outside entities aggravates the risk of
policy drift inherent in any principal-agent relationship. . . The fact that the
subdelegation in this case is to state commissions rather than private organizations
does not alter the analysis.[63]

The ED has premised its proposed regulations on state and local educational institutions' legal

authority to ensure FERPA compliance under state and local laws.  The agency would

unlawfully remove the most fundamental safeguard standing between bad actors and private

student data: the threat of federal agency enforcement actions.  As discussed above, Congress's

intent in drafting FERPA is anything but "an affirmative showing of congressional authorization

for such a subdelegation," as the D.C. Circuit would require in this case.[64]  This proposed

amendment is thus not only unwise, but also clearly unlawful.

## IV. Expanding "Educational Programs": The Agency Uses the Pretext of Education To Justify Exposing Troves of Sensitive, Non-Academic Data

The agency has also proposed to expand the acceptable purposes for which third parties

may access student records without notifying parents.  The agency intends to reinterpret the

statutory term "education programs."[65]  Under existing law, regulated parties can grant

---

[62] 20 U.S.C. § 1232g(b)(1) (2011).
[63] *U.S. Telecom Ass'n* at 565-66.
[64] *Id*. at 565.
[65] NPRM at 19729-30.

"authorized representatives" access to "education records in connection with an audit or evaluation of Federal or State supported education programs, or for the enforcement of or compliance with Federal legal requirements that relate to those programs."[66]  The ED proposes to include as "educational programs" any single "program" that is

> principally engaged in the provision of education, including, but not limited to early childhood education, elementary and secondary education, postsecondary education, special education, job training, career and technical education, and adult education, regardless of whether the program is administered by an education authority.[67]

Foreshadowing the ED's lax enforcement of this provision, the agency provides an example that fails even to fall within its own expansive list: "[f]or example, in many States, State-level health and human services departments administer early childhood education programs, including early intervention programs authorized under Part C of the Individuals with Disabilities Education Act."[68]

The reason state-level health and human services agencies administer Part C of the Individuals with Disabilities Act is that Part C is not principally educational.  Part C of the Act, while a meritorious program in its own right, is principally engaged in non-academic services provided by: "Audiologists; Family therapists; Nurses; Nutritionists; Occupational therapists; Orientation and mobility specialists; Pediatricians and other physicians; Physical therapists; Psychologists; Social workers; Special educators; and Speech and language pathologists."[69] Linking state educational records to Part C data would expose a range of personal student information, including data pertaining to "catheterization, tracheostomy care, tube feeding, the

---

[66] 34 C.F.R. 99.35(a)(1) (2011).
[67] NPRM at 19729-30.
[68] *Id.* at 19730.
[69] 34 C.F.R. § 303.12(e)(1)-(12) (2011).

changing of dressings or colostomy collection bags, and other health services;"[70]

"[a]dministration of medications, treatments, and regimens prescribed by a licensed physician;"[71]

"[f]eeding skills and feeding problems; and . . . [f]ood habits and food preferences;"[72]

"psychological and developmental tests and other assessment procedures;"[73] and "problems in a

child's and family's living situation (home, community, and any center where early intervention

services are provided) that affect the child's maximum utilization of early intervention

services."[74] For parents struggling to meet the needs of developmentally disadvantaged child

during an economic recession, these regulations would present a Hobson's choice: forego

government assistance that can help your child or expose intimate information about the child,

and furthermore your entire "living situation," to any number of newly appointed and barely

regulated "authorized representatives."[75]

The agency states that "education may begin before kindergarten and may involve

learning outside of postsecondary institutions."[76] Expanding uses of academic data to

reflect this fact does not require gutting FERPA to link student PII with records

maintained by state health agencies. The agency should adjust its approach and propose

narrow, targeted expansions of existing regulations that account for specific advances in

school accountability. In doing so, it should develop clear, enforceable, and objective

standards that reflect Congress's intent to protect student data from non-academic

programs.

---

[70] 34 C.F.R. § 303.13(1) (2011).
[71] 34 C.F.R. § 303.12(iii) (2011).
[72] 34 C.F.R. § 303.12(C)-(D) (2011).
[73] 34 C.F.R. § 303.12(10)(1) (2011).
[74] 34 C.F.R. § 303.12(iv) (2011).
[75] *Id.*
[76] NPRM at 19730.

**V. Student ID Numbers as "Directory Information": The Agency Insufficiently
Safeguards Students from the Risks of Re-Identification**

In drafting FERPA, Congress provided an exception to the general prohibition against

releasing educational records for the narrow category of "directory information."[77]   The current

definition of "directory information" is "information contained in an education record of a

student that would not generally be considered harmful or an invasion of privacy if disclosed."[78]

Congress has explicitly limited "directory information" to:

> the student's name, address, telephone listing, date and place of birth, major field
> of study, participation in officially recognized activities and sports, weight and
> height of members of athletic teams, dates of attendance, degrees and awards
> received, and the most recent previous educational agency or institution attended
> by the student.[79]

The agency's proposed regulations contemplate designating student ID numbers as "directory

information."

This proposal would authorize schools to disclose publicly student ID numbers that are

displayed on individual cards or badges.[80]   The agency admits that this measure raises schools

"concerns [amongst school officials] about the potential misuse by members of the public of

personally identifiable information about students, including potential identity theft."[81]   Paired to

this acknowledged security risk is a single, insufficient safeguard whose implementation would

be impracticable.   The proposed regulations would prohibit the release of any student ID

numbers sufficient, *on their own*, to provide third parties direct access to students' personally

identifiable information.   The proposed regulations permit the public release of:

---

[77] 20 U.S.C. § 1232g(b)(1).
[78] 34 C.F.R. § 99.3.
[79] 20 U.S.C. § 1232g(a)(5)(A).
[80] *Id*. at 19729
[81] *Id*. at 19732

A student ID number, user ID, or other unique personal identifier used by a student for purposes of accessing or communicating in electronic systems, but only if the identifier cannot be used to gain access to education records except when used in conjunction with one or more factors that authenticate the user's identity, such as a personal identification number (PIN), password or other factor known or possessed only by the authorized user.[82]

As a starting point, the Department should change the language of the proposal to stipulate that any "factors" third parties could possibly use in conjunction with disclosed student ID numbers to access student data *must* be factors "known or possessed only by the authorized user."  This differs from the agency's current approach, which includes the "known or possessed only" language as an illustrative example in a non-exhaustive list.[83]

Still, the ED's fatal assumption is the relative ease with which it contemplates determining whether identifiers can be used to gain access to education records.[84] The information gleaned from unique identifiers can provide sensitive and potentially embarrassing reports.  It can be used for business purposes, as well as by individual citizens employing widely available tools. Re-identification can also be used for many types of investigative reporting, especially investigations involving celebrities or politicians.[85] It can also be used by parties trying to identify a very small group of individuals with a similar characteristic, or parties adjudicating criminal or divorce proceedings.

---

[82] *Id*. at 19737.

[83] *Id.* at 19729.

[84] *See, e.g.*, Latanya Sweeney, *Simple Demographics Often Identify People Uniquely,* Carnegie Mellon University, Data Privacy Working Paper No. 3 (2000); Ross J. Anderson, *The DeCODE Proposal for an Icelandic Health Database,* at 11 (Oct. 20, 1998); Ross J. Anderson, *Security Engineering: A Guide To Building Dependable Distributed Systems* 172 (2008); Fida Kamal Dankar & Khaled El Emam, *A Method for Evaluating Marketer Re-identification Risk,* Proceedings of the 2010 EDBT/ICDT Workshops, ACM, Article 28 (2010).

[85] Salvador Ochoa, *Re-identification of Individuals in Chicago's Homicide Database: A Technical and Legal Study*, Massachusetts Institute of Technology (2001).

AR 0532

Beyond changing the language, the Department should suspend this proposed regulation and consult with security experts to ensure it will not facilitate unaccountable and unlawful third-party access to education records.  As drafted, there is no objective standard for educational entities to ensure that third parties cannot use disclosed identifiers to gain access to undisclosed education records.  The Department must develop a binding, rigorous method that educational entities must undertake in order to ensure that student ID numbers cannot be used to breach student privacy.

## V. Conclusion

For the foregoing reasons, the EPIC recommends that the Department of Education revise the proposed regulations and fully assess the privacy and security implications of its aims. Proper interpretations of FERPA would, at a minimum: (1) recognize the clearly stated and legally binding intent Congress expressed in FERPA that prioritizes the protection of student data and restricts its uses for non-academic purposes; (2) restrict "authorized representatives" to regulated entities that are under direct agency control via Congress's FERPA funding sanctions; (3) propose only specific expansions of "educational programs" that are justified by recent educational developments and solely engaged in educational purposes; and (4) precede any expansion of third party access to student information with a comprehensive security assessment that doing so will not alter any baseline risk of identity theft, student re-identification, or unlawful disclosure of sensitive student data.  EPIC anticipates the agency's specific and substantive responses to each of these proposals.

The current NPRM is contrary to law, exceeds the scope of the agency's rulemaking authority, and should be withdrawn.

Marc Rotenberg
EPIC President


Conor Kennedy
EPIC Appellate Advocacy Fellow


Thomas H. Moore
EPIC Of Counsel

# DEPARTMENT OF EDUCATION

## 34 CFR Part 99

[DOCKET ID ED–2011–OM–0002]

RIN 1880–AA86

## Family Educational Rights and Privacy

**AGENCY:** Office of Management, Department of Education.

**ACTION:** Final regulations.

**SUMMARY:** The Secretary of Education (Secretary) amends the regulations implementing section 444 of the General Education Provisions Act (GEPA), which is commonly referred to as the Family Educational Rights and Privacy Act (FERPA). These amendments are needed to ensure that the U.S. Department of Education (Department or we) continues to implement FERPA in a way that protects the privacy of education records while allowing for the effective use of data. Improved access to data will facilitate States' ability to evaluate education programs, to ensure limited resources are invested effectively, to build upon what works and discard what does not, to increase accountability and transparency, and to contribute to a culture of innovation and continuous improvement in education. The use of data is vital to ensuring the best education for our children. However, the benefits of using student data must always be balanced with the need to protect student privacy. Protecting student privacy helps achieve a number of important goals, including avoiding discrimination, identity theft, as well as other malicious and damaging criminal acts.

**DATES:** These regulations are effective January 3, 2012. However, State and local educational authorities, and Federal agencies headed by officials listed in § 99.31(a)(3) with written agreements in place prior to January 3, 2012, must comply with the existing requirement in § 99.35(a)(3) to use written agreements to designate any authorized representatives, other than employees, only upon any renewal of or amendment to the written agreement with such authorized representative.

**FOR FURTHER INFORMATION CONTACT:** Ellen Campbell, U.S. Department of Education, 400 Maryland Avenue SW., Room 2E203, Washington, DC 20202–8520. *Telephone:* (202) 260–3887.

If you use a telecommunications device for the deaf (TDD), call the Federal Relay Service (FRS), toll-free, at 1–(800) 877–8339.

**SUPPLEMENTARY INFORMATION:** On April 8, 2011, the Department published a notice of proposed rulemaking (NPRM)

in the **Federal Register** (76 FR 19726). In the preamble to the NPRM, the Secretary stated that the proposed changes were necessary to ensure the Department's proper implementation of FERPA, while allowing for the effective use of student data, and to address other issues identified through the Department's experience in administering FERPA.

Protecting student privacy is paramount to the effective implementation of FERPA. All education data holders must act responsibly and be held accountable for safeguarding students' personally identifiable information (PII) from education records. The need for clarity surrounding privacy protections and data security continues to grow as statewide longitudinal data systems (SLDS) are built and more education records are digitized and shared electronically. As States develop and refine their information management systems, it is critical that they take steps to ensure that student information is protected and that PII from education records is disclosed only for authorized purposes and under circumstances permitted by law. (When we use the term "disclose" in this document, we sometimes are referring to redisclosures as well.)

The amendments reflected in these final regulations establish the procedures that State and local educational authorities, and Federal agencies headed by officials listed in § 99.31(a)(3) (FERPA-permitted entities), their authorized representatives, and organizations conducting studies must follow to ensure compliance with FERPA. The amendments also reduce barriers that have inhibited the effective use of SLDS as envisioned in the America Creating Opportunities to Meaningfully Promote Excellence in Technology, Education, and Science Act (the America COMPETES Act) (Pub. L. 110–69) and the American Recovery and Reinvestment Act of 2009 (ARRA) (Pub. L. 111–5). Finally, by expanding the requirements for written agreements and the Department's enforcement mechanisms, the amendments help to ensure increased accountability on the part of those with access to PII from education records.

These amendments include definitions for two previously undefined terms, "authorized representative" and "education program," to permit greater access by appropriate and authorized parties to information on students in order to evaluate the effectiveness of education programs. Specifically, we have modified the definition of and

requirements related to "directory information" to clarify (1) that the right to opt out of the disclosure of directory information under FERPA does not include the right to refuse to wear, or otherwise disclose, a student identification (ID) card or badge; (2) that schools may implement a limited directory information policy in which they specify the parties or purposes for which the information is disclosed; and (3) the Department's authority to hold State educational authorities and other recipients of Department funds under a program administered by the Secretary accountable for compliance with FERPA.

We believe that the regulatory changes adopted in these final regulations provide clarification on many important issues that have arisen over time with regard to how FERPA applies to SLDS and to other requests for data on student progress. Additionally, educational agencies and institutions continue to face considerable challenges implementing directory information policies that help them maintain safe campuses and protect PII from education records from potential misuse, such as identity theft. These final regulations, as well as the discussion in the preamble, will assist school officials in addressing these challenges in a manner that complies with FERPA. These final regulations also respond to the September 2010 U.S. Government Accountability Office (GAO) study entitled "Many States Collect Graduates' Employment Information, but Clearer Guidance on Student Privacy Requirements Is Needed," by clarifying the means by which States can collect and share graduates' employment information under FERPA.

Finally, we have discussed with the U.S. Department of Agriculture (USDA) the potential effect of these regulations on the use of information regarding individual children's eligibility for free or reduced price school meals in the National School Lunch and School Breakfast Programs (School Meals Programs or SMPs) in connection with an audit or evaluation of Federal- or State-supported education programs. Congress recognized that sharing of children's eligibility information could benefit schools and children participating in the SMPs. As a result, section 9(b)(6) of the Richard B. Russell National School Lunch Act, as amended (National School Lunch Act) (42 U.S.C. 1758(b)(6)) permits schools to disclose children's eligibility information to persons with a need to know who are associated with a Federal or State education program and who will not

further disclose that information. Because of the importance of assuring not only that FERPA requirements are met, but also that all of the Federal confidentiality protections in the National School Lunch Act are met, the two Departments intend to jointly issue guidance in the near future for use by the educational community and by State and local administrators of USDA programs.

**Notice of Proposed Rulemaking**

In the NPRM, we proposed regulations to:

• Amend § 99.3 to define the term "authorized representative" to include individuals or entities designated by FERPA-permitted entities to carry out an audit or evaluation of Federal- or State-supported education programs, or for the enforcement of or compliance with Federal legal requirements related to these programs (audit, evaluation, or enforcement or compliance activity);

• Amend the definition of "directory information" in § 99.3 to clarify that a unique student identification (ID) number may be designated as directory information for the purposes of display on a student ID card or badge if the unique student ID number cannot be used to gain access to education records except when used in conjunction with one or more factors that authenticate the user's identity, such as a Personal Identification Number, password, or other factor known or possessed only by the authorized user;

• Amend § 99.3 to define the term "education program" as any program principally engaged in the provision of education, including, but not limited to, early childhood education, elementary and secondary education, postsecondary education, special education, job training, career and technical education, and adult education;

• Amend § 99.31(a)(6) to clarify that FERPA-permitted entities are not prevented from redisclosing PII from education records as part of agreements with researchers to conduct studies for, or on behalf of, educational agencies and institutions;

• Remove the provision in § 99.35(a)(2) that required that any FERPA-permitted entity must have legal authority under other Federal, State, or local law to conduct an audit, evaluation, or enforcement or compliance activity;

• Amend § 99.35(a)(2) to provide that FERPA-permitted entities are responsible for using reasonable methods to ensure that their authorized representatives comply with FERPA;

• Add a new § 99.35(a)(3) to require that FERPA-permitted entities must use

a written agreement to designate an authorized representative (other than an employee) under the provisions in §§ 99.31(a)(3) and 99.35 that allow the authorized representative access to PII from education records without prior written consent in connection with any audit, evaluation, or enforcement or compliance activity;

• Add a new § 99.35(d) to clarify that in the event that the Department's Family Policy Compliance Office (FPCO or Office) finds an improper redisclosure in the context of §§ 99.31(a)(3) and 99.35 (the audit or evaluation exception), the Department would prohibit the educational agency or institution from which the PII originated from permitting the party responsible for the improper disclosure (*i.e.,* the authorized representative, or the FERPA-permitted entities, or both) access to PII from education records for a period of not less than five years (five-year rule);

• Amend § 99.37(c) to clarify that while parents or eligible students (students who have reached 18 years of age or are attending a postsecondary institution at any age) may opt out of the disclosure of directory information, this opt out does not prevent an educational agency or institution from requiring a student to wear, display, or disclose a student ID card or badge that exhibits directory information;

• Amend § 99.37(d) to clarify that educational agencies or institutions may develop policies that allow the disclosure of directory information only to specific parties, for specific purposes, or both; and

• Add § 99.60(a)(2) to authorize the Secretary to take appropriate actions to enforce FERPA against any entity that receives funds under any program administered by the Secretary, including funds provided by grant, cooperative agreement, contract, subgrant, or subcontract.

**Changes From the NPRM**

These final regulations contain the following substantive changes from the NPRM:

• In § 99.3, we have defined the term "early education program" as that term is used in the definition of education program. The definition is based on the definition of "early childhood education program" in section 103(8) of the Higher Education Act of 1965, as amended (HEA) (20 U.S.C. 1003(8));

• We have made changes to the definition of "education program" in § 99.3 to clarify that any program administered by an educational agency or institution is considered an education program; and

• We have modified the written agreement requirement in § 99.31(a)(3) to require that the agreement specify how the work falls within the exception of § 99.31(a)(3), including a description of the PII from education records that will be disclosed, and how the PII from education records will be used.

We have also made the following minor or non-substantive changes from the NPRM:

• We have made minor editorial changes to the definition of "authorized representative" in § 99.3 to ensure greater consistency between the language in that definition and the language in § 99.35(a)(1);

• We have removed language from §§ 99.31(a)(6)(iii)(C)(*4*) and 99.35(a)(3)(iii) and (a)(3)(iv) that permitted an organization conducting a study or an authorized representative to return PII from education records to the FERPA-permitted entity from which the PII originated, in lieu of destroying such information. We made these changes to more closely align the regulatory language with the statute and to ensure that the PII from education records is destroyed as required by the statute;

• We have made changes to § 99.35(a)(2) to clarify that the FERPA-permitted entity from which the PII originated is responsible for using reasonable methods to ensure *to the greatest extent practicable* that any entity or individual designated as its authorized representative complies with FERPA requirements;

• We have made editorial changes to § 99.35(a)(2) so the language in that section is more consistent with the language in § 99.35(a)(1) regarding the requirements for an audit, evaluation, or enforcement or compliance activity;

• We have clarified in § 99.35(a)(3)(v) that the required written agreement must establish policies and procedures to protect PII from education records from further disclosure, including by limiting use of PII to only authorized representatives with legitimate interests in the audit, evaluation, or enforcement or compliance activity;

• We have revised § 99.35(b)(1) to refer to a State or local educational authority or agency headed by an official listed in § 99.31(a)(3) rather than "authority" or "agency", to ensure consistency with the language used in § 99.35(a)(2) and (a)(3);

• We have consolidated all regulatory provisions related to prohibiting an educational agency or institution from disclosing PII from education records to a third party outside of an educational agency or institution for at least five years (five-year rule) and moved them to subpart E of part 99 (What are the

Enforcement Procedures?). Specifically, we—

○ Included in § 99.67(c) language from current § 99.31(a)(6)(iv) concerning the application of the five-year rule when the Department determines that a third party outside the educational agency or institution fails to destroy PII from education records after the information is no longer needed for the study for which it was disclosed;

○ Clarified in § 99.67(d) that, in the context of the audit or evaluation exception, the five-year rule applies to any FERPA-permitted entity or its authorized representative if the Department determines that either party improperly redisclosed PII from education records; and

○ Moved to § 99.67(e) the language from current § 99.33(e) concerning the application of the five-year rule when the Department determines that a third party outside the educational agency or institution improperly rediscloses PII from education records in violation of § 99.33 or fails to provide the notification required under § 99.33(b)(2);

• Throughout subpart E of part 99 (§§ 99.60 through 99.67), we have revised the language regarding enforcement procedures to clarify that the Secretary may investigate, process, and review complaints and violations of FERPA against an educational agency or institution or against any other recipient of Department funds under a program administered by the Secretary. This marks a change from the current provisions, which refer only to the Department's enforcement procedures against "educational agencies and institutions," which are defined in § 99.3 as any public or private agency or institution to which part 99 applies under § 99.1(a). Section 99.1 describes FERPA as applying to an educational agency or institution to which funds have been made available under any program administered by the Secretary if (1) The educational institution provides educational services or instruction, or both, to students; or (2) the educational agency is authorized to direct and control public elementary or secondary, or postsecondary educational institutions; and

• Throughout subpart E of part 99 (§§ 99.60 through 99.67), we have clarified the procedures that the Office will follow to investigate, review, process, and enforce the five-year rule against third parties outside of the educational agency or institution.

**Analysis of Comments and Changes**

We received a total of 274 comments on the proposed regulations. The comments represented a broad spectrum of viewpoints from a number of different interested parties, including students, parents, privacy advocacy organizations, researchers, numerous associations, and representatives from schools, local educational agencies (LEAs) (also referred to as "districts"), and State educational agencies (SEAs).

We have carefully considered these comments and, as a result of this public input, have made several changes to the final regulations since publication of the NPRM. An analysis of the comments and changes follows. We group major issues according to subject, with applicable sections of the regulations referenced in parentheses. Generally, we do not address technical and other minor changes that we made, or respond to suggested changes that the law does not authorize the Secretary to make, or to comments that were outside the scope of the NPRM.

**General Comments**

*Definitions*

*Comment:* Several commenters stated that the terms used in the proposed regulations to refer to the different types of entities affected by the regulations were unclear and asked for the Department to clarify their meaning. Specifically, they asked if there is a difference between an educational agency or institution, on the one hand, and a State or local educational authority, on the other. Some commenters requested that we clarify whether a State agency, other than an SEA, such as a State department of social services, could be considered a State educational authority under the regulations. Another commenter asked that we also define the term "school official" to differentiate it from the term "authorized representative."

*Discussion:* There are differences in meaning between the terms "educational agency," "educational institution," and "State and local educational authority," and we provide the following explanation to clarify how these terms are used in the context of FERPA and its implementing regulations.

In general, FERPA applies to an "educational agency or institution" that receives funds under a program administered by the Secretary. 20 U.S.C. 1232g(a)(3). In § 99.3, we define the term "educational agency or institution" as any public or private agency or institution to which part 99 applies under § 99.1(a).

*Educational institution.* We use the term "educational institution" to refer to any elementary or secondary school, including any school funded or operated by the U.S. Department of the Interior's Bureau of Indian Education (BIE),[1] or to any postsecondary institution that receives funds under a program administered by the Secretary and that provides educational services or instruction, or both, to students (see § 99.1(a)(1)). Additionally, § 99.3 of the FERPA regulations defines "institution of postsecondary education" as an institution that provides education to students beyond the secondary school level. We generally use the term "institution of postsecondary education" to refer to colleges and universities and, in this document, use it interchangeably with the terms "postsecondary institution" and "institution of higher education".

*Educational agency.* Under § 99.1(a)(2), an "educational agency" is an entity that is authorized to direct and control public elementary or secondary schools or postsecondary institutions. Thus, we consider LEAs (a term that we use interchangeably with school districts) to be "educational agencies" in the context of FERPA. However, we do not generally view SEAs as being "educational agencies" under § 99.1(a)(2) because we interpret the statutory definition of the term "student" to mean that an educational agency is an agency attended by students. Under paragraph (a)(6) of FERPA, a "student includes any person with respect to whom an educational agency or institution maintains education records or personally identifiable information, but does not include a person who has not been in attendance at such agency or institution." 20 U.S.C. 1232g(a)(6). For example, we have generally considered students to be in attendance at the Fairfax County Public Schools school district, but not at the Virginia Department of Education. Therefore, under this framework, the term "educational agencies or institutions" generally refers to LEAs, elementary and secondary schools, schools operated by BIE, and postsecondary institutions.

*State and local educational authorities.* The term "State and local educational authority" is not defined in FERPA. The term "State and local

---

[1] Under section 9204(a) of the Elementary and Secondary Education Act of 1965, as amended (ESEA), the Secretary of Education and the Secretary of the Interior are required to reach an agreement regarding how the BIE will comply with ESEA requirements. Under a 2005 Final Agreement between the Department of Education and the Department of the Interior, the two Departments agreed, as a general matter, that the Department of Education would treat BIE as an SEA and each BIE school as an LEA, for purposes of complying with the requirements of ESEA.

educational authority" is important in the context of FERPA's audit or evaluation exception in §§ 99.31(a)(3) and 99.35 because State and local educational authorities are permitted to access, without consent, PII from education records. We generally have interpreted the term "State and local educational authority" to refer to an SEA, a State postsecondary commission, BIE, or any other entity that is responsible for and authorized under local, State, or Federal law to supervise, plan, coordinate, advise, audit, or evaluate elementary, secondary, or postsecondary education programs and services in the State. (See *http://www2.ed.gov/policy/gen/guid/fpco/ferpa/library/wku071105.html* for more information.) While we have not generally viewed an SEA as being an educational agency under § 99.1(a)(2) for the reasons outlined in the preceding paragraph, it is important to note that we do view an SEA as a State educational authority for FERPA purposes.

An LEA can be both an educational agency and a local educational authority under FERPA because an LEA is authorized to direct and control public elementary and secondary schools and to supervise Federal- or State-supported education programs and services in the State. Because an LEA is considered to be an educational authority, the LEA may conduct an audit or evaluation of a Federal- or State-supported education program under the audit or evaluation exception. For example, an LEA may wish to evaluate the effectiveness of a particular program in the school district.

Some commenters asked whether a State agency other than an SEA, such as a State social services agency, could be considered an "educational agency or institution" or a "State or local educational authority." We believe that State agencies other than an SEA could, depending on the individual circumstances, be considered to be an "educational agency or institution" or a State educational authority under FERPA. The Department generally considers a State postsecondary commission to be a State educational authority because such commissions are typically responsible for and authorized under State law to supervise, plan, coordinate, advise, audit, or evaluate Federal- or State-supported postsecondary education programs and services in the State. Likewise, a State-administered school that receives funds under a program administered by the Secretary, such as a school serving hearing-impaired students, is considered an educational institution

under FERPA because it provides educational services or instruction to students. In general, the Department does not consider a State social services agency to be an "educational agency or institution" under FERPA because, although such an agency may provide educational services or instruction to students, it is not authorized to direct and control public elementary or secondary or postsecondary educational institutions, and it does not have students in attendance. In addition, the Department does not consider a State social services agency to be a State educational authority because such an agency generally is not responsible for and authorized under State law to supervise, plan, coordinate, advise, audit, or evaluate federally or State-supported elementary, secondary, or postsecondary education programs and services in the State. However, because States vary widely in how they administer programs, the Department would make this determination on a case-by-case basis and evaluate the particular responsibilities of that agency before giving definitive guidance on whether a particular agency would be considered an educational agency or institution or a State or local educational authority under FERPA.

With regard to the request that we define the term "school official" to avoid confusion with the term "authorized representative," we note that current § 99.31(a)(1) in the FERPA regulations already describes "school official." This section makes clear that school officials are teachers and administrators who work within a school, school district, or postsecondary institution. The regulations also state in § 99.31(a)(1) that contractors, consultants, volunteers, or other parties to whom an educational agency or institution has outsourced institutional services or functions under the conditions listed in § 99.31(a)(1)(i)(B)(*1*) through (a)(1)(i)(B)(*3*) may be considered school officials with legitimate educational interests in students' education records. We believe that this language in § 99.31(a)(1) and the definition of "authorized representative" are sufficiently clear to ensure that there is no confusion between these different categories of individuals.

*Changes:* None.

*Comment:* Several commenters asked the Department to include definitions for, and examples of, the following terms: "evaluation," "audit," "research," "legitimate educational interest," "compliance activities," and "enforcement activities."

*Discussion:* The terms identified by the commenters are not defined in FERPA, and the Department did not propose to define them in the NPRM because we did not wish to define them in ways that would unnecessarily restrict the educational community. Moreover, we do not believe it would be appropriate to define these terms in these final regulations because the public would not have had an opportunity to comment on them.

*Changes:* None.

**Fair Information Practice Principles**

*Comment:* Some commenters stated that the proposed amendments to part 99 in the NPRM represented a "wholesale repudiation of the fair information practices." Others contended that the proposed regulatory changes go too far; that the changes would permit the disclosure of confidential student records to organizations that have little involvement in education, and the data will be used for purposes unrelated to education. Others expressed concern that the regulatory changes would result in student records being used for a wide range of activities under the pretext that some educational result would be derived from those activities. Others commented that obtaining parental consent to permit the disclosure of PII from education records should be the preferred approach.

*Discussion:* The Fair Information Practice Principles (FIPPs) are the foundation for information privacy in the United States. These principles are sometimes referred to just as FIPs (Fair Information Practices) and various versions of these principles exist with different numbering schemes. These principles include: That there be no secret recordkeeping systems; that individuals should have a way to find out information about themselves in a record and how it is used; that individuals be allowed to prevent information obtained for one purpose from being used for another; that individuals be allowed to correct records about themselves; and that the organization that created the record assure its reliability and take steps to prevent misuse. FIPPs form the basis of most State and Federal privacy laws in the United States, including FERPA. Like most privacy laws, however, the FIPPs must be adapted to fit the educational context of data disclosure. For example, one of the FIPPs principles is that individuals should have the right to prevent information for one purpose from being used for another. FERPA expressly permits the redisclosure, without consent, of PII from education

**75608** **Federal Register** / Vol. 76, No. 232 / Friday, December 2, 2011 / Rules and Regulations

records for a reason other than the reason for which the PII was originally collected, if the redisclosure is made on behalf of the educational agency or institution that provided the PII and the redisclosure meets the requirements of sec. 99.31.

The Department is not repudiating FIPPs, but rather is making only narrow changes to its regulations that it has determined are necessary to allow for the disclosure of PII from education records to improve Federal- and State-supported education programs while still preserving student privacy. The Department remains committed to FIPPs and believes that the final regulations appropriately embody core FIPPs tenets. In fact, FIPPs underlay the Department's recent privacy initiatives, including creating a Chief Privacy Officer position,[2] creating the Privacy Technical Assistance Center (PTAC),[3] and issuing a series of technical briefs on privacy, confidentiality, and data security.

We agree that it is preferable to obtain consent before disclosing PII from education records, and nothing in these final regulations is intended to change the statutory framework for consent. Nonetheless, Congress explicitly provided in FERPA that for certain purposes, PII from education records may be disclosed without consent. 20 U.S.C. 1232g(b).

We recognize that some may fear that these final regulations will permit the disclosure of PII from education records to improper parties, or for improper purposes, but we firmly believe such fears lack foundation. To be clear, these final regulations do not permit PII from education records to be disclosed for purposes unrelated to education. For example, the statute limits disclosures to those organizations that conduct studies for the purposes of "developing, validating, or administering predictive tests, administering student aid

programs, and improving instruction." We believe that the best method to prevent misuse of education records is not to bar all legitimate uses of education data, but rather to provide guidance and technical assistance on how legitimate uses can be implemented while properly protecting PII from education records in accordance with FERPA.

*Changes:* None.

*Comments:* Several commenters expressed concern or confusion about how the FERPA recordation, review, and correction provisions would work at the various school, LEA, or State levels.

Several commenters raised concerns about "up-stream data sharing" as it relates to the validity of the information maintained in SLDS. They expressed general concern that changes made to education records at the local level would not be reflected in the SLDS, so that authorized representatives of an SEA would be looking at out-of-date information. Some commenters suggested that when schools amend education records, they should be required to forward these amendments or corrections to their LEA or SEA.

A few commenters recommended that we require schools to notify parents and eligible students when PII from education records is disclosed to an outside entity. One commenter suggested that parents and students not only be notified, but that they also be given an opportunity to opt out of the disclosure. Several commenters expressed support for the notion that parents and students should be able to inspect and review education records held by authorized representatives.

One commenter asked why the Department did not propose to use its "putative enforcement authority" to create the right for parents and eligible students to inspect and seek to correct education records in the hands of authorized representatives.

*Discussion:* We appreciate the concern that records at State and local educational authorities be up-to-date to reflect changes made at the school level. We decline, however, to require schools to forward every change to "up-stream" educational entities, as this would be overly burdensome. Schools correct and update student education records on a daily basis and requiring daily "up-stream" updates is not feasible. Rather, we urge LEAs and SEAs to arrange for periodic updates. We believe that such an arrangement will help ensure the validity and accuracy of PII from education records disclosed to LEAs and SEAs and ultimately held in an SLDS.

We decline to adopt the suggestion that schools be required to notify parents and eligible students when PII from education records is redisclosed to an outside entity, and to provide parents and eligible students with an opportunity to opt out of the disclosure. FERPA expressly provides for disclosure without consent in these circumstances, a reflection of the importance of those limited disclosures.

Under § 99.7(a), educational agencies and institutions are required to annually notify parents and eligible students of their rights under FERPA. While FERPA does not require that this notice inform parents or eligible students of individual data sharing arrangements, we believe that transparency is a best practice. For this reason, we have amended our model notifications of rights under FERPA to include an explanation of the various exceptions to FERPA's general consent disclosure rule. This change to the model notifications should help parents and eligible students understand under what circumstances, such as the evaluation of a Federal- or State-supported education program, PII from education records may be disclosed to third parties without prior written consent. The *Model Notification of Rights under FERPA for Elementary and Secondary Schools* is included as Appendix B to this notice and the *Model Notification of Rights under FERPA for Postsecondary Institutions* is included as Appendix C to this notice; these model notifications are also available on the FPCO Web site at: *http://www2.ed.gov/policy/gen/guid/fpco/ferpa/lea-officials.html* and *http://www2.ed.gov/policy/gen/guid/fpco/ferpa/ps-officials.html.*

With respect to the suggestion that we revise the regulations so that parents and eligible students can inspect and review and seek to amend education records held by authorized representatives, we note that FERPA provides a right for parents and eligible students to inspect and review their education records held by SEAs, LEAs, and schools. 20 U.S.C. 1232g(a)(1)(A) and (a)(1)(B). The statute does not provide any right to inspect and review education records held by authorized representatives of FERPA-permitted entities or other third parties (other than SEAs). Further, FERPA also provides a right for parents and eligible students to seek to amend their education records held by LEAs and schools, but not SEAs. 20 U.S.C. 1232g(a)(2). Again, however, the statute does not provide any right to seek to amend education records held by authorized representatives of FERPA-permitted entities or other third parties. For this

---

[2] The Department established an executive level Chief Privacy Officer (CPO) position in early 2011. The CPO oversees a new division dedicated to advancing the responsible stewardship, collection, use, maintenance, and disclosure of information at the national level and for States, LEAS, postsecondary institutions, and other education stakeholders.

[3] PTAC was established to serve as a one-stop resource for SEAs, LEAs, the postsecondary community, and other parties engaged in building and using education data systems. PTAC's role is to provide timely and accurate information and guidance about data privacy, confidentiality, and security issues and practices in education; disseminate this information to the field and the public; and provide technical assistance to key stakeholders. PTAC will share lessons learned; provide technical assistance in both group settings and in one-on-one meetings with States; and create training materials on privacy, confidentiality, and security issues.

reason, we do not have the authority to expand these statutory provisions to apply to authorized representatives of FERPA-permitted entities or other third parties (other than the right to inspect and review education records maintained by SEAs).

Parents and eligible students seeking to inspect and review a student's education records held by an authorized representative or a third party other than the SEA may contact the disclosing school or LEA. The school or LEA would then be required to allow them to inspect and review and seek to amend the education records that they maintain. Additionally, while FERPA does not accord a right to a parent or an eligible student to inspect and review and seek to amend education records held by authorized representatives, FERPA-permitted entities are free to include inspection or amendment requirements in the written agreements they enter into with their authorized representatives, assuming it is permissible under applicable State and local law to do so.

FERPA does not require parental or student notification of individual data sharing arrangements that may utilize PII from education records. However, § 99.32(a) does require recordation, except as provided in § 99.32(d), of disclosures whenever an educational agency or institution or FERPA-permitted entity discloses PII from education records under one of the exceptions to the consent requirement. Thus, the recordation provisions in § 99.32(a)(3) require educational agencies and institutions to record the parties to whom they have disclosed PII from education records and the legitimate interests the parties had in obtaining the information. This recordation must also identify the FERPA-permitted entities that may make further disclosures of PII from education records without consent (see § 99.32(a)(1)). When requested, FERPA-permitted entities must provide pursuant to § 99.32(b)(2)(iii) a copy of their record of further disclosures to the requesting educational agency or institution where the PII from education records originated within a reasonable period of time, not to exceed 30 days. For example, a school may request a record of all further disclosures made by its SEA of PII from education records from that school. The SEA would be required to comply with this request within 30 days.

*Changes:* None.

**Legal Authority**

*Comment:* Numerous commenters questioned the Department's legal authority to issue the proposed regulations, stating the proposals exceed the Department's statutory authority. Enacting the proposed changes, many of these commenters argued, would require legislative amendments to FERPA that could not be achieved through the rulemaking process.

Several commenters also stated that the America COMPETES Act and ARRA do not confer legal authority upon the Department to propose regulations that would allow the disclosure of PII from education records in the manner envisioned in the NPRM. While acknowledging that the America COMPETES Act generally supports the establishment and expansion of SLDS, several commenters noted that the America COMPETES Act requires States to develop and utilize their SLDS only in ways that comply with the existing FERPA regulations. One commenter stated that ARRA was merely an appropriations law and did not suggest any shift in Congressional intent regarding FERPA's privacy protections, information sharing, or the disclosure of student education records, generally.

*Discussion:* We disagree with commenters who stated that they believe the Department lacks the statutory authority to promulgate the proposed regulations contained in the NPRM. As a general matter, the Department has broad statutory authority to promulgate regulations to implement programs established by statute and administered by the Department. Under section 414 of the Department of Education Organization Act, 20 U.S.C. 3474, "[t]he Secretary is authorized to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department." Similarly, section 410 of GEPA, 20 U.S.C. 1221e–3, provides that the Secretary may "make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department."

Neither section 444 of GEPA, which is more commonly known as FERPA, nor any other statute, limits the Department's authority to promulgate regulations to protect the privacy of PII from education records or to interpret its regulations on FERPA consistently with other Federal statutes. The proposed regulations in the NPRM fall clearly within the commonplace use of the Department's regulatory authority. Adopting these provisions is necessary to ensure that the Department's implementation of FERPA continues to protect the privacy of PII from education records, while allowing for PII from education records to be effectively used, particularly in SLDS.

Moreover, we disagree with the contention that the America COMPETES Act and ARRA do not provide evidence of Congressional intent to expand and develop SLDS to include early childhood education, postsecondary, and workforce information. We believe the America COMPETES Act and ARRA should be read consistently with FERPA, where permissible. It is a well-established canon of statutory construction that a statute must not be interpreted so that it is inconsistent with other statutes where an ambiguity exists. Where two statutes appear to be inconsistent with one another, it is appropriate to provide an interpretation that reconciles them while still preserving their original sense and purpose. *See, e.g., Lewis* v. *Lewis & Clark Marine, Inc.,* 531 U.S. 438 (2001); *Ruckelshaus* v. *Monsanto Co.,* 467 U.S. 986, 1017–18 (1984).

In this case, the Department is interpreting its regulations in a manner that is consistent with FERPA, the America COMPETES Act, and ARRA. Under section 6401(e)(2)(D) of the America COMPETES Act, Congress clearly set forth its desire that States develop SLDS that cover students from preschool through postsecondary education by including information such as "the capacity to communicate with higher education data systems," "information regarding the extent to which students transition successfully from secondary school to postsecondary education, including whether students enroll in remedial coursework," and "other information determined necessary to address alignment and adequate preparation for success in postsecondary education."

ARRA provides clear evidence of Congressional intent to support the expansion of SLDS, and is not merely an appropriations law, as suggested by one commenter. Section 14001(d) of ARRA specified that the Governor of a State desiring to receive an allocation under the State Fiscal Stabilization Fund was required to include assurances in its application that, among other things, the State will establish a longitudinal data system that includes the elements described in section 6401(e)(2)(D) of the America COMPETES Act. All States received grants under the State Fiscal Stabilization Fund. Thus, all States are required to include these 12 elements in their SLDS. Through ARRA, Congress also provided $250 million for additional State grants to support the expansion of SLDS to include postsecondary and workforce

information, providing further evidence of Congress' intention that States include these elements in their SLDS.

Interpretations of our current FERPA regulations created obstacles for States in their efforts to comply with ARRA's requirement that SLDS include the 12 elements specified in the America COMPETES Act, and thereby allow for the sharing of education data from preschool to higher education. The changes that the Department is adopting through these regulations should eliminate barriers that may have prevented States from complying with the ARRA assurances while still ensuring that PII in education records is protected under FERPA. For example, under these final regulations, a local or State educational authority may designate a postsecondary institution as its "authorized representative," in connection with the evaluation of Federal- or State-supported education programs. As such, the K–12 local or State educational authority may disclose PII from education records to the postsecondary institution without consent for purposes of evaluating either the K–12 or postsecondary Federal- or State-supported education programs.

If the Department were to make no regulatory changes, as requested by several commenters, then Congress' stated intentions behind the America COMPETES Act and ARRA regarding the development and expansion of SLDS would be significantly impeded. Instead, considering the extent of data sharing contemplated by these statutes, the Department is amending several regulatory provisions that have unnecessarily hindered the development and expansion of SLDS as envisioned by the America COMPETES Act and required under ARRA, while still remaining consistent with FERPA's underlying purpose of protecting student privacy.

*Changes:* None.

## FERPA Does Not Provide Authority for Data Collection

*Comment:* Several commenters expressed concern about the types of student PII described in the NPRM and what they perceived as the Department's intent to collect information on individual students. The Department received similar comments from multiple parties who inferred from the NPRM that the Department sought to collect information on students such as "hair color, blood type or health care history." These commenters appeared to believe that the Department would collect this data and provide it to other Federal agencies, such as Labor and

Health and Human Services, to "facilitate social engineering such as development of the type of 'workforce' deemed necessary by the government."

*Discussion:* The Department agrees that it should not collect such information or guide students "toward predetermined workforce outcomes," as the commenters stated. Moreover, the Department did not propose in the NPRM to permit the collection of this information or to conduct the activities described by these commenters.

Commenters mistakenly inferred that the proposed changes to the regulations would expand the types of data collections that the Department may require as conditions of receiving Federal funds. FERPA itself does not establish the authority for any type of data collection at any level, whether Federal, State, or local. Likewise, FERPA does not authorize the establishment of SLDS. Congress granted the Department the authority to provide grants to States for the development of SLDS under section 208 of the Educational Technical Assistance Act of 2002, 20 U.S.C. 9607. States have invested in SLDS to enhance their ability to efficiently and accurately manage, analyze, and use education data, which includes PII from education records that are protected under FERPA. SLDS for K–12 education often include data related to Federal- and State-funded education programs, such as data related to assessments, grades, course enrollment and completion, attendance, discipline, special education status, homeless status, migrant status, graduation or dropout status, demographics, and unique student identifiers. Schools and LEAs are the primary collectors of these data. LEAs report these individual student-level data to the SEA to meet various requirements, and the data is warehoused in the SLDS.

For Federal K–12 reporting, SEAs report aggregated counts at the State, local, and school levels for various indicators that are required for participation in Federal education programs, such as the number of students participating in and served by Title I. Similarly, postsecondary institutions are required to complete Integrated Postsecondary Education Data Systems (IPEDS) surveys if they participate in or are applicants for participation in any Federal student financial aid program (such as Pell grants and Federal student loans). While schools, LEAs, SEAs, and postsecondary institutions maintain student-level data, what is reported to the Department in IPEDS and in Federal K–12 reporting is aggregated, at a minimum, at the

institutional level. The Department does not collect PII from education records outside of its duties that require it, such as administering student loans and grants, conducting surveys, and investigating individual complaints.

The Department offers this clarification to address the public comments that mistakenly interpreted the Department's proposed regulations as a mechanism to collect sensitive personal data on individual students at the Federal level, including data elements that are not related to education, to be used for non-educational purposes. As discussed later in this preamble, the Department is not legally authorized to create a national, student-level database, and the Department has no desire or intention to create a student record data system at the national level. Thus, the SLDS mentioned in these final regulations refers to individual States' longitudinal data systems, not a Federal database.

Commenters interested in understanding more about the data collections required by the Department should visit the Department's Web site at *http://edicsweb.ed.gov* and select the "Browse Active Collections" link.

*Changes:* None.

*Comment:* Several commenters expressed concern that the Department's proposal would create a national database of student PII. One commenter expressed strong opposition to the establishment of a national database because of concern that such a database could be used for non-educational purposes. Another commenter recommended that the Department publicly affirm that it does not support the establishment of a national database.

Several commenters indicated that the proposed changes reflected in the NPRM would permit data sharing and linking of SLDS across State lines, allowing for the creation of a "de facto" national database of student PII. These commenters expressed concern that interconnected SLDS would invite substantial threats to student privacy. Another commenter noted that the prohibition regarding the establishment of a national database in the ESEA, demonstrated Congress' intent to prohibit Federal funding of an interconnected SLDS.

*Discussion:* The Department is not establishing a national database of PII from education records and we have no intention to do so. Moreover, neither ESEA nor HEA provides the Department with the authority to establish a Federal database of PII from education records. Specifically, "[n]othing in [ESEA] * * * shall be construed to authorize the development of a nationwide database"

AR 0702

of PII from education records. 20 U.S.C. 7911. Likewise, "nothing in [HEA] shall be construed to authorize the development, implementation, or maintenance of a Federal database" of PII from education records. 20 U.S.C. 1015c(a).

On the other hand, we do not agree with the suggestion that Congress intended to prohibit States from developing their own SLDS or linking SLDS across State lines. The right to develop SLDS or link SLDS across State lines is reserved to the States. Both ESEA and HEA permit States or a consortium of States to develop their own State-developed databases. In fact, HEA specifically states that it does not prohibit "a State or a consortium of States from developing, implementing, or maintaining State-developed databases that track individuals over time, including student unit record systems that contain information related to enrollment, attendance, graduation and retention rates, student financial assistance, and graduate employment outcomes." 20 U.S.C. 1015c(c).

The Department does not agree with those commenters who expressed concerns that the linking of SLDS across State lines would allow for the creation of a "de facto" national database of student PII. First, as discussed earlier, States are not prohibited from establishing their own SLDS or linking SLDS across State lines provided that they do so in compliance with all applicable laws, including FERPA. Second, if a consortium of States chose to link their individual SLDS across State lines, such a system of interconnected SLDS would not be "national" because the Federal Government would not play a role in its operation. Rather, responsibility for operating such a system would lie entirely with the consortium of States.

Further, Congress made clear in the America COMPETES Act and ARRA that it supports the development and expansion of SLDS. For example, title VIII of ARRA appropriated $250,000,000 to the Institute of Education Sciences to carry out section 208 of the Educational Technical Assistance Act to provide competitive grants to States for the development of their SLDS that include early childhood through postsecondary and workforce information. In addition, section 14005 of ARRA provides that in order to receive funds under the State Fiscal Stabilization Fund a State was required to provide an assurance that it will establish an SLDS that includes the elements described in section 6401(e)(2)(D) of the America COMPETES Act (20 U.S.C. 9871). Consistent with congressional intent,

these activities are only being carried out at the State level, not through the creation of a Federal database. These final regulations will help reduce barriers that have hindered States and consortia of States from developing, implementing, and maintaining their own SLDS.

*Changes:* None.

## Use of Social Security Numbers

*Comment:* Several commenters requested clarification on whether Social Security numbers (SSNs) could be maintained in an SLDS or used as a linking variable. These commenters stated that they had been hindered in their efforts to build a robust SLDS by limitations on the exchange of SSNs. Other commenters suggested that the use of SSNs, names, and dates of birth be minimized, and that SLDS should instead create a common identifier that would allow the SEA and its authorized representative to match student records data without an unnecessary transfer of SSNs and other identifying information.

*Discussion:* We understand that data contained within an SLDS cannot be used effectively without using unique linking variables. Without the use of linking variables, States would be unable to monitor the educational progress and experiences of individual students as they progress through the education system across grade levels, schools, institutions, and into the workforce.

FERPA does not prohibit the use of a SSN as a personal identifier or as a linking variable. However, we agree with commenters that the use of SSNs should be minimized given that SSNs are often used by criminals for identity theft. The Federal Government itself attempts to minimize the use of SSNs. *See, e.g.,* Office of Management and Budget (OMB) Directive M–07–16, "Safeguarding Against and Responding to the Breach of Personally Identifiable Information," and "Guidance for Statewide Longitudinal Data Systems," (National Center for Education Statistics (NCES) 2011- 602). The importance of limiting SSN use is recognized in FERPA, as schools are prohibited from designating SSNs as directory information. Hence, while FERPA does not expressly prohibit States from using SSNs, best practices dictate that States should limit their use of SSNs to instances in which there is no other feasible alternative.

*Changes:* None.

## Disclosures Beyond State Lines

*Comment:* Several commenters sought clarification on whether FERPA allowed PII from education records to be

disclosed across State lines, noting that there is increased demand to disclose PII from education records to third parties in other States to make comparative evaluations of Federal- or State-supported education programs, or to connect data on students who may be educated in multiple States. For example, one commenter asked the Department to clarify whether FERPA would permit postsecondary institutions to disclose PII from education records, including outcome data back to high schools in another State.

Several stakeholders have raised questions about whether the proposed regulations would permit the State educational authority in one State to designate a State educational authority in another State as its authorized representative to disclose PII from education records from one authority to the other.

Another commenter recommended that the Department restrict the disclosure of PII from education records under the audit or evaluation exception to authorized representatives within a State, or alternatively limit out-of-State authorized representatives to only other State educational authorities. Another commenter also asked about a school's ability to disclose PII from education records to other countries.

*Discussion:* FERPA makes no distinctions based on State or international lines. However, transfers of PII from education records across international boundaries, in particular, can raise legal concerns about the Department's ability to enforce FERPA requirements against parties in foreign countries. It is important to keep in mind that for a data disclosure to be made without prior written consent under FERPA, the disclosure must meet all of the requirements under the exceptions to FERPA's general consent requirement. For example, if the conditions under the audit or evaluation exception in FERPA are met, a State educational authority could designate an entity in a different State as an authorized representative for the purpose of conducting an audit or evaluation of the Federal- or State-supported education programs in either State. The disclosure of PII from education records is not restricted by geographic boundaries. However, disclosure of PII from education records for an audit or evaluation of a Federal- or State-supported education program is permitted only under the written agreement requirements in § 99.35(a)(3) that apply to that exception. Under these requirements, the disclosing entity would need to take reasonable methods

to ensure to the greatest extent practicable that its authorized representative is in compliance with FERPA, as is explained further under the *Reasonable Methods (§ 99.35(a)(2))* section in this preamble. More specifically, an LEA could designate a university in another State as an authorized representative in order to disclose, without consent, PII from education records on its former students to the university. The university then may disclose, without consent, transcript data on these former students to the LEA to permit the LEA to evaluate how effectively the LEA prepared its students for success in postsecondary education.

*Changes:* None.

### Cloud Computing

*Comment:* Several commenters sought clarification on whether the proposed regulations would permit cloud computing, where data can be hosted in a different State or country. Commenters suggested that the final regulations not discriminate based on where data are hosted.

*Discussion:* The Department has not yet issued any official guidance on cloud computing, as this is an emerging field. We note, however, that the Federal Government itself is moving towards a model for secure cloud computing. Regardless of whether cloud computing is contemplated, States should take care that their security plans adequately protect student data, including PII from education records, regardless of where the data are hosted.

*Changes:* None.

### Administrative Burden

*Comment:* Several commenters predicted an increase in administrative time and resources needed to comply with the proposed regulations, with one predicting an "exponential" increase. Given the current state of State budget deficits, several commenters asked the Department to provide guidance for ways to decrease burden, such as offering "planning and streamlining administrative processes and tools," while still ensuring the protection of PII from education records.

*Discussion:* The Department appreciates this suggestion and acknowledges the current reality of State budget deficits. The Department believes, however, that regulating the specifics of data sharing would drive up costs, not reduce them. The Department notes that the changes reflected in these regulations aim to reduce the barriers to data sharing while still protecting student privacy. FERPA regulations themselves also do not require any data

sharing by educational agencies or institutions; these data sharing activities are voluntary, and may occur at the discretion of educational agencies or institutions. We recognize that some educational agencies and institutions may need technical assistance from the Department to help ensure that their data sharing activities comply with these regulations, and the Department will help meet this potential need for SEAs and LEAs.

See the *Potential Costs and Benefits,* elsewhere in this preamble, for our estimation of costs associated with these regulations.

*Changes:* None.

### Audit or Evaluation Exception (§ 99.35)

*General Discussion*

*Comment:* We received many comments supporting the proposed changes to the audit or evaluation exception. A comment co-signed by two dozen organizations supported the proposed regulations as the revised interpretations would permit more opportunities for data analysis by States, LEAs, schools, and research organizations.

Other commenters generally expressed support for the proposed changes, asserting that they would increase the ability to evaluate and improve education programs.

Supporters of the proposed regulations noted that, by reducing barriers to data sharing, more States would be able to connect their data systems to drive improvement in K–12 schools. Commenters noted several specific evaluations that would be possible with the proposed amendments to the audit or evaluation exception. For example, an evaluation of college freshmen, who all graduated from the same high school, may reveal the students needed postsecondary remediation in math. This information could help the high school improve its math program.

Likewise, career and technical education (CTE) agencies would be able to improve program effectiveness by accessing more data with their collaborative partners in workforce development and other non-educational agencies that prepare students for college and careers. Several commenters noted that these changes would allow State departments of education to assess their CTE programs and meet Federal accountability requirements in the Carl D. Perkins Vocational and Technical Education Act of 2006 (Pub. L. 109–270). Those that were supportive of these amendments stated that the written agreement requirements were

reasonable and would help protect the confidentiality of the data.

*Discussion:* The Department agrees with these commenters that these activities would be permissible under these final regulations.

*Changes:* None.

*Comment:* One commenter stated that the Department's proposed change to remove the requirement in § 99.35(a)(2) that express authority is required under Federal, State, or local law to conduct an audit, evaluation, or enforcement or compliance activity would turn a narrow exception to consent into a "magic incantation" that would allow "unfettered access" to PII from education records for purposes other than what Congress intended. Several commenters objected on the grounds that the proposed change would result in confusion, with educational institutions struggling to separate real claims of authority from frivolous or false ones. Finally, a few commenters contended that the Department lacks the legal authority to make this proposed change.

*Discussion:* In 2008, we amended § 99.35(a)(2) of the Department's FERPA regulations to specifically require that legal authority exist under Federal, State, or local law to conduct an audit, evaluation, or enforcement or compliance activity. While we imposed no requirement to identify legal authority for other exceptions, we explained that we added this requirement to the audit or evaluation exception because we viewed the educational community as being significantly confused about who may receive education records without consent for audit or evaluation purposes under § 99.35. We explained that "[i]t [was] not our intention in § 99.35(a)(2) to require educational agencies or institutions and other parties to identify specific statutory authority before they disclose or redisclose PII from education records for audit or evaluation purposes but to ensure that some local, State or Federal authority exists for the audit or evaluation, including for example an Executive Order or an administrative regulation." 73 FR 74806, 74822 (December 9, 2008).

In the NPRM, we proposed removing the language regarding legal authority in § 99.35(a)(2) due to confusion caused by the 2008 regulations. We explained in the preamble of the NPRM that the authority for a FERPA-permitted entity to conduct an audit, evaluation, or enforcement or compliance activity may be express or implied. The intent behind this proposed change was to make clear that Federal, State, and local

law determine whether a given audit or evaluation is permitted, not FERPA.

Based on the comments, however, we are concerned that our explanation in the NPRM was not sufficiently clear. Certainly, if an educational agency or institution is concerned that a third party seeking access to PII from education records is not authorized under Federal, State, or local law to conduct an audit, evaluation, or enforcement or compliance activity, that educational agency or institution should seek guidance from its attorneys or from the State attorney general if the concern involves the interpretation of State law. If the concern involves the interpretation of Federal law, the educational agency or institution should seek guidance from its attorneys or from the Federal agency that administers the law in question. FERPA itself does not confer the authority to conduct an audit, evaluation, or enforcement or compliance activity.

We disagree with the commenters' contention that the Department lacks legal authority to amend the 2008 regulations. Because the statute itself does not specifically require that legal authority is necessary under Federal, State, or local law before an audit, evaluation, or enforcement or compliance activity may be conducted—and is, in fact, entirely silent on this issue—we retain the authority, subject to rulemaking requirements, to remove the language we added in 2008, effectively clarifying that the authority may be either express or implied. This deletion makes § 99.35(a)(2) consistent with the rest of the regulations, which do not address legal authority beyond FERPA.

*Changes:* None.

*Comment:* One commenter stated that the Department lacked the authority to regulate how education records are shared with respect to programs that are funded by the U.S. Department of Health and Human Services (HHS). Specifically, this commenter stated the authority to regulate education records maintained by Early Head Start and Head Start programs (collectively, "Head Start") fell within the exclusive jurisdiction of HHS and could not be regulated by the Department of Education. This commenter relied upon a provision in the Head Start Act that states the:

Secretary [of HHS], through regulation, shall ensure the confidentiality of any personally identifiable data, information, and records collected or maintained under this subchapter by the Secretary or any Head Start agency. Such regulations shall provide the policies, protections, and rights equivalent to those provided to a parent, student, or

educational agency or institution under [FERPA].

42 U.S.C. 9836a(b)(4)(A). This commenter also suggested that the Department and HHS work together to minimize the financial burden of the proposed regulations on Head Start agencies.

*Discussion:* We disagree with the commenter's contention that proposed §§ 99.3 and 99.35 would supplant the authority of HHS as those provisions relate to Head Start; these proposed changes would not overreach into HHS' "sphere of activity." First, we note that FERPA applies directly to LEAs that receive funding under a program administered by the Department, including the Head Start programs that they operate. Concurrent jurisdiction exists between the Department and HHS for these Head Start programs. The Department did not propose in the NPRM that FERPA requirements would apply to Head Start programs not under the concurrent jurisdiction of the Department and HHS.

Further, under current regulations, SEAs and LEAs receiving funding under a program administered by the Department—and, therefore, falling under the Department's exclusive jurisdiction—are unable to disclose PII from educational records, such as the kindergarten grades of former Head Start students, to Head Start programs in order to evaluate the effectiveness of the Head Start programs. These final regulations permit State and local educational agencies and BIE funded and operated schools to disclose PII from education records to Head Start programs for an audit, evaluation, or enforcement or compliance activity. We believe this change aligns with Congress' stated intention in the America COMPETES Act and ARRA to link data across all sectors. Permitting access to student longitudinal data also builds upon the Department's and HHS' commitment to coordinate programs administered by State and local educational agencies and BIE funded and operated schools with early learning programs administered by non-educational agencies.

Finally, the Department believes that any potential financial burden on Head Start agencies that may result from these regulations is outweighed by the elimination of unnecessary barriers to the evaluation of their programs and the increased flexibility in the operation of their programs. Nonetheless, the Department is committed to working with HHS to minimize the financial burden of these regulations should such an increase in burden actually occur.

*Changes:* None.

*Comment:* One commenter asked whether the proposed regulations would allow an entity that receives PII from education records under the audit or evaluation exception to redisclose the PII from education records over the original disclosing entity's objection.

*Discussion:* In 2008, we amended the FERPA regulations to expressly permit FERPA-permitted entities to redisclose PII from education records received under the audit or evaluation exception in certain conditions. See § 99.33(b)(1) and (b)(2). For example, this change permitted an SEA to redisclose PII "on behalf of" the LEA if the redisclosure is to another school where the student seeks or intends to enroll, under §§ 99.31(a)(2) and 99.34 and the recordkeeping requirements in § 99.32(b)(1) or (b)(2) are met.

However, in 2008 we did not clarify that a redisclosure under the studies exception would be on behalf of an educational agency or institution if the SEA or other FERPA-permitted entity believed it would benefit the educational agency or institution.

In the NPRM, we specifically proposed that FERPA-permitted entities that receive PII from education records under the audit or evaluation exception be able to redisclose the PII from education records under the studies exception if all requirements to that exception are met. For example, a FERPA-permitted entity would be permitted to redisclose PII from education records under the studies exception in § 99.31(a)(6) if: (1) The FERPA-permitted entity has the express or implied legal authority to have the study in question conducted, and (2) the educational agency or institution either agrees to the redisclosure, in which case the redisclosure would be "for" the educational agency or institution, or the study is designed to improve instruction, in which case the redisclosure would be "on behalf of" the educational agency or institution. Accordingly, a redisclosure may be "for" or "on behalf of" of the original disclosing entity even if that entity objects to the redisclosure. For instance, an SEA receiving PII from an LEA may redisclose PII "on behalf of" the LEA if the redisclosure is for a study designed to improve the LEA's instruction. In this example, it would be irrelevant if the LEA objected to the SEA's redisclosure. FERPA-permitted entities that make further disclosures of PII from education records under the studies exception also must comply with the conditions specified in § 99.31(a)(6) and ensure that the recordkeeping requirements in § 99.32(b)(1) or (b)(2) have been met.

AR 0705

*Changes:* None.

## Definition of "Education Program" (§§ 99.3 and 99.35)

*Comment:* Many commenters were supportive of the proposal to define the term "education program." Many of these commenters commended the Department's proposal to adopt a broad definition of "education program" because doing so recognizes the fact that education begins prior to kindergarten and involves programs not administered by State or local educational agencies. While some commenters expressed concern that an overly broad definition of "education program" would result in extraneous programs being wrongly allowed access to student PII from education records, others expressed concern that an overly narrow definition would hinder legitimate data sharing needed to improve education programs. One commenter was concerned that the definition would omit programs many believe are necessary for students to succeed but may not be "principally engaged in the provision of education." The commenter gave several examples including substance abuse, anti-bullying, and suicide prevention programs.

Numerous commenters provided other examples of specific programs and asked the Department to identify if those programs would be considered an education program under the proposed definition. Commenters specifically requested clarity about what types of early childhood programs would be considered education programs. A few commenters suggested that the Department utilize the HEA definition of "early childhood education program."

One commenter suggested that we change "principally" to "primarily" in the definition of "education program." Another recommended that the definition include "transitions from secondary to postsecondary education." We also received the suggestion that we amend the definition of "education program" to specify that the program must be principally engaged in the provision of education to students in early childhood through postsecondary.

One commenter requested further clarity regarding who determines whether a program meets the definition of "education program" and how to handle any potential disputes regarding that determination.

Another commenter suggested that the Department was acting outside of its legal authority to expand the use of PII from education records to programs not administered by an educational agency

or institution, and termed it an "unreasonable interpretation."

*Discussion:* The Department has decided to make several changes to the definition as a result of the comments received. Whether a program is determined to be an education program should be based on the totality of the program, and not on whether the program contains a specific "incidental educational or training activity within a broader non-education program," as suggested by one commenter. The number of commenters requesting clarity on which early childhood programs would be considered education programs under FERPA suggested a real need for the Department to define the term in the regulations to support faithful implementation of the FERPA amendments in the field. We agree with those commenters who suggested that the Department utilize the HEA definition of "early childhood education program" and are adopting this definition for several key reasons. By adopting a definition already established by Congress, we are confident that it will provide the requested clarity. This definition also provides greater consistency across Federal programs, resulting in more transparency and less burden.

The final regulations provide that any program administered by an educational agency or institution is considered to be an education program. We have made this change to ensure that, in addition to programs dedicated to improving academic outcomes, this definition includes programs, such as bullying prevention, cyber-security education, and substance abuse and violence prevention, when administered by an educational agency or institution.

It is the Department's intent that the following types of programs, regardless of where or by whom they are administered, fall under the new definition of "education program": The educational programs conducted by correctional and juvenile justice facilities or alternative long-term facilities such as hospitals, dropout prevention and recovery programs, afterschool programs dedicated to enhancing the academic achievement of its enrollees, schools for the hearing and visually impaired, college test tutoring services, and high school equivalency programs. The following are examples of the types of programs that will generally be excluded from the definition of "education program": Programs that are principally engaged in recreation or entertainment (such as programs designed to teach hunting, boating safety, swimming, or exercise), programs administered by direct

marketers, and neighborhood book clubs. These are not all-inclusive lists; each program will need to be assessed to determine if it meets this regulatory definition of "education program" because it is principally engaged in the provision of education.

The Department declines to change the word "principally" to "primarily" in the definition of "education program" because we view these terms as being synonymous and interchangeable. The Department also declines to explicitly state that transitions from secondary to postsecondary education are included in the definition, because any transition program must meet the definition of "education program," and it may be misleading to list some types of these programs and not others. The Department further declines to amend the definition of "education program" to require that the education program be principally engaged in the provision of education to "students" in early childhood through postsecondary education. Explicitly adding "students" to the definition would potentially exclude certain programs that would otherwise fit under this definition and that the Department intends to include. For example, this change would be particularly problematic for early childhood education programs, such as Head Start and IDEA Part C, which refer to their participants as children and infants or toddlers, respectively, not students. Head Start and IDEA Part C are explicitly included in the definition of "early childhood education program," and the Department refrains from adding language that would contradict this definition and create confusion for implementation.

FERPA-permitted entities may disclose PII from education records without obtaining consent in order to conduct an audit, evaluation, or enforcement or compliance activity. FERPA permits these disclosures to occur without consent, but FERPA-permitted entities have the discretion to set their own policies and practices for implementing these disclosures, including any resolution processes that may be necessary to handle disputes regarding whether a program meets the definition of education program.

Finally, we disagree with the commenters who suggested that the Department lacks the legal authority to define "education program" in a way that would allow authorized representatives to use PII from education records to evaluate programs not administered by an educational agency or institution. As discussed elsewhere in greater detail, the

Department has broad authority under GEPA to promulgate regulations that implement programs established by statute and administered by the Department, including FERPA. In this case, nothing in the statute itself or its legislative history limits the Department's authority to define "education program," a previously undefined term.

The new definition of "education program" helps to ensure that the FERPA regulations do not impede States' ability to comply with ARRA. As discussed in the NPRM, in order to ensure that the Department's regulations do not create obstacles to States' compliance with ARRA, the Department sought to find a solution that would give effect to both FERPA and this more recent legislation by defining the term "education program" to include programs that are not administered by an educational agency or institution.

The Department's definition of the term "education program" is intended to facilitate the disclosure of PII from education records, as necessary, to evaluate a broad category of education programs.

The Department's definition of "education program" is also intended to harmonize FERPA and ARRA so as to protect PII from education records, even where the Department may not have a direct funding relationship with the recipient of PII from education records. We believe that the definition of the term "education program" sufficiently recognizes those common elements among entities that need to evaluate education programs and services, regardless of whether the education programs are funded by the Department.

*Changes:* In § 99.3, we have added a definition of the term "early childhood education program." In addition, we have revised the definition of "education program" to include any program that is administered by an educational agency or institution.

*Comment:* One commenter requested that the Department clarify that PII from education records disclosed without obtaining consent under the audit or evaluation exception must be limited to PII related to educational data, given the wider variety of health information and other PII included in the school records of students with disabilities.

*Discussion:* Under the audit or evaluation exception, PII from education records may be disclosed without consent only to audit or evaluate Federal- or State-supported education programs, or to enforce or to comply with Federal legal requirements related to such programs. If PII from education records related to a student's

health is necessary to evaluate an education program, this information may be disclosed without obtaining consent, provided all other requirements in the regulations are met. However, the same information would not be permitted to be disclosed without obtaining consent to evaluate the effectiveness of a health program.

*Changes:* None.

## Definition of Authorized Representative (§§ 99.3 and 99.35)

*Comment:* Numerous commenters expressed support for our proposed definition of the term "authorized representative." Among other reasons given for support, commenters stated that they were confident that the definition would facilitate better evaluations or would lead to an increased ability to conduct evaluations of Federal- and State-supported education programs. One commenter stated that the proposed definition was appropriate and necessary and reasonable in scope. One commenter was especially pleased that an SEA or LEA would have the ability to designate an individual or entity under the new definition for the purposes of conducting evaluations. Multiple commenters stated that the proposed definition would assist SEAs in handling PII disclosed from education records and in linking it across sectors, including the education and workforce sectors for the purposes of an audit, evaluation, or enforcement or compliance activity.

Finally, one commenter stated that FERPA-permitted entities under § 99.31 should include tribal education agencies (TEAs). This commenter contended that because FERPA regulations allow for the disclosure, without consent, of PII from education records to "State and local educational authorities" for audit or evaluation of Federal and State-funded education programs, TEAs—the education arms of sovereign tribal governments—should also be allowed to access PII from education records without consent.

*Discussion:* The Department agrees with these commenters that the definition of the term "authorized representative" in the final regulations will increase the ability of FERPA-permitted entities to conduct audits or evaluations of Federal- and State-funded education programs, including those that link PII from education records across the education and workforce sectors.

As for TEAs, the Department's current interpretation of "State and local educational authorities" does not include them. Although the Department,

as part of its proposal for the reauthorization of ESEA, supports strengthening the role of TEAs in coordinating and implementing services and programs for Indian students within their jurisdiction, we did not propose to define the term "State and local educational authorities" in the NPRM and, therefore, decline to regulate on it without providing the public with notice and the opportunity to comment. The Department's interpretation of the term "State and local educational authorities" does, however, include BIE.

*Changes:* None.

*Comment:* One commenter requested that we clarify the proposed definition of the term "authorized representative" to make it more similar to the regulatory language currently used in § 99.35(a)(1). This commenter expressed concern that, in our proposed definition, an authorized representative could be interpreted to mean an individual or entity who is engaged only in activities connected to Federal legal requirements related to Federal or State supported education programs. The commenter noted that § 99.35(a)(1) addresses both audit or evaluation activities associated with a Federal- or State-supported education program, and activities associated with enforcement of, or compliance with, Federal legal requirements that relate to those programs. The commenter recommended that we clarify the definition of the term "authorized representative" to align it with § 99.35(a)(1) and make clear that the Federal legal requirement only modifies the compliance or enforcement activity. Specifically, when describing the activities an authorized representative can carry out, the commenter requested we add an "or" between the words "audit" and "evaluation," as opposed to a comma, and the word "any" before the term "compliance or enforcement activity."

*Discussion:* We intend for our definition of the term "authorized representative" to cover both an individual or an entity engaged in the enforcement of or compliance with Federal legal requirements related to Federal- or State-supported education programs, and also to cover an individual or an entity conducting an audit or evaluation of a Federal- or State-supported education program. Accordingly, we are making this clarification in the definition.

*Changes:* We have made the minor changes suggested by the commenter to the definition of "authorized representative".

*Comment:* Multiple commenters suggested that the Department exceeded

AR 0707

its legal authority by proposing to define the term "authorized representative." While acknowledging that FERPA does not define this term, these commenters stated that authorized representatives should only consist of the Comptroller General, the Attorney General, the Secretary, and State and local educational authorities since FERPA specifically allows for the disclosure of PII from education records to these entities. The commenters contended that expanding the definition beyond the four entities specifically identified in FERPA would be impermissible and that such a change would require congressional action. A few commenters pointed to a statement from the preamble to the final FERPA regulations (73 FR 74806, 74828) published in the **Federal Register** on December 9, 2008, in which the Department stated that "any further expansion of the list of officials and entities in FERPA that may receive education records without the consent of the parent or the eligible student must be authorized by legislation enacted by Congress."

Other commenters objected to the rescission of the "direct control" requirement contained in the policy guidance on authorized representatives issued by then-Deputy Secretary of Education William D. Hansen in a memorandum dated January 30, 2003 (Hansen Memorandum). The Hansen Memorandum required that under the "audit or evaluation exception," an authorized representative of a State educational authority must be a party under the direct control of that authority, *e.g.,* an employee or a contractor. Under the Hansen Memorandum, an SEA or other State educational authority could not disclose PII without consent from education records to other State agencies, such as a State health and human services department, a State unemployment insurance department, or a State department of labor because these State agencies were not under the SEA's direct control.

Commenters further cited the conclusion in the Hansen Memorandum that the two references to the word "officials" in paragraph (b)(3) of FERPA reflect a congressional concern that the authorized representatives of a State educational authority be under the direct control of that authority. Specifically, commenters relied upon a December 13, 1974, joint statement in explanation of the Buckley/Pell Amendment (Joint Statement) that suggested that FERPA "restricts transfer, without the consent of parents or students, of PII concerning a student to * * * auditors from the General

Accounting Office and the Department of Health, Education, and Welfare." From this Joint Statement, these commenters suggested that Congress did not intend for "authorized representative" to be defined as broadly.

Commenters also cited several policy reasons for precluding other entities from serving as authorized representatives of FERPA-permitted entities, including that this definition would weaken the accountability of State or local educational authorities and would allow criminals, repeated privacy violators, and those with dubious standing to serve as authorized representatives. One commenter questioned whether individual State politicians or private companies could be authorized representatives.

One commenter, though supporting our definition of the term "authorized representative," suggested that the definition of the term was too narrow and should be broadened to include child welfare agencies and their obligations to monitor the education outcomes of the children in their care. One commenter challenged the Department's proposed definition of "authorized representative" on the grounds that it constituted an unlawful sub-delegation of the Department's statutory authority by vesting the interpretation of FERPA in non-Federal entities. This commenter cited *U.S. Telecom Ass'n* v. *F.C.C.,* 359 F.3d 554, 565 (DC Cir., *cert. denied,* 543 U.S. 925 (2004), in support of the position that such delegations are "improper absent an affirmative showing of congressional authorization."

*Discussion:* It is important to note that FERPA does not define the term "authorized representative." In the absence of a statutory definition, the Supreme Court has made it clear that it is appropriate to "construe a statutory term in accordance with its ordinary or natural meaning." *See, e.g., FDIC* v. *Meyer,* 510 U.S. 471, 476 (1994).

In this case, "authorize" is commonly understood to mean to: "Invest especially with legal authority: EMPOWER * * *." "Representative" is commonly understood to mean: "* * * standing or acting for another especially through delegated authority * * *." *Merriam-Webster's Collegiate Dictionary* (11th Ed. 2011).

Following these standard definitions of "authorize" and "representative," it is entirely appropriate that we permit State educational authorities, the Secretary, the Comptroller General, and the Attorney General to have the flexibility and discretion to determine who would best be able to represent them in connection with audits,

evaluations, or enforcement or compliance activities. Restricting their discretion to select only their own officers and employees or those under their "direct control" is not required by the term's plain, dictionary meaning.

Additionally, we do not find the policy concerns for precluding other entities from serving as authorized representatives offered by commenters to be persuasive. While nothing in the final regulations specifically prohibits a State politician or private company, for example, from being designated as an authorized representative, the full requirements under FERPA must be met before PII from education records may be disclosed to any party. These regulations do not expand any of the reasons an individual or an entity can be designated as an authorized representative. As before, it may only be done to conduct an audit, evaluation, or enforcement or compliance activity. For example, to authorize a representative to conduct an evaluation, there must be a written agreement specifying the terms of the disclosure, and PII from education records may only be used for the purposes specified in the written agreement; the FERPA-permitted entity authorizing the evaluation must also take reasonable methods to ensure to the greatest extent practicable that its authorized representative complies with FERPA, as is explained in the "Reasonable Methods (§ 99.35(a)(2))," section later in this preamble. If an individual or organization sought access to PII from education records for its own purpose, disclosure of the PII from education records without consent would not be permitted under FERPA, and the FERPA-permitted entity must not authorize the representative or permit the disclosure of PII from education records without consent. The written agreement operates as a contract between the FERPA-permitted entity and the authorized representative, so in the event that an individual or entity misuses PII from education records for purposes other than those that are authorized, there would be recourse according to the terms specified in the written agreement, in addition to any enforcement actions the Department may take.

Also, we continue to believe that there are good policy reasons to allow other agencies to serve as authorized representatives of FERPA-permitted entities. As we explained in the NPRM, we believe that our prior interpretation of the term "authorized representative" unduly restricted State and local educational authorities from disclosing PII from education records for the purpose of obtaining data on post-

school outcomes, such as employment of their former students, in order to evaluate the effectiveness of education programs. Accordingly, we believe that our interpretation reflected in these final regulations reasonably permits State and local educational authorities, the Secretary, the Comptroller General, and the Attorney General of the United States to have the necessary flexibility and discretion to determine who may represent them with respect to audits and evaluations of Federal- or State-supported education programs and to enforce and to comply with Federal legal requirements that relate to such programs, subject to the requirements in FERPA.

Some commenters also appear to have misunderstood the Department's previous interpretation of the term "authorized representative" and mistakenly assumed that the Department has historically only permitted employees and contractors of FERPA-permitted entities to serve as authorized representatives. This is not the case. For instance, prior to the issuance of the Hansen Memorandum in 2003, the Department entered into a memorandum of agreement with the Centers for Disease Control and Prevention (CDC) in which the Department designated the CDC to serve as its authorized representative for purposes of collecting information under the Metropolitan Atlanta Developmental Disabilities Surveillance Program.

Further, prior to the Hansen Memorandum, the Department had provided guidance that State educational authorities could designate a State Unemployment Insurance agency as an authorized representative for the purpose of conducting wage record matches to carry out the performance reporting requirements of the Workforce Investment Act (WIA). Memorandum on Application of FERPA to Reporting for Eligible Training Providers under Title I of WIA from Judith A. Winston, Undersecretary of the Department of Education, (January 19, 2001).

Further, in the 2008 FERPA regulations, the term "authorized representative" was not limited to employees and contractors of the FERPA-permitted entities. In the preamble to those regulations, we wrote:

In general, the Department has interpreted FERPA and implementing regulations to permit the disclosure of personally identifiable information from education records, without consent, in connection with the outsourcing of institutional services and functions. Accordingly, the term "authorized representative" in § 99.31(a)(3) includes

contractors, consultants, volunteers, and other outside parties (*i.e.*, nonemployees) used to conduct an audit, evaluation, or compliance or enforcement activities specified in § 99.35, or other institutional services or functions for which the official or agency would otherwise use its own employees. For example, a State educational authority may disclose personally identifiable information from education records, without consent, to an outside attorney retained to provide legal services or an outside computer consultant hired to develop and manage a data system for education records.

73 FR 74806, 74825 (Dec. 9, 2008).

In other words, since 2008, we have included within the definition of "authorized representative" any outside party used to conduct an audit, evaluation, or enforcement or compliance activity specified in § 99.35, or other institutional services or functions for which the official or agency would otherwise use its own employees. These outside parties were required to be under the direct control of an SEA pursuant to the Hansen Memorandum; however, as we discuss in further detail in the following paragraphs, the Department has decided to eliminate the Hansen Memorandum's direct control requirement in these final regulations.

The statement in the preamble to the 2008 final regulations that "any further expansion of the list of officials and entities in FERPA that may receive education records without the consent of the parent or the eligible student must be authorized by legislation enacted by Congress," means that any expansion of the current statutory exceptions to the consent requirement must be authorized by Congress. Today's change is not an expansion of the statutory exceptions to the consent requirement; rather it is a modification of the Department's interpretation of a term used in one of FERPA's existing statutory exceptions to consent so as to be consistent with recent developments in the law.

Moreover, the 2008 FERPA amendments did not provide an exhaustive or comprehensive list of the exceptions to the written consent requirement that would permit disclosure to non-educational State agencies. Rather, we noted that there are "some exceptions that might authorize disclosures to non-educational State agencies for specified purposes" and listed as examples disclosures made under the health or safety emergency exception (§§ 99.31(a)(10) and 99.36), the financial aid exception (§ 99.31(a)(4)), or pursuant to a State statute under the juvenile justice exception (§§ 99.31(a)(5) and 99.38).

This was not an exhaustive listing of FERPA exceptions to the general consent requirement that would permit disclosure to non-educational State agencies. For example, a disclosure without consent also may be made to non-educational State agencies pursuant to the exception for lawfully issued subpoenas (§ 99.31(a)(9)), but this was not included in the 2008 preamble.

Even if the preamble to the 2008 final regulations clearly stated that the officials and agencies listed under § 99.31(a)(3)(i) through (a)(3)(iv) could not designate non-educational State agencies as their authorized representatives—which it did not—the Department still retains the authority to change its interpretation through notice-and-comment rulemaking, especially in light of recent legislation. Accordingly, because the term "authorized representative" is not defined in the statute, and the America COMPETES Act and ARRA have provided evidence of Congressional intent to expand and develop SLDS to include early childhood, postsecondary, and workforce information, the Department has decided to change its interpretation of the term "authorized representative" in order to permit State and local educational authorities, the Secretary of Education, the Comptroller General, and the Attorney General of the United States to have greater flexibility and discretion to designate authorized representatives who may access PII from education records as needed to conduct an audit, evaluation, or enforcement or compliance activity specified in § 99.35.

In response to commenters who objected to the rescission of the Hansen Memorandum's direct control requirement, the direct control requirement is not found in FERPA and is inconsistent with requirements of the America COMPETES Act and ARRA. We do not interpret the two references to the word "officials" in paragraph (b)(3) of FERPA as defining who may serve as an authorized representative of the officials listed in the exception. This would, in fact, limit those who could serve as an authorized representative to officials of the heads of agencies listed, which is inconsistent with the position adopted by the Hansen Memorandum. Rather, we interpret the word "officials" in paragraph (b)(3) of FERPA as simply a reference back to the four officials who are listed in the exception: the Secretary, the Comptroller General, the Attorney General of the United States, and State educational authorities.

The 1974 Joint Statement stated that "existing law restricts transfer, without the consent of parents or students, of personally identifiable information

concerning a student to * * * auditors from the General Accounting Office and the Department of Health, Education, and Welfare * * *'' 120 Cong. Rec. at 39863 (December 13, 1974). FERPA, however, was originally enacted on August 21, 1974. Thus, the Joint Statement provides little more than a retrospective narrative background regarding the exception to consent in 20 U.S.C. 1232g(b)(1)(C) and (b)(3), which already was in existing law and was not being amended in December 1974. Further, the Joint Statement only provides a short-hand and incomplete summary of this exception to consent. Significantly, the Joint Statement omits many aspects of this then-existing exception, which in addition to permitting disclosure of PII from education records without consent to ''authorized representatives of'' the Comptroller General and the Secretary of Health, Education, and Welfare (as referred to in the Joint Statement) also permitted disclosure without consent to ''authorized representatives of'' ''State educational authorities'' and ''an administrative head of an education agency.'' See section 513 of Pub. L. 93–380 (August 21, 1974). Further, this then existing exception to consent permitted disclosure of PII from education records without consent not only for the conduct of audits by auditors (as referred to in the Joint Statement), but also for the conduct of evaluations and the enforcement of Federal legal requirements. *Id.*

While we support the efforts in the Hansen Memorandum to protect student privacy, the Hansen Memorandum's direct control requirement resulted in State and local educational authorities engaging in convoluted processes to conduct an audit, evaluation, or enforcement or compliance activity that may serve only to increase costs and lessen privacy protection. Student privacy can be protected without having to prohibit disclosure of PII from education records to other entities in order to conduct an audit, evaluation, or enforcement or compliance activity. Although increased data sharing may result from our definition of ''authorized representative,'' it still would only be permitted under the terms of the exception. To disclose PII from education records without consent to an authorized representative (other than an employee), the exception requires written agreements and the use of reasonable methods to ensure to the greatest extent practicable FERPA compliance by an authorized representative. Further, an authorized representative's use of PII from

education records is restricted to audits, evaluations, or enforcement or compliance activities.

The Department also disagrees that its definition of ''authorized representative'' constitutes an unlawful sub-delegation of authority to non-Federal entities. Although *U.S. Telecom* stands for the proposition that certain Federal agency sub-delegations are improper, its holding is inapposite when applied to the Department's definition of the term ''authorized representative'' in § 99.3. Unlike the statutory language in 20 U.S.C. 1232g(b)(1)(C) and (b)(3) that specifically identifies authorized representatives of the designated entities as potential recipients to whom PII from education records may be disclosed without consent, the authorizing statute at issue in *U.S. Telecom* assigned the FCC the specific responsibility of making impairment determinations:

''* * * the Commission shall consider, at a minimum, whether—(A) access to such network elements as are proprietary in nature is necessary; and (B) the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer''.

*See* 47 U.S.C. 251(d)(2). The *U.S. Telecom* court rejected the FCC's argument that it possessed the presumptive authority to sub-delegate its statutory decisionmaking responsibilities to any party absent congressional intent to the contrary. In this case, however, the Department is not attempting to delegate its decisionmaking authority and is only permitting authority for an audit, evaluation, or enforcement or compliance activity to be delegated to authorized representatives of FERPA-permitted entities, as Congress specifically identified in FERPA.

*U.S. Telecom* is similarly distinguished in *Fund for Animals* v. *Norton*, 365 F. Supp. 2d 394 (S.D.N.Y. 2005), which held that the Fish and Wildlife Service (FWS) did not act unlawfully by delegating limited authority over management of cormorant populations to regional FWS and State wildlife services directors, State agencies, and federally recognized Indian Tribes. *Fund for Animals* emphasized that FWS' delegation was not inconsistent with the statutory requirements and thus was entitled to deference under the Supreme Court's decision in *Chevron U.S.A. Inc.* v. *NRDC*, 467 U.S. 837 (1984). *Id.* at 410–11. Unlike the FCC's wholesale delegation to State commissioners of its statutory responsibility to make access

determinations under 47 U.S.C. 251(d)(2), the FWS retained ultimate control over the delegates' determinations.

Likewise, in adopting the definition of the term ''authorized representative,'' the Department is not delegating its statutory authority to address violations of FERPA under 20 U.S.C. 1232g(f). The Department is simply delegating the authority to the entities specified in 20 U.S.C. 1232g(b)(1)(C) and (b)(3) to determine who may serve as their authorized representatives to conduct an audit, evaluation, or enforcement or compliance activity. This delegation is premised on compliance with other statutory and regulatory conditions, in connection with audits, evaluations, or enforcement or compliance activities.

Some commenters asked that we expand the definition of the term ''authorized representative'' to include child welfare agencies, to allow these agencies to monitor the educational outcomes of children under their care and responsibility. Paragraph (b)(3) of FERPA, however, does not allow this expansion of the purposes for which PII from education records may be used by authorized representatives. While we agree that authorized representatives of State educational authorities may generally include child welfare agencies, authorized representatives may only access PII from education records under paragraph (b)(3) of FERPA in order to conduct audits, evaluations, or enforcement or compliance activities.

*Changes:* None.

*Comment:* One commenter expressed concern about being held responsible for the disclosure of PII from education records to an authorized representative over which it does not have direct control, such as another State agency, if the authorized representative improperly rediscloses that information. This commenter, therefore, recommended that the FERPA regulations provide that a State or local educational authority is not required to comply with FERPA in regard to PII from education records that it discloses to an authorized representative over which it does not have direct control. In the alternative, this commenter requested that the regulations clarify that a State or local educational authority retains control over the entity or individual designated as its authorized representative through the required written agreement to ensure PII from education records is protected from unauthorized redisclosure.

*Discussion:* Like any disclosing entity, State or local educational authorities have an important responsibility to

protect the privacy of PII from education records. To carry out this responsibility, a State or local educational authority must use reasonable methods to ensure to the greatest extent practicable that its authorized representative is complying with FERPA. A disclosing State or local educational authority, such as an SEA, also must enter into a written agreement with its authorized representative that details the responsibilities of both parties to protect the PII from education records disclosed to the authorized representative by the educational authority. If the State or local educational authority, such as an SEA, does not have confidence that the authorized representative will meet its responsibilities under the written agreement to protect PII from education records, the State or local educational authority should not authorize the individual or entity as a representative. The Department would be abdicating its responsibility under FERPA to protect the privacy of PII from education records if we released a State or local educational authority from responsibility when it discloses PII from education records to an authorized representative that is not under its direct control, such as another State agency.

*Changes:* None.

*Comment:* One commenter stated that, because the definition of "authorized representative" would allow "any individual or entity" to be designated as an authorized representative, the Department appears to be adopting a position under which an authorized representative is not required to have a "legitimate educational interest" to receive PII from education records under the audit or evaluation exception.

*Discussion:* We believe the regulations clearly articulate that a FERPA-permitted entity may only disclose PII from education records to an authorized representative under the audit or evaluation exception if the authorized representative will use PII from education records for one of the statutorily-specified purposes, *i.e.,* if it is needed to conduct audits, evaluations, or enforcement or compliance activities. We have revised the regulations regarding written agreements between FERPA-permitted entities and their authorized representatives to include a requirement that the written agreement establish the policies and procedures that limit the use of PII from education records to only authorized representatives for statutorily-specified purposes. If an authorized representative receives PII from education records for one of these statutorily-specified purposes, then this

constitutes a legitimate interest in receiving PII from education records. We have not required that authorized representatives have "legitimate educational interests" in receiving PII from education records, as suggested by the commenter, because we already require in § 99.31(a)(1) of the current regulations that educational agencies and institutions must determine that school officials have legitimate educational interests. Because authorized representatives differ from school officials and may receive PII from education records only for statutorily-specified purposes, we refer to the interests of authorized representatives in receiving PII from education records as "legitimate interests."

*Changes:* We have revised § 99.35(a)(3)(v) to substitute the phrase "authorized representatives with legitimate interests in the audit or evaluation of a Federal- or State-supported education program or for compliance or enforcement of Federal legal requirements related to these programs" for the phrase "authorized representatives with legitimate interests."

*Comment:* Some commenters indicated that the proposed definition of "authorized representative" should be amended so that authorized representatives may use PII from education records for any compliance or enforcement activity in connection with State legal requirements that relate to Federal- or State-supported education programs, as opposed to just Federal legal requirements.

*Discussion:* The Department lacks the statutory authority to make the requested change to expand the disclosures of PII from education records permitted without consent to include compliance or enforcement activity in connection with State legal requirements that relate to Federal- or State-supported education programs. Specifically, section (b)(3) and (b)(5) of FERPA only permit the disclosure of PII from education records, without consent, "in connection with the enforcement of the Federal legal requirements" that relate to Federal- or State-supported education programs. Accordingly, the Department is unable to expand the permitted disclosures of PII from education records to include a compliance or enforcement activity in connection with State legal requirements.

*Changes:* None.

*Comment:* One commenter also requested that, in lieu of the proposed definition of "authorized representative," we provide that State

agencies or other entities responsible for an education program, as that term was defined in the NPRM, are educational authorities for the limited purpose of the administration of their Federal- or State-supported education programs and that such entities are subject to the enforcement powers of the Department.

*Discussion:* We did not propose in the NPRM to define the term "State and local educational authorities," which is used in § 99.31(a)(3). Therefore, we do not believe it is appropriate to define this term without providing the public with notice and the opportunity to comment on a proposed definition. Further, we do not agree that every entity that is responsible for an "education program" would be considered a State or local educational authority. As explained earlier in the preamble, the Department has generally interpreted the term "State and local educational authorities" to mean LEAs, SEAs, State postsecondary commissions, BIE, or entities that are responsible for and authorized under State or Federal law to supervise, plan, coordinate, advise, audit, or evaluate elementary, secondary, or postsecondary education programs and services in the State. Thus, we would not consider individual schools or early learning centers to be State or local educational authorities. Finally, the Department's enforcement powers with respect to a State or local educational authority are dependent on whether the educational authority receives funding under a program administered by the Secretary. If an educational authority does not receive such funding, then the Department's only FERPA enforcement measure would be the five-year rule.

*Changes:* None.

*Comment:* Several commenters stated that the Department should adopt additional remedies or sanctions to hold authorized representatives accountable.

*Discussion:* FERPA authorizes the Secretary to pursue specific remedies against recipients of funds under programs administered by the Secretary. Congress expressly directed the Secretary to "take appropriate actions" to "enforce" FERPA and "to deal with violations" of its terms "in accordance with [GEPA]." 20 U.S.C. 1232g(f). In GEPA, Congress provided the Secretary with the authority and discretion to take enforcement actions against any recipient of funds under any program administered by the Secretary for failures to comply substantially with FERPA (or other requirements of applicable law). 20 U.S.C. 1221 and 1234c(a). GEPA's enforcement methods expressly permit the Secretary to issue a complaint to compel compliance

through a cease and desist order, to recover funds improperly spent, to withhold further payments, to enter into a compliance agreement, or to ''take any other action authorized by law,'' including suing for enforcement of FERPA's requirements. 20 U.S.C. 1234a, 1234c(a), 1234d, 1234e; 1234f; 34 CFR 99.67(a); *see also United States* v. *Miami Univ.,* 294 F.3d 797 (6th Cir. 2002) (affirming district court's decision that the United States may bring suit to enforce FERPA). Thus, if an authorized representative receives funds under a program administered by the Secretary, the Department has the authority to enforce failures to comply with FERPA under any of GEPA's enforcement methods. If an authorized representative does not receive funds under a program administered by the Secretary and improperly rediscloses PII from education records, then the only remedy available under FERPA against the authorized representative would be for the Department to prohibit the disclosing educational agency or institution from permitting the authorized representative from accessing PII from education records for a period of not less than five years. 20 U.S.C. 1232g(b)(4)(B). These are the only remedies available to the Department to enforce FERPA. Remedies, such as assessing fines against any entity that violates FERPA, are not within the Department's statutory authority.

Under the FERPA regulations, and in accordance with its longstanding practice, the Department only will take an enforcement action if voluntary compliance and corrective actions cannot first be obtained. If the violating entity refuses to come into voluntary compliance, the Department can take the above listed enforcement actions. However, in addition to these statutorily authorized remedies, we encourage FERPA-permitted entities to consider specifying additional remedies or sanctions as part of the written agreements with their authorized representatives under § 99.35 in order to protect PII from education records. Written agreements can be used to permit increased flexibility in sanctions, to the extent that the desired sanction is permitted under law.

*Changes:* None.

### Reasonable Methods (§ 99.35(a)(2))

*Comment:* Commenters were split on whether it was appropriate to define ''reasonable methods'' in the regulations. Some commenters agreed that the Department should not prescribe reasonable methods in the regulations and welcomed the additional flexibility offered by the

proposed regulations. Others criticized the failure of the proposed regulations to require specific reasonable methods, contending that the Department was taking steps to allow more access to PII from education records but was not taking commensurate steps to prevent misuse of PII from education records being disclosed. One commenter requested further clarification on the expected enforcement actions the Department would take if an LEA or SEA did not use reasonable methods to ensure that its authorized representatives were in compliance with FERPA before disclosing PII from education records to them.

*Discussion:* The Department proposed the reasonable methods requirement to increase accountability so that FERPA-permitted entities disclosing PII from education records hold their authorized representatives accountable for complying with FERPA. FERPA-permitted entities must monitor the data handling practices of their own employees. They must also use reasonable methods to ensure FERPA compliance to the greatest extent practicable by their authorized representatives. The Department believes that FERPA-permitted entities should be accorded substantial flexibility to determine the most appropriate reasonable methods for their particular circumstances. In other words, what constitutes a reasonable method for ensuring compliance is not a one-size-fits-all solution; there are numerous actions a FERPA-permitted entity may take to ensure to the greatest extent practicable FERPA compliance by its authorized representatives. Nonetheless, while the Department is granting more flexibility to determine appropriate reasonable methods given the specific circumstances of the data disclosure, the Department will consider a FERPA-permitted entity disclosing PII from education records to its authorized representative without taking any reasonable methods to be in violation of FERPA and subject to enforcement actions by the Department.

It is worth noting that the FERPA regulations already require that educational agencies and institutions use reasonable methods such as access controls so that school officials only may access those education records in which they have a legitimate educational interest. See § 99.31(a)(1)(ii). The lack of specificity in § 99.31(a)(1)(ii) is appropriate, given variations in conditions from school-to-school. The Department believes similar flexibility is appropriate when FERPA-permitted entities disclose PII from

education records to authorized representatives.

While the Department declines to impose specific requirements for reasonable methods, we are issuing non-regulatory guidance on best practices for reasonable methods as Appendix A. Variations of the elements appear in Appendix A as best practices for written agreements. In the following paragraphs, we provide a summary and discussion of the various suggestions for reasonable methods the Department received in response to the NRPM, and discuss whether we consider them best practices. Please note that Appendix A may also include best practices that were not mentioned by commenters, but that the Department believes would result in both increased data and privacy protection.

Reasonable methods are those actions the disclosing FERPA-permitted entity would take to ensure to the greatest extent practicable that its authorized representative complies with FERPA. The disclosing FERPA-permitted entity should generally take most of these actions by requiring them in its written agreement with its authorized representative. Many commenters discussed how reasonable methods could ensure FERPA compliance, but some commenters suggested that these techniques be required for FERPA-permitted entities in addition to their authorized representatives. While this is beyond the scope of the reasonable methods contemplated in the regulations, the best practices that the Department provides apply equally to other entities as a starting point for good data governance, the responsible use of data, and the protection of student privacy.

The Department has already produced several technical briefs that address many of the suggestions the Department received on reasonable methods and written agreements: ''Basic Concepts and Definitions for Privacy and Confidentiality in Student Education Records,'' ''Data Stewardship: Managing Personally Identifiable Information in Electronic Student Education Records,'' and ''Statistical Methods for Protecting Personally Identifiable Information in Aggregate Reporting.'' The briefs can be found at *http://nces.ed.gov/programs/ptac/Toolkit.aspx?section= Technical%20Briefs.* The Department is continually looking to improve the best practices information found in the briefs and encourages comments and suggestions to be emailed to the Department at *SLDStechbrief@ed.gov.* As with the best practices in Appendix A to this document, these briefs serve as resources for practitioners to consider

adopting or adapting to complement the work they are already doing; they are not one-size-fits-all solutions.

*Changes:* None.

*Comment:* One commenter objected to the use of the word "ensure," as it was proposed in § 99.35(a)(2), stating the term was "unrealistic and misleading" as nothing could definitively ensure that FERPA violations would not happen.

*Discussion:* The Department agrees with the commenter and is changing the language concerning reasonable methods in § 99.35(a)(2) to clarify that we expect FERPA-permitted entities to be responsible for using reasonable methods to ensure to the greatest extent practicable that their authorized representatives protect PII from education records in accordance with FERPA.

*Changes:* Section 99.35(a)(2) has been revised to state that FERPA-permitted entities are "responsible for using reasonable methods to ensure to the greatest extent practicable that any entity or individual designated as its authorized representative" protects PII from education records.

*Comment:* The Department received multiple suggestions on actions a FERPA-permitted entity should take to verify that its authorized representative is trustworthy and has a demonstrated track record of protecting data responsibly. Several comments suggested the need to verify that an authorized representative has disciplinary policies and procedures in place to ensure that employees who violate FERPA are dealt with appropriately, including possible termination of employment. Others suggested that individuals accessing PII from education records as authorized representatives should be required to undergo criminal background checks. A number of commenters suggested that the Department require verification that the authorized representative has a training program to teach employees who will have access to PII from education records about their responsibilities under FERPA. A common suggestion was to require the authorized representative to verify that it has no previous record of improperly disclosing PII from education records. One possible method of corroboration included requiring the authorized representative to divulge under penalty of perjury, both to the entity disclosing the data and to the general public, parents, and students, whether it has violated any written agreements or otherwise inappropriately disclosed FERPA-protected data. Another suggested receiving assurances that the authorized representative has no

previous record of improperly disclosing PII from education records and that it is not currently "under suspension" from any State or local educational authority for inappropriate disclosure of student data. Multiple commenters also suggested that the Department publish a list of individuals or entities we found to have violated FERPA and against which we have taken enforcement actions. Some commenters stated that reasonable methods should include verifying that the authorized representative is not on that list published by the Department, while others suggested that individuals and entities on the list should be prevented from entering into future written agreements with all other FERPA-permitted entities, not just the FERPA-permitted entity whose data were mishandled.

*Discussion:* The Department agrees that it is vital to verify that the individual or entity acting as an authorized representative has proven that it is trustworthy and has policies and procedures in place to continue that record. While the Department will not mandate any specific requirements, the best practices for reasonable methods in Appendix A include:

• *Verify the existence of disciplinary policies to protect data.* The FERPA-permitted entity may want to verify that its authorized representative has appropriate disciplinary policies for employees that violate FERPA. This can include termination in appropriate instances.

• *Know to whom you are disclosing data.* The FERPA-permitted entity may want to require its authorized representative to conduct background investigations of employees who will have access to PII from education records, or it may want to conduct these investigations itself. Additionally, the FERPA-permitted entity may want to require its authorized representative to disclose past FERPA or data management violations. If the FERPA-permitted entity discovers past violations, it would want to explore the circumstances behind the violation, and discover all information that would allow it to make an informed judgment on whether the individual or entity is likely to be a responsible data steward. This may include discovering whether the violation was covered up, including if it was voluntarily reported to affected students or FPCO, and whether appropriate breach response procedures were followed.

• *Verify training.* The FERPA-permitted entity may want to verify that its authorized representative has a training program to teach its employees

about FERPA and how to protect PII from education records, or the FERPA-permitted entity may want to train its authorized representative itself.

As these are best practices, it is up to the FERPA-permitted entities to determine which actions are appropriate based on the circumstances; it is their responsibility to determine whether their authorized representatives understand their obligations under FERPA and whether they are likely to comply with FERPA's requirements. For example, even if an authorized representative discloses a past FERPA violation, a FERPA-permitted entity may nonetheless determine that the circumstances are such that it is still appropriate to disclose PII from education records to that individual or entity. The disclosing entity should take all factors into account, including the length of time since the violation, subsequent good behavior, corrective actions taken to negate the possibility of any similar future violations, *etc.*

For the time being, the Department has decided not to implement the idea of compiling a list of FERPA violators. The Department believes that a public list of entities that have violated FERPA is an intriguing idea and will continue to keep this idea in mind and possibly implement it at a later date.

The Department declines to broaden the requirement that, under the five-year rule, the authorized representative is prevented only from receiving PII from education records from the educational agency or institution that originally disclosed the PII from education records. The statutory language is clear that the five-year rule only permits the Department to prohibit further disclosures from the educational agenc(ies) or institution(s) which maintained the original education records from which PII was improperly redisclosed.

If an authorized representative is alleged to have violated FERPA, the Department will also investigate the complaint to determine the extent to which the disclosing FERPA-permitted entity employed reasonable methods. The Department's investigation will consider the reasonable methods taken and the specific circumstances of the disclosure.

*Changes:* None.

*Comment:* Numerous commenters suggested that FERPA-permitted entities should require their authorized representatives to use specific data security methods in order to ensure FERPA compliance. Many commenters provided suggestions for data security methods, including: Requiring strong encryption, publishing security

AR 0713

guidelines, instituting dual-key login, preparing formal security assessments, instituting a security audit program, completing formal risk assessments, monitoring security events, creating data disposal procedures, implementing access controls, and monitoring physical security controls, including what people keep on their desks and printers. Several commenters stated that the Department should specifically regulate data security, as HHS does in the Health Insurance Portability and Accountability Act of 1996 Security Rule, 45 CFR 164.306 *et seq.*

*Discussion:* The Department does not believe it is appropriate to regulate specific data security requirements under FERPA. The Department believes it is more appropriate to allow for flexibility based on individual circumstances. In addition, rapid changes in technology may potentially make any regulations related to data security quickly obsolete. With the increasing move toward mobile computing, evolving hacking techniques, and the push toward ever stronger encryption standards, we believe that it is inadvisable to establish specific regulations in this area.

Still, the Department recognizes the important need, especially with the development of SLDS, for authorized representatives to have strong data security policies and programs in place. Data security is also an essential part of complying with FERPA as violations of the law can occur due to weak or nonexistent data security protocols. As such, the Department is adding the following to its best practices, which are included as Appendix A to this document:

• *Verify the existence of a sound data security plan.*

The FERPA-permitted entity may wish to verify before disclosing PII from education records that its authorized representative has a sound data security program, one that protects both data at rest and data in transmission. A FERPA-permitted entity has a responsibility to determine if its authorized representative's data security plan is adequate to prevent FERPA violations. The steps that the disclosing entity may need to take in order to verify a sound data security program are likely to vary with each situation. In some cases, it may suffice to add language to the written agreement that states what data security measures are required. In other cases, it may be more prudent for the FERPA-permitted entity to take a hands-on approach and complete a physical inspection. Additionally, the FERPA-permitted entity's written agreements could specify required data security

elements, including requirements related to encryption, where the data can be hosted, transmission methodologies, and provisions to prevent unauthorized access.

*Changes:* None.

*Comment:* Some commenters suggested that the Department mandate that FERPA-permitted entities require their authorized representatives to implement various practices that fall under the rubric of data governance. Several commenters suggested the addition of various staff positions as part of a proper data governance strategy. One commenter suggested that the Department require LEAs to appoint formal FERPA compliance liaisons who would develop FERPA policies and procedures and provide professional development to those at the LEA who handle PII from education records. Another commenter suggested that the FERPA-permitted entity require the authorized representative to create an information security office. One commenter recommended, that as data governance is ultimately the responsibility of everyone in an organization, that the FERPA-permitted entity should require its authorized representative to adopt a formal governance plan that includes all levels of stakeholders, such as management, the policy team, data providers, and data consumers. The same commenter recommended that the Department require FERPA-permitted entities to have a formal communications plan so expectations regarding the governance plan are known to everyone.

*Discussion:* The Department declines to regulate specific data governance requirements, as we prefer to grant FERPA-permitted entities the flexibility to determine the appropriate elements for their authorized representatives to include in a comprehensive governance plan. The Department is adding the following element to the best practices for reasonable methods in Appendix A:

*Verify the existence of a data stewardship program.* The FERPA-permitted entity may want to examine its authorized representative's data stewardship program. Data stewardship should involve internal control procedures that protect PII from education records and include all aspects of data collection—from planning to maintenance to use and dissemination. The Department believes that a good data stewardship plan would have support and participation from across the organization, including the head of the organization, management, legal counsel, and data administrators, providers, and users. The plan should detail the

organization's policies and procedures to protect privacy and data security, including the ongoing management of data collection, processing, storage, maintenance, use, and destruction. The plan could also include designating an individual to oversee the privacy and security of the PII from the education records it maintains.

As with data security, it is up to the FERPA-permitted entities to determine if the authorized representative's data stewardship plan is sufficient. Depending on the circumstances of the disclosure, this may include simply adding a description of the data governance plan to the written agreement or conducting an on-site inspection to ensure the authorized representative is properly implementing its plan.

*Changes:* None.

*Comment:* Multiple commenters suggested ways that reasonable methods could be used to prevent the authorized representative from improperly redisclosing PII from education records. Some commenters expressed concern that there is no bright line rule for how long PII from education records could be maintained by an authorized representative before it was required to be destroyed or returned. One commenter suggested a period of five years should be mandated as the maximum time PII from education records could be kept. Others expressed the view that exact timelines for keeping data were not warranted. Some requested that the Department clarify how PII from education records can be retained for purposes of long-term analysis.

Several commenters asked the Department to require a formal process to document the destruction or return of the disclosed PII from education records, such as a notarized letter, to ensure that both the disclosing FERPA-permitted entity and the authorized representative are upholding their responsibilities. Some commenters argued that this type of process would be ideal as it is often too difficult for the disclosing FERPA-permitted entity to verify that PII from education records has in fact been fully destroyed, and that the authorized representative did not maintain some electronic copy of the PII. If such a notarized statement were required, one commenter then asserted that the FERPA-permitted entity making the disclosure be held harmless if its authorized representative nonetheless maintained a copy of the data. Others stated that there should be more flexibility, such as permitting the storage of PII from education records in

secure archives as opposed to fully returning or destroying it.

The Department also received comments suggesting that we limit the number or nature of data elements in PII from education records that can be disclosed or included in an SLDS, including how that data could potentially be linked to other information. The Department received comments stating that FERPA-permitted entities should be given the right to review any document being published by the authorized representative that uses the disclosed PII from education records to ensure that proper disclosure avoidance techniques were used to prevent an unauthorized disclosure. Finally, several commenters requested that reasonable methods include a provision that would allow the disclosing FERPA-permitted entity access to the authorized representative's policies, procedures, and systems to conduct monitoring and audit activities to ensure the authorized representative is taking all necessary steps to protect the PII from education records. Some commenters stated that these audits should be completed by independent third parties. Other commenters requested that the results of the audits be disclosed to the public.

*Discussion:* The Department believes that outlining the time period that an authorized representative can maintain data for the purpose of an audit, evaluation, or enforcement or compliance activity is extremely important, which is why it is one of the minimum required components of the written agreement (see § 99.35(a)(3)(iv)). Nonetheless, the Department declines to specify a set period of time in the regulations for data retention, as the necessary amount of retention time is highly fact specific. For example, if an SEA is disclosing PII from education records to an authorized representative for an evaluation that is expected to take six months, it may be, depending on the circumstances of the evaluation, reasonable to require that the authorized representative to destroy the disclosed PII in six months. If, however, an SEA is disclosing PII from education records to a regional entity for a longitudinal, multi-year evaluation, the written agreement might specify that data retention would be reviewed annually, with data elements being retained or destroyed as appropriate. The Department believes it is important to leave the determination of the appropriate time period up to the parties to the agreement.

The comments about methods for destruction do, however, point out a potential inconsistency in the NPRM

that should be corrected. The NPRM provided that in some instances data must be destroyed when no longer needed, and that the data must be returned or destroyed in other instances. We believe the reference to returning data was more appropriate in a paper-based environment, and that destroying data is the more appropriate action when discussing electronic records. An entity could elect to destroy the data in question by returning the original file and erasing all versions of the data from its servers.

Accordingly, we have decided to remove the proposed requirements in § 99.35(a)(3)(iii) and (a)(3)(iv) that permitted an authorized representative to return PII from education records to the FERPA-permitted entity, in lieu of destroying such information, in order to correct the inconsistency.

While the Department is not regulating on this particular process, when assessing responsibility, if the Department finds that PII from education records has not been appropriately destroyed by an authorized representative, the Department would review all of the reasonable methods taken by the disclosing FERPA-permitted entity, such as if the written agreement included a formal process to verify the destruction of PII from education records.

The Department is not addressing through the FERPA regulations the number or nature of elements that can be disclosed, included in an SLDS, or linked to other elements. As stated earlier, FERPA is not a data collection statute, and it is beyond the scope of the statute to address these issues in these regulations. So long as all requirements of FERPA are met, the parties to the agreement have the flexibility to determine what elements should be disclosed and how they can be combined with other elements. Still, the FERPA regulations require that PII from education records may not be used for any purpose other than the audit, evaluation, or enforcement or compliance activity that prompted the original disclosure.

It is important that the authorized representative not purposely or inadvertently redisclose PII from education records inappropriately. For example, the written agreement could reflect the expectations that the FERPA-permitted entities have of the authorized representatives when it comes to making the data public. Methods, such as using disclosure avoidance techniques or exercising the right to review and approve any reports using the data before release, can be

detailed in the written agreement to help ensure that unauthorized redisclosures do not happen.

In addition, the FERPA-permitted entities might wish to maintain the right to conduct monitoring and audits of the authorized representative's processes, procedures, and systems. If the FERPA-permitted entities decide to exercise this right, they should be free to choose who should conduct the audits or monitoring activities, whether it is themselves or an external third party, and if the results should be made public. The Department declines to regulate on this issue as we do not believe that it will always be necessary to conduct such audits or monitoring activities. The parties to the data disclosure agreement can determine if such activity is warranted based on criteria, such as the scope or duration of the audit, evaluation, or enforcement or compliance activity.

Based on the discussion in this section, we are including the following elements in Appendix A as best practices for FERPA-permitted entities to consider when implementing reasonable methods.

• *Convey the limitations on the data.* A FERPA-permitted entity should take steps to ensure that its authorized representative knows the limitations on the use of the data (*i.e.,* that the data is only to carry out the audit or evaluation of Federal- or State-supported education programs, or to enforce or to comply with Federal legal requirements that relate to those programs).

• *Obtain assurances against redisclosure.* A FERPA-permitted entity should obtain assurances from its authorized representative that the data will not be redisclosed without permission, including such assurances that the authorized representative will provide the FERPA-permitted entity (the disclosing entity) the right to review any data prior to publication and to verify proper disclosure avoidance techniques have been used.

• *Be clear about destruction.* A FERPA-permitted entity should set clear expectations so its authorized representative knows what process needs to be followed for the proper destruction of PII from education records.

• *Maintain a right to audit.* A FERPA-permitted entity should maintain the right to conduct audits or other monitoring activities of the authorized representative's policies, procedures, and systems.

• *Disclose only PII from education records that is needed.* When the FERPA-permitted entity considers disclosing PII from education records to an authorized representative for an

**75624**     **Federal Register** / Vol. 76, No. 232 / Friday, December 2, 2011 / Rules and Regulations

audit, evaluation, or enforcement or compliance activity, it may want to explore which specific data elements are necessary for that activity and provide only those elements. FERPA-permitted entities should take care to ensure that they are not disclosing more PII from education records than needed for the stated activity and purpose. FERPA-permitted entities should also explore whether PII from education records is actually required, or whether de-identified data would suffice.

*Changes:* The Department has removed the proposed requirement in § 99.35(a)(3)(iii) and (a)(3)(iv) that permitted an authorized representative to return PII from education records to the FERPA-permitted entity, in lieu of destroying such information, in order to be more consistent with the statute and to correct an inconsistency in the NPRM.

### Written Agreements (§ 99.35(a)(3))

*Comment:* As with reasonable methods, the Department received mixed comments on the value of the proposed written agreement requirement and suggestions for how to improve it. One commenter, while approving of the written agreement provision, expressed concern that the proposed changes would relieve data recipients of responsibility for actually implementing protections, theorizing that the agreements would require only that "policies and procedures" be established, rather than the inclusion of any provisions providing true accountability. Other commenters requested that the Department provide the flexibility to FERPA-permitted entities to draft agreements that meet the needs and requirements of the circumstances of the data disclosures and the requirements of the relevant State and local laws. One requester asked the Department to add the phrase "including but not limited to" when referring to the specific requirements of written agreements as laid out in the NPRM. Several commenters requested further guidance on written agreements, including asking the Department to provide a model template. One commenter asked the Department to provide clarity around why the "other than an employee" language is included in the written agreement requirement. Another commenter requested that the Department replace the term "written agreement" with "data exchange agreement" because the commenter believed the "written agreement" term is too vague and "data exchange agreement" is the standard information security term.

*Discussion:* The Department proposed adding a new § 99.35(a)(3) to require written agreements when FERPA-permitted entities designate an authorized representative (other than an employee) under the audit or evaluation exception. The proposal included several specific provisions that must be included in written agreements: (1) Designate the individual or entity as an authorized representative; (2) specify the information to be disclosed and that the purpose for which the information is disclosed to the authorized representative is to carry out an audit or evaluation of Federal- or State-supported education programs, or to enforce or to comply with Federal legal requirements that relate to those programs; (3) require the authorized representative to destroy or return to the State or local educational authority or agency headed by an official listed in § 99.31(a)(3) personally identifiable information from education records when the information is no longer needed for the purpose specified; (4) specify the time period in which the information must be returned or destroyed; and (5) establish policies and procedures consistent with FERPA and other Federal and State confidentiality and privacy provisions to protect personally identifiable information from education records from further disclosure (except back to the disclosing entity) and unauthorized use, including limiting use of personally identifiable information to only authorized representatives with legitimate interests.

While the Department agrees that it is vital that written agreements clearly set forth all parties' obligations with respect to PII from education records, the Department believes that it would be inappropriate to be more prescriptive than the specific safeguards and provisions we are including in these regulations. The Department believes that it is more appropriate to provide the parties to the agreements with the flexibility to draft written agreements that meet the specific needs of the circumstances surrounding the data disclosure. In addition, the Department defers to State law governing contracts and written agreements, including the imposition of allowable sanctions.

While the Department declines to impose additional requirements for written agreements, the Department is including in Appendix A a summary of best practices for written agreements. In the following discussion, we address comments and suggestions the Department received and whether the Department considers these best practices. Appendix A also includes best practices that have not been

mentioned in the comments, but the adoption of which the Department believes would result in increased accountability for all parties to the agreement. At this time the Department is not providing a model template for a written agreement but intends to issue one as additional non-regulatory guidance at a later date. It is also worth noting that the studies exception has had a requirement for written agreements since 2008. The matters discussed here logically apply to PII from education records disclosed under both the studies and audit or evaluation exceptions. It is only through the use of written agreements that parties can establish legally binding roles and responsibilities.

We specifically carve out employees from the written agreement requirements reflected in § 99.35(a)(3) because the Department is not requiring written agreements when FERPA-permitted entities use their own employees to conduct audits, evaluations, or compliance or enforcement activities. Agreements under the audit or evaluation exception are only necessary when an authorized representative is selected that is outside of the organization disclosing the data. Employees have an inherently different relationship with their employing organization than does an outside entity. It is important that any organization with access to PII from education records train its employees about their responsibilities under FERPA, including proper data governance and data security procedures. We would expect, therefore, that organizations would establish conditions of employment for their employees that are consistent with the components required of written agreements under § 99.35(a)(3) and that violations of those conditions would result in disciplinary actions, up to and including termination.

The Department declines to add the suggested "including but not limited to" language when referring to the minimum written agreement provisions specified in the regulations. The language in the final regulations, as proposed in the NPRM, reads that the written agreement must include these provisions but does not indicate that these are the only provisions that can be included in the written agreement. As such, the Department believes that the "including but not limited to" language is implied and therefore unnecessary.

Likewise, the Department declines to change the term "written agreement" to "data exchange agreement." "Written agreement" is a general term that would include the more specific "data

exchange agreement.'' The Department is leaving it up to the discretion of the parties to the agreement to decide how the agreement may be termed, whether that be written agreement, contract, memorandum of understanding, data exchange agreement, or some other term.

*Changes:* None.

*Comment:* Several commenters seemed to misinterpret one of the Department's proposed required components of the written agreement: ''Specify the information to be disclosed and that the purpose for which the information is disclosed to the authorized representative is to carry out an audit or evaluation of Federal or State supported education programs, or to enforce or to comply with Federal legal requirements that relate to those programs.'' These commenters stated that the Department was requiring the written agreement to include ''the purposes for which the information is being disclosed.'' Others noted that anytime PII from education records is shared through one of the exceptions to the general consent rule under FERPA, the specific reasons for that disclosure should be clearly stated.

*Discussion:* The Department originally only proposed that a written agreement include a statement that the purpose of the disclosure was for an audit, evaluation, or enforcement or compliance activity. The NPRM did not include a requirement to describe the details of the activity or why PII from education records was a necessary component to the activity. Based on the comments we received, the Department is revising the regulations to require that written agreements include a description of the audit, evaluation, or enforcement or compliance activity.

*Changes:* Section 99.35(a)(3)(ii)(C) is added to require that the written agreement include a description of the activity with sufficient specificity to make clear that the work falls within the exception of § 99.31(a)(3), including a description of how the personally identifiable information from education records will be used.

*Comment:* Several commenters suggested that FERPA-permitted entities should be required to provide information about PII from education records being disclosed, such as the data elements being shared and the purpose of the disclosure, to parents and other stakeholders. Use of a Web site for this purpose was specifically recommended, particularly for posting the information on the minimum provisions required for written agreements. One commenter noted that it was important for the written agreements to be made available in order for the public to provide oversight regarding the appropriateness of the data disclosures.

*Discussion:* The Department concurs that transparency is important to ensuring the accountability of all parties. While we decline to issue regulations requiring it, we suggest that FERPA-permitted entities post substantive information on their Web sites or in other public locations about the disclosure of PII from education records, including the written agreements governing data disclosures and information about specific projects and uses. As such, we have added the following to Appendix A as a best practice:

• *Inform the public about written agreements.* Transparency is a best practice. The FERPA-permitted entity might want to post its data sharing agreements on its Web site, or provide some equivalent method to let interested parties know what data it is sharing, the reasons it is being disclosed, and how it is being protected. While the Department generally recommends public posting of written agreements, parties are encouraged to review their contractual data security provisions carefully and redact, prior to publication, any provisions that may aid those seeking unauthorized access to systems. In certain instances a separate confidential IT Security Plan may be appropriate.

*Changes:* None.

*Comment:* The Department received multiple suggestions on ways to increase the legal protections offered by the written agreements. Several commenters requested that the Department explicitly require that the written agreements comply with all applicable laws, whether at the Federal, State, or local level. One commenter specifically mentioned ensuring compliance with State data security laws and policies. Several commenters requested the inclusion of provisions that would ensure that Institutional Review Board (IRB) protocols are in place and properly implemented. Another commenter requested that the Department require the written agreement to include a provision specifying the legal authority for the data disclosure in order to ensure that anyone disclosing or receiving PII from education records has the authority to do so. Finally, the Department received many comments stating that increased accountability over authorized representatives could be achieved if the Department required that written agreements have the force of a contract under applicable State law. Specifically, these commenters strongly urged the Department to mandate, as a condition of data disclosure, that the written agreements include contractual safeguards such as liquidated damage provisions for breach of the agreement and third party beneficiary status for individuals whose PII from education records is disclosed.

*Discussion:* The Department agrees with many of the suggestions included in these comments; however, we decline to incorporate them as regulatory requirements. Rather, many suggestions have been included as best practices for written agreements in order to provide FERPA-permitted entities with the flexibility to craft provisions in the written agreements that meet their specific needs and the circumstances of the data disclosures. The Department agrees that the written agreements must comply with all applicable laws at the Federal, State, and local levels. This would include any State data security laws. The Department cannot regulate through FERPA on whether IRB review and approval is necessary or prudent. On the other hand, if the circumstances surrounding the audit, evaluation, or enforcement or compliance activity dictate that IRB involvement is required, it would be a best practice for the written agreement to reflect that. It should be noted, however, that the amendments are not intended to supersede the research regulations under the Common Rule that apply to Federally funded research of educational data that qualifies as human subject research. This includes the requirement that the researcher receive a waiver from an IRB if they intend to conduct research with identifiable information without consent of the participants.

The Department also agrees that it is sensible to list the express or implied legal authority that permits the data disclosure and the audit, evaluation, or enforcement or compliance activity. As stated elsewhere in this document, FERPA itself does not grant the authority for these activities, and the existence of this authority is generally a matter of other Federal, State, and local laws.

In general, the Department agrees with the view that written agreements should be used, to the extent permissible under applicable State law, to ensure that authorized representatives (other than employees) comply with FERPA to the greatest extent practicable. While the Department believes that there is merit in having written agreements that clearly set forth all parties' obligations with respect to FERPA-protected information, the Department believes

AR 0717

that it would be inappropriate to require that the parties include specific contractual safeguards. The fact that the authority to enforce FERPA lies with the Department should not be taken to abrogate the responsibility that FERPA-permitted entities have to protect PII from education records. FERPA-permitted entities that are disclosing PII from education records to authorized representatives (other than employees) are encouraged to provide for sanctions in their written agreements, and to enforce those sanctions. The Department believes that it is appropriate to defer to applicable State laws governing contracts and written agreements for purposes of safeguarding FERPA-protected information.

Based on these suggestions, the following is being added to the best practices listed in Appendix A:

• *Identify and comply with all legal requirements.* It is important to remember that FERPA may not be the only law that governs a data sharing agreement. The agreement could broadly require compliance with all applicable Federal, State, and local laws and regulations, and identify the legal authority (whether express or implied) that permits the audit, evaluation, or enforcement or compliance activity.

• *Mention Institutional Review Board (IRB) review and approval.* While FERPA does not mention IRBs, research proposals involving human subjects may have to be reviewed and approved by IRBs, if required under protection of human subject regulations of the Department and other Federal agencies. If IRB review and approval is required or expected, this may be noted in the written agreement.

• *Identify penalties.* The agreement could include penalties under State contract law such as liquidated damages, data bans of varying length, and any other penalties the parties to the agreement deem appropriate. The FERPA-permitted entity may want its agreement to create third-party beneficiary rights, *e.g.*, allowing parties injured by a data breach to sue for damages. While FERPA itself has little flexibility for sanctions, the FERPA-permitted entity can include a wide range of appropriate sanctions in its written agreements.

*Changes:* None.

*Comment:* Several commenters suggested that because the disclosure of PII from education records may create serious risks such as identify theft, the proposed regulations should require timely notification to parents and eligible students when their data has been disclosed as a result of a data security breach. Commenters also

suggested that the written agreement include provisions for the handling of the breach, such as who would bear the costs associated with notifying those affected.

*Discussion:* The Department takes seriously the suggestion that parents and eligible students should be notified when PII from education records has been disclosed in violation of FERPA and agrees that notice should be given when there is a data security breach. However, the Department declines to impose through the FERPA regulations specific requirements for breach notification. This will allow FERPA-permitted entities the requisite flexibility to ascertain the appropriate responses and approaches to their particular situations and to comply with any existing Federal, State, or local laws or regulations governing breach notification.

Good data governance also includes breach notification; every organization responsible for managing education records that contain PII should maintain a breach response plan. These plans should provide specific guidelines for an appropriate and timely response to a breach, including a clear description of what constitutes a breach, and a description of the immediate steps to be taken in the event that a breach is suspected. In particular, there should be a designated person in the management chain who will be notified in the event of actual or suspected breaches. When a breach occurs, the designated authority should conduct an analysis of the likelihood of exposure and potential harm to affected individuals. This analysis will inform whether notification is warranted and what its content may be. There should also be an analysis of the circumstances that resulted in the breach, so that the system or procedures can be modified as quickly as possible to avoid further breaches through the same mechanism.

Although the Department is not regulating on breach notification, the following is being added to the best practices listed in Appendix A:

• *Have plans to handle a data breach.* While no one anticipates a data breach, data loss may occur. The FERPA-permitted entity may wish to include specific procedures in its written agreements detailing the parties' expectations in the event that PII from education records is lost, including specifying the parties' responsibilities with regard to breach response and notification and financial responsibility.

*Changes:* None.

*Comment:* The Department received requests to clarify to whom breaches of written agreements should be reported.

*Discussion:* As discussed earlier in this preamble, it is not only the FERPA regulations that govern what can be included in a written agreement. As such, it is important to address any remedies that are also available under State law. Nonetheless, a breach of the provisions in a written agreement may also constitute a violation of FERPA and should therefore be reported to FPCO.

*Changes:* None.

*Comment:* None.

*Discussion:* The Department wishes to reduce the implementation burden of the new written agreement requirement in § 99.35(a)(3) on FERPA-permitted entities by only requiring that new, renewed, or amended written agreements with authorized representatives that are entered into on or after the effective date of the regulations comply with the new requirement. The written agreement requirement in § 99.35(a)(3) must be adhered to for any new designation of an authorized representative that is not an employee as of the effective date of these regulations. As provided in the DATES section of the preamble, for written agreements that are in place with authorized representatives prior to the effective date of the regulations, FERPA-permitted entities must comply with the written agreement requirements in § 99.35(a)(3) when they renew or amend their agreements.

*Changes:* None.

## Protection of PII From Education Records By FERPA-Permitted Entities (§ 99.35(b)(1))

*Comment:* None.

*Discussion:* The Department wishes to make the language used to refer to FERPA-permitted entities in § 99.35(b)(1) consistent with the language used to refer to FERPA-permitted entities in §§ 99.35(a)(2) and (a)(3).

*Changes:* We have revised § 99.35(b)(1) so that it uses the term, ''State or local educational authority or agency headed by an official listed in § 99.31(a)(3),'' which is used in §§ 99.35(a)(2) and (a)(3).

## Disclosures to Organizations Conducting Studies (§ 99.31(a)(6))

*Comment:* A few commenters suggested that FERPA's ''for, or on behalf of'' requirement in the studies exception contains a significant limitation. Specifically, these commenters suggested that the exception prohibits FERPA-permitted entities, such as an SEA, from redisclosing PII from education records that they received under one of FERPA's exceptions to the general consent rule,

for, or on behalf of, the original disclosing educational agency or institution, such as an LEA, if the original agency or institution objected to the disclosure. Another commenter asked that we interpret § 99.31(a)(6) to permit disclosures to organizations conducting studies for, on behalf of, or in partnership with, or in the interest of, educational agencies or institutions, as determined by those agencies or institutions.

*Discussion:* We disagree that the phrase ''for, or on behalf of'' prohibits a disclosure to which the original disclosing educational agency or institution objects. Historically, the Department has viewed the ''for, or on behalf of'' requirement as being based on the unstated premise that some form of agreement by the original disclosing educational agency or institution, such as an LEA or postsecondary institution, was a necessary prerequisite for these types of disclosure. However, it has become necessary for the Department to consider whether its interpretation concerning the ''for, or on behalf of'' language was fully consistent with recently enacted laws.

We have concluded that ''for, or on behalf of'' does not require the assent of or express approval by the original disclosing educational agency or institution. For example, it is not necessary for an SEA to secure the approval of an LEA prior to making disclosures for, or on behalf of the LEA, so long as the SEA is acting with express or implied legal authority and for the benefit of the LEA.

The changes to § 99.31(a)(6)(ii) are necessary to clarify that while FERPA does not confer legal authority on FERPA-permitted entities to enter into agreements and act as representatives of LEAs or postsecondary institutions, nothing in FERPA prevents them from entering into agreements and redisclosing PII from education records related to studies conducted on behalf of LEAs or postsecondary institutions under § 99.31(a)(6), provided that the redisclosure requirements in § 99.33(b) are met. Permissive disclosures of this type may be made notwithstanding the objection of the LEA or postsecondary institution so long as the disclosing FERPA-permitted entity has independent authority to have the study conducted, whether expressly stated or implied, and makes the disclosure on behalf of the LEA or postsecondary institution.

We anticipate that the majority of redisclosures made by FERPA-permitted entities will be made for, or with the approval of, the original disclosing educational agency or institution.

Nevertheless, we can reasonably foresee instances in which these FERPA-permitted entities would make redisclosures on behalf of an LEA or postsecondary institution without obtaining its approval.

For instance, an SEA must have the authority to enter into agreements with researchers to conduct studies to improve instruction across LEAs within its own State. Studies such as these can help States save money and improve student outcomes by identifying effective practices and targeting limited resources accordingly, while simultaneously increasing the transparency of taxpayer investments. Therefore, in order to provide greater flexibility to FERPA-permitted entities, we interpret the phrase ''for, or behalf of'' to recognize both disclosures for the LEA or postsecondary institution that are made with the approval of the LEA or postsecondary institution and disclosures made on behalf of the LEA or postsecondary institution that are made for their benefit in the absence of their approval.

This approach ensures that FERPA-permitted entities have the necessary latitude to fulfill their statutory and regulatory mandates. They may conduct studies of publicly funded education programs while still ensuring that any PII from education records is appropriately protected. FERPA permits disclosure without consent to an organization conducting a study ''for, or on behalf of, educational agencies or institutions'' for statutorily enumerated purposes. 20 U.S.C. 1232g(b)(1)(F). We see no need to deviate from the statutory language in the regulations and agree that § 99.31(a)(6) permits disclosure without consent to organizations conducting studies in partnership with educational agencies or institutions, in which case we would view the study as being ''for'' the educational agencies or institutions. Similarly, as explained earlier in this discussion, we also view § 99.31(a)(6) as permitting disclosure without consent to organizations conducting studies for the benefit of educational agencies or institutions, in which case we would consider the study to be ''on behalf of'' educational agencies or institutions.

However, we disagree with the contention that only an educational agency or institution may make the determination regarding whether a study is for or on its behalf. Rather, FERPA-permitted entities may also make the determination that a study is for the benefit of the original disclosing educational agency or institution. For example, an SEA may conduct a study that compares program outcomes across

its LEAs to further assess what programs provide the best instruction and then duplicate those results in other LEAs.

*Changes:* None.
*Comment:* None.
*Discussion:* Upon further review, we decided to remove the proposed requirement in § 99.31(a)(6)(iii)(C)(*4*) and the requirement in § 99.31(a)(6)(ii)(C)(*4*) of the current regulations that permitted an organization conducting a study to return PII from education records to the FERPA-permitted entity, in lieu of destroying such information. We made these changes so that the regulations are more consistent with the statute, which requires the destruction of such information, and to correct an inconsistency in the current and proposed regulations, which required both the destruction of such information and the return or destruction of such information. While returning the information to the originating entity can be a form of destruction so long as the organization conducting the study also properly erases all PII from education records that is maintained in electronic format, returning the information would be insufficient if the PII from education records is continued to be maintained in electronic format by the organization conducting the study.

*Changes:* We have removed the proposed requirement in § 99.31(a)(6)(iii)(C)(*4*) and the requirement in § 99.31(a)(6)(ii)(C)(*4*) of the current regulations that permitted an organization conducting a study to return PII from education records, in lieu of destroying such information, in order to be more consistent with the statute and to correct an inconsistency in the current and proposed regulations.

**Directory Information (§§ 99.3 and 99.37)**

*Definition of Directory Information (§ 99.3)*

*Comment:* One commenter supported the proposed change to the definition of ''directory information,'' which clarifies that an educational agency or institution may designate and disclose as directory information a student's ID number, or other unique personal identifier that is displayed on a student's ID card or badge, if the identifier cannot be used to gain access to education records, except when used in conjunction with one or more factors that authenticate the student's identity. We also received numerous comments from a variety of parties that expressed support for this change.

One commenter suggested that we remove from the definition of ''directory

information'' the items ''address,''
''telephone listing,'' and ''date and place
of birth,'' noting that the availability of
directory information jeopardizes
students' right to privacy and makes
identity theft easier. Another
commenter raised a number of concerns
about how directory information might
affect a student who is homeless and
recommended that a student's address
not be included in the definition of
''directory information'' for a student
who meets the definition of ''homeless
child or youth'' under the McKinney-
Vento Homeless Assistance Act. For a
number of reasons, the commenter
stated that disclosing a homeless
student's address would be harmful or
an invasion of privacy. A few
commenters raised concerns about what
they mistakenly thought was an
expansion of the definition of ''directory
information'' by including any student
ID number, user ID, or other unique
personal identifier used by a student for
purposes of accessing or communicating
in electronic systems.

*Discussion:* We appreciate the support
that we received from those parties who
agreed with the clarification we
proposed to the definition of ''directory
information,'' and we regret any
confusion caused by including the
entire definition in the NPRM. As we
explained in the preamble to the NPRM,
we proposed to modify the definition of
''directory information'' only to clarify
that under § 99.37(c)(2), an educational
agency or institution may require
students to wear or display ID badges or
identity cards that display directory
information, even if the parent or the
eligible student opted out of directory
information. The inclusion of a student
ID number or other unique identifier in
the definition of ''directory
information'' is not new; we made this
amendment in 2008. The NPRM merely
proposed to establish that the student ID
number or other unique identifier that
we allowed to be designated as directory
information in 2008 could *also* be
displayed on a student ID card or badge.

With regard to the concerns about
including in the definition of ''directory
information'' such items as ''address,''
''telephone listing,'' and ''date and place
of birth,'' we note that these items have
been in the FERPA statute since its
enactment in 1974, and any change to
remove these items would require
congressional action. We include these
and other items in the regulations,
explaining in § 99.37 that an
educational agency or institution *may*
disclose directory information under
certain conditions, including the
condition that it notify parents and
eligible students of the types of PII from

education records it has designated as
directory information. If a school has
the administrative capacity, it may
permit parents or eligible students to
opt out of specific items it has
designated. However, it has been our
understanding that most schools do not
have the administrative capacity to
permit parents and eligible students to
opt out of some, but not all, directory
information. Because the disclosure of
directory information is permissive, we
have advised schools that they can
employ an all-or-nothing approach to
the disclosure of directory information.
That is, a school may provide public
notice of the items that it has designated
as directory information and permit
parents and eligible students to opt out
of the disclosure of the items as a whole.

With regard to the comment about not
designating an address as ''directory
information'' for a student who is
homeless, as explained elsewhere,
FERPA provides schools with the
authority to include or exclude any
items within the definition of ''directory
information.''

The definition of ''directory
information'' in FERPA is generally a
guideline for schools to use in
designating types of information as
directory information. A school is not
required to designate all of the types of
information given as examples in
FERPA as directory information. The
decision to designate certain types of
information as directory information,
such as the student's address, is left to
the discretion of the individual
educational agency or institution.

We share the concerns raised by
commenters that certain directory
information items may make identity
theft easier in our modern information
age. We encourage school officials to be
cognizant of this fact and, if feasible, to
work hand-in-hand with parents and
eligible students in their community to
develop a directory information policy
that specifically meets their needs and
addresses legitimate concerns.

*Changes:* None.

**Student ID Cards and ID Badges
(§ 99.37)**

*Comment:* Several commenters
expressed support for the proposed
amendment in § 99.37(c)(2), which
provides that parents and eligible
students may not use their right to opt
out of directory information disclosures
in order to prevent an educational
agency or institution from requiring
students to wear or otherwise disclose
student ID cards or badges that display
information that may be directory
information. One commenter noted that
schools can embed student ID numbers

in bar codes or magnetic stripes, as
needed, to avoid any privacy conflicts.
A student stated that a university
should be able to require that students
wear ID badges on campus in order to
better protect students.

Another commenter recommended
that we specify which directory
information can be displayed on a
student ID card or badge. Some
commenters asked if there would be any
situations in which a student might be
exempted from wearing an ID badge,
such as where a student is the victim of
stalking at a large postsecondary
institution. Another commenter
expressed concern that including a
student ID number as directory
information would have a negative
effect on students receiving services
under the Individuals with Disabilities
Education Act (IDEA) and raised
concerns about physical safety and
protection from identity theft. The
commenter suggested that a student ID
number or other unique identifier that
may be displayed on a student ID card
and is designated as directory
information should not be used—even
in conjunction with one or more factors
that authenticate the user's identity—to
gain access to education records. The
same commenter supported permitting a
school to require a student to wear or
publicly display a student ID card or
badge that exhibits directory
information, as long as the student ID
number cannot be used to gain access to
education records.

A commenter also suggested that we
amend this provision to include other
activities for which parents and eligible
students cannot opt out, such as
participation in education activities that
require sign-in access to electronic
systems. Specifically, the commenter
requested that we add a new
requirement stating that a parent or
eligible student could not opt out of
directory information disclosures to
prevent an educational agency or
institution from disclosing or requiring
a student to disclose the student's name,
identifier, or institutional email address
in a class in which the student is
enrolled. This would include access to
instruction, curriculum, courses, or
other administrative functions provided
online. The commenter stated that the
increased use of electronic systems for
both instructional and administrative
activities dictates that the Secretary not
differentiate between these types of
activities in which students may opt
out. The commenter asked for these
changes to ensure that students are not
allowed to opt out of participation in
various classroom or other instructional
activities simply because they have to

sign on to an electronic system. Another commenter asked that we not permit the student's picture to be on the student ID. This commenter also expressed support for permitting parents and eligible students to have the right to opt out of wearing a student ID badge.

*Discussion:* We appreciate the support we received concerning this proposed change. With regard to the comment that we specify the directory information that can or cannot be displayed on an ID card or badge (*e.g.,* a student's picture), we do not believe this is appropriate or necessary. Rather, we believe that educational agencies and institutions should have the flexibility to make these determinations best suited to their particular situations. Similarly, we do not believe that we should require that information displayed on a student ID card or badge contain only information that cannot be used to gain access to education records. Student ID numbers, user IDs, and any other unique personal identifiers may only be included as directory information if they cannot be used to gain access to education records except when used in conjunction with one or more other factors that authenticate the user's identity.

For the same reasons school administrators need the flexibility to determine what type of information is directory information, they need to have the flexibility to determine what directory information should be included on a student ID card or badge. Smaller schools may know their student population well enough that they may not need to have an ID number or other unique identifier, while larger LEAs, colleges, and universities may need to include more information. As one school official noted, educational agencies and institutions can embed student ID numbers in bar codes or magnetic stripes to address privacy concerns, including identity theft. This practice would also address the apprehension of some commenters that some students may have special reasons for not wearing ID badges, such as special education students, younger children, or students who are the victims of stalking. This amendment to FERPA permits, but does not require, schools to include directory information on student ID cards and badges or to require students to wear or display ID cards and badges.

With regard to the request that we include other activities for which parents and student cannot opt out, such as activities that require sign-in access to electronic systems for instructional and administrative activities, we note that this is outside the scope of the NRPM and, therefore, do not believe it is appropriate to address in these final regulations.

Additionally, in 2008, we expanded the definition of "directory information" in § 99.3 of the FERPA regulations to include a student ID number, user ID, or other unique personal identifier used by the student for purposes of accessing or communication in electronic systems, if the identifier could not be used to gain access to education records, except when used in conjunction with one or more factors to authenticate the user's identity. Further, the 2008 regulation changes clarified the definition of "attendance" to clarify that students who are not physically present in the classroom may attend an educational agency or institution via videoconference, satellite, Internet, or other electronic information and telecommunications technologies.

In 2008, we also amended § 99.37(c) to state that parents or eligible students may not use their right to opt out of directory information to prevent a school from disclosing, or requiring the disclosure of, a student's name, identifier, or institutional email address in a class in which the student is enrolled. 73 FR 74806 (December 9, 2008). These three provisions are read together to permit directory information to be used to access online electronic systems and to prevent opt-out rights from being used to prevent an educational agency or institution from disclosing or requiring a student to disclose the student's name, identifier, or institutional email address in a class in which the student is attending, in either a traditional or non-traditional classroom setting.

*Changes:* None.

**Limited Directory Information Policy (§ 99.37(d))**

*Comment:* A number of commenters expressed support for the proposal clarifying that an educational agency or institution may have a limited directory information policy. One commenter stated that this clarification will provide educational agencies and institutions with more certainty and control in using directory information for their own purposes. A few commenters stated that it would be helpful if the regulations clarified that institutions can have different policies based on each specific type or subset of directory information, such as being able to institute a policy that only certain directory information may be disclosed to specific parties. Some pointed out that the proposed regulations did not specify whether a school could put into effect a policy that

specifically limits who may not receive directory information. Two commenters recommended that the regulations explicitly state that directory information designated by a school may not be disclosed, except for the limited disclosure to specific parties, or for specific purposes, or both.

One commenter supported the amendment to permit schools to have a limited directory information policy, believing this change would help ensure that school officials do not contact landlords, employers, or other third parties to discuss a child's housing situation. One commenter stated that he opposed any changes to the FERPA regulations that would restrict access to directory information. Another commenter said that adopting § 99.37(d) as proposed would add confusion and may raise unnecessary allegations of improper disclosure of directory information from parents and eligible students. This commenter pointed out that there is no requirement in FERPA that a school adopt a directory information policy or disclose directory information even if it has a policy. One commenter expressed concern that the proposed changes to the definition of "directory information" do not adequately address the capacity of marketers and other commercial enterprises to obtain, use, and re-sell student information. The commenter stated that few parents are aware, for example, that anyone can request and receive a student directory from a school. The commenter also stated that States may take action, through legislation, to tighten restrictions on the use of directory information, perhaps restricting the disclosure of directory information for marketing purposes.

A few commenters expressed concern that the proposal to permit schools to have a limited directory information policy would prevent the release of information about students to those who have a legitimate reason for obtaining the information, such as the media. The commenters also expressed concern that withholding directory information could become a tool for schools to engage in retribution against disfavored media outlets, social or political causes, or parental activist groups. The commenters stated that the Secretary should give detailed guidance to educational agencies and institutions concerning this change in order to diminish any negative effect that such policies could have on the free flow of information to the public. These commenters stated that the effect of the regulatory changes will be that schools will decide not to disclose directory information to the media for any reason,

AR 0721

**75630**   **Federal Register** / Vol. 76, No. 232 / Friday, December 2, 2011 / Rules and Regulations

including publicity or investigations. One of these commenters said that it was not clear how recipients of directory information would be chosen, whether the specific parties would be selected by the institution or by each individual student. This commenter noted that a limited directory information policy might make it difficult for a party that was not included in the policy at the beginning of a year but that needed to do business with the school mid-year to have fair access to directory information.

A commenter stated that the ability to disclose directory information for some purposes, but not others, might prove more useful to educational agencies and institutions that are not subject to a State open records law than to those that are. Educational agencies and institutions that are subject to open records laws would be required to disclose all directory information and would not benefit from a limited directory information policy. The commenter requested clarification whether the ability to limit directory information is optional and whether a failure to institute such a policy would subject the institution to enforcement proceedings by the Department. Similarly, another commenter asked for clarification as to whether a school that chose not to adopt a limited directory information policy may under the proposed regulations still limit the disclosure of directory information to whomever they want, and for whatever reason they want, even though State law may require disclosure.

Finally, a few commenters pointed out that even under a limited directory information policy, it would not be a violation of FERPA for a party that received directory information to redisclose it. To address that issue, some of the commenters supported the idea of a non-disclosure agreement so that the disclosing school could control any redisclosures of directory information. However, one commenter stated that our suggestion in the preamble to the NPRM that schools adopt a non-disclosure agreement is unrealistic; schools may have difficulty identifying who may redisclose the information, and schools have no authority and limited resources to enforce such agreements. This commenter also stated that making recipients sign such agreements could be a significant administrative burden for LEAs that receive many requests for directory information, even if they have adopted a limited directory information policy.

*Discussion:* Under FERPA, educational agencies and institutions are only required to provide access to education records to parents and eligible students. All other disclosures listed in § 99.31 are optional. This includes the disclosure of directory information under § 99.31(a)(11), under the conditions specified in § 99.37. However, some educational agencies and institutions have advised, and administrative experience has shown, that State open records laws have required disclosure of student directory information because, in most cases, FERPA does not specifically prohibit the disclosure of this information. It is our understanding that many, if not most, State open records or sunshine laws require that public entities, such as public schools, LEAs, and State colleges and universities, disclose information to the public unless the disclosure is specifically prohibited by another State law or by a Federal law such as FERPA. Thus, in practice, while FERPA only requires schools to disclose PII from education records to parents or eligible students, State sunshine laws may require the public release of properly designated directory information from which parents and eligible students have not opted out.

With regard to the commenter who asked whether a school that chooses not to adopt a limited directory information policy could still limit the disclosure of directory information if its State law required the disclosure, FERPA permits the disclosure of directory information but it does not require it. Some States have State open records laws that may require the disclosure of directory information if a school has a directory information policy and the parent or eligible student has not opted out.

We believe that the FERPA regulations will better assist educational agencies and institutions in protecting directory information if an educational agency or institution that adopts a limited directory information policy limits its directory information disclosures only to those parties and purposes that were specified in the policy. To clarify, this regulatory scheme gives each school the option of limiting its directory information disclosures and does not subject a school to enforcement proceedings by FPCO if the school elects not to limit disclosure to specific parties or for specific purposes, or both.

With regard to the recommendations by commenters that the regulations explicitly state that directory information not be disclosed except to specific parties or for specific purposes, we do not believe this change is necessary. As noted, neither the disclosure of directory information nor the adoption of a limited directory information policy is required by the regulations. The regulations make clear that if a school chooses to adopt a limited directory information policy, then it must limit its directory information disclosures to those specified in its public notice.

With regard to concerns expressed by commenters about directory information being released to entities for marketing purposes, a school has the flexibility to allow or restrict disclosure to any potential recipient. For example, a limited directory information policy may be expressed in a negative fashion, indicating that the school does not disclose directory information for marketing purposes. While Congress has not amended FERPA to specifically address disclosure of directory information to companies for marketing purposes, Congress amended section 445 of GEPA, commonly referred to as the Protection of Pupil Rights Amendment (PPRA) in 2001 to address this issue. Public Law 107–110, § 1061.

Under PPRA, LEAs are required to work in consultation with parents to develop and adopt a policy governing the collection, disclosure, or use of personal information collected from students for the purpose of marketing or for selling that information (or otherwise providing that information to others for those purposes). The policy must include arrangements to protect student privacy in the event of such collection, disclosure, or use. LEAs are also required to notify parents of students of any activities that involve the collection, disclosure, or use of personal information collected from students for the purpose of marketing or selling that information (or otherwise providing that information to others for those purposes) so that parents may opt their child out of participation in those activities. 20 U.S.C. 1232h(c)(1)(E) and (c)(2). While PPRA does not generally apply to postsecondary institutions, understanding and complying with its requirements for LEAs should address some of the commenters' concerns about this matter.

With regard to the fact that we did not propose to amend the FERPA regulations to prevent third parties that receive directory information from further disclosing it, we do not believe that it is realistic to make such a change. By its nature, directory information is intended to be publicly shared. Congress included the disclosure of properly designated directory information as an exception to the general consent requirement in FERPA so that schools may make disclosures of the type of information generally not

considered harmful or an invasion of privacy, such as information on students that would normally be found in a school yearbook or directory. It is not administratively practicable to take action against a third party that rediscloses directory information. For example, it would be virtually impossible to control how student information contained in a yearbook is distributed to others. Therefore, we believe that schools are in the best position to determine who should receive directory information and, should they choose, implement a limited directory information policy.

With regard to the commenter who stated that adopting the limited directory information provision in the regulations would add confusion and possibly raise unnecessary allegations of improper disclosure from parents and eligible students, we do not believe this is the case. On the contrary, the option to have a limited directory information policy should better protect against improper disclosures of PII from education records and reduce the number of complaints in this regard.

With regard to our recommendation that schools adopting a limited directory information policy consider entering into non-disclosure agreements to restrict the information from being further disclosed, we agree that this will not always be feasible. Clearly there are situations in which a school could not have a non-disclosure agreement, such as when it publishes directory information in a school yearbook, a sports event program, or a program for a school play. Schools will have to exercise judgment with respect to whether to utilize non-disclosure agreements to prevent further disclosure of directory information by assessing the circumstances surrounding the disclosure of the directory information.

Finally, we note that the regulatory change to allow educational agencies and institutions to implement a limited directory information policy was not specifically intended to address how schools interact with or disclose directory information to members of the media. Rather, we were addressing concerns raised by school officials who, alarmed about the increase in identity theft, expressed a need to protect the privacy of students' directory information. We encourage school officials to act responsibly in developing a limited directory information policy and to keep in mind routine disclosures that schools need to make in the normal course of business, including providing properly designated directory information to the media about various

student activities and extracurricular pursuits of students.

*Changes:* None.

**General Enforcement Issue (§ 99.67)**

*Comment:* Several commenters stated that the Department lacks the legal authority to investigate, review, process, or enforce an alleged FERPA violation committed by recipients of Department funds under a program administered by the Secretary that students do not attend. These recipients include but are not limited to, SEAs, nonprofit organizations, student loan lenders, and guaranty agencies. Specifically, the commenters stated that nonprofit organizations, guaranty agencies, and lenders could not be considered educational agencies or institutions under FERPA because these organizations have no students in attendance. In addition, some commenters argued that as financial institutions, student loan lenders, servicers, and guaranty agencies are already subject to numerous Federal laws that require them to protect PII from education records, making them subject to FERPA would not effectively increase protection.

*Discussion:* The Department disagrees with the comment that it does not have the legal authority to take enforcement actions against entities that receive Department funding under a program administered by the Secretary that students do not attend. Section (f) of FERPA provides that the Department shall take appropriate actions to enforce and deal with violations of provisions in FERPA in accordance with GEPA. 20 U.S.C. 1232g(f). However, as we discussed in the preamble to the NPRM (76 FR at 19733), the current regulations do not clearly describe the entities against which we may take actions under section (f) of FERPA. Accordingly, the Department believes that it is necessary to clarify in these new regulations that FPCO has the authority to hold these entities responsible for FERPA compliance, given the disclosures of PII from education records that are needed to implement SLDS. We believe this clarification is necessary in light of recent developments in the law.

In addition, in order for the Department to appropriately investigate, process, and review complaints and alleged violations of FERPA, the Department proposed in § 99.60(a)(2) to take a more expansive view of the term "educational agency or institution." The expanded definition would include entities that do not necessarily have students in attendance but still receive Department funding under a program

administered by the Secretary and which, nevertheless, are in possession and control of PII from education records.

The Department continues to believe that it is necessary to use its broad enforcement powers to ensure that FERPA's protections apply to these recipients. The Department has decided, however, not to define in § 99.60(a)(2) all recipients of Department funding under a program administered by the Secretary as "educational agencies and institutions" in the context of the enforcement provisions, as was reflected in proposed § 99.60(a)(2), because it is evident from the comments that the terminology is confusing. We have decided instead to revise §§ 99.61 through 99.67, which set out FERPA's enforcement procedures. These amendments authorize the Department to investigate, process, and review complaints and violations of FERPA alleged to have been committed by educational agencies and institutions, as well as other recipients of Department funds under any program administered by the Secretary (*e.g.,* State educational authorities, such as SEAs, and State postsecondary agencies, local educational authorities, nonprofit organizations, student loan guaranty agencies, and student loan lenders). Because these entities receive PII from education records, we believe that this change is justified in order to protect against improper redisclosure of PII from education records.

In the case of an improper redisclosure of PII from education records by a non-profit organization, lender, servicer, or guaranty agency that is a recipient of Department funds under a program administered by the Secretary and that received PII from education records from an institution of higher education, the Department will enforce sanctions against the responsible party, whether that be the non-profit organization, lender, servicer, or guaranty agency. The Department, however, may also pursue enforcement measures against the institution of higher education, depending on the circumstances. In addition, we are not convinced that other confidentiality laws that apply to financial institutions provide the same protections as FERPA. Although the confidentiality laws cited by the commenters address privacy generally, they are not specifically designed to protect the confidentiality of student education records. Moreover, while the Secretary can take steps to enforce FERPA directly, we may need to rely on other Federal and State agencies to enforce these other confidentiality laws identified by the commenters.

AR 0723

*Changes:* The Department has decided not to adopt the change proposed in § 99.60(a)(2), which would have provided, solely for purposes of enforcement of FERPA under 34 CFR part 99, subpart E, all recipients of Department funds under a program administered by the Secretary as "educational agencies and institutions." Rather, the Department has decided to amend §§ 99.61 through 99.67 to clarify FPCO's enforcement responsibilities. Specifically, we revised these sections to clarify that FPCO may investigate, review, and process complaints filed against, or alleged violations of FERPA committed by, any recipient of Department funds under a program administered by the Secretary—not just educational agencies and institutions—and may hold any such recipient accountable for compliance with FERPA.

*Comment:* One commenter asked that we clarify which enforcement tools legally available to the Secretary would be utilized in actions against State and local educational authorities and other recipients of Department funding under a program administered by the Secretary.

Four commenters requested that the Department adopt more significant penalties, including incarceration and substantial fines, for FERPA violations caused by authorized representatives. Another commenter stated that the Department should sanction an entity that makes an unauthorized disclosure by requiring the entity to surrender all PII from education records already in its possession. Several commenters stated that other privacy statutes include significant sanctions and that FERPA requires a similar deterrent to prevent violations of student privacy.

*Discussion:* In FERPA, Congress expressly directed the Secretary to "take appropriate actions" to "enforce" FERPA and "to deal with violations" of its terms "in accordance with [GEPA]." 20 U.S.C. 1232g(f).

In GEPA, Congress provided the Secretary with the authority and discretion to take enforcement actions against any recipient of funds under any program administered by the Secretary for failures to comply substantially with any requirement of applicable law, including FERPA. 20 U.S.C. 1234c(a). GEPA's enforcement methods expressly permit the Secretary to issue a complaint to compel compliance through a cease and desist order, to recover funds improperly spent, to withhold further payments, to enter into a compliance agreement, or to "take any other action authorized by law," including suing for enforcement of

FERPA's requirements. 20 U.S.C. 1234a, 1234c(a), 1234d; 1234e; 1234f; 34 CFR 99.67(a); *see also United States* v. *Miami Univ.,* 294 F.3d 797 (6th Cir. 2002) (affirming the district court's decision that the United States may bring suit to enforce FERPA). Therefore, the Secretary will use one or a combination of these enforcement tools as is appropriate given the circumstances. Additionally, the Department has the authority to impose the five-year rule against any entity that FPCO determines has violated FERPA either through an improper redisclosure of PII from education records or through its failure to destroy PII from education records under the studies exception. (See discussion of five-year rule later in this preamble).

With respect to the suggestion that we create additional penalties, the Department lacks the statutory authority to incarcerate violators, impose fines, or force a third party to surrender all PII from education records currently in its possession because the Department lacks the statutory authority to do so.

*Changes:* None.
*Comment:* One commenter requested that the Department clarify that "non-school entities" are only required to comply with FERPA to the extent they have received FERPA-protected PII from education records from an educational agency or institution.

*Discussion:* The Department would only take actions against "non-school entities" that have not complied with FERPA requirements that relate to PII from education records they received under one of the exceptions to FERPA's general consent requirement. The Department has no authority under FERPA to take actions for other PII these entities may possess.

*Changes:* None.
*Comment:* A commenter suggested that other parties beyond those enumerated in the statute (*i.e.,* eligible parents and students) should have standing to file complaints with FPCO. Further, this commenter suggested that the Department should increase the amount of time a complainant has to file a complaint with FPCO.

*Discussion:* We decline to expand the entities eligible to file complaints with FPCO beyond parents and eligible students and decline to increase the amount of time a complainant has to file a complaint with FPCO beyond 180 days of the date of the alleged violation (or of the date that the complainant knew or reasonably should have known of the alleged violation). We did not propose these changes in the NPRM and therefore cannot make these changes in these final regulations without allowing

an opportunity for further public comment and review. Still, it is important to note that FPCO can initiate an investigation on its own, without receiving a complaint, to address other violations.

*Changes:* None.
*Comment:* One commenter asked us to consider expanding the scope of our enforcement procedures to apply to tax exempt organizations under 26 U.S.C. 501(c) that students do not attend and that are not the recipients of Department funds but that have PII from education records.

*Discussion:* If a tax exempt organization under 26 U.S.C. 501(c) has PII from education records, but is not a recipient of funds under a program administered by the Secretary, then the Department would not have the authority under GEPA to take enforcement measures against such an organization. FPCO, however, may impose, under 20 U.S.C. 1232g(b)(4)(B) and new § 99.67(c), (d), and (e), the five-year rule against any entity that FPCO determines has violated FERPA either through an improper redisclosure of PII from education records received under any of the exceptions to the general consent rule or through the failure to destroy PII from education records under the studies exception. (See discussion of five-year rule later in this preamble.)

For instance, if an LEA's authorized representative does not receive funding from the Department and violates FERPA due to poor data security practices, FPCO could apply the five-year rule by prohibiting the disclosing LEA from providing PII from education records to the authorized representative for at least five years. If the disclosing LEA refuses to comply and continues its relationship with the authorized representative, FPCO could, under GEPA, terminate funding to the LEA.

*Changes:* None.
*Comment:* One commenter asked that we clarify how the enforcement measures would apply if a contractor of an entity that received funding under a program administered by the Department violated FERPA's requirements. The commenter wanted to know, for example, what the liability of a school would be if its contractor violated FERPA.

*Discussion:* Whether the Department would take enforcement action against a contractor that violates FERPA under a program administered by the Secretary, depends upon the exception to FERPA under which the contractor received the PII from education records, if the contractor was a recipient of Department funds, and the

circumstances of the violation. If the contractor was a recipient of Department funds and violated FERPA, the Department could take sanctions as permissible under GEPA. If the contractor was not a recipient of Department funds and improperly disclosed PII from education records received under any of the exceptions to the general consent rule or failed to destroy PII from education records in accordance with the requirements of the studies exception, the Department could implement the five-year rule. (See discussion of the five-year rule later in this preamble.)

Likewise, the Department may also take enforcement action against the entity that disclosed PII from education records to the contractor. For example, if the contractor was acting as an authorized representative of a FERPA-permitted entity and violated FERPA, FPCO would investigate and review whether the disclosing entity met all of its obligations under FERPA, such as taking reasonable methods to ensure to the greatest extent practicable the FERPA compliance of the contractor. FPCO could take applicable GEPA enforcement actions against the disclosing entity, if it did not meet its responsibilities.

If the contractor received PII from education records while acting as a school official under § 99.31(a)(1)(i)(B), then the educational agency or institution would be liable for the contractor's FERPA violation and is subject to GEPA enforcement actions by the Department. In any of these instances, FPCO would initiate an investigation and seek voluntary compliance before imposing any sanctions.

*Changes:* None.

**Five-Year Rule (§ 99.67)**

*Comments:* Many commenters raised questions about the provision in FERPA that prohibits an educational agency or institution from disclosing PII from education records to a third party "for a period of not less than five years" if that third party improperly discloses PII from education records received under any of the exceptions to the general consent rule or fails to destroy PII from education records under the studies exception. 20 U.S.C. 1232g(b)(4)(B).

Multiple commenters appeared to believe that the Department was proposing the five-year rule for the first time in the NPRM and questioned whether the Department had the legal authority to implement such a rule. One commenter specifically opposed the rule on the grounds that it was

inconsistent with the statute and that changes in the law should be made through a legislative amendment and not rulemaking.

*Discussion:* To clarify, the Department did not propose the five-year rule for the first time in the NPRM; rather, Congress amended FERPA in the Improving America's Schools Act of 1994, § 249, Public Law 103–382, to provide that if a "third party outside the educational agency or institution" improperly rediscloses FERPA-protected data that it received under any of the exceptions to the general consent rule or fails to destroy information under the studies exception, then the educational agency or institution "shall be prohibited from permitting access to information * * * to that third party for a period of not less than five years." 20 U.S.C. 1232g(b)(4)(B).

The Department amended its regulations to implement this statutory change in 1996. 61 FR 59292 (November 21, 1996). The Department's current regulations in § 99.31(a)(6)(iv) and § 99.33(e), taken together, provide that if FPCO determines that a third party outside the educational agency or institution improperly rediscloses PII from education records in violation of § 99.33 or fails to destroy PII from education records in violation of § 99.31(a)(6)(ii)(B), then the educational agency or institution may not provide that third party access for a minimum period of five years.

Still, based upon the confusion expressed by commenters regarding the five-year rule, we are changing the final regulations to consolidate all regulatory provisions relating to the five-year rule into one section of the regulations, § 99.67. This is not a substantive change, but it is one intended to improve comprehension and promote ease of use because we believe it will be helpful for readers to see all of the regulatory language concerning the five-year rule in a single regulatory section.

*Changes:* We are removing the existing two provisions in § 99.31(a)(6)(iv) and § 99.33(e) regarding the five-year rule and consolidating all provisions relating to the five-year rule into § 99.67.

In addition, we are changing the language that we proposed in § 99.35(d) that stated that in the event that FPCO finds an improper re-disclosure of PII from education records, "* * * the educational agency or institution from which the [PII] originated may not allow the authorized representative, or the State or local educational authority or the agency headed by an official listed in § 99.31(a)(3), or both, access to [PII] from education records for at least five

years." 65 FR 19738 (April 8, 2011). Specifically, we are replacing "authorized representative, or the State or local educational authority or the agency headed by an official" in proposed § 99.35(d) with "the third party" in the final regulation. Similarly, we are also consolidating the text of proposed § 99.35(d) into § 99.67, the enforcement section.

*Comment:* Many commenters asked which entities were subject to the five-year rule. Some of these commenters expressed concern that the rule would be enforced against an entire educational agency or institution acting as a third party, such as a State university system, and asked whether the rule could be applied in a more limited manner against an individual researcher or department within the educational agency or institution, arguing, for example, that if an individual researcher is at fault, it would be excessive to prohibit an entire organization from receiving PII from education records for a period of not less than five years.

At the same time, others were equally emphatic that the rule must apply to the entire educational agency or institution acting as a third party to have any enforcement effect or to deter potential violations. Consequently, many of these commenters asked how the Department would define an educational agency or institution as a third party.

One commenter recommended that the five-year rule only be applied against an educational agency or institution acting as a third party that was expressly responsible for the unauthorized redisclosure of PII from education records. Another commenter wanted the Department to clarify whether FERPA-permitted entities could be subjected to the five-year rule due to an unauthorized redisclosure of PII from education records made by the FERPA-permitted entity's authorized representative.

*Discussion:* The statute and current §§ 99.31(a)(6)(iv) and 99.33(e), taken together, are clear that any third party outside of the educational agency or institution that improperly rediscloses PII from education records received under any of the exceptions to the general consent rule or fails to destroy PII from education records as required under current § 99.31(a)(6)(ii)(B) may be subjected to the five-year rule. We understand a "third party" to refer broadly to any entity outside of the educational agency or institution from which the PII from education records was originally disclosed and may include an authorized representative. In other words, authorized representatives

AR 0725

make up a subset of the larger set of third parties outside the educational agency or institution from which the PII from education records was originally disclosed. Any individual or entity to which PII from education records is disclosed without consent by an educational agency or institution under § 99.31(a), except for disclosures under § 99.31(a)(1) to school officials because they are within the educational institution or agency, is a third party.

The NPRM proposed adding a third regulatory provision to § 99.35 in order to implement the five-year rule more specifically in the context of an improper redisclosure of PII from education records by FERPA-permitted entities or by their authorized representatives (which are third parties). As explained in the NPRM, the Department sought to clarify that FPCO could impose the five-year rule against FERPA-permitted entities, their authorized representatives, or both. Under the final regulations, the provisions of the five-year rule apply to all improper redisclosures by third parties outside of the educational agency or institution from which PII from education records was originally disclosed. These third parties include FERPA-permitted entities or their authorized representatives, whether they obtained PII from education records under the studies exception, the audit or evaluation exception, or any other exception to the requirement of consent in § 99.31(a) (other than § 99.31(a)(1), which applies to disclosures to school officials who are within the educational institution or agency).

The five-year rule also applies to all third parties that fail to destroy PII from education records in violation of the studies exception in § 99.31(a)(6). By contrast, the statute does not specifically authorize the Department to apply the rule against a third party for failure to destroy PII from education records under the audit or evaluation exception or for other inappropriate activities that affect privacy beyond the improper redisclosure and the failure to destroy PII from education records in violation of the studies exception in § 99.31(a)(6), as discussed earlier. However, FERPA-permitted entities are free to include sanctions for other inappropriate activities that affect privacy as part of their written agreements with third parties and authorized representatives.

*Changes:* None.
*Comment:* Many commenters requested clarification regarding how the five-year rule would be implemented and specifically requested

a detailed explanation regarding who could enforce the rule, how the rule would be applied, and whether those sanctioned would have a right to appeal. Several commenters asked how much discretion educational agencies and institutions would have to either bar third parties or authorized representatives under the five-year rule or to modify the length of the debarment depending upon the circumstances.

Several commenters asked how much discretion the Department would have when applying the five-year rule. Some expressed concern that the Department would apply the five-year rule automatically after a single unauthorized redisclosure of PII from education records by a third party. One commenter expressed concern that the Department would apply the rule like a "zero tolerance" policy.

Concerned about the severity of the five-year rule, many commenters requested an opportunity to come into compliance with approved best practices and methods for data protection as an alternative to an immediate application of the five-year rule. One commenter suggested remediation as an alternative to the five-year rule to help a third party with the process of voluntary compliance.

Another commenter asked the Department to amend the regulations to apply the five-year rule only when there are repeated, unauthorized redisclosures of PII from education records or when the parties responsible for the unauthorized disclosure are grossly negligent. Some of these commenters suggested that we take into account the level or magnitude of the improper redisclosure. One commenter suggested that the regulations should be modified to recognize that in today's technological environment, it is not feasible to require absolute compliance.

Finally, a few commenters asked whether debarment under the five-year rule "follows" an individual who has been debarred from one employer to the individual's next employer. These commenters also asked whether debarment attaches to a third party even if the individual who is found to be responsible for an improper redisclosure of PII from education records leaves the employment of that third party.

*Discussion:* Some commenters appeared to have misunderstood the NPRM as proposing that an individual school or LEA would have the authority to impose the five-year rule against a third party, such as an SEA or a Federal agency headed by an official listed in § 99.31(a)(3), in the event of an improper redisclosure by that third party. This is incorrect—only FPCO has

the authority to impose the five-year rule against third parties that FPCO determines have violated either the redisclosure provisions of § 99.33 or the destruction requirements of § 99.31(a)(6)(iii)(B). In other words, only FPCO has the authority to implement the five-year rule to prohibit an educational agency or institution from providing a third party with access to FERPA-protected data.

When making such a determination, FPCO, consistent with its longstanding practice, will investigate allegations of third parties improperly redisclosing PII from education records under § 99.33 or failing to destroy data under § 99.31(a)(6)(iii)(B). If FPCO were to find a FERPA violation, then it would first attempt to bring the offending third party into voluntary compliance. As suggested by one commenter, FPCO may use remediation as a tool to bring the third party into voluntary compliance. For instance, if FPCO were to investigate and determine that a third party had failed to timely destroy data, FPCO could work with the third party conducting the study to implement an appropriate destruction policy. If FPCO were unable to bring the offending third party into voluntary compliance, then FPCO would have the discretion to prohibit the educational agency or institution from allowing that third party access to PII from education records for a period of at least five years. In deciding whether to exercise this discretion and which third parties should be banned, FPCO will consider the nature of the violation and the attendant circumstances. One factor FPCO will consider is whether the third party has repeatedly redisclosed PII from education records improperly, which will make it more likely that the FPCO will apply the five-year rule. The Department believes that outlining this detailed process here provides adequate clarification of FPCO's enforcement procedures.

Moreover, as discussed in more detail earlier in this preamble, FPCO is not limited to the five-year rule in the enforcement actions it may take; it also has the discretion to consider whether it would be more appropriate to apply GEPA enforcement mechanisms against those third parties receiving Federal funds. Accordingly, the five-year rule is not a "zero tolerance" policy, as suggested by one commenter, and FPCO would not apply the rule without considering the facts of each particular situation, as some commenters feared.

As for whether a third party would be able to appeal a decision made by FPCO to prohibit an educational agency or institution from disclosing PII from

education records to that third party, no such appeal right exists. Under current § 99.60(b)(1), only FPCO has the authority to "[i]nvestigate, process, and review complaints and violations under the Act * * *." FPCO also retains complete authority to enforce the five-year rule, and its decisions are final. However, FPCO's investigative process would provide ample opportunity for the party being investigated to have FPCO consider all relevant facts and circumstances before making a decision.

Importantly, the fact that FPCO must find a violation before the five-year rule may be enforced does not relieve educational agencies and institutions or FERPA-permitted entities of their responsibility to protect PII from education records. As discussed earlier, we encourage FERPA-permitted entities that are redisclosing PII from education records to third parties to include sanctions in their written agreements with their third parties and authorized representatives, and to enforce those sanctions. FERPA-permitted entities, and their authorized representatives, may agree to any sanctions permissible under applicable law. For instance, written agreements could call for monetary penalties, data bans of varying length, or any of the range of civil penalties that the disclosing entity believes is appropriate. The Department encourages the use of these agreed-upon sanctions to ensure control and proper use of PII from education records.

Finally, depending upon the specific facts of the situation, debarment may "follow" an individual who has been sanctioned under the five-year rule from one employer to another. Further, debarment would likely not remain attached to a third party if it is determined that only the debarred individual was responsible for the improper redisclosure of PII from education records, the debarred individual leaves the third party's employment, and the improper redisclosure was not caused by a policy of the third party. It is important to note, however, that such determinations are highly fact specific and the Department will review each situation case by case.

*Changes:* We are amending §§ 99.61, 99.62, 99.64, 99.65, 99.66 and 99.67 of the FERPA regulations. These changes provide more detailed procedures governing the investigation, processing, and review of complaints and violations against third parties outside of an educational agency or institution for failing to destroy PII from education records in violation of § 99.31(a)(6)(iii)(B) or for improperly redisclosing PII from education records in violation of § 99.33.

*Comment:* Several commenters provided general support for the five-year rule as a means to enforce FERPA. One commenter stated that five years is an appropriate time period for such a violation, and another stated that substantial consequences are a must and that debarment would be an appropriate remedy for FERPA violations.

Other commenters found this sanction insufficient to adequately protect privacy and called for more extensive and harsher penalties. One commenter requested that other penalties be developed out of a concern that the five-year rule would not be used frequently enough to deter egregious and flagrant violations of FERPA. Several commenters requested that the Department apply the rule more broadly. For example, one commenter stated that the Department should sanction other inappropriate activities that affect privacy besides improper redisclosures, including, but not limited to, "using records for an improper purpose; examining individual records without justification * * * and not allowing access to or correction of records when appropriate."

Still others expressed concern that the Department would apply the five-year rule too broadly. One commenter suggested limiting the scope of the prohibition to PII from education records used for the purposes of conducting studies and not necessarily for other purposes related to the provision of products, services, and other functions.

*Discussion:* The Department lacks the legal authority to expand the enforcement mechanisms available under FERPA beyond those discussed in this preamble and therefore declines to include harsher penalties such as those requested by a number of commenters. For the same reason, we cannot expand the list of "inappropriate activities" that may be sanctioned under the five-year rule beyond improper redisclosures under § 99.33 and the failure to destroy PII in violation of § 99.31(a)(6)(iii)(B). The five-year rule is clear that it only applies to improper redisclosures of PII received under any of the exceptions to the general consent rule and the failure to destroy PII from education records under the studies exception.

The Department also declines to limit the scope of the prohibition to the purpose of conducting studies and not necessarily for other purposes related to the provision of products, services, and other functions. Section (b)(4)(B) of FERPA (20 U.S.C. 1232g(b)(4)(B)) provides that the five-year rule applies to any improper redisclosure made by any third party and not just to an

improper redisclosure made by a third party conducting research under the studies exception. Thus, the final regulations include a third regulatory provision, reflected in § 99.67(d), that describes the five-year rule as it applies specifically in the context of the audit or evaluation exception. Section 99.67 states that in the context of the audit or evaluation exception, where the FERPA-permitted entities and any of their authorized representatives are third parties, the five-year rule could be applied against the FERPA-permitted entities, an authorized representative thereof, or both.

*Changes:* None.

*Comment:* Another commenter requested that the regulations be changed to prohibit the offending third party from requesting PII from education records from the disclosing educational agency or institution in the future rather than placing the burden on the educational agency or institution to deny access.

*Discussion:* The Department cannot prohibit a third party who has violated FERPA from requesting PII from education records from an educational agency or institution. The five-year rule clearly states that it is the duty of the educational agency or institution that originally disclosed the PII from education records to the third party to prevent further disclosure to the same third party. Still, the five-year rule does not prohibit all educational agencies and institutions from disclosing PII from education records to the offending third party; as made clear by the statute, the prohibition only applies to the educational agency or institution that originally disclosed PII from education records to that third party.

*Changes:* None.

*Comments:* Some expressed concern that under the five-year rule, educational agencies and institutions, such as LEAs, would be prohibited from disclosing PII from education records to third parties, such as SEAs, if these third parties improperly redisclosed FERPA-protected data that they received from the educational agency or institution. The commenters expressed concern that Federal and State education laws require LEAs to share data with SEAs in order to qualify for Federal and State education funds.

Another commenter expressed a similar concern that an institution of higher education might be prohibited from offering Federal financial aid to its students if the Department itself were responsible for the improper redisclosure. In the commenter's example, the institution of higher education would be unable to make data

disclosures needed to process Federal and State loans, if the five-year rule were applied to the Department.

*Discussion:* The Department would interpret the five-year rule consistently with other Federal laws to the greatest extent possible in order to avoid a conflict between Federal laws. If imposition of the five-year rule would prevent an LEA from complying with other legal requirements, FPCO may sanction the offending SEA using an enforcement mechanism that is available to the Department under GEPA, such as issuing a cease and desist order, thereby allowing the LEA to meet its other legal obligations.

Similarly, in response to those commenters who expressed a concern that subjecting the Department to the five-year rule would prevent institutions of higher education from providing student information to the Department's Federal Student Aid (FSA) office, the Department will administer FERPA in a reasonable manner and read it consistently with Federal laws governing student financial aid. Like any other third party outside of an educational agency or institution, FSA, or any other office in the Department that receives PII from education records, must also comply with FERPA; if FPCO found that FSA, or any other third party, violated the redisclosure provisions in FERPA, FPCO would then work with that third party to obtain voluntary compliance with FERPA, potentially eliminating the need to impose the five-year ban.

*Changes:* None.

*Comment:* One commenter expressed concern about existing contracts and written agreements being violated because of an application of the five-year rule regarding a separate and unrelated improper redisclosure of PII from education records by an authorized representative.

*Discussion:* The Department disagrees that application of the five-year rule will automatically result in a debarred third party from complying with its obligations under other pre-existing contracts or written agreements. If FPCO were to find that application of the rule was warranted, the regulations would prohibit only the original, disclosing educational agency or institution from providing PII from education records to the third party. Furthermore, this prohibition would only occur if the third party refused to work with FPCO to voluntarily comply with FERPA.

*Changes:* None.

*Comment:* Two commenters noted what they perceived to be a conflict between the language used in the statute (and the preamble of the NPRM)

regarding the five-year rule and the language in current regulations. Although the statute states that the original, disclosing educational agency or institution "shall be prohibited" from permitting an offending third party to access PII from education records for at least five years, the regulations state that the disclosing educational agency or institution "may not" allow the third party access to PII from education records. One commenter preferred to use the terms "may not" instead of "shall be prohibited" because "may not" suggested greater flexibility in how the five-year rule would be applied.

*Discussion:* We disagree that a conflict exists between the language contained in the statute and current regulations regarding the five-year rule. Specifically, we consider the terms used in the regulations ("may not" allow access) to have the same meaning as the language used in the statute ("shall be prohibited" from permitting access).

*Changes:* None.

**Executive Order 12866 and 13563**

*Regulatory Impact Analysis*

Under Executive Order 12866, the Secretary must determine whether the regulatory action is "significant" and therefore subject to the requirements of the Executive Order and subject to review by OMB. Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action likely to result in regulations that may (1) have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local or tribal governments or communities in a material way (also referred to as "economically significant" regulations); (2) create serious inconsistency or otherwise interfere with an action taken or planned by another agency; (3) materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive order.

Pursuant to the terms of the Executive Order, we have determined this regulatory action is significant and subject to OMB review under section 3(f)(4) of Executive Order 12866. Notwithstanding this determination, we have assessed the potential costs and benefits—both quantitative and qualitative—of this regulatory action. The Department believes that the benefits justify the costs.

The Department has also reviewed these regulations pursuant to Executive Order 13563, published on January 21, 2011 (76 FR 3821). Executive Order 13563 is supplemental to and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent permitted by law, agencies are required by Executive Order 13563 to: (1) Propose or adopt regulations only upon a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify); (2) tailor their regulations to impose the least burden on society, consistent with obtaining regulatory objectives, taking into account, among other things, and to the extent practicable, the costs of cumulative regulations; (3) select, in choosing among alternative regulatory approaches, those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity); (4) specify, to the extent feasible, performance objectives, rather than specifying the behavior or manner of compliance that regulated entities must adopt; and (5) identify and assess available alternatives to direct regulation, including providing economic incentives to encourage the desired behavior, such as user fees or marketable permits, or providing information upon which choices can be made by the public.

We emphasize as well that Executive Order 13563 requires agencies "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." In its February 2, 2011, memorandum (M–11–10) on Executive Order 13563, improving regulation and regulatory review, the Office of Information and Regulatory Affairs in OMB has emphasized that such techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes."

We are issuing these regulations only upon a reasoned determination that their benefits justify their costs, and we selected, in choosing among alternative regulatory approaches, those approaches that maximize net benefits. Based on the following analysis, the Department believes that these final regulations are consistent with the principles in Executive Order 13563.

We also have determined that this regulatory action would not unduly interfere with State, local, and tribal governments in the exercise of their governmental functions.

## Potential Costs and Benefits

Following is an analysis of the costs and benefits of the changes reflected in these final FERPA regulations. These changes facilitate the disclosure, without written consent, of PII from education records for the purposes of auditing or evaluating Federal- or State-supported education programs and enforcing or ensuring compliance with Federal legal requirements related to these programs. In conducting this analysis, the Department examined the extent to which the changes add to or reduce the costs of educational agencies, other agencies, and institutions in complying with the FERPA regulations prior to these changes, and the extent to which the changes are likely to provide educational benefit. Allowing data-sharing across agencies, because it increases the number of individuals who have access to PII from education records, may increase the risk of unauthorized disclosure of PII from education records. However, we do not believe that the staff in the additional agencies who will have access to PII from education records are any more likely to violate FERPA than existing users, and the strengthened accountability and enforcement mechanisms reflected in these regulations will help to ensure better compliance overall. While there will be administrative costs associated with implementing data-sharing protocols that ensure that PII from education records is disclosed in accordance with the limitations in FERPA, we believe that the relatively minimal administrative costs of establishing these protocols will be off-set by potential analytic benefits. Based on this analysis, the Secretary has concluded that the amendments reflected in these final regulations will result in savings to entities and have the potential to benefit the Nation by improving capacity to conduct analyses that will provide information needed to improve education.

## Authorized Representative

These regulations amend § 99.3 by adding a definition of the term "authorized representative;" an authorized representative is any individual or entity designated by a State or local educational authority or a Federal agency headed by the Secretary, the Comptroller General, or the Attorney General to carry out audits, evaluations, or enforcement or compliance activities relating to education programs. FERPA permits educational authorities to provide to authorized representatives PII from education records for the

purposes of conducting audits, evaluations, or enforcement and compliance activities relating to Federal- and State-supported education programs. However, in the past, we had not defined the term "authorized representative" in our regulations. The Department's position had been that educational authorities may only disclose education records to entities over which they have direct control, such as an employee or a contractor. Therefore, under the Department's interpretation of its regulations, SEAs were not able to disclose PII from education records to many State agencies, even for the purpose of evaluating education programs under the purview of the SEAs. For example, an SEA or LEA could not disclose PII from education records to a State employment agency for the purpose of obtaining data on post-school outcomes such as employment for its former students. Thus, if an SEA or LEA wanted to match education records with State employment records for purposes of evaluating its secondary education programs, it would have to import the entire workforce database and do the match itself (or contract with a third party to do the same analysis). Similarly, if a State workforce agency wanted to use PII from education records maintained by the SEA in its SLDS, in combination with data it had on employment outcomes, to evaluate secondary vocational education programs, it would not be able to obtain PII from the education records in the SEA's SLDS to conduct the analyses. It would have to provide the workforce data to the SEA so that the SEA could conduct the analyses or to a third party (*e.g.,* an entity under the direct control of the SEA) to construct the needed longitudinal administrative data systems. While feasible, these strategies force agencies to outsource their analyses to other agencies or entities, adding administrative cost, burden, and complexity. Moreover, preventing agencies from using PII from education records directly for conducting their own analytical work increases the likelihood that the work will not meet their expectations or get done at all. Finally, the previous interpretation of the current regulations exposed greater amounts of PII from education records to risk of disclosure as a result of greater quantities of PII from education records moving across organizations (*e.g.,* the entire workforce database) than would be the case with a more targeted data request (*e.g.,* disclosure of PII from education records for graduates from a given year who appear in the workforce

database). These final regulations allow FERPA-permitted entities to disclose PII from education records without consent to authorized representatives, which may include other State agencies, or to house data in a common State data system, such as a data warehouse administered by a central State authority for the purposes of conducting audits or evaluations of Federal- or State-supported education programs, or for enforcement of and ensuring compliance with Federal legal requirements relating to Federal- and State-supported education programs (consistent with FERPA and other Federal and State confidentiality and privacy provisions).

The Department also amends § 99.35 to require that FERPA-permitted entities use written agreements with an authorized representative (other than employees) when they agree to disclose PII from education records without consent to the authorized representative under the audit or evaluation exception. The cost of entering into such agreements should be minimal in relation to the benefits of being able to disclose this information. Section § 99.35(a)(3) requires that the written agreement specify that the information is being disclosed for the purpose of carrying out an allowable audit, evaluation, or enforcement or compliance activity, as well as a description of the activity and how the disclosed information is to be used.

## Education Program

The final regulations amend § 99.3 by adding a definition for the term "education program." This definition clarifies that an education program can include a program administered by a non-educational agency (*e.g.,* an early childhood program administered by a human services agency or a career and technical education program administered by a workforce or labor agency) and any program administered by an educational agency or institution. These final regulations also define the term "early childhood education program," because that term is used in the definition of "education program." For the definition of the "early education program," we use the definition of that term from HEA.

These definitions, in combination with the addition of the definition of the term "authorized representative," results in a regulatory framework for FERPA that allows non-educational agencies to have easier access to PII in student education records that they can use to evaluate the education programs they administer. For example, these changes permit disclosures of PII in

elementary and secondary school education records without consent to a non-educational agency that is administering an early childhood education program in order to evaluate the impact of its early childhood education program on its students' long-term educational outcomes. The potential benefits of these regulatory changes are substantial, including the benefits of non-educational agencies that are administering education programs, as that term is defined in these regulations, being able to conduct their own analyses without incurring the prohibitive costs of obtaining consent for access to individual students' PII from education records.

**Research Studies**

Section (b)(1)(F) of FERPA permits educational agencies and institutions to disclose PII from education records without consent to organizations conducting research studies for, or on behalf of, educational agencies or institutions from which the PII from education records originated, for statutorily-specified purposes. The amendment to § 99.31(a)(6) permits any of the authorities listed in § 99.31(a)(3), including SEAs, to enter into written agreements that provide for the disclosure of PII from education records to research organizations for studies that would benefit the educational agencies or institutions that disclosed the PII to the SEA or other educational authorities. The preamble to the final FERPA regulations published in the **Federal Register** on December 9, 2008 (73 FR 74806, 74826) took the position that an SEA, for example, could not redisclose PII from education records that it obtained from an LEA to a research organization unless the SEA had separate legal authority to act for, or on behalf of, the LEA (or other educational institution. Because, in practice, this authority may not be explicit in all States, we are amending § 99.31 to specifically allow State educational authorities, which include SEAs, to enter into agreements with research organizations for studies that are for one or more of the enumerated purposes under FERPA, such as studies to improve instruction (see § 99.31(a)(6)(ii)). The Department believes that this regulatory change will be beneficial because it will reduce the administrative costs of, and reduce the barriers to, using PII from education records, including PII from education records in SLDS, in order to conduct studies to improve instruction in education programs.

**Authority To Evaluate**

Current § 99.35(a)(2) provides that the authority for a FERPA-permitted entity to conduct an audit, evaluation, or enforcement or compliance activity must be established under a Federal, State, or local authority other than FERPA. Lack of such explicit State or local authority has hindered the use of PII from education records in some States. These final regulations remove this language about legal authority because we believe that the language unnecessarily caused confusion in the field. This is because FERPA does not require that a State or local educational authority have express legal authority to conduct audits, evaluations, or compliance or enforcement activities. Rather, we believe FERPA permits disclosure of PII from education records to a State or local educational authority if that entity also has implied authority to conduct audit, evaluation, or enforcement or compliance activities with respect to its own programs.

This regulatory change also allows an SEA to receive PII from education records originating at postsecondary institutions as needed to evaluate its own programs and determine whether its schools are adequately preparing students for higher education. The preamble to the final FERPA regulations published in the **Federal Register** on December 9, 2008 (73 FR 74806, 74822) suggested that PII in education records maintained by postsecondary institutions could only be disclosed to an SEA if the SEA had legal authority to evaluate postsecondary institutions. This interpretation restricted SEAs from conducting analyses to determine how effectively their own programs are preparing students for higher education and from identifying effective programs. As a result, this interpretation resulted in a regulatory framework for FERPA that has hindered efforts to improve education. The primary benefit of this change is that it will allow SEAs to conduct analyses of data that includes PII from education records for the purpose of program evaluations (consistent with FERPA and other Federal and State confidentiality and privacy provisions) without incurring the prohibitive costs of obtaining prior written consent from eligible students or parents.

**Educational Agency or Institution**

Sections (f) and (g) of FERPA authorize the Secretary to take appropriate actions to enforce the law and address FERPA violations, but subpart E of the current FERPA regulations only addressed alleged

violations of FERPA by an ''educational agency or institution.'' Because the Department had not interpreted the term ''educational agency or institution'' to include agencies or institutions that students do not attend (such as an SEA), the current FERPA regulations do not specifically permit the Secretary to bring an enforcement action against an SEA or other State or local educational authority or any other recipient of Department funds under a program administered by the Secretary that did not meet the definition of an ''educational agency or institution'' under FERPA. Thus, for example, if an SEA improperly redisclosed PII from education records obtained from its LEAs, the Department could pursue enforcement actions against each of the LEAs (because the Department views an LEA as an educational agency attended by students), but not the SEA. These final regulations amend the regulatory provisions in subpart E to clarify that the Secretary may investigate, process, review, and enforce complaints and violations of FERPA against an educational agency or institution, any other recipient of Department funds under a program administered by the Secretary, or other third parties.

This change will result in some administrative savings and improve the efficiency of the enforcement process. Under the current regulations, if, for example, an SEA with 500 LEAs improperly redisclosed PII from its SLDS to an unauthorized party, the Department would have had to investigate each of the 500 LEAs, which are unlikely to have had knowledge relating to the disclosure. Under the final regulations, the LEAs will be relieved of any administrative costs associated with responding to the Department's request for information about the disclosure and the Department will immediately direct the focus of its investigation on the SEA, the agency most likely to have information on and bear responsibility for the disclosure of PII, without having to spend time and resources contacting the LEAs.

**Regulatory Flexibility Act Certification**

The Secretary certifies that this regulatory action will not have a significant economic impact on a substantial number of small entities.

The small entities that this final regulatory action will affect are small LEAs. The Secretary believes that the costs imposed by these regulations will be limited to paperwork burden related to requirements concerning data-sharing agreements and that the benefits from ensuring that PII from education records are collected, stored, and shared

appropriately outweigh any costs incurred by these small LEAs. In addition, it is possible that State and local educational authorities may enter into agreements with small institutions of higher education or other small entities that will serve as their authorized representatives to conduct evaluations or other authorized activities. Entering into such agreements would be entirely voluntary on the part of the institutions of higher education or other entities, would be of minimal cost, and presumably would be for the benefit of the institution of higher education or other entity.

The U.S. Small Business Administration Size Standards define as "small entities" for-profit or nonprofit institutions with total annual revenue below $7,000,000 or, if they are institutions controlled by small governmental jurisdictions (that are comprised of cities, counties, towns, townships, villages, school districts, or special districts), with a population of less than 50,000.

According to estimates from the U.S. Census Bureau's Small Area Income and Poverty Estimates programs that were based on school district boundaries for the 2007–2008 school year, there are 12,484 LEAs in the country that include fewer than 50,000 individuals within their boundaries and for which there is estimated to be at least one school-age child. In its 1997 publication, *Characteristics of Small and Rural School Districts,* the NCES defined a small school district as "one having fewer students in membership than the sum of the (a) 25 students per grade in the elementary grades it offers (usually K–8) and (b) 100 students per grade in the secondary grades it offers (usually 9–12)." Using this definition, a district would be considered small if it had fewer than 625 students in membership. The Secretary believes that the 4,800 very small LEAs that meet this second definition are highly unlikely to enter into data-sharing agreements directly with outside entities.

In the NPRM, the Department solicited comments from entities familiar with data sharing in small districts on the number of entities likely to enter into agreements each year, the number of such agreements, and the number of hours required to execute each agreement, but we received no comments and do not have reliable data with which to estimate how many of the remaining 7,684 small LEAs will enter into data-sharing agreements. For small LEAs that enter into data-sharing agreements, we estimate that they will spend approximately 4 hours executing each agreement, using a standard data-sharing protocol. Thus, we assume the impact on the entities will be minimal.

**Federalism**

Executive Order 13132 requires us to ensure meaningful and timely input by State and local elected officials in the development of regulatory policies that have federalism implications. "Federalism implications" means substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Among other requirements, the Executive order requires us to consult with State and local elected officials respecting any regulations that have federalism implications and either preempt State law or impose substantial direct compliance costs on State and local governments, and are not required by statute, unless the Federal government provides the funds for those costs.

The Department has reviewed these final regulations in accordance with Executive Order 13132. We have concluded that these final regulations do not have federalism implications, as defined in the Executive order. The regulations do not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government.

In the NPRM we explained that the proposed regulations in §§ 99.3, 99.31(a)(6), and 99.35 may have federalism implications, as defined in Executive Order 13132, and we asked that State and local elected officials make comments in this regard. One commenter stated that it believed that some of the proposed changes would increase burdens on SEAs, especially with respect to enforcing the destruction of PII from education records once a study or an audit or evaluation has ended.

The FERPA requirements that PII from education records be destroyed when no longer needed for both the studies exception and the audit or evaluation exception are statutory (20 U.S.C. 1232g(b)(1)(F) and 1232g(b)(3)). Further, the regulatory provisions concerning destruction for these two exceptions (§§ 99.31(a)(6) and 99.35) are not new. Therefore, these final regulations do not include additional burden.

After giving careful consideration to the comment, we conclude that these final regulations do not have federalism implications as defined in Executive Order 13132.

**Paperwork Reduction Act of 1995**

As part of its continuing effort to reduce paperwork and respondent burden, the Department conducts a preclearance consultation program to provide the general public and Federal agencies with an opportunity to comment on proposed and continuing collections of information in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)). This helps ensure that: the public understands the Department's collection instructions; respondents can provide the requested data in the desired format; reporting burden (time and financial resources) is minimized; collection instruments are clearly understood; and the Department can properly assess the impact of collection requirements on respondents. The term "collections of information" under the PRA includes regulatory requirements that parties must follow concerning paperwork, *e.g.,* the requirement that educational agencies and institutions annually notify parents and eligible students of their rights under FERPA. It does not necessarily mean that information is being collected by a government entity.

Sections 99.7, 99.31(a)(6)(ii), 99.35(a)(3), and 99.37(d) contain information collection requirements. In the NPRM published on April 8, 2011, we requested public comments on the information collection requirements in proposed §§ 99.31(a)(6)(ii) and 99.35(a)(3). Since publication of the NPRM, we have determined that § 99.37(d) also has an information collection associated with it. In addition, since publication of the NPRM, we decided to make changes to the model notification, which we provide to assist entities to comply with the annual notification of rights requirement in § 99.7. Therefore, this section discusses the information collections associated with these four regulatory provisions. These information collections will be submitted to OMB for review and approval. A valid OMB control number will be assigned to the information collection requirements at the end of the affected sections of the regulations.

**Section 99.7—Annual Notification of Rights Requirement (OMB Control Number 1875–0246)**

Although we did not propose any changes to § 99.7, which requires that educational agencies and institutions annually notify parents and eligible students of their rights under FERPA, we did make some modifications to our

model notification associated with this requirement. Specifically, to allow parents and eligible students to more fully understand the circumstances under which disclosures may occur without their consent, we have amended the model annual notifications to include a listing of the various exceptions to the general consent rule in the regulations. The model notices (one for elementary and secondary schools and another one for postsecondary institutions) are included as Appendix B and Appendix C to this notice. We also post the model notifications on our Web site and have indicated the site address in the preamble. We do not believe that this addition to the model notification increases the currently approved burden of .25 hours (15 minutes) we previously estimated for the annual notification of rights requirement.

## Section 99.31(a)(6)(ii)—Written Agreements for Studies (OMB Control Number 1875–0246)

The final regulations modify the information collection requirements in § 99.31(a)(6)(ii); however, the Department does not believe these regulatory changes result in any new burden to State or local educational authorities. As amended, § 99.31(a)(6)(ii) clarifies that FERPA-permitted entities may enter into written agreements with organizations conducting studies for, or on behalf of, educational agencies and institutions. We do not believe this will result in a change or an increase in burden because the provision would permit an organization conducting a study to enter into one written agreement with a FERPA-permitted entity, rather than making the organization enter into multiple written agreements with a variety of schools and school districts.

## Section 99.35(a)(3)—Written Agreements for Audits, Evaluations, Compliance or Enforcement Activities (OMB Control Number 1875–0246)

Section 99.35(a)(3) requires FERPA-permitted entities to use a written agreement to designate authorized representatives other than agency employees. Under the final regulations, the agreement must: (1) Designate the individual or entity as an authorized representative; (2) specify the PII from education records to be disclosed; (3) specify that the purpose for which the PII from education records is disclosed to the authorized representative is to carry out an audit or evaluation of Federal- or State-supported education programs, or to enforce or to comply with Federal legal requirements that

relate to those programs; (4) describe the activity to make clear that it legitimately fits within the exception of § 99.31; (5) require the authorized representative to destroy PII from education records when the information is no longer needed for the purpose specified; (6) specify the time period in which the PII from education records must be destroyed; and (7) establish policies and procedures, consistent with FERPA and other Federal and State confidentiality and privacy provisions, to protect PII from education records from further disclosure (except back to the disclosing entity) and unauthorized use. The total estimated burden under this provision is 9,928 hours. Specifically, the burden for States under this provision is estimated to be 40 hours annually for each of the 103 State educational authorities in the various States and territories subject to FERPA (one for K–12 and one for postsecondary in each SEA). Assuming that each State authority handles the agreements up to 10 times per year with an estimated 4 hours per agreement, the total anticipated increase in annual burden would be 4,120 hours for this new requirement in OMB Control Number 1875–0246. In addition, the burden for large LEAs and postsecondary institutions (1,452 educational agencies and institutions with a student population of over 10,000) is estimated to be 4 hours annually. Assuming each large LEA and postsecondary institution handles the agreements up to 1 time per year with an estimated 4 hours per agreement, the total anticipated increase in annual burden for large LEAs and postsecondary institutions would be 5,808 hours for this requirement.

**Note:** For purposes of the burden analysis for § 99.35(a)(3), we estimate the burden on large LEAs and postsecondary institutions because we believe that estimating burden for these institutions captures the high-end of the burden estimate. We expect that burden for smaller LEAs and postsecondary institutions under § 99.35(a)(3) would be much less than estimated here.

## Section 99.37(d)—Parental Notice of Disclosure of Directory Information (OMB Control Number 1875–0246)

Section 99.37(d) requires any educational agency or institution that elects to implement a limited directory information policy to specify its policy in the public notice to parents and eligible students in attendance at the educational agency or institution. We do not expect this requirement to result in an additional burden for most educational agencies and institutions because educational agencies and institutions are already required under

§ 99.37(a) to provide public notice of its directory information policy. However, the change reflected in amended § 99.37(d) could result in a burden increase for an educational agency or institution that currently has a policy of disclosing all directory information and elects, under the new regulations, to limit the disclosure of directory information. The agency or institution would now be required to inform parents and eligible students that it has a limited directory information policy. The notice provides parents and eligible students with the opportunity to opt out of the disclosure of directory information. Additionally, many educational agencies and institutions include their directory information notice as part of the required annual notification of rights under § 99.7, which is already listed as a burden and approved under OMB Control Number 1875–0246. These educational agencies and institutions, therefore, would not experience an increase in burden associated with the changes reflected in § 99.37(d).

## Assessment of Educational Impact

In the NPRM, and in accordance with section 441 of the General Education Provisions Act, 20 U.S.C. 1221e–4, we requested comments on whether the proposed regulations would require transmission of information that any other agency or authority of the United States gathers or makes available.

Based on the response to the NPRM and on our review, we have determined that these final regulations do not require transmission of information that any other agency or authority of the United States gathers or makes available.

*Accessible Format:* Individuals with disabilities can obtain this document in an accessible format (*e.g.,* braille, large print, audiotape, or compact disc) on request to the program contact person listed under **FOR FURTHER INFORMATION CONTACT**.

*Electronic Access to This Document:* The official version of this document is the document published in the **Federal Register.** Free Internet access to the official edition of the **Federal Register** and the Code of Federal Regulations is available via the Federal Digital System at: *http://www.gpo.gov/fdsys.* At this site you can view this document, as well as all other documents of this Department published in the **Federal Register,** in text or Adobe Portable Document Format (PDF). To use PDF you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal**

**Register** by using the article search feature at: *http:// www.federalregister.gov.* Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

(Catalog of Federal Domestic Assistance Number does not apply.)

**List of Subjects in 34 CFR Part 99**

Administrative practice and procedure, Directory information, Education records, Information, Parents, Privacy, Records, Social Security numbers, Students.

Dated: November 23, 2011.

**Arne Duncan,**

*Secretary of Education.*

For the reasons discussed in the preamble, the Secretary amends part 99 of title 34 of the Code of Federal Regulations as follows:

## PART 99—FAMILY EDUCATIONAL RIGHTS AND PRIVACY

■ 1. The authority citation for part 99 continues to read as follows:

**Authority:** 20 U.S.C. 1232g, unless otherwise noted.

■ 2. Section 99.3 is amended by:
■ A. Adding, in alphabetical order, definitions for *authorized representative, early childhood education program,* and *education program.*
■ B. Revising the definition of *directory information.* The additions and revision read as follows:

### § 99.3   What definitions apply to these regulations?

\*     \*     \*     \*     \*

*Authorized representative* means any entity or individual designated by a State or local educational authority or an agency headed by an official listed in § 99.31(a)(3) to conduct—with respect to Federal- or State-supported education programs—any audit or evaluation, or any compliance or enforcement activity in connection with Federal legal requirements that relate to these programs.

(Authority: 20 U.S.C. 1232g(b)(1)(C), (b)(3), and (b)(5))

\*     \*     \*     \*     \*

*Directory information* means information contained in an education record of a student that would not generally be considered harmful or an invasion of privacy if disclosed.

(a) Directory information includes, but is not limited to, the student's name; address; telephone listing; electronic mail address; photograph; date and place of birth; major field of study; grade level; enrollment status (*e.g.,* undergraduate or graduate, full-time or part-time); dates of attendance; participation in officially recognized activities and sports; weight and height of members of athletic teams; degrees, honors, and awards received; and the most recent educational agency or institution attended.

(b) Directory information does not include a student's—

(1) Social security number; or

(2) Student identification (ID) number, except as provided in paragraph (c) of this definition.

(c) In accordance with paragraphs (a) and (b) of this definition, directory information includes—

(1) A student ID number, user ID, or other unique personal identifier used by a student for purposes of accessing or communicating in electronic systems, but only if the identifier cannot be used to gain access to education records except when used in conjunction with one or more factors that authenticate the user's identity, such as a personal identification number (PIN), password or other factor known or possessed only by the authorized user; and

(2) A student ID number or other unique personal identifier that is displayed on a student ID badge, but only if the identifier cannot be used to gain access to education records except when used in conjunction with one or more factors that authenticate the user's identity, such as a PIN, password, or other factor known or possessed only by the authorized user.

(Authority: 20 U.S.C. 1232g(a)(5)(A))

\*     \*     \*     \*     \*

*Early childhood education program* means—

(a) A Head Start program or an Early Head Start program carried out under the Head Start Act (42 U.S.C. 9831 *et seq.*), including a migrant or seasonal Head Start program, an Indian Head Start program, or a Head Start program or an Early Head Start program that also receives State funding;

(b) A State licensed or regulated child care program; or

(c) A program that—

(1) Serves children from birth through age six that addresses the children's cognitive (including language, early literacy, and early mathematics), social, emotional, and physical development; and

(2) Is—

(i) A State prekindergarten program;

(ii) A program authorized under section 619 or part C of the Individuals with Disabilities Education Act; or

(iii) A program operated by a local educational agency.

\*     \*     \*     \*     \*

*Education program* means any program that is principally engaged in the provision of education, including, but not limited to, early childhood education, elementary and secondary education, postsecondary education, special education, job training, career and technical education, and adult education, and any program that is administered by an educational agency or institution.

(Authority: 20 U.S.C. 1232g(b)(3), (b)(5))

\*     \*     \*     \*     \*

■ 3. Section 99.31 is amended by:
■ A. Removing paragraph (a)(6)(iii).
■ B. Redesignating paragraph (a)(6)(ii) as paragraph (a)(6)(iii).
■ C. Adding a new paragraph (a)(6)(ii).
■ D. Revising the introductory text of newly redesignated paragraph (a)(6)(iii).
■ E. Revising the introductory text of newly redesignated paragraph (a)(6)(iii)(C).
■ F. Revising newly redesignated paragraph (a)(6)(iii)(C)(*4*).
■ G. Revising paragraph (a)(6)(iv).

The addition and revisions read as follows:

### § 99.31   Under what conditions is prior consent not required to disclose information?

(a) \*  \*  \*

(6) \*  \*  \*

(ii) Nothing in the Act or this part prevents a State or local educational authority or agency headed by an official listed in paragraph (a)(3) of this section from entering into agreements with organizations conducting studies under paragraph (a)(6)(i) of this section and redisclosing personally identifiable information from education records on behalf of educational agencies and institutions that disclosed the information to the State or local educational authority or agency headed by an official listed in paragraph (a)(3) of this section in accordance with the requirements of § 99.33(b).

(iii) An educational agency or institution may disclose personally identifiable information under paragraph (a)(6)(i) of this section, and a State or local educational authority or agency headed by an official listed in paragraph (a)(3) of this section may redisclose personally identifiable information under paragraph (a)(6)(i) and (a)(6)(ii) of this section, only if—

\*     \*     \*     \*     \*

(C) The educational agency or institution or the State or local educational authority or agency headed by an official listed in paragraph (a)(3)

of this section enters into a written agreement with the organization that—

\* \* \* \* \*

(4) Requires the organization to destroy all personally identifiable information when the information is no longer needed for the purposes for which the study was conducted and specifies the time period in which the information must be destroyed.

(iv) An educational agency or institution or State or local educational authority or Federal official listed in paragraph (a)(3) of this section is not required to initiate a study or agree with or endorse the conclusions or results of the study.

\* \* \* \* \*

**§ 99.33  [Amended]**

■ 4. Section 99.33 is amended by removing paragraph (e).
■ 5. Section 99.35 is amended by:
■ A. Revising paragraph (a)(2).
■ B. Adding a new paragraph (a)(3).
■ C. Revising paragraph (b).
■ D. Revising the authority citation at the end of the section.

The addition and revisions read as follows:

**§ 99.35  What conditions apply to disclosure of information for Federal or State program purposes?**

(a) \* \* \*

(2) The State or local educational authority or agency headed by an official listed in § 99.31(a)(3) is responsible for using reasonable methods to ensure to the greatest extent practicable that any entity or individual designated as its authorized representative—

(i) Uses personally identifiable information only to carry out an audit or evaluation of Federal- or State-supported education programs, or for the enforcement of or compliance with Federal legal requirements related to these programs;

(ii) Protects the personally identifiable information from further disclosures or other uses, except as authorized in paragraph (b)(1) of this section; and

(iii) Destroys the personally identifiable information in accordance with the requirements of paragraphs (b) and (c) of this section.

(3) The State or local educational authority or agency headed by an official listed in § 99.31(a)(3) must use a written agreement to designate any authorized representative, other than an employee. The written agreement must—

(i) Designate the individual or entity as an authorized representative;

(ii) Specify—

(A) The personally identifiable information from education records to be disclosed;

(B) That the purpose for which the personally identifiable information from education records is disclosed to the authorized representative is to carry out an audit or evaluation of Federal- or State-supported education programs, or to enforce or to comply with Federal legal requirements that relate to those programs; and

(C) A description of the activity with sufficient specificity to make clear that the work falls within the exception of § 99.31(a)(3), including a description of how the personally identifiable information from education records will be used;

(iii) Require the authorized representative to destroy personally identifiable information from education records when the information is no longer needed for the purpose specified;

(iv) Specify the time period in which the information must be destroyed; and

(v) Establish policies and procedures, consistent with the Act and other Federal and State confidentiality and privacy provisions, to protect personally identifiable information from education records from further disclosure (except back to the disclosing entity) and unauthorized use, including limiting use of personally identifiable information from education records to only authorized representatives with legitimate interests in the audit or evaluation of a Federal- or State-supported education program or for compliance or enforcement of Federal legal requirements related to these programs.

(b) Information that is collected under paragraph (a) of this section must—

(1) Be protected in a manner that does not permit personal identification of individuals by anyone other than the State or local educational authority or agency headed by an official listed in § 99.31(a)(3) and their authorized representatives, except that the State or local educational authority or agency headed by an official listed in § 99.31(a)(3) may make further disclosures of personally identifiable information from education records on behalf of the educational agency or institution in accordance with the requirements of § 99.33(b); and

(2) Be destroyed when no longer needed for the purposes listed in paragraph (a) of this section.

\* \* \* \* \*

(Authority: 20 U.S.C. 1232g(b)(1)(C), (b)(3), and (b)(5))

■ 5. Section 99.37 is amended by:
■ A. Revising paragraph (c).

■ B. Redesignating paragraph (d) as paragraph (e).
■ C. Adding a new paragraph (d).

The addition and revision read as follows:

**§ 99.37  What conditions apply to disclosing directory information?**

\* \* \* \* \*

(c) A parent or eligible student may not use the right under paragraph (a)(2) of this section to opt out of directory information disclosures to—

(1) Prevent an educational agency or institution from disclosing or requiring a student to disclose the student's name, identifier, or institutional email address in a class in which the student is enrolled; or

(2) Prevent an educational agency or institution from requiring a student to wear, to display publicly, or to disclose a student ID card or badge that exhibits information that may be designated as directory information under § 99.3 and that has been properly designated by the educational agency or institution as directory information in the public notice provided under paragraph (a)(1) of this section.

(d) In its public notice to parents and eligible students in attendance at the agency or institution that is described in paragraph (a) of this section, an educational agency or institution may specify that disclosure of directory information will be limited to specific parties, for specific purposes, or both. When an educational agency or institution specifies that disclosure of directory information will be limited to specific parties, for specific purposes, or both, the educational agency or institution must limit its directory information disclosures to those specified in its public notice that is described in paragraph (a) of this section.

\* \* \* \* \*

■ 6. Section 99.61 is revised to read as follows:

**§ 99.61  What responsibility does an educational agency or institution, a recipient of Department funds, or a third party outside of an educational agency or institution have concerning conflict with State or local laws?**

If an educational agency or institution determines that it cannot comply with the Act or this part due to a conflict with State or local law, it must notify the Office within 45 days, giving the text and citation of the conflicting law. If another recipient of Department funds under any program administered by the Secretary or a third party to which personally identifiable information from education records has been non-

consensually disclosed determines that it cannot comply with the Act or this part due to a conflict with State or local law, it also must notify the Office within 45 days, giving the text and citation of the conflicting law.

(Authority: 20 U.S.C. 1232g(f))

■ 7. Section 99.62 is revised to read as follows:

**§ 99.62  What information must an educational agency or institution or other recipient of Department funds submit to the Office?**

The Office may require an educational agency or institution, other recipient of Department funds under any program administered by the Secretary to which personally identifiable information from education records is non-consensually disclosed, or any third party outside of an educational agency or institution to which personally identifiable information from education records is non-consensually disclosed to submit reports, information on policies and procedures, annual notifications, training materials, or other information necessary to carry out the Office's enforcement responsibilities under the Act or this part.

(Authority: 20 U.S.C. 1232g(b)(4)(B), (f), and (g))

■ 8. Section 99.64 is amended by:
■ A. Revising paragraphs (a) and (b).
■ B. Revising the authority citation at the end of the section.

The revisions read as follows:

**§ 99.64  What is the investigation procedure?**

(a) A complaint must contain specific allegations of fact giving reasonable cause to believe that a violation of the Act or this part has occurred. A complaint does not have to allege that a violation is based on a policy or practice of the educational agency or institution, other recipient of Department funds under any program administered by the Secretary, or any third party outside of an educational agency or institution.

(b) The Office investigates a timely complaint filed by a parent or eligible student, or conducts its own investigation when no complaint has been filed or a complaint has been withdrawn, to determine whether an educational agency or institution or other recipient of Department funds under any program administered by the Secretary has failed to comply with a provision of the Act or this part. If the Office determines that an educational agency or institution or other recipient of Department funds under any program administered by the Secretary has failed

to comply with a provision of the Act or this part, it may also determine whether the failure to comply is based on a policy or practice of the agency or institution or other recipient. The Office also investigates a timely complaint filed by a parent or eligible student, or conducts its own investigation when no complaint has been filed or a complaint has been withdrawn, to determine whether a third party outside of the educational agency or institution has failed to comply with the provisions of § 99.31(a)(6)(iii)(B) or has improperly redisclosed personally identifiable information from education records in violation of § 99.33.

\*     \*     \*     \*     \*

(Authority: 20 U.S.C. 1232g(b)(4)(B), (f) and (g))

■ 9. Section 99.65 is amended by revising paragraph (a) to read as follows:

**§ 99.65  What is the content of the notice of investigation issued by the Office?**

(a) The Office notifies in writing the complainant, if any, and the educational agency or institution, the recipient of Department funds under any program administered by the Secretary, or the third party outside of an educational agency or institution if it initiates an investigation under § 99.64(b). The written notice—

(1) Includes the substance of the allegations against the educational agency or institution, other recipient, or third party; and

(2) Directs the agency or institution, other recipient, or third party to submit a written response and other relevant information, as set forth in § 99.62, within a specified period of time, including information about its policies and practices regarding education records.

\*     \*     \*     \*     \*

■ 10. Section 99.66 is revised to read as follows:

**§ 99.66  What are the responsibilities of the Office in the enforcement process?**

(a) The Office reviews a complaint, if any, information submitted by the educational agency or institution, other recipient of Department funds under any program administered by the Secretary, or third party outside of an educational agency or institution, and any other relevant information. The Office may permit the parties to submit further written or oral arguments or information.

(b) Following its investigation, the Office provides to the complainant, if any, and the educational agency or institution, other recipient, or third

party a written notice of its findings and the basis for its findings.

(c) If the Office finds that an educational agency or institution or other recipient has not complied with a provision of the Act or this part, it may also find that the failure to comply was based on a policy or practice of the agency or institution or other recipient. A notice of findings issued under paragraph (b) of this section to an educational agency or institution, or other recipient that has not complied with a provision of the Act or this part—

(1) Includes a statement of the specific steps that the agency or institution or other recipient must take to comply; and

(2) Provides a reasonable period of time, given all of the circumstances of the case, during which the educational agency or institution or other recipient may comply voluntarily.

(d) If the Office finds that a third party outside of an educational agency or institution has not complied with the provisions of § 99.31(a)(6)(iii)(B) or has improperly redisclosed personally identifiable information from education records in violation of § 99.33, the Office's notice of findings issued under paragraph (b) of this section—

(1) Includes a statement of the specific steps that the third party outside of the educational agency or institution must take to comply; and

(2) Provides a reasonable period of time, given all of the circumstances of the case, during which the third party may comply voluntarily.

(Authority: 20 U.S.C. 1232g(b)(4)(B), (f), and (g))

■ 11. Section 99.67 is revised to read as follows:

**§ 99.67  How does the Secretary enforce decisions?**

(a) If an educational agency or institution or other recipient of Department funds under any program administered by the Secretary does not comply during the period of time set under § 99.66(c), the Secretary may take any legally available enforcement action in accordance with the Act, including, but not limited to, the following enforcement actions available in accordance with part D of the General Education Provisions Act—

(1) Withhold further payments under any applicable program;

(2) Issue a complaint to compel compliance through a cease and desist order; or

(3) Terminate eligibility to receive funding under any applicable program.

(b) If, after an investigation under § 99.66, the Secretary finds that an educational agency or institution, other

recipient, or third party has complied voluntarily with the Act or this part, the Secretary provides the complainant and the agency or institution, other recipient, or third party with written notice of the decision and the basis for the decision.

(c) If the Office finds that a third party, outside the educational agency or institution, violates § 99.31(a)(6)(iii)(B), then the educational agency or institution from which the personally identifiable information originated may not allow the third party found to be responsible for the violation of § 99.31(a)(6)(iii)(B) access to personally identifiable information from education records for at least five years.

(d) If the Office finds that a State or local educational authority, a Federal agency headed by an official listed in § 99.31(a)(3), or an authorized representative of a State or local educational authority or a Federal agency headed by an official listed in § 99.31(a)(3), improperly rediscloses personally identifiable information from education records, then the educational agency or institution from which the personally identifiable information originated may not allow the third party found to be responsible for the improper redisclosure access to personally identifiable information from education records for at least five years.

(e) If the Office finds that a third party, outside the educational agency or institution, improperly rediscloses personally identifiable information from education records in violation of § 99.33 or fails to provide the notification required under § 99.33(b)(2), then the educational agency or institution from which the personally identifiable information originated may not allow the third party found to be responsible for the violation access to personally identifiable information from education records for at least five years.

(Authority: 20 U.S.C. 1232g(b)(4)(B) and (f); 20 U.S.C. 1234c)

**Note:** The following appendices will not appear in the Code of Federal Regulations.

BILLING CODE 4000–01–P

## APPENDIX A

### The Family Educational Rights and Privacy Act

#### Guidance for Reasonable Methods and Written Agreements

*What is the Family Educational Rights and Privacy Act?*

The Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. §1232g, is a Federal privacy law administered by the Family Policy Compliance Office (FPCO or Office) in the U.S. Department of Education (Department or we). FERPA and its implementing regulations in 34 CFR part 99 protect the privacy of students' education records and afford parents and eligible students (i.e., students who are 18 years of age or older or attend an institution of postsecondary education) certain rights to inspect and review education records, to seek to amend these records, and to consent to the disclosure of personally identifiable information from education records (PII from education records).

The general rule under FERPA is that PII from education records cannot be disclosed without written consent. However, FERPA includes several exceptions that permit the disclosure of PII from education records without consent. Two of these exceptions are discussed in this document – the studies exception and the audit or evaluation exception. The two exceptions contain specific, and slightly different, requirements, described more fully in the implementing regulations (34 CFR Part 99).

*What is the purpose of this document?*

The audience for this document includes schools, school districts (also referred to as local educational agencies (LEAs)), postsecondary institutions, and State educational authorities (such as State educational agencies (SEAs)) that may disclose PII from education records. Our intent is to provide these entities with information about requirements and best practices for data disclosures under the studies exception and the audit or evaluation exception.

*What is the Studies Exception? (see 20 U.S.C. §1232g(b)(1)(F) and §99.31(a)(6))*

The studies exception allows for the disclosure of PII from education records without consent to organizations conducting studies for, or on behalf of, schools, school districts, or postsecondary institutions. Studies can be for the purpose of developing, validating, or administering predictive tests; administering student aid programs; or improving instruction.

> Example: An SEA may disclose PII from education records without consent to an organization for the purpose of conducting a study that compares program outcomes across school districts to further assess what programs provide the best instruction and then duplicate those results in other districts.

*What is the Audit or Evaluation Exception? (see 20 U.S.C. 1232g(b)(1)(C), (b)(3), and (b)(5) and §§99.31(a)(3) and 99.35)*

A-1

AR 0737

The audit or evaluation exception allows for the disclosure of PII from education records without consent to authorized representatives of the Comptroller General of the U.S., the Attorney General, the Secretary of Education, and State or local educational authorities (FERPA-permitted entities). Under this exception, PII from education records must be used to audit or evaluate a Federal- or State-supported education program, or to enforce or comply with Federal legal requirements that relate to those education programs (audit, evaluation, or enforcement or compliance activity). The entity disclosing the PII from education records is specifically required to use reasonable methods to ensure to the greatest extent practicable that its designated authorized representative complies with FERPA and its regulations.

> Example: An LEA could designate a university as an authorized representative in order to disclose, without consent, PII from education records on its former students to the university. The university then may disclose, without consent, transcript data on these former students to the LEA to permit the LEA to evaluate how effectively the LEA prepared its students for success in postsecondary education.

*How do you define education program?*

"Education program" is an important term under the audit or evaluation exception because PII from education records can only be disclosed to audit or evaluate a Federal- or State-supported "education program," or to enforce or to comply with Federal legal requirements related to an education program. As specified in the FERPA regulations, §99.3, an education program must be principally engaged in the provision of education, including, but not limited to, early childhood education, elementary and secondary education, postsecondary education, special education, job training, career and technical education, and adult education, and any program that is administered by an educational agency or institution. For a definition of "early childhood program" please refer to §99.3 of the FERPA regulations.

*Do we need to have a written agreement to disclose PII from education records without consent?*

Yes. Both the studies exception and the audit or evaluation exception specifically require that the parties execute a written agreement when disclosing PII from education records without consent. The mandatory elements of that agreement vary slightly between the two exceptions.

*Are there mandatory provisions for written agreements under the studies exception?*

Yes. Written agreements under the studies exception must in accordance with the requirements in §99.31(a)(6)(iii)(C):

1. Specify the purpose, scope, and duration of the study and the information to be disclosed. Your agreement must specify the purpose of the study, describe its scope and its duration, and identify the information being disclosed.

2. Require the organization to use PII from education records only to meet the purpose or purposes of the study as stated in the written agreement. Your agreement must specify that the PII from education records must only be used for the study identified in the agreement.

A-2

3. Require the organization to conduct the study in a manner that does not permit the personal identification of parents and students by anyone other than representatives of the organization with legitimate interests. Your agreement must require the organization to conduct the study so as not to identify students or their parents. This typically means that the organization should allow internal access to PII from education records only to individuals with a need to know, and that the organization should take steps to maintain the confidentiality of the PII from education records at all stages of the study, including within the final report, by using appropriate disclosure avoidance techniques.

4. Require the organization to destroy all PII from education records when the information is no longer needed for the purposes for which the study was conducted, and specify the time period in which the information must be destroyed. Your agreement must require the organization to destroy the PII from education records when it is no longer needed for the identified study. You should determine the specific time period for destruction based on the facts and circumstances surrounding the disclosure and study. The parties to the written agreement may agree to amend the agreement to extend the time period if needed, but the agreement must include a time limit.

*Are there mandatory provisions for written agreements under the audit or evaluation exception?*

Yes. The mandatory provisions for written agreements under the audit or evaluation exception are similar to, but slightly different from, the provisions required for written agreements under the studies exception. Section 99.35(a)(3) specifically requires that the following provisions be included in written agreements under the audit or evaluation exception:

1. Designate the individual or entity as an authorized representative. Your agreement must formally designate the individual or entity as an authorized representative.

2. Specify the PII from education records to be disclosed. Your agreement must identify the information being disclosed.

3. Specify that the purpose for which the PII from education records is being disclosed to the authorized representative is to carry out an audit or evaluation of Federal- or State-supported education programs, or to enforce or to comply with Federal legal requirements that relate to those programs. Your agreement must state specifically that the disclosure of the PII from education records is in furtherance of an audit, evaluation, or enforcement or compliance activity.

4. Describe the activity with sufficient specificity to make clear that it falls within the audit or evaluation exception. This must include a description of how the PII from education records will be used. Don't be vague – the agreement must describe the methodology and why disclosure of PII from education records is necessary to accomplish the audit, evaluation, or enforcement or compliance activity.

AR 0739

5. Require the authorized representative to destroy the PII from education records when the information is no longer needed for the purpose specified. Your agreement should be clear about how the PII from education records will be destroyed.

6. Specify the time period in which the PII must be destroyed. Your agreement must provide a time period for destruction. You should determine the specific time period for destruction based on the facts and circumstances surrounding the disclosure and activity. The parties to the written agreement may agree to amend the agreement to extend the time period if needed, but the agreement must include a time limit.

7. Establish policies and procedures, consistent with FERPA and other Federal and State confidentiality and privacy provisions, to protect PII from education records from further disclosure (except back to the disclosing entity) and unauthorized use, including limiting use of PII from education records to only authorized representatives with legitimate interests in an audit, evaluation, or enforcement or compliance activity. The agreement must establish the policies and procedures, consistent with FEPRA and other Federal and State laws, to protect PII from education records from further disclosure or unauthorized use.

*Can an entity receiving PII from education records disclose it in a way that allows individual students to be identified?*

No. Absent consent from the parent or eligible student, FERPA provides that the PII from education records cannot be published in a way that would allow individual students and their parents to be identified. The organization conducting the study, audit, or evaluation can use PII from education records to conduct the study, audit, or evaluation, but results must be published in a way that protects the privacy and confidentiality of the individuals involved. For example, when publishing tables, cell suppression and other methods of disclosure avoidance can be used so that students cannot be identified through small numbers displayed in table cells.

*Under the audit or evaluation exception, what is your responsibility to use "reasonable methods" to ensure that your authorized representative is FERPA-compliant to the greatest extent practicable? (§99.35(a)(2))*

When you disclose PII from education records under the audit or evaluation exception, you are required to use "reasonable methods" to ensure to the greatest extent practicable that your authorized representative is FERPA-compliant. This specifically means ensuring that your authorized representative does the following:

1. Uses PII from education records only to carry out an audit or evaluation of Federal- or State-supported education programs, or for the enforcement of or compliance with, Federal legal requirements related to these programs. You should make sure that the proposed audit or evaluation is legitimate, and require in your written agreement that your authorized representative use the PII from education records only for that audit, evaluation, or enforcement or compliance activity. You should not disclose all of your PII from education records; rather, you should determine which specific elements your authorized representative needs and disclose only those.

A-4

AR 0740

2. Protects the PII from education records from further disclosures or other uses, except as authorized by you in accordance with FERPA. Your agreement must specify that your authorized representative may not further disclose the PII from education records, unless authorized. Approval to use the PII from education records for one audit or evaluation does not confer approval to use it for another.

3. Destroys the PII from education records when no longer needed for the audit, evaluation, or enforcement or compliance activity. Your agreement must specify that your authorized representative is required to destroy the PII from education records when it is no longer needed and specify the time period in which the PII must be destroyed.

*Are there best practices that support reasonable methods?*

Yes. While it is vital for organizations to comply with FERPA and its regulations, FERPA represents the floor for protecting privacy, not the ceiling. Accordingly, the Department is also specifying best practices, in which we describe actions we recommend you take to ensure that your authorized representative is protecting privacy to the greatest extent possible. Best practices are broader than FERPA compliance and describe recommended actions you should take to ensure that your authorized representative is FERPA-compliant to the greatest extent practicable.

These best practices may apply to data sharing under both the audit and evaluation exception and the studies exception. Please keep in mind that not all of the following best practices are appropriate in every instance, and this list does not include every possible protection. Before disclosing PII from education records under one of these exceptions, you should examine the following list and tailor your practices as necessary and appropriate.

- *Convey the limitations on the data.* You should take steps to ensure your authorized representative knows the limitations on the use of the data (i.e., that the data is only to carry out the audit or evaluation of Federal- or State-supported education programs, or to enforce or to comply with Federal legal requirements that relate to those programs).

- *Obtain assurances against redisclosure.* You should obtain assurances from your authorized representative that the data will not be redisclosed without permission, including such assurances that your authorized representative will provide you (the disclosing entity) the right to review any data prior to publication and to verify proper disclosure avoidance techniques have been used.

- *Be clear about destruction.* You should set clear expectations so your authorized representative knows what process needs to be followed for the proper destruction of PII from education records.

- *Maintain a right to audit.* You should maintain the right to conduct audits or other monitoring activities of your authorized representative's policies, procedures, and systems.

AR 0741

- *Verify the existence of disciplinary policies to protect data.* You may want to verify that your authorized representative has appropriate disciplinary policies for employees that violate FERPA. This can include termination in appropriate instances.

- *Verify the existence of a sound data security plan.* You may wish to verify before disclosing PII from education records that your authorized representative has a sound data security program, one that protects both data at rest and data in transmission. You have a responsibility to determine if your authorized representative's data security plan is adequate to prevent FERPA violations. The steps that you may need to take in order to verify a sound data security program are likely to vary with each situation. In some cases, it may suffice to add language to the written agreement that states what data security provisions are required. In other cases, it may be more prudent for you to take a hands-on approach and complete a physical inspection. Additionally, your written agreements could specify required data security elements, including requirements related to encryption, where the data can be hosted, transmission methodologies, and provisions to prevent unauthorized access.

- *Verify the existence of a data stewardship program.* You may want to examine your authorized representative's data stewardship program. Data stewardship should involve internal control procedures that protect PII from education records and include all aspects of data collection – from planning to maintenance to use and dissemination. The Department believes that a good data stewardship plan would have support and participation from across the organization, including the head of the organization, management, legal counsel, and data administrators, providers, and users. The plan should detail the organization's policies and procedures to protect privacy and data security, including the ongoing management of data collection, processing, storage, maintenance, use, and destruction. The plan could also include designating an individual to oversee the privacy and security of the PII from the education records it maintains. For more information, we have posted for comment a technical brief: "Data Stewardship: Managing Personally Identifiable Information in Electronic Student Education Records" that can be found at http://nces.ed.gov/programs/Ptac/Toolkit.aspx?section=Technical%20Briefs.

- *Disclose only PII from education records that is needed.* When you consider disclosing PII from education records to an authorized representative for an audit, evaluation, or enforcement or compliance activity, you may want to explore which specific data elements are necessary for that activity and provide only those elements. You should take care to ensure that you are not disclosing more PII from education records than needed for the stated activity and purpose. You should also explore whether PII from education records is actually required, or whether de-identified data would suffice.

- *Know to whom you are disclosing data.* You may want to require your authorized representative to conduct background investigations of employees who will have access to PII from education records, or you may want to conduct these investigations yourself. Additionally, you may want to require your authorized representative to

AR 0742

disclose past FERPA or data management violations. If you discover past violations, you would want to explore the circumstances behind the violation, and discover all information that would allow you to make an informed judgment on whether the individual or entity is likely to be a responsible data steward. This may include discovering whether the violation was covered up, including if it was voluntarily reported to affected students or FPCO, and whether appropriate breach response procedures were followed.

- *Verify training.* You may want to verify that your authorized representative has a training program to teach its employees about FERPA and how to protect PII from education records, or you may want to train your authorized representatives yourself.

*Are there best practices for written agreements?*

You should consider the following items for inclusion in your written agreements for work under both the audit or evaluation exception and the studies exception. We note that this list may not cover everything you want in your agreement – you should look to the facts and circumstances surrounding the disclosure agreement and include all terms necessary to be clear about roles, responsibilities, and expectations for safeguarding PII from education records.

- *Bind individuals to the agreement.* It can be important to bind not just the entity to whom you are disclosing PII from education records, but also the individuals who will be accessing that data. There are several ways to accomplish this result. One way is to identify the individuals in the agreement itself, and have them execute the agreement in their individual capacity as well as having a representative execute the agreement for the entity. Alternatively, your agreement can require individuals accessing the PII from education records to execute affidavits of nondisclosure or other documentation indicating their individual agreement to handle the PII from education records properly.

- *Agree on limitations on use of the PII from education records.* Your agreement should be clear about limitations on the use of the PII from education records, meaning that it can only be used for the activities described in the agreement. Your agreement may also address methodological limitations, for example, identifying which data sets, if any, the PII from education records may be linked.

- *Agree to not redisclose.* The most basic provision of the agreement is to make clear that the PII from education records is confidential and must not be redisclosed through direct data disclosures or publishing results that allow individuals to be directly or indirectly identified. FERPA-permitted entities may wish to require that specified disclosure avoidance methodologies be applied, or may wish to review all results prior to publication, or both.

- *Specify points of contact/data custodians.* Your written agreements should specify points of contact and data custodians (the individuals directly responsible for managing the data in question).

AR 0743

- *Mention Institutional Review Board (IRB) review and approval.* While FERPA does not mention IRBs, research proposals involving human subjects may have to be reviewed and approved by IRBs, if required under protection of human subject regulations of the Department and other Federal agencies. If IRB review and approval is required or expected, this may be noted in the written agreement.

- *State ownership of PII from education records.* You may wish for your agreement to be clear that, in disclosing PII from education records to an entity, you are in no way assigning ownership of the PII or records to that entity, and that it may only be redisclosed with your permission or otherwise in compliance with FERPA and its regulations.

- *Identify penalties.* Your agreement could include penalties under State contract law such as liquidated damages, data bans of varying length, and any other penalties the parties to the agreement deem appropriate. You may want your agreement to create third-party beneficiary rights, e.g., allowing parties injured by a data breach to sue for damages. While FERPA itself has little flexibility for sanctions, you can include a wide range of appropriate sanctions in your written agreements.

- *Set terms for data destruction.* As discussed previously, written agreements for both studies and audits and evaluations are required to contain provisions dealing with the destruction of PII from education records when those records are no longer needed. The agreement could include a method for documenting the destruction, such as the use of notarized statements.

- *Include funding terms.* If the agreement involves cost reimbursement, these details could be specified.

- *Maintain right to audit.* You may want to include the right to conduct audits or otherwise monitor the entity to which you are disclosing PII from education records to periodically affirm that the entity has appropriate policies and procedures in place to protect the PII from education records.

- *Identify and comply with all legal requirements.* It is important to remember that FERPA may not be the only law that governs your agreement. The agreement could broadly require compliance with all applicable Federal, State, and local laws and regulations, and identify the legal authority (whether express or implied) that permits the audit, evaluation, or enforcement or compliance activity.

- *Have plans to handle a data breach.* While no one anticipates a data breach, data loss may occur. You may wish to include specific procedures in your written agreements detailing the parties' expectations in the event that PII from education records is lost, including specifying the parties' responsibilities with regard to breach response and notification and financial responsibility.

- *Review and approve reported results.* If applicable, the written agreement could specify the parties' agreements with respect to publication of results. For example,

A-8

you may wish to review and approve reports prior to publication to make sure that they reflect the original intent of the agreement.

- *Define terms for conflict resolution.* The agreement could specify procedures for how disputes between the parties would be resolved.

- *Specify modification and termination procedures.* The agreement could specify how it can be modified or terminated. You may wish to provide specific provisions for termination based on improper handling of PII from education records.

*What do I do if the terms of the written agreement are violated?*

If the entity to which you have disclosed PII from education records without consent (whether under the studies exception or the audit an evaluation exception) violates the terms of the written agreement, you should evaluate your options under the penalty and termination provisions of the agreement. You may want to stop disclosing PII from education records to that organization, or pursue legal redress. If you have reason to believe that the entity has violated FERPA, you should contact FPCO.

*How should the public be informed?*

It is a best practice to keep the public informed when you disclose PII from education records.

- *Inform the public about written agreements.* Transparency is a best practice. You might want to post your data sharing agreements on your Web site, or provide some equivalent method to let interested parties know what data you are disclosing, the reasons it is being disclosed, and how it is being protected. While the Department generally recommends public posting of written agreements, parties are encouraged to review their contractual data security provisions carefully and redact, prior to publication, any provisions that may aid those seeking unauthorized access to systems. In certain instances a separate confidential IT Security Plan may be appropriate. For more information on data security best practices, see the Privacy Technical Assistance Center (PTAC) Web site: http://nces.ed.gov/programs/ptac.

*Who should I call if I have questions?*

If you would like more information about best practices to protect PII from education records, contact the PTAC Help Desk at PrivacyTA@ed.gov or 855-249-3072.

If you are a parent, eligible student, school, LEA, or SEA and would like more information on FERPA, please call FPCO at 1-800-872-5327.

AR 0745

**75654**   **Federal Register** / Vol. 76, No. 232 / Friday, December 2, 2011 / Rules and Regulations

## APPENDIX B

### Model Notification of Rights under FERPA for Elementary and Secondary Schools

The Family Educational Rights and Privacy Act (FERPA) affords parents and students who are 18 years of age or older ("eligible students") certain rights with respect to the student's education records. These rights are:

1. The right to inspect and review the student's education records within 45 days after the day the [Name of school ("School")] receives a request for access.

   Parents or eligible students should submit to the school principal [or appropriate school official] a written request that identifies the records they wish to inspect. The school official will make arrangements for access and notify the parent or eligible student of the time and place where the records may be inspected.

2. The right to request the amendment of the student's education records that the parent or eligible student believes are inaccurate, misleading, or otherwise in violation of the student's privacy rights under FERPA.

   Parents or eligible students who wish to ask the [School] to amend a record should write the school principal [or appropriate school official], clearly identify the part of the record they want changed, and specify why it should be changed. If the school decides not to amend the record as requested by the parent or eligible student, the school will notify the parent or eligible student of the decision and of their right to a hearing regarding the request for amendment. Additional information regarding the hearing procedures will be provided to the parent or eligible student when notified of the right to a hearing.

3. The right to provide written consent before the school discloses personally identifiable information (PII) from the student's education records, except to the extent that FERPA authorizes disclosure without consent.

   One exception, which permits disclosure without consent, is disclosure to school officials with legitimate educational interests. A school official is a person employed by the school as an administrator, supervisor, instructor, or support staff member (including health or medical staff and law enforcement unit personnel) or a person serving on the school board. A school official also may include a volunteer or contractor outside of the school who performs an institutional service of function for which the school would otherwise use its own employees and who is under the direct control of the school with respect to the use and maintenance of PII from education records, such as an attorney, auditor, medical consultant, or therapist; a parent or student volunteering to serve on an official committee, such as a disciplinary or grievance committee; or a parent, student, or other volunteer assisting another school official in performing his or her tasks. A school official has a legitimate educational interest if the official needs to review an education record in order to fulfill his or her professional responsibility.

B-1

AR 0746

[Optional] Upon request, the school discloses education records without consent to officials of another school district in which a student seeks or intends to enroll, or is already enrolled if the disclosure is for purposes of the student's enrollment or transfer. [NOTE: FERPA requires a school district to make a reasonable attempt to notify the parent or student of the records request unless it states in its annual notification that it intends to forward records on request.]

4. The right to file a complaint with the U.S. Department of Education concerning alleged failures by the [School] to comply with the requirements of FERPA. The name and address of the Office that administers FERPA are:

> Family Policy Compliance Office
> U.S. Department of Education
> 400 Maryland Avenue, SW
> Washington, DC 20202

[NOTE: In addition, a school may want to include its directory information public notice, as required by §99.37 of the regulations, with its annual notification of rights under FERPA.]

[Optional] See the list below of the disclosures that elementary and secondary schools may make without consent.

FERPA permits the disclosure of PII from students' education records, without consent of the parent or eligible student, if the disclosure meets certain conditions found in §99.31 of the FERPA regulations. Except for disclosures to school officials, disclosures related to some judicial orders or lawfully issued subpoenas, disclosures of directory information, and disclosures to the parent or eligible student, §99.32 of the FERPA regulations requires the school to record the disclosure. Parents and eligible students have a right to inspect and review the record of disclosures. A school may disclose PII from the education records of a student without obtaining prior written consent of the parents or the eligible student –

- To other school officials, including teachers, within the educational agency or institution whom the school has determined to have legitimate educational interests. This includes contractors, consultants, volunteers, or other parties to whom the school has outsourced institutional services or functions, provided that the conditions listed in §99.31(a)(1)(i)(B)(*1*) – (a)(1)(i)(B)(*2*) are met. (§99.31(a)(1))

- To officials of another school, school system, or institution of postsecondary education where the student seeks or intends to enroll, or where the student is already enrolled if the disclosure is for purposes related to the student's enrollment or transfer, subject to the requirements of §99.34. (§99.31(a)(2))

- To authorized representatives of the U. S. Comptroller General, the U. S. Attorney General, the U.S. Secretary of Education, or State and local educational authorities, such as the State educational agency in the parent or eligible student's State (SEA). Disclosures under this provision may be made, subject to the requirements of §99.35, in connection with an audit or evaluation of Federal- or State-supported education

AR 0747

programs, or for the enforcement of or compliance with Federal legal requirements that relate to those programs. These entities may make further disclosures of PII to outside entities that are designated by them as their authorized representatives to conduct any audit, evaluation, or enforcement or compliance activity on their behalf. (§§99.31(a)(3) and 99.35)

- In connection with financial aid for which the student has applied or which the student has received, if the information is necessary to determine eligibility for the aid, determine the amount of the aid, determine the conditions of the aid, or enforce the terms and conditions of the aid.  (§99.31(a)(4))

- To State and local officials or authorities to whom information is specifically allowed to be reported or disclosed by a State statute that concerns the juvenile justice system and the system's ability to effectively serve, prior to adjudication, the student whose records were released, subject to §99.38. (§99.31(a)(5))

- To organizations conducting studies for, or on behalf of, the school, in order to:  (a) develop, validate, or administer predictive tests; (b)  administer student aid programs; or (c)  improve instruction.  (§99.31(a)(6))

- To accrediting organizations to carry out their accrediting functions.  (§99.31(a)(7))

- To parents of an eligible student if the student is a dependent for IRS tax purposes. (§99.31(a)(8))

- To comply with a judicial order or lawfully issued subpoena.  (§99.31(a)(9))

- To appropriate officials in connection with a health or safety emergency, subject to §99.36.  (§99.31(a)(10)

- Information the school has designated as "directory information" under §99.37. (§99.31(a)(11))

B-3

## APPENDIX C

## Model Notification of Rights under FERPA for Postsecondary Institutions

The Family Educational Rights and Privacy Act (FERPA) affords eligible students
certain rights with respect to their education records.  (An "eligible student" under
FERPA is a student who is 18 years of age or older or who attends a postsecondary
institution.)  These rights include:

1.  The right to inspect and review the student's education records within 45 days
    after the day the [Name of postsecondary institution ("School")] receives a
    request for access.  A student should submit to the registrar, dean, head of the
    academic department, or other appropriate official, a written request that
    identifies the record(s) the student wishes to inspect.  The school official will
    make arrangements for access and notify the student of the time and place
    where the records may be inspected.  If the records are not maintained by the
    school official to whom the request was submitted, that official shall advise
    the student of the correct official to whom the request should be addressed.

2.  The right to request the amendment of the student's education records that the
    student believes are inaccurate, misleading, or otherwise in violation of the
    student's privacy rights under FERPA.

    A student who wishes to ask the school to amend a record should write the
    school official responsible for the record, clearly identify the part of the record
    the student wants changed, and specify why it should be changed.

    If the school decides not to amend the record as requested, the school will
    notify the student in writing of the decision and the student's right to a hearing
    regarding the request for amendment.  Additional information regarding the
    hearing procedures will be provided to the student when notified of the right
    to a hearing.

3.  The right to provide written consent before the university discloses personally
    identifiable information (PII) from the student's education records, except to
    the extent that FERPA authorizes disclosure without consent.

    The school discloses education records without a student's prior written
    consent under the FERPA exception for disclosure to school officials with
    legitimate educational interests.  A school official is a person employed by the
    [School] in an administrative, supervisory, academic, research, or support
    staff position (including law enforcement unit personnel and health staff); a
    person serving on the board of trustees; or a student serving on an official
    committee, such as a disciplinary or grievance committee.  A school official
    also may include a volunteer or contractor outside of the [School] who
    performs an institutional service of function for which the school would
    otherwise use its own employees and who is under the direct control of the

C-1

AR 0749

school with respect to the use and maintenance of PII from education records, such as an attorney, auditor, or collection agent or a student volunteering to assist another school official in performing his or her tasks. A school official has a legitimate educational interest if the official needs to review an education record in order to fulfill his or her professional responsibilities for the [School].

[Optional] Upon request, the school also discloses education records without consent to officials of another school in which a student seeks or intends to enroll. [NOTE TO POSTSECONDARY INSTITUTION: FERPA requires a school to make a reasonable attempt to notify each student of these disclosures unless the school states in its annual notification that it intends to forward records on request.]

4. The right to file a complaint with the U.S. Department of Education concerning alleged failures by the [School] to comply with the requirements of FERPA. The name and address of the Office that administers FERPA is:

Family Policy Compliance Office
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

[NOTE: In addition, a school may want to include its directory information public notice, as required by §99.37 of the regulations, with its annual notification of rights under FERPA.]

[Optional] See the list below of the disclosures that postsecondary institutions may make without consent.

FERPA permits the disclosure of PII from students' education records, without consent of the student, if the disclosure meets certain conditions found in §99.31 of the FERPA regulations. Except for disclosures to school officials, disclosures related to some judicial orders or lawfully issued subpoenas, disclosures of directory information, and disclosures to the student, §99.32 of FERPA regulations requires the institution to record the disclosure. Eligible students have a right to inspect and review the record of disclosures. A postsecondary institution may disclose PII from the education records without obtaining prior written consent of the student –

• To other school officials, including teachers, within the [School] whom the school has determined to have legitimate educational interests. This includes contractors, consultants, volunteers, or other parties to whom the school has outsourced institutional services or functions, provided that the conditions listed in §99.31(a)(1)(i)(B)(*1*) - (a)(1)(i)(B)(*2*) are met. (§99.31(a)(1))

• To officials of another school where the student seeks or intends to enroll, or where the student is already enrolled if the disclosure is for purposes related to

C-2

AR 0750

the student's enrollment or transfer, subject to the requirements of §99.34. (§99.31(a)(2))

- To authorized representatives of the U. S. Comptroller General, the U. S. Attorney General, the U.S. Secretary of Education, or State and local educational authorities, such as a State postsecondary authority that is responsible for supervising the university's State-supported education programs. Disclosures under this provision may be made, subject to the requirements of §99.35, in connection with an audit or evaluation of Federal- or State-supported education programs, or for the enforcement of or compliance with Federal legal requirements that relate to those programs. These entities may make further disclosures of PII to outside entities that are designated by them as their authorized representatives to conduct any audit, evaluation, or enforcement or compliance activity on their behalf. (§§99.31(a)(3) and 99.35)

- In connection with financial aid for which the student has applied or which the student has received, if the information is necessary to determine eligibility for the aid, determine the amount of the aid, determine the conditions of the aid, or enforce the terms and conditions of the aid. (§99.31(a)(4))

- To organizations conducting studies for, or on behalf of, the school, in order to: (a) develop, validate, or administer predictive tests; (b) administer student aid programs; or (c) improve instruction. (§99.31(a)(6))

- To accrediting organizations to carry out their accrediting functions. ((§99.31(a)(7))

- To parents of an eligible student if the student is a dependent for IRS tax purposes. (§99.31(a)(8))

- To comply with a judicial order or lawfully issued subpoena. (§99.31(a)(9))

- To appropriate officials in connection with a health or safety emergency, subject to §99.36. (§99.31(a)(10))

- Information the school has designated as "directory information" under §99.37. (§99.31(a)(11))

- To a victim of an alleged perpetrator of a crime of violence or a non-forcible sex offense, subject to the requirements of §99.39. The disclosure may only include the final results of the disciplinary proceeding with respect to that alleged crime or offense, regardless of the finding. (§99.31(a)(13))

- To the general public, the final results of a disciplinary proceeding, subject to the requirements of §99.39, if the school determines the student is an alleged perpetrator of a crime of violence or non-forcible sex offense and the student

AR 0751

has committed a violation of the school's rules or policies with respect to the allegation made against him or her. (§99.31(a)(14))

- To parents of a student regarding the student's violation of any Federal, State, or local law, or of any rule or policy of the school, governing the use or possession of alcohol or a controlled substance if the school determines the student committed a disciplinary violation and the student is under the age of 21. (§99.31(a)(15))

C-4

[FR Doc. 2011–30683 Filed 12–1–11; 8:45 am]

**BILLING CODE 4000–01–C**

## DEPARTMENT OF EDUCATION

**34 CFR Part 99**

RIN 1855–AA05

[Docket ID ED–2008–OPEPD–0002]

**Family Educational Rights and Privacy**

**AGENCY:** Office of Planning, Evaluation, and Policy Development, Department of Education.

**ACTION:** Final regulations.

**SUMMARY:** The Secretary amends our regulations implementing the Family Educational Rights and Privacy Act (FERPA), which is section 444 of the General Education Provisions Act. These amendments are needed to implement a provision of the USA Patriot Act and the Campus Sex Crimes Prevention Act, which added new exceptions permitting the disclosure of personally identifiable information from education records without consent. The amendments also implement two U.S. Supreme Court decisions interpreting FERPA, and make necessary changes identified as a result of the Department's experience administering FERPA and the current regulations.

These changes clarify permissible disclosures to parents of eligible students and conditions that apply to disclosures in health and safety emergencies; clarify permissible disclosures of student identifiers as *directory information;* allow disclosures to contractors and other outside parties in connection with the outsourcing of institutional services and functions; revise the definitions of *attendance, disclosure, education records, personally identifiable information,* and other key terms; clarify permissible redisclosures by State and Federal officials; and update investigation and enforcement provisions.

**DATES:** These regulations are effective January 8, 2009.

**FOR FURTHER INFORMATION CONTACT:** Frances Moran, U.S. Department of Education, 400 Maryland Avenue, SW., room 6W243, Washington, DC 20202–8250. Telephone: (202) 260–3887.

If you use a telecommunications device for the deaf (TDD), you may call the Federal Relay Service (FRS) at 1–800–877–8339.

Individuals with disabilities may obtain this document in an alternative format (*e.g.,* Braille, large print, audiotape, or computer diskette) on request to the contact person listed under **FOR FURTHER INFORMATION CONTACT.**

**SUPPLEMENTARY INFORMATION:** On March 24, 2008, the U.S. Department of Education (the Department or we) published a notice of proposed rulemaking (NPRM) in the **Federal Register** (73 FR 15574). In the preamble to the NPRM, the Secretary discussed the major changes proposed in that document that are necessary to implement statutory changes made to FERPA, to implement two U.S. Supreme Court decisions, to respond to changes in information technology, and to address other issues identified through the Department's experience in administering FERPA.

We believe that the regulatory changes adopted in these final regulations provide clarification on many important issues that have arisen over time with regard to how FERPA affects decisions that school officials have to make on an everyday basis. Educational agencies and institutions face considerable challenges, especially with regard to maintaining safe campuses, protecting personally identifiable information in students' education records, and responding to requests for data on student progress. These final regulations, as well as the discussion on various provisions in the preamble, will assist school officials in addressing these challenges in a manner that complies with FERPA and protects the privacy of students' education records.

**Notice of Proposed Rulemaking**

In the NPRM, we proposed regulations to implement section 507 of the USA Patriot Act (Pub. L. 107–56), enacted October 26, 2001, and the Campus Sex Crimes Prevention Act, section 1601(d) of the Victims of Trafficking and Violence Protection Act of 2000 (Pub. L. 106–386), enacted October 28, 2000. Other major changes proposed in the NPRM included the following:

• Amending § 99.5 to clarify the conditions under which an educational agency or institution may disclose personally identifiable information from an eligible student's education records to a parent without the prior written consent of the eligible student;

• Amending § 99.31(a)(1) to authorize the disclosure of education records without consent to contractors, consultants, volunteers, and other outside parties to whom an educational agency or institution has outsourced institutional services or functions;

• Amending § 99.31(a)(1) to ensure that teachers and other school officials only gain access to education records in which they have legitimate educational interests;

• Amending § 99.31(a)(2) to permit educational agencies and institutions to disclose education records, without consent, to another institution even after the student has enrolled or transferred so long as the disclosure is for purposes related to the student's enrollment or transfer;

• Amending § 99.31(a)(6) to require that an educational agency or institution may disclose personally identifiable information under this section only if it enters into a written agreement with the organization specifying the purposes of the study and the use and destruction of the data;

• Amending § 99.31 to include a new subsection to provide standards for the release of information from education records that has been de-identified;

• Amending § 99.35 to permit State and local educational authorities and Federal officials listed in § 99.31(a)(3) to make further disclosures of personally identifiable information from education records on behalf of the educational agency or institution; and

• Amending § 99.36 to remove the language requiring strict construction of this exception and add a provision stating that if an educational agency or institution determines that there is an articulable and significant threat to the health or safety of a student or other individual, it may disclose the information to any person, including parents, whose knowledge of the information is necessary to protect the health or safety of the student or other individuals.

**Significant Changes From the NPRM**

These final regulations contain several significant changes from the NPRM as follows:

• Amending the definition of *personally identifiable information* in § 99.3 to provide a definition of *biometric record;*

• Removing the proposed definition of *State auditor* in § 99.3 and provisions in § 99.35(a)(3) related to State auditors and audits;

• Revising § 99.31(a)(6) to clarify the specific types of information that must be contained in the written agreement between an educational agency or institution and an organization conducting a study for the agency or institution;

• Removing the statement from § 99.31(a)(16) that FERPA does not require or encourage agencies or institutions to collect or maintain information concerning registered sex offenders;

• Requiring a State or local educational authority or Federal official or agency that rediscloses personally identifiable information from education records to record that disclosure if the

AR 0753

educational agency or institution does not do so under § 99.32(b); and

• Revising § 99.32(b) to require an educational agency or institution that makes a disclosure in a health or safety emergency to record information concerning the circumstances of the emergency.

These changes are explained in greater detail in the following *Analysis of Comments and Changes.*

**Analysis of Comments and Changes**

In response to the Secretary's invitation in the NPRM, 121 parties submitted comments on the proposed regulations. An analysis of the comments and of the changes in the regulations since publication of the NPRM follows.

We group major issues according to subject, with applicable sections of the regulations referenced in parentheses. We discuss other substantive issues under the sections of the regulations to which they pertain. Generally, we do not address technical and other minor changes, or suggested changes that the law does not authorize the Secretary to make. We also do not address comments pertaining to issues that were not within the scope of the NPRM.

**Definitions (§ 99.3)**

*(a) Attendance*

*Comment:* We received no comments objecting to the proposed changes to the definition of the term *attendance.* Three commenters expressed support for the changes because the availability and use of alternative instructional formats are not clearly addressed by the current regulations. One commenter suggested that the definition could avoid obsolescence by referring to the receipt of instruction leading to a diploma or certificate instead of listing the types of instructional formats.

*Discussion:* We proposed to revise the definition of *attendance* because we received inquiries from some educational agencies and institutions asking whether FERPA was applicable to the records of students receiving instruction through the use of new technology methods that do not require a physical presence in a classroom. Because the definition of *attendance* is key to determining when an individual's records at a school are education records protected by FERPA, it is essential that schools and institutions understand the scope of the term. To prevent the regulations from becoming out of date as new tools and methods are developed, the definition provides that attendance may also include ''other electronic

information and telecommunications technologies.''

While most schools are aware of the various formats distance learning may take, we believe it is informative to list the different communications media that are currently used. Also, we believe that parents, eligible students, and other individuals and organizations that use the FERPA regulations may find the listing of formats useful.

We do not agree that the definition of *attendance* should be limited to receipt of instruction leading to a diploma or certificate, because this would improperly exclude many instructional formats.

*Changes:* None.

*(b) Directory Information (§§ 99.3 and 99.37)*

*(1) Definition (§ 99.3)*

*Comment:* We received a number of comments on our proposal to revise the definition of *directory information* to provide that an educational agency or institution may not designate as directory information a student's social security number (SSN) or other student identification (ID) number. The proposed definition also provided that a student's user ID or other unique identifier used by the student to access or communicate in electronic systems could be considered directory information but only if the electronic identifier cannot be used to gain access to education records except when used in conjunction with one or more factors that authenticate the student's identity.

All commenters agreed that student SSNs should not be disclosed as directory information. Several commenters strongly supported the definition of *directory information* as proposed, noting that failure to curtail the use of SSNs and student ID numbers as directory information could facilitate identity theft and other fraudulent activities.

One commenter said that the proposed regulations did not go far enough to prohibit the use of students' SSNs as a student ID number, placing SSNs on academic transcripts, and using SSNs to search an electronic database. Another commenter expressed concern that the proposed regulations could prohibit reporting needed to enforce students' financial obligations and other routine business practices. According to this commenter, restrictions on the use of SSNs in FERPA and elsewhere demonstrate the need for a single student identifier that can be tied to the SSN and other identifying information to use for grade transcripts, enrollment verification,

default prevention, and other activities that depend on sharing student information. Another commenter stated that institutions should not be allowed to penalize students who opt out of directory information disclosures by denying them access to benefits, services, and required activities.

Several commenters said that the definition in the proposed regulations was confusing and unnecessarily restrictive because it treats a student ID number as the functional equivalent of an SSN. They explained that when providing access to records and services, many institutions no longer use an SSN or other single identifier that both identifies and authenticates identity. As a result, at many institutions, the condition specified in the regulations for treating electronic identifiers as directory information, *i.e.,* that the identifier cannot be used to gain access to education records except when used in conjunction with one or more factors that authenticate the user's identity, often applies to student ID numbers as well because they cannot be used to gain access to education records without a personal identification number (PIN), password, or some other factor to authenticate the user's identity. Some commenters suggested that our nomenclature is the problem and that regardless of what it is called, an identifier that does not allow access to education records without the use of authentication factors should be treated as directory information. According to one commenter, allowing institutions to treat student ID numbers as directory information in these circumstances would improve business practices and enhance student privacy by encouraging institutions to require additional authentication factors when using student ID numbers to provide access to education records.

One commenter strongly opposed allowing institutions to treat a student's electronic identifier as directory information if the identifier could be made available to parties outside the school system. This commenter noted that electronic identifiers may act as a key, offering direct access to the student's entire file, and that PINs and passwords alone do not provide adequate security for education records. Another commenter said that if electronic identifiers and ID numbers can be released as directory information, then password requirements need to be more stringent to guard against unauthorized access to information and identity theft.

Some commenters recommended establishing categories of directory information, with certain information

made available only within the educational community. One commenter expressed concern about Internet safety because the regulations allow publication of a student's e-mail address. Another said that FERPA should not prevent institutions from printing the student's ID number on an ID card or otherwise restrict its use on campus but that publication in a directory should not be allowed.

Two commenters asked the Department to confirm that the regulations allow institutions to post grades using a code known only by the teacher and the student.

*Discussion:* We share commenters' concerns about the use of students' SSNs. In general, however, there is no statutory authority under FERPA to prohibit an educational agency or institution from using SSNs as a student ID number, on academic transcripts, or to search an electronic database so long as the agency or institution does not disclose the SSN in violation of FERPA requirements. As discussed elsewhere in this preamble, FERPA does prohibit using a student's SSN, without consent, to search records in order to confirm directory information.

Some States prohibit the use of SSNs as a student ID number, and some institutions have voluntarily ceased using SSNs in this manner because of concerns about identity theft. Students are required to provide their SSNs in order to receive Federal financial aid, and the regulations do not prevent an agency or institution from using SSNs for this purpose. We note that FERPA does not address, and we do not believe that there is statutory authority under FERPA to require, creation of a single student identifier to replace the SSN. In any case, the Department encourages educational agencies and institutions, as well as State educational authorities, to follow best practices of the educational community with regard to protecting students' SSNs.

We agree that students should not be penalized for opting out of directory information disclosures. Indeed, an educational agency or institution may not require parents and students to waive their rights under FERPA, including the right to opt out of directory information disclosures. On the other hand, we do not interpret FERPA to require educational agencies and institutions to ensure that students can remain anonymous to others in the school community when using an institution's electronic communications systems. As a result, parents and students who opt out of directory information disclosures may not be able to use electronic communications

systems that require the release of the student's name or electronic identifier within the school community. (As discussed later in this notice in our discussion of the comments on § 99.37(c), the right to opt out of directory information disclosures may not be used to allow a student to remain anonymous in class.)

The regulations allow an educational agency or institution to designate a student's user ID or other electronic identifier as directory information if the identifier functions essentially like the student's name, and therefore, disclosure would not be considered harmful or an invasion of privacy. That is, the identifier cannot be used to gain access to education records except when combined with one or more factors that authenticate the student's identity.

We have historically advised that student ID numbers may not be disclosed as directory information because they have traditionally been used like SSNs, *i.e.*, as both an identifier and authenticator of identity. We agree, however, that the proposed definition was confusing and unnecessarily restrictive because it failed to recognize that many institutions no longer use student ID numbers in this manner. If a student identifier can be used to access records or communicate electronically without one or more additional factors to authenticate the user's identity, then the educational agency or institution may treat it as directory information under FERPA regardless of what the identifier is called. We have revised the definition of *directory information* to provide this flexibility.

We share the commenters' concerns about the use of PINs and passwords. In the preamble to the NPRM, we explained that PINs or passwords, and single-factor authentication of any kind, may not be reasonable for protecting access to certain kinds of information (73 FR 15585). We also recognize that user IDs and other electronic identifiers may provide greater access and linking to information than does a person's name. Therefore, we remind educational agencies and institutions that disclose student ID numbers, user IDs, and other electronic identifiers as directory information to examine their recordkeeping and data sharing practices and ensure that, when these identifiers are used, the methods they select for authenticating identity provide adequate protection against the unauthorized disclosure of information in education records.

We also share the concern of commenters who stated that students' e-mail addresses and other identifiers

should be disclosed as directory information only within the school system and should not be made available outside the institution. The disclosure of directory information is permissive under FERPA, and, therefore, an agency or institution is not required to designate and disclose any student identifier (or any other item) as directory information. Further, while FERPA does not expressly recognize different levels or categories of directory information, an agency or institution is not required to make student directories and other directory information available to the general public just because the information is shared within the institution. For example, under FERPA, an institution may decide to make students' electronic identifiers and e-mail addresses available within the institution but not release them to the general public as directory information. In fact, the preamble to the NPRM suggested that agencies and institutions should minimize the public release of student directories to mitigate the risk of re-identifying information that has been de-identified (73 FR 15584).

With regard to student ID numbers in particular, an agency or institution may print an ID number on a student's ID card whether or not the number is treated as directory information because under FERPA simply printing the ID number on a card, without more, is not a disclosure and, therefore, is not prohibited. *See* 20 U.S.C. 1232g(b)(2). If the student ID number is not designated as directory information, then the agency or institution may not disclose the card, or require the student to disclose the card, except in accordance with one of the exceptions to the consent requirement, such as to school officials with legitimate educational interests. If the student ID number is designated as directory information in accordance with these regulations, then it may be disclosed. However, the agency or institution may still decide against making a directory of student ID numbers available to the general public.

We discuss codes used by teachers to post grades in our discussion of the definition of *personally identifiable information* elsewhere in this preamble.

*Changes:* We have revised the definition of *directory information* in § 99.3 to provide that directory information includes a student ID number if it cannot be used to gain access to education records except when used with one or more other factors to authenticate the user's identity.

(2) Conditions for Disclosing Directory Information

(i) 99.37(b)

*Comment:* All comments on this provision supported our proposal to clarify that an educational agency or institution must continue to honor a valid request to opt out of directory information disclosures even after the student no longer attends the institution. One commenter stated that the proposed regulations appropriately provided former students with the continuing ability to control the release of directory information and remarked that this will benefit students and families. One commenter asked how long an opt out from directory information disclosures must be honored. Another commenter said that students may object if their former schools do not disclose directory information without their specific written consent because the school is unable to determine whether the student previously opted out. This could occur, for example, if a school declined to disclose that a student had received a degree to a prospective employer.

*Discussion:* The regulations clarify that once a parent or eligible student opts out of directory information disclosures, the educational agency or institution must continue to honor that election after the student is no longer in attendance. While this is not a new interpretation, school districts and postsecondary institutions have been unclear about its application and have not administered it consistently. The inclusion in the regulations of this longstanding interpretation is necessary to ensure that schools clearly understand their obligation to continue to honor a decision to opt out of the disclosure of directory information after a student stops attending the school, until the parent or eligible student rescinds it.

Educational agencies and institutions are not required under FERPA to disclose directory information to any party. Therefore, parents and students have no basis for objecting if an agency or institution does not disclose directory information because it is not certain whether the parent or student opted out. The regulations provide an educational agency or institution with the flexibility to determine the process it believes is best suited to serve its population as long as it honors prior elections to opt out of directory information disclosures.

*Changes:* None.

(ii) § 99.37(c)

*Comment:* We received two comments in support of our proposal to clarify in this section that parents and students may not use the right to opt out of directory information disclosures to prevent disclosure of the student's name or other identifier in the classroom.

*Discussion:* We appreciate the commenters' support.

*Changes:* None.

(iii) § 99.37(d)

*Comment:* Two commenters supported the prohibition on using a student's SSN to disclose or confirm directory information unless a parent or eligible student provides written consent. One of these commenters questioned the statutory basis for this interpretation.

Several commenters asked whether, under the proposed regulations, a school must deny a request for directory information if the requester supplies the student's SSN. One commenter asked whether a request for directory information that contains a student's SSN may be honored so long as the school does not use the SSN to locate the student's records. One commenter stated that the regulations could more effectively protect students' SSNs but was concerned that denying a request for directory information that contains an SSN may inadvertently confirm the SSN.

One commenter expressed concern that the prohibition on using a student's SSN to verify directory information would leave schools with large student populations unable to locate the appropriate record because they will need to rely solely on the student's name and other directory information, if any, provided by the requester, which may be duplicated in their databases. This commenter said that students would object if institutions were unable to respond quickly to requests by banks or landlords for confirmation of enrollment because the request contained the student's SSN.

One commenter suggested that the regulations require an educational agency or institution to notify a requester that the release or confirmation of directory information does not confirm the accuracy of the SSN or other non-directory information submitted with the request. Another commenter asked whether the regulations apply to confirmation of student enrollment and other directory information by outside service providers such as the National Student Clearinghouse.

*Discussion:* The provision in the proposed regulations prohibiting an educational agency or institution from using a student's SSN when disclosing or verifying directory information is based on the statutory prohibition on disclosing personally identifiable information from education records without consent in 20 U.S.C. 1232g(b). The prohibition applies also to any party outside the agency or institution providing degree, enrollment, or other confirmation services on behalf of an educational agency or institution, such as the National Student Clearinghouse.

A school is not required to deny a request for directory information about a student, such as confirmation whether a student is enrolled or has received a degree, if the requester supplies the student's SSN (or other non-directory information) along with the request. However, in releasing or confirming directory information about a student, the school may not use the student's SSN (or other non-directory information) supplied by the requester to identify the student or locate the student's records unless a parent or eligible student has provided written consent. This is because confirmation of information in education records is considered a disclosure under FERPA. See 20 U.S.C. 1232g(b). A school's use of a student's SSN (or other non-directory information) provided by the requester to confirm enrollment or other directory information implicitly confirms and, therefore, discloses, the student's SSN (or other non-directory information). This is true even if the requester also provides the school with the student's name, date of birth, or other directory information to help identify the student.

A school may choose to deny a request for directory information, whether or not it contains a student's SSN, because only a parent or eligible student has a right to obtain education records under FERPA. Denial of a request for directory information that contains a student's SSN is not an implicit confirmation or disclosure of the SSN.

These regulations will not adversely affect the ability of institutions to respond quickly to requests by parties such as banks and landlords for confirmation of enrollment that contain the student's SSN because students generally provide written consent for schools to disclose information to the inquiring party in order to obtain banking and housing services. We note, however, that if a school wishes to use the student's SSN to confirm enrollment or other directory information about the student, it must ensure that the written consent provided by the student includes consent for the school to

disclose the student's SSN to the requester.

There is no authority in FERPA to require a school to notify requesters that it is not confirming the student's SSN (or other non-directory information) when it discloses or confirms directory information. However, when a party submits a student's SSN along with a request for directory information, in order to avoid confusion, unless a parent or eligible student has provided written consent for the disclosure of the student's SSN, the school may indicate that it has not used the SSN (or other non-directory information) to locate the student's records and that its response may not and does not confirm the accuracy of the SSN (or other non-directory information) supplied with the request.

We recognize that with a large database of student information, there may be some loss of ability to identify students who have common names if SSNs are not used to help identify the individual. However, schools that do not use SSNs supplied by a party requesting directory information, either because the student has not provided written consent or because the school is not certain that the written consent includes consent for the school to disclose the student's SSN, generally may use the student's address, date of birth, school, class, year of graduation, and other directory information to identify the student or locate the student's records.

*Changes:* None.

*(c) Disclosure (§ 99.3)*

*Comment:* Two commenters said that the proposal to revise the definition of *disclosure* to exclude the return of a document to its source was too broad and could lead to improper release of highly sensitive documents, such as an individualized education program (IEP) contained in a student's special education records, to anyone claiming to be the creator of a record. One of the commenters stated that changing the definition was unnecessary, as schools already have a means of verifying documents by requesting additional copies from the source. Both commenters also expressed concern that, because recordation is not required, a parent or eligible student will not be aware that the verification occurred.

We also received comments of strong support for the proposed change to the definition of *disclosure.* The commenters stated that this change, targeted to permit the release of records back to the institution that presumably created them, will enhance an

institution's ability to identify and investigate suspected fraudulent records in a timely manner.

*Discussion:* For several years now, school officials have advised us that problems related to fraudulent records typically involve a transcript or letter of recommendation that has been altered by someone other than the responsible school official. Under the current regulations, an educational agency or institution may ask for a copy of a record from the presumed source when it suspects fraudulent activity. However, simply asking for a copy of a record may not be adequate, for example, if the original record no longer exists at the sending institution. In these circumstances, an institution will need to return a record to its identified source to be able to verify its authenticity. The final regulations permit a targeted release of records back to the stated source for verification purposes in order to provide schools with the flexibility needed for this process while preserving a more general prohibition on the release of information from education records.

We do not agree that the term disclosure as proposed in the NPRM is too broad and could lead to the improper release of highly sensitive documents to anyone claiming to be the creator of the record. School officials have not advised us that they have had problems receiving IEP records and other highly sensitive materials from parties who did not in fact create or provide the record. Therefore, we do not believe that the proposed definition of disclosure is too broad.

The commenters are correct that the return of an education record to its source does not have to be recorded, because it is not a disclosure. We do not consider this problematic, however, because the information is merely being returned to the party identified as its source. This is similar to the situation in which a school is not required under the regulations to record disclosures of education records made to school officials with legitimate educational interests. As in that instance, there is no direct notice to a parent or student of either the disclosure of the record or the information in the record. We also believe that if a questionable document is deemed to be inauthentic by the source, the student will be informed of the results of the authentication process by means other than seeing a record of the disclosure in the student's file. There appears to be little value in notifying a parent or student that a document was suspected of being fraudulent if the document is found to be genuine and accurate.

Finally, we note that a transcript or other document does not lose its protection under FERPA, including the written consent requirements, when an educational agency or institution returns it to the source. The document and the information in it remains an "education record" under FERPA when it is returned to its source. As an education record, it may not be redisclosed except in accordance with FERPA requirements, including § 99.31(a)(1), which allows the source institution to disclose the information to teachers and other school officials with legitimate educational interests, such as persons who need to verify the accuracy or authenticity of the information. If the source institution makes any further disclosures of the record or information, it must record them.

*Changes:* None.

**Additional Changes to the Definition of Disclosure**

*Comment:* Several commenters requested additional changes to the definition of *disclosure.* One commenter requested that any transfer of education records to a State's longitudinal data system not be considered a disclosure. Several commenters requested that additional changes be made so that a school could provide current education records of students back to the students' former schools or districts. A commenter recommended excluding from the definition of *disclosure* statistical information that is personally identifiable because of small cell sizes when the recipient agrees to maintain the confidentiality of the information.

*Discussion:* The revised definition of *disclosure,* which excludes the return of a document to its stated source, clarifies that information provided by school districts or postsecondary institutions to State educational authorities, including information maintained in a consolidated student records system, may be provided back to the original district or institution without consent. There is no statutory authority, however, to exclude from the definition of *disclosure* a school district's or institution's release or transfer of personally identifiable information from education records to its State longitudinal data system. We discuss the *disclosure* of education records in connection with the development of consolidated, longitudinal data systems in our response to comments on redisclosure and recordkeeping requirements elsewhere in this preamble.) Likewise, there is no statutory authority to exclude from the definition of disclosure the release of personally identifiable information from

education records to parties that agree to keep the information confidential. (See our discussion of personally identifiable information and de-identified records and information elsewhere in this preamble.)

The revised regulations do not authorize the disclosure of education records to third parties who are not identified as the provider or creator of the record. For example, a college may not send a student's current college records to a student's high school under the revised definition of *disclosure* because the high school is not the stated source of those records. (We discuss this issue elsewhere in the preamble under *Disclosure of Education Records to Students' Former Schools.*)

*Changes:* None.

*(d) Education Records*

(1) Paragraph (b)(5)

*Comment:* Several commenters supported our proposal to clarify the existing exclusion from the definition of *education records* for records that only contain information about an individual after he or she is no longer a student, which we referred to as "alumni records" in the NPRM, 73 FR 15576. One commenter suggested that the term "directly related," which is used in the amended definition in reference to a student's attendance, is inconsistent with the use of the term "personally identifiable" in other sections of the regulations and could cause confusion.

One commenter asked whether a postsecondary school could provide a student's education records from the postsecondary school to a secondary school that the student attended previously.

Several commenters objected to the proposed regulations because, according to the commenters, the regulations would expand the records subject to FERPA's prohibition on disclosure of education records without consent. A journalist stated that the settlement agreement cited in the NPRM is an example of a record that should be excluded from the definition and that schools already are permitted to protect too broad a range of documents from public review because the documents are education records. The commenter stated that information from education records such as a settlement agreement is newsworthy, unlikely to contain confidential information, and that disclosure of such information provides a benefit to the public. Another commenter expressed concern that the regulations allow schools to collect negative information about a former student without giving the individual an

opportunity to challenge the content because the information is not an education record under FERPA.

*Discussion:* It has long been the Department's interpretation that records created or received by an educational agency or institution on a former student that are directly related to the individual's attendance as a student are not excluded from the definition of *education records* under FERPA, and that records created or received on a former student that are not directly related to the individual's attendance as a student are excluded from the definition and, therefore, are not "education records." The proposed regulations in paragraph (b)(5) were intended to clarify the use of this exclusion, not to change or expand its scope.

Our use of the phrase "directly related to the individual's attendance as a student" to describe records that do not fall under this exclusion from the definition of *education records* is not inconsistent with the term "personally identifiable" as used in other parts of the regulations and should not be confused. The term "personally identifiable information" is used in the statute and regulations to describe the kind of information from education records that may not be disclosed without consent. *See* 20 U.S.C. 1232g(b); 34 CFR 99.3, 99.30. While "personally identifiable information" maintained by an agency or institution is generally considered an "education record" under FERPA, personally identifiable information does not fall under this exclusion from the definition of education records if the information is not directly related to the student's attendance as a student. For example, personally identifiable information related solely to a student's activities as an alumnus of an institution is excluded from the definition of education records under this provision. We think that the term "directly related" is clear in this context and will not be confused with "personally identifiable."

A postsecondary institution may not disclose a student's postsecondary education records to the secondary school previously attended by the student under this provision because these records are directly related to the student's attendance as a student at the postsecondary institution. (We discuss this issue further under *Disclosure of Education Records to Students' Former Schools.*)

We do not agree that documents such as settlement agreements are unlikely to contain confidential information. Our experience has been that these documents often contain highly

confidential information, such as special education diagnoses, educational supports, or mental or physical health and treatment information. Our changes to the definition were intended to clarify that schools may not disclose this information to the media or other parties, without consent, simply because a student is no longer in attendance at the school at the time the record was created or received. A parent or eligible student who wishes to share the student's own records with the media or other parties is free to do so.

Neither FERPA nor the regulations contains a provision for a parent or eligible student to challenge information that is not contained in an education record. FERPA does not prohibit a parent or student from using other venues to seek redress for collection and release of information in non-education records.

*Changes:* None.

(2) Paragraph (b)(6)

*Comment:* We received several comments supporting the proposed changes to the definition of *education records* that would exclude from the definition grades on peer-graded papers before they are collected and recorded by a teacher. These commenters expressed appreciation that this revision would be consistent with the U.S. Supreme Court's decision on peer-graded papers in *Owasso Independent School Dist. No. I–011* v. *Falvo,* 534 U.S. 426 (2002) (*Owasso*). Two commenters asked how the provision would be applied to the use of group projects and group grading within the classroom.

*Discussion:* The proposed changes to the definition of *education records* in paragraph (b)(6) are designed to implement the U.S. Supreme Court's 2002 decision in *Owasso,* which held that peer grading does not violate FERPA. As noted in the NPRM, 73 FR 15576, the Court held in *Owasso* that peer grading does not violate FERPA because "the grades on students' papers would not be covered under FERPA at least until the teacher has collected them and recorded them in his or her grade book." 534 U.S. at 436.

As suggested by the Supreme Count in *Owasso,* 534 U.S. at 435, FERPA is not intended to interfere with a teacher's ability to carry out customary practices, such as group grading of team assignments within the classroom. Just as FERPA does not prevent teachers from allowing students to grade a test or homework assignment of another student or from calling out that grade in class, even though the grade may eventually become an education record,

FERPA does not prohibit the discussion of group or individual grades on classroom group projects, so long as those individual grades have not yet been recorded by the teacher. The process of assigning grades or grading papers falls outside the definition of *education records* in FERPA because the grades are not "maintained" by an educational agency or institution at least until the teacher has recorded the grades.

*Changes:* None.

*(e) Personally Identifiable Information*

Comments on the proposed definition of *personally identifiable information* are discussed elsewhere in this preamble under the heading *Personally Identifiable Information and De-identified Records and Information.*

*(f) State Auditors and Audits (§§ 99.3 and Proposed 99.35(a)(3))*

*Comment:* Several commenters supported the clarification in proposed § 99.35(a)(3) that State auditors may have access to education records, without consent, in connection with an "audit" of Federal or State supported education programs under the exception to the written consent requirement for authorized representatives of "State and local educational authorities." All but one of the commenters, however, disagreed strongly with the proposed definition of *audit* in § 99.35(a)(3), which was limited to testing compliance with applicable laws, regulations, and standards and did not include the broader concept of evaluations.

In general, the commenters said that the proposed definition of *audit* was too narrow and would prevent State auditors from conducting performance audits and other services that they routinely provide in accordance with professional auditing standards, including the U.S. Comptroller's Government Auditing Standards. *See www.gao.gov/govaud/ybk01.htm.* A State legislative auditor noted, for example, that 45 State legislatures have established legislative program evaluation offices whose express purpose is to provide research and evaluation for legislative decision making, and that these offices regularly use personally identifiable information from education records for their work. Some of the commenters also questioned whether financial audits and attestation engagements would be excluded under the proposed definition.

One commenter said that the State auditor provisions in proposed §§ 99.3 and 99.35(a)(3) should be expanded to apply to other non-education State officials responsible for evaluating publicly funded programs. Another commenter recommended that the regulations include examination of education records by health department officials to improve compliance with mandated immunization schedules.

The majority of the comments we received with respect to the inclusion of local auditors in the proposed definition of *State auditor* in § 99.3 supported permitting local auditors to have access to personally identifiable information for purposes of auditing Federal or State supported education programs. One commenter said that local auditors should not be included in the definition, while another commenter stated that auditors for the city health department need access to FERPA-protected information to determine the accuracy of claims for payment and asked for further clarification on the issue.

*Discussion:* We explained in the preamble to the NPRM that the statute allows disclosure of personally identifiable information from education records without consent to authorized representatives of "State educational authorities" in connection with an audit or evaluation of Federal or State supported education programs. 73 FR 15577. Legislative history indicates that Congress amended the statute in 1979 to "correct an anomaly" in which the existing exception to the consent requirement in 20 U.S.C. 1232g(b)(3) was interpreted to preclude State auditors from obtaining access to education records for audit purposes. *See* H.R. Rep. No. 338, 96th Cong., 1st Sess. at 10 (1979), *reprinted in* 1979 U.S. Code Cong. & Admin. News 819, 824. However, because the amended statutory language in 20 U.S.C. 1232g(b)(5) refers only to "State and local educational officials," the proposed regulations sought to clarify that this included "State auditors" or auditors with authority and responsibility under State law for conducting audits. Due to the breadth of this inclusion, however, the proposed regulations also sought to limit access to education records by State auditors by narrowing the definition of *audit.*

The Secretary has carefully reviewed the comments and, based upon further intradepartmental review, has decided to remove from the final regulations the provisions related to State auditors and audits in §§ 99.3 and 99.35(a)(3). We share the commenters' concerns about preventing State auditors from conducting activities that they routinely perform under applicable auditing standards. However, because our focus was on the narrow definition of *audit,* we proposed a very broad definition of *State auditor* in § 99.3 and did not examine which of the various types of officials, offices, committees, and staff in executive and legislative branches of State government should be included in the definition. We are concerned that without the narrow definition of *audit* as proposed in § 99.35(a)(3), the proposed definition of *State auditor* may allow non-consensual disclosures of education records to a variety of officials for purposes not supported by the statute. The Department will study the matter further and may issue new regulations or guidance, as appropriate. In the interim, the Department will provide guidance on a case-by-case basis.

*Changes:* We are not including the definition of *State auditor* in § 99.3 and the provisions related to State auditors and audits in § 99.35(a)(3) in these final regulations.

**Disclosures to Parents (§§ 99.5 and 99.36)**

*Comment:* A majority of commenters approved of the Secretary's efforts to clarify that, even after a student has become an eligible student, an educational agency or institution may disclose education records to the student's parents, without the consent of the student, if certain conditions are met. Those commenters stated that the clarification was especially helpful, particularly in light of issues that arose after the April 2007 shootings at the Virginia Polytechnic Institute and State University (Virginia Tech). A commenter stated that the clarification will assist emergency management officials on college and university campuses and help school officials know when they can properly share student information with parents and students. One commenter expressed support for the proposed regulations, because it has been her experience that colleges do not share information with parents on their children's financial aid or academic status.

Some commenters disagreed with the proposed changes. One stated that, due to varying family dynamics, disclosures should not be limited only to parents, but should also include other appropriate family members. Another commenter objected to the phrase in § 99.5(a)(2) that would permit disclosure to a parent without the student's consent if the disclosure meets "any other provision in § 99.31(a)." The commenter stated that this "catch-all phrase" exceeded statutory authority.

Noting the sensitivity of financial information included in income tax returns, a few commenters raised concerns about the discussion in the

NPRM in which we explained that an institution can determine that a parent claimed a student as a dependent by asking the parent to supply a copy of the parent's most recent Federal tax return. Another commenter stated that the NPRM did not go far enough and recommended specifically requiring an institution to rely on a copy of a parent's most recent Federal tax return to determine a student's dependent status, while another commenter recommended that we change the regulations to indicate that only the parent who has claimed the student as a dependent may have access to the student's education records.

A commenter noted that some States have high school students who are concurrently enrolled in secondary schools and postsecondary institutions as early as ninth grade and supported the clarification that postsecondary institutions may disclose information to parents of students who are tax dependents.

*Discussion:* Parents' rights under FERPA transfer to a student when the student reaches age 18 or enters a postsecondary institution. 20 U.S.C. 1232g(d). However, under § 99.31(a)(8), an educational agency or institution may disclose education records to an eligible student's parents if the student is a dependent as defined in section 152 of the Internal Revenue Code of 1986. Under § 99.31(a)(8), neither the age of a student nor the parent's status as custodial parent is relevant to the determination whether disclosure of information from an eligible student's education records to that parent without written consent is permissible under FERPA. If a student is claimed as a dependent for Federal income tax purposes by either parent, then under the regulations, either parent may have access to the student's education records without the student's consent.

The statutory exception to the consent requirement in FERPA for the disclosure of records of dependent students applies only to the parents of the student. 20 U.S.C. 1232g(b)(1)(H). Accordingly, the Secretary does not have statutory authority to apply § 99.31(a)(8) to any other family members. However, under § 99.30(b)(3), an eligible student may provide consent for the school to disclose information from his or her education records to another family member. In some situations, such as when there is no parent in the student's life or the student is married, a spouse or other family member may be considered an appropriate party to whom a disclosure may be made, without consent, in connection with a

health or safety emergency under §§ 99.31(a)(10) and 99.36.

In most cases, when an educational agency or institution discloses education records to parents of an eligible student, we expect the disclosure to be made under the dependent student provision (§ 99.31(a)(8)), in connection with a health or safety emergency (§§ 99.31(a)(10) and 99.36), or if a student has committed a disciplinary violation with respect to the use or possession of alcohol or a controlled substance (§ 99.31(a)(15)). This is the reason we mention these provisions specifically in the regulations. However, inclusion of the phrase "of any other provision in § 99.31(a)" in § 99.5(a)(2) is necessary and within our statutory authority because there may be other exceptions to FERPA's general consent requirement under which an agency or institution might disclose education records to a parent of an eligible student, such as the directory information provision in § 99.31(a)(11) and the provision permitting disclosure in compliance with a court order or lawfully issued subpoena in § 99.31(a)(9).

As we explained in the NPRM, institutions can determine that a parent claims a student as a dependent by asking the parent to submit a copy of the parent's most recent Federal income tax return. However, we do not think it is appropriate to require an agency or institution to rely only on the most recent tax return to determine the student's dependent status because institutions should have flexibility in how to reach this determination. For instance, institutions may rely instead on a student's assertion that he or she is not a dependent unless the parent provides contrary evidence. We agree that financial information on a Federal tax return is sensitive information and, for that reason, in providing technical assistance and compliance training to school officials, we have advised that parents may redact all financial and other unnecessary information that appears on the form, as long as the tax return clearly shows the parent's or parents' names and the fact that the student is claimed as a dependent.

In addition, in the fall of 2007, we developed two model forms that appear on the Department's Family Policy Compliance Office (FPCO or the Office) Web site that institutions may adapt and provide to students at orientation to indicate whether they are a dependent and, if not, obtaining consent from the student for disclosure of information to parents: *http://www.ed.gov/policy/gen/guid/fpco/ferpa/safeschools/*

*modelform.html* and *http://www.ed.gov/policy/gen/guid/fpco/ferpa/safeschools/modelform2.html.*

With regard to the comment about high school students who are concurrently enrolled in postsecondary institutions as early as ninth grade, FERPA not only permits those postsecondary institutions to disclose information to parents of the high school students who are dependents for Federal income tax purposes, it also permits high schools and postsecondary institutions who have dually-enrolled students to share information. Where a student is enrolled in both a high school and a postsecondary institution, the two schools may share education records without the consent of either the parents or the student under § 99.34(b). If the student is under 18, the parents still retain the right under FERPA to inspect and review any education records maintained by the high school, including records that the college or university disclosed to the high school, even though the student is also attending the postsecondary institution.

*Changes:* None.

**Outsourcing (§ 99.31(a)(1)(i)(B))**

*(a) Outside Parties Who Qualify as School Officials*

*Comment:* A few commenters disagreed with the proposal to expand the "school officials" exception in § 99.31(a)(1)(i)(B) to include contractors, consultants, volunteers, and other outside parties to whom an educational agency or institution has outsourced institutional services or functions it would otherwise use employees to perform. They believed that the modifications undermined the plain language of the statute and congressional intent. Several other commenters supported the proposed regulations, saying that it was helpful to include in the regulations what has historically been the Department's interpretation of the "school officials" exception. A majority of commenters, while not agreeing or disagreeing with the proposed changes in § 99.31(a)(1)(i)(B), raised a number of issues concerning the proposal.

Several commenters expressed concern that the requirement that an outside party must perform an institutional service or function for which the agency or institution would otherwise use employees is too restrictive and impractical. One commenter noted that some functions that a contractor performs could not be performed by a school official.

Some commenters said we should clarify the regulations to explain the

AR 0760

circumstances under which volunteers may serve as school officials and have access to personally identifiable information from education records in connection with their services or responsibilities to the school. One commenter noted that this clarification was needed especially for parent-volunteers working at a school attended by their own children where they are likely to know other students and their families.

Several commenters asked that we clarify in the regulations that § 99.31(a)(1) also applies to school transportation officials, school bus drivers, and school bus attendants who need access to education records in order to safely and efficiently transport students. Another commenter asked for clarification whether, under the proposed regulations, practicum students, fieldwork students, and unpaid interns in schools would be considered "school officials." One commenter asked whether § 99.31(a)(1) permits outsourced medical providers to be considered "school officials."

One commenter asked how proposed § 99.31(a)(1) would apply to parties other than educational agencies and institutions. The commenter was concerned about permitting SEAs to disclose personally identifiable information to outside parties under § 99.31(a)(1)(i)(B) because SEAs are not subject to § 99.7, which requires educational agencies and institutions to annually notify parents and eligible students of their rights under FERPA, including a specific requirement in § 99.7(a)(3)(iii) that an educational agency or institution that has a policy of disclosing information under § 99.31(a)(1) must include in its annual notice a specification of criteria for determining who constitutes a school official and what constitutes a legitimate educational interest. A number of commenters requested clarification about the applicability of § 99.31(a)(1)(i)(B) to State authorities that operate State longitudinal data systems that maintain records of local educational agencies (LEAs) or institutions and are responsible for certain reporting requirements under the No Child Left Behind Act. Some of these commenters believe that State authorities operating these systems are "school officials" under § 99.31(a)(1) who should be able to disclose education records for the purpose of outsourcing under § 99.31(a)(1)(i)(B).

One commenter recommended that the regulations permit the disclosure of education records to non-educational State agencies for evaluation purposes under § 99.31(a)(1). Another commenter

asked that we revise the regulations to permit representatives of the Centers for Disease Control and Prevention to access education records for the purpose of public health surveillance under the "school officials" exception.

Another commenter requested further guidance on how § 99.31(a)(1) would apply to local law enforcement officers who work in collaboration with schools in various capacities and whether education records could be shared with these officers in order to ensure safe campuses.

*Discussion:* The Secretary does not agree that the proposed changes to § 99.31(a)(1) go beyond the plain reading of the statute and congressional intent. As we explained in the NPRM, FERPA's broad definition of *education records* includes records that are maintained by "a person acting for" an educational agency or institution. 20 U.S.C. 1232g(a)(4)(A)(ii); *see* 34 CFR 99.3. (In floor remarks describing the meaning of the definition of *education records,* Senators James Buckley and Claiborne Pell, principal sponsors of the December 1974 FERPA amendments, specifically referred to materials that are maintained by a school "or by one of its agents." See "Joint Statement in Explanation of Buckley/Pell Amendment" (Joint Statement), 120 Cong. Rec. S21488 (Dec. 13, 1974).) Although the Secretary is concerned that educational agencies and institutions not misapply § 99.31(a)(1), the changes to the regulations are necessary to clarify the scope of the "school officials" exception in FERPA.

We disagree with commenters that the requirement in § 99.31(a)(1)(i)(B)(*1*) that the outside party must perform an institutional service or function for which the agency or institution would otherwise use employees is too restrictive or unworkable. The requirement serves to ensure that the "school officials" exception does not expand into a general exception to the consent requirement in FERPA that would allow disclosure any time a vendor or other outside party wants access to education records to provide a product or service to schools, parents, and students. As explained in the preceding paragraphs and in the NPRM, 73 FR 15578–15579, the statutory basis for expanding the "school officials" exception to outside service providers is that they are "acting for" the agency or institution, not selling products and services. This means, for example, that a school may not use the "school officials" exception to disclose personally identifiable information from a student's education record, such as the student's SSN or student ID number,

without consent, to an insurance company that wishes to offer students a discount on auto insurance because the school is not outsourcing an institutional service or function for which it would otherwise use its own employees.

Further, the requirement that the outside party must be performing services or functions an employee would otherwise perform does not mean that a school employee must be able to perform the outsourced service in order for the outside party to be considered a school official under § 99.31(a)(1)(i)(B)(*1*). For example, many school districts outsource their legal services on an as-needed basis. Even though these school districts may have never hired an attorney as an employee, they may still disclose personally identifiable information from education records to outside legal counsel to whom they have outsourced their legal services. FERPA does not otherwise restrict whether a school may outsource institutional services and functions; it only addresses to whom and under what conditions personally identifiable information from students' education records may be disclosed.

Once a school has determined that an outside party is a "school official" with a "legitimate educational interest" in viewing certain education records, that party may have access to the education records, without consent, in order to perform the required institutional services and functions for the school. These outside parties may include parents and other volunteers who assist schools in various capacities, such as serving on official committees, serving as teachers' aides, and working in administrative offices, where they need access to students' education records to perform their duties.

The disclosure of education records under any of the conditions listed in § 99.31, including the "school officials" exception, is permissive and not required. (Only parents and eligible students have a right under FERPA to inspect and review their education records.) Therefore, schools should always use good judgment in determining the extent to which volunteers, as well as other school officials, need to have access to education records and to ensure that school officials, including volunteers, do not improperly disclose information from students' education records.

We decline to adopt commenters' suggestion that we include in § 99.31(a)(1)(i)(B) a list of the types of parties who may serve as school officials and receive personally identifiable information from education

records in connection with the institutional services and functions outsourced by the school. We think it would be impossible to provide a comprehensive listing and believe that agencies and institutions are in the best position to make these determinations. At the discretion of a school, school officials may include school transportation officials (including bus drivers), school nurses, practicum and fieldwork students, unpaid interns, consultants, contractors, volunteers, and other outside parties providing institutional services and performing institutional functions, provided that each of the requirements in § 99.31(a)(1)(i)(B) has been met.

Under § 99.31(a)(1), a university could outsource the practical training of students. The information disclosed to the hospital, clinic, or business conducting the practical training may only be used for the purposes for which it was disclosed. In the NPRM, we discuss in more detail the types of services and functions covered under § 99.31(a)(1)(i)(B). (73 FR 15578–15580.)

In response to the comment about the applicability of § 99.31(a)(1)(i)(B) to State educational authorities that operate State longitudinal data systems, such officials are not ''school officials'' under FERPA. Rather, these officials are generally considered authorized representatives of a State educational authority, and LEAs typically disclose information from students' education records to a longitudinal data system maintained by an SEA or other State educational authorities under the exception to the consent requirement for disclosures to authorized representatives of State and local educational authorities, § 99.31(a)(3)(iv)), not the ''school officials'' exception. This issue is explained in more detail elsewhere in this preamble under *Educational research (§§ 99.31(a)(6), 99.31(a)(3).* We also discuss disclosures to non-educational agencies, such as to public health agencies, in the section of this preamble entitled *Disclosure of Education Records to Non-Educational Agencies.*

Members of a school's *law enforcement unit,* as defined in § 99.8 of the regulations, who are employed by the agency or institution qualify as school officials under § 99.31(a)(1)(i)(A) if the school has complied with the notification requirements in § 99.7(a)(3)(iii). As school officials, they may be given access to personally identifiable information from those students' education records in which the school has determined they have legitimate educational interests. The

school's law enforcement unit must protect the privacy of education records it receives and may disclose them only with consent or under one of the exceptions to consent listed in § 99.31. For that reason, it is advisable that officials of a law enforcement unit maintain education records separately from law enforcement unit records, which are not subject to FERPA requirements. As we explained in *Balancing Student Privacy and School Safety: A Guide to the Family Educational Rights and Privacy Act for Elementary and Secondary Schools,* investigative reports and other records created by an institution's law enforcement unit are excluded from the definition of *education records* under § 99.3 and, therefore, are not subject to FERPA requirements. Accordingly, schools may disclose information from law enforcement unit records to anyone, including local police and other outside law enforcement authorities, without consent. This brochure can be found on FPCO's ''Safe Schools & FERPA'' Web page: *http://www.ed.gov/policy/gen/ guid/fpco/ferpa/safeschools/index.html.*

Outside police officers or other non-employees to whom the school has outsourced its safety and security functions do not qualify as ''school officials'' under FERPA unless they meet each of the requirements of § 99.31(a)(1)(i)(B). If these police officers or other outside parties do not meet the requirements for being a school official under FERPA, they may not have access to students' education records without consent, unless there is a health or safety emergency, a lawfully issued subpoena or court order, or some other exception to FERPA's general consent requirement under which the disclosure falls.

With respect to our amendment to the ''school officials'' exception, we note that § 99.32(d) excludes from the recordation requirements disclosures of education records that educational agencies and institutions make to school officials. This exclusion from the recordation requirement will apply as well to disclosures to contractors, consultants, volunteers, and other outside parties to whom an agency or institution discloses education records under § 99.31(a)(1)(i)(B). The Department has long recognized that FERPA does not prevent schools from outsourcing institutional services and functions; to require schools to record disclosures to these outside parties serving as school officials would be overly burdensome and unworkable.

An educational agency or institution that complies with the notification requirements in § 99.7(a)(3)(iii) by

specifying its policy regarding the disclosure of education records to contractors and other outside parties serving as school officials provides legally sufficient notice to parents and students regarding these disclosures. We have posted model notifications on our Web site, one for postsecondary institutions and one for LEAs. See *http://www.ed.gov/policy/gen/guid/ fpco/ferpa/ps-officials.html and http:// www.ed.gov/policy/gen/guid/fpco/ ferpa/lea-officials.html.*

*Changes:* None.

*(b) Direct Control*

*Comment:* Some commenters asked the Department to clarify what the term ''direct control'' means as used in § 99.31(a)(1)(i)(B)(*2*). This section provides that in order to be considered a ''school official'' an outside party must be under the direct control of the agency or institution. Some commenters asked if this term means that the school must monitor the operations of the outside party, and how it affects an agency's or institution's relationship with subcontractors or third- or fourth-party database hosting companies. One commenter stated that the regulations should not distinguish between whether the education records are hosted in a vendor's offsite network or within the institution's local network servers, while another commenter asked for clarification of how § 99.31(a)(1)(i)(B) applies to outsourcing electronic mail (e-mail) services to third parties such as Microsoft or Google.

One commenter stated that institutions should be required to verify that parties to whom they outsource services have the necessary resources to safeguard education records provided to them.

A commenter suggested that, instead of the proposed ''direct control'' standard, the Department adopt language similar to the safeguarding standard found in the Gramm-Leach-Bliley Act (GLB) (Pub. L. 106–102, November 12, 1999). The commenter suggested that, as adapted in FERPA, the standard would require that for an outside party, acting on behalf of an educational institution, to be considered a ''school official,'' the institution would have to: (1) Take reasonable steps to select and retain contractors, consultants, volunteers, or other outside parties that are capable of maintaining appropriate safeguards with respect to education records; and (2) mandate by contract that the outside party implement and maintain such safeguards.

*Discussion:* The term ''direct control'' in § 99.31(a)(1)(i)(B)(*2*), is intended to

ensure that an educational agency or institution does not disclose education records to an outside service provider unless it can control that party's maintenance, use, and redisclosure of education records. This could mean, for example, requiring a contractor to maintain education records in a particular manner and to make them available to parents upon request. We are revising the regulations, however, to provide this clarification.

Neither the statute nor the FERPA regulations specifically requires that educational agencies and institutions verify that outside parties to whom schools outsource services have the necessary resources to safeguard education records provided to them. However, as discussed in the NPRM, educational agencies and institutions are responsible under FERPA for ensuring that they themselves do not have a policy or practice of releasing, permitting the release of, or providing access to personally identifiable information from education records, except in accordance with FERPA. This includes ensuring that outside parties that provide institutional services or functions as "school officials" under § 99.31(a)(1)(i)(B) do not maintain, use, or redisclose education records except as directed by the agency or institution that disclosed the information.

The "direct control" requirement is intended to apply only to the outside party's provision of specific institutional services or functions that have been outsourced and the education records provided to that outside party to perform the services or function. It is not intended to affect an outside service provider's status as an independent contractor or render that party an employee under State or Federal law.

We believe that the use of the "direct control" standard strikes an appropriate balance in identifying the necessary and proper relationship between the school and its outside parties that are serving as "school officials." The recommendation that we adopt a standard more closely aligned with the GLB standard does not appear workable, especially with regard to requiring that schools enter into formal contracts with each outside party performing services, including parent-volunteers. However, one way in which schools can ensure that parties understand their responsibilities under FERPA with respect to education records is to clearly describe those responsibilities in a written agreement or contract.

Exercising direct control could prove more challenging in some situations than in others. Schools outsourcing information technology services, such as

web-based and e-mail services, should make clear in their service agreements or contracts that the outside party may not use or allow access to personally identifiable information from education records, except in accordance with the requirements established by the educational agency or institution that discloses the information.

*Changes:* We have revised § 99.31(a)(1)(B)(2) to clarify that the outside party must be under the direct control of the agency or institution with respect to the use and maintenance of information from education records.

*(c) Protection of Records by Outside Parties Serving as School Officials*

*Comment:* We received several comments on proposed § 99.31(a)(1)(i)(B)(3), which provides that an outside party serving as a "school official" is subject to the requirement in § 99.33(a), regarding the use and redisclosure of personally identifiable information from education records. One commenter stated that, while he supported and welcomed this clarification, the proposed regulations did not go far enough to clarify that these outside third parties could not use education records of multiple institutions for which they serve as a contractor to engage in activities not associated with the service or function they were providing.

Some commenters suggested that the regulations should require all school officials who handle education records, including parties to whom institutional services and functions are outsourced, to participate in annual training and to undergo fingerprint and background investigations.

Another commenter stated that any disclosures associated with the outsourcing of institutional services and functions should include a record that will serve as an audit trail. The commenter noted that both the Health Insurance Portability and Accountability Act (HIPAA) and the Privacy Act of 1974 require the maintenance of audit trails or an accounting of disclosures of records.

*Discussion:* An agency or institution must ensure that an outside party providing institutional services or functions does not use or allow access to education records except in strict accordance with the requirements established by the educational agency or institution that discloses the information. Section 99.33(a)(2) of the FERPA regulations applies to employees and outside service providers alike and prohibits the recipient from using education records for any purpose other than the purposes for which the

disclosure was made. This includes ensuring that outside parties do not use education records in their possession for purposes other than those specified by the institution that disclosed the records.

FERPA does not specifically require that educational agencies and institutions provide annual training to school officials that handle education records, and we decline to establish such a requirement in these regulations. Educational agencies and institutions should have flexibility in determining the best way to ensure that school officials are made aware of the requirements of FERPA. However, for entities subject to the Individuals with Disabilities Education Act (IDEA), 34 CFR 300.623(c) provides that all persons collecting or using personally identifiable information must receive training or instruction regarding their State's policies and procedures under 34 CFR 300.123 (Confidentiality of personally identifiable information) and 34 CFR Part 99, the FERPA regulations. We note that while schools are certainly free to implement a policy requiring school officials and parties to whom services have been outsourced to undergo fingerprint and background investigations, there is no statutory authority in FERPA to include such a requirement in the regulations.

We note also that the Department routinely provides compliance training on FERPA for school officials. Typically, presentations are made throughout the year to national, regional, or State educational association conference workshops with numerous institutions in attendance. Training sessions are also scheduled for State departments of education and local school districts in the vicinity of any conference.

For a discussion of the comment that recommended that the regulations require that schools maintain an audit trail or an accounting of disclosures to school officials, including outside providers, see the discussion under the following section entitled *Control of Access to Education Records by School Officials.*

*Changes:* None.

**Control of Access to Education Records by School Officials (§ 99.31(a)(1)(ii))**

*Comment:* Many commenters supported proposed § 99.31(a)(1)(ii), which requires an educational agency or institution to use reasonable methods to ensure that school officials have access to only those education records in which the official has a legitimate educational interest. In this section, we also proposed that an educational

agency or institution that does not use physical or technological access controls must ensure that its administrative policy for controlling access to education records is effective and that it remains in compliance with the "legitimate educational interest" requirement.

One commenter who supported the proposed regulations expressed concern that not all districts and institutions have the financial or technological resources to create or purchase an electronic system that provides fully automated access control and that an institution using only administrative controls would be required to demonstrate that each school official who accessed education records possessed a legitimate educational interest in the education records to which the official gained access. According to the commenter, the regulations seem to allow the "reasonable methods" concept for those schools that utilize administrative controls rather than physical or technological controls. The commenter was concerned that smaller schools that lack resources to create or purchase a system that fully monitors record access would be disadvantaged by having to meet a higher standard of ensuring a legitimate educational interest on the part of the school officials that access the records.

One commenter expressed concern that the standard in § 99.31(a)(1)(ii) is too restrictive and asked whether the Department would use flexibility and deference in taking into consideration an institution's efforts in compliance with the requirement.

Another commenter requested that we include in the regulations a requirement that contractors hosting data at offsite locations must institute effective access control measures. The commenter stated that many schools and contractors are uncertain as to whether the school or the contractor is responsible for ensuring that access controls are applied to data hosted by contractors.

One commenter stated that the regulations created an unnecessary burden, as school districts already do their best to comply with FERPA and an occasional mistake should be excused. The commenter, however, was pleased that the regulations do not require the use of technological controls. The commenter was concerned that schools are unable to pre-assign risk levels to categories of records in order to determine appropriate methods to mitigate improper access. The commenter supported the use of effective administrative controls as determined by a district to ensure that

information is available only to those with a legitimate educational interest.

One commenter expressed concern that the requirement to use reasonable methods to ensure appropriate access was not sufficiently restrictive, because under the regulations, all volunteers would be designated as school officials. The commenter believed that the regulations would enable volunteers to gain access more easily to confidential and sensitive information in education records.

A commenter who is a parent of a special education student also expressed concern that the language in the regulations was not adequate. The commenter described a software package used by her district that permits all school officials unrestricted access to the IEPs of all special education students.

*Discussion:* Section 99.30 requires that a parent or eligible student provide written consent for a disclosure of personally identifiable information from education records unless the circumstances meet one of the exceptions to consent, such as the release of information to a school official with a legitimate educational interest. Thus, a district or institution that makes a disclosure solely on the basis that the individual is a school official violates FERPA if it does not also determine that the school official has a legitimate educational interest. The regulations in § 99.31(a)(1)(ii) are designed to clarify the responsibility of the educational agency or institution to ensure that access to education records by school officials is limited to circumstances in which the school official possesses a legitimate educational interest.

We believe that the standard of "reasonable methods" is sufficiently flexible to permit each educational agency or institution to select the proper balance of physical, technological, and administrative controls to effectively prevent unauthorized access to education records, based on their resources and needs. In order to establish a system driven by physical or technological access controls, a school would generally first determine when a school official has a legitimate educational interest in education records and then determine which physical or technological access controls are necessary to ensure that the official can access only those records. The regulations require a school that uses only administrative controls to ensure that its administrative policy for controlling access to education records is effective and that the school is in compliance with the legitimate

educational interest requirement in § 99.31(a)(1)(i)(A). However, the "reasonable methods" standard applies whether the control is physical, technological, or administrative.

The regulations permit the use of a variety of methods to protect education records, in whatever format, from improper access. The Department expects that educational agencies and institutions will generally make appropriate choices in designing records access controls, but the Department reserves the right to evaluate the effectiveness of those efforts in meeting statutory and regulatory requirements.

The additional language that one commenter requested concerning outsourcing is already included in the regulations in § 99.31(a)(1). That section specifically provides that contractors are subject to the same conditions governing the access and use of records that apply to other school officials. As long as those conditions are met, the physical location in which the contractor provides the service is not relevant.

Because the regulations permit the use of a variety of methods to effectively reduce the risk of unauthorized access to education records, we do not believe the requirement to establish "reasonable methods" for controlling access is unduly burdensome. Schools have the flexibility to decide the method or methods best suited to their own circumstances. For the many schools, districts, and institutions that already meet the standard, no operational changes should be necessary.

The regulations do not designate all volunteers as school officials. Rather, the regulations clarify that schools may designate volunteers as school officials who may be provided access to education records only when the volunteer has a legitimate educational interest. Schools can and should carefully assess and limit access by any school official, including volunteers. This issue is discussed in more detail previously in this preamble under the section entitled *Outsourcing.*

With regard to the parent who expressed concern that the language in the regulations was not adequate to address the problem of software that permits all school officials to access the IEPs of all special education students, we believe that the language in § 99.31(a)(1)(ii) is sufficient. As previously noted, FERPA prohibits school officials from having access to education records unless they have a legitimate educational interest. The commenter's point illustrates the need for educational agencies and institutions to ensure that adequate controls are in

place to restrict access to education records only to a school official with a legitimate educational interest.

*Changes:* None.

**Transfer of Education Records to Student's New School (§§ 99.31(a)(2) and 99.34(a))**

*Comment:* All of the comments we received on proposed §§ 99.31(a)(2) and 99.34(a) supported the clarification that an educational agency or institution may disclose a student's education records to officials of another school, school system, or institution of postsecondary education not just when the student seeks or intends to enroll, but after the student is already enrolled, so long as the disclosure is for purposes related to the student's enrollment or transfer. Some commenters noted that this clarification reduces legal uncertainty about how long a school may continue to send records or information to a student's new school; other commenters noted that this clarification will be helpful in serving students who are homeless or in foster care because these students are often already enrolled in a new school system while waiting for records from a previous enrollment.

A few commenters asked us to clarify the requirement that the disclosure must be for purposes related to the student's enrollment or transfer. The commenters asked whether this meant that only records specifically related to the new school's decision to admit the student or records related to the transfer of course credit could be disclosed, or whether the agency or institution could also disclose information about previously undisclosed disciplinary actions related to the student's ongoing attendance at the new institution. One commenter suggested that we remove the requirement that the disclosure must be for purposes of the student's enrollment or transfer because it was confusing and unnecessary. Some commenters asked the Department to provide guidance about the types of records that may be sent under the regulations to a student's new school, noting that the preamble to the NPRM stated that the regulations allow school officials to disclose any and all education records, including health and disciplinary records, to the new school (73 FR 15581).

One commenter asked us to clarify that any school, not just the school the student attended most recently, may disclose information from education records to the institution that the student currently attends. Another commenter asked whether the amended regulations would permit the disclosure of education records to an institution in which a student seeks information or services but not enrollment, such as when a charter school student requests an evaluation under the IDEA from the student's home school district.

Two commenters asked whether mental health and other treatment records of postsecondary students, which are excluded from the definition of *education records* under FERPA, could be disclosed to the new school. Other commenters asked whether FERPA places any limits on the transfer of information about student disciplinary actions to colleges and universities and what information a postsecondary institution may ask for and receive regarding a student's disciplinary actions. A few commenters asked us to address the relationship between these regulations and guidance issued by the Department's Office for Civil Rights (OCR) prohibiting the pre-admission release of information about a student's disability under section 504 of the Rehabilitation Act of 1973, as amended, and Title II of the Americans with Disabilities Act of 1990, as amended.

*Discussion:* The regulations are intended to eliminate uncertainty about whether, under § 99.31(a)(2), an educational agency or institution may send education records to a student's new school even after the student is already enrolled and attending the new school. The requirement that the disclosure must be for purposes related to the student's enrollment or transfer is not intended to limit the kind of records that may be disclosed under this exception. Instead, the regulations are intended to clarify that, after a student has already enrolled in a new school, the student's former school may disclose any records or information, including health records and information about disciplinary proceedings, that it could have disclosed when the student was seeking or intending to enroll in the new school.

These regulations apply to any school that a student previously attended, not just the school that the student attended most recently. For example, under § 99.31(a)(2), a student's high school may send education records directly to a graduate school in which the student seeks admission, or is already enrolled. Section 99.34(b), which explains the conditions that apply to the disclosure of information to officials of another school, school system, or postsecondary institution, allows a public charter school or other agency or institution to disclose the education records of one of its students in attendance to the student's home school district if the student receives or seeks to receive services from the home school district, including an evaluation under the IDEA. We note, however, that the confidentiality of information regulations under Part B of the IDEA contain additional consent requirements that may also apply in these circumstances.

Under section 444(a)(4)(B)(iv) of FERPA, 20 U.S.C. 1232g(a)(4)(B)(iv), medical and psychological treatment records of eligible students are excluded from the definition of *education records* if they are made, maintained, and used only in connection with treatment of the student and disclosed only to individuals providing the treatment, including treatment providers at the student's new school. (While the comment concerned records of postsecondary students, we note that the treatment records exception to the definition of *education records* applies also to any student who is 18 years of age or older, including 18 year old high school students.) An educational agency or institution may disclose an eligible student's treatment records to the student's new school for purposes other than treatment provided that the records are disclosed under one of the exceptions to written consent under § 99.31(a), including § 99.31(a)(2), or with the student's written consent under § 99.30. If an educational agency or institution discloses an eligible student's treatment records for purposes other than treatment, the treatment records are no longer excluded from the definition of *education records* and are subject to all other FERPA requirements, including the right of the eligible student to inspect and review the records and to seek to have them amended under certain conditions. In practical terms, this means that an agency or institution may disclose an eligible student's treatment records to the student's new school either with the student's written consent, or under one of the exceptions in § 99.31(a), including § 99.31(a)(2), which permits disclosure to a school where a student seeks or intends to enroll, or where the student is already enrolled so long as the disclosure is for purposes related to the student's enrollment or transfer.

FERPA does not contain any particular restrictions on the disclosure of a student's disciplinary records. Further, Congress has enacted legislation to ensure that schools transfer disciplinary records to a student's new school in certain circumstances. In particular, section 444(h) of the statute, 20 U.S.C. 1232g(h), and the implementing regulations in § 99.36(b) provide that nothing in FERPA prevents an educational agency

or institution from including in a student's records and disclosing to teachers and school officials, including those in other schools, appropriate information about disciplinary actions taken against the student for conduct that posed a significant risk to the safety or well-being of that student, other students, or other members of the school community. This authority is in addition to any other authority in FERPA for the disclosure of education records without consent, including the authority under § 99.36(a) to disclose education records in connection with a health or safety emergency. In addition, section 4155 of the Elementary and Secondary Education Act of 1965 (ESEA), 20 U.S.C. 7165, as amended by the No Child Left Behind Act of 2001 (NCLB), requires a State that receives funds under the ESEA to have a procedure in place to facilitate the transfer of disciplinary records, with respect to a suspension or expulsion, by LEAs to any private or public elementary school or secondary school for any student who is enrolled or seeks, intends, or is instructed to enroll, on a full-or part-time basis, in the school.

There are, however, other Federal laws, such as the IDEA, section 504 of the Rehabilitation Act of 1973, as amended (Rehabilitation Act), and Title II of the Americans with Disabilities Act of 1990, as amended (ADA), with different requirements that may affect the release of student information. For example, educational agencies and institutions that are "public agencies" or "participating agencies" under the IDEA must comply with the requirements in the Part B confidentiality of information regulations. *See, e.g.,* 34 CFR 300.622(b)(2) and (3). By way of further illustration, because educational agencies and institutions receive Federal financial assistance, they must comply with the regulations implementing section 504 of the Rehabilitation Act, which generally prohibit postsecondary institutions from making pre-admission inquiries about an applicant's disability status. See 34 CFR 104.42(b)(4) and (c). However, after admission, in connection with an emergency and if necessary to protect the health or safety of a student or other persons as defined under FERPA and its implementing regulations, section 504 of the Rehabilitation Act and Title II of the ADA do not prohibit postsecondary institutions from obtaining information and education records concerning a current student, including those with disabilities, from any school previously attended by the student. See the

discussion in the section entitled *Health or Safety Emergency (§ 99.36).*

*Changes:* None.

### Ex Parte Court Orders Under the USA Patriot Act (§ 99.31(a)(9))

*Comment:* Two commenters expressed support for the proposed regulations, which incorporate statutory changes that allow an educational agency or institution to comply with an *ex parte* court order issued under the USA Patriot Act. One commenter said that it would be helpful to add to the regulations a statement from the preamble to the NPRM that an institution is not responsible for determining the relevance of the information sought or the merits of the underlying claim for the court order.

Several commenters opposed § 99.31(a)(9). One commenter said that the USA Patriot Act is unconstitutional and that its provisions will sunset in 2009. Another commenter said that the regulations harm its ability to preserve the confidentiality of education records, particularly those of foreign students. The commenter asked us to change the regulations to permit institutions to notify students when records are requested, unless the *ex parte* court order specifically states that the student should not be notified. Another commenter said that schools should be required to notify parents when records are requested and to record the disclosure.

*Discussion:* The USA Patriot Act amendments to FERPA have not been ruled unconstitutional, and its provisions relevant to FERPA do not sunset in 2009. Therefore, we are implementing these provisions in our regulations at this time.

Under the USA Patriot Act, the U.S. Attorney General, or a designee in a position not lower than an Assistant Attorney General, may apply for an *ex parte* court order to collect, retain, disseminate, and use certain education records in the possession of an educational agency or institution without regard to any other FERPA requirements, including in particular the recordkeeping requirements. 20 U.S.C. 1232g(j)(3) and (4). The USA Patriot Act amendments to FERPA also provide that an educational agency or institution that complies in good faith with the court order is not liable to any person for producing the information. Nothing in these amendments, including the "good faith" requirement, requires an educational agency or institution to evaluate the underlying merits or legal sufficiency of the court order before disclosing the requested information without consent. As with

any court order or subpoena that forms the basis of a disclosure without consent under § 99.31(a)(9), the agency or institution must simply determine whether the *ex parte* court order is facially valid. We see no reason to include this general requirement in the regulations.

Section 99.31(a)(9)(ii) requires an agency or institution to make a reasonable effort to notify a parent or eligible student of a judicial order or lawfully issued subpoena in advance of compliance, except for certain law enforcement subpoenas if the court has ordered the agency or institution not to disclose the existence or contents of the subpoena or information disclosed. An *ex parte* order is by definition an order issued without notice to or argument from the other party, including the party whose education records are sought, and the USA Patriot Act amendments provide that the Attorney General may collect and use the records without regard to any FERPA requirements, including the recordation requirements. Under this statutory authority, the regulations properly provide that the agency or institution is not required to notify the parent or eligible student before complying with the order or to record the disclosure.

We do not agree with the commenter's request that we amend the regulations to allow agencies and institutions to notify parents and students and record these disclosures. We note that FERPA does not prohibit an educational agency or institution from notifying a parent or student or recording a disclosure made in compliance with an *ex parte* court order under the USA Patriot Act. However, an agency or institution that does so may violate the terms of the court order itself and may also fail to meet the good faith requirements in the USA Patriot Act for avoiding liability for the disclosure. We would also recommend that agencies and institutions consult with legal counsel before notifying a parent or student or recording a disclosure of education records made in compliance with an *ex parte* court order under the USA Patriot Act.

*Changes:* None.

### Registered Sex Offenders (§ 99.31(a)(16))

*Comment:* One commenter asked for clarification whether the proposed regulations authorizing the disclosure of personally identifiable information from education records concerning registered sex offenders authorize only the disclosure of information that is received from local law enforcement officials, or whether disclosure could

also include other information from a student's education records, such as campus of attendance. A second commenter expressed appreciation that the regulations clarify that school districts are not required or encouraged to collect or maintain information on registered sex offenders and that these disclosures are permissible but not required.

*Discussion:* The Campus Sex Crimes Prevention Act (CSCPA) amendments to FERPA allow educational agencies and institutions to disclose any information concerning registered sex offenders provided to the agency or institution under section 170101 of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. 14071, commonly known as the Wetterling Act. Since publication of the NPRM, we have determined that the proposed regulations were confusing, because they limited these disclosures to information that was obtained and disclosed by an agency or institution in compliance with a State community notification program. In fact, the CSCPA amendments to FERPA cover any information provided to an educational agency or institution under the Wetterling Act, including not only information provided under general State community notification programs, which are required under subsection (e) of the Wetterling Act, 42 U.S.C. 14071(e), but also information provided under the more specific campus community notification programs for institutions of higher education, which are required under subsection (j), 42 U.S.C. 14071(j).

The Wetterling Act requires States to release relevant information about persons required to register as sex offenders that is necessary to protect the public, including specific State reporting requirements for law enforcement agencies having jurisdiction over institutions of higher education. The exception to the consent requirement in FERPA allows educational agencies and institutions to make available to the school community any information provided to it under the Wetterling Act. We interpret this to also include any additional information about the student that is relevant to the purpose for which the information was provided to the educational agency or institution—protecting the public. This could include, for example, the school or campus at which the student is enrolled.

The proposed regulations included a sentence stating that FERPA does not require or encourage agencies or institutions to collect or maintain information about registered sex

offenders. We have determined through further review, however, that this sentence could be confusing and should be removed. Participating institutions are required under section 485(f)(1) of the Higher Education Act of 1965, as amended, 20 U.S.C. 1092(f)(1), to advise the campus community where it may obtain law enforcement agency information provided by the State under 42 U.S.C. 14071(j) concerning registered sex offenders. Further, the Department does not wish to discourage educational agencies and institutions from disclosing relevant information about a registered sex offender in appropriate circumstances.

*Changes:* We have revised the regulations to remove the reference to the disclosure of information obtained by the educational agency or institution in compliance with a State community notification program. The regulations now simply allow disclosure without consent of any information concerning registered offenders provided to an educational agency or institution under 42 U.S.C. 14071 and applicable Federal guidelines. We also have removed the sentence stating that neither FERPA nor the regulations requires or encourages agencies or institutions to collect or maintain information about registered sex offenders.

**Redisclosure of Education Records and Recordkeeping by State and Local Educational Authorities and Federal Officials and Agencies (§§ 99.31(a)(3); 99.32(b); 99.33(b); 99.35(a)(2); 99.35(b))**

*(a) Redisclosure*

*Comment:* We received a number of comments on the proposed changes in § 99.35(b) that would permit State and local educational authorities and Federal officials and agencies listed in § 99.31(a)(3) to redisclose personally identifiable information from education records on behalf of educational agencies and institutions without parental consent under the existing redisclosure authority in § 99.33(b). (Section 99.33(b) allows an educational agency or institution to disclose personally identifiable information from education records with the understanding that the recipient may make further disclosures of the information on behalf of the agency or institution if the disclosure falls under one of the exceptions in § 99.31(a) and the agency or institution has complied with the recordation requirements in § 99.32(b).) Many commenters said that the proposed change would ease administrative burdens on State and local educational authorities, agencies, and institutions. For example, under the

proposed regulations, a student's new school district or institution would be able to obtain the student's prior education records from a single State agency instead of contacting and waiting for records from separate districts or institutions. Commenters noted, however, that certain issues had not been addressed in the proposed regulations and that further clarification was required. Commenters also supported the new redisclosure authority to the extent that it facilitates the exchange of education records among State educational authorities, educational agencies and institutions, and educational researchers through consolidated, statewide systems or separate data sharing arrangements.

Two commenters expressed substantial concerns that the regulations inappropriately expanded the situations in which personally identifiable information could be redisclosed without parental or student consent. One commenter noted that the theoretical benefits of maintaining large, consolidated data systems, which allow users to track individual students over time, do not outweigh the need to protect individual privacy. Another commenter stated that the regulations should not allow State and local educational authorities and the Federal officials and agencies listed in § 99.31(a)(3) to set up and operate record systems containing personally identifiable information that parents and students have no right to review or amend, and may not even know about. Barring the withdrawal of these regulations, these commenters urged the Department to strengthen or at least preserve the safeguards and protections that accompany this new data sharing authority. One commenter asked us to require any State or Federal entity that maintains education records to provide parents and students with annual notification and the right to review and amend the students' records.

Many commenters indicated their strong support for allowing State educational authorities to respond to requests for information from education records and redisclose personally identifiable information, whether for data sharing systems, transferring records to a student's new school, or other purposes authorized under § 99.31(a), without involving school districts and postsecondary institutions. These commenters generally thought that State educational authorities and Federal officials listed in § 99.31(a)(3) should not be required to consult with educational agencies and institutions when redisclosing information from education records. One commenter

asked us to clarify the role of the SEA or other State educational authority as the custodian of education records and its authority to act for educational agencies and institutions. Several commenters urged us to revise the regulations to make clear that the redisclosing official is authorized to make further disclosures under § 99.31(a) without approval from, or further consultation with, the original source of the records and maintain the appropriate record related to the redisclosure.

One commenter said that the regulations must allow State educational authorities to transfer records on behalf of LEAs and postsecondary institutions. One commenter strongly supported the changes in § 99.35(b) because they would allow the State McKinney-Vento coordinator to control transfer of education records of abused and homeless students to their new schools and prevent potential abusers from locating the student.

Some commenters believed that current regulations impede the ability of States to establish and operate data sharing systems and that regulatory changes must allow all educational agencies, institutions, SEAs, and other State educational authorities to exchange data among themselves and work with researchers. One commenter recommended that we create a specific exception in § 99.31(a) that would allow data sharing across State educational authorities in order to establish and operate consolidated, longitudinal data systems.

Several commenters asked for clarification of the requirement in § 99.35(a)(2) that authority for an agency or official listed in § 99.31(a)(3) to conduct an audit, evaluation, or compliance or enforcement activity is not conferred by FERPA or the regulations and must be established under other Federal, State, or local law, including valid administrative regulations. One commenter supported data sharing among pre-school, K–12, and postsecondary institutions, provided that appropriate legal authority for the underlying audit, evaluation, or compliance and enforcement activity is established as required under § 99.35(a)(2). One commenter asked whether citation to a specific law or regulations will be required, or whether general State laws that provide joint authority to evaluate programs at all levels is sufficient for parties to enter into data sharing agreements under the regulations.

One commenter indicated that its State has no laws or regulations that specifically allow the State-level advisory council to audit or evaluate education programs, or that allow a K–12 school district to audit or evaluate the programs offered by postsecondary institutions, and vice versa, and the commenter asked whether general authority for these entities to act under State law would be sufficient. Two commenters whose States do not house their K–12 and postsecondary systems within the same agency expressed concern whether they will be able to develop consolidated databases under the regulations if their K–12 and postsecondary agencies do not have appropriate authority to audit or evaluate each other's programs.

*Discussion:* We continue to believe that State and local authorities and Federal officials that receive education records under §§ 99.31(a)(3) and 99.35 should be permitted to redisclose education records on behalf of educational agencies and institutions in accordance with the existing regulations governing the redisclosure of information in § 99.33(b). We agree with the commenters that this change will ease administrative burdens at all levels and facilitate the creation and operation of statewide data sharing systems that support the student achievement, program accountability, transfer of records, and other objectives of Federal and State education programs while protecting the privacy rights of parents and students in students' education records.

We respond first to commenters' concerns about the requirement in § 99.33(b) that any redisclosure of personally identifiable information from education records must be made on behalf of the educational agency or institution that disclosed the information to the receiving party, including any requirement for consulting with or obtaining approval from the educational agency or institution that disclosed the information. The statutory prohibitions on the redisclosure of education records apply to education records that SEAs, State higher educational authorities, the Department, and other Federal officials receive under an exception to the written consent requirement in FERPA, such as §§ 99.31(a)(3) and 99.35 (for audit, evaluation, compliance and enforcement purposes) and § 99.31(a)(4) (for financial aid purposes). As explained in the preamble to the NPRM, § 99.33(b) allows an educational agency or institution to disclose education records with the understanding that the recipient may make further disclosures on its behalf under one of the exceptions in § 99.31 (73 FR 15586–15587). In that case, the disclosing agency or institution must record the names of the additional parties to which the receiving party may redisclose the information on behalf of the educational agency or institution and their legitimate interests under § 99.31.

Under the regulatory framework for redisclosing education records in § 99.33(b), educational agencies and institutions retain primary responsibility for disclosing and authorizing redisclosure of their education records without consent. (We note again that the only disclosures of education records that are mandatory under FERPA are those made to parents and eligible students.) The purpose of § 99.33(b), which allows redisclosure of education records notwithstanding the general statutory restrictions, has always been to ease administrative burdens on educational agencies and institutions that disclose education records. The legal basis for this accommodation is that the recipient is acting "on behalf of" the agency or institution from which it received information from education records and making a further disclosure that the agency or institution would otherwise make itself under § 99.31(a). Section 99.33(b) does not confer on any recipient of education records independent authority to redisclose those records apart from acting "on behalf of" the disclosing educational agency or institution.

The Department recognizes that the State and local educational authorities and Federal officials that receive education records without consent under § 99.31(a)(3) are responsible for supervising and monitoring educational agencies and institutions and that many of them also maintain centralized data systems that constitute a valuable resource of information from education records. The proposed changes to § 99.35(b) would allow these State and Federal authorities and officials to redisclose information received under § 99.31(a)(3) under any of the exceptions in § 99.31(a), including transferring education records to a student's new school under § 99.31(a)(2), sharing information among other State and local educational authorities and Federal officials for audit or evaluation purposes under § 99.31(a)(3), and using researchers to conduct evaluations and studies under § 99.31(a)(3) or § 99.31(a)(6), without violating the statutory prohibitions on redisclosing education records provided certain conditions have been met. In the event that an educational agency or institution objects to the redisclosure of information it has provided, the State or

local educational authority or Federal official or agency may rely instead on any independent legal authority it has to further disclose the information.

We agree that current regulations were unclear about the ability of States to establish and operate data sharing systems with educational agencies and institutions, which is why we amended § 99.35(b). As explained in the NPRM (73 FR 15587), §§ 99.35(a)(2) and 99.35(b) allow SEAs, higher education authorities, and educational agencies and institutions, including local school districts and postsecondary institutions, to share education records in personally identifiable form with one another, provided that Federal, State, or local law authorizes the recipient to conduct the audit, evaluation, or compliance or enforcement activity in question. Accordingly, data sharing arrangements among State and local educational authorities and educational agencies and institutions generally must meet these requirements to be permissible under FERPA. (Data sharing with educational researchers is discussed below under *Educational research*.)

With respect to the comments recommending that we create a specific exception in § 99.31(a) to allow data sharing across State educational authorities in order to establish and operate consolidated, longitudinal data systems and other data sharing arrangements, there is no provision in FERPA that allows disclosure or redisclosure of education records, without consent, for the specific purpose of establishing and operating consolidated databases and data sharing systems, and, therefore, we are without authority to establish one in these regulations.

In response to the questions concerning the need for Federal, state, or local legal authority to disclose education records for audit or evaluation purposes, we note that, in general, FERPA allows educational agencies and institutions to disclose (and authorized recipients to redisclose) education records without consent in accordance with the exceptions listed in § 99.31(a), including for audit or evaluation purposes under §§ 99.31(a)(3) and 99.35. It does not, however, provide the underlying authority for individuals and organizations to conduct the various activities that may allow them to receive education records without consent under these exceptions. For example, § 99.31(a)(7) does not authorize an organization to accredit educational institutions; it allows educational institutions to disclose personally identifiable information from education

records, without consent, to an organization to carry out its accrediting functions. If that organization is not, in fact, an accreditation authority for that particular institution, then disclosure under § 99.31(a)(7) is invalid and violates FERPA. Likewise, § 99.31(a)(9) does not authorize a court or Federal grand jury to issue an order or subpoena; it allows an educational agency or institution to comply with a facially valid order or subpoena, without consent.

We added the requirement in § 99.35(a)(2) that the recipient have authority under Federal, State, or local law to conduct the activity for which the disclosure was made because there was significant confusion in the educational community about who may receive education records without consent for audit and evaluation purposes under § 99.35. For example, in 2005 the Pennsylvania Department of Education (PDOE) asked the Department whether, in the absence of parental consent, a charter school LEA responsible under State law for providing a free appropriate public education to students with disabilities enrolled in the charter school could send the local school district of residence the IEP of each student with a disability. The school districts of residence claimed that they needed this information to substantiate the charter school's invoices for higher payments based on the student's special education status under the IDEA.

Our January 2006 response to PDOE explained that in order to meet the requirements for disclosure of education records under §§ 99.31(a)(3) and 99.35, Federal, State, or local law (including valid administrative regulations) must authorize the relevant State or local educational authority to conduct the audit, evaluation, or compliance or enforcement activity in question. In particular, we noted that charter schools in Pennsylvania could disclose the IEP cover sheet under §§ 99.31(a)(3) and 99.35 of the regulations if the State law in question authorized a local school district to ''audit or evaluate'' a charter school's request for payment of State funds at the special education rate and the school district needed personally identifiable information for that purpose, and that we would defer to the State Attorney General's interpretation of State law on the matter. We also explained that there appeared to be no legal authority that would allow charter schools in the State to disclose a student's entire IEP to the resident school district, as requested by the resident school districts.

The Department has always interpreted §§ 99.31(a)(3) and 99.35 to allow educational agencies and institutions to disclose personally identifiable information from education records to the SEA or State higher education board or commission responsible for their supervision based on the understanding that those entities are authorized to audit or evaluate (or enforce Federal legal requirements related to) the education programs provided by the agencies and institutions whose records are disclosed. Under this reasoning, a K–12 school district (LEA) may disclose personally identifiable information from education records to another LEA, or to a State higher education board or commission, without consent, if that LEA, board, or commission has legal authority to conduct the audit, evaluation, or compliance or enforcement activity with regard to the disclosing district's programs. States do not have to house their K–12 or P–12 and postsecondary systems within the same agency in order to take advantage of this provision. However, they may need to review and modify the supervisory and oversight responsibilities of various State and local educational authorities to ensure that there is valid legal authority for LEAs, postsecondary institutions, SEAs, and higher education authorities to disclose or redisclose personally identifiable information from education records to one another under § 99.35(a) before information is released.

It is not our intention in § 99.35(a)(2) to require educational agencies and institutions and other parties to identify specific statutory authority before they disclose or redisclose education records for audit or evaluation purposes but to ensure that some local, State, or Federal legal authority exists for the audit or evaluation, including for example an Executive Order or administrative regulation. The Department encourages State and local educational authorities and educational agencies and institutions to seek guidance from their State attorney general on their legal authority to conduct a particular audit or evaluation. The Department may also provide additional guidance, as appropriate.

*Changes:* None.

*(b) Recordation Requirements*

*Comment:* In the NPRM, 73 FR 15587, we invited public comment on whether an SEA, the Department, or other official or agency listed in § 99.31(a)(3) should be allowed to maintain the record of the redisclosures it makes on behalf of an educational agency or

institution as a means of relieving any administrative burdens associated with recording disclosures of education records. One commenter urged the Department not to delegate responsibility for recordkeeping to State and local educational authorities and Federal agencies and officials that redisclose education records under § 99.33(b). Another said that if a State or local educational authority or Federal agency or official rediscloses information ''on behalf of'' an educational agency or institution under § 99.35(b), these further disclosures should be included in the student's record at the educational agency or institution. All other comments on this issue supported revising the regulations to allow State and local educational authorities and Federal officials and agencies listed in § 99.31(a)(3) to record any redisclosures they make under § 99.33(b).

Several commenters suggested that the recordation requirements in § 99.32(b) would place an undue burden on State and local officials when State educational authorities redisclose education records because the State authority would need to return to each original source of the records to record the redisclosure. Some commenters noted that compliance with § 99.32(b) is practically impossible if an LEA or postsecondary institution is required to record all authorized redisclosures at the time of the initial disclosure of information to the State or Federal authority. Two commenters suggested that we eliminate the recordation problem by redefining the term *disclosure* so that it does not include disclosing information under § 99.31(a)(3) for audit, evaluation, or compliance and enforcement purposes. Another commenter suggested that we define ''*educational agency or institution*'' to include State educational authorities so that disclosures to State educational authorities would not be considered a *disclosure* under FERPA.

One commenter said that the regulations should permit State educational authorities to record redisclosures as they are made and without having to identify each student by name. Another commenter asked for clarification whether the recordation requirements apply to redisclosures that SEAs make to education researchers and other parties that are not authorized to make any further disclosures, and what level of detail is required in the record regarding who accessed the data and what specific information was viewed.

One commenter stated that if State educational authorities and Federal officials are authorized to record their own redisclosures of information, then the educational agency or institution should be required to retrieve these records in response to a request to review education records by parents and eligible students who would otherwise not know about the redisclosures. Other commenters suggested that the State educational authority or Federal official could either make the redisclosure record available directly to parents and students or send it to the LEA or postsecondary institution for this purpose.

*Discussion:* We agree with commenters that in order to facilitate the operation of State data systems and ease administrative burdens on all parties, the regulations should allow State educational authorities and Federal officials and agencies to record further disclosures they make on behalf of educational agencies and institutions under § 99.33(b). We are revising the provisions of § 99.32 to address commenters' concerns and ensure that these changes will not expand the redisclosure authority of a State or local educational authority or Federal official or agency under § 99.35(b) and that parents and students will have notice of and access to any State or Federal record of further disclosures that is created.

In response to the commenter's suggestion that we define ''educational agency or institution'' and the term *disclosure* to address recordation issues associated with the new redisclosure authority in § 99.35(b), we note that an educational agency or institution is required by statute to maintain with each student's education records a record of each request for access to and each disclosure of personally identifiable information from the education records of the student, including the parties who have requested or received information and their legitimate interests in the information. 20 U.S.C. 1232g(b)(4)(A); 34 CFR 99.32(a). This includes each disclosure of personally identifiable information from education records that an educational agency or institution makes to an SEA or other State educational authority and to Federal officials and agencies, including the Department, for audit, evaluation, or compliance and enforcement purposes under §§ 99.31(a)(3) and 99.35, and under most other FERPA exceptions, such as the financial aid exception in § 99.31(a)(4). (Regulatory exceptions to the statutory recordation requirements, which are set forth in § 99.32(d), cover disclosures that a parent or eligible student would generally know about without the recordation or for which

notice is prohibited under court order; the exceptions do not include disclosures made to parties outside the agency or institution for audit, evaluation, or compliance and enforcement purposes.)

An educational agency or institution is required under FERPA to record its disclosures of personally identifiable information from education records even when it discloses information to another educational agency or institution, such as occurs under § 99.31(a)(2) when a school district transfers education records to a student's new school. See 20 U.S.C. 1232g(b)(4)(A); 34 CFR 99.32(a). Therefore, even if a State educational authority were considered an ''educational agency or institution'' under § 99.1, a school district or postsecondary institution would still be required to record its own disclosures to that State educational authority; defining a State educational authority as an educational agency or institution would not eliminate this requirement. Therefore, a school district or postsecondary institution is required to record its disclosures to any State educational authority.

The term *disclosure* is defined in § 99.3 to mean to permit access to or the release, transfer, or other communication of personally identifiable information contained in education records to any party, by any means, including oral, written, or electronic means. This includes releasing or making a student's education records available to school officials within the agency or institution, for which an exception to the consent requirement exists under § 99.31(a)(1). We see no legal basis for redefining the term *disclosure* to exclude the release of personally identifiable information to third parties outside the educational agency or institution under the audit, evaluation, or compliance and enforcement exception to the consent requirement in §§ 99.31(a)(3) and 99.35.

With regard to the level of detail required in the record of redisclosures, current § 99.32(b) requires an educational agency or institution to record the ''names of the additional parties to which the receiving party may disclose the information'' on its behalf and their legitimate interests under § 99.31. This means the name of the individual (if an organization is not involved) or the organization and the exception under § 99.31(a) that would allow the redisclosure to be made without consent. Under current § 99.33(a)(2), the officers, employees, and agents of a party that receives

information from education records may use the information for the purposes for which the disclosure was made without violating the limitations on redisclosure in § 99.33(a)(1). Therefore, we interpret the recordation requirement in § 99.32(b) to mean that an educational agency or institution may record the name of an organization, including a research organization, to which a recipient may make further disclosures under § 99.33(b) and is not required to record the name of each individual within the organization who is authorized to use that information in accordance with § 99.33(a)(2).

We also recognize that sometimes an educational agency or institution does not know at the time of its disclosure of education records that the receiving party may wish to make further disclosures on its behalf. Therefore, we interpret § 99.32(b) to allow a receiving party to ask an educational agency or institution to record further disclosures made on its behalf after the initial receipt of the records or information.

These same policies apply to further disclosures made by State and local educational authorities and Federal officials listed in § 99.31(a)(3) that redisclose information on behalf of educational agencies and institutions under the new authority in § 99.35(b). Educational agencies and institutions that disclose education records under § 99.31(a)(3) with the understanding that the State or Federal authority or official may make further disclosures may continue to record those further disclosures as provided in § 99.32(b)(1). Like any other recipient of education records, a State or Federal authority or official may also ask an educational agency or institution to record further disclosures made on its behalf after the initial receipt of the records or information. It is incumbent upon a State or Federal authority or official that makes further disclosures on behalf of an educational agency or institution under § 99.33(b) to determine whether the educational agency or institution has recorded those further disclosures. If the educational agency or institution does not do so, then under the revisions to § 99.32(b)(2)(i) in the final regulations, the State and local educational authority or Federal official or agency that makes further disclosures must maintain the record of those disclosures.

We have also revised § 99.32(a) to ensure that educational agencies and institutions maintain a listing in each student's record of the State and local educational authorities and Federal officials and agencies that may make further disclosures of the student's

education records without consent under § 99.33(b). This will help ensure that parents and students know that the record of disclosures maintained by an educational agency or institution as required under § 99.32(a) may not contain all further disclosures made on behalf of the agency or institution by a State or Federal authority or official and alert parents and students to the need to ask for access to this additional information. We have also revised § 99.32(a) to require an educational agency or institution to obtain a copy of the record of further disclosures maintained at the State or Federal level and make it available for parents and students to inspect and review upon request.

In response to commenters' suggestions, the regulations in new § 99.32(b)(2)(ii) allow a State or local educational authority or Federal official or agency to identify the redisclosure by the student's class, school, district, or other appropriate grouping rather than by the name of each student whose record was redisclosed. For example, an SEA may record that it disclosed to the State higher education authority the scores of each student in grades nine through 12 on the State mathematics assessment for a particular year. We believe that this procedure eases administrative burdens while ensuring that a parent or student may access information about the redisclosure.

We note that the recordation requirements under § 6401(c)(i)(IV) of the America COMPETES Act, Public Law 110–69, 20 U.S.C. 9871(c)(i)(IV), are more detailed and stringent than those required under FERPA. In particular, a State that receives a grant to establish a statewide P–16 education data system under § 6401(c)(2), 20 U.S.C. 9871(c)(2), is required to keep an accurate accounting of the date, nature, and purpose of each disclosure of personally identifiable information in the statewide P–16 education data system; a description of the information disclosed; and the name and address of the person, agency, institution, or entity to whom the disclosure is made. The State must also make this accounting available on request to parents of any student whose information has been disclosed. The Department will issue further guidance on these requirements if the program is funded and implemented.

*Changes:* We have made several changes to § 99.32, as follows:

• New § 99.32(b)(2)(i) provides that a State or local educational authority or Federal official or agency listed in § 99.31(a)(3) that makes further disclosures of information from

education records must record the names of the additional parties to which it discloses information on behalf of an educational agency or institution and their legitimate interests under § 99.31 in the information if the information was received from an educational agency or institution that has not recorded the further disclosures itself or from another State or local official or Federal official or agency listed in § 99.31(a)(3).

• New § 99.32(b)(2)(ii) provides that a State or local educational authority or Federal official or agency that records further disclosures of information may maintain the record by the student's class, school, district or other appropriate grouping rather than by the name of the student.

• New § 99.32(b)(2)(iii) provides that upon request of an educational agency or institution, a State or local educational authority or Federal official or agency that maintains a record of further disclosures must provide a copy of the record of further disclosures to the educational agency or institution within a reasonable period of time not to exceed 30 days.

• Revised § 99.32(a)(1) requires educational agencies and institutions to list in each student's record of disclosures the names of the State and local educational authorities and Federal officials or agencies that may make further disclosures of the information on behalf of the educational agency or institution under § 99.33(b).

• New § 99.32(a)(4) requires an educational agency or institution to obtain a copy of the record of further disclosures maintained by a State or local educational authority or Federal official or agency and make it available in response to a parent's or student's request to review the student's record of disclosures.

**Educational Research (§§ 99.31(a)(6) and 99.31(a)(3))**

*Comment:* We received a number of comments on proposed § 99.31(a)(6)(ii). In this section, we proposed that an educational agency or institution that discloses personally identifiable information without consent to an organization conducting studies for, or on behalf of, the educational agency or institution must enter into a written agreement with the organization specifying the purposes of the study and containing certain other elements. This exception to the consent requirement is often referred to as the ''studies exception.'' While all of the comments on this provision generally supported the changes, many of the commenters raised concerns about the scope and

applicability of the studies exception and requested clarification on some of the proposed changes, particularly with regard to the provisions relating to written agreements.

*Discussion:* We address commenters' specific concerns about the key portions of these regulations in the following sections.

*Changes:* None.

*(a) Scope and Applicability of § 99.31(a)(6)*

*Comment:* Several commenters stated that the proposed regulations did not clearly indicate that the studies exception applies to State educational authorities. Some commenters, assuming that § 99.31(a)(6) applied to State educational authorities, noted that the proposed regulations did not provide clear authority for State educational authorities such as an SEA, or a State longitudinal data system using State generated data (such as State assessment results), to enter into research agreements on behalf of educational agencies and institutions. One commenter stated that § 99.31(a)(6) should not be interpreted to require that research agreements be entered into by individual schools or that any resulting redisclosures be recorded by the individual schools.

One commenter asked for clarification regarding whether § 99.31(a)(6) permitted a school to disclose a student's education records to his or her previous school for the purpose of evaluating Federal or State-supported education programs or for improving instruction.

Another commenter stated that the Department should further revise the regulations to provide that only individuals in the organization conducting the study who have a legitimate interest in the information disclosed be given access to the information. The commenter also stated that the Department should specifically limit § 99.31(a)(6) to bona fide research projects by prohibiting organizations conducting studies under this exception from using record-level data for other operational or commercial purposes. The commenter also expressed concern about the duration of research projects, noting that significantly more restrictive access should be required for studies that track personally identifiable information for long periods of time. The commenter stated further that the Department should consider imposing a time limit on how long information obtained through longitudinal studies can be retained.

*Discussion:* FERPA permits an educational agency or institution to disclose personally identifiable information from an education record of a student without consent if the disclosure is to an organization conducting studies for, or on behalf of, the educational agency or institution to (a) develop, validate, or administer predictive tests; (b) administer student aid programs; or (c) improve instruction. 20 U.S.C. 1232g(b)(1)(F); 34 CFR 99.31(a)(6). Disclosures made under the studies exception may only be used by the receiving party for the purposes for which the disclosure was made and for no other purpose or study. As such, § 99.31(a)(6) is not a general research exception to the consent requirement in FERPA but an exception for studies limited to the purposes specified in the statute and regulations.

We first note that it may not be necessary or even advantageous for State educational authorities to use the studies exception in order to conduct or authorize educational research because of the limitations in § 99.31(a)(6). In contrast, § 99.31(a)(3)(iv), under the conditions set forth in § 99.35, allows educational agencies and institutions, such as LEAs and postsecondary institutions, to disclose education records without consent to State educational authorities for audit and evaluation purposes, which can include a general range of research studies beyond the more limited group of studies specified under § 99.31(a)(6). Also, as explained more fully elsewhere in this preamble, while a State educational authority must have the underlying legal authority to audit or evaluate the records it receives from LEAs or postsecondary institutions under § 99.35, the LEA or postsecondary institution is not required to enter into a written agreement for the audit or evaluation as it is required to do under § 99.31(a)(6). (*See Redisclosure of Education Records and Recordkeeping by State and Local Educational Authorities and Federal Officials and Agencies.*) The absence of an explanation of the authorized representatives exception (§ 99.31(a)(3)) in the NPRM created confusion, especially with regard to how State departments of education may utilize education records for evaluation purposes. Therefore, we have included that explanation here.

The conditions for disclosing education records without consent under §§ 99.31(a)(3)(iv) and 99.35 are discussed in the Department's Memorandum from the Deputy Secretary of Education (January 30, 2003) available at *http://www.ed.gov/policy/gen/guid/secletter/030130.html.* The Deputy Secretary's memorandum

explains that under this exception an "authorized representative" of a State educational authority is a party under the direct control of that authority, *e.g.*, an employee or a contractor.

In general, the Department has interpreted FERPA and implementing regulations to permit the disclosure of personally identifiable information from education records, without consent, in connection with the outsourcing of institutional services and functions. Accordingly, the term "authorized representative" in § 99.31(a)(3) includes contractors, consultants, volunteers, and other outside parties (*i.e.*, non-employees) used to conduct an audit, evaluation, or compliance or enforcement activities specified in § 99.35, or other institutional services or functions for which the official or agency would otherwise use its own employees. For example, a State educational authority may disclose personally identifiable information from education records, without consent, to an outside attorney retained to provide legal services or an outside computer consultant hired to develop and manage a data system for education records.

The term "authorized representative" also includes an outside researcher working as a contractor of a State educational authority or other official listed in § 99.31(a)(3) that has outsourced the evaluation of Federal or State supported education programs. An outside researcher may conduct independent research under this provision in the sense that the researcher may propose or initiate research projects for consideration and approval by the State educational authority or other official listed in § 99.31(a)(3) either before or after the parties have negotiated a research agreement. Likewise, the State educational authority or official does not have to agree with or endorse the researcher's results or conclusions. In so doing, an outside researcher retained to evaluate education programs by a State educational authority or other official listed in § 99.31(a)(3) as an "authorized representative" may be given access to personally identifiable information from education records, including statistical information with unmodified small data cells. However, the term "authorized representative" does not include independent researchers that are not contractors or other parties under the direct control of an official or agency listed in § 99.31(a)(3).

While an educational agency or institution may not disclose personally identifiable information from students' education records to independent researchers, nothing in FERPA prohibits

them from disclosing information that has been properly de-identified. Further discussion of this issue is provided in the following paragraphs and under the section entitled *Personally Identifiable Information and De-Identified Records and Information.*

An SEA or other State educational authority that has legal authority to enter into agreements for LEAs or postsecondary institutions under its jurisdiction may enter into an agreement with an organization conducting a study for the LEA or institution under the studies exception. If the SEA or other State educational authority does not have the legal authority to act for or on behalf of an LEA or institution, then it would not be permitted to enter into an agreement with the organization conducting the study under this exception. As previously mentioned, FERPA authorizes certain disclosures without consent; it does not provide an SEA or other State educational authority with the legal authority to act for or on behalf of an LEA or postsecondary institution.

With regard to the request for clarification whether § 99.31(a)(6) permits a school to disclose a student's education records to his or her previous school for evaluation purposes, the studies exception only allows disclosures to organizations conducting studies for, or on behalf of, the educational agency or institution that discloses its records. The "for, or on behalf of" language from the statute does not permit disclosures under this exception so that the receiving organization can conduct a study for itself or some other party. This issue is discussed in more detail under the section of this preamble entitled *Disclosure of Education Records to Student's Former Schools.*

We agree with the comment that the regulations should be revised to provide that only those individuals in the organization conducting the study that have a legitimate interest in the personally identifiable information from education records can have access to the records. The Secretary also shares the commenter's concerns about limiting § 99.31(a)(6) to bona fide research projects, prohibiting commercial utilization of education records, and limiting the duration of research projects. We address these issues in greater detail in the following section concerning written agreements.

*Changes:* None.

*(b) Written Agreements for Studies*

*Comment:* Several commenters expressed concern that § 99.31(a)(6) not be read so broadly as to erode parents'

and students' privacy rights, and, therefore, supported the restrictions that the Secretary included in this provision. Specifically, they supported the new requirement that educational agencies and institutions must enter into a written agreement with the organization conducting the study that specifies: the purpose of the study, that the information from the education records disclosed be used only for the stated purpose, that individuals outside the organization may not have access to personally identifiable information about the students being studied, and that the information be destroyed or returned when it is no longer needed for the purpose of the study.

Several commenters said that the Department should clarify that the existence of a written agreement is not a rationale in and of itself for the disclosure of education records. They stated that the regulations should provide explicitly that a written agreement does not modify the protections under FERPA or justify the use of the records transferred other than as permitted by the statute and the regulations. Some of these commenters stated that the written agreement should include a description of the specific records to be disclosed for the study.

Several commenters agreed with the provision in the proposed regulations that specified that an educational agency or institution does not need to agree with or endorse the conclusions or results of the study. Other commenters asked that we include in the regulations the explanation provided in the preamble to the NPRM that the school also does not need to initiate the study.

One commenter suggested that we change the references from "study" to "studies" so that it is clear that an agency or institution and a research organization could enter into one agreement that would cover a variety of studies that support the State's or school district's educational objectives. One commenter suggested that the Department certify agreements between educational agencies and research organizations as meeting the requirements of FERPA.

There were several comments on the destruction of information requirements in FERPA. Some suggested that we include in the regulations the specific time period by which information disclosed to a researcher must be destroyed, while others stated that ongoing access to data is necessary and that researchers should be permitted to retain information indefinitely. Some commenters suggested that the required time period for the destruction or return of education records, as deemed

necessary by the parties to support the purposes of the authorized study or studies, be established in the written agreement.

One commenter approved including the requirements regarding the use and destruction of data in the written agreement as a way of improving compliance with FERPA. However, the commenter questioned our explanation that the language in the statute providing that the study must be conducted "for, or on behalf of" the educational agency or institution means that the disclosing school must retain control over the information once it has been given to a third party conducting a study. The commenter believed that school districts will not be involved in how a study is performed and that the written agreement with the organization specifying the organization's obligations with regard to the use and destruction of data should be sufficient.

*Discussion:* The Secretary shares the concerns raised by commenters that § 99.31(a)(6) not be read so broadly as to erode parents' and students' privacy rights. Accordingly, we have revised § 99.31(a)(6) to address some of these concerns and believe that these changes will provide adequate protection of students' education records that may be disclosed under the studies exception.

In the NPRM, we proposed to remove current § 99.31(a)(6)(ii)(A) and (B) and included these requirements under the provisions for written agreements. These paragraphs provide that the study must be conducted in a manner that does not permit personal identification of parents and students by individuals other than representatives of the organization and that the information be destroyed when no longer needed for the purposes for which the study was conducted. We are including § 99.31(a)(6)(ii)(A) and (B) in the final regulations. After reviewing comments on the proposed changes, we concluded that, by moving these two provisions into the new paragraph relating to written agreements, we would have weakened the statutory requirements concerning the studies exception. We believe this correction will alleviate commenters' concerns about weakening parents' and students' privacy rights under FERPA.

We agree with the comments that the existence of a written agreement is not a rationale in and of itself for the disclosure of education records. As a privacy statute, FERPA requires that parents and eligible students provide written consent before educational agencies and institutions disclose personally identifiable information from students' education records. There are

several statutory exceptions to FERPA's general consent rule, one of which is § 99.31(a)(6), an exception that permits disclosure of records for studies limited to the purposes specified in the statute and regulations. However, a written agreement, a memorandum of understanding, or a contract is not a justification for disclosure of education records. Rather, a disclosure must meet the requirements in § 99.31(a)(6) or the other permitted disclosures under § 99.31. If a disclosure meets the conditions of § 99.31(a)(6), the disclosure may be made, and the written agreement sets forth the requirements that must be followed when entering into such an agreement.

As noted in our earlier discussion of the scope and applicability of the studies exception, the Secretary concurs that the regulations should be revised to require that a written agreement expressly include the purpose, scope, and duration of the agreed upon study, as well as the information to be disclosed. We also agree with commenters that the regulations should specifically limit any disclosures of personally identifiable information from students' education records to those individuals in the organization conducting the study that have a legitimate interest in the information. This requirement is consistent with § 99.32(a)(3)(ii), which requires that an educational agency or institution record the "legitimate interests" the parties had in obtaining information under FERPA.

The Secretary strongly recommends that schools carefully limit the disclosure of students' personally identifiable information under this and the other exceptions in § 99.31 and reminds educational agencies and institutions that disclosures without consent are subject to § 99.33(a)(2), which states: "The officers, employees, and agents of a party that receives information under paragraph (a)(1) of this section may use the information, but only for the purposes for which the disclosure was made." The recordation requirements in § 99.32 also apply to any disclosures of personally identifiable information made under the studies exception. (We note that a school does not have to record the disclosure of information that has been properly de-identified.)

Although FERPA permits schools to disclose personally identifiable information under § 99.31(a)(6) to organizations conducting studies for or on its behalf, the Secretary recommends that educational agencies and institutions release de-identified information whenever possible under this exception. Even when schools opt

not to release de-identified information in these circumstances, we recommend that schools reduce the risk of unauthorized disclosure by removing direct identifiers, such as names and SSNs, from records that don't require them, even though these records may still contain some personally identifiable information. This is especially important when a school also discloses sensitive information about students, such as type of disability and special education services received by the students.

We agree with commenters that § 99.31(a)(6) should be revised to indicate that an educational agency or institution is not required to initiate a study. Additionally, we have revised § 99.31(a)(6) to include the word "studies" so that an educational agency or institution may utilize one written agreement for more than one study, so long as the requirements concerning information that must be in the agreement are met.

While we do not have the authority under FERPA to officially certify agreements between educational agencies and institutions and organizations conducting studies, FPCO does provide technical assistance to educational agencies or institutions on FERPA. As such, if school officials have questions about whether an agreement meets the requirements in § 99.31(a)(6), they may contact FPCO for assistance.

With regard to the comments that we include in the regulations a specific time period by which information provided under the studies exception must be destroyed, we believe that the parties entering into the agreement should decide when information has to be destroyed or returned to the educational agency or institution. As we have discussed, we have revised § 99.31(a)(6) to require that the written agreement include the duration of the study and the time period during which the organization must either destroy or return the information to the educational agency or institution.

With regard to the comment that a written agreement with the organization conducting the study should be sufficient for an educational agency or institution to retain control over information from education records once the information is given to an organization conducting a study, we agree that a written agreement required under the regulations will help ensure that the information is used only to meet the purposes of the study stated in the written agreement and that all applicable requirements are met. However, similar to the requirement that an outside service provider serving

as a school official is subject to FERPA's restrictions on the use and redisclosure of personally identifiable information from education records, educational agencies and institutions must ensure that organizations with which they have entered into an agreement to conduct a study also comply with FERPA's restrictions on the use of personally identifiable information from education records. (See pages 15578–15580 of the NPRM.) That is, the school must retain control over the organization's access to and use of personally identifiable information from education records for purposes of the study or studies, including access by the organization's own employees and subcontractors, as well as any school officials whom the organization permits to have access to education records.

An educational agency or institution may need to determine that the organization conducting the study has reasonable controls in place to ensure that personally identifiable information from education records is protected. We note that it is common practice for some data sharing agreements to have a "controls section" that specifies required controls and how they will be verified (*e.g.*, surprise inspections). We recommend that the agreement required by § 99.31(a)(6) include a section that sets forth similar requirements. If a school is unable to verify that these controls are in place, then it should not disclose personally identifiable information from education records to an organization for the purpose of conducting a study.

In this regard, it should be noted that educational agencies and institutions are responsible for any failures by an organization conducting a study to comply with applicable FERPA requirements. FERPA states that if a third party outside the educational agency or institution fails to destroy information in violation of 20 U.S.C. 1232g(b)(1)(F), the studies exception in FERPA, the educational agency or institution shall be prohibited from permitting access to information from education records to that third party for a period of not less than five years. See 20 U.S.C. 1232g(b)(4)(B).

*Changes:* We have revised § 99.31(a)(6) to: (1) Retain § 99.31(a)(6)(ii)(A) and (B); (2) amend § 99.31(a)(6)(ii)(A) to provide that the study must be conducted in a manner that does not permit personal identification of parents or students by anyone other than representatives of the organization that have legitimate interest in the information; (3) amend § 99.31(a)(6)(ii)(C) to require that the written agreement specify the purpose,

scope, and duration of the study and the information to be disclosed; require the organization to use personally identifiable information from education records only to meet the purpose or purposes of the study as stated in the written agreement; limit any disclosures of information to individuals in the organization conducting the study who have a legitimate interest in the information; and require the organization to destroy or return to the educational agency all personally identifiable information when the information is no longer needed for the purposes of the study and specify the time period during which the organization must either destroy or return the information to the educational agency or institution; and (4) amend § 99.31(a)(6) in new paragraph (iii) to provide that an educational agency or institution is not required to initiate a study.

**Disclosure of Education Records to Non-Educational State Agencies**

*Comment:* Several commenters stated that the proposed amendments did not specifically address whether an educational agency or institution is permitted to disclose education records to non-educational State agencies, such as State health or labor agencies, as part of an agreement with those agencies, without first obtaining consent. One commenter said that because the Department has taken the position that education records may be shared with State auditors who are not educational officials and who are not, by definition, under the control of a State educational authority, there is no legal basis to prohibit the disclosure of education records to other non-educational State and local agencies.

Some officials representing State health agencies commented that FERPA should be more closely aligned with the disclosure provisions of the HIPAA Privacy Rule. One commenter noted that there was a critical need for public health researchers to be able to access, without consent, personally identifiable information contained in student health records to allow for analyses, public health studies, and research that will benefit school-aged children, as well as the general population. One organization representing school nurses noted that public health officials need access to education records for the purposes of public health reporting, surveillance, and reimbursement.

Several commenters recommended that SEAs be authorized to share data from education records with State social services, health, juvenile, and employment agencies, to serve the needs of students, including special needs, low-income, and at-risk students. One SEA commented that it did not support extending access to student data to non-education State agencies, except to State auditors, as specified in proposed § 99.35(a)(3). This commenter asserted that access to and use of information from students' education records should be controlled by a limited number of education officials who are sensitive to the intent of FERPA and well acquainted with its safeguards.

*Discussion:* There is no specific exception to the written consent requirement in FERPA that permits the disclosure of personally identifiable information from students' education records to non-educational State agencies. Educational agencies and institutions may disclose personally identifiable information for audit or evaluation purposes under §§ 99.31(a)(3) and 99.35 only to authorized representatives of the officials or agencies listed in § 99.31(a)(3)(i) through (iv). Typically, LEAs and their constituent schools disclose education records to State educational authorities under § 99.31(a)(3)(iv), such as the SEA, for audit, evaluation, or compliance and enforcement purposes.

There are some exceptions that might authorize disclosures to non-educational State agencies for specified purposes. For example, disclosures may be made in a health or safety emergency (§§ 99.31(a)(10) and 99.36), in connection with financial aid (§ 99.31(a)(4)), or pursuant to a State statute under the juvenile justice system exception (§§ 99.31(a)(5) and 99.38), and any disclosures must meet the specific requirements of the particular exception. FERPA, however, does not contain any specific exceptions to permit disclosures of personally identifiable information without consent for public health or employment reporting purposes. That said, nothing in FERPA prohibits an educational agency or institution from importing information from another source to perform its own evaluations.

We believe that any further expansion of the list of officials and entities in FERPA that may receive education records without the consent of the parent or eligible student must be authorized by legislation enacted by Congress.

We explained in the NPRM on page 15577 that, with respect to State auditors, legislative history for the 1979 FERPA amendment indicates that Congress specifically intended that FERPA not preclude State auditors from obtaining personally identifiable information from education records in order to audit Federal and State supported education programs, notwithstanding that the statutory language in the amendment refers only to "State and local educational officials." *See* 20 U.S.C. 1232g(b)(5); H.R. Rep. No. 338, 96th Cong., 1st Sess. at 10 (1979), *reprinted in* 1979 U.S. Code Cong. & Admin. News 819, 824. This legislative history provides a basis for drawing a distinction between State auditors and officials of other State agencies that also are not under the control of the State educational authority. (As explained more fully under *State auditors,* upon further review, we have removed from the final regulations the proposed regulations related to State auditors and audits.)

The 1979 amendment to FERPA does not apply to other State officials or agencies, and there is no other legislative history to indicate that Congress intended that FERPA be interpreted to permit educational agencies and institutions, or State and local educational authorities or Federal officials and agencies listed in § 99.31(a)(3), to share students' education records with non-educational State officials. In fact, Congress has, on numerous occasions, indicated otherwise.

As discussed elsewhere in this preamble under the heading *Health or Safety Emergency,* the HIPAA Privacy Rule specifically excludes from coverage health care information that is maintained as an "education record" under FERPA. 45 CFR 160.103, Protected health information. We understand that the HIPAA Privacy Rule allows covered entities to disclose identifiable health data without written consent to public health authorities. However, there is no comparable exception to the written consent requirement in FERPA.

As mentioned previously, in conducting an audit, evaluation, or compliance or enforcement activity, an educational authority may collaborate with other State agencies by importing data from those sources and conducting necessary matches. Any reports or other information created as a result of the data matches may only be released to those non-educational officials in non-personally identifiable form. Educational authorities may also release information on students to non-educational officials that has been properly de-identified, as described in § 99.31(b)(1).

Additionally, many agencies providing services to low income or at-risk families have parents sign a consent form authorizing disclosure of

information at intake time so that the agency can receive necessary information from schools. In 1993, we amended the FERPA regulations to help facilitate this practice. In final regulations published in the **Federal Register** on January 7, 1993 (58 FR 3188), we removed the previous requirement in the regulations that schools ''obtain'' consent from parents and eligible students so that parents and eligible students may ''provide'' a signed and dated consent to third parties in order for the school to disclose education records to those parties.

Therefore, parents can provide consent at intake time to State and local social services and other non-educational agencies serving the needs of students in order to permit their children's schools (or the SEA) to disclose education records to the agency. For example, parents routinely provide consent to the Medicaid agency that permits that agency to collect information from other agencies on the family being served. In many cases those consents are written in a manner that complies with the consent requirement in § 99.30, and the student's school may disclose information to the Medicaid agency necessary for reimbursement purposes for services provided the student.

*Changes:* None.

## Disclosure of Education Records to Student's Former Schools (§§ 99.31(a)(3), 99.31(a)(6), and 99.35(b))

*Comment:* One commenter asked for clarification whether a school could disclose a student's education records to the student's previous school for the purpose of evaluating Federal or State supported education programs or for improving instruction. Several commenters said that there is a critical need for school districts to be able to access the records of their former students from the student's new district or postsecondary institution so that the previous institution can evaluate the effectiveness of its own education programs. Some commenters said that § 99.35(a) clearly allows a K–12 data system to use postsecondary records to evaluate its own programs, and that a K–12 system does not need to have legal authority to evaluate postsecondary programs for the disclosure to be valid under the audit or evaluation exception.

*Discussion:* Section 99.31(a)(2) allows an educational agency or institution to disclose personally identifiable information from education records, without consent, to a school where the student seeks or intends to enroll or is

already enrolled if the disclosure relates to the student's enrollment or transfer. There is no specific authority in FERPA for an educational agency or institution, or a State or local educational authority, to disclose or redisclose personally identifiable information from education records to a student's former school without consent.

As discussed above, §§ 99.31(a)(3) and 99.35 allow educational agencies and institutions to disclose personally identifiable information from education records without consent to State and local educational authorities that are legally authorized to audit or evaluate the disclosing institution's programs or records. We encourage State and local authorities to take advantage of this exception and establish or modify State or local legal authority, as necessary, to allow K–12 and postsecondary educational authorities to audit or evaluate one another's programs. As noted above, the Department will generally defer to a State Attorney General's interpretation of State or local law on these matters.

Section 99.31(a)(6) allows an educational agency or institution to disclose personally identifiable information from education records without consent to an organization conducting a study for, or on behalf of, the agency or institution that discloses its records. The ''for, or on behalf of'' language from the statute and regulations, however, does not allow the educational agency or institution to disclose personally identifiable information from education records under this exception so that the receiving organization can conduct a study for itself or some other party. Further, the Secretary does not as a policy matter support expanding the studies exception to permit such a disclosure because it would result in a vast increase in the number of parties gaining access to and maintaining personally identifiable information on students. As discussed below, educational agencies and institution and other parties, including State educational authorities, may always release information from education records to a student's former school, without consent, if all personally identifiable information has been de-identified.

## Personally Identifiable Information and De-Identified Records and Information (§§ 99.3 and 99.3(b))

### (a) Definition of Personally Identifiable Information

*Comment:* We received a number of comments on proposed § 99.3 regarding

changes to the definition of *personally identifiable information.* One commenter applauded the Department's recognition of the increasing ease of identifying individuals from redacted records and statistical information because of the large amount of detailed personal information that is maintained on most Americans by many different organizations. This commenter and others, however, stated that the proposed regulations did not go far enough to ensure that personally identifiable information about students would not be released.

One commenter expressed concern about our proposal to eliminate paragraphs (e) and (f) from the existing definition of *personally identifiable information,* which included a list of personal characteristics and other information that would make a student's identity easily traceable. The commenter said that this was a change to long-standing Department policy and represented an unwarranted invasion of privacy that exceeds statutory authority. This commenter also expressed concern that eliminating the ''easily traceable'' provisions for determining whether information was personally identifiable could prevent parents from accessing their children's education records and might allow school officials to circumvent FERPA requirements by using nicknames, initials, and other personal characteristics to refer to children.

In contrast, several commenters stated that the regulations would be unworkable or were too restrictive and would prevent or discourage the release of information from education records needed for school accountability and other public purposes. These commenters stated that paragraphs (f) and (g) in the proposed definition of *personally identifiable information,* which replaces the ''easily traceable'' provisions, would provide school officials too much discretion to conceal information the public deserves to have in order to debate public policy. Proposed paragraph (f) provided that personally identifiable information includes other information that, alone or in combination, is linked or linkable to a specific student that would allow a reasonable person in the school or its community, who does not have personal knowledge of the relevant circumstances, to identify the student with reasonable certainty. Proposed paragraph (g) provided that personally identifiable information includes information requested by a person who the educational agency or institution reasonably believes has direct, personal knowledge of the identity of the student

to whom the education record relates, sometimes known as a "targeted request."

Several commenters expressed support for the provisions in paragraphs (f) and (g) of the definition of *personally identifiable information*. One of these commenters said that the "school and community" limitation and the "reasonable person" standard in paragraph (f) is sufficiently clear for implementation by parties that release de-identified records. Another commenter said that ambiguity in the terms "reasonable person" and "reasonable certainty" was necessary so that organizations can develop their own standards for addressing the problem of ensuring that information that is released is not personally identifiable. This commenter asked the Department to retain the flexibility in the proposed language and provide examples of policies that have been implemented that meet the requirements in paragraphs (f) and (g) of the definition. The commenter said that most school districts know when they are receiving a targeted request (paragraph (g)) but asked that the Department provide examples to help districts determine whether a non-targeted request will reveal personally identifiable information.

Journalism and writers' associations expressed concern about the "reasonable person" standard in paragraph (f) and our statement in the preamble to the NPRM (73 FR 15583) that an educational agency or institution may not be able to release redacted education records that concern students or incidents that are well-known in the school community, including when the parent or student who is the subject of the record contacts the media and causes the publicity that prevents the release of the record. These commenters stated that FERPA should not prevent schools from releasing records from which all direct and indirect identifiers, such as name, date of birth, address, unusual place of birth, mother's maiden name, and sibling information, have been removed without regard to any outside information, particularly after a student or parent has waived any pretense of confidentiality by contacting the media. They also said that the proposed definition of *personally identifiable information* does not acknowledge the public interest in school accountability.

One commenter said that the "reasonable person in the school or its community" standard in paragraph (f) was too narrow and inappropriate because it would allow individuals with even modest scientific and

technological abilities to identify students based on supposedly de-identified information. Another commenter said that the reference in paragraph (f) to a "reasonable person" should be changed to "ordinary person." A commenter said that if we retain the "reasonable person" standard, we should remove the references to the school or its community and personal knowledge of the circumstances and simply refer to a reasonable person. Several commenters said the "school or its community" standard is too vague and needs to be clarified, particularly in relation to the provision in paragraph (g) regarding targeted requests; these commenters said that school officials will choose to evaluate a request for information based on whether a reasonable person in the community, a broader standard than a reasonable person in the school, could identify the student and automatically find their own decisions to be reasonable. One commenter said that the phrase "relevant circumstances" in paragraph (f) is vague.

One commenter said that the standard in paragraph (f) about whether the information requested is "linked or linkable" to a specific student was too vague and overly broad and could be logically extended to cover almost any information about a student. This commenter said that the regulations should focus on preventing the release of records that in and of themselves contain unique personal descriptors that would make the student identifiable in the school community and not refer to outside information, including what members of the public might know independently of the records themselves.

Several commenters expressed concerns that the provision in paragraph (g) regarding targeted requests will make FERPA and the regulations administratively unwieldy and unnecessarily subjective. One of these commenters said that paragraph (g) is unclear and adds more confusion as opposed to providing clarity; this commenter said that paragraph (g) should be removed and that the requirements in paragraph (f) were sufficient. Another commenter said that the standard in paragraph (g) unfairly holds agencies and institutions responsible for ascertaining the requester's personal knowledge. One commenter said that we should delete the words "direct, personal" before "knowledge" because these terms are unclear. According to this commenter, if a school reasonably believes that the requester knows the student's identity, the school should not disclose the

records, whether the knowledge is "direct" or "personal."

Other commenters expressed a more general concern that the standard for targeted requests in paragraph (g) places an undue burden on school officials to obtain information about the person requesting information and creates a potential conflict with State open records laws. According to these commenters, the regulations as proposed would encourage agencies and institutions to make illegitimate inquiries into a requester's motives for seeking information and what the requester intends to do with it, or require the agency or institution to read the mind of a party requesting information. According to the commenter, this would introduce a degree of subjective judgment that would invariably lead to abuse because the same record that could be considered a public record to one requester could be a confidential document to another. A large university that has decentralized administrative operations questioned how it could be expected to take institutional knowledge into account in evaluating whether a request for records is targeted and asked for confirmation that the Department will not substitute its judgment for that of the institution so long as there was a rational basis for the decision to release information.

We received a few comments on the example of a targeted request that we provided in the preamble to the NPRM (73 FR 15583–15584), in which rumors circulate that a candidate running for political office plagiarized other students' work, and a reporter asks the university for the redacted disciplinary records of all students who were disciplined for plagiarism for the year in which the candidate graduated. We explained that the university may not release the records in redacted form because the circumstances indicate that the requester had direct, personal knowledge of the subject of the case. Two commenters said that confirmation that one unnamed student was disciplined in 1978 for plagiarism does not identify that student or confirm that the candidate was that student, and our explanation of the standard with this example showed that the regulations would prevent parents and the media from discharging their vital oversight responsibilities.

One school district said that the targeted request provision could impair due process in some student discipline cases by limiting the release of redacted witness statements that concern more than one student. The commenter suggested that under its current

practice, if four students are involved in an altercation, the school redacts all personally identifiable information with regard to students 2 through 4 when releasing the statement without parental consent to student 1, but under the proposed regulations, student 1's request would violate the requirements in paragraph (g) because of the student's knowledge of the identity of the other students to whom the record relates. This commenter said that the regulations should not be adopted if they do not address these due process concerns.

Several commenters said they appreciated the addition of a student's date of birth and other indirect identifiers in the definition of *personally identifiable information.* Another commenter said that a comprehensive list of indirect identifiers would be helpful. One commenter asked us to define the concept of indirect identifiers. Another commenter asked us to clarify which personally identifiable data elements may be released without consent. A commenter asked us to define the term biometric record as used in the definition of *personally identifiable information.*

*Discussion:* The Joint Statement explains that the purpose of FERPA is two-fold: to assure that parents and eligible students can access the student's education records, and to protect their right to privacy by limiting the transferability of their education records without their consent. 120 Cong. Rec. 39862. As such, FERPA is not an open records statute or part of an open records system. The only parties who have a right to obtain access to education records under FERPA are parents and eligible students. Journalists, researchers, and other members of the public have no right under FERPA to gain access to education records for school accountability or other matters of public interest, including misconduct by those running for public office. Nonetheless, as explained in the preamble to the NPRM, 73 FR 15584–15585, we believe that the regulatory standard for defining and removing personally identifiable information from education records establishes an appropriate balance that facilitates school accountability and educational research while preserving the statutory privacy protections in FERPA.

The simple removal of nominal or direct identifiers, such as name and SSN (or other ID number), does not necessarily avoid the release of personally identifiable information. Other information, such as address, date

and place of birth, race, ethnicity, gender, physical description, disability, activities and accomplishments, disciplinary actions, and so forth, can indirectly identify someone depending on the combination of factors and level of detail released. Similarly, and as noted in the preamble to the NPRM, 73 FR 15584, the existing professional literature makes clear that public directories and previously released information, including local publicity and even information that has been de-identified, is sometimes linked or linkable to an otherwise de-identified record or data set and renders the information personally identifiable. The regulations properly require parties that release information from education records to address these situations.

We removed the "easily traceable" standard from the definition of *personally identifiable information* because it lacked specificity and clarity. We were also concerned that the "easily traceable" standard suggested that a fairly low standard applied in protecting education records, *i.e.*, that information was considered personally identifiable only if it was easy to identify the student.

The removal of the "easily traceable" standard and adoption of the standards in paragraphs (f) and (g) will not affect a parent's right under FERPA to inspect and review his or her child's education records. Records that teachers and other school officials maintain on students that use only initials, nicknames, or personal descriptions to identify the student are education records under FERPA because they are directly related to the student.

Further, records that identify a student by initials, nicknames, or personal characteristics are personally identifiable information if, alone or combined with other information, the initials are linked or linkable to a specific student and would allow a reasonable person in the school community who does not have personal knowledge about the situation to identify the student with reasonable certainty. For example, if teachers and other individuals in the school community generally would not be able to identify a specific student based on the student's initials, nickname, or personal characteristics contained in the record, then the information is not considered personally identifiable and may be released without consent. Experience has shown, however, that initials, nicknames, and personal characteristics are often sufficiently unique in a school community that a reasonable person can identify the student from this kind of information

even without access to any personal knowledge, such as a key that specifically links the initials, nickname, or personal characteristics to the student.

In contrast, if a teacher uses a special code known only by the teacher and the student (or parent) to identify a student, such as for posting grades, this code is not considered personally identifiable information under FERPA because the only reason the teacher can identify the student is because of the teacher's access to personal knowledge of the relevant circumstances, *i.e.*, the key that links the code to the student's name.

In response to the commenter who stated that a school should not be prevented from releasing information when the subject of the record has waived any pretense of confidentiality by contacting the media and making the incident well-known in the community, we have found that in limited circumstances a parent or student may impliedly waive their privacy rights under FERPA by disclosing information to parties in a special relationship with the institution, such as a licensing or accreditation organization. However, we have not found and do not believe that parents and students generally waive their privacy rights under FERPA by sharing information with the media or other members of the general public. The fact that information is a matter of general public interest does not give an educational agency or institution permission to release the same or related information from education records without consent.

The "reasonableness" standards in paragraphs (f) and (g) of the new definition, which replace the "easily traceable" standard, do not require the exercise of subjective judgment or inquiries into a requester's motives. Both provisions require the disclosing party to use legally recognized, objective standards by referring to identification not in the mind of the disclosing party or requester but by a reasonable person and with reasonable certainty, and by requiring the disclosing party to withhold information when it reasonably believes certain facts to be present. These are not subjective standards, and these changes will not diminish the privacy protections in FERPA.

The standard proposed in paragraph (f) regarding the knowledge of a reasonable person in the school or its community was not intended to describe the technological or scientific skill level of a person who would be capable of re-identifying statistical information or redacted records. Rather, it provided the standard an agency or

institution should use to determine whether statistical information or a redacted record will identify a student, even though certain identifiers have been removed, because of a well-publicized incident or some other factor known in the community. For example, as explained in the preamble to the NPRM, 73 FR 15583, a school may not release statistics on penalties imposed on students for cheating on a test where the local media have published identifiable information about the only student (or students) who received that penalty; that statistical information or redacted record is now personally identifiable to the student or students because of the local publicity.

Paragraph (f) in the proposed definition provided that the agency or institution must make a determination about whether information is personally identifiable information not with regard to what someone with personal knowledge of the relevant circumstances would know, such as the principal who imposed the penalty, but with regard to what a reasonable person in the school or its community would know, *i.e.*, based on local publicity, communications, and other ordinary conditions. We agree with the comment that the "school or its community" standard was confusing because it was not clear whether just the school itself or the larger community in which the school is located is the relevant group for determining what a reasonable person would know.

We are changing this standard in paragraph (f) to the "school community" and by this change we mean that an educational agency or institution may not select a broader "community" standard when the information to be released would be personally identifiable under the narrower "school" standard. For example, it might be well known among students, teachers, administrators, parents, coaches, volunteers, or others at the local high school that a student was caught bringing a gun to class last month but generally unknown in the town where the school is located. In these circumstances, a school district may not disclose that a high school student was suspended for bringing a gun to class last month, even though a reasonable person in the community where the school is located would not be able to identify the student, because a reasonable person in the high school would be able to identify the student. The student's privacy is further protected because a reasonable person in the school community is also presumed to have at least the knowledge of a reasonable person in the local

community, the region or State, the United States, and the world in general. The "school community" standard, therefore, provides the maximum privacy protection for students.

We do not agree that the reference to "reasonable person" should be changed to "ordinary person." "Reasonable person" is a legally recognized standard that represents a hypothetical, rational, prudent, average individual. It would be confusing and inappropriate to introduce a new term "ordinary" in this context.

The standard in paragraph (f) excludes from the "reasonable person in the school community" standard persons who have personal knowledge of the "relevant circumstances," which one commenter considered vague. Under this standard, an agency or institution is not required to take into consideration when releasing redacted or statistical information that someone with special knowledge of the circumstances could identify the student. For example, if it is generally known in the school community that a particular student is HIV-positive, or that there is an HIV-positive student in the school, then the school could not reveal that the only HIV-positive student in the school was suspended. However, if it is not generally known or obvious that there is an HIV-positive student in school, then the same information could be released, even though someone with special knowledge of the student's status as HIV-positive would be able to identify the student and learn that he or she had been suspended.

The provisions in paragraph (g) regarding targeted requests do not require an educational agency or institution to ascertain or guess a requester's motives for seeking information from education records or what a requester intends to do with the information. This paragraph addresses a situation in which a requester seeks what might generally qualify as a properly redacted record but the facts indicate that redaction is a useless formality because the subject's identity is already known.

An educational agency or institution is not required under paragraph (g) to make any special inquiries or otherwise seek information about the person requesting information from education records. It must use information that is obvious on the face of the request or provided by the requester, such as when a requester asks for the redacted transcripts of a particular student. Paragraph (f) also requires an agency or institution to use information known to a reasonable person in the school

community, such as when a requester asks for the redacted transcripts of all basketball players who were expelled for accepting bribes after the local newspaper published a story about the matter. Paragraphs (f) and (g) do not require an educational agency or institution to inquire whether a requester has special knowledge not available generally in the school community that would make the subject of the record identifiable. We disagree with the comment that paragraph (f) is sufficient and paragraph (g) should be removed. Paragraph (g) addresses the problem of targeted requests, which is not addressed under paragraph (f).

We agree with the comment that the provision in paragraph (g) under which an agency or institution must determine whether the information requested is personally identifiable information based on its reasonable belief that the requester has "direct, personal" knowledge of the identity of the student to whom the record relates is ambiguous and confusing, especially in relation to what might be considered indirect knowledge. Therefore, we have modified this provision so that an educational agency or institution must simply have a reasonable belief that the requester knows the identity of the student to whom the record relates.

In reviewing a complaint that an educational agency or institution disclosed personally identifiable information from an education record in response to a targeted request, the Department would examine the request itself, the facts on which the agency or institution based its decision to release the information, as well as any information known generally in the school community that the agency or institution failed to take into account. The Department would also counsel an agency or institution about the nature of the violation in connection with the Department's responsibility for seeking voluntary compliance with FERPA before initiating any enforcement action under § 99.67.

With regard to the comment that the standard in paragraph (g) will impair due process in student discipline cases, it is unclear what the commenter means by releasing redacted witness statements under its current practice. *Education records* are defined in FERPA as records that are directly related to a student and maintained by an educational agency or institution, or by a party acting for the agency or institution. 20 U.S.C. 1232g(a)(4)(A); 34 CFR 99.3. Under this definition, a parent (or eligible student) has a right to inspect and review any witness statement that is directly related to the student, even if that statement

contains information that is also directly related to another student, if the information cannot be segregated and redacted without destroying its meaning.

For example, parents of both John and Michael would have a right to inspect and review the following information in a witness statement maintained by their school district because it is directly related to both students: "John grabbed Michael's backpack and hit him over the head with it." Further, in this example, before allowing Michael's parents to inspect and review the statement, the district must also redact any information about John (or any other student) that is not directly related to Michael, such as: "John also punched Steven in the stomach and took his gloves." Since Michael's parents likely know from their son about other students involved in the altercation, under paragraph (g) the district could not release any part of this sentence to Michael's parents. We note also that the sanction imposed on a student for misconduct is not generally considered directly related to another student, even the student who was injured or victimized by the disciplined student's conduct, except if a perpetrator has been ordered to stay away from a victim.

In order to provide maximum flexibility to educational agencies and institutions, we did not attempt to define or list all other "indirect identifiers". We believe that the examples listed in paragraph (3) of the definition of *personally identifiable information*—date of birth, place of birth, and mother's maiden name—indicate clearly the kind of information that could identify a student. Race and ethnicity, for example, could also be indirect identifiers. It is not possible, however, to list all the possible indirect identifiers and ways in which information might indirectly identify a student. Further, unlike the HIPAA Privacy Rule, these regulations do not attempt to provide a "safe harbor" by listing all the information that may be removed in order to satisfy the de-identification requirements in § 99.31(b). We have also added a definition of *biometric record* that is based on National Security Presidential Directive 59 and Homeland Security Presidential Directive 24.

*Changes:* We added a definition of *biometric record,* which provides that the term means a record of one or more measurable biological or behavioral characteristics that can be used for automated recognition of an individual. Examples include fingerprints, retina and iris patterns, voiceprints, DNA

sequence, facial characteristics, and handwriting.

We also have revised paragraph (f) in the definition of *personally identifiable information* to change the reference "school or its community" to "school community." In paragraph (g) of the definition of *personally identifiable information,* we removed the requirement that the requester have "direct, personal knowledge." As revised, paragraph (g) provides that personally identifiable information means information requested by a person who the educational agency or institution reasonably believes knows the identity of the student to whom the record relates.

*(b) De-Identified Records and Information*

*Comment:* We received a number of comments on § 99.31(b)(1), which would allow an educational agency or institution, or a party that has received personally identifiable information from education records, to release the records or information without parental consent after the removal of all personally identifiable information, provided that the educational agency or institution or other party has made a reasonable determination that a student's identity is not personally identifiable because of unique patterns of information about the student, whether through single or multiple releases, and taking into account other reasonably available information. In order to permit ongoing educational research with the same data, § 99.31(b)(2) allows an educational agency or institution or other party that releases de-identified, non-aggregated data (also known as "microdata") from education records to attach a code to each record, which may allow the recipient to match information received from the same source, under three conditions—(1) the educational agency or institution does not disclose any information about how it generates and assigns a record code, or that would allow a recipient to identify a student based on a record code; (2) the record code is used for no purpose other than identifying a de-identified record for purposes of education research and cannot be used to ascertain personally identifiable information about a student; and (3) the record code is not based on a student's social security number or other personal information.

Several commenters supported these proposed regulations and said that they will help facilitate valuable educational research. One of these commenters said that the provisions for de-identification of education records create clear standards that will allow researchers to

conduct necessary research without compromising student privacy. One commenter appreciated being able to attach a code or linking key to records to facilitate matching students across data sets while preserving student confidentiality.

One commenter stated that de-identified data do not support appropriate analytical research that will lead to improved educational outcomes. Further, according to this commenter, complete de-identification of systematic, longitudinal data on every student may not be possible.

Two commenters expressed concern that agencies and institutions redact too much information from education records and said that the Department should err on the side of disclosure of disaggregated data so that journalists and researchers can obtain accurate information about how students in every accountability subgroup are performing. These commenters said that the regulations should take into account the real track record of journalists and researchers in maintaining the confidentiality of information from education records.

One commenter said that many institutions and individuals have the ability to re-identify seemingly de-identified data and that it is generally much easier to do than most people realize because 87 percent of Americans can be identified uniquely from their date of birth, five-digit zip code, and gender. This commenter said that the regulations need to take into account that re-identification is a much greater risk for student data than other kinds of information because FERPA allows for the regular publication of student directories that contain a wealth of personal information, including address and date of birth, that can be used with existing tools and emerging technology to re-identify statistical data, even by non-experts.

Another commenter said that because the de-identification process is so resource-intensive, the regulations should allow the research entity to de-identify education records as a contractor under § 99.31(a)(1) of the regulations.

We explained in the preamble to the NPRM (73 FR 15585) that educational agencies and institutions should monitor releases of coded, de-identified microdata from education records to ensure that overlapping or successive releases do not result in data sets in which a student's personally identifiable information is disclosed. One commenter said that this monitoring requirement was too burdensome given the vast number of

data requests it receives and asked us to limit the monitoring requirement to single or multiple releases it makes to the same party. An SEA asked specifically for clarification in the regulations regarding what steps, if any, it must take to ensure that multiple releases of de-identified data to the same requester over time that the requester intends to use for a longitudinal study do not result in small data cells that may reveal the identity of the student. A school district said that the regulations should require the destruction of de-identified information from education records by the receiving party to avoid the problem of combining successive data releases to identify students.

Some commenters said that the regulations should provide objective standards for the de-identification of education records. One commenter asked the Department to prescribe a method for States to adopt to ensure that student confidentiality is protected. Two commenters asked specifically for guidance on what minimum cell size should be allowed when releasing statistical information. Several commenters said that SEAs and school districts need specific guidance regarding the release of student achievement data under the NCLB, including, in particular, reporting 100 percent achievement of certain performance levels on State assessments. One commenter who opposed restrictions on the release of de-identified data referred to instances in which some States have created minimum cell sizes of 100 for reporting disaggregated data under NCLB, which prevents the release of a great deal of important information. Another commenter said that our discussion of small cell sizes in the preamble to the NPRM, 73 FR 15584, reflected a misunderstanding of the problem.

One commenter said that § 99.31(b) is confusing because it is not clear how paragraph (b)(2), which is limited to educational research, relates to paragraph (b)(1), which is not so limited. This commenter also said that the regulations impose an unnecessary burden on the entity receiving a request for information and that the requirements of paragraph (f) in the definition of *personally identifiable information* are sufficient to de-identify education records. Another commenter said that the language in § 99.31(b)(1) that requires consideration of unique patterns of information about a student is confusing and creates ambiguity because the definition of *personally identifiable information* itself incorporates standards for de-

identification that appear to differ from the standard in § 99.31(b).

*Discussion:* As explained in the preamble to the NPRM, 73 FR 15584–15585, we believe that the regulatory standard for de-identifying information from education records establishes an appropriate balance that facilitates the release of appropriate information for school accountability and educational research purposes while preserving the statutory privacy protections in FERPA. Unlike the HIPAA Privacy Rule, these regulations do not attempt to provide a "safe harbor" by listing all the direct and indirect identifiers that may be removed to satisfy the de-identification requirements in § 99.31(b). Rather, they are intended to provide standards under which information from education records may be released without consent because all personally identifiable information has been removed.

The Department recognizes that de-identified data may not be appropriate for all educational research purposes and that complete de-identification of longitudinal student data may not be possible without sacrificing essential content and usability. In these situations, and as discussed elsewhere in this preamble, FERPA allows the disclosure and redisclosure of personally identifiable information from education records, without consent, to researchers under the terms and conditions specified in §§ 99.31(a)(1), 99.31(a)(3), and 99.31(6). We note that a researcher who receives personally identifiable information under these provisions would, however, have to de-identify any report or other information in accordance with § 99.31(b) before releasing it to the public or other parties, including other researchers.

In response to comments that educational agencies and institutions may remove too much information from education records, we note that while we have attempted to provide a balanced standard for the release of de-identified data for school accountability and other purposes, FERPA is a privacy statute, and no party has a right under FERPA to obtain information from education records except parents and eligible students. Further, there is no statutory authority in FERPA to modify the prohibition on disclosure of personally identifiable information from education records, or the exceptions to the written consent requirement, based on the track record of the party, including journalists and researchers, in maintaining the confidentiality of information from education records that they have received.

In response to the comment about allowing a researcher to de-identify education records, educational agencies and institutions may outsource the de-identification process to any outside service provider serving as a school official in accordance with the requirements in § 99.31(a)(1)(i)(B). (Those requirements are discussed in detail in the preamble to the NPRM at 73 FR 15578–15580 and elsewhere in these final regulations.) State and local educational authorities and Federal officials and agencies listed in § 99.31(a)(3) may outsource the de-identification process to their authorized representatives under the conditions specified in § 99.35.

We agree that the risk of re-identification may be greater for student data than other information because of the regular publication of student directories, commercial databases, and de-identified but detailed educational reports by States and researchers that can be manipulated with increasing ease by computer technology. As noted in the preamble to the NPRM, 73 FR 15584, the re-identification risk of any given release is cumulative, *i.e.,* directly related to what has previously been released, and this includes both publicly-available directory information, which is personally identifiable, and de-identified data releases. For that reason, we advised in the NPRM that parties should minimize information released in directories to the extent possible because, since the enactment of FERPA in 1974, the risk of re-identification from such information has grown as a result of new technologies and methods.

In response to comments about the need to monitor releases of coded, de-identified microdata to avoid re-identification of the data, because the risk of re-identification is cumulative, when making a new disclosure of coded data an educational agency or institution or other party must take into account all releases of information from education records it has made, not just releases it has made to the recipient of new data. We note that some of the publicly available directory information and de-identified data releases that need to be taken into account have been produced by the same agency or institution, State or local educational authority, or Federal official that wishes to release newly de-identified information. In general, FERPA poses no restrictions on the recipient's use of directory information and de-identified data from education records. Therefore, it may be unclear whether previous data releases are available generally, have been shared with a limited number of

parties, or not shared at all. Further, unlike personally identifiable information that is disclosed under §§ 99.31(a)(3) and (a)(6), de-identified information from education records does not have to be destroyed when no longer needed for the purposes for which it was released. We note, however, that a releasing party would reduce its monitoring responsibilities if it requires destruction or prohibits redisclosure of coded, de-identified microdata, because coded, de-identified microdata has a higher risk of re-identification than de-identified microdata. In the future the Department will provide further information on how to monitor and limit disclosure of personally identifiable information in successive statistical data releases.

In response to requests for guidance on what specific steps and methods should be used to de-identify information (and as noted in the preamble to the NPRM, 73 FR 15584), it is not possible to prescribe or identify a single method to minimize the risk of disclosing personally identifiable information in redacted records or statistical information that will apply in every circumstance, including determining whether defining a minimum cell size is an appropriate means to protect the confidentiality of aggregated data and, if so, selection of an appropriate number. This is because determining whether a particular set of methods for de-identifying data and limiting disclosure risk is adequate cannot be made without examining the underlying data sets, other data that have been released, publicly available directories, and other data that are linked or linkable to the information in question. For these reasons, we are unable to provide examples of rules and policies that necessarily meet the de-identification requirements in § 99.31(b). The releasing party is responsible for conducting its own analysis and identifying the best methods to protect the confidentiality of information from education records it chooses to release. We recommend that State educational authorities, educational agencies and institutions, and other parties refer to the examples and methods described in the NPRM at page 15584 and refer to the Federal Committee on Statistical Methodology's Statistical Policy Working Paper 22, *www.fcsm.gov/working-papers/ wp22.html*, for additional guidance.

With regard to issues with NCLB reporting in particular, determining the minimum cell size to ensure statistical reliability of information is a completely different analysis than that used to determine the appropriate minimum cell size to ensure confidentiality. Further, as noted in the preceding paragraph and in the preamble to the NPRM, use of minimum cell sizes or data suppression is only one of several ways in which information from education records may be de-identified before release. Statistical Policy Working Paper 22 describes other disclosure limitation methods, such as "top coding" and "data swapping," which may be more suitable than simple data suppression for releasing the maximum amount of information to the public without breaching confidentiality requirements. Decisions regarding whether to use data suppression or some other method or combination of methods to avoid disclosing personally identifiable information in statistical information must be made on a case-by-case basis.

We agree with the commenter who said that the example we provided in the preamble to the NPRM regarding the small cell problem in reporting that two Hispanic females failed to graduate was misleading and offer the following, more complete explanation. Simply knowing that one out of 100 Hispanic females failed to graduate does not identify which of the Hispanic females it might be. But suppose this female is an English language learner who is also enrolled in special education classes. The school also publishes tables on participation in special education classes by race, ethnicity, and grade, and tables that include the graduation status of Hispanic females disaggregated in one table by English language proficiency status, and by participation in special education classes in another. Suppose that these three tabulations each show separately that there is one 12th grade Hispanic female enrolled in special education classes, that the one Hispanic female who did not graduate was enrolled in special education classes, and that the one Hispanic female who did not graduate was an English language learner. With this information, the discerning observer knows that the one Hispanic female who failed to graduate is an English language learner and that she was the only 12th grade Hispanic student enrolled in special education classes. Any number of people in the school would be able to identify the Hispanic female who did not graduate with these three pieces of information.

Expanding the example to two individuals, the logic is similar, except in this case each of the Hispanic females knows her own characteristics and can find herself in each of the available tables, and thus by a process of elimination identifies the characteristics of the other non-graduate, perhaps learning something she did not already know about the other student. The published tables show that there are two 12th grade Hispanic females enrolled in special education classes, one with a learning disability and one with mental retardation. The tables also show that the two Hispanic females who did not graduate were enrolled in special education classes, and that the two Hispanic females who did not graduate were both English language learners. Others in the school community may be able to identify the two 12th grade Hispanic females who are English language learners enrolled in special education classes, but not necessarily be able to distinguish the student with the learning disability from the student with mental retardation. However, each girl knows her own disability and by the process of elimination now knows the other girl's disability. Similarly, anyone with knowledge of one of the two Hispanic females who did not graduate can find that girl in the tables, and then isolate the characteristics that belong to the other Hispanic female.

This example can be expanded to an example with three Hispanic females who fail to graduate. All three of the Hispanic females who did not graduate are English language learners, and two Hispanic females who did not graduate are enrolled in special education classes—one with a learning disability and the other with mental retardation. In this case, the one Hispanic female who is an English language learner and did not graduate now knows that the other two Hispanic females in her English language learner classes and also did not graduate are in the special education program, but she does not know which condition each girl has. By the same logic, each of the two females who did not graduate and are in special education classes knows her own disability and as a result knows the disability of the other Hispanic female who was an English language learner enrolled in special education classes who did not graduate. These are some examples of situations in which small cell data reveals personally identifiable information from education records.

The Secretary has no statutory authority to modify the regulations to allow LEAs and SEAs to report that 100 percent of students achieved specified performance levels. In that regard we note that the Department's Non-Regulatory Guidance for NCLB Report Cards (2003) provides:

[S]chools must also ensure that the data they report do not reveal personally identifiable information about individual students * * *. States must adopt a strategy

for dealing with a situation in which all students in a particular subgroup scored at the same achievement level. One solution, referred to as ''masking'' the data, is to use the notation of >95% when all students in a subgroup score at the same achievement level.

See *www.ed.gov/programs/titleiparta/reportcardsguidance.doc* on page 3. Likewise, LEAs and SEAs must adopt a strategy for ensuring that they do not disclose personally identifiable information about low-performing students when they release information about their high-performing students.

In response to the comments that paragraphs (1) and (2) in § 99.31(b) are confusing, paragraph (1) establishes a standard for de-identifying education records that applies to disclosures made to any party for any purpose, including, for example, parents and other members of the general public who are interested in school accountability issues, as well as education policy makers and researchers. The release of de-identified information from education records under § 99.31(b)(1) is not limited to education research purposes because, by definition, the information does not contain any personally identifiable information.

Paragraph (2) of § 99.31(b) applies only to parties conducting education research; it allows an educational agency or institution, or a party that has received education records, such as a State educational authority, to attach a code to each record that may allow the researcher to match microdata received from the same educational source under the conditions specified. The purpose of paragraph (2) is to facilitate education research by authorizing the release of coded microdata. The requirements in paragraph (2) that apply to a record code preclude matching de-identified data from education records with data from another source. Therefore, by its terms, the release of coded microdata under paragraph (2) is limited to education research.

We agree with the commenter who stated that the reference in § 99.31(b)(1) to ''unique patterns of information about a student'' is confusing in relation to the definition of *personally identifiable information* and believe that it essentially restated the requirements in paragraph (f) of the definition. Therefore, we have removed this phrase from the regulations. We disagree that the definition of *personally identifiable information* and the requirements in § 99.31(b) impose an unnecessary burden on the entity receiving a request for de-identified information from education records and that the requirements in paragraph (f) in the definition are sufficient. As explained above, paragraph (f) does not address the problem of targeted requests. It also does not address the re-identification risk associated with multiple data releases and other reasonably available information, or allow for the coding of de-identified micro data for educational research purposes. Section 99.31(b) provides the additional standards needed to help ensure that educational agencies and institutions and other parties do not identify students when they release redacted records or statistical data from education records.

*Changes:* We have removed the reference to ''unique patterns of information'' in § 99.31(b).

**Notification of Subpoena (§ 99.33(b)(2))**

*Comment:* We received a few comments on our proposal in § 99.33(b)(2) to require a party that has received personally identifiable information from education records from an educational agency or institution to provide the notice to parents and eligible students under § 99.31(a)(9) before it discloses that information on behalf of an educational agency or institution in compliance with a judicial order or lawfully issued subpoena. One national education association supported the proposed amendment.

One commenter asked the Department to clarify the intent of the proposed language. This commenter said that, when an educational agency or institution requests that a third party make the disclosure to comply with a lawfully issued subpoena or court order, it is reasonable to expect the educational agency or institution to send the required notice to the student(s). The commenter also said that it was not clear from the proposed change whether it is sufficient for the educational agency or institution to send the notice or whether it must come from the third party.

*Discussion:* The Secretary agrees that there needs to be clarification about which party is responsible for notifying parents and eligible students before an SEA or other third party outside of the educational agency or institution discloses education records to comply with a lawfully issued subpoena or court order. We have revised the regulation to provide that the burden to notify a parent or eligible student rests with the recipient of the subpoena or court order. While a third party, such as an SEA, that is the recipient of a subpoena or court order is responsible for notifying the parents and eligible students before complying with the order or subpoena, the educational agency or institution could assist the third party in the notification requirement, by providing it with contact information so that it could provide the notice.

In order to ensure that this new requirement is enforceable, we have also revised § 99.33(e) so that if the Department determines that a third party, such as an SEA, did not provide the notification required under § 99.31(a)(9)(ii), the educational agency or institution may not allow that third party access to education records for at least five years.

*Changes:* We have amended § 99.33(b)(2) to clarify that the third party that receives the subpoena or court order is responsible for meeting the notification requirements under § 99.31(a)(9). We also have revised § 99.33(e) to provide that if the Department determines that a third party, such as an SEA, did not provide the notification required under § 99.31(a)(9)(ii), the educational agency or institution may not allow that third party access to education records for at least five years.

**Health or Safety Emergency (§ 99.36)**

*Comment:* We received many comments in support of our proposal to amend § 99.36 regarding disclosures of personally identifiable information without consent in a health or safety emergency. Most of the parties that commented stated that the proposed changes demonstrated the right balance between student privacy and campus safety. A number of commenters specifically supported the clarification regarding the disclosure of information from an eligible student's education records to that student's parents when a health or safety emergency occurs. One commenter said that the proposed amendment would provide appropriate protection for sensitive and otherwise protected information while clarifying that educational agencies and institutions may notify parents and other appropriate individuals in an emergency so that they may intervene to help protect the health and safety of those involved.

*Discussion:* We appreciate the commenters' support for the amendments to the ''health or safety emergency'' exception in § 99.36(b). Educational agencies and institutions are permitted to disclose personally identifiable information from students' education records, without consent, under § 99.31(a)(10) in connection with a health or safety emergency. Disclosures under § 99.31(a)(10) must meet the conditions described in § 99.36. We address specific comments

about the proposed amendments to this exception in the following paragraphs.

*Changes:* None.

### (a) Disclosure in Non-Emergency Situations

*Comment:* Some commenters suggested that we interpret § 99.36 to permit the sharing of information on reportable diseases to health officials in non-emergency situations. These commenters stated that the disclosure of routine immunization data should be subject to State, local, and regional public health laws and regulations and not FERPA. One of these commenters noted that the HIPAA Privacy Rule allows covered entities to disclose personally identifiable health data, without consent, to public health authorities.

*Discussion:* There is no authority in FERPA to exclude students' immunization records from the definition of *education records* in FERPA. Further, the HIPAA Privacy Rule specifically excludes from coverage health care information that is maintained as an ''education record'' under FERPA. 45 CFR 160.103, Protected health information. We understand that the HIPAA Privacy Rule allows covered entities to disclose identifiable health data without written consent to public health authorities. However, there is no statutory exception to the written consent requirement in FERPA to permit this type of disclosure.

As explained in the preamble to the NPRM (73 FR 15589), the amendment to the health or safety emergency exception in § 99.36 does not allow disclosures on a routine, non-emergency basis, such as the routine sharing of student information with the local police department. Likewise, this exception does not cover routine, non-emergency disclosures of students' immunization data to public health authorities. Consequently, there is no statutory basis for the Department to revise the regulatory language as requested by the commenters.

*Changes:* None.

### (b) Strict Construction Standard

*Comment:* Several commenters expressed concern that removing the language from current § 99.36 requiring strict construction of the ''health and safety emergency'' exception and substituting the language providing for a ''rational basis'' standard would not require schools to make an individual assessment to determine if there is an emergency that warrants a disclosure. One commenter stated that removal of the ''strict construction'' requirement would severely weaken the

Department's enforcement capabilities and that schools may see this change as an excuse to disclose sensitive student information when there is not a real emergency.

A commenter stated that the removal of the ''strict construction'' requirement would mean that the Department would eliminate altogether its review of actions taken by schools under the health and safety emergency exception. Another commenter stated that removing the requirement that this exception be strictly construed could erode the privacy rights of individuals. The commenter noted that because parents and eligible students cannot bring suit in court to enforce FERPA, schools face virtually no liability if they violate FERPA requirements.

A commenter asked that the Department clarify what is meant by an ''emergency'' and how severe a concern must be to qualify as an emergency.

*Discussion:* Section 99.36(c) eliminates the previous requirement that paragraphs (a) and (b) of this section be ''strictly construed'' and provides instead that, in making a determination whether a disclosure may be made under the ''health or safety emergency'' exception, an educational agency or institution may take into account the totality of the circumstances pertaining to a threat to the health or safety of a student or other individuals. The new provision states that if there is an articulable and significant threat to the health or safety of the student or other individuals, an educational agency or institution may disclose information to appropriate parties.

As we indicated in the preamble to the NPRM, we believe paragraph (c) provides greater flexibility and deference to school administrators so they can bring appropriate resources to bear on a circumstance that threatens the health or safety of individuals. 73 FR 15574, 15589. In that regard, paragraph (c) provides that the Department will not substitute its judgment for that of the agency or institution if, based on the information available at the time of the determination there is a rational basis for the agency's or institution's determination that a health or safety emergency exists and that the disclosure was made to appropriate parties.

We do not agree that removal of the ''strict construction'' standard weakens FERPA or erodes privacy protections. Rather, the changes appropriately balance the important interests of safety and privacy by providing school officials with the flexibility to act quickly and decisively when emergencies arise. Schools should not

view FERPA's ''health or safety emergency'' exception as a blanket exception for routine disclosures of student information but as limited to disclosures necessary to protect the health or safety of a student or another individual in connection with an emergency.

After consideration of the comments, we have determined that educational agencies and institutions should be required to record the ''articulable and significant threat to the health or safety of a student or other individuals'' so that they can demonstrate (to parents, students, and to the Department) what circumstances led them to determine that a health or safety emergency existed and how they justified the disclosure. Currently, educational agencies and institutions are required under § 99.32(a) to record any disclosure of personally identifiable information from education records made under § 99.31(a)(10) and § 99.36. We are revising the recordation requirements in § 99.32(a)(5) to require an agency or institution to record the articulable and significant threat that formed the basis for the disclosure. The school must maintain this record with the education records of the student for as long as the student's education records are maintained (§ 99.32(a)(2)).

We do not specify in the regulations a time period in which an educational agency or institution must record a disclosure of personally identifiable information from education records under § 99.32(a). We interpret this to mean that an agency or institution must record a disclosure within a reasonable period of time after the disclosure has been made, and not just at the time, if any, when a parent or student asks to inspect the student's record of disclosures. We will treat the requirement to record the significant and articulable threat that forms the basis for a disclosure under the health or safety emergency exception no differently than the recordation of other disclosures. In determining whether a period of time for recordation is reasonable, we would examine the relevant facts surrounding the disclosure and anticipate that an agency or institution would address the health or safety emergency itself before turning to recordation of any disclosures and other administrative matters.

In response to concerns about the Department's enforcement of the provisions of § 99.36, the ''rational basis'' test does not eliminate the Department's responsibility for oversight and accountability. Actions that the Secretary may take in addressing violations of this and other

FERPA provisions are addressed in the analysis of comments under the section in this preamble entitled *Enforcement.* While parents and eligible students do not have a right to sue for violations of FERPA in a court of law, the statute provides that the Secretary may not make funds available to any agency or institution that has a policy or practice of violating parents' and students' rights under the statute with regard to consent to the disclosure of education records. As such, parents and eligible students may file a complaint with the Office if they believe that a school has violated their rights under FERPA and has disclosed education records under § 99.36 inconsistent with these regulations. In conducting an investigation, the Office will require that schools identify the underlying facts that demonstrated that there was an articulable and significant threat precipitating the disclosure under § 99.36.

In response to the comment about what would constitute an emergency, FERPA permits disclosure "* * * in connection with an emergency * * * to protect the health or safety of the student or other persons." 20 U.S.C. 1232g(b)(1)(I). We note that the word "protect" generally means to keep from harm, attack, or injury. As such, the statutory text underscores that the educational agency or institution must be able to release information from education records in sufficient time for the institution to act to keep persons from harm or injury. Moreover, to be "in connection with an emergency" means to be related to the threat of an actual, impending, or imminent emergency, such as a terrorist attack, a natural disaster, a campus shooting, or the outbreak of an epidemic such as e-coli. An emergency could also be a situation in which a student gives sufficient, cumulative warning signs that lead an educational agency or institution to believe the student may harm himself or others at any moment. It does not mean the threat of a possible or eventual emergency for which the likelihood of occurrence is unknown, such as would be addressed in emergency preparedness activities.

*Changes:* We have amended the recordkeeping requirements in § 99.32(a)(5) to require educational agencies and institutions to record the articulable and significant threat that formed the basis for a disclosure under the health or safety emergency exception and the parties to whom the information was disclosed.

### (c) Articulable and Significant Threat

*Comment:* One commenter stated that the word "articulable" in § 99.36(c) was confusing in reference to a school's determination that there is an "articulable and significant threat to the health or safety of a student or other individuals." This commenter stated that school officials might interpret the provision to mean that there must be a verbal threat or that school officials must write down the exact wording of the threat.

*Discussion:* The requirement that there must be an "articulable and significant threat" does not mean that the threat must be verbal. It simply means that the institution must be able to articulate what the threat is under § 99.36 when it makes and records the disclosure.

In that regard, the words "articulable and significant" are adjectives modifying the key noun "threat." As such, the focus is on the threat, with the question being whether the threat itself is articulable and significant. The word "articulable" is defined to mean "capable of being articulated." *http://www.merriam-webster.com/dictionary/articulable.* This portion of the standard simply requires that a school official be able to express in words what leads the official to conclude that a student poses a threat. The other half of the standard is the word "significant," which means "of a noticeably or measurably large amount." *http://www.merriam-webster.com/dictionary/significant.* Taken together, the phrase "articulable and significant threat" means that if a school official can explain why, based on all the information then available, the official reasonably believes that a student poses a significant threat, such as a threat of substantial bodily harm, to any person, including the student, the school official may disclose education records to any person whose knowledge of information from those records will assist in protecting a person from that threat.

*Changes:* None.

### (d) Parties That May Receive Information Under § 99.36

*Comment:* A commenter recommended that the Department adopt a more subjective standard regarding the persons to whom education records may be disclosed under § 99.36, suggesting that we remove the requirement that the disclosure must be to a person "whose knowledge of the information is necessary to protect the health or safety of the student or other individuals." Conversely, another commenter

expressed concern that the Department was sending the wrong message to educational agencies and institutions with these changes to § 99.36. The commenter stated that the health or safety emergency exception must not be perceived to permit schools to routinely disclose education records to parents, police, or others.

A commenter asked who at a school may share personally identifiable information in a health or safety emergency, and specifically whether a school secretary would be allowed to tell parents that a student on campus made a threat to others.

A commenter stated that school districts, especially small or rural districts, may not have the expertise on staff to determine whether a situation constitutes an "articulable and significant threat." The commenter said that personally identifiable information on students may need to be disclosed to outside law enforcement and mental health professionals so that they can help schools determine whether a real threat exists. The commenter recommended that the Department change the proposed regulations to allow school districts to involve outside experts in determining whether a health or safety emergency exists. Noting that the NPRM addressed the disclosure of education records to an eligible student's parents, the organization also asked for clarification regarding whether the parents of a potential perpetrator and the potential victim at the K–12 level could be told about a threat.

Several commenters stated that our proposed amendments did not go far enough and urged the Department to expand § 99.36 to permit a school to notify whomever the student has listed as his or her emergency contact. Another commenter requested that the Secretary, through these regulations, direct institutions to proactively notify parents of students who are in acute care situations, such as illness or accidents, if any institutional official is aware of the emergency.

*Discussion:* On its face, FERPA permits disclosure to "appropriate persons if the knowledge of such information is necessary to protect the health or safety of the student or other persons." 20 U.S.C. 1232g(b)(1)(I). FERPA does not require that the person receiving the information be responsible for providing the protection. Rather, the focus of the statutory provision is on the information itself: The "health or safety emergency" exception permits the institution to disclose information from education records in order to gather information from any person who has information that would be necessary to

provide the requisite protection. Thus, for example, an educational institution that reasonably believes that a student poses a threat of bodily harm to any person may disclose information from education records to current or prior peers of the student or mental health professionals who can provide the institution with appropriate information to assist in protecting against the threat. Moreover, the institution may disclose records to persons such as law enforcement officials that it determines may be helpful in providing appropriate protection from the threat. An educational agency or institution may also generally disclose information under § 99.36 to a potential victim and the parents of a potential victim as ''other individuals'' whose health or safety may need to be protected.

Similarly, in order to obtain information that would inform its judgment on how to address the threat, the student's current institution may disclose information from education records to other schools or institutions which the student previously attended. In that regard, the same set of facts underlying the current institution's determination that an emergency existed would also permit former schools and institutions attended by the student to disclose personally identifiable information from education records to the student's current institution. That is, a former school would not need to make a separate determination regarding the existence of an articulable and significant threat to the health or safety of a student or others, and could rely instead on the determination made by the school currently attended by the student in making the disclosure.

In the discussion on page 15589 of the NPRM, we noted that the ''health or safety emergency'' exception does not permit a local school district to routinely share its student information database with the local police department. This example was meant to clarify that FERPA's health or safety provisions would not permit a school to disclose without consent education records to the local police department unless there was a health or safety emergency and the disclosure of the information was necessary to protect the health or safety of students or other individuals. This does not prevent schools from having working relationships with local police authorities and to use local police officers in maintaining the safety of their campuses.

In response to the comment about which school official should be permitted to disclose information under

§ 99.36, an educational agency or institution will need to make its own determination about which school officials may access a student's education records and disclose information to parents or other parties whose knowledge of the information is necessary to protect the health or safety of the student or other individuals. Under § 99.31(a)(1), an educational agency or institution may disclose education records, without consent, to school officials whom the agency or institution has determined have legitimate educational interests in the information. It may be helpful for schools to have a policy in place concerning which school officials will have access to and the responsibility for disclosing information in emergency situations.

We understand that some educational agencies and institutions may need assistance in determining whether a health or safety emergency exists for purposes of complying with these regulations. The Department encourages schools to implement a threat assessment program, including the establishment of a threat assessment team that utilizes the expertise of representatives from law enforcement agencies in the community. Schools can respond to student behavior that raises concerns about a student's mental health and the safety of the student and others that is chronic or escalating by using a threat assessment team, and then make other disclosures under the health or safety emergency exception, as appropriate, when an ''articulable and significant threat'' exists. Information on establishing a threat assessment program and other helpful resources for emergency situations can be found on the Department's Web site at: *http:// www.ed.gov/admins/lead/safety/ edpicks.jhtml?src=ln.*

An educational agency or institution may disclose education records to threat assessment team members who are not employees of the district or institution if they qualify as ''school officials'' with ''legitimate educational interests'' under § 99.31(a)(1)(i)(B), which is discussed elsewhere in this preamble. To receive the education records under the ''school officials'' exception, members of the threat assessment team must be under the direct control of the educational agency or institution with respect to the maintenance and use of personally identifiable information from education records. For example, a representative from the city police who serves on a school's threat assessment team generally could not redisclose to the city police personally identifiable information from a student's education

records to which he or she was privy as part of the team. As noted above, however, the institution may disclose personally identifiable information from education records when and if the threat assessment team determines that a health or safety emergency exists under §§ 99.31(a)(10) and 99.36.

We believe that § 99.36 does not need to be expanded to permit a school to contact whomever an eligible student has listed as his or her emergency contact, nor is there authority to do so. FERPA does not preclude institutions from contacting other parties, including parents, in addition to the emergency contacts provided by the student, if the school determines these other parties are ''appropriate parties'' under this exception. (An eligible student may provide consent for the institution to notify certain individuals in case of an emergency, should an emergency occur.)

The regulations would not prevent an institution from having a policy of seeking prospective consent from eligible students for the disclosure of personally identifiable information or from having a policy for obtaining consent for disclosure on a case-by-case basis. However, FERPA does not require that a postsecondary institution disclose information to any party except to the eligible student, even if the student has consented to the disclosure. Thus, the Secretary does not have the statutory authority to require school officials to disclose information from a student's education records in compliance with a consent signed by the student or to otherwise require the institution to contact a family member.

*Changes:* None.

*(e) Treatment Records*

*Comment:* A commenter stated that while the amendments to § 99.36 provide needed clarification about when an educational agency or institution may disclose students' education records to avert tragedies like the one at Virginia Tech in April 2007, the NPRM did not provide clarity on the issue of information sharing between on-campus and off-campus health care providers. The commenter also noted that the Virginia Tech Review Panel recommended that Congress amend FERPA to explain how Federal privacy laws apply to medical records held for treatment purposes and that the NPRM did not provide that clarity.

Another commenter stated that if information about a student related to a health or safety emergency is part of the treatment records maintained by a university's health clinic, the treatment records should be treated like education

records so that they may be disclosed under the health and safety emergency exception. A commenter asked that the Department clarify that college health and mental health records are not education records under FERPA and must be treated like other health and mental health records in other settings.

*Discussion:* While we have carefully considered the comments concerning ''treatment records,'' the Secretary does not believe that it is necessary to amend the regulations to provide clarification on the handling of health and medical records. The Departments of Education and Health and Human Services have issued joint guidance that explains the relationship between FERPA and the HIPAA Privacy Rule. The guidance addresses this issue for these records at the elementary and secondary levels, as well as at the postsecondary level. The joint guidance, which is on the Web sites of both agencies, addresses many of the questions raised by school administrators, health care professionals, and others as to how these two laws apply to records maintained on students. It also addresses certain disclosures that are allowed without consent or authorization under both laws, especially those related to health and safety emergency situations. The guidance can be found here: *http:// www.ed.gov/policy/gen/guid/fpco/ index.html.*

As discussed elsewhere in this preamble with respect to § 99.31(a)(2), while ''treatment records'' are excluded from the definition of *education records* under FERPA, if an eligible student's treatment records are used for any purpose other than the student's treatment, or if a school wishes to disclose the treatment records for any purpose other than the student's treatment, they may only be disclosed as education records subject to FERPA requirements. Therefore, an eligible student's treatment records may be disclosed to any party, without consent, as long as the disclosure meets one of the exceptions to FERPA's general consent rule. *See* 34 CFR 99.31. One of the permitted disclosures under this section is the ''health or safety emergency'' exception.

*Changes:* None.

**Identification and Authentication of Identity (§ 99.31(c))**

*Comment:* Several commenters supported our proposal to require educational agencies and institutions to use reasonable methods to identify and authenticate the identity of parents, students, school officials, and any other parties to whom the agency or

institution discloses personally identifiable information from education records. One commenter supported the provision but advocated requiring the use of two-factor identification for information that could be used to commit identity theft and financial fraud. (Two-factor identification requires the use of two methods to authenticate identity, such as fingerprint identification in addition to a PIN.)

One commenter said that the identification and authentication requirement will help protect students affected by domestic violence who are living in substitute care situations. The commenter noted that many parents in situations involving domestic violence do not have photo identification (ID) and would be unable to meet a requirement to provide photo ID in order to access their children's education records.

One commenter strongly supported the proposed amendment and said it will be valuable in aiding the privacy and protection of homeless children. Another commenter questioned whether the identification and authentication requirement is necessary for staff of large school districts with centralized offices.

One commenter did not support the proposed regulation stating that it will be an additional burden on school districts. The commenter agreed with our statement in the preamble to the NPRM that the regulations should permit districts to determine their own methods of identification and authentication. However, the commenter stated that districts should not be required to have a sliding scale of control based on the level of potential threat and harm and that it would not be practical to give every person requesting access to education records a PIN or similar method of authentication. For example, the commenter stated that parents might be provided with a PIN, but districts would not want to provide a PIN to a reporter or other third party. The commenter requested additional examples of how districts may authenticate requests received by phone or e-mail. The commenter also stated that districts are sometimes concerned that government-issued photo IDs are fraudulent. As a result, the group requested that the Department adopt a ''safe harbor'' provision that requiring a government-issued photo ID for in-person requests is reasonable.

One commenter expressed concern that the proposed regulations were too restrictive and could be too complex to administer, and that this would cause an institution to choose not to transfer

information even though it is permitted to do so. This commenter added whether the Department will accept an institution's efforts at compliance as sufficient without examining the effectiveness of those efforts.

*Discussion:* The identification and authentication methods discussed in the NPRM (73 FR 15585) are intended as examples and should not be considered to be exhaustive. Because there are many methods available to provide secure authentication of identity, and as more methods continue to be developed, we do not think it appropriate at this time to require the use of two-factor authentication as requested by the commenter. Two-factor authentication can be expensive and cumbersome, and we believe that each educational agency or institution should decide whether to use its resources to implement a two-factor authentication method or another reasonable method to ensure that education records are disclosed only to an authorized party. The comment that a portion of the population will be disadvantaged if only photo ID is permitted to authenticate identity confirms that we need to retain flexibility in the regulations.

We do not agree that certain types of staff should be excepted from the identification and authentication requirement. All staff members, whether in a centralized office, or in separate administrative offices throughout a school system, must be cognizant of and responsible for complying with identification and authentication requirements.

Due to the differences in size, complexity, and access to technology, we believe that educational agencies and institutions should have the flexibility to decide the methods for identification and authentication of identity best suited to their own circumstances. The regulatory requirement is that agencies and institutions use ''reasonable'' methods to identify and authenticate identity when disclosing personally identifiable information from education records. ''Effectiveness'' is certainly one measure, but not necessarily a dispositive measure, of whether the methods used by an agency or institution are ''reasonable''. As we explained in the NPRM, an agency or institution is not required to eliminate all risk of unauthorized disclosure of education records but to reduce that risk to a level commensurate with the likely threat and potential harm. 73 FR 15585.

Further in that regard, we note that a ''sliding scale'' of protection is not mandated *per se.* However, it may not be ''reasonable'' to use the same

methods to protect students' SSNs or credit card numbers from unauthorized access and disclosure that are used to protect students' names and other directory information. We believe that a PIN process could be useful to provide access to education records for parties, such as parents, students, or school officials, but that it would not generally be useful for providing records to outside parties, such as reporters or parties seeking directory information. While the use of government-issued photo ID may be a reasonable method to authenticate identity, depending on the circumstances and the information being released, we are unable to conclude at this time that it is sufficiently secure to constitute a safe harbor for meeting this requirement.

*Changes:* None.

**Enforcement (§ 99.64)**

*(a) § 99.64(a)*

*Comment:* One commenter supported our proposal to amend § 99.64(a) to provide that a complaint submitted to FPCO does not have to allege that a violation or failure to comply with FERPA is based on a policy or practice of the agency or institution. The commenter stated that parents often are not aware of legal and technical criteria, and complaints filed by parents should not be subject to technical rules typically applied to filings made by attorneys.

Another commenter did not support the proposed amendment and asked several questions concerning the effects of the change. The commenter asked whether this provision means that the Office will investigate an allegation concerning a single and perhaps unintentional action not related to a policy or practice of the institution. The commenter also asked whether such an investigation could result in a finding of a violation if the finding is not based on an institution's policy or practice, and what enforcement actions can be taken in those circumstances. The commenter suggested that we modify the regulations to provide that, for complaints not alleging a violation based on an institution's policy or practice, the Office will undertake an investigation only when it determines that the allegations are of a sufficiently serious nature to warrant an inquiry.

*Discussion:* The changes we proposed in this section were intended to clarify that it is sufficient for a complaint to allege that an educational agency or institution violated a requirement of FERPA, and that a complaint does not need to allege that the violation is a result of a policy or practice of an agency or institution in order for the Office to investigate the complaint.

We explain in our discussion of the proposed changes to § 99.67 that the Secretary must find that an educational agency or institution has a policy or practice in violation of the non-disclosure requirements in FERPA before seeking to withhold, terminate, or recover program funds for that violation. However, FPCO is not limited to investigating complaints and finding that an educational agency or institution violated FERPA only if the allegations and findings are based on a policy or practice of an educational agency or institution.

Moreover, we do not agree that only conduct that involves a policy or practice or that affects multiple students is serious enough to warrant an investigation of the allegations. An educational agency or institution may not even be aware of FERPA violations committed by its own school officials until the Office investigates an allegation of misconduct. These kinds of investigations often serve the very important purpose of helping ensure that single instances of misconduct do not become policies or practices of an agency or institution. Further, while an agency or institution may not think that a single, unintentional violation of FERPA is significant, it is often considered serious by the parent or student affected by the violation.

Therefore, consistent with its current practice, the Office may find that an educational agency or institution violated FERPA without also finding that the violation was based on a policy or practice. Note that under §§ 99.66(c) and 99.67, the Office may not take any enforcement action against an agency or institution that has violated FERPA until it provides the agency or institution with a reasonable period of time to come into compliance voluntarily.

*Changes:* None.

*(b) § 99.64(b)*

*Comment:* A number of commenters supported proposed § 99.64(b), which provided that the Office may investigate a possible FERPA violation even if it has not received a timely complaint from a parent or student or if a valid complaint is subsequently withdrawn. Several of these commenters stated that it is appropriate and important to permit persons who are not parents or eligible students, but who have knowledge of potential FERPA violations, to provide this information to the Office for consideration of a possible investigation.

Several commenters objected to the proposed change. One commenter expressed serious concern that the regulations will greatly expand the authority of the Office to investigate any potential FERPA violation, even when no complaint is filed or when a complaint has been withdrawn. In particular, the commenter stated that an institution would not have an opportunity to review and respond to specific allegations when the investigation does not concern a particular complaint.

Another commenter asserted that the Department has not demonstrated why the proposed amendment is necessary. The commenter said that unless there is evidence of a widespread problem, the proposed change will increase university costs in responding to investigations without a corresponding benefit to the public.

Another commenter said that the Office should not investigate allegations that are not filed by a parent or eligible student because an institution must know the name of the filing party and the specific circumstances of the allegation in order to properly defend its actions. The commenter said that it should not be unnecessarily burdened by an investigation by the Office when it has already dealt with the situation to the satisfaction of the affected student, and that any student who is not satisfied with the institution's efforts retains the ability to file a complaint. The commenter also noted that a complaint filed by an affected student has more credibility than allegations made by other parties. The commenter was concerned that accepting information from other parties could result in filings from persons with grievances unrelated to FERPA, such as a disgruntled employee, or an applicant rejected for admission, or a parent or eligible student who missed a filing deadline of some kind.

One commenter said that the proposed change would result in an ineffective use of the limited resources of the Office because it would be investigating allegations that may not have a sufficient basis.

*Discussion:* We proposed the changes to § 99.64(b) to clarify that the Office may initiate its own investigation that an educational agency or institution has violated FERPA. (The amendment also clarifies that if the Office determines that an agency or institution violated FERPA, it may also determine whether the violation was based on a policy or practice of the agency or institution.)

Our experience has shown that sometimes FERPA violations are brought to the attention of the Office by

AR 0788

school officials, officials in other schools, or by the media. It is important that the Office have authority to investigate allegations of non-compliance in these situations. Consistent with its current practice, a notice of investigation issued by the Office will provide sufficient and specific factual information to permit the agency or institution to adequately investigate and respond to the allegations, whether or not the investigation is based on a complaint by a parent or eligible student.

We do not agree that allowing the Office to initiate its own investigations of possible FERPA violations will lead to abuses of the process by persons seeking to redress other grievances with an institution. The Office will continue to be responsible for evaluating the validity of the information and allegations that come to its attention by means other than a valid complaint and determining whether to initiate an investigation. We do not anticipate that the Office will initiate an investigation of every allegation or information it receives. We believe, however, that it is important that the Office be able to investigate any violation of FERPA for which it receives notice. As stated in the NPRM, 73 FR 15591, the Department is not seeking to expand the scope of FERPA investigations beyond the current practices of the Office.

*Changes:* None.

*(c) § 99.66*

*Comment:* We received one comment on the proposed change to § 99.66(c), which allows but does not require FPCO to make a finding that an educational agency or institution has a policy or practice in violation of a FERPA requirement when the Office issues a notice of findings in § 99.66(b). The commenter stated that its review of FERPA and the Supreme Court decision in *Gonzaga University* v. *Doe,* 536 U.S. 273 (2002) (*Gonzaga*), indicates that the Office may not issue a finding of a violation of FERPA and require corrective action or take any enforcement action without also finding that the violation constituted a policy or practice of the agency or institution.

*Discussion:* We explain in the discussion of the changes to § 99.67 that there are circumstances in which the Office would be required to find that an educational agency or institution has a policy or practice in violation of a FERPA requirement before taking certain enforcement actions, such as an action to terminate funding for a violation of the non-disclosure requirements, 20 U.S.C. 1232g(b)(1) and (b)(2) and 34 CFR 99.30. However, the

Office is not required to find a policy or practice in violation of FERPA before issuing a notice of findings or taking other kinds of enforcement actions.

*Changes:* None.

*(d) § 99.67*

*Comment:* One commenter supported the clarification in proposed § 99.67 that the Office may not seek to withhold payments, terminate eligibility for funding, or take certain other enforcement actions unless it determines that the educational agency or institution has a policy or practice that violates FERPA. Another commenter expressed general support for the proposed change, including the clarification that the Secretary may take any legally available enforcement action, in addition to those specifically listed in the current regulations. The commenter expressed concern, however, that the penalties are not severe enough to effectively discourage unintentional or willful violations by third parties, particularly in areas of research and data sharing with outside parties.

Another commenter expressed concern that the proposed amendment would unnecessarily broaden the enforcement options available to the Secretary. The commenter stated that educational agencies and institutions will not be able to assess the risks and consequences associated with their actions without a limitation on the range of enforcement actions available to the Department when a violation of FERPA is found.

One commenter asked the Department to clarify that all methods of enforcing FERPA that are contained in the current regulations will be retained in the final regulations. The commenter said that the proposed regulations in the NPRM (73 FR 15602) appear to remove the Secretary's ability to terminate funding.

*Discussion:* We explained in the preamble to the NPRM (73 FR 15592) that there were two reasons for the proposed changes to § 99.67(a). One was the need to clarify that the Secretary may take any enforcement action that is legally available and is not limited to those specified under the current regulations, *i.e.,* withholding further payments under any applicable program; issuing a complaint to compel compliance through a cease-and-desist order; or terminating eligibility to receive funding under any applicable program. Other actions the Secretary may take to enforce FERPA include entering into a compliance agreement under 20 U.S.C. 1234f and seeking an injunction.

This change to § 99.67(a) does not broaden the Secretary's enforcement options, as suggested by one commenter. The General Education Provisions Act (GEPA) provides the Secretary with the authority to take certain enforcement actions to address violations of statutory and regulatory requirements, including general authority to ''take any other action authorized by law with respect to the recipient.'' 20 U.S.C. 1234c(a)(4). The change to § 99.67(a) simply includes, for purposes of clarity, the Secretary's existing authority under GEPA to take any legally available action to enforce FERPA requirements. (We note that before taking enforcement action the Office must determine that the educational agency or institution is failing to comply substantially with a FERPA requirement and provide it with a reasonable period of time to comply voluntarily. See 20 U.S.C. 1234c(a); 20 U.S.C. 1232g(f); and 34 CFR 99.66(c).)

We also proposed to amend § 99.67(a) to clarify that the Office may issue a notice of violation for failure to comply with specific FERPA requirements and require corrective actions but may not seek to terminate eligibility for funding, withhold payments, or take other enforcement actions unless the Office determined that an agency or institution has a policy or practice in violation of FERPA requirements (73 FR 15592). Upon further review, we have decided not to adopt this particular change because we believe it limits the Secretary's enforcement authority in a manner that is not legally required.

In support of its holding in *Gonzaga* that FERPA's non-disclosure provisions do not create rights that are enforceable under 42 U.S.C. 1983, the Court observed that FERPA provides that no funds shall be made available to an educational agency or institution that has a policy or practice of disclosing education records in violation of FERPA requirements. 536 U.S. at 288; see also 20 U.S.C. 1232g(b)(1) and (b)(2); 34 CFR 99.30. As such, the statute and Gonzaga decision suggest that with respect to violations of FERPA's non-disclosure requirements, the Secretary must find that an educational agency or institution has a policy or practice in violation of FERPA requirements before taking actions to terminate, withhold, or recover funds for those violations. However, there is no requirement under the statute (or the *Gonzaga* decision) for the Secretary to find a policy or practice in violation of FERPA requirements on the part of an educational agency or institution before taking other kinds of enforcement actions for violations of the non-disclosure requirements, such as

seeking an injunction or a cease-and-desist order. We note also that the *Gonzaga* opinion does not address violations of other FERPA requirements, such as parents' right to inspect and review their children's education records and the requirement that educational agencies and institutions afford parents an opportunity for a hearing to challenge the content of a student's education records under certain circumstances, which do not contain the same ''policy or practice'' language as the non-disclosure requirements. Because we did not address enforcement of these other FERPA requirements in the NPRM, we have decided not to address in the final regulations limitations or pre-conditions that apply solely to actions to terminate, withhold, or recover program funds for violations of the non-disclosure requirements.

In response to the comment that the available penalties are not severe enough to discourage FERPA violations, we note that the Secretary has authority to terminate, withhold, and recover program funds and take other enforcement actions in accordance with part E of GEPA. The Secretary may not increase penalties beyond those authorized under FERPA and GEPA. Further, the regulations do not remove the Secretary's authority to terminate eligibility for program funding or any other enforcement authority. The changes noted by the commenter who was concerned that the proposed regulations removed the Secretary's authority to terminate funding were corrections to punctuation and formatting only, not substantive changes.

*Changes:* We have removed the language in § 99.67(a) that requires the Office to determine that an educational agency or institution has a policy or practice in violation of FERPA requirements before taking any enforcement action.

**Department Recommendations for Safeguarding Education Records**

*Comment:* We received a few comments on the recommendations for safeguarding education records included in the NPRM. One commenter expressed concern that schools and school districts should exercise enhanced security for the records of children receiving special education services. According to the commenter, these children often have a large number of records and may receive services from a variety of providers, which can add to the challenge of ensuring that appropriate privacy controls are used.

One commenter supported the safeguarding recommendations and suggested that we revise the recommendations to list non-Federal government sources providing guidance on methods for safeguarding education records. Another commenter supported the recommendations, but suggested that the regulations should require that a parent or eligible student receive notification of an unauthorized release or theft of information.

*Discussion:* The comments on the records of students who receive special education services illustrate the necessity for educational agencies and institutions to ensure that adequate controls are in place so that the education records of all students are handled in accordance with FERPA's privacy protections. The safeguarding recommendations that we provided in the NPRM, and are repeated in these final regulations, are intended to provide agencies and institutions additional information and resources to assist them in meeting this responsibility. In addition, educational agencies and institutions should refer to the protections required under § 300.623 of the confidentiality of information requirements in Part B of the IDEA, 34 CFR 300.623 (Safeguards).

We acknowledge that there are many sources available concerning information security technology and processes. The Department does not wish to appear to endorse the information or product of any company or organization; therefore, we have included only Federal government sources in this notice.

The Department does not have the authority under FERPA to require that agencies or institutions issue a direct notice to a parent or student upon an unauthorized disclosure of education records. FERPA only requires that the agency or institution record the disclosure so that a parent or student will become aware of the disclosure during an inspection of the student's education record.

*Changes:* None.

We are republishing here, for the administrative convenience of educational agencies and institutions and other parties, the *Department Recommendations for Safeguarding Education Records* that were published in the preamble to the NPRM (73 FR 15598–15599):

The Department recognizes that agencies and institutions face significant challenges in safeguarding educational records. We are providing the following information and recommendations to assist agencies and institutions in meeting these challenges.

As noted elsewhere in this document, FERPA provides that no funds administered by the Secretary may be made available to any educational agency or institution that has a policy or practice of releasing, permitting the release of, or providing access to personally identifiable information from education records without the prior written consent of a parent or eligible student except in accordance with specified exceptions. In light of these requirements, the Secretary encourages educational agencies and institutions to utilize appropriate methods to protect education records, especially in electronic data systems.

In recent years the following incidents have come to the Department's attention:

• Students' grades or financial information, including SSNs, have been posted on publicly available Web servers;

• Laptops and other portable devices containing similar information from education records have been lost or stolen;

• Education records, or devices that maintain education records, have not been retrieved from school officials upon termination of their employment or service as a contractor, consultant, or volunteer;

• Computer systems at colleges and universities have become favored targets because they hold many of the same records as banks but are much easier to access. See ''College Door Ajar for Online Criminals'' (May 2006), available at *http://www.uh.edu/ednews/2006/latimes/200605/20060530hackers.html.* and July 10, 2006, Viewpoint in Business Week/Online available at *http://www.businessweek.com/technology/content/jul2006/tc20060710_558020.htm*;

• Nearly 65 percent of postsecondary educational institutions identified theft of personal information (SSNs, credit/debit/ATM card, account or PIN numbers, etc.) as a high risk area. See Table 7, Perceived Risks at *http://www.educause.edu/ir/library/pdf/ecar_so/ers/ers0606/Ekf0606.pdf*; and

• In December 2006, a large postsecondary institution alerted some 800,000 students and others that the campus computer system containing their names, addresses, and SSNs had been compromised.

The Department's Office of Inspector General (OIG) noted in Final Inspection Alert Memorandum dated February 3, 2006, that the Privacy Rights Clearinghouse reported that between February 15, 2005, and November 19, 2005, there were 93 documented computer breaches of electronic files

involving personal information from education records such as SSNs, credit card information, and dates of birth. According to the reported data, 45 percent of these incidents have occurred at colleges and universities nationwide. OIG expressed concern that student information may be compromised due to a failure to implement or administer proper security controls for information systems at postsecondary institutions.

The Department recognizes that no system for maintaining and transmitting education records, whether in paper or electronic form, can be guaranteed safe from every hacker and thief, technological failure, violation of administrative rules, and other causes of unauthorized access and disclosure. Although FERPA does not dictate requirements for safeguarding education records, the Department encourages the holders of personally identifiable information to consider actions that mitigate the risk and are reasonably calculated to protect such information. Of course, an educational agency or institution may use any method, combination of methods, or technologies it determines to be reasonable, taking into consideration the size, complexity, and resources available to the institution; the context of the information; the type of information to be protected (such as social security numbers or directory information); and methods used by other institutions in similar circumstances. The greater the harm that would result from unauthorized access or disclosure and the greater the likelihood that unauthorized access or disclosure will be attempted, the more protections an agency or institution should consider using to ensure that its methods are reasonable.

One resource for administrators of electronic data systems is ''The National Institute of Standards and Technology (NIST) 800–100, Information Security Handbook: A Guide for Managers'' (October 2006). *See http://csrc.nist.gov/ publications/nistpubs/800-100/SP800-100-Mar07-2007.pdf.* A second resource is NIST 800–53, Information Security, which catalogs information security controls. *See http://csrc.nist.gov/ publications/nistpubs/800-53-Rev1/800-53-rev1-final-clean-sz.pdf.* Similarly, a May 22, 2007, memorandum to heads of Federal agencies from the Office of Management and Budget requires executive departments and agencies to ensure that proper safeguards are in place to protect personally identifiable information that they maintain, eliminate the unnecessary use of SSNs, and develop and implement a ''breach notification policy.'' This memorandum,

although directed towards Federal agencies, may also serve as a resource for educational agencies and institutions. *See http:// www.whitehouse.gov/omb/memoranda/ fy2007/m07-16.pdf.*

Finally, if an educational agency or institution has experienced a theft of files or computer equipment, hacking or other intrusion, software or hardware malfunction, inadvertent release of data to Internet sites, or other unauthorized release or disclosure of education records, the Department suggests consideration of one or more of the following steps:

• Report the incident to law enforcement authorities.
• Determine exactly what information was compromised, *i.e.,* names, addresses, SSNs, ID numbers, credit card numbers, grades, and the like.
• Take steps immediately to retrieve data and prevent any further disclosures.
• Identify all affected records and students.
• Determine how the incident occurred, including which school officials had control of and responsibility for the information that was compromised.
• Determine whether institutional policies and procedures were breached, including organizational requirements governing access (user names, passwords, PINS, etc.); storage; transmission; and destruction of information from education records.
• Determine whether the incident occurred because of a lack of monitoring and oversight.
• Conduct a risk assessment and identify appropriate physical, technological, and administrative measures to prevent similar incidents in the future.
• Notify students that the Department's Office of Inspector General maintains a Web site describing steps students may take if they suspect they are a victim of identity theft at *http://www.ed.gov/about/offices/list/ oig/misused/idtheft.html;* and *http:// www.ed.gov/about/offices/list/oig/ misused/victim.html.*

FERPA does not require an educational agency or institution to notify students that information from their education records was stolen or otherwise subject to an unauthorized release, although it does require the agency or institution to maintain a record of each disclosure. 34 CFR 99.32(a)(1). (However, student notification may be required in these circumstances for postsecondary institutions under the Federal Trade Commission's Standards for Insuring

the Security, Confidentiality, Integrity and Protection of Customer Records and Information (''Safeguards Rule'') in 16 CFR part 314.) In any case, direct student notification may be advisable if the compromised data includes student SSNs and other identifying information that could lead to identity theft.

**Executive Order 12866**

Under Executive Order 12866, the Secretary must determine whether this regulatory action is ''significant'' and therefore subject to the requirements of the Executive Order and subject to review by OMB. Section 3(f) of Executive Order 12866 defines a ''significant regulatory action'' as an action likely to result in a rule that may (1) have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local or tribal governments, or communities in a material way (also referred to as an ''economically significant'' rule); (2) create serious inconsistency or otherwise interfere with an action taken or planned by another agency; (3) materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive order. The Secretary has determined that this regulatory action is significant under section 3(f)(4) of the Executive order.

*1. Summary of Public Comments*

The Department did not receive any comments on the analysis of the costs and benefits in the NPRM. However, since the publication of the NPRM, we have identified several information collection requirements that were not identified in the NPRM. We have added discussions of the costs and benefits of two information collection requirements in the following Summary of Costs and Benefits.

*2. Summary of Costs and Benefits*

Following is an analysis of the costs and benefits of the most significant changes to the FERPA regulations. In conducting this analysis, the Department examined the extent to which the regulations add to or reduce the costs of educational agencies and institutions and, where appropriate, State educational agencies (SEAs) and other State and local educational authorities in relation to their costs of complying with the FERPA regulations prior to these changes.

This analysis is based on data from the most recent *Digest of Education Statistics* (2007) published by the National Center for Education Statistics (NCES), which projects total enrollment for Fall 2008 of 49,812,000 students in public elementary and secondary schools and 18,264,000 students in postsecondary institutions; and a total of 97,382 public K–12 schools; 14,166 school districts; and 6,463 postsecondary institutions. (Excluded are data from private institutions that do not receive Federal funding from the Department and, therefore, are not subject to FERPA.) Based on this analysis, the Secretary has concluded that the changes in these regulations will not impose significant net costs on educational agencies and institutions. Analyses of specific provisions follow.

**Alumni Records**

The regulations in § 99.3 clarify the current exclusion from the definition of *education records* for records that only contain information about an individual after he or she is no longer a student, which is intended to cover records of alumni and similar activities. Some institutions have applied this exclusion to records that are created after a student has ceased attending the institution but that are directly related to his or her attendance as a student, such as investigatory reports and settlement agreements about incidents and injuries that occurred during the student's enrollment. The amendment will clarify that this provision applies only to records created or received by an educational agency or institution after an individual is no longer a student in attendance and that are not directly related to the individual's attendance as a student.

We believe that most of the more than 103,845 K–12 schools and postsecondary institutions subject to FERPA already adhere to this revised interpretation in the regulations and that for those that do not, the number of records affected is likely to be very small. Assuming that each year one half of one percent of the 68.1 million students enrolled in these institutions have one record each affected by the change, in the year following issuance of the regulations institutions will be required to try to obtain written consent before releasing 350,380 records that they would otherwise release without consent. We estimate that for the first year contacting the affected parent or student to seek and process written consent for these disclosures will take approximately one-half hour per record at an average cost of $32.67 per hour for a total cost of $5,562,068.

(Compensation for administrative staff time is based on published estimates for 2005 from the Bureau of Labor Statistics' National Compensation Survey of $23.50 per hour plus an average 39 percent benefit load for Level 8 administrators in education and related fields.)

In terms of benefits, the change will protect the privacy of parents and students by clarifying the intent of this regulatory exclusion and help prevent the unlawful disclosure of these records. It will also provide greater legal certainty and therefore some cost savings for those agencies and institutions that may be required to litigate this issue in connection with a request under a State open records act or other legal proceeding. For these reasons, we believe that the overall benefits outweigh the potential costs of this change.

**Exclusion of SSNs and ID Numbers From Directory Information**

The proposed regulations in § 99.3 clarified that a student's SSN or student ID number is personally identifiable information that may not be disclosed as directory information under FERPA. The final regulations allow an educational agency or institution to designate and disclose student ID numbers as directory information if the number cannot be used by itself to gain access to education records, *i.e.*, it is used like a name. SSNs may never be disclosed as directory information.

The principal effect of this change is that educational agencies and institutions may not post grades by the student's SSN or non-directory student ID number and may not include these identifiers with directory information they disclose about a student, such as a student's name, school, and grade level or class, on rosters, or on sign-in sheets that are made available to students and others. (Educational agencies and institutions may continue to include SSNs and non-directory student ID numbers on class rosters and schedules that are disclosed only to teachers and other school officials who have legitimate educational interests in this information.)

A class roster or sign-in sheet that contains or requires students to affix their SSN or non-directory student ID number makes that information available to every individual who signs in or sees the document and increases the risk that the information may be improperly used for purposes such as identity theft or to find out a student's grades or other confidential educational information. In regard to posting grades, an individual who knows which classes

a particular student attends may be able to ascertain that student's SSN or non-directory student ID number by comparing class lists for repeat numbers. Because SSNs are not randomly generated, it may be possible to identify a student by State of origin based on the first three (area) digits of the number, or by date of issuance based on the two middle digits.

The Department does not have any actual data on how many class or test grades are posted by SSN or non-directory student ID number at this time, but we believe that the practice is rare or non-existent below the secondary level. Although the practice was once widespread, particularly at the postsecondary level, anecdotal evidence suggests that as a result of consistent training and informal guidance by the Department over the past several years, together with the increased attention States and privacy advocates have given to the use of SSNs, many institutions now either require teachers to use a code known only to the teacher and the student or prohibit the posting of grades entirely.

The most recent figures available from the Bureau of Labor Statistics (2007) indicate that there are approximately 2.7 million secondary and postsecondary teachers in the United States. As noted above, we assume that most of these teachers either do not post grades at all or already use a code known only to the teacher or student. We assume further that additional costs to deliver grades personally in the classroom or through electronic mail, instead of posting, will be minimal. For purposes of this analysis, we estimate that no more than five percent of 2.7 million, or 135,000 teachers, continue to post grades by SSN or non-directory student ID number and thus will need to convert to a code, which will require them to spend an average of one-half hour each semester establishing and managing grading codes for students. Since we do not know how many teachers at either education level will continue to post grades, and wages for postsecondary teachers are higher than secondary teacher wages, we use postsecondary teacher wages to ensure that the estimate encompasses the upper limit of possible costs. Using the Bureau of Labor Statistics' published estimate of average hourly wages of $42.98 for teachers at postsecondary institutions and an average 39 percent load for benefits, we estimate an average cost of $59.74 per teacher per year, for a total of $8,064,900. Parents and students should incur no costs except for the time they might have to spend to

AR 0792

contact the school official if they forget the student's grading code.

This change will benefit parents and students and educational agencies and institutions by reducing the risk of identity theft associated with posting grades by SSN, and the risk of disclosing grades and other confidential educational information caused by posting grades by a non-directory student ID number. It is difficult to quantify the value of reducing the risk of identity theft. According to the Federal Trade Commission, however, for the past few years over one-third of complaints filed with that agency have been for identity theft. According to the Better Business Bureau, identity theft costs businesses nearly $57 billion in 2006, while victims spent an average of 40 hours resolving identity theft issues. It is even more difficult to measure the benefits of enhanced privacy protections for student grades and other confidential educational information from education records because the value individuals place on the privacy of this information varies considerably and because we are unable to determine how often it happens. Therefore, we have no basis to estimate the value of these enhanced privacy protections in relation to the expected costs to implement the changes.

**Prohibit Use of SSN To Confirm Directory Information**

The regulations will prevent an educational agency or institution (or a contractor providing services for an agency or institution) from using a student's SSN (or other non-directory information) to identify the student when releasing or confirming directory information. This occurs, for example, when a prospective employer or insurance company telephones an institution or submits an inquiry through the institution's Web site to find out whether a particular individual is enrolled in or has graduated from the institution. While this provision will apply to educational agencies and institutions at all grade levels, we believe that it will affect mainly postsecondary institutions because K–12 agencies and institutions typically do not provide enrollment and degree verification services.

A survey conducted in March 2002 by the American Association of Collegiate Registrars and Admissions Officers (AACRAO) showed that nearly half of postsecondary institutions used SSNs as the primary means to track students in academic databases. Since then, use of SSNs as a student identifier has decreased significantly in response to public concern about identity theft.

While postsecondary institutions may continue to collect students' SSNs for financial aid and tax reporting purposes, many have ceased using the SSN as a student identifier either voluntarily or in compliance with State laws. Also, over the past several years the Department has provided training on this issue and published on the Office Web site a 2004 letter finding a postsecondary institution in violation of FERPA when its agent used a student's SSN, without consent, to search its database to verify that the student had received a degree. *www.ed.gov/policy/ gen/guid/fpco/ferpa/library/ auburnuniv.html.* Given these circumstances, we estimate that possibly one-quarter of the nearly 6,463 postsecondary institutions in the United States, or 1,616 institutions, may ask a requester to provide the student's SSN (or non-directory student ID number) in order to locate the record and respond to an inquiry for directory information.

Under the regulations an educational agency or institution that identifies students by SSN (or non-directory student ID number) when releasing directory information will either have to ensure that the student has provided written consent to disclose the number to the requester, or rely solely on a student's name and other properly designated directory information to identify the student, such as address, date of birth, dates of enrollment, year of graduation, major field of study, degree received, etc. Costs to an institution of ensuring that students have provided written consent for these disclosures, for example by requiring the requester to fax copies of each written consent to the institution or its contractor, or making arrangements to receive them electronically, could be substantial for large institutions and organizations that utilize electronic recordkeeping systems. Institutions may choose instead to conduct these verifications without using SSNs or non-directory student IDs, which may make it more difficult to ensure that the correct student has been identified because of the known problems in matching records without the use of a universal identifier. Increased institutional costs either to verify that the student has provided consent or to conduct a search without use of SSNs or non-directory student ID numbers should be less for smaller institutions, where the chances of duplicate records are decreased. Parents and students may incur additional costs if an employer, insurance company, or other requester is unable to verify enrollment or graduation based solely on directory information, and written consent for disclosure of the student's SSN or non-directory student ID number is required. Due to the difficulty in ascertaining actual costs associated with these transactions, we have no basis to estimate costs that educational agencies and institutions and parents and students will incur as a result of this change.

The enhanced privacy protections of this amendment will benefit students and parents by reducing the risk that third parties will disclose a student's SSN without consent and possibly confirm a questionable number for purposes of identity theft. Similarly, preventing institutions from implicitly confirming a questionable non-directory student ID number will help prevent unauthorized individuals from obtaining confidential information from education records. In evaluating the benefits or value of this change, we note that this provision does not affect any activity that an educational agency or institution is permitted to perform under FERPA or other Federal law, such as using SSNs to identify students and confirm their enrollment status for student loan purposes, which is permitted without consent under the financial aid exception in § 99.31.

**User ID for Electronic Communications**

The regulations will allow an educational agency or institution to disclose as directory information a student's ID number, user ID or other electronic identifier so long as the identifier functions like a name; that is, it cannot be used without a PIN, password, or some other authentication factor to gain access to education records. This change will impose no costs and will provide benefits in the form of regulatory relief allowing agencies and institutions to use directory services in electronic communications systems without incurring the administrative costs associated with obtaining student consent for these disclosures.

Costs related to honoring a student's decision to opt out of these disclosures will be minimal because we assume that only a small number of students will elect not to participate in electronic communications at their school. Applying this change to records of both K–12 and postsecondary students and assuming that one-tenth of one percent of parents and eligible students will opt out of these disclosures, we estimate that institutions will have to flag the records of approximately 68,000 students for opt-out purposes. We lack sufficient data on costs institutions currently incur to flag records for

directory information opt-outs for other purposes, so we are unable to estimate the administrative and information technology costs institutions will incur to process these new directory information opt-outs resulting from this change.

## Student Anonymity in the Classroom

The final regulations will ensure that parents and students do not use the right to opt out of directory information disclosures to remain anonymous in the classroom, by clarifying that opting out does not prevent disclosure of the student's name, institutional e-mail address, or electronic identifier in the student's physical or electronic classroom. We estimate that this change will result in a small net benefit to educational agencies and institutions because they will have greater legal certainty about the element of classroom administration, and it will reduce the institutional costs of responding to complaints from students and parents about the release of this information.

## Disclosing Education Records to New School and to Party Identified as Source Record

The final regulations in § 99.31(a)(2) will allow an educational agency or institution to disclose education records, or personally identifiable information from education records, to a student's new school even after the student is already attending the new school so long as the disclosure relates to the student's enrollment in the new school. This change will provide regulatory relief by reducing legal uncertainty about how long a school may continue to send records or information to a student's new school, without consent, under the "seeks or intends to enroll" exception.

The amendment to the definition of *disclosure* in § 99.3 will allow a school that has concerns about the validity of a transcript, letter of recommendation, or other record to return these documents (or personally identifiable information from these documents) to the student's previous school or other party identified as the source of the record in order to resolve questions about their validity. Combined with the change to § 99.31(a)(2), this change will also allow the student's previous school to continue to send education records, or clarification about education records, to the student's new school in response to questions about the validity or meaning of records sent previously by that party. We are unable to determine how much it will cost educational agencies and institutions to return potentially

fraudulent documents to the party identified as the sender because we do not have any basis for estimating how often this occurs. However, we believe that these changes will provide significant regulatory relief to educational agencies and institutions by helping to reduce transcript and other educational fraud based on falsified records.

## Outsourcing

The regulations in § 99.31(a)(1)(i) will allow educational agencies and institutions to disclose education records, or personally identifiable information from education records, without consent to contractors, volunteers, and other non-employees performing institutional services and functions as school officials with legitimate educational interests. An educational agency or institution that uses non-employees to perform institutional service and functions will have to amend its annual notification of FERPA rights to include these parties as school officials with legitimate educational interests.

This change will provide regulatory relief by permitting, and clarifying the conditions for, non-consensual disclosure of education records. Our experience suggests that virtually all of the more than 103,000 schools subject to FERPA will take advantage of this provision. We have no actual data on how many school districts publish annual FERPA notifications for the 97,382 K–12 public schools included in this total and, therefore, how many entities will be affected by this requirement. However, because educational agencies and institutions were already required under previous regulations to publish a FERPA notification annually, we believe that costs to include this new information will be minimal.

## Access Control and Tracking

The regulations in § 99.31(a)(1)(ii) will require an educational agency or institution to use reasonable methods to ensure that teachers and other school officials obtain access to only those education records in which they have legitimate educational interests. This requirement will apply to records in any format, including computerized or electronic records and paper, film, and other hard copy records. An educational agency or institution that chooses not to restrict access to education records with physical or technological controls, such as locked cabinets and role-based software security, must ensure that its administrative policy for controlling access is effective and that it remains in

compliance with the legitimate educational interest requirement.

Administrative experience has shown that schools that allow teachers and other school officials to have unrestricted access to education records tend to have more problems with unauthorized disclosures, such as school officials obtaining access to education records for personal rather than professional reasons. Preventing unrestricted access to education records by teachers and other school officials will benefit parents and students by helping to ensure that education records are used only for legitimate educational purposes. It will also help ensure that education records are not accessed or disclosed inadvertently.

Information gathered by the Director of the Office at numerous FERPA training sessions and seminars, along with recent discussions with software vendors and educational organizations, indicates that the vast majority of mid- and large-size school districts and postsecondary institutions currently use commercial software for student information systems. These systems generally include role-based security features that allow administrators to control access to specific records, screens, or fields according to a school official's duties and responsibilities. These systems also typically contain transactional logging features that document or track a user's actual access to particular records, which will help ensure that an agency's or institution's access control methods are effective. Educational agencies and institutions that already have these systems will incur no additional costs to comply with the regulations.

For purposes of this analysis we excluded from a total of 14,166 school districts and 6,463 postsecondary institutions those with more than 1,000 students, for a total of 6,887 small K–12 districts and 3,906 small postsecondary institutions that may not have software with access control security features. The discussions that the Director of the Office has had with numerous SEAs and local districts suggest that the vast majority of these small districts and institutions do not make education records available to school officials electronically or by computer but instead use some system of administrative and physical controls.

We estimate for this analysis that 15 percent, or 1,619, of these small districts and institutions use home-built computerized or electronic systems that may not have the role-based security features of commercial software. The most recent published estimate we have for software costs comes from the final

Standards for Privacy of Individually Identifiable Health Information under the Health Insurance Portability and Accountability Act of 1996 (HIPAA Privacy Rule) published by the Department of Health and Human Services (HHS) on December 28, 2000, which estimated that the initial per-hospital cost of software upgrades to track the disclosure of medical records would be $35,000 (65 FR 82768). We assume that costs will be comparable for education records, and, as discussed above, software that tracks disclosure history can also be used to control or restrict access to electronic records. Based on these assumptions, if 1,619 small K–12 districts and postsecondary institutions decide to purchase student information software rather than rely on administrative policies to comply with the regulations, they will incur estimated costs of $56,665,000. We estimate that the remaining 9,174 small districts and institutions will not purchase new software because they do not make education records available electronically and rely instead on less costly administrative and physical methods to control access to records by school officials. Those that provide school officials with open access to hard copy education records may incur new costs to track actual disclosures to help ensure that they remain in compliance with legitimate educational interests requirements. We assume that these districts and institutions may devote some additional administrative staff time to procedures such as keeping logs of school officials who access records. However, no reliable estimates exist for the average number of teachers and other school officials who access education records or the number of times access is sought, so we are unable to estimate the cost of restricting or tracking actual disclosures of hard copy education records to school officials.

**Education Research**

The regulations in § 99.31(a)(6)(ii)(C) require an educational agency or institution to enter into a written agreement before disclosing personally identifiable information from education records, without consent, to organizations conducting studies for, or on behalf of, the educational agency or institution to: (a) Develop, validate, or administer predictive tests; (b) administer student aid programs; or (c) improve instruction. The written agreement must specify the purpose or purposes, scope, and duration of the study or studies and the information to be disclosed, require the organization to conduct the study in a manner that does not permit personal identification of

parents and students by anyone other than representatives of the organization with legitimate interests, require the destruction or return of the information to the educational agency or institution when the study is completed, and specify the time period for destruction or return of the information. We believe that the additional cost of entering into written agreements to comply with this change is unlikely to be significant because most educational agencies and institutions already specify the terms under which personally identifiable information can be used when it is disclosed to organizations for these types of studies. Although this change will create an additional information collection requirement, we believe the benefits of the written agreement outweigh the costs, because it will ensure better compliance with FERPA and provide clarity for both researchers and educational agencies and institutions about the restrictions and use of personally identifiable information disclosed under § 99.31(a)(6) for studies.

**Identification and Authentication of Identity**

The regulations in § 99.31(c) require educational agencies and institutions to use reasonable methods to identify and authenticate the identity of parents, students, school officials and other parties to whom the agency or institution discloses personally identifiable information from education records. The use of widely available information to authenticate identity, such as the recipient's name, date of birth, SSN or student ID number, is not considered reasonable under the regulations.

The regulations will impose no new costs for educational agencies and institutions that disclose hard copy records through the U.S. postal service or private delivery services with use of the recipient's name and last known official address.

We were unable to find reliable data that would allow us to estimate the additional administrative time that educational agencies and institutions will spend checking photo ID against school records or using other reasonable methods, as appropriate, to identify and authenticate the identity of students, parents, and other parties to whom the agency or institution discloses education records in person.

Authentication of identity for electronic or telephonic access to education records involves a wider array of security options because of continuing advances in technologies, but is not necessarily more costly than

authentication of identity for hard-copy records. We assume that educational agencies and institutions that require users to enter a secret password or PIN to authenticate identity will deliver the password or PIN through the U.S. postal service or in person. We estimate that no new costs will be associated with this process because agencies and institutions already have direct contact with parents, eligible students, and school officials for a variety of other purposes and will use these opportunities to deliver a secret authentication factor.

As noted in the preamble to the NPRM, 73 FR 15585, single-factor authentication of identity, such as a standard form user name combined with a secret password or PIN, may not provide reasonable protection for access to all types of education records or under all circumstances. We lack a basis for estimating costs of authenticating identity when educational agencies and institutions allow authorized users to access sensitive personal or financial information in electronic records for which single-factor authentication would not be reasonable.

**Redisclosure and Recordkeeping**

The regulations allow the officials and agencies listed in § 99.31(a)(3) (the U.S. Comptroller General, the U.S. Attorney General, the Secretary, and State and local educational authorities) to redisclose education records, or personally identifiable information from education records, without consent under the same conditions that apply currently to other recipients of education records under § 99.33(b). This change provides substantial regulatory relief to these parties by allowing them to redisclose information on behalf of educational agencies and institutions under any provision in § 99.31(a), which allows disclosure of education records without consent. For example, States will be able to consolidate K–16 education records under the SEA or State higher educational authority without having to obtain written consent under § 99.30. Parties that currently request access to records from individual school districts and postsecondary institutions will in many instances be able to obtain the same information in a more cost-effective manner from the appropriate State educational authority or the Department.

In accordance with the current regulations in § 99.32(b), an educational agency or institution must record any redisclosure of education records made on its behalf under § 99.33(b), including the names of the additional parties to

which the receiving party may redisclose the information and their legitimate interests or basis for the disclosure without consent under § 99.31 in obtaining the information. The regulations require SEAs and other State educational authorities (such as higher education authorities), the Secretary, and other officials or agencies listed in § 99.31(a)(3) that make further disclosures on behalf of an educational agency or institution to maintain the record of redisclosure required under § 99.32(b) if the educational agency or institution has not recorded the redisclosure or if the information was obtained from another State or Federal official or agency listed in § 99.31(a)(3). The regulations also require the State or Federal official or agency listed in § 99.31(a)(3) to provide a copy of its record of redisclosures to the educational agency or institution upon request. In addition, an educational agency or institution must maintain with each student's record of disclosures the names of State and local educational authorities and Federal officials and agencies that may make further disclosures from the student's records without consent under § 99.33(b) and must obtain a copy of the record of redisclosure, if any, maintained by the State or Federal official that redisclosed information on behalf of the agency or institution.

State educational authorities and Federal officials listed in § 99.31(a)(3) will incur new administrative costs if they maintain the record of redisclosure for the educational agency or institution on whose behalf they redisclose education records under the regulations. We estimate that two educational authorities or agencies in each State and the District of Columbia (one for K–12 and one for postsecondary) and the Department itself, for a total of 103 authorities, will maintain the required records of redisclosures. (We anticipate that educational agencies and institutions will record under § 99.32(b)(1) any further disclosures made by the other Federal officials listed in § 99.31(a)(3), the U.S. Comptroller General and the U.S. Attorney General.) We estimate further that these authorities will need to record two redisclosures per year from their records and that it will take one hour of administrative time to record each redisclosure electronically at an average hourly rate of $32.67, for a total annual administrative cost of $6,730. (Compensation for administrative staff time is explained earlier in this analysis.) We also assume for purposes of this analysis that State educational

authorities and the Department already have software that will allow them to record these disclosures electronically.

State educational authorities and Federal officials that maintain records of redisclosures will also have to make that information available to the educational agency or institution whose records were redisclosed, upon request, so that the agency or institution can make that record available to a parent or eligible student who has asked to inspect and review the student's record of disclosures. We assume that few parents and students request this information and, therefore, use an estimate that one tenth of one percent of a total of 68.1 million students will make such a request each year, or 68,076 requests. If it takes one-quarter of an hour to locate and print a record of disclosures at an average administrative hourly rate of $32.67, the average annual administrative cost for State and Federal officials and agencies to provide this service will be $556,011, plus mailing costs (at $.42 per letter) of $28,592, for a total of $584,603. We estimate that educational agencies and institutions themselves will incur comparable costs when they ask State and Federal officials to send them these records of redisclosure and then make them available to parents and students. We note that printing and mailing costs may be reduced to the extent that e-mail is used to transmit the record, and if parents or students pick up the record on-site, but we do not have information to estimate these potential savings.

The Department believes that these changes will result in a net benefit to educational agencies and institutions because they will not have to record further disclosures made by State and Federal authorities and officials who redisclose information from education records on their behalf and will not have to ask for a copy unless a parent or eligible student asks to inspect and review the student's record of disclosures. State and Federal authorities and officials will also benefit because they will not have to provide their record of further disclosures to anyone unless the educational agency or institution asks for a copy. Overall, the costs to State and Federal authorities to record their own redisclosures will be offset by the savings that educational agencies and institutions will realize by not having to record the disclosures themselves.

**Notification of Compliance With Court Order or Subpoena**

The regulations in § 99.33(b)92) require any party that rediscloses education records in compliance with a

court order or subpoena under § 99.31(a)(9) to provide the notice to parents and eligible students required under § 99.31(a)(9)(ii). We anticipate that this provision will affect mostly State and local educational authorities, which maintain education records they have obtained from their constituent districts and institutions and, under § 99.35(b), may redisclose the information, without consent, in compliance with a court order or subpoena under § 99.31(a)(9).

There is no change in costs as a result of shifting responsibility for notification to the disclosing party under this change. However, we believe that minimizing or eliminating uncertainty about which party is legally responsible for the notification will result in a net benefit to all parties.

**Health or Safety Emergency**

The regulations in § 99.32(a)(5) require that a school that discloses information under the health and safety emergency exception in § 99.36 record the articulable and significant threat that formed the basis for the disclosure and the parties to whom the education records were disclosed. Because § 99.32(a) already requires schools to record disclosures made under § 99.36, including the legitimate interests the parties had in requesting or obtaining the information, we believe these changes will not create any significant additional administrative costs for schools and that the benefit of including the legitimate interests the parties had in requesting or obtaining the information outweighs the costs.

**Directory Information Opt Outs**

The regulations in § 99.37(b) clarify that while an educational agency or institution is not required to notify former students under § 99.37(a) about the institution's directory information policy or allow former students to opt out of directory information disclosures, they must continue to honor a parent's or student's decision to opt out of directory information disclosures after the student leaves the institution. Most agencies and institutions should already comply with this requirement because of informal guidance and training provided by FPCO.

Parents and students will benefit from this clarification because it will help ensure that schools do not invalidate the parent's or student's decisions on directory information disclosures after the student is no longer in attendance. It will also benefit schools by eliminating any uncertainty they may have about whether they must continue to honor an opt out once the student is

no longer in attendance. We have insufficient information to estimate the number of institutions affected and the additional costs involved in changing systems to maintain opt-out flags on education records of former students.

**Paperwork Reduction Act of 1995**

Following publication of the NPRM, we provided, through a notice published in the **Federal Register** (73 FR 28810, May 19, 2008) opportunity for the public to comment on information collections in the current regulations, and indicated in that notice the pendency of the NPRM. Additionally, based on comments received in response to the NPRM, we have identified several information collection requirements associated with these regulations. We describe these information collections in the following paragraphs and will be submitting these sections to OMB for review and approval. We note that the Paperwork Reduction Act of 1995 does not require a response to these information collection requirements unless they display a valid OMB control number. A valid OMB control number will be assigned to the information collection requirements at the end of the affected sections of the regulations.

*(1) § 99.31(a)(6)(ii)*

FERPA permits an educational agency or institution to disclose personally identifiable information from education records, without consent, to organizations conducting studies for or on behalf of the agency or institution for purposes of testing, student aid, and improvement of instruction. In the NPRM, we proposed to add § 99.31(a)(6)(ii) to require that an educational agency or institution to disclose personally identifiable information under § 99.31(a)(6)(i) only if it enters into a written agreement with the organization specifying the purposes of the study. Under these final regulations, this written agreement must specify the purpose, scope, and duration of the study or studies and the information to be disclosed; require the organization to use personally identifiable information from education records only to meet the purpose or purposes of the study as stated in the written agreement; require the organization to conduct the study in a manner that does not permit personal identification of parents and students by individuals other than representatives with legitimate interest of the organization that conducts the study; require the organization to destroy the information or return to the educational agency or institution when it is no

longer needed for the purposes for which the study was conducted; and specify the time period for the destruction or return of the information.

The Department did not identify in the NPRM the requirement in § 99.31(a)(6)(ii) as an information collection requirement under the Paperwork Reduction Act of 1995 and did not realize this would be an information collection requirement until a commenter brought this matter to our attention. The commenter pointed out that, while this change created another paperwork burden for school districts, the commenter did not object to the written agreement requirement because putting the requirements regarding the use and destruction of data in writing may improve compliance with FERPA. The Department agrees with the comment.

*(2) § 99.32(a)(1)*

Under FERPA, an educational agency or institution is required to record its disclosures of personally identifiable information from education records, even when it discloses information to its own State educational authority. This statutory requirement is reflected in the current FERPA regulations. The final regulations permit the State and local educational authorities and Federal officials listed in § 99.31(a)(3) to make further discloses of personally identifiable information from education records on behalf of the educational agency or institution in accordance with the requirements of § 99.33(b) and require them to record these further disclosures of § 99.33(b) if the educational agency or institution does not do so. We have included provisions in the final regulations that require educational agencies and institutions to maintain a listing in each student's record of the State and local educational authorities and Federal officials and agencies that may make further disclosures of the student's education records without consent so that parents and eligible students will be made aware of these further disclosures.

*(3) § 99.32(a)(4)*

Under this new provision, parents and eligible students will be able to inspect and review any further disclosures that were made by any of the parties listed under § 99.31(a)(3) by asking the educational agency or institution to obtain a copy of the record of further disclosures. We believe that this is only a minor paperwork burden for schools because it would involve asking officials to whom they have disclosed education records for the record of further disclosure or, in the

case of some SEAs, accessing the State database for this information. Also, we do not expect that a large number of parents and eligible students will ask to see the record of further disclosures.

*(4) § 99.32(a)(5)*

During the development of the final regulations, we identified another change to the recordation requirements of § 99.32 that would require the collection of information. In response to several comments we received regarding changes to FERPA's "health or safety emergency exception" in § 99.36, we have amended § 99.32(a) to include a new recordation requirement. Specifically, we have added a paragraph to the recordation requirement that requires that for any disclosures under § 99.36 a school must record the articulable and significant threat to the health or safety of a student or other individuals that formed the basis for the disclosure and the parties to whom the agency or institution disclosed information.

The Secretary believes that this is only a minor paperwork burden for schools because schools are already required to record disclosures made under § 99.36. The new language in § 99.32(a)(5) simply clarifies the type of information that must be recorded when a school discloses personally identifiable information in response to a health or safety emergency, either for one student or for all students in a school.

*(5) § 99.32(b)(2)*

In the NPRM, we specifically noted that the Department was interested in relieving any administrative burdens associated with recording disclosures of education records and, therefore, invited public comment on whether an SEA, the Department, or other authority or official listed in § 99.31(a)(3) should be allowed to maintain the record of the redisclosures it makes on behalf of an educational agency or institution under § 99.32(b).

Several commenters stated that an SEA (or other authority or official listed in § 99.31(a)(3)) should be responsible for maintaining the record of disclosure required under § 99.32 when it rediscloses information on behalf of educational agencies and institutions. The commenters stated that requiring each educational agency or institution, such as school districts, to record each redisclosure made by an SEA or other State educational authority on its behalf imposes an unacceptable recordkeeping burden on school districts and is impractical for State educational authorities to adhere to in making

further disclosures on behalf of the agency or institution. In response to these comments, we are revising §99.32 to require the State and local educational authorities and Federal officials listed in §99.31(a)(3) to maintain the record of further disclosures if the educational agency or institution does not do so and make it available to the educational agency or institution upon request. We agree that by requiring State and Federal authorities and officials to record their redisclosures in these circumstances school districts will have less total paperwork burden because schools will not have to comply with the recordkeeping requirement in these instances.

**Assessment of Educational Impact**

In the NPRM, and in accordance with section 411 of the General Education Provisions Act, 20 U.S.C. 1221e–4, we requested comments on whether the proposed regulations would require transmission of information that any other agency or authority of the United States gathers or makes available.

Based on the response to the NPRM and on our review, we have determined that these final regulations do not require transmission of information that any other agency or authority of the United States gathers or makes available.

**Electronic Access to This Document**

You may view this document, as well as all other Department of Education documents published in the **Federal Register**, in text or Adobe Portable Document Format (PDF) on the Internet at the following site: *www.ed.gov/news/fedregister.*

To use PDF you must have Adobe Acrobat Reader, which is available free at this site. If you have questions about using PDF, call the U.S. Government Printing Office (GPO), toll free, at 1–888–293–6498; or in the Washington, DC area at (202) 512–1530.

**Note:** The official version of this document is the document published in the **Federal Register**. Free Internet access to the official edition of the **Federal Register** and the Code of Federal Regulations is available on GPO Access at *www.gpoaccess.gov/nara/index.html.*

(Catalog of Federal Domestic Assistance Number does not apply.)

**List of Subjects in 34 CFR Part 99**

Administrative practice and procedure, Directory information, Education records, Information, Parents, Privacy, Records, Social Security Numbers, Students.

Dated: December 2, 2008.

**Margaret Spellings,**
*Secretary of Education.*

■ For the reasons discussed in the preamble, the Secretary amends part 99 of title 34 of the Code of Federal Regulations as follows:

**PART 99—FAMILY EDUCATIONAL RIGHTS AND PRIVACY**

■ 1. The authority citation for part 99 continues to read as follows:

**Authority:** 20 U.S.C. 1232g, unless otherwise noted.

■ 2. Section 99.2 is amended by revising the note following the authority citation to read as follows:

**§99.2   What is the purpose of these regulations?**

\*      \*      \*      \*      \*

**Note to §99.2:** 34 CFR 300.610 through 300.626 contain requirements regarding the confidentiality of information relating to children with disabilities who receive evaluations, services or other benefits under Part B of the Individuals with Disabilities Education Act (IDEA). 34 CFR 303.402 and 303.460 identify the confidentiality of information requirements regarding children and infants and toddlers with disabilities and their families who receive evaluations, services, or other benefits under Part C of IDEA. 34 CFR 300.610 through 300.627 contain the confidentiality of information requirements that apply to personally identifiable data, information, and records collected or maintained pursuant to Part B of the IDEA.

■ 3. Section 99.3 is amended by:
■ A. Adding, in alphabetical order, a definition of *Biometric record.*
■ B. Revising the definitions of *Attendance, Directory information, Disclosure,* and *Personally identifiable information.*
■ C. In the definition of *Education records,* revising paragraph (b)(5) and adding a new paragraph (b)(6).

These additions and revisions read as follows:

**§99.3   What definitions apply to these regulations?**

\*      \*      \*      \*      \*

*Attendance* includes, but is not limited to—
(a) Attendance in person or by paper correspondence, videoconference, satellite, Internet, or other electronic information and telecommunications technologies for students who are not physically present in the classroom; and
(b) The period during which a person is working under a work-study program.

(Authority: 20 U.S.C. 1232g)

\*      \*      \*      \*      \*

*Biometric record,* as used in the definition of *personally identifiable information,* means a record of one or more measurable biological or behavioral characteristics that can be used for automated recognition of an individual. Examples include fingerprints; retina and iris patterns; voiceprints; DNA sequence; facial characteristics; and handwriting.

(Authority: 20 U.S.C. 1232g)

\*      \*      \*      \*      \*

*Directory information* means information contained in an education record of a student that would not generally be considered harmful or an invasion of privacy if disclosed.
(a) Directory information includes, but is not limited to, the student's name; address; telephone listing; electronic mail address; photograph; date and place of birth; major field of study; grade level; enrollment status (*e.g.,* undergraduate or graduate, full-time or part-time); dates of attendance; participation in officially recognized activities and sports; weight and height of members of athletic teams; degrees, honors and awards received; and the most recent educational agency or institution attended.
(b) Directory information does not include a student's—
(1) Social security number; or
(2) Student identification (ID) number, except as provided in paragraph (c) of this section.
(c) Directory information includes a student ID number, user ID, or other unique personal identifier used by the student for purposes of accessing or communicating in electronic systems, but only if the identifier cannot be used to gain access to education records except when used in conjunction with one or more factors that authenticate the user's identity, such as a personal identification number (PIN), password, or other factor known or possessed only by the authorized user.

(Authority: 20 U.S.C. 1232g(a)(5)(A))

\*      \*      \*      \*      \*

*Disclosure* means to permit access to or the release, transfer, or other communication of personally identifiable information contained in education records by any means, including oral, written, or electronic means, to any party except the party identified as the party that provided or created the record.

(Authority: 20 U.S.C. 1232g(b)(1) and (b)(2))

\*      \*      \*      \*      \*

Education Records

\*      \*      \*      \*      \*

(b) \* \* \*
(5) Records created or received by an educational agency or institution after

an individual is no longer a student in attendance and that are not directly related to the individual's attendance as a student.

(6) Grades on peer-graded papers before they are collected and recorded by a teacher.

\*     \*     \*     \*     \*

Personally Identifiable Information

The term includes, but is not limited to—

(a) The student's name;

(b) The name of the student's parent or other family members;

(c) The address of the student or student's family;

(d) A personal identifier, such as the student's social security number, student number, or biometric record;

(e) Other indirect identifiers, such as the student's date of birth, place of birth, and mother's maiden name;

(f) Other information that, alone or in combination, is linked or linkable to a specific student that would allow a reasonable person in the school community, who does not have personal knowledge of the relevant circumstances, to identify the student with reasonable certainty; or

(g) Information requested by a person who the educational agency or institution reasonably believes knows the identity of the student to whom the education record relates.

(Authority: 20 U.S.C. 1232g)

\*     \*     \*     \*     \*

■ 4. Section 99.5 is amended by redesignating paragraph (a) as paragraph (a)(1) and adding a new paragraph (a)(2) to read as follows:

**§ 99.5  What are the rights of students?**

(a)(1) \* \* \*

(2) Nothing in this section prevents an educational agency or institution from disclosing education records, or personally identifiable information from education records, to a parent without the prior written consent of an eligible student if the disclosure meets the conditions in § 99.31(a)(8), § 99.31(a)(10), § 99.31(a)(15), or any other provision in § 99.31(a).

\*     \*     \*     \*     \*

■ 5. Section 99.31 is amended by:

■ A. Redesignating paragraph (a)(1) as paragraph (a)(1)(i)(A) and adding new paragraphs (a)(1)(i)(B) and (a)(1)(ii).

■ B. Revising paragraph (a)(2).

■ C. Redesignating paragraphs (a)(6)(iii) and (a)(6)(iv) as paragraphs (a)(6)(iv) and (a)(6)(v), respectively.

■ D. Revising paragraph (a)(6)(ii).

■ E. Adding a new paragraph (a)(6)(iii).

■ F. In paragraph (a)(9)(ii)(A), removing the word "or" after the punctuation ";".

■ G. In paragraph (a)(9)(ii)(B), removing the punctuation "." and adding in its place the word ";or".

■ H. Adding paragraph (a)(9)(ii)(C).

■ I. Adding paragraph (a)(16).

■ J. Revising paragraph (b).

■ K. Adding paragraphs (c) and (d).

■ L. Revising the authority citation at the end of the section.

The additions and revisions read as follows:

**§ 99.31  Under what conditions is prior consent not required to disclose information?**

(a) \* \* \*

(1)(i)(A) \* \* \*

(B) A contractor, consultant, volunteer, or other party to whom an agency or institution has outsourced institutional services or functions may be considered a school official under this paragraph provided that the outside party—

(1) Performs an institutional service or function for which the agency or institution would otherwise use employees;

(2) Is under the direct control of the agency or institution with respect to the use and maintenance of education records; and

(3) Is subject to the requirements of § 99.33(a) governing the use and redisclosure of personally identifiable information from education records.

(ii) An educational agency or institution must use reasonable methods to ensure that school officials obtain access to only those education records in which they have legitimate educational interests. An educational agency or institution that does not use physical or technological access controls must ensure that its administrative policy for controlling access to education records is effective and that it remains in compliance with the legitimate educational interest requirement in paragraph (a)(1)(i)(A) of this section.

(2) The disclosure is, subject to the requirements of § 99.34, to officials of another school, school system, or institution of postsecondary education where the student seeks or intends to enroll, or where the student is already enrolled so long as the disclosure is for purposes related to the student's enrollment or transfer.

**Note:** Section 4155(b) of the No Child Left Behind Act of 2001, 20 U.S.C. 7165(b), requires each State to assure the Secretary of Education that it has a procedure in place to facilitate the transfer of disciplinary records with respect to a suspension or expulsion of a student by a local educational agency to any private or public elementary or secondary school in which the student is subsequently enrolled or seeks, intends, or is instructed to enroll.

(6)(i) \* \* \*

(ii) An educational agency or institution may disclose information under paragraph (a)(6)(i) of this section only if—

(A) The study is conducted in a manner that does not permit personal identification of parents and students by individuals other than representatives of the organization that have legitimate interests in the information;

(B) The information is destroyed when no longer needed for the purposes for which the study was conducted; and

(C) The educational agency or institution enters into a written agreement with the organization that—

(1) Specifies the purpose, scope, and duration of the study or studies and the information to be disclosed;

(2) Requires the organization to use personally identifiable information from education records only to meet the purpose or purposes of the study as stated in the written agreement;

(3) Requires the organization to conduct the study in a manner that does not permit personal identification of parents and students, as defined in this part, by anyone other than representatives of the organization with legitimate interests; and

(4) Requires the organization to destroy or return to the educational agency or institution all personally identifiable information when the information is no longer needed for the purposes for which the study was conducted and specifies the time period in which the information must be returned or destroyed.

(iii) An educational agency or institution is not required to initiate a study or agree with or endorse the conclusions or results of the study.

\*     \*     \*     \*     \*

(9) \* \* \*

(ii) \* \* \*

(C) An *ex parte* court order obtained by the United States Attorney General (or designee not lower than an Assistant Attorney General) concerning investigations or prosecutions of an offense listed in 18 U.S.C. 2332b(g)(5)(B) or an act of domestic or international terrorism as defined in 18 U.S.C. 2331.

\*     \*     \*     \*     \*

(16) The disclosure concerns sex offenders and other individuals required to register under section 170101 of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. 14071, and the information was provided to the educational agency or institution under 42 U.S.C. 14071 and applicable Federal guidelines.

(b)(1) *De-identified records and information.* An educational agency or

institution, or a party that has received education records or information from education records under this part, may release the records or information without the consent required by § 99.30 after the removal of all personally identifiable information provided that the educational agency or institution or other party has made a reasonable determination that a student's identity is not personally identifiable, whether through single or multiple releases, and taking into account other reasonably available information.

(2) An educational agency or institution, or a party that has received education records or information from education records under this part, may release de-identified student level data from education records for the purpose of education research by attaching a code to each record that may allow the recipient to match information received from the same source, provided that—

(i) An educational agency or institution or other party that releases de-identified data under paragraph (b)(2) of this section does not disclose any information about how it generates and assigns a record code, or that would allow a recipient to identify a student based on a record code;

(ii) The record code is used for no purpose other than identifying a de-identified record for purposes of education research and cannot be used to ascertain personally identifiable information about a student; and

(iii) The record code is not based on a student's social security number or other personal information.

(c) An educational agency or institution must use reasonable methods to identify and authenticate the identity of parents, students, school officials, and any other parties to whom the agency or institution discloses personally identifiable information from education records.

(d) Paragraphs (a) and (b) of this section do not require an educational agency or institution or any other party to disclose education records or information from education records to any party.

(Authority: 20 U.S.C. 1232g(a)(5)(A), (b), (h), (i), and (j)).

■ 6. Section 99.32 is amended by:
■ A. Revising paragraph (a)(1).
■ B. Adding new paragraphs (a)(4) and (a)(5).
■ C. Redesignating paragraphs (b)(1) and (b)(2) as paragraphs (b)(1)(i) and (b)(1)(ii) and redesignating paragraph (b), introductory text, as paragraph (b)(1).
■ D. Revising newly redesignated paragraph (b)(1).

■ E. Adding a new paragraph (b)(2).
■ F. Revising paragraph (d)(5).

The additions and revisions read as follows:

§ 99.32  What recordkeeping requirements exist concerning requests and disclosures?

(a)(1) An educational agency or institution must maintain a record of each request for access to and each disclosure of personally identifiable information from the education records of each student, as well as the names of State and local educational authorities and Federal officials and agencies listed in § 99.31(a)(3) that may make further disclosures of personally identifiable information from the student's education records without consent under § 99.33(b).

*    *    *    *    *

(4) An educational agency or institution must obtain a copy of the record of further disclosures maintained under paragraph (b)(2) of this section and make it available in response to a parent's or eligible student's request to review the record required under paragraph (a)(1) of this section.

(5) An educational agency or institution must record the following information when it discloses personally identifiable information from education records under the health or safety emergency exception in § 99.31(a)(10) and § 99.36:

(i) The articulable and significant threat to the health or safety of a student or other individuals that formed the basis for the disclosure; and

(ii) The parties to whom the agency or institution disclosed the information.

(b)(1) Except as provided in paragraph (b)(2) of this section, if an educational agency or institution discloses personally identifiable information from education records with the understanding authorized under § 99.33(b), the record of the disclosure required under this section must include:

*    *    *    *    *

(2)(i) A State or local educational authority or Federal official or agency listed in § 99.31(a)(3) that makes further disclosures of information from education records under § 99.33(b) must record the names of the additional parties to which it discloses information on behalf of an educational agency or institution and their legitimate interests in the information under § 99.31 if the information was received from:

(A) An educational agency or institution that has not recorded the further disclosures under paragraph (b)(1) of this section; or

(B) Another State or local educational authority or Federal official or agency listed in § 99.31(a)(3).

(ii) A State or local educational authority or Federal official or agency that records further disclosures of information under paragraph (b)(2)(i) of this section may maintain the record by the student's class, school, district, or other appropriate grouping rather than by the name of the student.

(iii) Upon request of an educational agency or institution, a State or local educational authority or Federal official or agency listed in § 99.31(a)(3) that maintains a record of further disclosures under paragraph (b)(2)(i) of this section must provide a copy of the record of further disclosures to the educational agency or institution within a reasonable period of time not to exceed 30 days.

*    *    *    *    *

(d) * * *

(5) A party seeking or receiving records in accordance with § 99.31(a)(9)(ii)(A) through (C).

*    *    *    *    *

■ 7. Section 99.33 is amended by revising paragraphs (b), (c), (d), and (e) to read as follows:

*    *    *    *    *

§ 99.33  What limitations apply to the redisclosure of information?

*    *    *    *    *

(b)(1) Paragraph (a) of this section does not prevent an educational agency or institution from disclosing personally identifiable information with the understanding that the party receiving the information may make further disclosures of the information on behalf of the educational agency or institution if—

(i) The disclosures meet the requirements of § 99.31; and

(ii)(A) The educational agency or institution has complied with the requirements of § 99.32(b); or

(B) A State or local educational authority or Federal official or agency listed in § 99.31(a)(3) has complied with the requirements of § 99.32(b)(2).

(2) A party that receives a court order or lawfully issued subpoena and rediscloses personally identifiable information from education records on behalf of an educational agency or institution in response to that order or subpoena under § 99.31(a)(9) must provide the notification required under § 99.31(a)(9)(ii).

(c) Paragraph (a) of this section does not apply to disclosures under §§ 99.31(a)(8), (9), (11), (12), (14), (15), and (16), and to information that postsecondary institutions are required

to disclose under the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. 1092(f) (Clery Act), to the accuser and accused regarding the outcome of any campus disciplinary proceeding brought alleging a sexual offense.

(d) An educational agency or institution must inform a party to whom disclosure is made of the requirements of paragraph (a) of this section except for disclosures made under §§ 99.31(a)(8), (9), (11), (12), (14), (15), and (16), and to information that postsecondary institutions are required to disclose under the Clery Act to the accuser and accused regarding the outcome of any campus disciplinary proceeding brought alleging a sexual offense.

(e) If this Office determines that a third party outside the educational agency or institution improperly rediscloses personally identifiable information from education records in violation of this section, or fails to provide the notification required under paragraph (b)(2) of this section, the educational agency or institution may not allow that third party access to personally identifiable information from education records for at least five years.

*   *   *   *   *

■ 8. Section 99.34 is amended by revising paragraph (a)(1)(ii) to read as follows:

**§ 99.34   What conditions apply to disclosure of information to other educational agencies and institutions?**

(a) * * *

(1) * * *

(ii) The annual notification of the agency or institution under § 99.7 includes a notice that the agency or institution forwards education records to other agencies or institutions that have requested the records and in which the student seeks or intends to enroll or is already enrolled so long as the disclosure is for purposes related to the student's enrollment or transfer;

*   *   *   *   *

■ 9. Section 99.35 is amended by revising paragraphs (a) and (b)(1) to read as follows:

**§ 99.35   What conditions apply to disclosure of information for Federal or State program purposes?**

(a)(1) Authorized representatives of the officials or agencies headed by officials listed in § 99.31(a)(3) may have access to education records in connection with an audit or evaluation of Federal or State supported education programs, or for the enforcement of or compliance with Federal legal requirements that relate to those programs.

(2) Authority for an agency or official listed in § 99.31(a)(3) to conduct an audit, evaluation, or compliance or enforcement activity is not conferred by the Act or this part and must be established under other Federal, State, or local authority.

(b) * * *

(1) Be protected in a manner that does not permit personal identification of individuals by anyone other than the officials or agencies headed by officials referred to in paragraph (a) of this section, except that those officials and agencies may make further disclosures of personally identifiable information from education records on behalf of the educational agency or institution in accordance with the requirements of § 99.33(b); and

*   *   *   *   *

■ 10. Section 99.36 is amended by revising paragraphs (a) and (c) to read as follows:

**§ 99.36   What conditions apply to disclosure of information in health and safety emergencies?**

(a) An educational agency or institution may disclose personally identifiable information from an education record to appropriate parties, including parents of an eligible student, in connection with an emergency if knowledge of the information is necessary to protect the health or safety of the student or other individuals.

*   *   *   *   *

(c) In making a determination under paragraph (a) of this section, an educational agency or institution may take into account the totality of the circumstances pertaining to a threat to the health or safety of a student or other individuals. If the educational agency or institution determines that there is an articulable and significant threat to the health or safety of a student or other individuals, it may disclose information from education records to any person whose knowledge of the information is necessary to protect the health or safety of the student or other individuals. If, based on the information available at the time of the determination, there is a rational basis for the determination, the Department will not substitute its judgment for that of the educational agency or institution in evaluating the circumstances and making its determination.

*   *   *   *   *

■ 11. Section 99.37 is amended by:
■ A. Revising paragraph (b).
■ B. Adding new paragraphs (c) and (d). The revision and additions read as follows:

**§ 99.37   What conditions apply to disclosing directory information?**

*   *   *   *   *

(b) An educational agency or institution may disclose directory information about former students without complying with the notice and opt out conditions in paragraph (a) of this section. However, the agency or institution must continue to honor any valid request to opt out of the disclosure of directory information made while a student was in attendance unless the student rescinds the opt out request.

(c) A parent or eligible student may not use the right under paragraph (a)(2) of this section to opt out of directory information disclosures to prevent an educational agency or institution from disclosing or requiring a student to disclose the student's name, identifier, or institutional e-mail address in a class in which the student is enrolled.

(d) An educational agency or institution may not disclose or confirm directory information without meeting the written consent requirements in § 99.30 if a student's social security number or other non-directory information is used alone or combined with other data elements to identify or help identify the student or the student's records.

*   *   *   *   *

■ 12. Section 99.62 is revised to read as follows:

**§ 99.62   What information must an educational agency or institution submit to the Office?**

The Office may require an educational agency or institution to submit reports, information on policies and procedures, annual notifications, training materials, and other information necessary to carry out its enforcement responsibilities under the Act or this part.

(Authority: 20 U.S.C. 1232g(f) and (g))

**§ 99.63   [Amended]**

■ 13. Section 99.63 is amended by removing the mail code designation "4605" before the punctuation ".".

■ 14. Section 99.64 is amended by:
■ A. Revising the section heading.
■ B. Revising paragraphs (a) and (b). The revisions read as follows:

**§ 99.64   What is the investigation procedure?**

(a) A complaint must contain specific allegations of fact giving reasonable cause to believe that a violation of the Act or this part has occurred. A complaint does not have to allege that a violation is based on a policy or practice of the educational agency or institution.

(b) The Office investigates a timely complaint filed by a parent or eligible student, or conducts its own investigation when no complaint has been filed or a complaint has been withdrawn, to determine whether an educational agency or institution has failed to comply with a provision of the Act or this part. If the Office determines that an educational agency or institution has failed to comply with a provision of the Act or this part, it may also determine whether the failure to comply is based on a policy or practice of the agency or institution.

\*    \*    \*    \*    \*

■ 15. Section 99.65 is revised to read as follows:

**§ 99.65   What is the content of the notice of investigation issued by the Office?**

(a) The Office notifies the complainant, if any, and the educational agency or institution in writing if it initiates an investigation under § 99.64(b). The notice to the educational agency or institution—

(1) Includes the substance of the allegations against the educational agency or institution; and

(2) Directs the agency or institution to submit a written response and other relevant information, as set forth in § 99.62, within a specified period of time, including information about its policies and practices regarding education records.

(b) The Office notifies the complainant if it does not initiate an investigation because the complaint fails to meet the requirements of § 99.64.

(Authority: 20 U.S.C. 1232g(g))

■ 16. Section 99.66 is amended by revising paragraphs (a), (b), and the introductory text of paragraph (c) to read as follows:

**§ 99.66   What are the responsibilities of the Office in the enforcement process?**

(a) The Office reviews a complaint, if any, information submitted by the educational agency or institution, and any other relevant information. The Office may permit the parties to submit further written or oral arguments or information.

(b) Following its investigation, the Office provides to the complainant, if any, and the educational agency or institution a written notice of its findings and the basis for its findings.

(c) If the Office finds that an educational agency or institution has not complied with a provision of the Act or this part, it may also find that the failure to comply was based on a policy or practice of the agency or institution. A notice of findings issued under paragraph (b) of this section to an educational agency or institution that has not complied with a provision of the Act or this part—

\*    \*    \*    \*    \*

■ 17. Section 99.67 is amended by revising paragraph (a) to read as follows:

**§ 99.67   How does the Secretary enforce decisions?**

(a) If an educational agency or institution does not comply during the period of time set under § 99.66(c), the Secretary may take any legally available enforcement action in accordance with the Act, including, but not limited to, the following enforcement actions available in accordance with part E of the General Education Provisions Act—

\*    \*    \*    \*    \*

[FR Doc. E8–28864 Filed 12–8–08; 8:45 am]

**BILLING CODE 4000–01–P**



UNITED STATES DEPARTMENT OF EDUCATION

THE DEPUTY SECRETARY

| | |
|---|---|
| Memorandum to: | Chief State School Officers<br>State Directors of Vocational-Technical Education<br>State Directors of Adult Education<br>State Directors of Community, Junior and Technical Colleges |
| From: | William D. Hansen<br>Deputy Secretary of Education |
| Subject: | Additional Guidance on the Application of the Family Educational Rights and Privacy Act (FERPA) to Reporting under the Carl D. Perkins Vocational and Technical Education Act and the Adult Education and Family Literacy Act |
| Date: | January 30, 2003 |

In response to inquiries from States and education groups, the Department issued formal guidance on the interplay of the Family Educational Rights and Privacy Act (FERPA) and the accountability requirements in the Carl D. Perkins Vocational and Technical Education Act (Perkins III) and the Adult Education and Family Literacy Act (AEFLA) on January 18, 2001. The guidance presented here, which will become effective April 30, 2003, will supersede the previous guidance and is intended to harmonize program evaluation requirements in Perkins III and AEFLA with FERPA, permitting the evaluation functions in the former statutes to be carried out while protecting the privacy of students as reflected in FERPA.

Specifically, the Department has reviewed the January 18, 2001, memorandum (2001 memorandum) in light of its concern for the privacy of students' records and compliance with FERPA. Based on that review, we believe that further, more specific guidance is needed to avoid application of the memorandum by the States in a manner that may interfere with FERPA protections. In addressing these matters, we have focused our attention on the possible use of the "authorized representatives" provision in FERPA as legal authority for conducting audits or evaluations to determine whether Federal program accountability requirements are being met.

The 2001 memorandum stated that:

> FERPA permits the disclosure of protected student information without the prior consent of students in certain, limited circumstances. (20 U.S.C. § 1232g(b); 34 CFR § 99.31.) One exception permits the disclosure of information derived from education records without prior consent to "authorized representatives of" the Comptroller General of the United States, the Secretary, the Attorney General or

"State or local educational authorities." The disclosure must be "in connection with the audit and evaluation of Federally-supported education programs, or in connection with the enforcement of the Federal legal requirements which relate to such programs."

Based on this provision, the 2001 memorandum simply concluded that "…a State educational authority may authorize the State UI [Unemployment Insurance] agency (or other agency that has access to State UI wage records) to be its representative for the purpose of evaluating whether local vocational and adult education programs have achieved the student employment goals established by the State under Perkins III or AEFLA."

We have reevaluated this conclusion in light of the full text of the statutory language of FERPA and congressional statements as to its meaning and purpose. Specifically, in authorizing disclosure to authorized representatives, § 1232g(b)(1)(C) limits such disclosures to "the conditions set forth in paragraph (3)," which pertinently provides:

> *Provided,* That except when collection of personally identifiable information is specifically authorized by Federal law, any data collected by such <u>officials</u> shall be protected in a manner which will not permit the personal identification of students and their parents by other than those <u>officials</u>…

(Emphasis added.) 20 USC § 1232g (b)(3). The multiple references to "officials" in paragraph (b)(3) reflect a Congressional concern that the authorized representatives of a State educational authority be under the direct control of that authority. This conclusion is supported by the Joint Statement presented by Senators Buckley and Pell while enacting important amendments to FERPA late in 1974. Specifically, in explaining the meaning and effect of what is now § 1232g(b)(1)(C), the Joint Statement provides:

> Section 438(b)(1) of existing law restricts transfer, without the consent of parents or students, of personally identifiable information concerning a student to … auditors from the General Accounting Office and the Department of Health, Education, and Welfare …

120 Cong. Rec. at 39863 (December 13, 1974). Plainly, the sponsors of FERPA did not view the concept of "authorized representatives" in an expansive manner; rather, their vision was closely tied to employees and officials of, for example, the Comptroller General and the Secretary.

We conclude, therefore, that for the purposes of FERPA, an "authorized representative" of a State educational authority must be under the direct control of that authority, *e.g.,* an employee or a contractor of the authority. Thus, the State educational authority could not, for example, designate a State department of labor to perform an audit or evaluation because the department of labor is not under the educational agency's direct control. However, the following guidance would permit State educational authorities to work with other State agencies to obtain information necessary to comply with Perkins III and

2

AR 0833

AEFLA reporting requirements, while at the same time maintaining FERPA privacy protections.

Regarding the collection of data, a State educational authority that maintains the student records should conduct, oversee, or participate *directly* in the computer match to ensure that it is carried out consistent with FERPA requirements. Even if the computer match cannot be effected in a State educational authority's own facilities, the State educational authority is responsible for ensuring that any disclosure of education records of students to carry out an evaluation on its behalf complies with FERPA, and should maintain oversight and direction of the matching process. This is because FERPA requires that the information collected be protected in a manner that does not permit personal identification of individuals by anyone except the officials of the State educational authority, and must be destroyed when no longer needed for the purposes listed in 34 CFR § 99.35(a).

A State educational authority may obtain State unemployment insurance (UI) wage record data from the State UI agency and conduct the computer match through its employees or contractors under its direct control in order to determine the employment status of students. This approach meets the requirements of FERPA because the State educational authority has not disclosed personally identifiable information from education records to an outside entity. Alternatively, if the computer match is implemented at other facilities, such as at the State UI agency or a neutral location, an employee of the State educational authority, or a party under the direct control of the State educational authority, should conduct the computer match.

The Department anticipates that, in many cases, the State educational authority will carry out the responsibility of matching student data with UI records on behalf of all educational institutions participating in Perkins III and AEFLA. In some cases, however, individual community colleges and other schools may be given the responsibility for acquiring employment-related outcome data required by Perkins III and AEFLA, and providing those outcome data to the State educational authority administering the program. If the community college or other school chooses to use UI record matching to comply with the employment-related outcome data requirements, it will need to follow procedures similar to those applicable to the State educational authority to ensure that records are maintained under the direct control of the local educational authority. There are reasonable strategies for implementing this guidance, such as in cases where distance is prohibitive for a community college or other school to send staff to directly oversee the matching process. For example, a school may hire a contractor that is located in proximity to the UI agency to act as the school's representative in directly overseeing the match. Additional compliance guidance can be obtained from the Department's Family Policy Compliance Office, the office that administers FERPA. (Contact information for the office is provided at the end of this document.)

Additionally, educational agencies and institutions may disclose information from a student's education records, such as the student's social security number, if the student is an "eligible student" and has provided prior, written consent for the disclosure. (An "eligible student" is defined in FERPA as a student who is either 18 years of age or older

3

or who is attending a postsecondary institution at any age. At the secondary level, consent must be obtained from the parent to disclose information, unless the student is 18 years old or older. In the latter case, the "eligible student" is the person from whom the agency or institution seeks consent.) Thus, a State educational authority—such as a community college commission—may disclose student social security numbers to a State UI agency (or other agency that has access to State UI wage records) for the purpose of determining employment status if the eligible students in question have provided consent for the disclosure by the State educational authority to the outside entity. This written consent must be signed and dated by the eligible student and must:

> (1) Specify the records that may be disclosed;
> (2) State the purpose of the disclosure; and
> (3) Identify the party or class of parties to whom the disclosure may be made.

See 34 CFR § 99.30(b). Requesting student consent for this disclosure, for example, may be made a regular part of the intake or admission process for vocational and adult education programs. The Department's Family Policy Compliance Office is available to assist with the development of consent forms.

FERPA also requires that educational agencies and institutions make a record of the disclosure of information from a student's education records—unless the disclosure was made with the consent of the parent or eligible student. This requirement is found in 34 CFR § 99.32. Therefore, if a postsecondary institution discloses information from a student's education record to a State educational authority specifically for program evaluation purposes under Perkins III or AEFLA, the institution is required to record in each student's education records the party or parties to whom the information was disclosed and the legitimate interest the party or parties had in obtaining the information.

The Department recognizes that parties have reasonably relied upon the guidance issued on January 18, 2001. Therefore, the Department has delayed the effective date of the guidance set forth in this memorandum until April 30, 2003. Parties may, therefore, continue to rely on the prior guidance until that date.

The Department's Family Policy Compliance Office is available to provide technical assistance to States in applying the guidance provided herein. The address and telephone number for the Family Policy Compliance Office are as follows:

> Family Policy Compliance Office
> U.S. Department of Education
> 400 Maryland Avenue, SW
> Washington, D.C. 20202-4605
>
> Telephone number:    (202) 260-3887
> Fax number:          (202) 260-9001
> E-mail address:      FERPA@ed.gov

4

AR 0835



**U.S. DEPARTMENT OF LABOR**
**U.S. DEPARTMENT OF EDUCATION**



| | |
|---|---|
| **MEMORANDUM FOR:** | **STATE WORKFORCE DIRECTORS** |
| | **STATE DIRECTORS OF HIGHER EDUCATION** |
| | **AGENCIES** |
| | **STATE DIRECTORS OF COMMUNITY, JUNIOR AND** |
| | **TECHNICAL COLLEGES** |
| | **STATE DIRECTORS OF EMPLOYMENT SECURITY** |
| | **AGENCIES** |
| | |
| **FROM:** | **RAYMOND BRAMUCCI, Assistant Secretary of the Department of Labor** |
| | **for Employment and Training** |
| | |
| | **JUDITH A. WINSTON, UnderSecretary of the Department of Education** |
| | |
| **SUBJECT:** | **APPLICATION OF FERPA TO REPORTING FOR ELIGIBLE** |
| | **TRAINING PROVIDERS UNDER TITLE I OF WIA** |
| | |
| **DATE:** | **January 19, 2001** |

The purpose of this memorandum is to address concerns that have been raised by some States
regarding the effect of the Family Educational Rights and Privacy Act (FERPA) (20 U.S.C.
1232g) on the administration of the eligible training provider provisions under section 122 of the
Workforce Investment Act of 1998 (WIA) (29 U.S.C. 1801, et seq.). As this memorandum
describes below, we believe the performance information required under section 122 may be
obtained by entities administering WIA in a manner that is consistent with the requirements of
FERPA.

Eligible Training Provider Requirements of Title I of WIA

Section 122 of the WIA requires that, for a program of study to be eligible to receive training
funds under section 134(d)(4) of WIA (relating to adult and dislocated worker programs), the
provider of the program (often an educational institution) must, among other things, provide
certain performance outcome information relating to all students who participated in the
program. WIA requires performance outcomes on all students, whether or not such students
received financial assistance under section 134 of the law. This information includes program
completion rates, percentage of students obtaining unsubsidized employment, and wages at
placement in employment. Section 122 of WIA also requires additional information relating to
the performance outcomes of students in the program who received assistance under section 134,
including retention in employment and earnings six months after placement in employment.

1

AR 0837

The primary purpose of all of this information is to develop "consumer reports" on eligible programs that will be made available at local One-Stop centers to assist section 134 participants, as well members of the general public, in selecting the most effective training providers. In addition, the information is used to determine whether the programs meet the minimum performance levels established by each State under section 122(c) for the programs to retain eligibility to receive assistance under section 134 of WIA.

The data on each program is to be reported to the public in the aggregate. Section 122(c)(5)(B) of WIA generally requires that wage record matches be used in developing the aggregate reports relating to placement in unsubsidized employment and earnings. Wage record matches, which are also the most efficient and reliable method for obtaining this performance information, are accomplished by conducting a computer match of the Social Security Number (SSN) of the student (maintained by the educational institution) with the wage records that are maintained by State agencies administering the unemployment insurance program. The SSN maintained by the educational institution is an education record under FERPA. Under the exceptions discussed below, an educational institution may disclose an SSN to an entity involved in the administration of section 122, that has been authorized by the state educational authority to receive such information. The entity receiving the SSN may not redisclose the education record in personally identifiable form. Further, this record must be destroyed when no longer needed for the purposes of complying with section 122 of WIA.

**Application of FERPA Requirements**

FERPA is a Federal law that protects an eligible student's privacy interest in his or her "education records." In particular, FERPA affords eligible students the right to inspect and review their education records, the right to seek to have the records amended, and the right to have some control over the disclosure of information from the records. Section 136(f)(3) of the WIA specifically makes FERPA applicable to WIA programs. The term "education records" is broadly defined as:

"[T]hose records, files, documents, and other materials, which (i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution." (20 U.S.C. 1232g(a)(4). See also 34 CFR 99.3 "Education records.")

FERPA provides that education records, or personally identifiable information from such records, may be disclosed by educational agencies and institutions only after an eligible student provides prior written consent, except in statutorily specified circumstances (20 U.S.C. 1232g(b)(1) and (d). See also 34 CFR 99.30.). "Personally identifiable information" is defined by 34 CFR 99.3 as information that "includes but is not limited to:

2

(a) the student's name;

(b) the name of the student's parent or other family member;

(c) the address of the student or the student's family;

(d) a personal identifier, such as the student's social security number or student number;

(e) a list of personal characteristics that would make the student's identity easily traceable; or

(f) other information that would make the student's identity easily traceable."

FERPA generally prohibits an educational institution from disclosing personally identifiable information from individual student records (such as an SSN) without the prior written consent of the eligible student or parent unless such disclosure falls within one of several exceptions specified under the Act. One of the exceptions, subject to the conditions and limitations discussed in more detail below, is a disclosure in connection with a student's application for or receipt of financial aid (20 U.S.C. 1232g(b)(1)(D)). We believe this exception applies only to the disclosure of student records relating to those students who receive training assistance under section 134 of WIA. Thus, in the case of a WIA participant, the financial aid exception allows for the disclosure a student's SSN to another state agency for the purposes of measuring performance outcome as required by section 122 of WIA.

Subject to the conditions and limitations discussed below, we believe that another exception under FERPA allows providers to disclose the SSNs of all students in a program of study to the entity responsible for preparing the performance information required under section 122 of WIA. This exception allows educational institutions (providers) to disclose personally identifiable information from education records to authorized representatives of State educational authorities in connection with the audit and evaluation of Federally-supported education programs, or in the enforcement of Federal legal requirements relating to such programs (20 U.S.C. 1232g(b)(1)(C)). In short, a State educational authority may authorize a representative to obtain the personally identifiable information such as SSNs from an educational institution for the limited purpose of conducting the required wage record matches and preparing the aggregate information necessary for the consumer reports. Such disclosures may be made to an authorized representative, which could include an entity such as the State UI agency, an entity involved in carrying out interstate wage record matches under the Wage Record Interchange System (WRIS), the State WIA agency, or another entity carrying out the performance reporting requirements of section 122 of WIA. The disclosure, however, is subject to the conditions and limitations of FERPA that are discussed in more detail below.

**Conditions and Limitations on Disclosures without Prior Consent**

As a condition of disclosure under the authorized representative exception, personally identifiable information such as an SSN from a student's records may not be redisclosed by an authorized representative to a third party without the prior written consent of the student. In applying the authorized representative exception, FERPA provides that personally identifiable information such as SSNs may be used only by the entity designated to prepare the performance information under section 122. Further, such information must be destroyed by such entity when

3

AR 0839

it is no longer needed for the purposes of section 122. Finally, FERPA requires that all disclosures by an educational institution be recorded in the student's file.

## Conclusion

This memorandum summarizes the requirements regarding the reporting of performance information for programs of study conducted by educational institutions required by section 122 of WIA. The memo further describes how such information may be obtained consistent with the requirements of FERPA. We do not believe such requirements will impose undue burdens on educational institutions or on entities involved in administering Title I of WIA, and we believe that these requirements can be carried out in a manner that ensures the accountability of training providers while appropriately protecting the privacy of individual students. If you have any questions regarding this memorandum, please contact Maria Kniesler, Division of One-Stop Operations, at (202) 693-3045.

4

AR 0840



🖨 Print                                    ✕ Close
                                              Window

## Family Educational Rights and Privacy Act

**Program Memorandum - OVAE/DVTE - 2001-2**

Date:      January 18, 2001

To:        Chief State School Officers
           State Directors of Vocational-Technical Education
           State Directors of Adult Education
           State Directors of Community, Technical and Junior Colleges

From:      Patricia W. McNeil

Subject:   The Family Educational Rights and Privacy Act and the Use of State
           Unemployment Insurance Wage Records to Report on Performance under
           the Carl D. Perkins Vocational and Technical Education Act and the Adult
           Education and Family Literacy Act

The Carl D. Perkins Vocational and Technical Education Act (P.L.105-332) (20 U.S.C. 2301 <u>et seq.</u>) (Perkins III) and the Adult Education and Family Literacy Act (Title II of the Workforce Investment Act of 1998, P.L. 105-220) (20 U.S.C. 2901 <u>et seq.</u>) (AEFLA) hold States accountable for reporting on, and achieving, annual performance goals for the placement and retention of students in employment, as well as a number of other student outcomes. In addition, some States have established comparable accountability requirements for State community college systems. There is growing interest among States in using State unemployment insurance (UI) wage records to determine the employment status of former students in order to fulfill these requirements. Generally, State UI wage records can provide more accurate information than mail or telephone surveys of former students. Moreover, using State UI records is less expensive than mail or telephone surveys.

The Department supports your efforts to improve the accuracy of the information that your State collects concerning student outcomes and to reduce the burden of obtaining this information. However, preserving student privacy is also required by law. As you investigate using State UI wage records to determine the employment status of students, please note that this approach requires the use of personally identifiable information from student education records. Such personally identifiable information is protected by the Family Educational Rights and Privacy Act (FERPA) (20 U.S.C. 1232g). The purpose of this memorandum is to assist you in understanding FERPA's privacy protections and how to use State UI wage records to determine the employment status of former students in accordance with FERPA. This guidance applies solely to Perkins III and AEFLA. It was developed in consultation with the Undersecretary and the Family Policy Compliance Office, which administers FERPA.

### Accountability Requirements Established by Perkins III and AEFLA

Perkins III creates a State performance accountability system for vocational and technical education through which the Secretary and each eligible agency reach agreement on annual levels of performance for a number of "core indicators" specified in the law. Student "placement in, retention, and completion of, postsecondary education or advanced training, placement in military service, or placement or retention in employment" is one of these core indicators (section 113(b)(2)(iii)). Each eligible agency must use the State adjusted levels of performance to evaluate annually the activities of eligible recipients (section 123(b)). Section 113(c) of Perkins III also requires each eligible agency to submit annually a report to the Secretary regarding "the progress of the State in achieving the State adjusted levels of performance on the core indicators of performance."

AEFLA establishes a similar performance accountability system for adult education and literacy activities. The Secretary and each eligible agency reach agreement on annual levels of performance for a number of "core indicators" specified in the law, including "placement in, retention in, or completion of postsecondary education, training, unsubsidized employment or career advancement" (section 212(b)(2)(ii) of WIA). Each eligible agency must evaluate annually the effectiveness of local adult education and literacy activities using the core indicators

AR 0841

of performance (section 224(b)(3)). States must report annually to the Secretary on "the progress of the eligible agency in achieving eligible agency performance measures, including information on the levels of performance achieved by the eligible agency with respect to the core indicators of performance" (section 212(c)).

To fulfill these evaluation and reporting requirements, a number of States have expressed interest in using State UI wage records to determine the employment status of former students. Maintained by State labor or employment security agencies, these records consist of quarterly reports of employee earnings that are submitted by employers who are required to comply with the State's unemployment compensation law. In most cases, a wage record includes at least three data elements: (1) an employee's social security number (SSN); (2) the total amount of reportable earnings paid to the employee during the quarter; and (3) the employer's unique identifier. Although Federal and State law protects the confidentiality of this information, most States have established procedures to enable other public agencies to access the information for evaluation purposes.

The employment status of a former student can only be determined from UI wage records by using the student's SSN. A student's SSN, however, is personally identifiable information that is protected by FERPA.

**Family Educational and Privacy Rights Act**

As you know, FERPA is a Federal law that protects an eligible student's privacy interest in his or her "education records." In particular, FERPA affords eligible students the right to inspect and review their education records, the right to seek to have the records amended, and the right to have some control over the disclosure of information from the records. The term "education records" is broadly defined as:

> "[T]hose records, files, documents, and other materials, which (i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution." (20 U.S.C. 1232g(a)(4). See also 34 CFR 99.3 "Education records.")

FERPA provides that education records, or personally identifiable information from such records, may be disclosed by educational agencies and institutions only after an eligible student provides prior written consent, except in statutorily specified circumstances. [(20 U.S.C. 1232g(b)(1) and (d). See also 34 CFR 99.30.]) "Personally identifiable information" is defined by 34 CFR 99.3 as information that "includes but is not limited to:

> (a) the student's name;
> (b) the name of the student's parent or other family member;
> (c) the address of the student or the student's family;
> (d) a personal identifier, such as the student's social security number or student number;
> (e) a list of personal characteristics that would make the student's identity easily traceable; or
> (f) other information that would make the student's identity easily traceable."

Because the vocational and adult education laws include identical provisions stipulating that "[n]othing in this Act shall be construed to supersede the privacy protections afforded students and parents under" FERPA (section 5 of Perkins III, section 504(a) of WIA), States must comply with FERPA in using State UI wage records.

Generally, there are three options available to State educational authorities for using State UI wage records consistent with the requirements of FERPA:

- "Importing" State UI wage records and using them internally to determine the employment status of former students;

- Obtaining the prior consent of eligible students to disclose their SSNs to the State UI agency (or other agency that has access to State UI wage records) in order to determine whether they secured or retained employment after they exited the program; and

- Authorizing the State UI agency (or other State agency that has access to UI records) to obtain student SSNs directly from local education agencies and educational institutions, determine the employment status of these students, and report the aggregate results, after which students' personally-identifiable information would be destroyed by the agency authorized to match the UI data.

**"Importing" State UI Wage Records to Determine Employment Outcomes**

A State educational authority may obtain State UI wage record data from the State UI agency and then use this information internally to determine the employment status of students. This approach meets the requirements of FERPA because the State educational authority has not disclosed personally identifiable information from an education record to others. State law, however, may restrict the extent to which you may share personally identifiable information derived from wage records with local education agencies and educational institutions. Providing local education agencies and educational institutions with information about the earnings of individual students, for example, may be prohibited by Federal or State law.

**Obtaining Student Consent for Disclosures to the State UI Agency**

FERPA permits the disclosure of protected student information if a student has consented in advance to this disclosure in writing. Thus, a State educational authority may disclose student SSNs to the State UI agency (or other agency that has access to State UI wage records) for the purpose of determining their employment status if it has secured the consent of these students for the disclosure. Requesting student consent for this disclosure, for example, may be made a regular part of the intake or admission process for vocational and adult education programs.

This written consent must be signed and dated by the eligible student and:

1. Specify the records that may disclosed;
2. State the purpose of the disclosure; and
3. Identify the party or class of parties to whom the disclosure may be made." (34 CFR 99.30(b))

In addition, the State educational authority or local educational agency or institution must provide the student, upon his or her request, a copy of the records that are disclosed. (34 CFR 99.30(c)(1)). A sample consent form that you may adapt is included in Appendix A.

**Authorizing a State UI Agency to Evaluate Employment Outcomes under Perkins III and AEFLA**

FERPA permits the disclosure of protected student information without the prior consent of students in certain, limited circumstances. (20 U.S.C. 1232g(b); 34 CFR 99.31). One exception permits the disclosure of information derived from education records without prior consent to "authorized representatives of" the Comptroller General of the United States, the Secretary, the Attorney General or "State or local educational authorities." The disclosure must be "in connection with the audit and evaluation of Federally-supported education programs, or in connection with the enforcement of the Federal legal requirements which relate to such programs."

Thus, a State educational authority may authorize the State UI agency (or other agency that has access to State UI wage records) to be its representative for the purpose of evaluating whether local vocational and adult education programs have achieved the student employment goals established by the State under Perkins III or AEFLA. Typically, this authorization will be executed by a Memorandum of Agreement (MOA) between the two agencies. The MOA must contain, at a minimum, the following provisions required by FERPA:

1. Information disclosed by a school to an authorized representative must not be redisclosed to a third party in personally identifiable form. The information only may be redisclosed in aggregate, non-personally identifiable form.

2. The information should be destroyed when no longer needed for the purpose of the disclosure.

3. The authorized representative may have access to the records in connection only with --

- an audit or evaluation of a Federally supported education program; or

- for the enforcement of or compliance with Federal legal requirements that relate to those programs.

See 20 U.S.C. 1232g(b)(3); 34 CFR 99.35. Sample Memoranda of Agreement are included as Appendix B.

Pursuant to the MOA, the State UI or other agency may then obtain student SSNs directly from local educational

agencies or educational institutions and determine the employment status of these students. It may also report the aggregate results of its evaluation to the State educational authority, but no personally identifiable information may be redisclosed in this report. We would expect that the State UI or other agency would destroy student SSNs and any other personally identifiable information at the time it makes its evaluation report to the State educational authority. In addition, FERPA also requires that each eligible recipient that discloses a student's SSN or other personally identifiable information must maintain a record of this disclosure with the education records of the student. (34 CFR 99.32)

FERPA also allows a State UI agency to obtain a student's SSN directly from the State educational authority in order to determine the student's employment status. For the purposes of complying with the reporting requirements of Perkins III and AEFLA, a State educational authority may disclose a student SSN to the State UI agency if the UI agency has been made an "agent" of the State educational authority through a written MOA. This MOA should contain the same provisions discussed above.

We hope this memorandum is helpful to you in identifying how State UI wage records may be used to determine the employment status of students in a way manner that complies with FERPA. State laws concerning the privacy of student records and UI wage information also should be reviewed carefully as you consider the options available to you. If you have further questions regarding the requirements of Perkins III and AEFLA, you may contact Mr. Braden Goetz at (202) 205-3373 or Mr. Jon Weintraub at (202) 205-5602. Please direct any further questions you may have concerning FERPA to:

Family Policy Compliance Office
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202-4605
(202) 260-3887 (Telephone)
(202) 260-9001 (Fax)


**Appendix A: Sample FERPA Consent Form**

The following consent forms are examples that you should adapt to reflect the specific circumstances in your State.

*Carl D. Perkins Vocational and Technical Education Act*

I, a student at a postsecondary educational institution or a student age 18 years or older, _____ , consent to the release of personally identifiable information from my education records or I, parent or guardian of a student at a secondary educational institution under the age of 18, _____ consent to the release of personally identifiable information from the education records of my son/daughter.

I understand that the records to be disclosed include my social security number and other personally identifiable information from my education records. I acknowledge that the purpose of the disclosure is to assist the _____ State Department of Education in obtaining and reporting information concerning the placement and retention of students in employment as required by section 113 of Carl D. Perkins Vocational and Technical Education Act. I understand that the personally identifiable information will be disclosed by the educational institution only to _____ Department of Labor / _____ Unemployment Insurance Agency. This information may not be redisclosed to others and will be destroyed as soon as all statistical analysis has been performed, or when the information is no longer needed, whichever date comes first.


_____  _____
Signature of Parent or Student    Date

*Adult Education and Family Literacy Act*

I, a student at a postsecondary educational institution or a student age 18 years or older,
_____ , consent to the release of personally identifiable information from my education
records or I, parent or guardian of a student at a secondary educational institution under the age of 18,
_____ consent to the release of personally identifiable information from the education records of my
son/daughter.


I understand that the records to be disclosed include my social security number and other personally identifiable
information from my education records. I acknowledge that the purpose of the disclosure is to assist the
_____ State Department of Education in obtaining and reporting information concerning the placement
and retention of students in employment as required by section 212 of the Adult Education and Family Literacy
Act. I understand that the personally identifiable information will be disclosed by the educational institution only
to _____ Department of Labor / _____ Unemployment Insurance Agency. This
information may not be redisclosed to others and will be destroyed as soon as all statistical analysis has been
performed, or when the information is no longer needed, whichever date comes first.




_____   _____
Signature of Parent or Student      Date



**Appendix B: Draft Memoranda of Agreement**

The following memoranda of agreement are examples that you should adapt to reflect the specific circumstances
in your State.



*Carl D. Perkins Vocational and Technical Education Act*



MEMORANDUM OF AGREEMENT BETWEEN

_____ STATE DEPARTMENT OF EDUCATION AND

THE _____ DEPARTMENT OF LABOR/ THE _____STATE

UNEMPLOYMENT INSURANCE AGENCY



This agreement, made the _____ day of _____ 2001, between the _____ State Department of
Education and the _____ Department of Labor (Labor Department)/ State Unemployment Agency (UI
Agency). The purpose of this agreement is to designate the Labor Department/UI Agency as an "authorized
representative" of the _____ Department of Education (Education Department) for purposes of obtaining
and reporting information concerning the placement and retention of students in employment as required by
section 113 of Carl D. Perkins Vocational and Technical Education Act (Perkins III).

*RECITALS:*

    1. Local secondary and postsecondary educational institutions maintain education records on enrollees that
    include information on student demographics, programs of study, achievement, attainment and social
    security numbers. Such records also include information on students participating in vocational education
    programs. The _____Labor Department/ UI Agency maintains unemployment insurance wage

records on all qualified employees in _____ state.

2. Perkins III (P. L. 105-332) creates a State performance accountability system for vocational education programs. States must report annually to the U.S. Department of Education (ED) on the progress of the state in reaching agreed upon levels of performance on core indicators specified in the law. These core indicators include placement and retention in employment.

3. In order to determine employment outcomes for those vocational education students included _____'s Perkins III accountability system, local education agencies and educational institutions will supply the _____ Labor Department/UI Agency with a list of the social security numbers of these students. The _____ Labor Department/UI Agency will access unemployment insurance wage records using these social security numbers and determine employment outcomes for these students. The _____ Labor Department/UI Agency will report the results of this analysis to the _____ Education Department in aggregate form only, without personally identifiable information. Local education agencies and education institutions will not release personally identifiable information from the education records of students to state agencies or departments other than those listed in this agreement.

4. The Family Educational Rights and Privacy Act (FERPA) generally prohibits the disclosure of education records without the consent of the parent for children under the age of 18 or from students attending postsecondary educational institutions. Under FERPA, education records are defined as records directly related to a student and maintained by an educational agency or institution. The records accessed by _____ Department of Education to meet Perkins III performance reporting requirements are education records, and subject to FERPA.

5. FERPA contains several exceptions to the general rule that education records may not be disclosed without prior, written parental consent. One exception allows for disclosures to authorized representatives of the Secretary of Education, the Comptroller General, the Attorney General, and state and local educational authorities. Such a disclosure must be made in connection with an audit or evaluation of a Federal or State supported education program. The disclosure may also be made for the enforcement of or compliance with Federal legal requirements related to the Federal or State education program.

6. The disclosure of personally identifiable student information by local education agencies and educational institutions to the _____ Labor Department/UI Agency is for the purpose of complying with the performance reporting requirements of Perkins III, and is permissible under FERPA. ED has concluded that the _____ Labor Department/UI Agency can be designated an authorized representative for purposes of compiling and reporting information as required by Perkins III.

7. Without access to these records, the state of _____ will be unable to provide accurate performance information required by Perkins III in a timely and cost-effective manner.

*AGREEMENT:*

1. The _____ Education Department designates the _____ Labor Department/UI Agency as its "authorized representative" under FERPA for the limited purpose of collecting information directly from local education agencies and educational institutions in order to comply with the performance reporting requirements of Perkins III. This authorization is limited to the collection of data from the education records (as defined by FERPA) of secondary and postsecondary vocational education students in _____. It is understood and acknowledged by the parties that the _____ Labor Department/ UI Agency will not redisclose any personally identifiable information from the education records.

2. The _____ Labor Department/UI Agency agrees to destroy all personally identifiable information such as social security numbers obtained from the above-referenced education records as soon as all statistical analysis has been performed, or when the information is no longer needed, whichever date comes first. All versions of such information and data, electronic, paper, or otherwise, must be destroyed.

3. The _____ Education Department agrees to work with ED, and in particular, the Family Policy Compliance Office (FPCO) to ensure that every educational agency and institution which discloses education records to the _____ Labor Department/UI Agency will update its annual notification to include the _____ Labor Department/UI agency as a recipient of education records for the purposes of complying with the performance reporting requirements of Perkins III.

AR 0846

This agreement shall be in effect for _____ years from the date of the last signature.


_____          _____
Superintendent
_____ Department of Education          Date


_____          _____
Secretary
_____ Labor Department/UI Agency   Date


*Adult Education and Family Literacy Act*


MEMORANDUM OF AGREEMENT BETWEEN

_____ STATE DEPARTMENT OF EDUCATION AND

THE _____ DEPARTMENT OF LABOR/ THE _____STATE

UNEMPLOYMENT INSURANCE AGENCY


This agreement, made the _____ day of _____ 2001, between the _____ State Department of Education and the _____ Department of Labor (Labor Department)/ State Unemployment Agency (UI Agency). The purpose of this agreement is to designate the Labor Department/UI Agency as an "authorized representative" of the _____ Department of Education (Education Department) for purposes of obtaining and reporting information concerning the placement and retention of students in employment as required by section 212 of the Adult Education and Family Literacy Act (AEFLA).

*RECITALS:*

1. Eligible providers maintain education records on participants enrolled in adult education and literacy programs that include information on student demographics, programs of study, achievement, attainment and social security numbers. The _____Labor Department/ UI Agency maintains unemployment insurance wage records on all qualified employees in _____ state.

2. AEFLA (P. L. 105-220) creates a performance accountability system for adult education and literacy programs. States must report annually to the U.S. Department of Education (ED) on the progress of the state in reaching agreed upon levels of performance on core indicators specified in the law. These core indicators include placement and retention in employment.

3. In order to determine employment outcomes for students enrolled in adult education and literacy programs, eligible providers will supply the _____ Labor Department/UI Agency with a list of the social security numbers of these students. The _____ Labor Department/UI Agency will access unemployment insurance wage records using these social security numbers and determine employment outcomes for these students. The _____ Labor Department/UI Agency will report the results of this analysis to the _____ Education Department in aggregate form only, without personally identifiable information. Eligible providers will not release personally identifiable information from the education records of students to state agencies or departments other than those listed in this agreement.

4. The Family Educational Rights and Privacy Act (FERPA) generally prohibits the disclosure of education records without the consent of the parent for children under the age of 18 or from students attending postsecondary educational institutions. Under FERPA, education records are defined as records directly related to a student and maintained by an educational agency or institution. The records accessed by

_____ Department of Education to meet AEFLA performance reporting requirements are education records, and subject to FERPA.

5. FERPA contains several exceptions to the general rule that education records may not be disclosed without prior, written parental consent. One exception allows for disclosures to authorized representatives of the Secretary of Education, the Comptroller General, the Attorney General, and state and local educational authorities. Such a disclosure must be made in connection with an audit or evaluation of a Federal or State supported education program. The disclosure may also be made for the enforcement of or compliance with Federal legal requirements related to the Federal or State education program.

6. The disclosure from the _____ Education Department to the _____ Labor Department/UI Agency is for the purpose of complying with the performance reporting requirements of AEFLA, and is permissible under FERPA. ED has concluded that the _____ Labor Department/UI Agency can be designated an authorized representative for purposes of compiling and reporting information as required by AEFLA.

7. Without access to these records, the state of _____ will be unable to provide accurate performance information required by AEFLA in a timely and cost-effective manner.

*AGREEMENT:*

1. The _____ Education Department designates the _____ Labor Department/UI Agency as its "authorized representative" under FERPA for the limited purpose of collecting information directly from eligible providers in order to comply with the performance reporting requirements of AEFLA. This authorization is limited to the collection of information and data from the education records (as defined by FERPA) of students enrolled in adult education and literacy programs in _____. It is understood and acknowledged by the parties that the _____ Labor Department/ UI Agency will not redisclose any personally identifiable information from the education records.

2. The _____ Labor Department/UI Agency agrees to destroy all personally identifiable information such as social security numbers obtained from the above-referenced education records as soon as all statistical analysis has been performed, or when the information is no longer needed, whichever date comes first. All versions of such information and data, electronic, paper, or otherwise, must be destroyed.

3. The _____ Education Department agrees to work with ED, and in particular, the Family Policy Compliance Office (FPCO) to ensure that every eligible provider which discloses education records to the _____ Labor Department/UI Agency will update its annual notification to include the _____ Labor Department/UI agency as a recipient of education records for the purposes of complying with the performance reporting requirements of AEFLA.

This agreement shall be in effect for _____ years from the date of the last signature.

_____     _____
Superintendent
_____ Department of Education     Date

_____     _____
Secretary
_____ Labor Department/UI Agency     Date

⎙ Print                                     ✕ Close
                                              Window

AR 0848

MEMORANDUM OF AGREEMENT BETWEEN
FAMILY POLICY COMPLIANCE OFFICE
OFFICE OF MANAGEMENT
UNITED STATES DEPARTMENT OF EDUCATION
AND
OFFICE OF SPECIAL EDUCATION PROGRAMS
OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES
UNITED STATES DEPARTMENT OF EDUCATION
AND
CENTERS FOR DISEASE CONTROL AND PREVENTION
PUBLIC HEALTH SERVICE
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES

This agreement, made the *11th* day of *Dec.*, 2000, between the Family Policy Compliance
Office (FPCO), Office of Management (OM), the U.S. Department of Education (ED) and the
Office of Special Education Programs (OSEP), the Office of Special Education and
Rehabilitative Services (OSERS), the U.S. Department of Education (ED) and the National
Center for Environmental Health (NCEH), Centers for Disease Control and Prevention (CDC),
Public Health Service (PHS), U.S. Department of Health and Human Services (HHS). The
purpose of this agreement is to designate the CDC as an "authorized representative" of ED for
purposes of collecting information under the Metropolitan Atlanta Developmental Disabilities
Surveillance Program (MADDSP or Program).

*RECITALS:*

1. The CDC has tracked the population-based prevalence of children with developmental
   disabilities since 1984. Since 1991, CDC has gathered this information as part of the
   MADDSP. Under the Program, CDC gathers information from both health and education
   records of students with disabilities.

2. In implementing the MADDSP, CDC reviews the education records of public school students
   in the metropolitan Atlanta region to track students with developmental disabilities.
   Researchers go into schools, review student files, and obtain relevant information on the
   nature of the disability and associated disability services. The Program focuses on children
   from ages 3 to 10 years. The MADDSP is the only population-based surveillance system for
   children with multiple developmental disabilities in the United States. The Program provides
   the only means of estimating the prevalence of disabilities such as autism, cerebral palsy,
   mental retardation and hearing and visual impairments in children.

3. The Family Educational Rights and Privacy Act (FERPA) generally prohibits the disclosure
   of education records without the consent of the parent for children under the age of 18.

Under FERPA, education records are defined as records directly related to a student and maintained by the school. The records accessed by the CDC at metropolitan Atlanta public schools are education records, and subject to FERPA.

4. FERPA contains several exceptions to the general rule that education records may not be disclosed without prior, written parental consent. One exception allows for disclosures to authorized representatives of the Secretary of Education. Such a disclosure must be made in connection with an audit or evaluation of a Federal or State supported education program. The disclosure may also be made for the enforcement of or compliance with Federal legal requirements related to the Federal or State education program.

5. ED currently uses information from the MADDSP in two ways. The OSEP uses the data from the MADDSP to establish indicators for its performance in meeting the requirements of IDEA. Specifically, the OSEP uses the data from the MADDSP to measure its performance under Part C of the Individual with Disabilities Act (IDEA) as required by the Government Performance Reporting Act (GPRA). Second, relying of the MADDSP data, OSEP awards grants for blind and hearing impairment programs.

6. In December 1999, LeRoy Rooker, the director of the FPCO, informally advised the Atlanta Metropolitan Regional Education Service Agency that the CDC's efforts in gathering information from schools for the MADDSP would not generally be authorized under FERPA. In February 2000, the CDC wrote ED and asked the Department to make the CDC an authorized representative of the Department.

7. ED, based on a recommendation of the FPCO, has concluded that the CDC should be designated an authorized representative for purposes of information collection under the MADDSP.

8. Without continued access to these records, the MADDSP will not be able to provide meaningful estimates of the occurrence of developmental disabilities in children. Without this Program, there will be no population-based prevalence estimates or description of the possible factors affecting the capabilities of children with these disabilities.

*AGREEMENT:*

1. ED designates the CDC as its "authorized representative" under FERPA. This authorization is limited to the collection of information and data from the education records (as defined by FERPA) of public school students in metropolitan Atlanta as necessary for the CDC to administer the MADDSP.

2. CDC agrees to share, upon request by OSEP, all data collected for the MADDSP with ED. The data submitted to ED must be in non-personally identifiable, aggregate form.

3. CDC agrees that all personally identifiable information gathered from the education records of students at public schools in metropolitan Atlanta will be protected from further redisclosure to any third party in personally identifiable form. CDC further agrees that

personally identifiable information from these records will not be disclosed to anyone other than those officials working directly with the MADDSP.

4. CDC agrees to destroy all personally identifiable student information obtained from the above-referenced education records as soon as all statistical analysis has been performed, or when the information is no longer needed, whichever date comes first. All versions of such information and data, electronic, paper, or otherwise, must be destroyed.

5. CDC agrees to work together with the FPCO to ensure that every school providing access to and/or disclosing education records for the MADDSP will record such disclosures as required by FERPA. CDC further agrees that it will work with the FPCO to ensure that every school providing access to and/or disclosing education records for the MADDSP will update its annual notification to include the CDC as a recipient of education records.

This agreement shall be in effect for five years from the date of the last signature. OSEP agrees to notify the FPCO on a yearly basis, on or by 30 _7h_ day of _Sep tember_, that it continues to use the information from the MADDSP for the purposes discussed above in paragraph five of the recital section. Such notification shall be made to the Director of the FPCO by the Director of OSEP or his or her designee, and shall be made in writing, including through electronic mail.

LeRoy Rooker
Director
Family Policy Compliance Office

_12/11/00_
Date

Kenneth Warlick
Director
Office of Special Education Programs

_11/30/00_
Date

Coleen Boyle
Director
Division of Birth Defects, Child
Development and Disability and Health
National Center for Environmental Health

_11/17/00_
Date

AR 0851

(A) representatives of local, statewide, regional, and national institutions, agencies, organizations, and associations which provide library and information services to the public;

(B) representatives of educational institutions, agencies, organizations, and associations (including professional and scholarly associations for the advancement of education and research) :

(C) persons with special knowledge of, and special competence in, technology as it may be used for the improvement of library and information services; and

(D) representatives of the general public.

The conference shall be planned and conducted under the direction of the National Commission on Libraries and Information Science (hereinafter referred to as the "Commission").

(2) In administering this joint resolution, the Commission shall—

(A) when appropriate, request the cooperation and assistance of other Federal departments and agencies in order to carry out its responsibilities;

(B) make technical and financial assistance (by grant, contract, or otherwise) available to the States to enable them to organize and conduct conferences and other meetings in order to prepare for the Conference; and

(C) prepare and make available background materials for the use of delegates to the Conference and associated State conferences, and prepare and distribute such reports of the Conference and associated State conferences as may be appropriate.

(3) (A) Each Federal department and agency is authorized and directed to cooperate with, and provide assistance to, the Commission upon its request under clause (A) of paragraph (2); and, for that purpose, each Federal department and agency is authorized to provide personnel to the Commission in accordance with section 3341 of title 5, United States Code. For the purposes of such section 3341 and this paragraph, the Commission shall be deemed to be a part of any executive or military department of which a request is made under clause (A) of paragraph (2).

(B) the Librarian of Congress is authorized to detail personnel to the Commission, upon request, to enable the Commission to carry out its functions under this joint resolution.

(4) In carrying out the provisions of this joint resolution, the Commission is authorized to engage such personnel as may be necessary, without regard for the provisions of title 5, United States Code, governing appointments in the competitive civil service, and without regard for chapter 51, and subchapter III of chapter 53 of such title relating to classification and General Schedule pay rates.

(5) The Commission is authorized to publish and distribute for the Conference the reports authorized under this joint resolution without regard for section 501 of title 44, United States Code.

(6) Members of the Conference may, while away from their homes or regular places of business and attending the Conference, be allowed travel expenses, including per diem in lieu of subsistence, as may be allowed under section 5703 of title 5, United States Code, for persons serving without pay. Such expenses may be paid by way of advances, reimbursement, or in installments as the Commission may determine.

(d) A final report of the Conference, containing such findings and recommendations as may be made by the Conference, shall be submitted to the President not later than one hundred and twenty days following the close of the Conference, which final report shall be made public and, within ninety days after its receipt by the President, transmitted to the Congress together with a statement of the President containing the

President's recommendations with respect to such report.

(e)(1) There is hereby established a twenty-eight member advisory committee to the Conference composed of (A) at least three members of the Commission designated by the Chairman thereof; (B) two persons designated by the Speaker of the House of Representatives; (C) two persons designated by the President pro tempore of the Senate; and (D) not more than twenty-one persons appointed by the President. Such advisory committee shall assist and advise the Commission in planning and conducting the Conference. The Chairman of the Commission shall serve as Chairman of the Conference.

(2) The Chairman of the Commission is authorized, in his discretion, to establish, prescribe functions for, and appoint members to, such advisory and technical committees as may be necessary to assist and advise the Conference in carrying out its functions.

(3) Members of any committee established under this subsection who are not regular full-time officers or employees of the United States shall, while attending to the business of the Conference, be entitled to receive compensation therefor at a rate fixed by the President but not exceeding the rate of pay specified at the time of such service for grade GS-18 in section 5332 of title 5, United States Code, including traveltime. Such members may, while away from their homes or regular places of business, be allowed travel expenses, including per diem in lieu of subsistence, as may be authorized under section 5703 of title 5, United States Code, for persons in the Government service employed intermittently.

(f) The Commission shall have authority to accept, on behalf of the Conference, in the name of the United States, grants, gifts, or bequests of money for immediate disbursement by the Commission in furtherance of the Conference. Such grants, gifts, or bequests offered the Commission, shall be paid by the donor or his representative to the Treasurer of the United States, whose receipts shall be their acquittance. The Treasurer of the United States shall enter such grants, gifts, and bequests in a special account to the credit of the Commission for the purposes of this joint resolution.

(g) For the purpose of this joint resolution, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the Virgin Islands, and the Trust Territory of the Pacific Islands.

(h) There are authorized to be appropriated without fiscal year limitations such sums, but not to exceed $10,000,000, as may be necessary to carry out this joint resolution. Such sums shall remain available for obligation until expended.

Amend the title so as to read: "A joint resolution to authorize and request the President to call a White House Conference on Library and Information Services in 1978, and for other purposes."

The PRESIDING OFFICER. The question is on agreeing to the amendment in the nature of a substitute.

Mr. BUCKLEY. Mr. President, I offer, on behalf of myself and the distinguished Senator from Rhode Island (Mr. PELL), an amendment to the amendment that has just been offered by Mr. Pell.

The PRESIDING OFFICER. The amendment will be stated.

The legislative clerk read as follows:

The Senator from New York (Mr. BUCKLEY) proposes an amendment to the amendment of the Senator from Rhode Island.

Mr. ROBERT C. BYRD. Mr. President, what is the amendment? Has anyone asked that further reading be dispensed with?

Mr. BUCKLEY. Mr. President, I ask unanimous consent that further reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered; and without objection, the amendment will be printed in the Record.

The amendment is as follows:

SEC. 2. (a) (1) (A) The first sentence of section 438(a)(1) of the General Education Provisions Act is amended by striking out "State and local educational agency, any institution of higher education, any community college, any school agency offering a preschool program, or any other educational institution" and inserting in lieu thereof "educational agency or institution".

(B) Such first sentence is amended by striking out "attending any school of such agency, or attending such institution of higher education, community college, school, preschool, or other educational institution" and inserting in lieu thereof "who are or have been in attendance at a school of such agency or at such institution, as the case may be".

(C) The third sentence of such section is amended by striking out "recipient" and inserting in lieu thereof "educational agency or institution".

(D) Paragraph (1) of section 438(b) of such Act is amended by striking out "State or local educational agency, any institution of higher education, any community college, any school, agency offering a preschool program, or any other educational institution" and inserting in lieu thereof "educational agency or institution".

(E) Paragraph (2) of such section is amended by striking out "State and local educational agency, any institution of higher education, any community college, any school, agency offering a preschool program, or any other educational institution" and inserting in lieu thereof "educational agency or institution".

(F) Subsection (e) of section 438 of such Act is amended by striking out "unless the recipient of such funds" and inserting in lieu thereof "to any educational agency or institution unless such agency or institution".

(G) Section 438(a) of such Act is amended by inserting at the end thereof the following new paragraph:

"(3) For the purposes of this section the term 'educational agency or institution' means any public or private agency or institution which is the recipient of funds under any applicable program."

(2) (A) The first sentence of section 438 (a) (1) of such Act is amended by striking out "any and all official records, files, and data directly related to their children, including all material that is incorporated into each student's cumulative record folder, and intended for school use or to be available to parties outside the school or school system, and specifically including, but not necessarily limited to, identifying data, academic work completed, level of achievement (grades, standardized achievement test scores), attendance data, scores on standardized intelligence, aptitude, and psychological tests, interest inventory results, health data, family background information, teacher or counselor ratings and observations, and verified reports of serious or recurrent behavior patterns." and inserting in lieu thereof "the education records of their children.".

(B) (i) The second sentence of such section is amended by striking out "Where such records or data include" and inserting in

lieu thereof "If any material or document in the education record of a student includes".

(ii) Such second sentence is amended by striking out "any student shall be entitled to receive, or be informed of, that part of such record or data as pertains to their child" and inserting in lieu thereof "one of such students shall have the right to inspect and review only such part of such material or document as relates to such student or to be informed of the specific information contained in such part of such material".

(C) The third sentence of such section is amended by striking out "their child's school records" and inserting in lieu thereof "the education records of their children".

(D) Section 438(a) (1) of such Act is amended by striking out "personally identifiable records or files (or personal information contained therein)" and inserting in lieu thereof "education records (or personally identifiable information contained therein other than directory information, as defined in paragraph (5) of subsection (a))".

(E) Paragraph (2) of such section is amended by striking out "furnishing, in any form, any personally identifiable information contained in personal school records, to any persons other than those listed in subsection (b)(1)" and inserting in lieu thereof "releasing, or providing access to, any personally identifiable information in education records other than directory information, or as is permitted under paragraph (1) of this subsection.".

(F) Section 438(a) of such Act is amended by adding at the end thereof the following new paragraphs:

"(4)(A) For the purposes of this section, the term 'education records' means, except as may be provided otherwise in subparagraph (B), those records, files, documents, and other materials which—

"(i) contain information directly related to a student; and

"(ii) are maintained by an educational agency or institution or by a person acting for such agency or institution.

"(B) The term 'education records' does not include—

"(i) records of instructional, supervisory, and administrative personnel and educational personnel ancillary thereto which are in the sole possession of the maker thereof and which are not accessible or revealed to any other person except a substitute;

"(ii) if the personnel of a law enforcement unit do not have access to education records under subsection (b)(1), the records and documents of such law enforcement unit which (I) are kept apart from records described in subparagraph (A), (II) are maintained solely for law enforcement purposes, and (III) are not made available to persons other than law enforcement officials of the same jurisdiction;

"(iii) in the case of persons who are employed by an educational agency or institution but who are not in attendance at such agency or institution, records made and maintained in the normal course of business which relate exclusively to such person in that person's capacity as an employee and are not available for use for any other purpose; or

"(iv) records on a student who is 18 years of age or older, or is attending an institution of postsecondary education, which are created or maintained by a physician, psychiatrist, psychologist, or other recognized professional or para-professional acting in his professional or para-professional capacity, or assisting in that capacity, and which are created, maintained, or used only in connection with the provision of treatment to the student, and are not available to any one other than persons providing such treatment; provided, however, that such records can be personally reviewed by a physician or other

appropriate professional of the student's choice.

"(C) Nothing in this section shall be construed to alter the confidentiality of communications otherwise protected by law as confidential.

"(5)(A) For the purposes of this section the term 'directory information' relating to a student includes the following: the student's name, address, telephone listing, date and place of birth, major field of study, participation in officially recognized activities and sports, weight and height of members of athletic teams, dates of attendance, degrees and awards received, and the most recent previous educational agency or institution attended by the student.

"(B) Any educational agency or institution making public directory information shall give public notice of the categories of information which it has designated as such information with respect to each student attending the institution or agency and shall allow a reasonable period of time after such notice has been given for a parent to inform the institution or agency that any or all of the information designated should not be released without the parent's prior consent.".

(3) Section 438(a)(1) of such Act is amended by inserting "(A)" after section "Sec. 438. (a) (1)" and adding at the end thereof the following new subparagraph:

"(B) The first sentence of subparagraph (A) shall not operate to make available to students in institutions of postsecondary education the following materials:

"(i) financial records of the parents of the student or any information contained therein;

"(ii) confidential letters and statements of recommendation, which were placed in 1975, if such letters or statements are not the education records prior to January 1, used for purposes other than those for which they were specifically intended;

"(iii) if the student has signed a waiver of the student's right of access under this subsection in accordance with subparagraph (C), confidential recommendations—

"(I) respecting admission to any educational agency or institution,

"(II) respecting an application for employment, and

"(III) respecting the receipt of an honor or honorary recognition; and

"(C) A student or a person applying for admission may waive his right of access to confidential statements described in clause (iii) of subparagraph (B), except that such waiver shall apply to recommendations only if (i) the student is, upon request, notified of the names of all persons making confidential recommendations and (ii) in the case of recommendations described in clause (iii) of such subparagraph, such recommendations are used solely for the purpose for which they were specifically intended.".

(4)(A) Paragraph (2) of section 438(a) is amended by striking out that part thereof which precedes "to insure" and inserting in lieu thereof the following: "No funds shall be made available under any applicable program to any educational agency or institution unless the parents of students who are or have been in attendance at a school of such agency or at such institution are provided an opportunity for a hearing by such agency or institution, in accordance with regulations of the Secretary, to challenge the content of such student's education records, in order"

(B) Such paragraph (2) is amended by inserting before the period at the end thereof the following: "and to insert into such records a written explanation of the parents respecting the content of such records".

(5) Section 438(a) of such Act is amended by adding at the end thereof the following new paragraph:

"(6) For the purposes of this section, the term 'student' includes any person with respect to whom an educational agency or institution maintains education records or personally identifiable information, but does not include a person who has not been in attendance at such agency or institution.".

(6) Section 438(b)(1) of such Act is amended by striking out "and" at the end of clause (C), by striking out the period at the end of clause (D) and inserting in lieu thereof a semicolon, and by adding at the end thereof the following new clauses:

"(E) State and local officials or authorities to whom such information is specifically required to be reported or disclosed pursuant to State statute;

"(F) organizations of educational agencies or institutions for the purpose of developing, validating, and administering predictive tests, if such information will not permit the identification of any person by the organization receiving such information;

"(G) accrediting organizations in order to carry out their accrediting functions;

"(H) parents of a dependent student of such parents, as defined in section 152 of the Internal Revenue Code of 1954; and

"(I) subject to regulations of the Secretary, in connection with an emergency, appropriate persons if the knowledge of such information is necessary to protect the health or safety of the student or other persons.".

(7) Section 438(g) of such Act is amended by adding at the end thereof the following new sentence: "Except for the conduct of hearings, none of the functions of the Secretary under this section shall be carried out in any of the regional offices of such Department.".

(8)(A) Paragraph (1) of section 438(b) of such Act is amended by inserting "or practice" after "which has a policy".

(B) Clause (A) of section 438(b)(1) of such Act is amended by striking out "who" and inserting in lieu thereof ", who have been determined by such agency or institution to".

(C) Clause (B) of such section 438(b)(1) is amended by inserting "seeks or" after "student".

(D) Section 438(b)(3) of such Act is amended by striking out "after the data" down through "collected" and inserting in lieu thereof "by such officials or agencies".

(9) Paragraph (4) (A) of section 438(b) of such Act is amended to read as follows:

"(4)(A) Each educational agency or institution shall maintain a record, kept with the education records of each student, which will indicate all individuals (other than those specified in paragraph (1)(A) of this subsection), agencies, or organizations which have requested or obtained access to a student's education records maintained by such educational agency or institution, and which will indicate specifically the legitimate interest that each such person, agency, or organization has in obtaining this information. Such record of access shall be available only to parents, to the school official and his assistants who are responsible for the custody of such records, and to persons or organizations authorized in, and under the conditions of, clauses (A) and (C) of paragraph (1) as a means of auditing the operation of the system.".

(10)(A) Clause (C) of section 438(b)(1) of such Act is amended by striking out "section 409 of this Act" and inserting in lieu thereof "section 408(c)".

(B) Section 438(g) of such Act is amended by striking out ", according to the procedures contained in section 434 and 437 of this Act".

(b) The amendments made by subsection (a) shall be effective, and retroactive to, November 19, 1974.

Mr. BUCKLEY. Mr. President, since the enactment in October of the Family Educational Rights and Privacy Act of

AR 0853

1974, the educational community has pointed to certain ambiguities that have been contained in the language and provisions—that because there was none of the normal legislative history, it means that HEW does not have an adequate record on the basis of which to develop the necessary regulations.

After consultation with the Senator from Rhode Island, we concluded that the most appropriate way to handle the situation would be to offer at this time the amendment I have just submitted to the desk on our joint behalf, which incorporates the necessary clarifications.

I also send to the desk at this time a statement that Senator PELL and I have agreed to, which provides a narrative and explanation of the meaning and intent of the various provisions of the amendment. I ask unanimous consent that the statement be printed in the RECORD.

There being no objection, the statement was ordered to be printed in the RECORD, as follows:

JOINT STATEMENT IN EXPLANATION OF BUCKLEY/PELL AMENDMENT

The Family Educational Rights and Privacy Act of 1974, section 513 of the Education Amendments of 1974, was signed into law by President Ford on August 21, 1974. Its provisions became effective ninety days after enactment, on November 19.

The purpose of the Act is two-fold—to assure parents of students, and students themselves if they are over the age of 18 or attending an institution or postsecondary education, access to their education records and to protect such individuals' rights to privacy by limiting the transferability of their records without their consent. The Secretary of Health, Education, and Welfare is charged with enforcement of the provisions of the Act, and failure to comply with its provisions can lead to withdrawal of Office of Education assistance to the educational agency or institution.

Since the passage of the Act, commonly referred to as the Buckley Amendment, after its principal sponsor, a number of ambiguities in its provisions have come to light. Since the language was offered as an amendment on the Senate floor, rather than having been the subject of Committee consideration, traditional legislative history materials such as hearings and Committee reports have not been available to serve as a guide to educational institutions, to students, and to the Department of Health, Education, and Welfare in carrying out their various responsibilities under the Act. The amendments being proposed are designed to remedy certain omissions in the provisions of existing law and to clarify other portions of the Act which have been the subject of extensive questioning and concern. It is the hope of the sponsors of these amendments that they provide a suitable response to the issues surrounding existing law which have been raised by parents, students, and institutions.

Existing law lists specifically, at several points in the Act, the institutions and agencies to which the provisions apply. However, these lists are not always identical, creating questions of the applicability of the Act to certain institutions under certain circumstances. The amendment, to standardize the Act's applicability, defines the term "educational agency or institution" as any public or private agency or institution which is the recipient of funds under any applicable program. This definition serves to clarify a number of issues. First, it makes uniform the Act's applicability under all its subsections, so that no question remains of a school's inclusion under one part of the Buckley Amendment but not under another. Second,

by defining the term generically rather than specifically, the amendment eliminates the possibility that any agency or institution not meeting the specific definition might fall outside the Act's coverage. Finally, by explicitly limiting the definition to those institutions participating in applicable programs, the amendment makes it clear that the Family Educational Rights and Privacy Act applies only to Office of Education programs and those programs delegated to the Commissioner of Education for administration. The entire Buckley Amendment is an amendment to Part C of the General Education Provisions Act, which by its own terms applies only to the Office of Education. However, there has been some question as to whether the Amendment's provisions should be applied to other HEW education-related programs such as Headstart or the educational research programs of the National Institute of Education. As rewritten, the limited nature of the Act's coverage should be clear.

Under the Family Educational Rights and Privacy Act, a parent is given the right to challenge the contents of his child's records to insure that they are not inaccurate, misleading, or otherwise in violation of the student's privacy or other rights. This provision, section 438(a)(2) of the General Education Provisions Act, has raised a number of questions which these amendments seek to answer—1) who has the right to challenge, 2) what records are covered, and 3) what sort of proceeding should be undertaken.

First, these amendments clarify that the parent need not have a child still in attendance at the educational agency or institution at the time a hearing is sought in order to have the right to seek a hearing on the accuracy or appropriateness of material in his child's file. The Buckley Amendment does give parents the right to challenge the content of records once their children have left the school possessing the records in order to assure that records still maintained by the school which could subsequently become available to parties outside the school do not contain inaccurate or inappropriate material.

In addition, the material subject to challenge is defined generically as "education records," eliminating the long list of illustrative examples contained in existing law. "Education records" are described as those records, files, documents, and other materials directly related to a student which are maintained by a school or by one of its agents. This definition is a key element in the amendment. An individual should be able to know, review, and challenge all information—with certain limited exceptions—that an institution keeps on him, particularly when the institution may make important decisions affecting his future, or may transmit such personal information to parties outside the institution. This is especially true when the individual is a minor. Parents need access to such information in order to protect the interest of their child.

The amendment makes certain reasonable exceptions to the access by parents and students to school records. The private notes and other materials, such as a teacher's daily record book, created by individual school personnel (such as teachers, deans, doctors, etc.) as memory aids would not be available to parents or students, provided they are not revealed to another person, other than in the case of a substitute who performs another's duties for a temporary period.

The law enforcement records of a law enforcement unit associated with a school would be excluded if its personnel are not allowed access to a student's education records, and if its records on a student are used solely for law enforcement purposes and are only available to other law enforcement officials of the same jurisdiction.

The employment records of a person not

attending a given school would not be available to him, even though he has been a student at another school, if they are used for other than employment purposes.

College students would not be able directly to inspect medical psychiatric, or similar records which are used solely in connection with treatment purposes and only available to recognized professionals or para-professionals in connection with such treatment. Such students would, however, be able to have a doctor or other professional of their choice inspect their records.

The amendment also notes that the law does not alter the confidentiality of communications otherwise protected by law.

The law is not specific concerning the format, procedure, or mechanism for the conduct of such a hearing at the local level. It is the intent of the sponsors of these amendments that again a rule of reason would be followed by those participants involved. Since the hearing is to be conducted at the local level, a detailed specification of procedures cannot be drawn that could possibly apply to each of the thousands of school districts and colleges across the nation. Each has a slightly different organizational structure and pattern of procedure. Obviously, the hearing mechanism must be adapted in each instance to conform to these individual differences. In some cases, a school district might wish to offer the parent a hearing at the district level; in other instances, disputes about the content of records might be better handled at the local school level. It is not the intent of the Amendment to burden schools with onerous hearing procedures.

The amendment is intended to require educational agencies and institutions to conform to fair information record-keeping practices. It is not intended to overturn established standards and procedures for the challenge of substantive decisions made by the institution. It is intended, however, to open the bases on which decisions are made to more scrutiny by the students, or their parents about whom decisions are being made, and to give them the opportunity to challenge and to correct—or at least enter an explanatory statement—inaccurate, misleading, or inappropriate information about them which may be in their files and which may contribute, or have contributed to an important decision made about them by the institution.

The law intends that parents have a full and fair opportunity to present evidence to show that their children's records contain inaccurate, misleading or otherwise inappropriate information. The hearing should be held and the institution's decision rendered within a reasonable period after the parent's request. There has been much concern that the right to a hearing will permit a parent or student to contest the grade given the student's performance in a course. That is not intended. It is intended only that there be procedures to challenge the accuracy of institutional records which record the grade which was actually given. Thus, the parents or student could seek to correct an improperly recorded grade, but could not through the hearing required pursuant to this law contest whether the teacher should have assigned a higher grade because the parents or student believe that the student was entitled to the higher grade.

On the other hand, if a child has been labeled mentally or otherwise retarded and put aside in a special class or school, parents would be able to review the materials in the record which led to this institutional decision, and perhaps seek professional assistance, to see whether these materials contain inaccurate information or erroneous evaluations about their child.

In general, it is intended that the parent would be shown the actual documents contained in the child's education records. However, under certain circumstances this might not be possible—where, for instance,

AR 0854

It is impossible to separate information about one student from that about others. If a student's name is one in a long list of names, it would violate the others' right to privacy to have the entire list shown to that student's parents. In such a situation, the responsibility of the educational agency or institution is to make the information concerning the student known to the parent, without actually having to show him the document.

Existing law prohibits the furnishing of personally identifiable information contained in school records to other than a specific list of persons, primarily other school officials, without the written consent of the student's parents or that of the student when he becomes 18 or enters postsecondary education. A literal interpretation of this language has led school attorneys around the country to advise their clients no longer routinely to print football players' weights in athletic programs and to seek written consent of the cast of the school play that their names may be printed in the program. This narrow reading of the law is not what its author intended to achieve, and he so stated during the floor debate in May on the amendment.

Therefore, these amendments specifically provide that a school may safely provide what is termed "directory information"—such personal facts as name, address, and telephone number—to third parties without fear of having its Federal funds withdrawn. The institution providing such directory information would be required to give public notice of the information it planned to make available to the general public, and to allow parents time to notify the institution that any or all of that information should not be released. This would allow parents with unlisted telephone numbers, for example, to have the right to keep such numbers unlisted.

On the other hand, clarification of the definition of "directory information" can be significant in allowing the functioning of other programs. For example, under the Guaranteed Student Loan Program a student is allowed a nine-month grace period after his last date of attendance before he is required to begin repayment of his obligation. If a school cannot routinely inform the lender of the student's last date of attendance, the lender has no basis for calculating when he may begin to collect the loan. These amendments would avoid this problem by making such information available on a routine basis, without a requirement that the student give his consent.

Much concern has been expressed by institutions of higher education concerning the potential impact of the Buckley Amendment on a number of traditional institutional practices. For instance, letters of recommendation for admission are usually solicited under a promise that such letters will not be available to the student, to his parents, or to third parties not associated with the purpose of the recommendation. What is their status if they become part of a student's permanent official file? Also, in conjunction with an application for student financial aid, a parent may have to file a financial statement. Should a student be given the right to see such a statement? If a student has acquired rights under the Amendment, can an institution require or suggest that he waive those rights and preserve the confidentiality of its files? These amendments seek to answer these and other questions.

A number of exceptions to the blanket right to see and challenge education records are made for students attending institutions of postsecondary education. They shall not have the right, under the provisions of the Amendment, to see financial records of their parents. They shall not have the right to see confidential letters and statements of recommendation placed in education records

prior to January 1, 1975, provided that they are not used for purposes other than those for which they were intended. And students may waive their rights of access to confidential recommendations in three areas—admissions, job placement, and receipt of awards. To protect students from wholesale abuse of such continued possibility of confidentiality, the amendments require that a student be notified of the names of all persons making confidential recommendations, if he does agree to waive his right of access. This notification would include not only those individuals suggested by the student as possible references, but also any others solicited by the institution or volunteering their consent.

With regard to letters of recommendation for a student in an institution of postsecondary education, two further clarifications are included. The use of confidential recommendations is intended solely to the purpose for which they were specifically intended. Such recommendations should not become a part of the student's on-going file and serve as a basis for continued official decision-making for purposes other than for which such letters were originally submitted. Second, the "student" to whom the right of access belongs is defined as any person concerning whom the educational agency maintains education records or personal information, but does not include anyone who has not been in attendance at such agency or institution. This means that the rejected applicant for admission is not given the right under the Buckley Amendment to see and challenge his letters of recommendation, nor does the amendment give him the right to challenge the institution's decision not to admit him. Such a right accrues only to the individual who actually attends the institution. For the purpose of this definition, a student who is only auditing a course, but on whom the institution maintains a personal file, would be included in the Amendment's coverage.

Section 438(b)(1) of existing law restricts transfer, without the consent of parents or students, of personally identifiable information concerning a student to other educational agencies or institutions, other school officials, auditors from the General Accounting Office and the Department of Health, Education, and Welfare, and in connection with the application for or receipt of student financial aid under certain specified conditions. It has become apparent in the last several months that these restrictions are too narrow and, if strictly applied, would seriously interfere in the operation of educational institutions. Therefore, after consultation with numerous educational representatives as well as students, the authors of these amendments have included a series of other potential recipients of student information, without the necessity of securing individual parents' consent.

First, these amendments permit the transmittal of personal information to State and local officials or authorities as required by State statute. It was not intended, in establishing a minimum Federal standard for record confidentiality and access, to preempt the States' authority in the field. Therefore, if a State law requires an educational official to transmit a specific piece of information about a student to State or local officials, or liberalizes a student's access to his own education records even farther than the Family Educational Rights and Privacy Act, such as in Maine, Idaho, and New Mexico, where the law permits students of any age to see their records, State law may be followed without securing a parent's specific consent. Of course, the provisions of the amendment do not affect whatever rights a student or his parents might have in civil proceedings, as in the case where confidentially-received material causes the student or his parents actionable damage.

Organizations such as the Educational Testing Service, the Law School Admissions Council, the College Entrance Examination Board, and the American Medical College Application Service, and others, develop and validate a number of tests which are used by institutions of higher education to predict the potential success of applicants for admission. These and other similar groups need student data in order to perform their function. The amendments would authorize release of such data to these organizations without individual parents' or students' consent, so long as the data are not personally identifiable to the individuals and organizations receiving such data.

Similarly, accrediting agencies form the basis for institutional eligibility to participate in a wide range of Federal assistance programs. In order to assess the quality of an institution's program and the strength of the institution itself, the agency must have access to certain confidential student data. The amendments would authorize such access to enable the accreditor to carry out its functions.

One concern that has been expressed about the working of existing law pertains to the transfer of all parental rights to information to the student about the latter's attaining the age of 18 or enrolling in postsecondary education. Colleges have been reluctant to send bills or grades of their students to the students' parents, for fear of violating the students' rights. The amendments proposed would make it clear that the parent of a dependent student, as defined for income tax purposes, would have a right to information about his child without the institution's having to seek the students' consent.

Finally, under certain emergency situations it may become necessary for an educational agency or institution to release personal information to protect the health or safety of the student or other students. In the case of the outbreak of an epidemic, it is unrealistic to expect an educational official to seek consent from every parent before a health warning can be issued. On the other hand, a blanket exception for "health or safety" could lead to unnecessary dissemination of personal information. Therefore, in order to assure that there are adequate safeguards on this exception, the amendments provided that the Secretary shall promulgate regulations to implement this subsection. It is expected that he will strictly limit the applicability of this exception.

Because of the concern that regionalizing the enforcement of the law may lead to multiple interpretations of it, and possibly work a hardship on parents, students, and institutions, the amendment authorizes that only activities involving the conduct of hearings by the Secretary's review board may be carried out in the regional offices of HEW.

The remainder of the amendment is purely technical in nature, correcting erroneous cross-references found in existing law which were created as a result of changes made in the bill on the floor of the Senate and in conference. The provisions of the amendment are retroactive to November 19, 1974, the date on which the Family Educational Rights and Privacy Act became effective.

With guidelines not yet published, the provisions of the Act, and its ramifications, have been the subject of much uncertainty, causing perplexity among school officials and frustrations among parents and students. It is the hope of the sponsors of this amendment that it will do much to clear up many of the unanswered questions, so that the substance of the provisions may be carried out in schools and colleges across the country as soon as possible, and so that parents and students may properly begin to exercise their rights under the law, and the protection of their privacy may be assured.

Mr. MONDALE. Mr. President, I am somewhat concerned as are Senator WILLIAMS and Senator JAVITS about the provision of this amendment that would permit students to waive their rights to confidentiality of or access to their records. Under the provisions of this amendment would a postsecondary institution be permitted to require, as a condition of application, acceptance, or any other service normally provided to students at the institution, that a student sign such a waiver?

Mr. PELL. There is nothing in the proposed language which would permit an institution to require such a waiver as a precondition of application, or any other service normally provided to students at the institution.

Mr. MONDALE. Would there be any conditions under which an institution could compel any of its students to sign such a waiver?

Mr. PELL. Under the proposed language an institution would be permitted to request such a waiver of applicants or students but would not be permitted to require that the student waive his rights to either the confidentiality of his records, or his access to those records as a precondition to enrollment or matriculation or any other service normally provided to students at the institution under any circumstances.

Mr. MONDALE. Could a postsecondary institution request a student, at time of application for admission, or any time thereafter, to sign a general waiver which would effectively waive the student's rights to examine any recommendations at any time in the future? For example, under the proposed language, confidential statements or recommendations are split into three classes: Recommendations for applications of admission, for employment, and for honors or awards. Would, then, a postsecondary institution have to request the waiver for each of those classes of recommendations at the appropriate time?

Mr. PELL. A postsecondary institution could not request a general waiver which would apply for all time, but would have to ask for a waiver at the appropriate time for each class of confidential statement or recommendation.

Mr. BUCKLEY. Mr. President, in the course of the past weeks, the Senator from Rhode Island and his staff and my staff and I have been in frequent contact about the questions and problems which have arisen regarding the act. We have discussed the problems with representatives of the various educational groups and institutions, student groups, and public interest organizations. We have received a great deal of valuable information and suggestions, and I believe we have succeeded, after many hours of working together, to incorporate them all in language that I believe will meet every legitimate question that has been raised about the proposed legislation.

At this time, I should like to take occasion to express my deep personal appreciation of the tremendous spirit of cooperation and understanding that has been extended to me by the distinguished chairman of the subcommittee and to express my appreciation for his enormous sense of fairness.

Mr. PELL. Mr. President, I thank the Senator from New York.

I fully support and am, indeed, the cosponsor of the series of amendments offered by Senator BUCKLEY to the Family Educational Rights and Privacy Act. The Senator has introduced into the RECORD an agreed upon explanation of the amendments we have prepared which will serve as legislative history in interpreting the language of the amendments. I will, at a suitable point in the RECORD ask unanimous consent for the printing of a document which in a report on legislation would be termed a cordon print. It will show the changes in the existing law; what has been deleted and where the new language fits and how it will be read after adoption of these amendments.

I wish to thank Mr. BUCKLEY for his most cooperative attitude over the past 2 months. Since the first week of October, I have been in contact with him numerous times over certain interpretations of the law.

There was some thought given to deferring the effective date of the law, but we, after numerous discussions decided on a series of amendments which will amend the law so that parents, students, and institutions could better interpret the provisions and exercise their rights under them.

Senator BUCKLEY and I have spent many hours working over the specific language changes. These amendments are not intended to deal with every single issue which has been raised. I fully expect that as students and institutions attempt to deal with the amended law further questions could arise. The Subcommittee on Education could well have oversight hearings on this matter next year after the law has been in operation.

In any event, I again thank Senator BUCKLEY for his actions on this matter.

I ask unanimous consent to have printed in the RECORD the document I have referred to.

There being no objection, the document was ordered to be printed in the RECORD, as follows:

CHANGES IN EXISTING LAW

PROTECTION OF THE RIGHTS AND PRIVACY OF PARENTS AND STUDENTS

SEC. 438. (a)(1) No funds shall be made available under any applicable program to any [State or local educational agency, any institution of higher education, any community college, any school, agency offering a preschool program, or any other educational institution] *educational agency or institution* which has a policy of denying, or which effectively prevents, the parents of students [attending any school of such agency, or attending such institution of higher education, community college, school, preschool, or other educational institution,] *who are or have been in attendance at a school of such agency or at such institution, as the case may be* the right to inspect and review [any and all official records, files, and data directly related to their children, including all material that is incorporated into each student's cumulative record folder, and intended for school use or to be available to parties outside the school or school system, and specifically including, but not necessarily limited to, identifying data, academic work completed, level of achievement (grades, standardized achievement test scores,) at-tendance data, scores on standardized intelligence, aptitude, and psychological tests, interest inventory results, health data, family background information, teacher or counselor ratings and observations, and verified reports of serious or recurrent behavior patterns.] *the education records of their children.* [Where such records or data include] *If any material or document in the education record of a student includes information on more than one student, the parents of* [any student shall be entitled to receive, or be informed of, that part of such record or data as pertains to their child.] *one of such students shall have the right to inspect and review only such part of such material or document as relates to such student or to be informed of the specific information contained in such part of such material. Each* [recipient] *educational agency or institution shall establish appropriate procedures for the granting of a request by parents for access to* [their child's school records] *the education records of their children within a reasonable period of time, but in no case more than forty-five days after the request has been made.*

(B) *The first sentence of subparagraph (A) shall not operate to make available to students in institutions of postsecondary education the following materials:*

(i) *financial records of the parents of the student or any information contained therein;*

(ii) *confidential letters and statements of recommendation, which were placed in the education records prior to January 1, 1975, if such letters or statements are not used for purposes other than those for which they were specifically intended;*

(iii) *if the student has signed a waiver of the student's right of access under this subsection in accordance with subparagraph (C), confidential recommendations—*

(I) *respecting admission to any educational agency or institution,*

(II) *respecting an application for employment, and*

(III) *respecting the receipt of an honor or honorary recognition; and*

(C) *A student or a person applying for admission may waive his right of access to confidential statements described in clause* (iii) *of subparagraph (B), except that such waiver shall apply to recommendations only if* (i) *the student is, upon request, notified of the names of all persons making confidential recommendations and* (ii) *in the case of recommendations described in clause* (iii) *of such subparagraph, such recommendations are used solely for the purpose for which they were specifically intended.*

(2) [Parents shall have an opportunity for a hearing to challenge the content of their child's school records.] *No funds shall be made available under any applicable program to any educational agency or institution unless the parents of students who are or have been in attendance at a school of such agency or at such institution are provided an opportunity for a hearing by such agency or institution, in accordance with regulations of the Secretary, to challenge the content of such student's education records, in order to insure that the records are not inaccurate, misleading, or otherwise in violation of the privacy or other rights of students, and to provide an opportunity for the correction or deletion of any such inaccurate, misleading, or otherwise inappropriate data contained therein and to insert into such records a written explanation of the parents respecting the content of such records.*

(3) *For the purposes of this section the term "educational agency or institution" means any public or private agency or institution which is the recipient of funds under any applicable program.*

(4) (A) *For the purposes of this section, the*

AR 0856

term "education records" means, except as may be provided otherwise in subparagraph (B), those records, files, documents, and other materials which—

(i) contain information directly related to a student; and

(ii) are maintained by an educational agency or institution, or by a person acting for such agency or institution.

(B) The term "education records" does not include—

(i) records of instructional, supervisory, and administrative personnel and educational personnel ancillary thereto which are in the sole possession of the maker thereof and which are not accessible or revealed to any other person except a substitute;

(ii) if the personnel of a law enforcement unit do not have access to education records under subsection (b) (1), the records and documents of such law enforcement unit which (I) are kept apart from records described in subparagraph (A), (II) are maintained solely for law enforcement purposes, and (III) are not made available to persons other than law enforcement officials of the same jurisdiction;

(iii) in the case of persons who are employed by an educational agency or institution but who are not in attendance at such agency or institution, records made and maintained in the normal course of business which relate exclusively to such person in that person's capacity as an employee and are not available for use for any other purpose; or

(iv) records on a student who is 18 years of age or older, or is attending an institution of postsecondary education, which are created or maintained by a physician, psychiatrist, psychologist, or other recognized professional or para-professional acting in his professional or para-professional capacity, or assisting in that capacity, and which are created, maintained, or used only in connection with the provision of treatment to the student, and are not available to anyone other than persons providing such treatment; provided, however, that such records can be personally reviewed by a physician or other appropriate professional of the student's choice.

(C) Nothing in this section shall be construed to alter the confidentiality of communications otherwise protected by law as confidential.

(5) (A) For the purposes of this section the term "directory information" relating to a student includes the following: the student's name, address, telephone listing, date and place of birth, major field of study, participation in officially recognized activities and sports, weight and height of members of athletic teams, dates of attendance, degrees and awards received, and the most recent previous educational agency or institution attended by the student.

(B) Any educational agency or institution making public directory information shall give public notice of the categories of information which it has designated as such information with respect to each student attending the institution or agency and shall allow a reasonable period of time after such notice has been given for a parent to inform the institution or agency that any or all of the information designated should not be released without the parent's prior consent.

(6) For the purposes of this section, the term "student" includes any person with respect to whom an educational agency or institution maintains education records or personally identifiable information, but does not include a person who has not been in attendance at such agency or institution.

"(b) (1) No funds shall be made available under any applicable program to any [State or local educational agency, any institution of higher education, any community college, any school, agency offering a preschool program, or any other educational institution] educational agency or institution which has a policy or practice of permitting the release of [personally identifiable records or files (or personal information contained therein)] education records (or personally identifiable information contained therein other than directory information, as defined in paragraph (5) of subsection (a)) of students without the written consent of their parents to any individual, agency, or organization, other than to the following—

(A) other school officials, including teachers within the educational institution or local educational agency [who], who have been determined by such agency or institution to have legitimate educational interests;

(B) officials of other schools or school systems in which the student seeks or, intends to enroll, upon condition that the student's parent be notified of the transfer, receive a copy of the record if desired, and have an opportunity for a hearing to challenge the content of the record;

(C) authorized representatives of (i) the Comptroller General of the United States, (ii) the Secretary, (iii) an administrative head of an education agency (as defined in section [409] 408(c) of this Act), or (iv) State educational authorities, under the conditions set forth in paragraph (3) of this subsection; and

(D) in connection with a student's application for, or receipt of, financial aid;

(E) State and local officials or authorities to which such information is specifically required to be reported or disclosed pursuant to State statute;

(F) organizations of educational agencies or institutions for the purpose of developing, validating, and administering predictive tests, if such information will not permit the identification of any person by the organization receiving such information;

(G) accrediting organizations in order to carry out their accrediting functions;

(H) parents of a dependent student of such parents, as defined in section 152 of the Internal Revenue Code of 1954; and

(I) subject to regulations of the Secretary, in connection with an emergency, appropriate persons if the knowledge of such information is necessary to protect the health or safety of the student or other persons.

(2) No funds shall be made available under any applicable program to any [State or local educational agency, any institution of higher education, any community college, any school, agency offering a preschool program, or any other educational institution] educational agency or institution which has a policy or practice of [furnishing, in any form, any personally identifiable information contained in personal school records, to any present other than those listed in subsection (b) (1)] releasing, or providing access to, any personally identifiable information in education records other than directory information, or as is permitted under paragraph (1) of this subsection unless—

(A) there is written consent from the student's parents specifying records to be released, the reasons for such release, and to whom, and with a copy of the records to be released to the student's parents and the student if desired by the parents, or

(B) such information is furnished in compliance with judicial order, or pursuant to any lawfully issued subpoena, upon condition that parents and the students are notified of all such orders or subpoenas in advance of the compliance therewith by the educational institution or agency.

(3) Nothing contained in this section shall preclude authorized representatives of (A) the Comptroller General of the United States, (B) the Secretary, (C) an administrative head of an education agency or (D) State educational authorities from having access to student or other records which may be necessary in connection with the audit

and evaluation of Federally supported education program, or in connection with the enforcement of the Federal legal requirements which relate to such programs: Provided, That, except when collection of personally identifiable data is specifically authorized by Federal law, any data collected by such officials with respect to individual students shall not include information (including social security numbers) which would permit the personal identification of such students or their parents [after the data so obtained has been collected] by such officials or agencies.

[(4) (A) With respect to subsections (c) (1) and (c) (2) and (c) (3), all persons, agencies, or organizations desiring access to the records of a student shall be required to sign a written form which shall be kept permanently with the file of the student, but only for inspection by the parents or student, indicating specifically the legitimate educational or other interest that each person, agency, or organization has in seeking this information. Such form shall be available to parents and to the school official responsible for record maintenance as a means of auditing the operation of the system.]

(4) (A) Each educational agency or institution shall maintain a record, kept with the education records of each student, which will indicate all individuals (other than those specified in paragraph (1)(A) of this subsection), agencies, or organizations which have requested or obtained access to a student's education records maintained by such educational agency or institution, and which will indicate specifically the legitimate interest that each such person, agency, or organization has in obtaining this information. Such record of access shall be available only to parents, to the school official and his assistants who are responsible for the custody of such records, and to persons or organizations authorized in, and under the conditions (b), clauses (A) and (C) of paragraph (1) as a means of auditing the operation of the system.

(B) With respect to this subsection, personal information shall only be transferred to a third party on the condition that such party will not permit any other party to have access to such information without the written consent of the parents of the student.

. (c) The Secretary shall adopt appropriate regulations to protect the rights of privacy of students and their families in connection with any surveys or data-gathering activities conducted, assisted, or authorized by the Secretary or an administrative head of an education agency. Regulations established under this subsection shall include provisions controlling the use, dissemination, and protection of such data. No survey or data-gathering activities shall be conducted by the Secretary, or an administrative head of an education agency under an applicable program, unless such activities are authorized by law.

(d) For the purposes of this section, whenever a student has attained eighteen years of age, or is attending an institution of postsecondary education the permission or consent required of and the rights accorded to the parents of the student shall thereafter only be required of and accorded to the student.

(e) No funds shall be made available under any applicable program [unless the recipient of such funds] to any educational agency or institution unless such agency or institution informs the parents of students, or the students, if they are eighteen years of age or older, or are attending an institution of postsecondary education, of the rights accorded them by this section.

(f) The Secretary, or an administrative head of an education agency, shall take appropriate actions to enforce provisions of this section and to deal with violations of this

CONGRESSIONAL RECORD — SENATE *December 13, 1974*

section, according to the provisions of this Act, except that action to terminate assistance may be taken only if the Secretary finds there has been a failure to comply with the provisions of this section, and he has determined that compliance cannot be secured by voluntary means.

(g) The Secretary shall establish or designate an office and review board within the Department of Health, Education, and Welfare for the purpose of investigating, processing, reviewing, and adjudicating violations of the provisions of this section and complaints which may be filed concerning alleged violations of this section [according to the procedures contained in sections 434 and 437 of this Act]. *Except for the conduct of hearings, none of the functions of the Secretary under this section shall be carried out in any of the regional offices of such Department.*

The PRESIDING OFFICER. The question is on agreeing to the amendment of the Senator from New York and the Senator from Rhode Island.

The amendment was agreed to.

The PRESIDING OFFICER. The question is on agreeing to the motion of the Senator from Rhode Island to concur in the House amendment with an amendment.

The motion was agreed to.

Mr. PELL. Mr. President, I move that the Senate insist upon its amendments and ask for a conference with the House, and that the Chair be authorized to appoint the conferees on the part of the Senate.

The motion was agreed to; and the Presiding Officer (Mr. WILLIAMS) appointed Mr. PELL, Mr. RANDOLPH, Mr. WILLIAMS, Mr. KENNEDY, Mr. MONDALE, Mr. EAGLETON, Mr. CRANSTON, Mr. HATHAWAY, Mr. DOMINICK, Mr. JAVITS, Mr. SCHWEIKER, Mr. BEALL, and Mr. STAFFORD conferees on the part of the Senate.

## SUPPLEMENTAL APPROPRIATIONS, 1975—CONFERENCE REPORT

The Senate continued with the consideration of the report of the committee of conference on the disagreeing votes of the two Houses on the amendments of the Senate to the bill (H.R. 16900) making supplemental appropriations for the fiscal year ending June 30, 1975, and for other purposes.

## CLOTURE MOTION

Mr. ROBERT C. BYRD. Mr. President, I send to the desk a cloture motion.

The PRESIDING OFFICER (Mr. WILLIAMS). The cloture motion having been presented under rule XXII, the Chair, without objection, directs the clerk to read the motion.

The legislative clerk read as follows:

CLOTURE MOTION

We, the undersigned Senators, in accordance with the provisions of Rule XXII of the Standing Rules of the Senate, hereby move to bring to a close the debate upon the amendment by the Senator from Pennsylvania (Mr. SCOTT) to House Amendment No. 17 to H.R. 16900, the Supplemental Appropriation Bill for 1975.

Pete Domenici, Robert Taft, Jr., Robert T. Stafford, Charles Percy, James B. Pearson, Jacob K. Javits, Hugh Scott, Clifford P. Case, Jennings Randolph, John O. Pastore, Warren G. Magnuson, Frank E. Moss, Claiborne

Pell, Harrison A. Williams, Abraham Ribicoff, Frank Church, Quentin N. Burdick, Walter F. Mondale, Alan Cranston.

Mr. ROBERT C. BYRD. Mr. President, I ask unanimous consent that the 1 hour under rule XXII tomorrow customarily used for debate on the motion to invoke cloture, on the Scott amendment to the amendment in disagreement No. 17 of the Supplemental Appropriation conference report, be equally divided between the Senator from Alabama (Mr. ALLEN) and the Senator from Pennsylvania (Mr. HUGH SCOTT).

The PRESIDING OFFICER. Without objection, it is so ordered.

## AMENDMENT OF THE EXPORT-IMPORT BANK ACT—CONFERENCE REPORT

The Senate continued with the consideration of the report of the committee of conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill (H.R. 15977) to amend the Export-Import Bank Act of 1945, and for other purposes.

## CLOTURE MOTION

Mr. ROBERT C. BYRD. Mr. President, I send to the desk a cloture motion.

The PRESIDING OFFICER (Mr. WILLIAMS). The cloture motion having been presented under rule XXII, the Chair, without objection, directs the clerk to read the motion.

The legislative clerk read as follows:

CLOTURE MOTION

We, the undersigned Senators, in accordance with the provisions of Rule XXII of the Standing Rules of Senate, hereby move to bring to a close the debate upon the adoption of the conference report on H.R. 15977, the Export-Import Bank Act Amendment.

Bob Packwood, John Tower, Edward W. Brooke, Paul J. Fannin, J. Glenn Beall, Adlai Stevenson, Thomas J. McIntyre, Walter F. Mondale, Dick Clark, Frank E. Moss, Lee Metcalf, Daniel Inouye, Gale W. McGee, Harrison A. Williams, Claiborne Pell, Edward Kennedy, Robert Stafford, Robert Taft, Jr., Charles W. Percy, Jacob K. Javits.

## ORDER TO HOLD RESOLUTIONS ON DEFERRALS AT THE DESK

Mr. ROBERT C. BYRD. Mr. President, I ask unanimous consent that two resolutions at the desk on deferrals, one by Mr. BENNETT and one by Mr. HUMPHREY, be held at the desk for later disposition. I further request that the later disposition not be had without my having first been contacted.

The PRESIDING OFFICER. Without objection, it is so ordered.

## COMMITTEE MEETINGS DURING SENATE SESSIONS

Mr. ROBERT C. BYRD. Mr. President, on behalf of the Senator from Michigan (Mr. HART) I ask unanimous consent that the Subcommittee on Administrative Practices of the Committee on the Judiciary be authorized to conduct hearings on amnesty on Wednesday and Thursday, December 18 and 19.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. ROBERT C. BYRD. I ask unanimous consent that the Committee on the Judiciary be authorized to meet on Thursday, December 19, to consider various nominations, and that the Committee on the Budget be authorized to meet Tuesday, December 17, Wednesday, December 18, and Thursday, December 19, to consider the impact of the changing economy on appropriate fiscal policies.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. ROBERT C. BYRD. Mr. President, I ask unanimous consent that the Committee on the Judiciary be authorized to meet on Monday, December 16, to consider the nomination of Murray Saltzman to be a member of the Commission on Civil Rights.

The PRESIDING OFFICER. Without objection, it is so ordered.

## CONSIDERATION OF CERTAIN MEASURES ON THE CALENDAR

Mr. ROBERT C. BYRD. Mr. President, I ask unanimous consent that the Senate proceed to the immediate consideration of the following measures on the calendar: Calendar Order No. 1248, Calendar Order No. 1264, Calendar Order No. 1266, Calendar Order No. 1267, Calendar Order No. 1270, and Calendar Order No. 1272.

The PRESIDING OFFICER. Without objection, it is so ordered.

## CHILDREN'S GIFT BELL MEMORIAL

The Senate proceeded to consider the joint resolution (S.J. Res. 212) to authorize the erection of a Children's Gift Bell and Memorial Tower in the District of Columbia, and for other purposes, which had been reported from the Committee on Public Works with an amendment to strike out all after the resolving clause and insert in lieu thereof:

That the American Freedom Train Foundation is authorized to erect a Children's Gift Bell memorial bell tower of appropriate design on public grounds in the District of Columbia or its environs, in honor of the bicentennial celebration of the signing of the Declaration of Independence.

SEC. 2. (a) The Secretary of the Interior is authorized and directed to select, with the approval of the National Commission of Fine Arts and the National Capital Planning Commission, a suitable site on public grounds in the District of Columbia, or its environs, upon which may be erected the memorial authorized in the first section of this Act: *Provided,* That if the site selected is on public grounds belonging to or under the jurisdiction of the government of the District of Columbia, the approval of the Mayor and City Council of the District of Columbia shall be obtained.

(b) The design and plans for such memorial bell tower shall be subject to the approval of the Secretary of the Interior, the National Commission of Fine Arts, and the National Capital Planning Commission.

SEC. 3. The memorial authorized to be erected by the first section of this Act shall be erected without expense to the United States and shall be maintained by the Secretary of the Interior.

SEC. 4. The authority granted by the first section of this Act shall terminate three

AR 0858

United States Government Accountability Office



Report to Congressional Committees

September 2010

# POSTSECONDARY EDUCATION

## Many States Collect Graduates' Employment Information, but Clearer Guidance on Student Privacy Requirements Is Needed



AR 0923



Highlights of GAO-10-927, a report to congressional committees.

**September 2010**

## POSTSECONDARY EDUCATION

### Many States Collect Graduates' Employment Information, but Clearer Guidance on Student Privacy Requirements Is Needed

## Why GAO Did This Study

Postsecondary education plays an important role in producing a skilled workforce able to compete in the global economy. Some stakeholders have suggested that collecting information on graduates' employment outcomes—whether they are employed in their field of study, for example—will provide better information to help assess the impact of a postsecondary education. The Higher Education Opportunity Act directed GAO to study the information that states have on the employment outcomes of postsecondary graduates. This report describes (1) the extent and purposes for which states collect employment-related information and the challenges they faced in doing so, (2) potential approaches to expanding states' collection efforts across states and nationwide, and (3) how selected states and schools collaborate with employers to align education and workforce needs. To address these objectives, GAO reviewed relevant research and interviewed officials from the U.S. Departments of Education (Education) and Labor, as well as postsecondary institutions, state agencies, and employers in seven states and two countries selected based on their data collection capabilities.

## What GAO Recommends

GAO recommends that Education clarify means by which states can collect and share graduates' employment information under the Family Educational Rights and Privacy Act and establish a time frame for doing so. Education agreed with the recommendation.

View GAO-10-927 or key components.
For more information, contact Katherine Iritani, 202-512-7215, iritanik@gao.gov.

## What GAO Found

Twenty-six states collect some employment-related data, such as data on salary and industry, on individual postsecondary graduates by linking student databases with states' labor data, according to a national 2010 study of state education databases. Officials in seven states GAO contacted reported using graduates' employment data for a variety of purposes, including economic development and institutional feedback. For example, one state reported using the data to compile information on the educational level of the local workforce to accommodate an out-of-state employer interested in opening offices in that area. However, some stakeholders cautioned against potentially inappropriate uses of the data, such as holding institutions accountable for the employment outcomes of graduates, noting that such outcomes are often beyond schools' control. Additionally, some state officials said that they faced challenges in their data collection efforts, including the means by which they can appropriately link student and employment data and comply with the Family Educational Rights and Privacy Act (FERPA), which prohibits disclosing a student's education records without written consent. Education officials acknowledged that confusion exists among some states and said they are planning to provide further guidance through various means, but as of September 2010, these plans had not been implemented.

A review of relevant literature and interviews with state officials and experts helped identify three potential approaches for expanding the collection of graduates' employment data, but many stakeholders emphasized the need to decide upon the specific purposes of the system prior to creating it. Possible approaches include expanding direct state-to-state data sharing, using a third party to expand interstate data sharing, and expanding existing national education-related surveys. An advantage of state-to-state data sharing is to follow individual students who go to school in one state and get a job in another. However, many stakeholders noted that sharing student data across states raises privacy concerns under FERPA, much like sharing data across different agencies within the state. In Australia and the United Kingdom, postsecondary institutions conduct national surveys of all recent graduates to obtain employment and other outcome information.

States and schools that GAO contacted collaborate with employers to align education and workforce needs in several ways, including through workforce investment boards, advisory committees, and employer surveys. The extent of school efforts to partner with employers varied depending on the mission and goals of the institution, with community colleges and vocational schools—with their emphasis on career and technical training—making greater use than 4-year schools of advisory committees. For example, a private, nonprofit technical school in one state has an advisory committee for each program that drives the curriculum for that program. On the basis of employer input, the school discontinued its auto body program because of a lack of opportunities and began networking with employers to identify programs in new areas.

# Contents

**Letter**                                                                                          1

    Background                                                                   4
    About Half of States Collect Employment-Related Information on
        Graduates for a Variety of Purposes, but Compliance with
        Student Privacy Requirements Presents Challenges             7
    Several Potential Approaches Exist for Expanding the Collection of
        Graduates' Employment Data                                   15
    States and Schools Collaborate with Employers in Several Ways to
        Align Education and Workforce Needs                           23
    Conclusions                                                                 26
    Recommendation for Executive Action                                         27
    Agency Comments and Our Evaluation                                          27

**Appendix I**        **Scope and Methodology**                              29

**Appendix II**      **Selected Characteristics of States' Postsecondary
Student Unit Record Data Systems**                                                                 33

**Appendix III**     **Examples of Selected National Surveys of
Postsecondary Education Students**                                                                 35

**Appendix IV**     **Structure of Postsecondary Education in Australia
and United Kingdom and Data Collection Methods**                                                   37

**Appendix V**      **Comments from the Department of Education**             41

**Appendix VI**     **GAO Contacts and Staff Acknowledgments**                  44

**Related GAO Products**                                                                           45

## Tables

Table 1: Data Capabilities of Selected States and Extent to Which These States' Postsecondary Data Systems Collect Certain Education and Employment Data on Graduates                10

Table 2: Description of Selected Possible Approaches to Expand the Collection of Graduates' Employment Information                22

## Figure

Figure 1: States Maintaining Postsecondary SUR Databases That Capture Employment-Related Data from Unemployment Insurance Wage Records                8

### Abbreviations

| | |
|---|---|
| B&B | Baccalaureate and Beyond |
| BPS | Beginning Postsecondary Students |
| ELS | Education Longitudinal Study |
| FERPA | Family Educational Rights and Privacy Act |
| HEOA | Higher Education Opportunity Act |
| K-12 | kindergarten through 12th grade |
| SHEEO | State Higher Education Executive Officers |
| SUR | student unit record |
| TAFE | Training and Further Education |
| UI | unemployment insurance |
| WRIS | Wage Record Interchange System |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States Government Accountability Office**
**Washington, DC 20548**

September 27, 2010

The Honorable Tom Harkin
Chairman
The Honorable Michael B. Enzi
Ranking Member
Committee on Health, Education,
    Labor and Pensions
United States Senate

The Honorable George Miller
Chairman
The Honorable John Kline
Ranking Member
Committee on Education and Labor
House of Representatives

While individuals may pursue postsecondary education for multiple
reasons, one of the key reasons for doing so is to obtain employment.[1]
Postsecondary education plays an important role in producing a skilled
workforce able to compete in the global economy. To this end, the U.S.
Department of Education (Education) provided more than $110 billion in
financial aid in fiscal year 2009 to help students finance the cost of a
postsecondary education. In today's economic climate, and because of the
escalating costs of postsecondary education, policymakers and consumers
have noted the need for reliable information about what happens to
students after they graduate. For instance, questions about college
graduates from different programs arise. Among them are the following:
Are the graduates employed? Are they working in their field of study? Are
they working in another state? To follow students' progress from
postsecondary education to the workforce over time and across state
lines, there is growing interest in examining the employment information
states currently are collecting, and the feasibility of collecting data across
states to address student mobility.

---

[1]Postsecondary education refers to the educational level that follows the completion of a
school providing a secondary education, such as high school, and is often optional.
Undergraduate, postgraduate, and vocational schools make up the various types of
postsecondary education.

Section 1102 of the Higher Education Opportunity Act (HEOA) directed GAO to study the information that states have on employment of postsecondary education graduates.[2] Essentially, the mandate requires a study of the availability of information at the state level regarding postsecondary graduates' employment, possible options for collecting and displaying such data, and how industry evaluates postsecondary education programs. This report addresses the following questions: (1) To what extent and for what purposes are states collecting employment-related information on postsecondary graduates, and what challenges have they faced in doing so? (2) What are the potential approaches and challenges to expanding the collection of graduates' employment information across states and nationwide? (3) How do selected states and postsecondary institutions collaborate with employers to align education and workforce needs?

To determine the extent to which states collect employment information on postsecondary graduates and the methods used to collect such information, we reviewed relevant research and studies, and consulted with subject matter experts. We reviewed information from a 2007 report by the Lumina Foundation[3] and a 2010 report by the State Higher Education Executive Officers (SHEEO),[4] to obtain information on the extent to which states are collecting employment-related and other outcome information on postsecondary education graduates, and how states obtain such information. In addition, to further understand how states collect, use, and display graduates' employment-related information, we selected seven states—Colorado, Connecticut, Florida, Indiana, Michigan, North Dakota, and Washington—for a combination of site visits and telephone interviews. These states were selected to reflect a geographically diverse set of states with a range of abilities to collect student and employment information. Within each selected state, we interviewed officials from the departments of higher education and labor; representatives from selected public, private, and for-profit postsecondary institutions, such as 2-year and 4-year colleges; and one or more employers. Our findings from these states are for illustrative purposes only

---

[2]Pub. L. No. 110-315, § 1102, 122 Stat. 3078, 3491-92 (2008).

[3]Peter Ewell and Marianne Boeke, *Critical Connections: Linking States' Unit Record Systems to Track Student Progress*, New Agenda Series, Lumina Foundation for Education, National Center for Higher Education Management Systems (January 2007).

[4]Tanya I. Garcia and Hans Peter L'Orange, *Strong Foundations: The State of State Postsecondary Data Systems*, State Higher Education Executive Officers (July 2010).

AR 0928

and are not generalizable nationally. Additionally, while we asked states about what they did to validate the data they collect on students, we did not use data collected by states to substantiate any of our findings.

To identify the potential approaches and challenges for expanding efforts to collect graduates' employment information, we focused on the states' efforts to share data both internally and with other states.[5] We also interviewed officials from federal and state education and labor departments, experts in the areas of state student data systems and postsecondary education, as well as representatives from postsecondary education organizations and institutions. We also examined postsecondary data collection systems of two selected countries—Australia and the United Kingdom—to obtain an international perspective (see app. IV). We selected these countries primarily on the basis of expert recommendations about countries known to be active in collecting outcome data on postsecondary graduates and preparing graduates for the workforce. In addition, we reviewed the Family Educational Rights and Privacy Act (FERPA), which includes requirements related to the use and disclosure of data on individual students.[6] To determine how selected states, schools, and employers identify and address workforce needs, we interviewed subject matter experts and officials in our seven selected states, including members of local workforce organizations and employers, and reviewed relevant provisions of the Workforce Investment Act of 1998.[7]

We conducted this performance audit from July 2009 to September 2010 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions

---

[5]We focused on state rather than federal efforts because the HEOA provided generally that nothing in the Higher Education Act of 1965 authorizes the U.S. Department of Education to create a federal unit record system to track individual college students. Sec. 113, § 134, 122 Stat. 3110-11 (codified at 20 U.S.C. § 1015c).

[6]20 U.S.C. § 1232g.

[7]Pub. L. No. 105-220, 112 Stat. 936 (codified in pertinent part as amended at 29 U.S.C. §§ 2801-2945). In addition, section 504 provided generally that nothing in the act was to be construed to permit the development of a national database of personally identifiable information on individuals receiving benefits under it. 112 Stat. 1245 (codified at 20 U.S.C. § 9274(b)).

based on our audit objectives. Appendix I discusses our scope and methodology in further detail.

## Background

A growing number of states are recognizing the potential of collecting data at the state level to inform changes in policy and practice that can lead to improved educational outcomes for students. State-level student unit record (SUR) data systems are one example of how individual students can be tracked over time—often called longitudinal data systems—as they move through the education system. In each state, a number of separate SUR data systems containing individually identified student data may exist at all levels of the education system. For example, a state may have multiple SUR systems that capture information on each student's educational data from kindergarten through 12th grade (K-12), with each school or school district maintaining its own SUR database, and other SUR systems that capture information on students at postsecondary institutions. Other state data systems capture information on people employed in the state. However, these systems historically have not been integrated with each other and therefore have not allowed for the tracking of students as they progress from one education level to the next and finally into the workforce. Furthermore, there is considerable variation across data systems with respect to the data elements collected. The focus of this report is on state-level SUR data systems containing postsecondary data that other research has found are generally maintained by the state's department of higher education or a similar agency that coordinates postsecondary education efforts.

The types of student data maintained in postsecondary SUR data systems include the following:

- basic demographic and enrollment data such as name, gender, ethnicity, major, degree granted, and academic history and

- financial aid information such as family income, expected family contribution, and financial assistance from state, federal, and other sources.

Because most SUR databases historically have contained only education information, states must use other sources to capture wage and other employment-related information. One such source is the unemployment insurance (UI) database, which contains wage records on certain workers in the state and is maintained by all states as part of their administration of the federal unemployment insurance program. States' UI wage records

AR 0930

generally include employees' wages, industry, and Social Security number. States compile UI wage records from data submitted each quarter by employers. Although UI wage records contain basic wage information for the majority of workers, certain categories of employees are excluded, such as self-employed persons, independent contractors, federal employees, and military personnel.[8]

At the time of our review, several federal initiatives were under way that promoted the linkage of education to employment databases. One such initiative is Education's Grant Program for Statewide Longitudinal Data Systems (SLDS), authorized by the Educational Technical Assistance Act of 2002,[9] through which Education awards competitive grants to states for the development of longitudinal data systems based on individual student records. While the grants initially focused on integrating the various K-12 systems maintained by schools and school districts, the focus has recently shifted to following students from prekindergarten through postsecondary education and into the workforce. In fiscal year 2010, Education awarded $250 million in SLDS grants to 20 states. Another initiative is the Department of Labor's (Labor) Workforce Data Quality Initiative, which supports the development of longitudinal data systems that integrate education and workforce data using funds provided under the Consolidated Appropriations Act, 2010.[10] Labor announced the availability of approximately $12.2 million to fund these competitive grants, for which applications were due by August 2010.

In establishing data linkages among agencies and sharing data from a student's education records, entities must be aware of and comply with FERPA, which generally affords parents and eligible students access to student education records while limiting the disclosure of those records to

---

[8]In prior reports, we found that there is a 6- to 9-month lag between the time employers report UI data and states update their UI wage records. See GAO-04-657, *Workforce Investment Act: State and Local Areas Have Developed Strategies to Assess Performance, but Labor Could Do More to Help* (Washington, D.C.: June 2004), and GAO-02-275, *Workforce Investment Act: Improvements Needed in Performance Measures to Provide a More Accurate Picture of WIA's Effectiveness* (Washington, D.C.: February 2002).

[9]Pub. L. No. 107-279, § 208, 116 Stat. 1940, 1981.

[10]Pub. L. No. 111-117, 123 Stat. 3034, 3228.

AR 0931

third parties.[11] Specifically, FERPA requires educational agencies and institutions that receive Education funds—such as schools, school districts, colleges, and universities—to provide parents and eligible students with access to education records and generally prohibits the disclosure of personally identifiable information from education records without the prior written consent of the parent or eligible student, unless an exception to the FERPA general consent requirement applies. One exception to the general consent requirement in FERPA permits educational agencies and institutions to disclose, without consent, personally identifiable information from students' education records to state and local educational authorities for the purpose of an audit or evaluation of federal- or state-supported education programs, or for the enforcement of or compliance with federal legal requirements that relate to those programs.[12] Representatives of state and local educational authorities—such as a state educational agency—may nonconsensually redisclose personally identifiable information from students' education records on behalf of the educational agency or institution in accordance with the redisclosure requirements of FERPA.[13] That is, the redisclosure must meet the statutory and regulatory exceptions to consent in FERPA. Accordingly, Education has interpreted FERPA to permit an educational authority to redisclose personally identifiable information from education records to another educational authority if the latter entity has the legal authority to audit or evaluate the federal- or state-supported education program of the educational agency or institution that disclosed the education records in the first place.[14]

---

[11]20 U.S.C. § 1232g.  In addition, the rights under FERPA, including the right to access student education records, transfer from the parent to the student when the student becomes an eligible student.  An eligible student is a student who has turned 18 years old or attends a postsecondary institution at any age.

[12]20 U.S.C. § 1232g(b)(3).

[13]34 C.F.R. § 99.33 (b) (2009).

[14]34 C.F.R. § 99.35(a) (2009). Within certain limitations, a state's K-12 educational agency that nonconsensually received personally identifiable information from education records to conduct an evaluation may nonconsensually redisclose the personally identifiable information to the state higher education authority. Such disclosure may be done on behalf of the educational agency that provided the information, in order for the state higher education authority to conduct another type of evaluation, as long as that state higher education authority has authority to conduct the evaluation of the disclosing districts' federal- or state-supported education program. There are other exceptions to FERPA's general requirements that may permit the sharing of information under certain circumstances. 20 U.S.C. § 1232g(b).

AR 0932

## About Half of States Collect Employment-Related Information on Graduates for a Variety of Purposes, but Compliance with Student Privacy Requirements Presents Challenges

About half of all states collect employment-related information on postsecondary graduates. This is usually accomplished by linking the state's postsecondary data system with labor data, such as UI wage records maintained by state labor agencies. According to the 2010 study on postsecondary data systems conducted by SHEEO, 45 states, including the District of Columbia, have at least one postsecondary data system[15] (see app. II for a list of states with postsecondary systems and their characteristics). Of these states, 26 have the capacity to capture employment information by linking their SUR data system with other state-level labor/workforce data, such as UI wage records (see fig. 1).

[15]According to SHEEO, 5 states do not have a SUR database: Delaware, Idaho, Michigan, Nebraska, and New Hampshire, and 1 state (Iowa) had limitations to its data system and enrollment numbers that precluded it from being included in the SHEEO report. Further, some states have multiple SUR databases, but for purposes of this report, we use states rather than individual data systems as the unit of analysis.

Page 7                                          GAO-10-927  Postsecondary Education

AR 0933

**Figure 1: States Maintaining Postsecondary SUR Databases That Capture Employment-Related Data from Unemployment Insurance Wage Records**



Sources: SHEEO Report: *Strong Foundations: The State of State Postsecondary Data Systems,*
*State Higher Education Executive Officers (July 2010);* Art Explosion (map).

Note: According to SHEEO, Iowa had limitations to its data system and enrollment numbers that
precluded it from being included in the report.

Further, according to the SHEEO report, most of the state postsecondary data systems include information on public institutions within the state.[16] Of the 26 states with postsecondary data systems that linked to employment data, 24 collect data from both public 2- and 4-year institutions and the other 2 states collect data only from public 4-year institutions. Furthermore, 8 of the 26 states collect data from independent, nonprofit institutions, and 5 collect data from for-profit institutions.

The types of employment-related data collected by the 26 states that link student data with labor data include the following:

- whether graduates were employed in-state,

- wages earned,

- employer name, and

- industry of employment.

Of the 7 states we selected for review, 6 have one or more SUR data systems containing postsecondary data, and 4 states linked those data systems to labor data to capture employment information on graduates. Florida state education officials reported that they also link their postsecondary data system to federal databases such as those maintained by the U.S. Postal Service, Office of Personnel Management, and Department of Defense to obtain employment data on federal employees. Since UI wage records do not capture information for federal employees, this capability allows Florida officials to obtain employment information on postsecondary graduates who are employed by the federal government.

Some of the specific education and employment data elements collected on postsecondary graduates by the selected states include individual students' courses of study during college, job obtained within a particular industry, their salary once they were employed, and the type of financial assistance they received while in college (see table 1).

[16]State profiles from the SHEEO report indicated that of the 45 states with postsecondary SUR databases, 42 collect data from both public 2- and 4-year institutions and the other 3 states collect data only from public 4-year institutions. Furthermore, 19 states collect data from independent, nonprofit institutions, and 7 collect data from for-profit institutions.

**Table 1: Data Capabilities of Selected States and Extent to Which These States' Postsecondary Data Systems Collect Certain Education and Employment Data on Graduates**

| Characteristics of selected states' postsecondary data systems | Selected states | | | | | | |
|---|---|---|---|---|---|---|---|
| | Colo. | Conn.[a] | Fla. | Ind. | Mich. | N.Dak. | Wash. |
| Has postsecondary data system | X | X | X | X | | X | X |
| Links postsecondary data system to labor data | | | X | X | | X | X |
| **Data elements collected** | | | | | | | |
| Course of study | X | X | X | X | | X | X |
| Job obtained within employer's industry | | X | X | X | | X | X |
| Whether job is related to course of study | | | | | | | |
| Salary | | X | X | X | | X | X |
| Student satisfaction with job preparation | | | | | | | |
| Financial aid received | X | X | X | X | | X | X |

Source: GAO analysis of data capabilities of selected states and the following data elements specified in HEOA mandate: type of job obtained, whether job was related to course of study, starting salary, student's satisfaction with his or her preparation for job, guidance provided with respect to securing job, and type of assistance received for recipients of federal student aid.

[a]While Connecticut does not link its postsecondary SUR data system to UI wage records, a state labor official said that the state has linked postsecondary data provided directly from public postsecondary institutions to UI wage data to capture certain labor elements required for annual reporting requirements.

In contrast, we found that occupational information was generally not available in states' labor systems, in part because their UI wage records often do not capture this information. Such information can indicate whether an individual got a job in a field related to his or her course of study during school. The UI wage records maintained by states commonly contain data that identify the industry—such as health care or retail—that employed individuals, but according to Labor, state labor agencies generally do not require employers to identify occupations in a way that would reflect the type of job—such as nurse or cashier. An industry code would indicate, for example, that a graduate with a nursing degree or certificate is employed in the health care industry but not whether the graduate is employed as a nurse or an administrative assistant. Several state officials and experts we spoke with believed that collecting the occupation code from employers would be valuable. However, some also acknowledged that this would require burdensome and costly system changes for both states and employers. One official in Connecticut estimated that it would initially cost the state approximately $800,000 to add occupation codes to its unemployment insurance data system, and about $400,000 each year thereafter.

AR 0936

Our selected states also reported that they were not able to use their data systems to gauge students' satisfaction with the preparation they received for the job obtained. Instead, student satisfaction information was usually collected through surveys administered by postsecondary institutions. For example, state officials and representatives at some institutions we interviewed said that student satisfaction surveys were typically conducted by for-profit institutions and certain professional programs at 4-year universities in the state because these schools were required to collect outcome information, such as placement rates, in order to satisfy national accreditation requirements.

Federal grant funds could result in further changes to states' systems for capturing employment information on graduates. All 7 states we contacted had received federal SLDS grants from Education, and some have used or planned to use these grants in part to develop student data systems, or expand their efforts to capture employment data using existing SUR data systems, according to state officials. For example, Colorado, which had a SUR data system containing postsecondary data but was not capturing any employment data from its UI wage record system, had established in 2009 a Government Data Advisory Board to oversee, among other things, the development of a comprehensive data system that would allow data to be collected on students from prekindergarten through their entry into the workforce. According to officials in Michigan, which had no postsecondary SUR database in place, the state planned to use the grant to develop a data system that linked K-12, postsecondary, and workforce data.

## Officials in Selected States Report Using Graduates' Employment Data to Promote Economic Development, Provide Institutional Feedback, and Raise Consumer Awareness

Selected states reported using graduates' employment-related data for a variety of purposes:

- **Promote economic development.** One official in Florida mentioned that the state workforce agency used the data to compile information on the educational level of the local workforce population at the request of an out-of-state employer that was interested in opening offices in that area. State workforce officials in Indiana also said that they use the student unit record database to inform prospective employers about the educational attainment of local postsecondary graduates, their geographic location within the state, and whether these graduates are still seeking employment. Officials in North Dakota's Department of Commerce said that they combine graduates' employment information with labor market information to determine the extent to which graduates are prepared for employment in high-growth industries.

**How Australia and the United Kingdom Use and Display Graduates' Employment Information**

Government officials we spoke with in Australia reported using education and employment information—collected through their Australian Graduate Survey—in a variety of ways. One way is to use the information as an accountability tool for overseeing universities that receive monetary incentives through a performance fund that is partly based on survey results. Australia also collects employment-related information on vocational education graduates and uses data collected at the time of enrollment and completion to determine how many students are trained in specific occupations, evaluate performance of training providers, and allocate funding, among other purposes. In the United Kingdom, employment information is also obtained through surveys of university and college graduates, which are used to help rank these institutions. Both countries make survey results publicly available through the Web sites of agencies that administer the surveys. For example, Australia publishes five annual reports based on information collected through the graduate surveys and made available online through the agency's Web site. These reports provide information on graduates such as earnings and course experiences. Prospective students can also use an online tool to view employment information on vocational schools, and can query the data through this tool to customize the data to their needs.

- **Provide institutional feedback.** North Dakota used the database to provide feedback to institutions. Using the data, the state compiled reports on the total number of degrees awarded, by institution, and whether graduates who earned those degrees were employed in-state. Indiana used its database to approve a master of liberal arts program at a particular campus. To do so, the state analyzed employment outcomes of graduates of a similar liberal arts program at other campuses and determined that these individuals were more likely to be employed in-state and have higher earnings after completing their degree.

- **Raise consumer awareness.** To better inform prospective students, some states that collect employment information reported that they make aggregate data and annual reports on graduates' employment publicly available, generally through their state Web site. For example, according to a state education official in Florida, the state higher education agency publishes an annual outcomes report that provides information on numbers of graduates, average salary, and whether they are working in-state. This report provides aggregate employment information on graduates and is publicly available on the state's Web site. Furthermore, some institutions we contacted, including for-profit and 4-year schools, also reported providing outcome information on the school's or state's Web site such as placement rates and average salary.

However, some stakeholders cautioned against what they considered to be potentially inappropriate uses of the data. Stakeholders raised concerns that employment outcomes that are beyond a school's control should not be used as a basis for assessing the quality of the education provided by the school or adequacy of preparing students for employment. For example, several postsecondary institution representatives in Michigan mentioned that many external factors such as the local economy are not captured by data systems even though they might influence whether graduates can successfully obtain employment. In addition, stakeholders were also concerned that employment outcome data may not be comparable from one institution to another, depending on how specific data elements are defined, such as job placement rate. Finally, representatives from several 4-year institutions and higher education associations noted that there are other reasons students choose to go to college besides employment, including enhancing skills and engaging in lifelong learning.

## Selected States Faced Challenges in Their Data Collection Efforts, Particularly Understanding Requirements for Protecting Student Privacy

One challenge cited by several state officials we interviewed was how to link postsecondary graduate student and employment data without violating student privacy requirements under FERPA. Linking student and employment data could entail sharing student records with entities outside education agencies, such as labor agencies, which in turn could violate FERPA. While FERPA may allow for the nonconsensual disclosure of personally identifiable information from student records with state educational agencies, as long as it is for a purpose permitted under one of FERPA's exceptions, such as for program evaluation to improve instruction,[17] it does not explicitly address the nonconsensual disclosure of personally identifiable information from education records to a state department of labor for the purpose of linking student and employment records or how these linkages could be performed. Consequently, some states have been unwilling to link their education data systems to labor data. Officials in Colorado and Michigan—states not linking education data to UI wage records—cited FERPA as a roadblock to their states' efforts to develop a comprehensive database that follows students after graduation. Moreover, the SHEEO report found that over half of states cited FERPA as a barrier to linking postsecondary data systems with labor data.

The means by which state education agencies can link or share student data consistent with FERPA can be complicated. According to stakeholders, how a state captures, maintains, and uses SUR data can depend on the individual state's laws, systems, or databases, and state educational agencies may need to take certain steps, such as establishing data use agreements among state agencies that share data in order to comply with FERPA and applicable state laws. States such as Florida and Indiana have established systems whereby educational data are not shared with the labor agency;[18] rather, the labor agency provides data to the

---

[17]20 U.S.C. § 1232g(b)(1)(C) and (F) and (b)(3).

[18]In Florida, this program is created by law and is referred to as the Florida Education and Training Placement Information Program. The purpose of the program is to compile, maintain, and disseminate information concerning the educational histories, placement and employment, and other measures of success of former participants in state educational and workforce development programs. Fla. Stat. § 1108.39 (2009).

educational agency, which then performs the linking function in-house within an education agency or state university system.[19]

Some state officials and other stakeholders we interviewed said that states' varying interpretations of FERPA have caused confusion, with one national stakeholder adding that the stakeholder has called upon Education to clarify FERPA so that states understand how they can link education and employment data. Education officials acknowledged that despite the agency's issuance of FERPA regulations in December 9, 2008, confusion remains among states in how to interpret FERPA's redisclosure provisions for sharing education data with noneducation entities.[20] Education officials said that they were taking steps to clarify how states can develop and use data in statewide longitudinal data systems consistent with FERPA. As previously discussed, many states are developing or enhancing statewide systems under Education's Grant Program for Statewide Longitudinal Data Systems, which supports data integration including education and workforce information. Education officials specifically said they were planning to improve the guidance and technical assistance available to education data stakeholders through activities that include issuing a Notice of Proposed Rulemaking; creating a Chief Privacy Officer position within Education; releasing technical briefs related to data security, confidentiality, and privacy; and launching a Privacy Technical Assistance Center. As of September 2010, Education said it was engaged in implementing these actions, with a timeline for completion expected to occur during fall 2010 and early winter 2011. At the time of this report, Education had not provided information on whether its guidance would specifically address linking education and employment data.

In addition, several state officials we spoke with were also challenged by trying to collect information on graduates who obtain employment outside of their state. Specifically, some state officials reported that existing postsecondary data systems are able to track students within the boundaries of a given state, but they have been rarely used to track

---

[19]In connection with other types of statewide longitudinal data systems, Education has explained that data maintained by a workforce agency is not an education record, so FERPA does not apply and does not present a barrier to the disclosure of such data by state workforce agencies to educational agencies. 74 Fed. Reg. 58,436, 58,452 (Nov 12, 2009).

[20]73 Fed. Reg. 74,806. Education issued these regulations, in part, in an attempt to clarify permissible redisclosures by state and federal officials without consent for audit and evaluation purposes. 73 Fed. Reg. 74,821-22.

AR 0940

students across state lines, in part based on the lack of common data elements, standardized definitions, and interoperable data systems.

# Several Potential Approaches Exist for Expanding the Collection of Graduates' Employment Data

On the basis of our review of relevant literature and interviews with numerous state officials and subject matter experts, we identified several potential approaches for expanding the collection of postsecondary graduates' employment information on a broad level, such as across states or nationwide. These include direct state-to-state or regional data-sharing arrangements, using third parties to assist state efforts in a variety of ways, and expanded national surveys that collect employment-related data.[21] Each approach presents challenges. Regardless of how collection efforts might expand, many state officials and other stakeholders we spoke to emphasized the importance of having a clear understanding of the specific policy questions that the data system should address prior to creating it. For example, state officials in Colorado noted that when the policy questions are known, it makes determining the required data elements needed to answer those questions easier and can decrease unnecessary data collection and costs.

## Expanding Direct State-to-State Data Sharing

One approach to expanding collection efforts is for states to directly share postsecondary graduates' employment data with each other, which can be done through data-sharing agreements. This approach allows states to expand their data on graduates' subsequent employment and allows analysis at the individual student or postsecondary institution level.[22] One example of the use of this approach is the data-sharing agreement between the Washington State Board for Community and Technical Colleges and Oregon's labor agency to provide UI wage data from the latter state. Board officials said this agreement allows the board to follow the employment progress of students who graduate from community and technical colleges in Washington and find a job in Oregon. This additional employment information has enabled Washington to better evaluate the education students received, since it has more data to determine whether

---

[21] Education officials noted that they have not reviewed or endorsed the potential approaches or the specific examples used to illustrate how they have been implemented.

[22] A prior GAO report noted the challenges in following the employment progress of students because of the lack of data sharing across states. GAO, *Career and Technical Education: States Have Broad Flexibility in Implementing Perkins IV*, GAO-09-683 (Washington, D.C.: July 29, 2009).

AR 0941

Washington community college graduates are working in the field in which they were trained. The SHEEO report noted that only three statewide postsecondary data systems shared data with other states.

Several key challenges that affect interstate data-sharing agreements are similar to those associated with sharing data across agencies in the same state, including privacy concerns under FERPA, the lack of standardization of certain data elements, and coordinating ownership and allowable uses of the data, as well as other matters, sometimes referred to generally as governance issues. However, these challenges can be more complex when they arise across different states rather than within the same state. Education's current FERPA regulations do not explicitly address linking data between agencies of different states, so state officials told us they lack sufficient guidance on how data can be shared between states in a way that is consistent with the requirements of FERPA. Further, according to one stakeholder, many states have their own privacy laws in addition to FERPA, and this can create additional challenges for sharing data across states. Nonetheless, several national postsecondary education organizations have indicated that interstate data exchanges could be handled consistent with the requirements of FERPA if certain guidelines are followed, such as having state legislatures specifically authorize state agencies to create the exchanges. A second challenge is the lack of standard data elements among states that may use a different coding system: Even when a state's own agencies have agreed on what data to share with each other and how to standardize the coding, those same kinds of issues must be resolved again by agencies sharing data across states. Another challenge to sharing data across states involves governance issues such as who owns the data, who has the right to use them, and how data quality is managed and assured.

Washington's approach to complying with FERPA--in seeking information on the employment of college graduates that had moved to a neighboring state, Oregon--entailed close supervision of the data and data-linking process. To maintain complete control over the student records and matching process, a staff member from one of the educational authorities in Washington will drive to the Oregon Employment Security Department and personally oversee the match and deliver the data back to the Washington board, according to a Washington state board official. The official said that the current agreement would comply with FERPA requirements. The official also noted that Washington will no longer obtain data from Idaho and Montana, as it had through separate agreements in the past, because it would take too much time to drive to those locations

to conduct the match and the current procedure requires personal oversight of the matching process.

## Using a Third Party to Help Expand Interstate Data Sharing

A second potential approach for expanding data collection may be to have third parties help, by coordinating interstate data sharing, or by warehousing the relevant data from institutions or states. This involves having states select one or more unrelated entities to serve various functions such as facilitating data-sharing agreements and analyzing or warehousing data. Similar to the first approach, this approach allows states to follow students across state lines and analyze outcomes at student and institution levels; however, it also presents FERPA and other challenges.[23] In 2007, Kentucky, Ohio, Tennessee, and West Virginia used the National Center for Higher Education Management Systems, a private nonprofit organization, to facilitate a data exchange designed to help the states examine postsecondary student mobility across their borders.[24] Serving as a third party "broker," the center created exchange agreements with each state individually to resolve governance issues such as how the data would be shared and used. The states also used an independent "administrator" that received data from each state, matched data across states, and constructed database tables based on the designated data elements. A third party, according to officials from the center, can also develop standard data-sharing methodology that can be applied to multiple states.

Another example of using a third party approach for sharing data is Labor's Wage Record Interchange System (WRIS). The WRIS facilitates the exchange of wage data among participating states for the purpose of assessing and reporting on employment and training under the Workforce Investment Act of 1998, among other purposes. States voluntarily participate in the WRIS, which acts like a third party by using the WRIS Clearinghouse to exchange wage data. According to Labor officials, the WRIS permits state workforce agencies to obtain wage data of individuals

---

[23]Using a third party administrator can also help states avoid giving one state access to other states' records. Accessing another state's records can raise FERPA issues, according to documentation from the National Center for Higher Education Management Systems. However, a third party that has education records, such as a contractor, must comply with FERPA with regard to any nonconsensual redisclosures of that information. Education had not issued any guidance on whether third parties may be utilized to facilitate the exchange of education records and employment records at the time of this review.

[24]*Tracking Postsecondary Students Across State Lines*, National Center for Higher Education Management Systems, (March 2008).

AR 0943

who have participated in workforce investment programs in one state, then subsequently taken a job in another. By participating in the WRIS, states can have a more robust picture of the effectiveness of their workforce investment programs, and are able to report more comprehensive outcomes against their performance measures, according to Labor documentation.[25]

In addition to performing these coordination and administrative functions, a third party could serve as a warehouse, maintaining all or some of the data content submitted by other databases, such as those maintained by state agencies' SUR databases or postsecondary institutions. Stakeholders suggested, for example, that the National Student Clearinghouse, a nonprofit institution that verifies student enrollment and other records on behalf of postsecondary institutions, could serve as a third party warehouse of a system that would expand current collection efforts.[26] The Clearinghouse maintains enrollment data on over 92 percent of all postsecondary students, obtained directly from institutions, including public, private, and proprietary institutions, according to Clearinghouse officials. However, these data would still need to be linked to state department of labor wage records in order to furnish employment information on graduates. Clearinghouse representatives responded to this idea by emphasizing that all the parties, including the postsecondary institutions themselves, would have to agree to the arrangement, since local postsecondary institutions own any data that would be provided to the Clearinghouse.

One challenge associated with the third party approach that some officials raised is how to pay for the third party, in addition to some of the same challenges with the state-to-state approach, including FERPA compliance and governance challenges, like data ownership. Recent data-sharing discussions among Hawaii, Idaho, Oregon, and Washington highlight

---

[25]The WRIS does not allow for the sharing of aggregate wage record results obtained through WRIS to third party entities, such as state education agencies. However, a proposal before the WRIS Advisory Group would allow states to participate in a process to share aggregate wage record results with education agencies to obtain information on behalf of workforce and economic development partner public agencies. Labor officials emphasized that participation by any state in such a process would be on an entirely voluntary basis.

[26]The National Student Clearinghouse, established by the higher education community in 1993, serves as a central repository and single point of contact for the collection and exchange of enrollment, degree, diploma, and certificate records on behalf of participating postsecondary and secondary institutions.

AR 0944

governance issues in the third party context. Those states have initiated an effort to develop a "prototype" multistate data exchange to follow students from K-12 through employment, according to an official from the third party coordinating the effort, the Western Interstate Commission for Higher Education.[27] In addition to data ownership, use, and quality, those states have discussed other governance challenges:

- How would the data system be organized (e.g., would the data reside with a third party)?

- How can the states establish a governance board in a cost-effective way, who should sit that board, what kind of authority for that board is needed (such as individual state legislation), and what kind of agreements are needed?

- How can the parties be motivated to continue working together, particularly in the event the shared data make some states appear better than others?

Likewise, states would have to resolve how to analyze results once the data system is in place. The commission's report on this data exchange effort highlighted the magnitude of governance challenges, noting that the time and effort needed to establish governance rules for data exchange systems generally will likely be significantly greater than the time and effort needed to actually match the data from one state's database to another.

---

[27]Brian T. Prescott and Peter Ewell, *A Framework for a Multi-State Human Capital Development Data System*, Western Interstate Commission for Higher Education, 2009. While state officials met together to discuss these issues, states had not progressed past this initial discussion and, as of May 2010, were seeking funds to continue the work.

AR 0945

## Expanding National Surveys That Track Postsecondary Education Outcomes

**National Data Collection Approach Taken by Australia and the United Kingdom**

In Australia, the primary mechanism to obtain employment outcome information on recent graduates of the country's 4-year universities and vocational education sector is a survey of all such graduates, according to Australian officials. Universities administer the survey 4 months after graduation, and information collected includes
- education (e.g., institution attended, degree earned, and major field of study),
- satisfaction with the quality of graduates' educational experience, and
- employment (e.g., employment status, job type, relation to course of study, and annual salary).

Similarly, the United Kingdom obtains outcome information from graduates of universities on whether they are employed, are taking part in further study, or are not available for employment; the type of industry they are working in; and their salary. See appendix IV for details of the information collected in these two countries.

A third potential approach for collecting more employment-related data on a larger number of postsecondary graduates is to expand existing national surveys.[28] Several federal agencies and private organizations conduct national surveys to gather information on numerous education and workforce topics, including graduates' postsecondary education, employment, and other life experiences. (See app. III for examples of relevant national surveys that collect information on postsecondary students and graduates.) For instance, Education's Baccalaureate and Beyond Longitudinal Study surveys a sample of graduating seniors to examine students' education and work experiences after they complete a bachelor's degree. That study gathers information on students' undergraduate experience and demographic background and follows groups of students over time to look at their workforce participation, income, and participation in graduate school programs, among other indicators. The study is designed to answer questions such as the following:

- Ten years after college, what percentage of graduates work full-time at one job?

- What percentage of recent graduates view their job as the start of a career?

- What is the unemployment rate among college graduates 1 year after graduation?

Additionally, officials we interviewed at one university mentioned that one private survey, conducted by the National Association of Colleges and Employers, already provides information on average salaries of recent

---

[28]We also spoke with a few employers and national associations representing employers or for-profit institutions about surveying employers online to obtain information on employer satisfaction with graduates they hire. They said that they would be willing to complete this type of survey if it would provide them with benefits such as access to aggregated information about graduates' institutions of postsecondary education attended, degrees, or starting pay. However, one association official stated that access to this information might not be enough of an incentive to compel employers to complete the online survey.

graduates and has information categorized by major and institution.[29] One major advantage of surveys is that because students themselves provide the information, FERPA compliance is not an issue. However, existing surveys have limitations. For example, surveys that are able to bridge postsecondary education and employment, like the Baccalaureate and Beyond Longitudinal Study, are compiled infrequently: That study has followed groups of students who graduated in 1993 and 2000, and data collection is under way for a third group of 2008 graduates. Further, the Baccalaureate and Beyond Longitudinal Study is representative for graduating seniors nationally and across all majors, but is not representative of any given state or institution, precluding analyses at those levels.[30] A few stakeholders also said that because surveys rely on self-reported information, they might be less reliable than other data sources. Other stakeholders noted that surveys sometimes have low response rates, and results might have significant lag time between data collection and data publication, and incur costs each time a survey is administered. (See table 2 for a summary of the various approaches.)

[29]The National Association of Colleges and Employers Salary Survey compiles data from career planning and placement offices of colleges and universities across the United States. The reports consist of starting salary offers made to new graduates by employing organizations in business, industry, and government, and by nonprofit and educational institutions. The figures reported are for base salaries only and do not include bonuses, fringe benefits, or overtime rates. The Salary Survey reports offers, not acceptances. It does not distinguish between single and multiple offers to individual students and, consequently, offers reported by the study cannot be equated with actual hires.

[30]Additionally, the survey may not be representative of all majors in follow-up surveys.

AR 0947

**Table 2: Description of Selected Possible Approaches to Expand the Collection of Graduates' Employment Information**

| Possible approach | Benefits of approach | Challenges | Example of approach |
|---|---|---|---|
| State-to-state data-sharing agreements: link one or more states' individual SUR data to other states' data | • Follows individual students across state lines, expanding the data states have on graduates' employment<br>• Builds on state systems already in place<br>• Makes data available at student, institution, and state levels, allowing for more detailed analyses<br>• Allows for flexibility and low initial cost | • Compliance with FERPA and differing individual state privacy laws across states<br>• Lack of standardization of data elements across states<br>• Coordination of governance structure, such as who controls the data and analyses<br>• Limited to states with SUR data systems that link graduates' education and employment data<br>• Limited institutional coverage of many SURs with respect to private and proprietary institutions<br>• Paying for states to create and follow these agreements | Washington state has a data-sharing agreement with Oregon to obtain employment data on its graduates |
| Third party intermediary: states use third parties to coordinate data sharing, linking, or housing graduates' employment data | • Follows individual students across state lines, expanding the data states have on graduates' employment<br>• Facilitates coordination of state agreements and analysis of data, according to some stakeholders<br>• Builds on state systems already in place<br>• Makes data available at student, institution, and state levels, allowing for more detailed analyses<br>• Could increase breadth of student information through use of the National Student Clearinghouse, according to some stakeholders | • Compliance with FERPA and differing individual state privacy laws across states and with a third party<br>• Coordination of governance structure, including who the third party will be, in addition to other governance issues<br>• Lack of standardization of data elements across states<br>• Limited to states with SUR data systems that link graduates' education and employment data<br>• Paying for the third party assistance<br>• If using the Clearinghouse, might need postsecondary institutions' permission to use the data | Kentucky, Ohio, Tennessee, and West Virginia used a third party to help create postsecondary data sharing agreements among the four states, and to analyze the data |

**GAO-10-927  Postsecondary Education**

AR 0948

| Possible approach | Benefits of approach | Challenges | Example of approach |
|---|---|---|---|
| Expand existing national education-related surveys | • Provides information to policymakers to guide education and workforce policy<br>• Eliminates FERPA issue, since respondents themselves voluntarily provide information<br>• Could provide more information than could be obtained using only the UI wage records linked to SUR data, because UI wage records generally contain only whether a person is employed, the salary, employer name, and industry of employment | • Low response rate and time delay between conducting survey and survey results can affect ability to capture current trends of overall population or generalize findings to all postsecondary graduates<br>• Self-reported data may be less reliable than linked SUR and UI information<br>• Paying for the survey, which incurs costs every time it is administered<br>• May not be representative at state or institution level, precluding analyses at that level | Other countries, specifically Australia and the United Kingdom, use surveys as a main source of their postsecondary graduates' employment information |

Source: GAO interviews.

# States and Schools Collaborate with Employers in Several Ways to Align Education and Workforce Needs

State and local workforce officials and postsecondary school representatives we interviewed said they collaborate with employers in various ways to keep abreast of workforce needs. At the state and local levels, these partnerships were generally facilitated through workforce investment boards established under the Workforce Investment Act of 1998,[31] or in some cases by the state's department of labor, though other means were also used to cultivate ties with employers.

Workforce officials in some states said that local workforce investment boards use the state workforce agency's labor market analysis to project high-growth occupations by industry in order to align education and training programs with employers' anticipated needs. For example, Michigan's No Worker Left Behind initiative uses labor market information to identify occupations that are in demand and will fund training only for those occupations. The state's 25 local workforce investment boards then work with the business sector and postsecondary schools to help equip workers with skills required for those occupations. Similarly, Connecticut's Department of Labor uses labor market information to

---

[31]This 1998 act required, in part, that states and localities unify federally funded employment and training programs and deliver them through a single service system known as the one-stop system. See 121(a), 112 Stat. 963 (codified at 29 U.S.C. § 2841). It also required establishment of business-led state and local workforce investment boards to assist in the development of state one-stop system plans and set policy, respectively. §§ 111(a) and 117(a), 112 Stat. 944-46 and 954 (codified at 29 U.S.C. §§ 2821 and 2832), respectively.

project occupational needs in the state and develops a profile for each industry. Local workforce investment areas then use this information to plan their education and training programs, some of which are delivered by community colleges.[32]

To promote partnerships with industry, Florida set up steering committees guided by local chamber of commerce and business leaders and embedded 13 centers—known as Banner Centers—at selected postsecondary institutions to promote coordination among local economic developers, employers, and schools. In Washington, the state workforce investment board, in conjunction with the state board representing public and private postsecondary schools, conducts an assessment every 2 years of the education and training credentials required to meet employer demand. The 2009 assessment showed that the largest gaps between supply and demand were in engineering, computer science, and the medical professions. It noted that the education system will need to expand in these fields to meet employer demand as would the number of students who are interested in and prepared for pursuing careers in these fields. Washington plans to survey employers as part of all subsequent assessments. In North Dakota, the oil and gas industry collaborated with the state workforce development office to assess the industry's workforce needs in light of a projected shortage of qualified workers in the state's labor pool. The industry's trade association partnered with the state to help identify skills needed—such as well drilling—and the state college designed a program around those skills. Another state college created a power plant technology program in response to industry demand for qualified power plant operators and hired one of the employer's retirees to head up the program, given his substantial experience in the industry. In turn, the industry contributed funding and equipment, such as simulators, for the classroom. North Dakota plans to conduct similar assessments for other industries, such as information technology and manufacturing, to help ensure that employers have access to a skilled labor pool.

At the school level, the vast majority of the postsecondary schools we contacted relied on program advisory committees or informal discussions to obtain employer input in designing or updating academic programs.

---

[32]For more information on how community colleges collaborate with the workforce investment system to develop career and technical training programs that meet industry needs, see GAO, *Workforce Development: Community Colleges and One-Stop Centers Collaborate to Meet 21st Century Workforce Needs,* GAO-08-547 (Washington, D.C.: May 15, 2008).

AR 0950

Fourteen of the 25 schools also surveyed employers in part to determine skills sought and satisfaction with recently hired graduates. Such collaboration often occurred at community colleges and for-profit vocational schools, given their focus on career and technical training, compared with 4-year schools whose stated mission is to provide a broad, comprehensive education. Nevertheless, officials from one 4-year university in Colorado said that certain programs, such as engineering, used advisory boards to inform program design, while at another university, in Washington, all of its degree programs had advisory boards to ensure classes were relevant to employer needs.

- **Advisory committees.** Twenty-one of 25 postsecondary schools we contacted reported using advisory committees, which include business and industry leaders, to plan and develop their programs and curricula.[33] A 4-year public school in Michigan has an employer advisory board consisting of 15 major corporations that advise the entire school and not just individual academic departments. At a private, nonprofit technical school in Washington, there is an advisory committee for each program that drives the curriculum for that program. On the basis of employer input, for example, the school discontinued its auto body program because of a lack of sufficient job opportunities and began networking with potential new employers. A for-profit school in Michigan meets with its advisory committees each year, in part to ensure that technology being used in the classroom is up to date.

- **Informal communication.** Twelve of the 25 schools we contacted said they cultivated ties with employers through informal communication. Schools maintained open lines of communication, for example, through luncheons with local business leaders to solicit feedback on the school and its graduates. The faculty of one community college in Indiana has built individual relationships with local businesses and meets directly with them. Fostering close relationships with employers enabled the faculty to incorporate employer needs into the classroom while helping students understand how classroom learning can be applied to the work world. In addition,

---

[33]Secondary and postsecondary career and technical programs establish and rely on advisory committees to meet requirements under the Carl D. Perkins Career and Technical Education Act of 2006 that involve parents, faculty, guidance counselors, local business, and local labor organizations in the planning, development, implementation, and evaluation of career and technical education programs in the state. Pub. L. No. 109-270, § 122(c)(5), 120 Stat. 683, 719 (codified at 20 U.S.C. § 2342(c)(5)).

AR 0951

**School and Employer Partnerships in Australia and the United Kingdom**

One university in Australia that offers vocational education categorizes its courses according to the specific industry. It then seeks input from industry representatives to inform the programs and to keep apprised of emerging skill needs. Another university obtains employer feedback on the curriculum and faculty of its biomedical and science programs, and also surveys employers on the quality of university graduates hired. An administrator at a university in the United Kingdom told us that 6-8 employers serve as members of the school's governing committee, and as many as 120 employers participate in an employer group that advises the school's career services office. The university also surveys employers and uses other means to gauge their satisfaction with graduates hired.

several employers we spoke with said they had a good working relationship with schools, enabling them to provide school administrators with informal feedback on the quality of graduates they hired and whether the curriculum needed to be adjusted to meet employer needs.

- **Employer and graduate surveys.** Surveying employers was a commonly used method among schools to determine what skills employers sought and employers' perception of how adequately recently hired graduates were prepared. In Indiana, a for-profit school surveyed its graduates to gauge how satisfied they were with the guidance they had received in preparing for and obtaining employment, while a community college surveyed graduates on how beneficial their coursework had been in helping them prepare to enter the job market. A community college in Indiana developed a workplace readiness certificate after survey results showed that employers' biggest demand was that graduates possess soft skills—the nontechnical skills and traits needed to function in a job, such as punctuality, teamwork, and work ethic. A for-profit school also in Indiana said it offers remedial training for graduates if employers are dissatisfied with their skills.

Some community college officials said that once employer input is obtained, the colleges can adjust their curricula and add new training or degree programs very quickly (e.g., anywhere from under 2 months to 1 year) to respond to employer needs. For example, officials at a community college in Indiana said they developed a new industrial technology program that met employers' needs for courses in advanced manufacturing. In contrast, officials at a 4-year school said that faculty, particularly if they are tenured, can be resistant to changing their program because their focus is on teaching rather than on the quality of jobs their graduates obtain.

## Conclusions

In an era of increasing focus on educational accountability and on U.S. competitiveness in a global economy, there are many merits to collecting employment data on postsecondary graduates and expanding on existing state data collection efforts. For example, collecting employment information on students that moved out of state could help close a knowledge gap when they obtain employment in another state. Some state officials and subject matter experts agree that such enhanced information could provide a more comprehensive picture, across states, of what happens to graduates when they enter the workforce, shedding light on the outcomes of education programs. A system that provides detailed

information on the percentage of a school's graduates that land jobs, average starting salary, and whether they are employed in another state could also raise consumer awareness about education and employment outcomes, as long as this information is made public, for example, by posting the information on the state's or school's Web site. Just over half of the states collect employment information on their postsecondary graduates, and while there could be significant advantages in expanding current data collection efforts, there are also several inherent challenges in doing so. In particular, many states are unsure about how to collect and share the information while still protecting student privacy under FERPA. Education is planning to take several steps to clarify FERPA guidance and provide technical assistance. These are positive steps toward improving guidance, but it is not clear when the guidance will be available and whether it will specifically address states' concerns regarding how to develop or broaden their existing data collection systems in accordance with FERPA. Developing such guidance is important to addressing ongoing confusion and is particularly needed in view of federal grants that require states to specify how they will link their education and employment systems.  Until such guidance is in place, the full potential of collecting longitudinal data within and across multiple states, while still ensuring necessary privacy protections, cannot be realized.

## Recommendation for Executive Action

To help address states' information needs, we recommend that the Secretary of Education develop and disseminate guidance that clarifies the means by which state education agencies can share student records to facilitate obtaining graduates' employment information while ensuring appropriate privacy protection under FERPA. In addition to establishing a time frame for implementation, this guidance should include how student records could be shared with state labor agencies, and how states can share data with one another.

## Agency Comments and Our Evaluation

We provided a draft of this report to officials at the Departments of Labor and Education for their review and comment. Labor had no comments. Education provided a response, which is included as appendix V of this report, and technical comments, which we incorporated as appropriate. In its comments, Education agreed with our recommendation and noted that it has started several initiatives that are in various stages of action. Specifically, Education intends to propose amendments to FERPA regulations to clarify what is permissible under FERPA. According to Education, these amendments, if adopted, would clarify how states can effectively develop and use data in statewide longitudinal data systems

while ensuring protection of individual privacy under FERPA. Education also stated it was creating a Chief Privacy Officer position and establishing a Privacy Technical Assistance Center to serve as a one-stop shop for state educational agencies and others for questions related to protecting privacy, confidentiality, and data security. In addition, Education is planning to release a new series of technical briefs on various issues related to the protection of personally identifiable information in student education records.

We are sending copies of this report to the Secretaries of Education and Labor, as well as to relevant congressional committees. In addition, this report will also be available at no charge on GAO's Web site at http://www.gao.gov/. Contact points for our Office of Congressional Relations and Public Affairs may be found on the last page of this report. Major contributors to this report are listed in appendix VI.

Katherine M. Iritani
Acting Director, Education, Workforce,
    and Income Security

# Appendix I: Scope and Methodology

To address the objectives of this study, we used a variety of methods. Our overall approach included a review of relevant federal laws, literature, studies, and reports, as well as interviews with state education and workforce agency officials, representatives at all types of postsecondary education institutions (i.e., vocational, 2-year, and 4-year schools that were either public, private not-for-profit, or private for-profit), employers, and database and postsecondary education experts. To provide an international context for our work, we reviewed relevant reports and studies and obtained recommendations from postsecondary education experts to identify countries that collect significant information on postsecondary students and that may have strong workforce development programs in place. We judgmentally selected seven states and two countries—Australia and the United Kingdom—where we spoke with officials from relevant education and workforce agencies, as well as postsecondary institutions, to help us understand their methods of data collection and workforce development planning. In conducting our review of states and other countries, we did not conduct independent reviews of their laws, but rather relied on statements attributable to government officials from those states and countries and reliable secondary sources, such as selected researchers, subject matter experts, and employers. We also contacted two accrediting bodies for their perspectives on our work.

To identify the extent to which and for what purposes states collect employment-related information on postsecondary graduates, we identified a sample of seven states for site visits and telephone interviews and, within these states, interviewed state education and labor officials to determine what information is available on the employment outcomes of college graduates and how states are capturing this information. We also met with selected postsecondary education institutions to discuss the types of outcome data they report to the state, any additional outcome information they collect for internal purposes, and the methods used to collect such information. Additionally, we asked state officials, postsecondary institution representatives, and other subject matter experts about how states and institutions collect graduates' employment outcome information, any barriers or challenges they face in doing so, how this information is displayed, and for what purposes the information is used.

To select our sample of states for review, we primarily relied on recommendations from postsecondary education experts and information from an external report published in 2007 by the Lumina Foundation

entitled *Critical Connections: Linking States' Unit Record Systems to Track Student Progress.*[1] This report is based on the results of a 50-state survey completed in 2006 by the National Center for Higher Education Management Systems that identifies the states that have postsecondary student unit record databases, the ability of these databases to link to employment-related data systems such as states' unemployment insurance wage records, and other data sources such as military records, federal employment data, and department of social services data, that provide employment outcome information. On the basis of a review of the Lumina Foundation report's state survey results, we grouped the states into the following four categories according to their data system capabilities:

**(1) Advanced data capabilities.** States in this category had an operational student unit record data system for postsecondary students, experience linking student data to unemployment insurance wage records, and experience linking student data to additional sources that provide employment outcome information.

**(2) Emerging data capabilities**. States in this category had an operational student unit record data system for postsecondary students and experience linking student data to unemployment insurance wage records, but did not have experience linking student data to other additional sources that provide employment outcome information.

**(3) Minimal capability.** States in this category had an operational student unit record data system for postsecondary students, but did not have experience linking to unemployment insurance wage records or other sources that provide employment outcome information.

**(4) No capabilities.** States in this category did not have an operational student unit record data system.

In selecting our sample of states, we also considered additional database functionality (such as including data from private and proprietary institutions), state participation in a regional data sharing agreement, and geographic and demographic diversity (e.g., rural, urban, and makeup of student population). On the basis of these considerations, we judgmentally

[1]Peter Ewell and Marianne Boeke, *Critical Connections: Linking States' Unit Record Systems to Track Student Progress*, New Agenda Series, Lumina Foundation for Education, National Center for Higher Education Management Systems (January 2007).

AR 0956

selected seven states with a range of capabilities for in-depth review: Colorado, Connecticut, Florida, Indiana, Michigan, North Dakota, and Washington. We used the information gathered from these states for illustrative purposes only, and that information is not generalizable to a larger group of states, including a group of states with similar database capabilities or attributes. Additionally, while we asked states about what they did to validate the data they collect on students, we did not use data collected by states to substantiate any of our findings. We supplemented this information with findings from the July 2010 report by the State Higher Education Executive Officers (SHEEO), *Strong Foundations: The State of State Postsecondary Data Systems*, which updated and expanded similar information in the 2007 Lumina report.[2] We corroborated the SHEEO report findings for the seven states we selected for in-depth review. However, we did not corroborate the findings for any other state.

To describe the potential approaches and challenges to expanding the collection of graduates' employment information, we interviewed state officials and subject matter experts. In conjunction with those stakeholders, we identified a number of nationally administered surveys, including surveys administered by federal agencies such as the U.S. Department of Education, the Bureau of Labor Statistics, the National Science Foundation, and others. We examined the extent to which these surveys include education and employment information and whether they could be expanded to collect certain outcome information on graduates. In addition, we analyzed the Family Educational Rights and Privacy Act. We did not examine whether these potential approaches are consistent with all requirements of FERPA, because such a review was beyond the scope of our work.

To identify how selected states and postsecondary institutions collaborate with employers and use graduates' employment-related information to align education and workforce needs, we relied on our state site visits and interviews with expert stakeholders. Because the Workforce Investment Act is the primary vehicle for delivering federally funded employment and training services, we also reviewed relevant information and provisions of that act. In addition, we reviewed prior GAO work on community colleges and workforce development to understand coordinated efforts between postsecondary education and workforce systems to meet employers'

---

[2]Tanya I. Garcia and Hans Peter L'Orange, *Strong Foundations: The State of State Postsecondary Data Systems*, State Higher Education Executive Officers (July 2010).

AR 0957

needs. Within the selected states, we interviewed state education and labor officials, representatives from 25 postsecondary institutions, and 16 employers. We asked these stakeholders how, if at all, state and local governments identified workforce needs and developed partnerships between employers and postsecondary institutions to meet those needs. Our meetings with employers and postsecondary institutions also focused on how local postsecondary institutions have tried to serve the needs of employers.

Overall, we conducted this performance audit from July 2009 to September 2010 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

AR 0958

# Appendix II: Selected Characteristics of States' Postsecondary Student Unit Record Data Systems

| State | Established postsecondary student unit record database | Institutional coverage | | | | Links postsecondary student data to workforce data |
|-------|------------------|----------------|----------------|----------------------|--------------------------|------------------|
| | | Public, 4-year | Public, 2-year | Nonprofit private | For-profit proprietary | |
| Alabama | Yes | Yes | Yes | Yes | No | No |
| Alaska | Yes | Yes | Yes | No | No | Yes |
| Arizona | Yes | Yes | Yes | No | No | No |
| Arkansas | Yes | Yes | Yes | Yes | No | No |
| California | Yes | Yes | Yes | No | No | Yes |
| Colorado | Yes | Yes | Yes | Yes | No | No |
| Connecticut | Yes | Yes | Yes | No | No | No |
| Delaware | No | N/A | N/A | N/A | N/A | N/A |
| District of Columbia | Yes | Yes | Yes | Yes | No | No |
| Florida | Yes | Yes | Yes | No | No | Yes |
| Georgia | Yes | Yes | Yes | No | No | Yes |
| Hawaii | Yes | Yes | Yes | No | No | No |
| Idaho | No | N/A | N/A | N/A | N/A | N/A |
| Illinois | Yes | Yes | Yes | Yes | No | No |
| Indiana | Yes | Yes | Yes | No | No | Yes |
| Iowa | No | N/A | N/A | N/A | N/A | N/A |
| Kansas | Yes | Yes | Yes | No | Yes | Yes |
| Kentucky | Yes | Yes | Yes | Yes | No | Yes |
| Louisiana | Yes | Yes | Yes | Yes | No | No |
| Maine | Yes | Yes | No | No | No | Yes |
| Maryland | Yes | Yes | Yes | Yes | No | Yes |
| Massachusetts | Yes | Yes | Yes | Yes | Yes | No |
| Michigan | No | N/A | N/A | N/A | N/A | N/A |
| Minnesota | Yes | Yes | Yes | Yes | Yes | Yes |
| Mississippi | Yes | Yes | No | No | No | Yes |
| Missouri | Yes | Yes | Yes | No | Yes | Yes |
| Montana | Yes | Yes | Yes | No | No | Yes |
| Nebraska | No | N/A | N/A | N/A | N/A | N/A |
| Nevada | Yes | Yes | Yes | No | No | Yes |
| New Hampshire | No | N/A | N/A | N/A | N/A | N/A |
| New Jersey | Yes | Yes | Yes | Yes | No | No |
| New Mexico | Yes | Yes | Yes | Yes | No | Yes |
| New York | Yes | Yes | Yes | Yes | Yes | No |
| North Carolina | Yes | Yes | Yes | No | No | Yes |

AR 0959

**Appendix II: Selected Characteristics of
States' Postsecondary Student Unit Record
Data Systems**

| State | Established postsecondary student unit record database | Institutional coverage | | | | Links postsecondary student data to workforce data |
|---|---|---|---|---|---|---|
| | | Public, 4-year | Public, 2-year | Nonprofit private | For-profit proprietary | |
| North Dakota | Yes | Yes | Yes | No | No | Yes |
| Ohio | Yes | Yes | Yes | No | No | Yes |
| Oklahoma | Yes | Yes | Yes | Yes | No | Yes |
| Oregon | Yes | Yes | Yes | No | No | Yes |
| Pennsylvania | Yes | Yes | Yes | Yes | No | No |
| Rhode Island | Yes | Yes | Yes | No | No | Yes |
| South Carolina | Yes | Yes | Yes | Yes | Yes | No |
| South Dakota | Yes | Yes | No | No | No | No |
| Tennessee | Yes | Yes | Yes | Yes | No | No |
| Texas | Yes | Yes | Yes | Yes | Yes | Yes |
| Utah | Yes | Yes | Yes | No | No | Yes |
| Vermont | Yes | Yes | Yes | No | No | No |
| Virginia | Yes | Yes | Yes | Yes | No | Yes |
| Washington | Yes | Yes | Yes | No | No | Yes |
| West Virginia | Yes | Yes | Yes | No | No | Yes |
| Wisconsin | Yes | Yes | Yes | No | No | No |
| Wyoming | Yes | Yes | Yes | No | No | No |

Source: State profiles from the State Higher Education Executive Officers (SHEEO) report, Strong Foundations: The State of State Postsecondary Data Systems, SHEEO (July 2010), and GAO analysis.

Note: N/A stands for Not Applicable, because the state did not have a postsecondary student unit record database.

AR 0960

# Appendix III: Examples of Selected National Surveys of Postsecondary Education Students

| Name of survey | Sponsoring entity | Survey information and analysis |
|---|---|---|
| National Postsecondary Student Aid Study | Department of Education's National Center for Education Statistics | A recurring survey that examines how students and their families pay for postsecondary education. It includes nationally representative samples of undergraduate and graduate students enrolled at all types of postsecondary institutions. Compiles a comprehensive research dataset, based on student-level records, on financial aid provided by the federal government, the states, postsecondary institutions, employers, and private agencies, along with student demographic and enrollment data. |
| Baccalaureate and Beyond Longitudinal Study (B&B) | Department of Education's National Center for Education Statistics | Examines students' education and work experiences after they complete a bachelor's degree, with a special emphasis on the experiences of new elementary and secondary teachers. Follows several cohorts of graduating seniors over time. The most recent B&B study, in summer 2009, surveyed more than 17,000 bachelor's degree recipients from 1,100 U.S. colleges and universities, and collected information about these graduates' demographic background, postsecondary education, employment, and other life experiences since leaving college in 2008. In 2012, the survey will contact the same graduates to find out about their longer-term experiences. |
| Beginning Postsecondary Students (BPS) Longitudinal Study | Department of Education's National Center for Education Statistics | Captures a national perspective of persistence, multiple enrollment, transfer, and attainment using students as the unit of analysis. This survey follows several cohorts of students who enrolled in postsecondary education for the first time. The study collects data on student persistence in and completion of postsecondary education programs, their transition to employment, demographic characteristics, and changes over time in their goals, marital status, income, and debt, among other indicators. BPS draws its initial cohorts from the National Postsecondary Student Aid Study and then they are surveyed through BPS 2 and 5 years after their first enrollment in postsecondary education. |
| Education Longitudinal Study of 2002 (ELS) | Department of Education's National Center for Education Statistics | The study is designed to monitor the transition of a national sample of young people as they progress from 10th grade through high school and into postsecondary education and/or their careers. The ELS is a longitudinal study, which means that the same individuals are surveyed repeatedly over time, and the information is collected from multiple respondent populations that represent students, their parents, their teachers, their librarians, and their schools. As a longitudinal study, ELS 2002 follows a nationally representative cohort of students from the time they were high school sophomores through the rest of their high school careers. By surveying the same young people over time, it is possible to record the changes taking place in their lives and help to explain these changes—that is, to help understand the ways in which earlier achievements, aspirations, and experience influence what happens to them later. |

AR 0961

| Name of survey | Sponsoring entity | Survey information and analysis |
|---|---|---|
| The National Survey of Recent College Graduates | National Science Foundation | Provides information about individuals who recently obtained bachelor's or master's degrees in a science, engineering, or health field. Represents individuals who have recently made the transition from school to the workplace. It also provides information about individuals attending graduate school. The survey results are used by educational planners and employers to understand and predict trends in employment opportunities and salaries in science, engineering, and health fields for recent graduates and to evaluate the effectiveness of equal opportunity efforts. The survey sample is a two-stage sample, in which a sample of institutions is selected at the first stage and a sample of graduates is selected at the second stage from lists provided by the sampled institutions. |
| National Survey of College Graduates | National Science Foundation | Longitudinal survey designed to provide data on the number and characteristics of individuals with education and/or employment in science, engineering, and related fields in the United States. The survey provides information on various characteristics of college-educated individuals in the workforce such as salaries, whether the college-educated population was working in their highest degree field of study, specific occupations, and a gender breakdown of the workforce. |
| Survey of Earned Doctorates | National Science Foundation | Annual survey, begun in 1957–1958, that collects data continuously on the number and characteristics of all individuals receiving research doctoral degrees from accredited U.S. institutions. The results are used to assess characteristics and trends in doctorate education and degrees. Each accredited U.S. graduate school is responsible for providing the survey to its graduates and then submitting completed forms to the survey contractor for editing and processing. |
| Salary Survey | National Association of Colleges and Employers | Compiles data from career planning and placement offices of colleges and universities across the United States. The reports consist of starting salary offers made to new graduates by employing organizations in business, industry, government, and nonprofit and educational institutions. The Salary Survey reports base salary and the number of offers, not acceptances. It does not distinguish between single and multiple offers to individual students, and therefore offers cannot be equated with actual hires. |

Source: GAO analysis of surveys administered to students and graduates on a nationwide basis.

# Appendix IV: Structure of Postsecondary Education in Australia and United Kingdom and Data Collection Methods

## Australia

| | |
|---|---|
| **Postsecondary education structure** | Australia's postsecondary education system is made up of a university system that is managed and funded primarily at the Commonwealth level, and a vocational education and training sector that is managed and funded primarily by state governments. |
| **System size** | The university system includes 39 universities, of which 37 are public and 2 are private. According to government officials, there are about 4,000 providers of vocational education of various sizes in Australia. Of these providers, 85 percent of the training is provided through about 58 public institutions, known as Training and Further Education (TAFE) institutes, which are funded and operated through the state governments. |
| **Postsecondary data collection method** | The university and vocational systems each maintain a student information data system to track students while they are enrolled in school. According to government officials, all universities and vocational institutions that receive government funding must collect data on their students. These data systems, however, do not track students beyond the point of program completion, and thus provide no employment outcome information on graduates. To capture employment outcome information on graduates, each educational system conducts its own national graduate surveys. |
| University system | According to officials we interviewed, the Australian Graduate Survey is the primary mechanism through which the Australian government obtains outcome information on university graduates. All of the universities participate in the survey. |

- Each university is responsible for administering the survey to its graduates 4 months after they complete an undergraduate program, and the responses are sent to Graduate Careers Australia, a nonprofit entity, for processing.

- The institutional response rate of 70 percent is desirable and achievable, but data cannot be disclosed publicly or published if the response rate falls below 50 percent.

**Appendix IV: Structure of Postsecondary Education in Australia and United Kingdom and Data Collection Methods**

- Education data collected include institution attended, degree earned, and major field of study, as well as satisfaction with the quality of graduates' educational experience.

- Employment outcome data collected include employer name, industry of employment, job title, primary job tasks, annual salary, hours worked per week, importance of major course of study to the current employment, and satisfaction with course experience.

**Vocational system**

According to government officials, the Student Outcomes Survey is the primary mechanism through which the Australian government obtains outcome information on the vocational education and training sector graduates. This survey is a sample survey conducted annually to assess the success of the vocational education and training sector in improving employment outcomes.

- Australia's National Centre for Vocational Education Research (NCVER) is responsible for administering the survey, which is sent to graduates 6-9 months after they complete training programs.

- The response rate is about 40 percent.

- Employment outcome data collected include industry of employment, job title, primary job tasks, salary, relevance of training to current employment, and overall satisfaction with the training.

- These data are available through the NCVER Vocational Education and Training Provider Collection (released on an annual basis) and the NCVER Apprentice and Training Statistics collection (released on a quarterly and annual basis).

- Employer survey: Every 2 years, the National Centre for Vocational Education Research uses a contractor to survey a sample of Australian employers over the phone. This survey helps officials determine why employers do or do not use the vocational education system.

AR 0964

**Appendix IV: Structure of Postsecondary
Education in Australia and United Kingdom
and Data Collection Methods**

# United Kingdom

| | |
|---|---|
| **Postsecondary education structure** | The United Kingdom's postsecondary system consists of a higher education system (universities and colleges similar to those in the United States) and a further education system (institutes of further education, similar to community colleges or vocational schools in the United States), according to officials from the United Kingdom Department for Business Innovation and Skills. Officials said that both parts of postsecondary education are primarily federally funded, though the individual countries (England, Northern Ireland, Scotland, and Wales), and local areas also have some control over postsecondary education. |
| **System size** | The higher education system is composed of 165 universities and higher education colleges. According to the Business Innovation and Skills officials, there are approximately 430 further education colleges in the United Kingdom.[1] |
| **Postsecondary data collection method** | According to officials from the United Kingdom Department for Business Innovation and Skills, annual national surveys are conducted of postsecondary education leavers, as well as an employer satisfaction survey. |
| **Higher education system** | The United Kingdom's Higher Education Statistics Agency conducts its *Destinations of Leavers from Higher Education* survey in two stages. |

- In the first stage, every higher education institution surveys all students 6 months after they graduate. Information is gathered on their current activity: employed, unemployed, in further study, or something else/not available for employment. Employment data collected include graduates' area of employment, occupation, salary, and whether the education was necessary for the job obtained, and reasons the student took the job.

- In the second stage, the country's Higher Education Statistics Agency uses a private contractor to send a survey to a sample of graduates 3½ years

---

[1]According to officials from the Department for Business Innovation and Skills, approximately 10 percent of higher education is carried out within further education colleges, and generally overseen by a higher education institution.

AR 0965

after graduation, and collects similar employment outcome data. This is
not an annual survey; there have been two such longitudinal surveys, and a
third one is under way as of September 2010, according to officials at the
Department for Business Innovation and Skills.

The target response rate for each institution is 80 percent for full-time
students (and 70 percent for part-time).

## Further education system

According to officials from the United Kingdom Department for Business
Innovation and Skills, the United Kingdom surveys all further education
leavers who complete a substantial amount of learning and/or basic skills
programs and asks them about the impact of that coursework. Officials
said that the survey asks, for example, about whether leavers are
continuing their education or have obtained employment or better
employment and whether the course was essential to that outcome. The
surveys are conducted by phone. The results of the survey can be used to
evaluate each institution's performance, according to officials.

## Employer survey

Employment information is obtained through surveys of university and
college graduates, and the results are publicly available through the Web
sites of the agencies that administer the surveys. The United Kingdom
Commission for Employment and Skills administers the National
Employer Skills Survey, which asks, among other things, employers to
evaluate how well prepared these postsecondary graduates are for their
occupations. Other areas the survey asks employers about include
recruitment difficulties and skill gaps. The results for the 2009 National
Employer Skills Survey for England were published in March 2010.

AR 0966

# Appendix V: Comments from the Department of Education



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF PLANNING, EVALUATION AND POLICY DEVELOPMENT

September 10, 2010

Ms. Katherine M. Iritani
Acting Director
Education, Workforce, and Income Security
Government Accountability Office
Washington, DC 20548

Dear Ms. Iritani:

Thank you for the opportunity to review and comment on the Government Accountability Office (GAO) draft report, *Postsecondary Education: Many States Collect Graduates' Employment Information, but Lack of Clear Guidance on Student Privacy Requirements Could Hinder Progress* (GAO-10-927). The U.S. Department of Education (the Department) appreciates GAO's efforts to describe the confusion that States have expressed regarding how to link data across State agencies while also adhering to the Family Educational Rights and Privacy Act (FERPA). The Department's response to GAO's recommendation follows.

**Recommendation:** *To help address states' information needs, we recommend that the Secretary of Education develop and disseminate guidance that clarifies the means by which state education agencies can share student records to facilitate obtaining graduates' employment information while ensuring appropriate privacy protection under FERPA. In addition to establishing a timeframe for implementation, this guidance should include how student records could be shared with state labor agencies, and how states can share data with one another.*

**Response:** The Department agrees with this recommendation and has already taken steps to increase the guidance and technical assistance it provides to States on protecting student privacy, confidentiality, and data security in order to promote full awareness of and compliance with Federal law and best practice. We have undertaken several initiatives to address this need that are in accordance with GAO's recommendation. These activities are summarized below.

The Department intends to propose amendments to the FERPA regulations that would respond to the frequently heard concerns from States, districts, and other education data stakeholders. The proposed regulations will address the lack of clarity around what is permissible under FERPA and the need to better protect student information. FERPA is an extremely important law intended to ensure student privacy is protected. However, the Department's regulations do not account for the evolution of data use we see today. As announced in the April 26, 2010, Office of Management and Budget's Unified Regulatory Agenda, the Department will propose changes to the regulations that will clarify how to comply with Federal law and provide guidance for ensuring student data are protected as States develop longitudinal data systems and use data to inform decisions. To protect the confidentiality of our decision-making processes and policy discussions, we are constrained in sharing details of our anticipated proposed changes to the FERPA regulations. However, please be assured that the changes we are considering, if adopted,

400 MARYLAND AVE., SW, WASHINGTON, DC 20202
www.ed.gov

*Our mission is to ensure equal access to education and to promote educational excellence throughout the nation.*

Page 2 – Ms. Katherine M. Iritani

will clarify how States can effectively develop and use data in Statewide longitudinal data
systems while ensuring protection of individual privacy under FERPA. We plan to publish a
Notice of Proposed Rulemaking (NPRM) this winter. When the NPRM is published, the
Department will consider public comments to further improve the FERPA regulations and
guidance.

We are also creating a Chief Privacy Officer (CPO) position. The CPO will be tasked with
ensuring the Department's compliance with Federal laws, regulations, and policies related to
information privacy, including implementation of the Privacy Act of 1974, as amended, and
FERPA. The CPO will be a member of the Senior Executive Service. The CPO will oversee the
Family Policy Compliance Office (FPCO) and serve as senior policy advisor on overall privacy
policy, including on regulations and nonregulatory guidance drafted by Department offices on
issues related to or including privacy, confidentiality, and data security, including the new
Privacy Technical Assistance Center (see below). The Chief Privacy Officer job announcement
is posted on www.usajobs.gov, with applications to be accepted until September 30, 2010.

In addition, through the National Center for Education Statistics (NCES), the Department is
establishing a Privacy Technical Assistance Center (PTAC) to serve as a one-stop shop for State
educational agencies (SEAs), local educational agencies (LEAs), the postsecondary community,
and other parties engaged with education data on questions related to protecting privacy,
confidentiality, and data security. As States continue to develop their longitudinal data systems,
PTAC will develop coordinated guidance and communication about privacy, confidentiality, and
security measures by working with various offices within the Department, including
representatives from the Performance Information Management Service (PIMS), FPCO, the
Office of Special Education and Rehabilitative Services (OSERS), the Office of the General
Counsel (OGC), the Office of Planning, Evaluation and Policy Development (OPEPD), and
NCES. PTAC will communicate frequently with education stakeholders about updated
knowledge on and changes to privacy, confidentiality, and security requirements, practices, and
regulations; share lessons learned about privacy protection practices from other government
agencies and other industries; facilitate the sharing of lessons learned among SEAs, LEAs, and
postsecondary institutions regarding privacy-related matters; provide virtual and real settings in
which user communities can collaborate; provide technical assistance in group settings and one-
on-one with States; and create training materials on privacy, confidentiality, and security issues.
PTAC will refer any FERPA questions, which cannot be addressed by existing guidance, to
FPCO. FPCO will continue to serve as the dedicated office to answer FERPA questions and
investigate allegations of violations. The Department anticipates having the contract for PTAC
awarded by the end of September 2010.

The Department, through NCES, will be releasing a new series of technical briefs on various
issues related to the protection of personally identifiable information in student education
records. The Department will solicit public comments on them and will ultimately incorporate,
where appropriate, those comments into nonregulatory guidance. Planned brief topics include
the following: basic concepts and definitions of personally identifiable information,
confidentiality, types of disclosures, processes for making personally identifiable information
anonymous in data being released, privacy, and fair information practice principles; data
stewardship, including the establishment of clear policies and procedures that govern collection,
storage, processing, and access to individual students' education records; electronic data security

Page 3  – Ms. Katherine M. Iritani

related to the transmission of data with personally identifiable information between different
entities; statistical methods to protect the identity of individual students in publicly available
information; recommended components of written agreements that permit State and local
educational authorities to redisclose personally identifiable information from education records
to organizations conducting studies pursuant to the terms of FERPA; and privacy and
confidentiality training needs for relevant staff at the State, district, and school levels, including
disclosure limitation procedures and internal access rules.  NCES will create additional briefs in
response to public requests for guidance on related topics.  The briefs will be released as
individual documents for each topic over time, starting fall 2010.

We believe that we must remain vigilant about safeguarding data and protecting privacy as the
reliance on using data to inform decisions grows and as States expand their longitudinal data
systems.  The above-listed initiatives are the first steps in what will be continuous development
and improvement of the technical assistance and guidance that the Department will provide to
ensure that States, districts, and schools are safeguarding personally identifiable information in
data systems and complying with Federal privacy laws.

Although we agree with GAO's recommendation for executive action, there are several technical
points of clarification needed in the draft report related to the Department and FERPA.  Enclosed
is an addendum outlining these points, which I trust GAO will find useful.  Thank you for the
opportunity to provide comments on the draft report.

Sincerely,

Carmel Martin

Carmel Martin
Assistant Secretary

Enclosure

GAO-10-927  Postsecondary Education

AR 0969

# Appendix VI: GAO Contacts and Staff Acknowledgments

| GAO Contact | Katherine M. Iritani, Acting Director, (202) 512-7215 or iritanik@gao.gov |
|---|---|
| Staff Acknowledgments | In addition to the contact named above, Meeta Engle, Assistant Director, and Susan Chin, Analyst-in-Charge, managed all aspects of the assignment. Jason Holsclaw, Andrew Nelson, Nancy Purvine, and Katy Trenholme made significant contributions to this report in all aspects of the work. Kate Van Gelder contributed to writing this report. Ronald Fecso and Luann Moy provided technical support, and Craig Winslow provided legal support. Mimi Nguyen developed the graphics for the report. |

# Related GAO Products

*Career and Technical Education: States Have Broad Flexibility in Implementing Perkins IV.* GAO-09-683. Washington, D.C.: July 29, 2009.

*Workforce Development: Community Colleges and One-Stop Centers Collaborate to Meet 21st Century Workforce Needs.* GAO-08-547. Washington, D.C.: May 15, 2008.

*Workforce Investment Act: State and Local Areas Have Developed Strategies to Assess Performance, but Labor Could Do More to Help.* GAO-04-657. Washington, D.C.: June 1, 2004.

*Workforce Investment Act: Improvements Needed in Performance Measures to Provide a More Accurate Picture of WIA's Effectiveness.* GAO-02-275. Washington, D.C.: February 1, 2002.

AR 0971

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday afternoon, GAO posts on its Web site newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to www.gao.gov and select "E-mail Updates." |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's Web site, http://www.gao.gov/ordering.htm.<br><br>Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537.<br><br>Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| To Report Fraud, Waste, and Abuse in Federal Programs | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| Congressional Relations | Ralph Dawn, Managing Director, dawnr@gao.gov, (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, DC 20548 |
| Public Affairs | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, DC 20548 |

Please Print on Recycled Paper

AR 0972

# CHILDREN'S EDUCATIONAL RECORDS AND PRIVACY

## A STUDY OF ELEMENTARY AND SECONDARY SCHOOL STATE REPORTING SYSTEMS

### October 28, 2009



**CENTER** on **L**AW and **I**NFORMATION **P**OLICY

**Joel R. Reidenberg**
Professor of Law and
   Founding Academic Director
**Jamela Debelak**, Esq.
Executive Director

**Student Project Fellows (Research & Drafting):**
Adam Gross
Lee Mayberry
Judith Simms
Elizabeth Woodard

**Student Project Fellows (Research):**
Camilla Abder
Luke Bagley
Lisa Cooms
Ezra Kover

© Fordham Center on Law and Information Policy. 2009.
This study may be reproduced for educational and non-commercial purposes.

**ACKNOWLEDGEMENTS**

This study was prepared as a research project of the Fordham Center on Law and Information Policy (CLIP) in connection with the educational mission of the Fordham University School of Law.   Under the supervision of Professor Joel R. Reidenberg, Jamela Debelak, as the Leitner Fellow and subsequently as the Executive Director of CLIP, led the team of Fordham students in their research and preliminary drafting of this study.   Joel Reidenberg and Jamela Debelak did the final editing of the report.

Funding for this project was provided by CLIP and CLIP gratefully acknowledges the financial support of the Fordham alumni and benefactors whose generosity makes the Center's activities, programs, and research possible.

The views and opinions expressed herein are not presented as those of Fordham University, the Fordham University School of Law nor any of the financial supporters of CLIP.

**FORDHAM CENTER ON LAW AND INFORMATION POLICY**

**CHILDREN'S EDUCATIONAL RECORDS AND PRIVACY:**
**A STUDY OF ELEMENTARY AND SECONDARY SCHOOL**
**STATE REPORTING SYSTEMS**

<u>**EXECUTIVE SUMMARY**</u>

Among state departments of education there has been a growing trend to establish statewide longitudinal databases of all K-12 children within a state in order to track students' progress and change over time. This trend is accompanied by a movement to create uniform data collection systems so that each state's student data systems are interoperable with one another. These two trends raised privacy concerns that we examine in this study. First, we were concerned with the way states were ensuring the privacy of their K-12 students. Specifically, our goal was to investigate what type of data was being collected and whether children were protected legally and technically from data misuse, improper data release, and data breaches. Second, we were concerned with the ease with which individual interoperable state data systems could potentially be combined to create a national database of all K-12 children.

We reviewed publicly available information from all 50 states and found that privacy protections for the longitudinal databases were lacking in the majority of states. We found that most states collected information in excess of what is needed for the reporting requirements of the No Child Left Behind Act and what appeared needed to evaluate overall school progress. The majority of longitudinal databases that we examined held detailed information about each child in what appeared to be non-anonymous student records. Typically, the information collected included directory, demographic, disciplinary, academic, health, and family information. Some striking examples are that at least 32% of the states warehouse children's social security numbers, at least 22% of the states record children's pregnancies, at least 46% of the states track mental health, illness, and jail sentences as part of the children's educational records, and almost all states with known programs collect family wealth indicators.

We found that, given the detailed and sensitive nature of the information collected, the databases generally had weak privacy protections. Often the flow of information from the local educational agency to the state department of education was not in compliance with the privacy requirements of the Family Educational Rights and Privacy Act. One state, New Jersey, even diverts special education medicaid funding to pay for an out-of-state contractor to warehouse data, including medical test results. Many states do not have clear access and use rules regarding the longitudinal database and over 80% of the states apparently fail to have data retention policies and are thus likely to hold student information indefinitely. Several states, like Montana, outsource the data warehouse without any protections for privacy in the vendor contract.

From our review, we were able to formulate several critical recommendations that we believe will increase the privacy, transparency, and accountability of these longitudinal databases:

    1) Data at the state level should be anonymized through the use of dual database architectures;

    2) Third party processors of educational records should have comprehensive agreements that explicitly address privacy obligations;

3)  The collection of information by the state should be minimized and specifically tied to an articulated audit or evaluation purpose;

4)   Clear data retention policies should be instituted and made mandatory;

5)   Access and permissible use policies should be well articulated and specific in nature;

6)  Audit logs of access to and use of the state databases should be maintained as a guard against unauthorized data processing;

7)  Information about the database, its security, and its use should be readily available and verifiable.

8)   States should have a Chief Privacy Officer in the department of education who assures that privacy protections are implemented for any educational record database and who publicly reports privacy impact assessments for database programs, proposals, and vendor contracts.

# TABLE OF CONTENTS

I.   **Introduction** ……………………………………………………………………   1
II.  **Background** …………………………………………………………………….   3
    A.  Methodology …………………………………………………………………   3
    B.  Statutory Framework ………………………………………………………….   3
        1.  FERPA ……………………………………………………………………   4
        2.  No Child Left Behind ……………………………………………………   11
    C.  Policy and Regulatory Influences ……………………………………………   15
        1.  Schools Interoperability Framework Association …………………………   16
        2.  Council of Chief State School Officers …………………………………..   18
        3.  Statewide Longitudinal Data Systems Grant Program ……………………   21
III. **Findings** ………………………………………………………………………..   24
    A.  Information Collection Practices ……………………………………………..   24
    B.  Privacy Protections …………………………………………………………   31
    C.  Third Party Vendors …………………………………………………………   43
IV.  **Recommendations** ……………………………………………………………   53
    A.  Best Practices ………………………………………………………………   53
    B.  Legislative Reform …………………………………………………………   56
V.   **Conclusion** …………………………………………………………………..   57
**Appendices**
    Appendix A – Table of Directory Information…………………………………   A-1
    Appendix B – Table of Personal Identifiers …………………………………   B-1
    Appendix C – Table of Demographic Information …………………………..   C-1
    Appendix D – Table of Academic Information …………………………………   D-1
    Appendix E – Table of Disciplinary Information………………………………   E-1
    Appendix F – Table of Economic Information …………………………………   F-1
    Appendix G – Table of Health Related Information …………………………   G-1
    Appendix H – Bibliography of State Materials …………………………………   H-1

# I.   INTRODUCTION

Since the passage of the *No Child Left Behind Act of 2001*,[1] ("NCLB") there has been an increase in data collection by educational agencies at the K-12 level.   The reporting requirements of the NCLB and a general interest in individualizing instruction have generated a desire to gather information and track student progress over time.   In furtherance of these goals, a trend has developed among state departments of education to create unified statewide longitudinal databases of student information.   These databases typically store information about all K-12 children within the state's public schools at the state level over an extended period of time.

The desired benefits of these longitudinal databases have been well articulated by their proponents.   First, some level of data collection at the state level is necessary in order for states to comply with the reporting requirements of NCLB.   In addition however, individualized information collection can be used by teachers and administrators to evaluate both specific teaching methods and generalized trends among various schools in order to effect change that is designed to improve student progress.

The goal of this project was to examine the privacy protections afforded to these longitudinal databases.   The study focused on basic privacy principles that are raised by state collections of children's information:

1) Control of personal information and data minimization: we examined the level of individual control over information.   We considered whether states were requiring collection of excessive amounts of information and whether parents had an adequate ability to withhold private information;

2) Permissible uses of collected information:   we looked for restrictions on the permissible use of the children's information.   Fair information practice principles require a legitimate and appropriate use of all information collected and a mechanism to identify and correct misuse.   Appropriate uses should protect children from public exposure and data manipulation; and

3) Data security:   we looked at the security of the system holding the information in order to ensure that states were properly protecting personal information from errant access, disclosure and misuse.

Privacy protection is a significant concern, because whenever personal information is amassed in electronic format, there is a risk of data breach and data misuse.   This concern is heightened when the information collected is sensitive and when the targeted group is a vulnerable population, such as school-age children.   Past misuse of information regarding children illustrates this concern.   For example, in 2003, the Student Marketing Group and American Student List, two information brokers that sold data pertaining to youth populations, were investigated by the Federal Trade Commission and the Office of the NY Attorney General for their data collection and data use practices.[2]   The practices that were challenged by these law enforcement agencies included collecting information without parental consent from surveys administered in classrooms and then selling the compiled data to telemarketers.[3]

---

[1]  Pub. L. 107-110. 115 Stat. 1425 (Jan 8, 2002).

[2]  *See* David Koeppel, *Holding the Reins in Marketing to Youth*, N.Y. TIMES, Feb. 17, 2002, at 14LI; Warren Strugatch, *Marketing Company to Destroy Files*, N.Y. TIMES, Feb. 2, 2003, at 14LI .

[3]  *See* People v. Student Marketing Group, Consent Order and Judgment #403543/02, NY Sup. Ct. Part 6 (2003), *available at* http://epic.org/privacy/student/SMGconsentorder.pdf

AR 0978

This study, thus, examines the longitudinal databases in place to determine whether there are appropriate mechanisms to protect the privacy of K-12 children and, if not, to recommend changes that would better ensure the security and fair use of children's educational records.  The study seeks to identify the types of personal information that are being collected at the state level in order to evaluate the level of sensitivity of the data.   The study reviews the regulations and technological measures in place to protect the privacy and confidentiality of the information held at the state level.  By examining both the types of information collected and the privacy protections attached to the databases, the study seeks to highlight potential security and misuse problems while many of these systems are still in the development phase so that changes can be implemented before privacy harms become inevitable.   Our findings are summarized below.

First, we found that data collection at the state level is often in excess of what is required by the *NCLB* and in excess of the data actually needed to evaluate overall school progress.  The majority of longitudinal databases that we examined hold detailed information about each child, often in a non-anonymous student record.  In general, there appears to be little distinction between the type of information that is held at the local level and the type of information that is passed onto the state departments of education.  The information collected in the state databases includes demographic information, detailed disciplinary information, health information, academic information, and family information.[4]

Second, we found that, given the detailed and sensitive nature of the information collected, the databases generally have weak privacy protections.  In most cases, the flow of information from the local educational agency to the state department of education does not appear to comply with the privacy requirements of the Family Educational Rights and Privacy Act.[5]  In addition, many states do not have clear access and use rules regarding the longitudinal database and appear to hold student information indefinitely.

Finally, in our review of the 50 states, we found a few states that had clearly thought about privacy concerns and had implemented some effective protections.  From these states, we formulated a series of best practices for privacy protection.  We present these recommendations at the end of this report.

These recommendations are critical because the privacy of the nation's children is currently at significant risk from the existing databases.  Without greater attention to privacy, information about children's elementary, middle and high school experiences and behavior is an open book.  The vulnerability of these data trails to hacking and to misuse jeopardize children today and leave them exposed as adults to be haunted by the incidents of their childhood.

---

[4]  *See infra* apps. A-G.
[5]  20 U.S.C. § 1232g (2005).

AR 0979

## II.   BACKGROUND

### A.  Methodology

We began by doing a survey of each of the 50 states to determine which states had or were developing student longitudinal databases.  Our initial research team collected publicly available information from the websites of the state departments of education during the spring and summer of 2008.[6]   The information collected included data dictionaries, user manuals, summaries of the data systems, privacy and security guidelines, press releases, and public presentations.  When we were unable to find sufficient information online regarding the data elements that were collected by a particular state or regarding the way the information system operated, we followed up with a phone call to those specific state departments of education.  From the calls we were usually either able to obtain additional documentation about the system, or we learned that the database was still in the development stages and additional information was not yet available.[7]

If the information we collected mentioned that the state used a third party vendor for the development of the system or for the storage of the data, we also made a request for a copy of the agreement with such third party vendor.  Most states responded promptly; however, as of the date of this report, we have not received requested contracts from a few of the states.[8]  Also, some states may use third party vendors without disclosing those relationships publicly on their websites.

The information on each of the states' programs is current as of November 1, 2008, when we concluded the primary research phase of this study.  Because of the nature of the programs and their development, it is unlikely that substantive changes have occurred since our research cut-off date.

Once the information was collected, the second research team reviewed all of the documents and categorized the information into several tables.[9]  We created three tables focused on (i) the data elements collected, (ii) the privacy protections applicable to the database, and (iii) the creation of and future plans for the database, respectively.  These tables appear in Appendices A through G.[10]  The second research team then analyzed the tables to identify trends.

### B.  Statutory Framework

Data collection regarding K-12 students is governed at the federal level by two statutes.  First, the *Family Educational Rights and Privacy Act*, or "FERPA," was enacted in 1974 and provides certain minimal privacy protections for educational records.[11]  Second, *No Child Left Behind Act*, or "NCLB," was promulgated in 2002[12] and established reporting requirements that initiated a need to increase data collection at the state level.  The requirements of these two statutes and their impact on state longitudinal databases are discussed below.

---

[6]  The initial research team consisted of Camilla Abder (FLS '08), Luke Bagley (FLS '09), Lisa Cooms (FLS '08), and Ezra Kover (FLS '08).

[7]  We did not receive additional information from the following states: Alabama, Arkansas, Idaho, Maryland, Nevada, Oklahoma, Utah, Washington, and West Virginia.

[8]  We did not receive vendor contracts or responses from Ohio and Rhode Island.

[9]  The second research team consisted of Adam Gross (FLS '10), Lee Mayberry (FLS '10), Judith Simms (FLS '10), and Elizabeth Woodard (FLS '09).

[10]  The tables reproduced in the Appendices are the consolidated results.

[11]  Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g (2005).

[12]  No Child Left Behind Act of 2001, 20 U.S.C. §§ 6301-7916 (2002).

AR 0980

1.   <u>FERPA</u>

FERPA was passed to protect the privacy of student educational records by regulating to whom and under what circumstances records may be disclosed.  FERPA applies to educational agencies and institutions that receive federal funds administered by the Secretary of Education.[13] Under FERPA, an educational agency or institution is "any public or private agency or institution which is the recipient of funds"[14] if the institution "provides educational services or instruction, or both, to students" or if the institution "is authorized to direct and control public elementary or secondary…educational institutions."[15] The Family Policy Compliance Office ("FPCO")[16] has stated in advisory letters that, based on this definition, most local public schools and school districts, or local educational agencies, are subject to FERPA.[17]  The office has also provided that, "[w]hile a [state educational agency ("SEA")] may receive funds from the [U.S. Department of Education], as a practical matter, FERPA generally would not apply to the records of an SEA . . . since students generally are not in attendance at an SEA."[18]  However, FERPA's requirements regarding disclosure would apply to a state educational agency when that agency receives student educational records from a school district or local educational agency.[19]  FERPA's requirements and prohibitions therefore apply to the individual schools that receive federal funding and provide educational services, to the school districts or local educational agencies that receive federal funds and direct such schools, and to states when they receive educational records as permitted under the statute.  The only remedy for a violation of FERPA is the withholding by the U.S Department of Education of all federal funding.[20]  Our research could not find any instance of the Department of Education withholding federal funds for a FERPA violation.

a.   *Educational Records*

FERPA defines educational records to include information "directly related to a student" and "maintained by an educational agency or institution or by a party acting for such agency or institution."[21]  Records include student files, student system databases kept in storage devices, or recordings and/or broadcasts.[22]  The records regarding each student that are generated by the local schools are educational records under FERPA and therefore disclosures by the local schools for inclusion in a statewide longitudinal database must meet FERPA's requirements.  Educational records are comprised of two types of information, directory information and non-directory information, and these two components have different disclosure protections under FERPA.

---

[13]  Family Educational Rights and Privacy Act Regulations, 34 C.F.R. § 99.1 (2000).

[14]  20 U.S.C. § 1232g(a)(4).

[15]  34 C.F.R. § 99.1.

[16]  FPCO was established by the Secretary of Education after the passage of FERPA.  FPCO is charged with "investigat[ing], process[ing], and review[ing] complaints and violations under the Act . . . and provid[ing] technical assistance to ensure compliance with the Act."  In this capacity, FPCO provides advisory letters to school and educational agencies regarding statutory interpretation. *See, e.g.*, 20 U.S.C. § 1232g(g); 34 C.F.R. §§ 99.60 – 99.67.

[17]  *See* Advisory Letter from FPCO to the California Department of Education (Feb. 18, 2004) [hereinafter California 2004 FPCO letter] (on file with CLIP); Advisory Letter from FPCO to the Pennsylvania Department of Education (Feb. 25, 2004) [hereinafter Pennsylvania 2004 FPCO letter] (on file with CLIP).

[18]  California 2004 FPCO letter, *supra* note 17; Pennsylvania 2004 FPCO letter, *supra* note 17.

[19]  20 U.S.C. § 1232g(b).

[20]  20 U.S.C. § 1232g.  The Supreme Court has held that there is no private right of action under FERPA. Gonzaga Univ. v. Doe, 536 U.S. 273 (2002)

[21]  34 C.F.R. § 99 Subpart A (2000).

[22]  20 U.S.C. § 1232g(a)(4)(A).

4

Directory information may include any of the following: "the student's name, address, telephone listing, date and place of birth, major field of study, participation in officially recognized activities and sports, weight and height of members of athletic teams, dates of attendance, degrees and awards received, and the most recent previous educational agency or institution attended by the student."[23]  Educational institutions are required to notify parents regarding what information from the above list they have defined as directory information.[24] Schools may typically disclose directory information without written consent from parents, however, a parent can choose to restrict the release of directory information by submitting a formal request to the school to limit disclosure.[25]  Disclosure of directory information therefore operates under an opt-out system.  Educational institutions are free to publicly disclose this information unless a parent submits a request to opt-out of disclosure.

Educational records may also consist of non-directory information.  Non-directory information is all other information related to a student and maintained by an educational agency or institution including, without limitation, social security numbers, student identification numbers, race, ethnicity, gender, and transcript or grade reports.[26]  Subject to certain exceptions discussed below, prior written consent is required before institutions can disclose non-directory information.  Prior written consent must include the following elements:

(i)   specification of the records to be disclosed;
(ii)  the purpose of the disclosure;
(iii) identification of the party or class of parties to whom the disclosure is to be made;
(iv)  date;
(v)   signature of the parent of the student whose record is to be disclosed; and
(vi)  signature of the custodian of the educational record.[27]

In addition, educational faculty and staff can only access non-directory information if they have a legitimate academic interest to do so.[28]

As we will discuss below in further detail, non-directory information that contains personally identifiable information or that is tied to personally identifiable directory information receives heightened disclosure protections under FERPA.  According to the regulations implementing FERPA, personally identifiable information is any "information that would make the student's identity easily traceable," including:  the student's name, the name of the student's parent or other family member, a personal identifier, such as a social security number or student ID number, or a list of personal characteristics that would make the student's identity easily traceable.[29]  FPCO has advised that "data that cannot be linked to a student by those reviewing and analyzing the data" will not be deemed "personally identifiable."[30]  The office has provided the following additional guidance regarding how agencies and institutions can create such

---

[23] *Id.* § 1232g(a)(5)(A).
[24] *Id.* § 1232g(a)(5)(B).
[25] *Id.*
[26] *See*, *e.g.*, 34 C.F.R. § 99.3 (2008); Will R. Van Dusen, Jr., NATIONAL ACADEMIC ADVISING ASSOCIATION CLEARINGHOUSE OF ACADEMIC ADVISING RESOURCES, FERPA—Overview, http://www.nacada.ksu.edu/Resources/FERPA-Overview.htm (last visited Mar. 18, 2009) (providing basic FERPA guidelines for faculty and staff).
[27] 20 U.S.C. § 1232g(b)(2).
[28] *Id.* § 1232g(b)(1)(A).
[29] 34 C.F.R. § 99.3.
[30] Advisory Letter from FPCO to the Tennessee Department of Education (Nov. 18, 2004) (on file with CLIP).

AR 0982

anonymous records using non-personal identifiers to ensure that records will not be deemed personally identifiable:

> "a student is identified **only** by a non-personal identifier **and** the following requirements are met:
>
>     1.    the non-personal identifier itself –
>
>         a.  is not a scrambled social security number or student number, unless such identifiers are protected by written agreements reflecting generally accepted confidentiality standards within the research community; and
>
>         b.  cannot be linked to an individual student by anyone who does not have access to the linking key;
>
>     2.    the anonymous data file is populated by data from educational records in a manner that ensures that the identity of any student cannot be determined, including assurances of sufficient cell and subgroup sizes; **and**
>
>     3.    the linking key that connects the non-personal identifier to the student information is itself an education record subject to the privacy protections of FERPA.  In other words, the linking key must be kept within the agency or institution and must not be shared with the requesting entity."[31]

For this report, the above guidance suggests that if an educational agency or institution creates a non-personal identifier for each record, but does not allow the receiving entity access to the database that generated such identifiers, the records disclosed might not be considered personally identifiable.  Such interpretation relies, however, on an assumption that the information and characteristics disclosed, taken together, do not allow identification of a specific student.  So, for example, if a non-personal identifier is used to release a record indicating that an anonymous ethnic minority male student with a disability at a specified elementary school had a certain score on standardized tests, and that elementary school has only one ethnic minority male in its students-with-disabilities program, such record would still be identifiable to that student and contain personally identifiable information.  Therefore, the record would be subject to the heightened disclosure protections discussed below.  In order to avoid this problem, agencies and institutions must use statistical methods to ensure that smaller demographic groups are not reported in such a fashion.[32]  If however, a local educational institution is able to anonymize the data, then disclosure of the non-directory information would be permissible under FERPA without parental consent.

> *b.   Rights Afforded Under FERPA*

FERPA provides parents of K-12 students with the following rights regarding educational records:

- the right to inspect and review their child's education records;[33]
- the right to seek to amend information in the records they believe to be inaccurate, misleading, or an invasion of privacy;[34]
- the right to annual notification of information concerning their rights;[35] and

---

[31] *Id.*

[32] *Id.*

[33] 20 U.S.C. § 1232g(a)(1).

[34] *Id.* § 1232g(a)(2).

[35] *Id.* § 1232g(e).

AR 0983

- the right to consent prior to the disclosure of non-directory and personally identifiable information in their child's education records.[36]

When a student turns 18 years old or enters a post-secondary institution, these rights transfer from the parents to the student.[37]  Educational agencies and institutions receiving federal funding must comply with each of these rights with respect to the information they forward to the state department of education for inclusion in a statewide student database.

Parents also have the right to inspect and review their child's educational records maintained by the school.[38]  Schools are not required to provide copies of the records to parents unless it is impossible for parents or eligible students to review the records onsite.  When copies are needed, schools may charge a fee for such copies.[39]

Parents who obtain access to educational records pursuant to FERPA and find information that they consider inaccurate, misleading, or a violation of privacy, may initiate a request to amend those records.[40]  If the educational agency or institution involved declines to make the requested amendments, then they must afford the students or parents an opportunity for a hearing to challenge the content of the records.  This hearing must be conducted within a reasonable time of the parent's request and on reasonable advance notice to the parents.  The decision of the agency or institution must be based solely on the evidence presented at the hearing.  If the records are not found to be inaccurate, misleading, or in violation of the student's rights, the parents have the right to place a statement in the records commenting on the contested information or stating why they disagree with the decision of the agency or institution.[41]

A school must annually notify parents of their rights under FERPA.[42]  The notice must inform parents that they may inspect and review their children's education records, seek amendment of inaccurate or misleading information in their children's educational records, and consent to most disclosures of personally identifiable information from the educational records. The annual notice must provide information about how to file a complaint of an alleged violation with FPCO.  It also must include a description of who is considered to be a school official, a definition of a legitimate educational interest, and information about who to contact to seek access to or amendment of educational records.  Means of notification can include local or student newspaper, calendars, student programs guide, rules handbook, or other means likely to inform parents.[43]

Finally, prior written consent is generally required before institutions can disclose non-directory, personally identifiable information.[44]  This general restriction applies any time a school or district agency discloses non-directory, personally identifiable information outside of such school or agency.  Disclosures to state departments of education or third party vendors are therefore prohibited unless they meet the requirements of one of the exceptions discussed below. It is important to note for purposes of this report, that information which is disclosed only with a student ID number, rather than a student name, is still personally identifiable under FERPA and subject to this heightened protection.  Only when an agency or institution removes all personally

---

[36] *Id*. § 1232g(b).
[37] 34 C.F.R § 99.5 (2000).  The educational institution may, however, disclose the student's educational records to his/her parents if the student is the parents' tax dependent.  20 U.S.C. § 1232g(b)(1)(H); 34 C.F.R. § 99.31(a)(8)
[38] 20 U.S.C. § 1232g(a)(1).
[39] 34 C.F.R. § 99.11.
[40] 20 U.S.C. § 1232g(a)(2).
[41] 34 C.F.R. §§ 99.21-99.22.
[42] 20 U.S.C. § 1232g(e).
[43] U.S. Department of Education, FERPA for Parents,
http://www.ed.gov/policy/gen/guid/fpco/ferpa/parents.html (last visited Feb. 26, 2009).
[44] 20 U.S.C. § 1232g(b).

AR 0984

identifiable information and assigns the records non-personal identifiers in compliance with the FPCO guidance above, are disclosures to outside parties permitted without prior consent.

### c.   Exceptions to the Right to Consent to Disclosure of Educational Records

FERPA's general rule requiring written consent of the parent for disclosure of non-directory information in educational records has several exceptions.  First, as we discussed above, educational records may be released without consent if all personally identifiable information has been removed.[45]  Additional exceptions, discussed in turn below, include: (i) disclosure to school officials with legitimate educational interests; (ii) the transfer of a transcript when a student changes schools or applies for admission elsewhere; (iii) disclosures in connection with studies undertaken on behalf of the school when such research can be conducted confidentially and anonymously; (iv) disclosures in connection with audits conducted by federal or state officials; and (v) disclosures in connection with records kept by law enforcement units.[46]

FERPA allows an educational agency or institution to disclose educational records without prior written consent to school officials within the agency or institution who have legitimate educational interests.[47]  Generally, if a school official is performing an official task for the educational institution that requires access to information in educational records, that official is deemed to have a legitimate educational interest.[48]  Under this exception, a third party may be considered a school official if such party is operating under the authorization of the institution and is performing an educational task that a school official would usually perform.[49] In a 2004 letter to a parent, the FPCO stated that "FERPA was not intended to prevent schools from seeking outside assistance in performing certain tasks that it would otherwise have to provide for itself."[50] As long as the task performed by the third party does not exceed the school's criteria for a legitimate educational interest, then disclosures of records to a service agent would not be outside the scope of this exception, provided that the agent was "under contract with the school to provide certain services."[51]  A third party authorized by the institution may therefore be included in this exception regardless of whether the school has specifically identified the party as a "school official" in its annual FERPA notice.  For purposes of this report, this exception would cover: (i) instances where a teacher or other local school official gains access to educational records in a database in order to perform his or her regular academic functions, or (ii) when a third party accesses educational records at the direction of school officials for regular academic functions, provided the third party and the educational agency have a contract authorizing such access.  The second criteria means that, if a local educational institution uses a third party vendor to gather and review information for inclusion in a state database, such local institution would need a contract between itself and the vendor.

Consent is also required for disclosure when a student changes schools or applies for admission elsewhere.  If the parent or student initiates the request for disclosure in a manner other than in writing, a school can send a student's educational record to another school in which the student is seeking to enroll without prior written consent.[52]  In a guidance letter to Cornell University, responding to an inquiry about supplying information to a student's transfer school,

---

[45]  *Id.* § 1232g(a)(5).
[46]  *Id.* § 1232g(b)(1).
[47]  *See id.* § 1232g(b)(1)(A); 34 C.F.R. § 99.31(a)(1) (2000).
[48]  Advisory Letter from FPCO to the University of North Dakota (Aug. 15, 2005) (on file with CLIP).
[49]  California 2004 FPCO letter, *supra* note 17.
[50]  Advisory Letter from FPCO to a Parent (Sept. 7, 2004) (on file with CLIP).
[51]  *Id.*
[52]  20 U.S.C. § 1232g(b)(1)(B); 34 C.F.R. § 99.34.

AR 0985

the FPCO stated that, "when such a request is made by a student by telephone or electronic transmission, the school should be reasonably sure that the request was indeed made by the student."[53]  This exception calls for validation of the request, but not written consent if the parent or student is the requestor.

Another exception to the written consent requirement arises for educational agencies or institutions that disclose personally identifiable, non-directory information to organizations conducting studies on behalf of the educational agency or institution.  To be in compliance, these studies must be conducted in order to develop, validate, or administer predictive tests, administer student aid programs, or improve instruction.[54]  The agency or institution may release information without prior written consent only if the study is conducted in a manner that does not permit personal identification of parents and students by anyone outside of the research organization and as long as the information is destroyed when no longer needed for the purposes for which the study was conducted.[55]   Recipients of information under this exception may not redisclose personally identifiable information outside of the research organization.[56]  Under this exception a school or school district may disclose educational records to a third party vendor that such school or district has contracted with for research purposes provided that the information disclosed to such vendors remains confidential and there is a schedule for deletion of such records following the completion of the stated purpose.  This exception does not permit SEAs to disclose educational records to third parties for research purposes.[57]  Research contracts must be directly tied to the school or local educational institution.

Local educational agencies and their constituent schools may also disclose educational records to "authorized representatives of (I) the Comptroller General of the United States, (II) the Secretary, or (III) State educational agencies"[58] without prior written consent and for statutorily authorized purposes.   The permitted disclosures are those made in connection with an audit or evaluation of federal or state supported education programs, or those made for the enforcement of, or compliance with, federal legal requirements relating to such programs.[59]  Information received under this provision must be protected in a manner that does not permit personal identification of individuals by anyone except the officials listed in the regulations, "except when collection of personally identifiable information is specifically authorized by Federal law."[60]  A state educational agency may not further disclose any information provided to it under this exception in personally identifiable form to any person other than authorized representatives of such agency.  The records must also be destroyed when no they are longer needed for the audit and evaluation purposes for which they were disclosed.[61]

The U.S. Department of Education and FPCO have provided detailed guidance about who is defined as an official and "authorized representative" under this exception.  In a January 30, 2003 memorandum to all Chief State School Officers, the former Deputy Secretary of Education provided guidance about who may be considered an authorized representative of a state educational agency.[62]  The memorandum stated that "an 'authorized representative' of a state educational authority must be under the direct control of that authority, *e.g.*, an employee or

---

[53]  Advisory Letter from FPCO to Cornell University (1994) (on file with CLIP).

[54]  20 U.S.C. § 1232g(b)(1)(F); 34 C.F.R. § 99.31(a)(6).

[55]  20 U.S.C. § 1232g(b)(1)(F); 34 C.F.R. § 99.31(a)(6).

[56]  20 U.S.C. § 1232g(b)(1)(F); *see also* California 2004 FPCO Letter, *supra* note 17.

[57]  *See infra.*

[58]  20 U.S.C. § 1232g(b)(1)(C).

[59]  *Id.*; 34 C.F.R. §§ 99.31(a)(3)(iv), 99.35.

[60]  34 C.F.R. § 99.31(a)(3).

[61]  20 U.S.C. § 1232g(b)(1)(C); *see also* Pennsylvania 2004 FPCO Letter, *supra* note 17.

[62]  Memorandum from William D. Hansen, Deputy Sec'y of Educ. to the Chief State Sch. Officials (Jan. 30, 2003), *available at* http://www.ed.gov/policy/gen/guid/secletter/030130.html (offering "[a]dditional Guidance on the Application of the Family Education Rights and Privacy Act").

AR 0986

a contractor of the authority."[63]  In a 2004 advisory letter to the California Department of Education, the FPCO further specified that a

> "[c]ontractor in this sense means outsourcing or using third-parties to provide services that the State educational authority would otherwise provide for itself, in circumstances where internal disclosure would be appropriate under §99.35 if the State educational authority were providing the service itself, and where the parties have entered into an agreement that establishes the State educational authority's direct control over the contractor with respect to the service provided by the contractor."[64]

This guidance approves a state department of education's use of outside contractors to perform audit and evaluation functions it would otherwise be permitted to perform itself, but the guidance does not sanction the state department of education to disclose the personally identifiable information it receives in any other situation.  In 2005, the FPCO specifically addressed whether FERPA permitted a state educational agency to disclose educational records to third parties who had legitimate educational interests.  The office stated:

> "There is no exception to the prior written consent requirement in FERPA that allows a State educational authority, such as CPE, to redisclose information from education records, in personally identifiable form, to outside researchers, whether or not they demonstrate 'legitimate education interest.' Educational agencies and institutions themselves may disclose education records, without prior written consent, to organizations conducting studies for them or on their behalf, for the improvement of instruction and other purposes set forth [in the regulations for the research exception]. However, this exception does not apply to a State education authority that has received information from educational records [under this exception]."[65]

Permitted disclosures for audit and evaluation purposes are significant for purposes of this report.  First, statutory purposes and FCPO guidance authorize the disclosure of personally identifiable information in educational records from schools and districts to a state department of education when the state department of education is collecting the information to evaluate the state educational system and provide reports to the U.S. Department of Education under NCLB.[66] The release of records into a statewide longitudinal database for audit and evaluation purposes is permitted provided that personally identifiable information is not disclosed to anyone other than state officials or agents acting on their behalf and provided that the information is destroyed when the audit or evaluation purpose is completed.[67]  This puts a durational limit on the storage of any information provided to a state agency.   Unfortunately, as we discuss in our findings, most states are not in compliance with this statutory authorization because, in the absence of data retention policies, the states appear to hold information in the database indefinitely.  Second, further disclosure by the state to any third party vendor is only permitted in narrow circumstances.  The vendor must enter into an agreement with the state department of education, which provides that such vendor is a contractor and is under the direct control of the department.[68]  Any disclosures

---

[63] *Id.*
[64] California 2004 FPCO letter, *supra* note 17.
[65] Advisory Letter from FPCO to Western Kentucky University (July 11, 2005) (on file with CLIP).
[66] *See* Section II.B.2
[67] 20 U.S.C. § 1232g(b)(1)(F) (2005); 34 C.F.R. § 99.31(a)(6) (2008).
[68] *See supra* note 63-64 and accompanying text.

AR 0987

that do not meet this criterion, or that are done simply for research purposes, are not permitted. At least one state, New Jersey, does not appear to comply with this restriction.  The New Jersey contract with Public Consulting Group is between the Public Consulting Group and The NJ State Department of Treasury Purchase and Property Division rather than the Department of Education and does not indicate that the Department of Education has direct control over the vendor.[69]

Finally, investigative reports and other records created and maintained by "law enforcement units" are not considered "education records" subject to FERPA as long as the law enforcement records are maintained separately by the law enforcement unit and not by an educational unit.[70]  Accordingly, FERPA does not restrict the disclosure by schools of information from law enforcement unit records to anyone, including outside law enforcement authorities, without parental consent.[71]  However, information about K-12 school disciplinary actions may be disclosed without consent only if all personally identifiable information about a student has been removed, including information that would make the student's identity "easily traceable."[72]  Determination of what could be considered easily traceable must be analyzed on a case-by-case basis.  In making this kind of determination, the U.S. Department of Education generally considers whether a reasonable person in the educational community or a requestor who does not have specific knowledge about the student would be able to identify the student to whom the records relate without substantial additional effort.[73]

## 2.  No Child Left Behind

NCLB requires states seeking government funding for education to create, maintain, and submit specified categories of anonymous data to the U.S. Department of Education.  The Act requires states to submit an application or "plan" for improvement of their educational system and a "report card" detailing the plan's success or failure.[74]  States may also choose to apply for funding under any of the many targeted initiatives in the statute, either separately or in one extensive application.[75]  Each initiative must be approved by the Secretary of Education (the "Secretary") before a state receives funds and becomes obligated to fulfill certain requirements.  One of the main objectives of NCLB is accountability at every level of the educational process, with the state department of education and the Secretary monitoring the progress of students and schools.  In order to facilitate this monitoring, each initiative in the act requires some form of disaggregated reporting that still maintains anonymity for individual students.

The data collection requirements start with the local schools which must collect data on, among others, individual students, groups of students, teachers, parents, teaching methods, and test scores and then provide most, if not all, of that information to the local administrative agency responsible for public schools in a specified area, called the Local Educational Agency ("LEA").[76]  The LEA in turn forwards the data from all of the schools reporting to it to the State Educational Agency ("SEA"), the state agency responsible for supervising the public school system.  Finally, the SEA sends the information required under NCLB to the Secretary.[77]

---

[69]  *See* Amendment No. 1 to Contract A61236 by and between Public Consulting Group and The New Jersey Division of Purchase and Property on behalf of the Department of Treasury and Department of Education, dated Aug. 31, 2005 (on file with CLIP).
[70]  20 U.S.C. § 1232g(a)(2)(B)(ii) (2005); 34 C.F.R. § 99.8 (2000).
[71]  20 U.S.C. § 1232g(a)(2)(B)(ii) (2005); 34 C.F.R. § 99.8 (2000).
[72]  34 C.F.R. § 99.3.
[73]  Advisory Letter from FPCO to the Michigan Department of Education (Aug. 13, 2003) (on file with CLIP).
[74]  20 U.S.C. §§ 6301-7916 (2002).
[75]  *Id.* § 7842.
[76]  *Id.* § 7801(26).
[77]  *Id.* § 7801(41).

AR 0988

Data reporting is central to NCLB, but the act does not specify how states are to collect and store the information they are required to report, or the nature of the information each level needs or should have.  In fact, the act's only guidance about data collection is a specific statement that states are not authorized under NCLB to create a "nationwide database of personally identifiable information" [78] and a vague statement that they should follow existing federal laws guaranteeing civil rights.[79]  The act does specifically provide that, in most circumstances, the data collected by the states or LEAs should be reported in a "disaggregated" fashion, provided that this can be done without revealing personally identifiable information.[80]  NCLB therefore requires that state departments of education and the U.S. Department of Education receive information that can detail certain demographic group trends without revealing individualized information.  This focus on anonymity suggests that the information required at the state level can be much less detailed and personal than many state databases currently are.  Certain initiatives under the act, however, do require more specific individualized information, making it difficult for states to know how much information they need to provide to fulfill their grants and maintain their funding.  This lack of significant guidance may provide one reason why many states have created statewide longitudinal databases with such large amounts of student information.

   *a.   Title I Part A*

Title I Part A of NCLB pertains to generalized educational funding provided by the federal government to the state departments of education.  In order to receive any funding under NCLB, a state must satisfy the requirements of Title I Part A by completing an application or plan, implementing it if approved, and submitting an annual report card at the close of each year documenting the state's success or failure in meeting the plan's enunciated standards.[81]  Schools that receive funds under this section of the Act are required to monitor the progress of their students to ensure that each one is meeting the academic objectives described in the plan.[82]  The schools' progress and capabilities are then monitored in turn by the LEAs and the SEA.  NCLB specifically provides that "[i]nformation collected under this section [Title I, Part A] shall be collected and disseminated in a manner that protects the privacy of individuals."[83]

The plan must describe:  (i) the state's current educational standards, (ii) its new standards, (iii) how it plans to ensure that the new standards are met and that schools make adequate yearly progress ("AYP"), and (iv) how it plans to collect and report student data.[84]  Each plan must also describe a method of performing yearly academic assessments of all students that conforms to certain requirements.[85]  Among the numerous requirements provided for the student assessments are the following that specifically address privacy concerns:  (1) the testing method must "enable results to be disaggregated within each State, local educational agency, and school by gender, race and ethnicity group, English proficiency, migrant status, disabled compared to non-disabled students, and economically disadvantaged students compared to non-economically disadvantaged students, unless such disaggregation would reveal personally identifiable information or the results would not be statistically reliable, and (2) the assessments should measure "academic achievement, knowledge and skills" objectively and  not "assess personal or

---

[78] *Id.* § 7911.
[79] *Id.* § 6847.
[80] *See, e.g., id.* § 6311(h)(1)(C)(i).
[81] *Id.* § 6311.
[82] *Id.* § 6312.
[83] *Id.* § 6311(i).
[84] *Id.* § 6311(a).
[85] *Id.* § 6311(b)(3).

AR 0989

family beliefs and attitudes, or publicly disclose personally identifiable information."[86]   So, while states are required to collect and report assessment results for certain specified categories of students, they are not required to collect individualized assessment results at the state level.  In fact, NCLB prohibits any reporting that would reveal individualized personally identifiable information.[87]   However, the Act also states that:  "[e]ach State educational agency may incorporate the data from the assessments under this paragraph into a State-developed longitudinal data system that links student test scores, length of enrollment, and graduation records over time."[88]   There is no further guidance in the Act regarding privacy for such systems, leaving FERPA as the default rule.

One year after a plan has been implemented, a state must create and distribute an "Annual Report Card" that includes:

- aggregate information from the student assessments described above, reported by the groups mentioned above if doing so would not reveal personally identifiable information;
- a comparison between the actual achievement of students in groups compared to the objectives;
- the percentage of students not tested;
- two-year trend in student achievement in designated subject areas and grades;
- aggregate information on any other data the state collects and uses to determine AYP;
- graduation rates;
- whether LEAs are making AYP and which LEAs need improvement; and
- teacher information.[89]

Again, the act requires anonymity in the reporting phase by permitting disaggregation only if personally identifiable information is not revealed.  The state may also include any other information it considers relevant, including:

- attendance rates,
- class size,
- limited English proficiency students' achievement and gains,
- incidences of violence, suspensions, expulsions or drugs,
- parental involvement,
- percentage of students completing AP courses and passing AP tests, and
- a description of the state's accountability system.[90]

Much of this information is derived from the annual report cards prepared by LEAs and given to states and the public.[91]   The LEA report must include all the information in the state report, as well as schools needing improvement and a comparison of the LEA's students' achievement with those of the state as a whole.[92]

The reporting requirements of this general NCLB section do not necessitate having personally identifiable information at the state level.  Disclosure of assessment results for the various demographic categories of students is in fact prohibited by the act if the disclosure is

---

[86]  *Id.* § 6311(b)(3)(C).
[87]  Id. §§ 6311(h)(1)(C)(i), 6311(h)(2)(D)
[88]  *Id.* § 6311(b)(3)(B).
[89]  *Id.* § 6311(h)(1)(C).
[90]  *Id.* § 6311(h)(1)(D).
[91]  *Id.* § 6311(h)(2).
[92]  *Id.* § 6311(h)(2)(B)-(C).

AR 0990

likely to reveal personally identifiable information.  While state departments of education do need to collect certain information about each student in order to properly report test results in the disaggregated categories, the reporting requirements do not necessitate that the state collect full personally identifiable educational records of each student.

      *b.   Titles I-IX:  Other Initiatives*

      NCLB includes additional sections allocating funds to states or LEAs that want to participate in certain programs or whose schools have a specified percentage of an identified group of students (e.g., Native Americans).  These sections require the applications for funding to contain specified information and "such other information as the Secretary may require."[93]  While most parts of these titles include the same protection against revealing personal information when disaggregating data, some sections require more detailed information concerning students, such as the correlation of test scores to the teaching method employed.[94]  Several specific sections are notable for their more specific reporting requirements:

      (i)  Title I Part C allocates funding for the education of migratory children[95] and requires a state to include in its application a plan for facilitating the "interstate and intrastate coordination of services for migratory children" and the transfer of their health and educational records.[96]  The Secretary may award separate grant money to facilitate this transfer and must assist in creating a system to link migrant students' health and educational records from each state to facilitate their electronic transfer.[97]  The Secretary also must "direct the National Center for Education Statistics to collect data on migratory children."[98]  This section is significant because it is exempt from the statement that NCLB does not authorize the creation of a national database.[99]

      (ii)  Title I Part D is called "the Prevention and Intervention Program for Children and Youth who are Neglected, Delinquent or At-Risk" and requires state agencies desiring funding to describe how they will ensure that student assessments and educational records are shared between LEAs and correctional facilities.[100]  This section of NCLB is focused on coordinating the exchange of information between schools or LEAs and all other state agencies responsible for students identified as delinquent or at-risk, including correctional facilities.[101]

      (iii) Title III, "Language Instruction for Limited English Proficient and Immigrant Students," allows states to apply for funding of programs for limited English speaking students provided the states have a system for reporting data concerning those students.[102]  Title III also directs the Secretary to coordinate all programs serving "limited English proficient children," insure that all data collected by the U.S. Department of Education includes that of limited English proficient children, and establish a National Clearinghouse for English Language Acquisition and Language Instruction Educational Programs.[103]

---

[93]  *Id.* § 6372.
[94]  This requirement is associated with NCLB's goal to use the "best" method of teaching students. *See  id.* § 6471.
[95]  *Id.* §§ 6391-93.
[96]  *Id.* § 6394(b)(3).
[97]  *Id.* § 6398.
[98]  *Id.* § 6398(e).
[99]  Specifically, the act states that:  "[n]othing in this chapter (other than section 6398(b) of this title [the section pertaining to funding for programs for migratory children]) shall be construed to authorize the development of a nationwide database of personally identifiable information on individuals involved in studies or other collections of data under this chapter." *Id.* § 7911.
[100]  *Id.* § 6434(9).
[101]  *Id.* §§ 6421, 6451.
[102]  *Id.* §§ 6801 et seq.
[103]  *Id.* §§ 6983(a)-(b), 7013.

AR 0991

(iv) Title IV, Part A, Subpart 3-Gun Possession, the "Gun Free Schools Act," requires all states "receiving federal funds under this act" to implement a State law mandating that LEAs expel for at least one year any student found to have "brought . . . or possessed a firearm at a school," with the caveat that the expulsion can be modified by the chief administering officer of the LEA "on a case-by-case basis."[104] LEAs requesting funding from the state must also report in their funding applications "the circumstances surrounding any expulsions imposed under the State law" discussed above, along with the school's name, the number of students expelled from the school, and "the type of firearms concerned."[105] The State must then report this information to the Secretary annually.  In addition, LEAs will not receive funding under "any title of this Act" unless they implement "a policy requiring referral to the criminal justice or juvenile delinquency system of any student who brings a firearm or weapon to a school served by such agency."[106] States receiving funds under the act also must have implemented a procedure "in accordance with the Family Educational Rights and Privacy Act of 1974" that facilitates the transfer of these disciplinary records of expulsion or suspension from LEAs to all schools in the state.[107] While this initiative calls for more detailed reporting by states, the requirements still do not necessitate the disclosure of personally identifiable information at the state level.

## C.  Policy and Regulatory Influences

As a result of NCLB's reporting requirements and the general belief in the educational community that more extensive data collection can lead to better, more individualized instruction, schools and local educational agencies have begun collecting more detailed information regarding students.   This locally collected information is then in turn forwarded to state departments of education for NCLB reporting purposes.  As larger amounts of data are accumulated at the state level from various schools and districts, there is an increased desire to seek more efficient mechanisms for data processing.  The response from both nonprofit policy groups and the U.S. Department of Education is that efficiency can best be accomplished by the development of data systems that use common interoperable data elements and codes.[108]  The argument is that states will be able to process and use data better if it is reported in common formats.

Below we discuss three ways in which interoperability is being advocated in the development of state databases.  First, there are two influential nonprofit organizations, the Schools Interoperability Framework Association ("SIFA") and the Council of Chief State School Officers ("CCSSO"), that have taken an active role in developing uniform standards for educational databases.  The U.S. Department of Education is an active participant in both.  Second, the U.S. Department of Education initiated a federal grant program, the Statewide Longitudinal Data Systems Grant Program ("SLDS"), to assist states in developing statewide longitudinal databases.

Interoperable data collection systems may, as advocates suggest, decrease costs and simplify labor, but they also raise a number of privacy concerns.  Specifically, common data standards, by definition, facilitate the combination of multiple data sets into one national data warehouse of K-12 children, which in turn could be combined with data from post-secondary data systems to create an unprecedented national database of personal information.  While NCLB expressly states that the statute does not authorize a "nationwide database of personally

---

[104] *Id.* § 7151(a)-(b).
[105] *Id.* § 7151(d)-(e).
[106] *Id.* § 7151(h).
[107] *Id.* § 7165.
[108] See SIF Association, Welcome to SIF Association, available at http://www.sifinfo.org/us/index.asp (last visited Oct. 23, 2009); Nat'l Forum on Education Statistics, Education Data Model Version 1 (PK-12) available at http://nces.ed.gov/forum/datamodel/index.asp (last visited Oct. 23, 2009)

AR 0992

identifiable information," the likelihood of combining information from several states becomes very real if states are using identical data elements and codes. Interoperability thus appears as a backdoor means to create a national database of children's information without express authority under NCLB to do so.

In addition, as described below, the U.S Department of Education appears to be heavily involved in the promotion of interoperability (even if only indirectly). This involvement has largely escaped public notice and scrutiny, and the lack of a privacy policy debate is a major concern. One would expect the federal government's role in the development and deployment of interoperable standards to be minimal since NCLB did not authorize a national aggregation of data and interoperability functions to make aggregation and sharing easier. Instead, the U.S. Department of Education generally has an active role in the nonprofit organizations that are advocating and developing interoperable standards. Because the Department's activity occurs in non-governmental standards setting organizations, the decisions fall outside the normal channels of the Administrative Procedures Act and escape public oversight. Likewise, state departments of education participate in the standards groups without similar transparency for the privacy debate at the state level. This non-transparent government involvement is problematic because of the public policy implications.

1. Schools Interoperability Framework Association (SIFA)

SIFA is a nonprofit organization whose members consist of school districts, 14 state departments of education,[109] the U.S. Department of Education, and over 1,400 software vendors.[110] SIFA's stated goal is to "make it possible for school administrators, teachers and other school personnel to have access to the most current and accurate data available."[111] SIFA's mission is to remedy inefficiencies of information collection systems caused by numerous data systems that lack interoperability.[112]

At the school level, a lack of interoperability means that different data entry programs are incompatible with one another, preventing the transfer of data between programs. This problem has triggered issues such as redundant data entry and increased costs. According to SIFA, without interoperability multiple school officials are forced to enter information on one system that has previously been entered by another employee on a different system.[113] For example, a teacher is often required to enter biographical information of a student into a data system. That same information, however, might have previously been needed to register the student at the school library. SIFA's goal is to help facilitate interoperability, so that the information entered by the librarian will automatically appear on the teacher's data system, saving the teacher the redundancy of entering the identical information.[114] Multiple programs that lack interoperability also lead schools to pay higher costs to ensure that all of the systems are working properly together.[115] SIFA reports that schools typically cannot afford to maintain the systems properly, and as a consequence data is often inaccurate.[116] SIFA claims that this often damages the

---

[109] SIF Association Member List, http://www.sifinfo.org/members-list.asp (last visited Feb. 26, 2009). State members of SIF include: Alaska, California, Delaware, Indiana, Kentucky, Maryland, Minnesota, Ohio, Oklahoma, Pennsylvania, South Carolina, Virginia, Wisconsin, and Wyoming. *Id.*
[110] SIF Association General Overview, http://www.sifinfo.org/general-overview.asp (last visited Feb. 26, 2009).
[111] *Id.*
[112] *Id.*
[113] SIF School FAQ, http://www.sifinfo.org/us/school-faq.asp (last visited Feb. 26, 2009).
[114] *Id.*
[115] *Id.*
[116] *Id.*

16

educational experience of the individual student, because schools must fund programs to ensure the accuracy of the information rather than fund other important educational programs.[117]

In order to address these problems, SIFA has developed an information collection protocol, the Schools Interoperability Framework ("SIF"), that:  (i) defines standard formats of shared data, (ii) defines standard naming conventions for this data, and then (iii) defines the rules of interaction among software applications.[118]  The common data definitions are called "data objects."[119]  For example, a student's name, address, and phone number are part of the "StudentPersonal" data object.[120]  There are currently more than 90 data objects, and this number is increasing as the demand for more detailed information rises.[121]  Other data objects include "StudentSectionEnrollment," "SchoolCourseInfo," and "SectionInfo."[122]  The uniform coding of information that SIFA members follow to input data enables seamless sharing of information.  Data collected and organized in one SIF-compliant system is easily transferable to other systems that are also in compliance with SIF.

SIFA's members have also come together to create a set of vendor-neutral rules and definitions called the "SIF Implementation Specification,"[123]  which "makes it possible for programs within a school or district to share data without any additional programming and without requiring each vendor to learn and support the intricacies of other vendors' applications."[124]  In other words, the SIF Implementation Specification is a set of guidelines that allows vendors to create software programs that can be interoperable, eliminating many of the problems discussed above.  As a trademark, SIF is sufficiently recognized and valuable that vendors pay for their products to be certified by SIFA and become members of the organization in an effort to increase their business.[125]  Before becoming members, vendors' products must be certified by SIFA.  The certification test consists of a thorough examination of the software program, ensuring that it is compliant with the SIF Implementation Specification and that it operates properly.[126]  Only after the program passes this test does the vendor get the benefit of using the SIF trademark and advertising that it participates in the SIF initiative.[127]

Departments of education and schools also may become SIFA members and have access to SIF.  States pay a membership fee of $2,500 and in turn receive the opportunity to influence the development of the SIF specification.[128]  One way members influence the standard development is by participating in a SIFA work group, task force, or committee.[129]  Schools must also pay a membership fee.  Schools (or districts) that want to be voting members pay a $1,000 fee, whereas nonvoting members pay only $500.[130]  All schools that join receive direct access to SIF implementation tools and support, and the school's name and website are linked on the SIFA site.[131]

---

[117] *Id.*

[118] *Id.*

[119] *Id.*

[120] *Id.*

[121] *How SIF Works*, T.H.E. JOURNAL, Mar. 2002, http://www.thejournal.com/articles/15899.

[122] Edustructures—SIF Integration for K-12 Education, http://www.edustructures.com/pro/sasixp.html (last visited Feb. 26, 2009).  Specific definitions of these data objects are only available to members of SIFA.

[123] General Overview, http://www.sifinfo.org/general-overview.asp (last visited Feb. 26, 2009).

[124] *Id.*

[125] SIF Certification, http://certification.sifinfo.org/ (last visited Feb. 26, 2009).

[126] *Id.*

[127] *See id.*

[128] Government Benefits, http://www.sifinfo.org/govt-benefit.asp (last visited Feb. 26, 2009).

[129] *Id.*

[130] Welcome to SIF, http://www.sifinfo.org/school-get-started.asp (last visited Feb. 26, 2009).

[131] *Id.*

AR 0994

The U.S. Department of Education became a member of SIFA in 2003.[132]  In January of 2005, the U.S. Department of Education publicly encouraged states to consider SIF certification.[133]  Hugh Walkup, Director of Strategic Accountability Service for the U.S. Department of Education, issued a statement explaining that "through its membership in SIFA the U.S. Department of Education intends to support common standards in educational data systems and to assure that Department data initiatives are aligned with and reflected in SIF standards."[134]  The U.S. Department of Education's National Educational Technology Plan stated in reference to SIFA that "integrated, interoperable data systems are the key to better allocation of resources, greater management efficiency, and online and technology-based assessment of student performance that empower educators to transform teaching and personalize instruction."[135]  The U.S. Department of Education saw the potential in the SIF model and wanted confirmation that its goals were factored into the SIF design.

## 2.  Council of Chief State School Officers (CCSSO)

The CCSSO is a nationwide nonprofit organization of elected and appointed[136] public officials who head departments of elementary and secondary education in all 50 states, the District of Columbia, the Department of Defense Education Activity and five extra-state jurisdictions.[137]  The CCSSO expresses views on major educational issues "to civic and professional organizations, federal agencies, Congress, and the public."[138] Since 1928, the CCSSO has provided its members with professional development tools in an effort to provide "cutting edge information" to state education agencies.[139]  They currently offer 25 official publications and numerous non-regulatory guidance handbooks on federal programs.[140]

In 2004, the CCSSO partnered with Standard & Poor's School Evaluation Services and the Center for Educational Leadership and Technology Corporation ("CELT") to launch the National Education Data Partnership ("NEDP"), funded by the Bill & Melinda Gates Foundation to address state data collection.[141]  In 2007, The NEDP established the State Education Data Center ("SEDC").[142]  The SEDC was designed to be the "leading voice on public education data" by nationally advocating "quality education data collection, standards, and use" and providing access to a free website of education data and analytic tools.[143]  The SEDC established two

---

[132]  *Id.*

[133]  Press Release, SIFA, US Department of Education Recommends Integrated Data Systems via SIF Certification (Jan. 11, 2005) (on file with CLIP).

[134]  Press Release, SIFA, United States Department of Education joins SIF (Apr. 24, 2003) (on file with CLIP).

[135]  Press Release, SIFA, How to Save $500,000 a Year (July 11, 2007) (on file with CLIP).

[136]  *See* Chief State School Officers/Method of Selection, www.ccsso.org/chief_state_school_officers/method_of_selection/index.cfm (last visited May 22, 2009) (listing which states elect their officials through partisan or non-partisan ballots and which states' officials are appointed and by whom).

[137]  COUNCIL OF CHIEF STATE SCH. OFFICERS, 2005-2006 ANNUAL REPORT, *available at* http://www.ccsso.org/content/PDFs/CCSSO_Annual_Report0506.pdf.

[138]  *Id.*

[139]  *Id.* at 6.

[140]  *See* CCSO.org—Publications, http://www.ccsso.org/publications/index.cfm?init=1 (last visited May 22, 2009) (for official publications); NCLB: Legislation, Regulation, and Guidance, www.ccsso.org/federal_programs/NCLB/3355.cfm (last visited May 22, 2009) (for non-regulatory guidance).

[141]  *See* National Education Data Partnership, www.ccsso.org/projects/National_Education_Data_Partnership/index.cfm (last visited Mar. 4, 2009).

[142]  *Id.*

[143]  *Id.*

18

programs, SchoolDataDirect.org and the Coordinated Data Ask ("CDA"), along with two advisory councils to administer these projects.[144]

      SchoolDataDirect.org is a publicly accessible website that displays comprehensive current and historical multi-state educational data and allows researchers to download that data directly from the website's database.[145] "It offers comparison tools, ratios, benchmarks, and performance indicators" designed to improve understanding of how money is being spent on education and where attention needs to be given to "improve performance."[146] Although the website is not designed for NCLB reporting, it is designed to assist administrators and "education leaders who work within the NCLB environment."[147]

      The multi-state data found at SchoolDataDirect.org is compiled from a number of different sources.[148] School directory information such as school type, county, and Title I status is provided by the National Center for Education Statistics ("NCES").[149] Community demographic data including population, median age, and household income distribution is provided by Global Insight, Inc., a private economic, financial, and industry analyst.[150] All NCLB Annual Yearly Progress data is provided by the state departments of education.[151] The state departments of education also provide data about school environments, such as class size, teacher quality, and disciplinary actions.[152] The NCES provides the enrollment breakdowns of each school if the state departments of education do not.[153] Enrollment is disaggregated by economically disadvantaged students, limited English proficiency, gifted and talented students, students with disabilities, and migrant students.[154] All spending, revenue and tax data is provided by the U.S. Census at the district level and NCES and the National Public Education Financial

---

[144] *See* State Education Data Center,  www.ccsso.org/projects/state_education_data_center/index.cfm (last visited Mar. 4, 2009).

[145] *Id.*

[146] *See* National Education Data Partnership, *supra* note 141.

[147] *See* SchoolDataDirect—FAQ, www.schooldatadirect.org/app/content/q/mtype=FAQ.shtml/mlvl=0/stid=-1/llid=-1/stllid=-1/locid=-1/site=pes (last visited Mar. 4, 2009).

[148] *See* SchoolDataDirect, Data Sources, http://download.schooldatadirect.org/_ddtv/DataDownloadGuideFiles/SDD_Data_Sources.pdf (Jan. 29, 2008) (listing every data element and who provided it to the website).

[149] *Id.* Directory information also includes: Physical Location, Charter Status, County Name, District ID, Education Entity Name, County Code, Locale Type, NCES ID, School ID, State Code, and Telephone Number. *Id.*

[150] *Id.* Community Demographics also include: Adults with Bachelor's Degree, Adults with High School Diploma, Number of Households, Population Density, Population Distribution by Age, and Single Parent Households with Children. *Id.*  For more information on the programs and methodologies of Global Insight, Inc., see IHS Global Insight—About, http://www.globalinsight.com/About/ (last visited May 20, 2009).

[151] SchoolDataDirect, Data Sources, *supra* note 148. AYP indicators include: Graduation Rate, Improvement Status, Overall Status, Proficiency Status, Proficiency Targets, and Accountability Measure.

[152] *Id.* Teacher Quality includes: Average Years of Experience, Percent of Classes in High-Poverty Schools Not Taught by "Highly Qualified" teachers, Percent of Classes in Low-Poverty Schools Not Taught by "Highly Qualified" teachers, Teachers holding a Bachelor Degree, Doctorate Degree, Masters Degree and less than a Bachelor Degree. *Id.*

[153] *Id.* All enrollment data is provided by the NCES or SDOEs. *Id.*  The SDOEs that provide enrollment data are: California, Colorado, Georgia, Idaho, Kentucky, Louisiana, Massachusetts, Michigan, Minnesota, Mississippi, Ohio, Texas, Virginia, Vermont,  and Washington. *Id.*  All SDOE's provide their gifted and talented enrollment; New York provides its own economically disadvantaged enrollment while NCES collects the other enrollment elements. *Id.*

[154] *Id.*

AR 0996

Survey at the state level.[155]  Most student performance data is provided by the state departments of education.[156]

The CDA is a new collaboration between the Data Quality Campaign ("DQC") and the U.S. Department of Education.  The role of the DQC in this collaboration is not surprising.  The DQC is a national initiative to coordinate efforts to support the states' development of longitudinal data systems and to inform policy makers of the need for that data.   The DQC was launched as part of the CCSSO's Data Summit and is supported by the Bill and Melinda Gates Foundation and managed by the National Center for Education Accountability.[157]  The DQC founding partners include significant organizations in the educational community such as Achieve, Inc.,[158] Alliance for Excellent Education,[159] CCSSO, The Education Trust,[160] National Center for Educational Accountability (NCEA),[161] National Center for Higher Education Management Systems,[162] National Governors Association Center for Best Practices,[163] SIFA,

---

[155] *Id.* Data elements include: Capital Expenditures by Function, Debt Service, Federal Aid by Designation, Financial Reserves, Instructional Expenditures, Local Revenue, Operating Expenditures, Revenue, Salaries, State Aid, and Total Compensation. *Id.*

[156] *Id.* SDOEs provide attendance rate, dropout rate, mobility rate (number of students entering after enrollment count plus the number of withdrawals after the enrollment count divided by the enrollment count), number tested for each grade level by subject tested, and post graduate intentions. The Manhattan Institute provides the cohort graduation rate (graduation rate estimate). *Id.*  The Urban Institute provides the cumulative promotion index (graduation rate estimate) and NCES provides the leaver rate (estimated four-year cohort graduation rate. *Id.*

[157] *See* Data Quality Campaign—Home, http://www.dataqualitycampaign.org/ (last visited May 22, 2009); *see also* 2005 Data Summit, http://www.ccsso.org/projects/Data_Quality_and_Standards_Project/7494.cfm (last visited May 22, 2009); Chiefline 11/30/05, http://www.ccsso.org/Whats_New/newsletters/chiefline/7544.cfm (last visited May 22, 2009).

[158] *See* 2005 Data Summit, *supra* note 157  (listing founding partners).  Achieve, Inc., is a bipartisan, non-profit organization created by governors and business leaders that helps states benchmark academic standards and "improve assessments and strengthen accountability to prepare all young people for postsecondary education, work and citizenship." Achieve, Inc., http://www.achieve.org/ (last visited May 22, 2009).

[159] *See* Alliance for Excellent Education, http://www.all4ed.org/about_the_alliance (last visited May 21, 2009) (Funded by philanthropists, foundations and corporations, the Alliance for Excellent Education develops and disseminates research based policy recommendations on the use of data-driven decisions to policymakers, education and civil rights advocates, and the press.).

[160] *See* About the Education Trust, http://www2.edtrust.org/edtrust/about+the+ed+trust (last visited May 21, 2009).  The Education Trust is funded by Bill and Melinda Gates and other foundations, and their goal is "to close the achievement gaps that separate low-income students and students of color from other youth." *Id.*; About the Education Trust, http://www2.edtrust.org/edtrust/about+the+ed+trust/major+funders (last visited June 11, 2008).

[161] *See* National Center for Educational Achievement/ Just for the Kids, http://www.just4kids.org/en/ (last visited May 22, 2009).  NCEA is a non-profit, non-partisan organization designed to raise academic expectations and promote practices that help students succeed.  It is the managing partner of DQC. *Id.*

[162] *See* Home—NCHEMS, http://www.nchems.org/ (last visited May 22, 2009).  NCHEMS "is a private non-profit organization whose mission is to improve strategic decision making in higher education . . . ." *Id.*

[163] *See* NGA—The Center for Best Practices, http://www.nga.org/portal/site/nga/menuitem.50aeae5ff70b817ae8ebb856a11010a0/ (last visited May 22, 2009).  NGA is a bipartisan organization of governors that "promotes visionary state leadership, shares best practices and speaks with a unified voice on national policy." National Governors Association, http://www.nga.org/portal/site/nga/menuitem.cdd492add7dd9cf9e8ebb856a11010a0/ (last visited May 22, 2009).

AR 0997

Standard & Poor's School Evaluation Services,[164] and State Higher Education Executive Officers.[165]

The DQC is a way for many organizations working on similar educational data system projects to coordinate their common goals. The DQC aims to build support to fully develop longitudinal data systems in every state by the end of 2009.[166] The DQC wants to promote the use of longitudinal and financial data to improve student achievement. The DQC will facilitate a national forum to ensure collaboration, develop consensus, and reduce duplication of effort by promoting, developing, and using common data standards and efficient data transfer and exchange.[167] The DQC has identified 10 essential elements for creating a successful longitudinal data system. These elements include: (a) unique statewide student identifier; (b) student-level enrollment, demographic and program participation information; (c) ability to match individual students' test records from year to year to measure growth; (d) information on untested students; (e) teacher identifier system with the ability to match teachers to students; (f) student-level transcript information, including information on courses completed and grades earned; (g) student-level college readiness test scores; (h) student-level graduation and dropout data; and (i) ability to match student records between the pre-K-12 and post-secondary systems.[168]

The CDA will provide a data collection template that "identifies the most commonly requested education data elements and their agreed upon definitions."[169] These elements are also compared to the suggested EDFacts data groups and to SIF objects before being finalized and can be downloaded from SchoolDataDirect.org.[170] States are being "encouraged" to develop databases with this template "to further reduce the burden of their data collection/reporting efforts."[171] Like the SIF specifications, the CDA is an effort to move states towards a more uniform system of data collection and, like SIFA, the CDA is a third-party program supported by the U.S Department of Education.

SchoolDataDirect.org and CDA demonstrate a common policy goal of universalizing data collection and building longitudinal databases. While these goals represent significant policy decisions, privacy concerns regarding interoperable data systems appear to be largely absent from the planning protocols and need to be addressed.

3.   Statewide Longitudinal Data Systems Grant Program (SLDS)

The Educational Technical Assistance Act of 2002 created the Institute of Education Sciences ("IES") and its National Center for Education Statistics ("NCES") and authorized the

---

[164]   *See* SchoolMatters—Home, http://www.schoolmatters.com/ (providing an objective source of information and analysis of school data).

[165]   *See* SHEEO Mission & History, http://www.sheeo.org/About/mission.htm (last visited May 22, 2009). SHEEO is a professional organization of CEOs serving statewide governing and coordinating boards of higher education dedicated to promoting relationships with federal agencies, colleges and universities, and higher education and other associations in the collection and exchange of data and information. *Id.*

[166]   See Data Quality Campaign, About DQC, available at http://www.dataqualitycampaign.org/about (last visited Oct. 23, 2009); Achieve, Data Quality Campaign Launched at Data Summit (Nov. 27, 2005) available at http://www.achieve.org/node/91 (last visited Oct. 23, 2009)

[167]   Id.

[168]   THE NAT'L EDUC. DATA SUMMIT, DATA QUALITY CAMPAIGN: IMPROVING THE QUALITY, ACCESSIBILITY AND USE OF DATA IN EDUCATION (2006), http://www.dataqualitycampaign.org/files/Presentations-NGA_FL_Data_Summitt_020206.pdf.

[169]   *See* State Education Data Center, www.ccsso.org/projects/state_education_data_center/index.cfm (last visited May 22, 2009).

[170]   *Id.*

[171]   *See supra* note 137.

21

AR 0998

SLDS grant program.[172]  The grants are designed to aid SEAs in their design, development and implementation of longitudinal data systems.[173]  The grants range from one and a half million to six million dollars per state and are given for three years.[174]  Grants are awarded based on the need for the project and the quality of the project's design and management plan.[175]As of June 2007, 27 states have received grants from the program.[176]  All states, territories, and the District of Columbia are eligible to apply.[177]  CCSSO staff, funded through a contract with NCES, supports the administration of these grants.[178]

There were 22 requirements that a state had to meet to receive a grant in 2007.   The requirements notably include the following:

- the state must articulate a governance structure including the representatives who will design, develop, implement, manage, and maintain the statewide longitudinal data system;
- the state must use permanent student identifiers;
- the state must create a data warehouse to manage and store linked data that can be accessible by teachers, schools, districts, and researchers;
- the state must link the data over time to allow for longitudinal analysis of student growth;
- the state must put in place clearly defined security, access, and use policies in conformance with FERPA as well as technical procedures for protecting security, confidentiality, and integrity of data;
- the state must have an automated reporting system that ensures timely and accurate data will meet reporting requirements;
- the state must provide data, reports, and analysis through "secure-access enterprise information portals" to inform decision-making of teachers, parents, administrators, LEA, and SEA; and
- the state must develop a data exchange to share data within the state and with institutions of other states, in conformance with FERPA.[179]

Additionally, 9 "voluntary standards and guidelines" were offered to prospective grant recipients.[180]  Significantly, SIF standards appear among the set of voluntary standards for grant

---

[172]  Statewide Longitudinal Data Systems Grant Program—Program Overview, http://nces.ed.gov/Programs/SLDS/index.asp (last visited May 24, 2009).
[173]  *Id.*
[174]  *Id.*
[175]  Press Release, U.S. Department of Education, 13 States Win $62.2 Million in Grants for Longitudinal Data Systems (July 2, 2007), *available at* http://www.ed.gov/news/pressreleases/2007/07/07022007a.html.
[176]  *See supra* note 165 (14 States received grants in November 2005: Alaska, Arkansas, California, Connecticut, Florida, Kentucky, Maryland, Michigan, Minnesota, Ohio, Pennsylvania, South Carolina, Tennessee, Wisconsin; 13 States received grants in June of 2007: Arizona, Colorado, District of Columbia, Indiana, Kansas, Maine, Nevada, New Hampshire, North Carolina, Oregon, Utah, Virginia).
[177]  *Id.*
[178]  *See* Administrative Data Improvement, www.ccsso.org/projects/administrative_data_improvement/index.cfm (last visited Mar. 3, 2009).
[179]  *See* Statewide Longitudinal Data Systems Grant Program—Archives, http://nces.ed.gov/Programs/SLDS/archives.asp (last visited Mar. 3, 2009).
[180]  *See* Statewide Longitudinal Data Systems Grant Program—Voluntary Standards and Guidelines, http://nces.ed.gov/Programs/SLDS/standardsguidelines.asp (last visited Mar. 3, 2009).
     "The development of a statewide longitudinal data system requires work and preparation. To guide States in their development efforts, please use the information contained on this page to inform and shape project plans.  Much of the information contained here was also

recipients, and 11 of the 13 states receiving grants in 2007 expressly mention SIF in their grant proposals.[181]  The popularity of including SIF standards in a grant proposal may indicate an understanding at the state level that the U.S. Department of Education supports and advocates uniform data collection and eventual aggregation.  While the grant system does require that security, access, and use policies be incorporated in the state database, other privacy concerns, such as the duration of storage and purpose limitations, are lacking.

---

included in the original RFA sent out to all prospective grantees and should be heeded in future grant application efforts."
*Id*.(Follow the links to coding systems, NCES handbooks for data definitions, confidentiality guides, security standards, reporting regulations, SIF standards, and the National education technology plan.).

[181]  *See* Grantee State Applications, http://nces.ed.gov/Programs/SLDS/stateinfo.asp (last visited May 21, 2009) (follow the links to each state to download the grant proposals).  All page numbers correspond to the pdfs of the state's individual grant proposal:  Nebraska pg. 16, North Carolina pg. 22, Kansas pg. 21, Colorado pg. 24, Virginia pg. 19, Indiana pg. 22, Utah pg. 17, New Hampshire pg. 31, Arizona (in partnership with Connecticut and Maine) pg. e15 and 23, District of Columbia pg. 31, Maine pg. 23.  Only Oregon and Nevada do not mention SIF explicitly.  Oregon does have a partnership in place that allows data transferability with Washington, but no national plans in place.  Nevada has just implemented a data sharing program with higher education facilities within the state and noted that grant funds may be used to support a national system, but did not mention SIF.

AR 1000

## III.   FINDINGS

All of the states have an ongoing interest and need to maintain student longitudinal databases.  Many states rely on NCLB to explain the existence of the database, stating on their websites or in letters to parents that the federal government requires them to collect information concerning students and then store it in a database.  Some states, however, also assert that the database method of information gathering is more efficient, in that its automated nature should make teachers' and administrators' reporting duties easier and faster.  They also argue that the database will improve the quality and usage of data by facilitating researchers' desires to learn about demographics and groups.  The ultimate goal is the use of the collected data to improve school quality in each state and the country as a whole, possibly through research into the "best" way to teach students.  Whatever the reason for the database, it is clear that increased data collection and use are priorities, and that best practices regarding privacy need to be incorporated into such databases.

The review of publicly available information resulted in findings that are presented in three categories.  First, the findings show trends related to data collection, including how and what information is collected at the state level.  Second, the findings show the various privacy protections that are applied to the state longitudinal databases.  Finally, the findings show the use of third party vendors in the collection and maintenance of the student data.

### A.  Information Collection Practices

Thirty-eight states are collecting some type of longitudinal student data at the state level.  Of the remaining 12 states, some are developing longitudinal programs and several have insufficient information available on their data practices to make an assessment.  Below, we identify the common types of data collected and the reasons for its collection.  Some data is clearly required to be collected by NCLB, some data appears to be collected to aid academic improvement, and other data appears to fall outside of legitimate educational purposes.[182]

It is critical to note that all of the data discussed below is collected in individualized form, even if the data is not tied directly to a name.  Each data field, for example, is collected in connection to a specific record, whether that record is identified by a student name or a non-personally identifiable student number.  This collection method is significant for privacy concerns, because one piece of non-identifiable information may become identifiable when linked to a second piece of information.

---

[182] This section should be considered in conjunction with the next section on privacy protections because regardless of the purpose, all information must be subject to effective privacy protections.

AR 1001

## Data Summary Chart- 1

### *EXISTING LONGITUDINAL DATABASES*

- ***States with longitudinal database (36 states):***

  **AK, AZ, CA, CO, FL, GA, IL, IA, KS, KY, LA, ME, MA, MI, MN, MO, MT, NE, NH, NJ, NM, NY, NC, ND, OH, OR, PA, RI, SD, TN, TX, VA, VT, WA, WI, WY**

- ***States developing a longitudinal database (5 states):***

  **CT, DE, HI, IN, SC**

- ***States with a longitudinal database, but without public information detailing the data processing (2 states):***
  **MS & OK**

- ***States with insufficient public information to determine (7 states):***
  **AL, AR, ID, MD, NV, UT, WV**

1. <u>General Overview</u>

Every state with a database collects directory information of students.[183]  As noted above, this can include:  "the student's name, address, telephone listing, date and place of birth, major field of study, participation in officially recognized activities and sports, weight and height of members of athletic teams, dates of attendance, degrees and awards received, and the most recent previous educational agency or institution attended by the student."[184]  Both Missouri and New York limit collection almost exclusively to directory information supplemented by a few additional data items.[185]  For these states with limited data collection, privacy concerns are muted.

Almost every state assigns each student a unique identification number to identify that student without using the student's name.[186]  Several states have systems in which a student receives a second identification number at the local level.[187]  Each state varies with respect to the data that is associated with each identification number.  Iowa, for example, only collects directory data in one system that assigns the state ID number, but collects more detailed information in

---

[183] *See infra* app. A.
[184] *See supra* note 23.
[185] *See infra* apps. A-G.
[186] *See infra* app. B.
[187] The following states appear to assign a second ID number at the local level:  Missouri, Montana, Nebraska, New Hampshire and New Jersey.

AR 1002

another database using that state ID number.[188]  Approximately 16 states also collect a student's social security number, and in Georgia and Louisiana the social security number usually doubles as the student's unique identification number.[189]

Most states also collect a range of demographic information relating to their students.[190] At least 36 states record the gender of an individual student and at least 35 states keep track of the race and ethnicity of their students.  At least 24 states require a record on the immigration status of their students and some states have data elements for a student's country of birth, which also provides an inference of immigration status.[191]  Over half the states collect data on a student's native language or the primary language spoken in a student's home.  For those students with limited English proficiency, 31 states keep track of their participation in Limited English Proficiency ("LEP") programs. Twenty-eight states also include a student's migrant status.[192]

The detailed personal information collected by the majority of states extends to a student's academic record as well.[193]  Every state keeps track of students' individual standardized test scores in order to report score statistics as required by NCLB.  At least 18 states record which students qualify for special testing accommodations, such as extra testing time.  A minimum of 15 states also maintain data on which students require extra help or tutoring with their school work.  The research indicates that Colorado, Connecticut and Iowa also keep data on their students' ACT scores.  Seven states collect information on whether an individual student takes AP courses and 18 states note whether a student is considered gifted or talented.  At the other end of the spectrum, a minimum of 27 states keep records on special education students.  Lastly, 12 states keep records on the post-graduation plans of students.

Disciplinary details relating to individual students are maintained by almost every state in various ways.[194]  Twenty-six states maintain records on the reason a student withdraws from a particular school.  Nineteen of these 26 states include reasons such as expulsion, jail, illness, mental health, or pregnancy as descriptors.  Fifteen states collect detailed data about disciplinary actions, including the reason a specific student was disciplined and the date the disciplinary action was taken.  A minority of states document the number of absences for each student, and a number of states keep track of every student's suspensions.[195]

States also track certain economic wealth factors related to students and their families.[196] An overwhelming majority of states maintain records on a student's eligibility for free or reduced price lunch.  At least 25 states note whether a student is homeless.  Of these states, 13 further document where the homeless student stays at night.

Lastly, a few states collect some form of health information about their students.[197] Maine and North Carolina record the Medicaid status and Medicaid numbers of applicable students.  Kentucky and New Jersey both keep track of a student's most recent medical examination date.  New Jersey also collects data on the date of a student's last lead test, the resulting lead level from that test, and the date of the student's polio immunization.  Florida has a

---

[188]  *See* Iowa Department of Education Data Access and Management Policy Statement For the Iowa Student Identification/Location System and Project Easier Student Records, http://www.iowa.gov/educate/index.php?option=com_docman&task=cat_view&gid=321&Itemid=1563 (last visited May 5, 2009) (follow the links to download the document).
[189]  *See infra* app. B.
[190]  *See generally infra* app. C.
[191]  *See* the Country of Birth column *infra* app. A.
[192]  *See generally infra* app. C.
[193]  For information regarding academic records, *see infra* app. D.
[194]  For information regarding disciplinary records, see generally *infra* app. E.
[195]  At least 18 states keep records of absences, and a minimum of six states do the same for suspensions, see *infra* app. E.
[196]  For information regarding economic and family information, see *infra* app. F.
[197]  For information regarding health records, *see infra* app. G.

AR 1003

separate immunization database where health records are stored, monitoring past and upcoming immunization dates.[198]  Finally, South Dakota collects the weight of students as part of its child obesity program.[199]

Overall, the information collected by the states can be broken down into two categories: (i) general data or information that is used for NCLB reporting purposes, and (ii) data that is not required by or used for NCLB.

---

**Data Summary Chart- 2**

*LONGITUDINAL DATABASES AND SENSITIVE DATA*

- *32% of states collect children's social security numbers*
- *22% of states record student pregnancies*
- *46% of states have a mechanism in place to track children's mental health, illness and jail sentences*
- *72% of states collect children's family wealth indicators*

---

2.  Data Used for NCLB Reporting

Much of the data collected by the states is required or permitted to be collected in a general manner for NCLB purposes, provided that personally identifiable information is removed prior to public reporting.  NCLB requires that all schools receiving funding keep track of the test scores of its students, and that states report statistics about those test scores in their annual report card "disaggregated by race, ethnicity, gender, disability status, migrant status, English proficiency, and [other statuses] such as economically disadvantaged."[200]  The annual report card may also include generalized information about student attendance rates, class size, school violence, drug use and AP test results.[201]  The requirements of the annual report card explain why many of the categories of information are collected at the state level; however, they do not necessitate that such information be tied to a specific student when collected by the state.  Rather than collecting this information in individualized student records, states could collect numerical information generally in disaggregated categories.

---

[198]  *See* Florida Compulsory School Immunization Update, *available at* http://www.fldoe.org/eias/databaseworkshop/word/immunization.doc (last visited Mar. 4, 2009).
[199]  *See* Tracking Childhood Obesity, http://doe.sd.gov/educationonline/2007/May/art_article3.asp (last visited Apr. 2, 2009).
[200]  20 U.S.C. § 6311(h)(1)(C)(i) (2002).
[201]  *Id.* § 6311(h)(1)(D).

AR 1004

There are also special funding programs that the states can apply for under NCLB.[202] These programs require the collection of additional information at the state level in order to receive federal funding.  For such programs, states are required to keep track of migrant students, special education students, and students with limited English proficiency.  All schools also must inform the local law enforcement or a juvenile facility when a student brings a weapon to school.[203]  Certain disciplinary incidents likewise must be reported in a generalized aggregate fashion.  These reports are not required to identify the victims of crimes or students accused of crimes.  Again, these additional programs help to explain why certain general categories of information are collected at the state level, but they do not require individualized personally identifiable reporting to the state.

Although much of the data collected by the states is required by NCLB, the data need not be linked to identifiable information at the state level.  The privacy protection section of this study addresses this topic in depth, but it is important to note that there are existing systems that effectively prevent the state from linking the information it receives to a specific student.  Unfortunately, most states do not use these anonymizing techniques.  This is especially problematic, because most states also have minimal or non-existent data retention policies, which means that the information collected in a student's education file will remain in that file for many years, even when that data is expunged from other files such as a student's juvenile criminal record.

3.   Data that is unlikely to be required by NCLB

Many states gather data that appears to exceed the collection requirements of NCLB such as teen pregnancies or country of birth.   While this additional data may be helpful at a school level to assist teachers in developing individualized teaching plans, there does not appear to be a strong rationale for processing this data at the state level; and, to the extent such data is collected at the state level, it does not need to be collected in an individualized fashion.

There is some data collected by states that is not required by NCLB, but there are reasonable explanations for the collection.  At least 11 states keep track of whether a particular student is pregnant or a single parent.[204]  Despite the intrusive nature of this information, teachers can use it to better tailor instruction for the student.  For example, a feasible homework load for a student-parent may be different from that of another student.  If teachers are aware of a student's situation, attention can be given as to how best to assure single parents do not fall behind.  Additionally, Kansas, Minnesota, and North Carolina amass information on what mode of transportation a student uses to get to school and how many miles that student must travel each day to get there.[205]  This data is not required for NCLB collection, but the time it takes for a student to get to school can be valuable information for a teacher.  Similar to the time constraints imposed on student parents, a student who spends an unusual amount of time traveling to and

---

[202] *See Section II.B.2(b)*
[203] *Id.* § 7151(d)-(e).
[204] *See infra* apps. C, G.  Arizona, Arkansas, Louisiana, Montana, New York, New Mexico, Oregon, Pennsylvania, Florida, Georgia, and Nebraska all keep track of student parents and/or pregnancy.
[205] *See* KIDS 2008-2009 Collection System File Specifications, *available at* http://www.ksde.org/LinkClick.aspx?fileticket=CfXC6hszkis%3d&tabid=2508&mid=6013; Data Element Definitions, http://education.state.mn.us/mdeprod/idcplg?IdcService=GET_FILE&dDocName=014043&RevisionSelectionMethod=latestReleased&Rendition=primary; NCWise Introduction to Student Demographics, *available at* http://www.ncwise.org/TRAINING/ncwise_training_documents/Documents/gen_stu_info/Student_Demographics.pdf (last visited May 20, 2009).

AR 1005

from school might have difficulty spending the necessary hours on school work.  Knowledge of this information can help a teacher tailor instruction for these individuals.  It is significant, however, that while this information can be helpful at the local level, at the state level the collection of this data on an individualized basis seems tertiary to the improvement of instruction.

Some states also collect data in excess of NCLB requirements that seem to lack any significant educational purpose.  For example, both Maine and Michigan keep track of the birth order of students.[206]  This information is not required by NCLB, and appears to be tertiary for instructional tracking.  Likewise, California records the educational level of a student's parents.[207]  This individualized data does not seem to be a legitimate marker for the need to improve instructional support for a public school child.  Collection of non-required information such as birth order and parental education level, while ostensibly benign, sets a precedent for excessive data collection.

Most troubling however, is the collection of information that exceeds the scope of NCLB and may have a legitimate purpose for collection, but also carries a high risk of harm to the students if privacy is not sufficiently maintained.  The inclusion of this type of information in a statewide database must be assessed against its usefulness for educational improvement and the risks associated with children's privacy.

The first of these problematic data categories includes elements that keep track longitudinally of a student's mental health or criminal history.  For example, Iowa's data system includes a code for court action as an explanation for a student's withdrawal from school,[208] and Illinois includes a code for jail as an explanation for why a student was not tested.[209]  At least 17 other states have codes for withdrawal that include jail, illness, or mental health.[210]  The collection of data pertaining to the criminal justice system can be especially damaging to a student.  Many states provide that juvenile criminal records can be sealed and eventually expunged.[211]  However, even if the juvenile criminal records are sealed or expunged once the student reaches the age of majority, the incidents will still remain part of the student's education file in the absence of a comparable data purge requirement.  Most states, however, do not have policies in place regarding data retention and data purging.  Thus, this information in a student's file is extremely troubling.

Many states also include far more detailed descriptions of disciplinary incidents than required by NCLB.  When a student brings a weapon to school, NCLB requires the school to refer the matter to local law enforcement officials.  As part of the school record, however, ten states keep track of the specific type of weapon used.  For example, Louisiana's weapon codes consist of handguns, rifles, shotguns, poisonous gas, any firearm muffler or silencer, or the frame of any weapon.[212]  Louisiana goes further than many states and provides 32 different codes to detail disciplinary action, including codes for rape, murder, assault and battery, kidnapping, foul

---

[206] *See* MEDMS On-line User Manual–Unit 6:  Maintain Student Information, https://www.medms.maine.gov/MEDMS/usermanual/unit6.htm (last visited May 25, 2009); Michigan Education Information System Single Record Student Database Data Field Description (Spring 2009), *available at* http://www.michigan.gov/documents/cepi/spr2009_SRSD_field_descriptions_258932_7.pdf.

[207] *See* Statewide Student Identifier User Guide (Version 2.2) (Sept. 29, 2008), *available at* http://www.csis.k12.ca.us/library/statewide-identifier/SSID-User-Guide-for-SB1453-v2-2-20080929.pdf.

[208] *See* Project EASIER—Iowa Department of Education, http://www.iowa.gov/educate/index.php?option=com_content&task=view&id=44&Itemid=12 (last visited Mar. 4, 2009) (follow the links to download the Data Dictionary 2008-2009).

[209] ISBE SIS Data Elements—Reason for Not Testing (Oct. 3, 2007), *available at* http://www.isbe.state.il.us/sis/pdf/not_testing.pdf.

[210] *See infra* app. E.

[211] *See* Reporter's Comm. for Freedom of the Press, Access to Juvenile Courts: State-by-State Summaries (Spring 1999), http://www.rcfp.org/juvcts/juvcts_stateindex.html (last visited October 20, 2009).

[212] *See infra* apps. E, G.

AR 1006

language, arson, missile throwing, burglary, and serious bodily harm.[213]  Louisiana describes serious bodily harm as a bodily injury "that involves a substantial risk of death; extreme physical pain; protracted and obvious disfigurement; or protracted loss or impairment of the function of bodily member, organ or faculty."[214] Florida's disciplinary codes also include involvement in hate crimes, gang related violence or drug and alcohol use.[215]  These detailed descriptions of disciplinary violations stay in the student's record for a duration that depends on the existence of a data retention policy.  This level of detail also makes identification of a student much easier even if the database is structured to anonymize students. Additionally, Michigan requires that schools keep track of students who have been victims of an incident, which is explicitly not required by NCLB.[216]  This may stigmatize a student as a victim throughout his or her school years.

Similarly, a number of states include more information about student disabilities than is required by NCLB.  States are not mandated to disclose the type of disability that a student has. Nonetheless, at least eight states include in the database students' disability type.[217]  Georgia has particularly detailed descriptions, with options ranging from "mild intellectual disability" to "severe intellectual disability," and finally "profound intellectual disability."[218]  There do not appear to be clear guidelines distinguishing the characteristics of each code.   Without clearer guidelines, it is possible for a student to be mislabeled by or mistreated as a result of these overarching terms.

The collection of health information that is not required by NCLB is also troubling. Congress has recognized that health records are of a particularly sensitive nature by its enactment of the *Health Insurance Portability and Accountability Act*.   Every precaution should be taken to ensure their privacy.  Their inclusion in education databases without special safeguards jeopardizes this goal.  States do collect health related information without apparent special protections.  For example, New Jersey keeps track of a student's most recent medical examination date and also collects the date of a student's last lead test, the resulting lead level from that test, and the date of the student's polio immunization.[219]  While New Jersey's detailed technical guidelines provide that disclosure of this health information is optional, it is not clearly presented that way in letters to parents.[220]  As a result, families may provide health information they would prefer to keep confidential, because they think disclosure is mandatory.

Lastly, Florida includes data that can be perceived as highly intrusive.  Specifically, Florida keeps track of the birth weight of a student's baby (when more than 5 pounds and eight

---

[213]  *See* SIS User Guide (ver. 8.6), *available at* http://www.doe.state.la.us/lde/uploads/7706.pdf (last visited Mar. 4, 2009).

[214]  *Id.* (Louisiana Disciplinary Code Number 32).

[215]  *See infra* apps. E, G.

[216]  *See* Michigan Education Information System Single Record Student Database Data Field Description, *supra* note 206.

[217]  *See infra* apps. D, G.

[218]  FY 2008 FTE Data Collection Data Element Detail Cycle 2, http://public.doe.k12.ga.us/DMGetDocument.aspx/FTE2008_2_Data%20Element%20Detail_10_25_07.pdf?p=6CC6799F8C1371F651B228FF2DA4BFDB0B711E805EC2A08BC245DA562544D56F&Type=D

[219]  *See infra* app. G.

[220]  Letter from Lucille E. Davy, Acting Commissioner, Dep't of Educ. and James W. Smith, Jr., Acting Commissioner, Dep't of Human Servs. to Parents (Sept. 15, 2006), http://www.state.nj.us/education/njsmart/data/abbott_health.pdf (concerning the collection of health-related data).

ounces).[221]  This data may be used to generate inferences regarding whether the mothers were using drugs while pregnant.

In general, it appears that the databases hold much more information than is required for NCLB reporting purposes.  While much of the detailed information in the longitudinal databases may be beneficial for local level personnel, the level of detail required for state reporting appears to be excessive.

---

**Data Summary Chart - 3**

***EXAMPLES OF EXCESSIVE DATA COLLECTED BY STATES***

- ***Birth order***
- ***Birth weight of a student's baby***
- ***Victim of peer violence***
- ***Medical test results***
- ***Parental education level***
- ***Mental health problems***
- ***Criminal history***

---

**B.  Privacy Protections**

Almost all of the states express an interest in protecting the privacy of their students and complying with FERPA.  The states use various mechanisms to ensure the privacy and confidentiality of student educational records.  First, the technical structure of  longitudinal databases affects the state's ability to protect privacy and to comply with FERPA.  And, second, beyond the database architecture, states use a variety of policy tools, including limitations for defined database users and uses, confidentiality agreements, FERPA required notices of data practices, and in some cases data retention policies.  However, as noted throughout these findings, many states only provide obscure, incomplete, or difficult to decipher information about their data practices and programs.  In itself, this lack of transparency for the state's processing of children's data is inconsistent with fair information practices and FERPA policy goals.

1.  Database Architecture

The state longitudinal databases appear to use two different infrastructure forms.  The majority of states have adopted a "dual" database system: one database collects a limited amount

---

[221]  Florida Department of Education, http://edwapp.doe.state.fl.us/bsn_subjects/TargetElementDesc1.aspx?SubjectID=1&FacetID=3&ViewID=512&TableID=143&ElementID=1394 (last visited Mar. 4, 2009) (data element descriptions).

AR 1008

of student information in order to assign student identifiers and a separate database stores the detailed longitudinal data about each student.[222]  The alternative system currently in practice is a "unified" database containing both identifying data and longitudinal data.[223]  The unified databases tend to rely on access restrictions to separate various data elements from general use. Each of these systems is discussed in greater detail below.

    As we reviewed the various types of databases, we considered whether the technical architecture was adequately designed to protect privacy by assessing whether the data flows in each structure supported compliance with FERPA's requirements and exceptions.  As we discussed above, FERPA requires written parental consent before the disclosure of personally identifiable non-directory information unless:  (i) the data is being used by the state for audit and evaluation purposes, subject to the requirements discussed above; or (ii) all personally identifiable information has been removed.[224]

    The architecture that a state adopts for the use of student identifiers in the database is a key factor in the protection of student privacy and for FERPA compliance.  Some type of unique student identifier ("USI") is necessary for states to implement statewide longitudinal databases. Privacy concerns and FERPA obligations depend on the link between the USI and individual students' identities.  If the USI is being used generally to identify a student for multiple purposes within the state or local school district, then the reporting of educational records by the local school districts to the state database may only be made for audit and evaluation purposes, because the student identifier functions as personally identifiable information and would thus not qualify for the anonymity exception.  However, when an institution successfully creates a non-personally identifiable USI that is used specifically for reporting information from the local educational agency to the state, that data reporting qualifies as a permitted disclosure of 'anonymized' data; all other personally identifiable information is withheld.  An important element in ensuring the USI is an anonymous identifier to qualify for the permitted disclosure is whether state level employees can trace a USI to a specific student.  Anonymity can only be accomplished when state level employees have no access to the linking key between the USI and the personally identifiable information, and no way to infer the identity of a specific student from the available data.

    The permitted disclosure of anonymous information to the state for non-audit and evaluation purposes also depends on whether the data flows into the state database system operate to prevent re-identification of individual students.  A statistical disclosure and, thus, re-identification arises when the number of students in a dataset or with a specified characteristic is small enough to permit re-identification of a single individual.  For instance, in a search of the state assessment scores of minority students, a particular school might report information to the state that corresponds only to one student.  It would not be hard to ascertain the identity of that student whose entire assessment information is publicly available.   The disclosure by the local school district to the state would violate FERPA unless the disclosure to the state was made in compliance with the audit and evaluation exception.  Re-identification is a major risk for disclosures related to any small number of children.  Statistical cutoff procedures must be applied to ensure confidentiality.

    The NCLB reporting obligations require safeguards to limit statistical disclosures of individual student information.  NCLB, for example, requires states to report information disaggregated by subgroup (e.g. race, gender) unless the disaggregation would result in a

---

[222] It appears that the following states use this architecture: Arkansas, Arizona, California, Colorado, Georgia, Illinois, Kansas, Michigan, New Hampshire, New York, Ohio, Rhode Island, South Carolina, and Texas.
[223]  It appears that the following states use this architecture:  Louisiana and Nebraska.
[224] *See supra* note 46.

statistical disclosure.[225]  To prevent the inadvertent reporting of personally identifiable information, it is necessary to have a minimum subgroup size.   NCLB allows the states to set the cutoff for minimum subgroup sizes.  The National Assessment of Educational Progress of the federal Department of Education uses 62 students as the minimum size reporting group to avoid statistical disclosures and the National Center for Education Statistics, the federal entity charged with collecting and analyzing data related to education, reports that the majority of states use subgroups ranging from 25 to 45 students as the minimum number for statistically reliable results."[226]  This approach also needs to be used when local school districts report student information to a state database for purposes other than the state's audit and evaluation of programs.  Nevertheless, with such a small subgrouping, re-identification will remain a serious issue.

> ### a.  Dual Database Systems

Dual database systems collect student information in two separate databases.  Most commonly, states use one database to collect demographic information in order to generate a USI and a second database to hold student records longitudinally for state access.[227]  The most common USI system requires the state employee or agent to enter a set of demographic data into the first database for the generation of a USI.   An algorithm or random number generator then converts each student's demographic data into an assigned, unique number.   As part of the USI generation process, the system uses the demographic data to verify that each student only has one USI by checking for matches with existing records.  This matching process is used to assure record-keeping accuracy for the educational data.  The USI is then used, instead of other identifiable information such as student name or birth date, to link student records longitudinally in the second database.

The dual database architecture tries to limit the personally identifiable information contained in the database that is accessed by state officials.  Some of the dual database systems are more successful than others at anonymizing student information.  Many states, though, seem to assume that use of a USI (instead of other demographic information) protects privacy.  However, in many instances, the USI itself remains personally identifiable information under FERPA because of an incomplete separation between the identifier and the individual student's identity and records.  In addition, statistical disclosure often remains an issue.  For example, if someone at the state level is able to trace a USI backwards to the local level or into the USI database in order to discover the identity of a specific student, the USI is personally identifiable.  In such instances, the release of records to the state officials must comply with the requirements of the audit and evaluation exception of FERPA.

In reviewing the dual database systems, the states appear to use three types of architecture.   In the first type, the state maintains both the USI database and a separate database for the student records.[228]   For this structure, local school officials transmit or input the demographic data into the state's USI database and into the state's longitudinal database.   This processing is a disclosure of personally identifiable children's data.   As such, FERPA allows this

---

[225]  20 U.S.C. § 6311(h)(1)(C)(i) (2002).

[226]  NAEP Analysis and Scaling – Minimum School and Student Sample Sizes for Reporting Group Results, http://nces.ed.gov/nationsreportcard/tdw/analysis/summary_rules_minimum.asp (last visited June 30, 2009); UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE, NO CHILD LEFT BEHIND ACT— IMPROVEMENTS NEEDED IN EDUCATION'S PROCESS FOR TRACKING STATES' IMPLEMENTATION OF KEY PROVISIONS 14, http://www.gao.gov/cgi-bin/getrpt?GAO-04-734  (last visited June 30, 2009).

[227]  It appears that the following states use this architecture: Arkansas, Arizona, California, Colorado, Georgia, Illinois, Kansas, Michigan, New Hampshire, New York, Ohio, Rhode Island, South Carolina, and Texas.

[228]  Vermont, Kansas, Texas, and Georgia appear to use this type of system, *see infra* app H.

AR 1010

disclosure only for audit and evaluation purposes and only if the criteria established for these purposes are met, including deletion of the data at the conclusion of the audit or evaluation.

In the second type of dual database architecture, the USI is assigned at the local level while the longitudinal database with student record data is maintained at the state level.[229] States that use this design still typically permit state officials to have access to the local USI database in order to verify the information in the longitudinal database.   As a result, the longitudinal data held by the state is personally identified because state officials can trace children's records back through the USI database to identify specific students.   Consequently, this architecture would, under FERPA, limit the disclosure by local schools of the student records to audit and evaluation purposes.

While these dual database architectures as presently designed seem to qualify only for audit and evaluation uses, the states that have implemented these architectures do not appear to meet the procedural requirements under FERPA.  FERPA requires that the data be deleted once the audit and evaluation programs are completed.[230]   Our review revealed that most states do not have any apparent data retention policies nor any apparent procedures for data deletion.  In addition, these basic architectures of the student databases do not appear to limit the uses of the data to audit and evaluation purposes.

In the third type of dual database architecture, some states take a further step in the design of their system and seek to create a firewall between personally identifiable information and the state's longitudinal database by using third parties to generate the USI numbers.[231]  The FERPA summary above discussed the guidance the FPCO has provided agencies and institutions implementing these systems to ensure the creation of a non-personally identifiable USI.[232]  This guidance essentially outlines three requirements that should be in place before a USI tied to an educational record is considered anonymous and, therefore, within the "non-personally identifiable" exception of FERPA:

> (i)   the USI must be something other than a scrambled social security number or student number, unless the USI is protected by "written agreements reflecting generally accepted confidentiality standards within the research community" and only those with "access to the linking key" would be able to link a student to their record;
> (ii)  the data from the records may only be released "in a manner that ensures that the identity of any student cannot be determined, including assurances of sufficient cell and subgroup sizes;" and
> (iii) the key that links the USI to identifiable information "is itself an education record subject to the privacy protections of FERPA" and it must not be shared with anyone outside the "agency or institution."[233]

The states opting for this design (using third parties to generate the USI) seek to create the necessary boundary between the linking key and the children's personal information so that the

---

[229]  Arkansas, Arizona, California, Colorado, Illinois, Michigan, Ohio, New Hampshire, Rhode Island, South Carolina, and New York appear to use this type of system, *see infra* app H.
[230]  20 U.S.C. § 1232g(b)(3)(C).
[231]  Arizona, California, New Hampshire, Ohio, Rhode Island, and South Carolina all have the separate databases used to create the USI that are maintained by third parties, *see infra* app H.  There may be other states who also utilize a separate third-party maintained database system but this information was often difficult to obtain publicly.
[232]  *See* Section II.B.1(a).
[233]  *See supra* note 30.

AR 1011

data reported to the state's separate longitudinal database can qualify as "non-personally identified" data in terms of FERPA.

When states create USI numbers that qualify as non-personally identifiable numbers, local school districts may report student data to the state database without parental consent.[234] Under these conditions, the state's use of the data is not limited to audit and evaluation purposes. When this advisory guidance is not followed, however, the USI may still be personally identifiable information and, as such, would still be subject to the requirements of FERPA unless the audit and evaluation exception applies.

For the majority of states, their adherence to the "linking key" guidance in the creation of the USI numbers is unclear.[235]  Our research of publicly available information determined there are only three states, New Hampshire, Kansas, and Ohio, that appear to be adhering to FPCO guidance on rendering data non-personally identifiable.[236]  Additionally, New York removes student names and the unique identifiers are encrypted when school records leave the local level.[237]  The 10 additional states that collect demographic data exclusively for USI purposes seem to utilize systems that may be able to comply with FPCO guidance, but either all of the protections are not in place or the specific details of their system are not available.[238]

As examples of effective architectures, New Hampshire and Ohio have each contracted with third parties to develop and maintain their USI databases.[239]  For these states, the third parties generate the USI and the local school districts anonymize the student record data before reporting the data to the state.  Procedurally, the local school district sends a student's demographic data, via a web based application, to the third party.  The third party then generates and reports the USI to the local school district.  This USI is then used, instead of any other personally identifiable information, when sending assessment data to the longitudinal database. In turn, state officials gain access from the longitudinal database to records using only the USI, and statistical measures are in place to ensure that the child's information is not personally identifiable.   This architecture means that only school personnel at the local level know which USI is linked to an individual student.  Additionally, only the third-party generating the USI would know the "linking key" between the demographic information and USI.   In the New

---

[234] If, however, the data reporting results in a statistical disclosure of children's identities, then the restrictions on personally identifiable data will apply.

[235] Most states and local school districts appear to follow the second prong of the FPCO guidance with respect to statistical samples and use sufficient group sizes to limit statistical disclosures of personally identifiable information, but it is not clear whether most states conform with the rest of the FPCO guidance.

[236]  New Hampshire, Kansas and Ohio apparently adhere to the FPCO guidance; California and Illinois seem to be in the process of developing this type of system as well. *See, e.g.*, Application for Grants Under the Statewide Longitudinal Data Systems (Mar. 15, 2007), *available at* http://nces.ed.gov/Programs/SLDS/pdf/Kansas.pdf (Kansas's application for grants); ODE—2003 EMIS Manual, http://www.ode.state.oh.us/GD/Templates/Pages/ODE/ODEDetail.aspx?page=3&TopicRelationID=1101&ContentID=12084&Content=50921 (last visited May 25, 2009); ODE—Statewide Student Identifier, http://www.ode.state.oh.us/GD/Templates/Pages/ODE/ODEDetail.aspx?Page=3&TopicRelationID=3&Content=60670 (last visited May 25, 2009); Policy and Procedures Manual for i4see and Related Data (Sept. 4, 2007), *available at* http://www.ed.state.nh.us/education/datacollection/i4see/NH%20i4see%20Policy%20Manual%20v080220.doc.

[237]  NY State Student Identification System User Guide, Version 5.4 (Dec. 29, 2006), *available at* http://www.emsc.nysed.gov/nysstudents/nyssisguide.doc.

[238]  *These states are:* Arkansas, Arizona, California, Colorado, Georgia, Illinois, Michigan, Rhode Island, South Carolina, and Texas.

[239]  For details on these USI and longitudinal databases, see ODE—2003 EMIS Manual, *supra* note 236; ODE—Statewide Student Identifier, *supra* note 236; Policy and Procedures Manual for i4see and Related Data, *supra* note 236.

AR 1012

Hampshire and Ohio models, the third party is bound by a confidentiality agreement to not share any personally identifiable information to which they are exposed, including the "linking key."[240] This appears to conform to the FCPO guidance on anonymization.   In effect, this structure seeks to assure that the state only maintains a database containing non-personally identifiable information, assuming that the proper statistical disclosure rules are in place before any information is sent on to the state level.

Whether most states adopting dual database architectures have structured their systems to enable compliance with FERPA is unclear, because there is only limited information available on how most states manage their USI databases and grant access to them.  Generally, the only information available is that a separate USI system exists.  For example, Indiana provides information about FERPA, but does not explain how the state's system is in compliance with the act.[241]  Likewise, Georgia makes no mention of any privacy protections or how the state's USI system functions.[242]  South Carolina, however, says the state will securely keep all personally identifiable information in an USI database and no other state agency will have access to that database.[243]  It is often unclear, however, how the USI is generated and who maintains access to the linking key.  In these cases, if anyone at the state level has access to the linking key, then the USI is considered personally identifiable information and the state's access to and use of the educational records must conform with the audit and evaluation exception.

Nevertheless, a properly structured dual database system seems to be a viable option for enabling anonymization.  All personally identifiable information is maintained separately from assessment data and can be easily subjected to heightened security precautions.  Furthermore, personally identifiable data is only relevant while a student is attending school so that their USI can be matched and verified.  Once the student is no longer within the educational system, the personally identifiable data and the USI linking key should be expunged.  While individual assessment data may be useful to educators and researchers for many years after a particular student leaves the educational system, there is no reason for that data to remain linked to the student.  The dual database system allows states to develop specific data retention policies that require personally identifiable information to be removed regularly while assessment data could remain until no longer needed.

---

[240]  California is also in the process of developing this type of system, see *infra* app H.

[241]  *See* Balancing Student Privacy and School Safety: A Guide to the Family Educational Rights and Privacy Act for Elementary and Secondary Schools, *available at* http://www.doe.in.gov/stn/pdf/FERPA.pdf (last visited May 25, 2009).

[242]  *See generally* Georgia Department of Education—Data Warehouse, http://www.doe.k12.ga.us/pea_infosys.aspx?PageReq=DataW (last visited May 25, 2009).

[243]  *See* South Carolina Department of Education SCEDS and SUNS Data Access and Management Policy, *available at* http://ed.sc.gov/agency/Accountability/Technology-Services/Documents/5-3DraftDataAccessPolicy.pdf (last visited Mar. 4, 2009).

AR 1013

---

### Data Summary Chart – 4

#### *ANONYMIZING DATA:  DUAL DATABASE STRUCTURES*

- *Only 6 states appear to use a third party who restricts the state's access to the student ID numbers (i.e. prevents state access to individual student data)*

- *4 states store both the student ID numbers and the longitudinal database at the state level (i.e. allows state access to individual student data)*

- *11 states store the student ID numbers locally but allow state employees access (i.e. allows the state access to individual student data)*

---

b.  *Unified Database System with Access Restrictions*

States that rely on the unified database architecture maintain a single database that contains all of a student's personally identifiable information and assessment data.[244] States adopting this approach attempt to protect personally identifiable information by controlling who may access specific data.  In the unified database models, access restrictions are imposed for specific data elements in an attempt to ensure confidentiality of personally identifiable information.

In the unified database architecture, the state assigns an access level to each data element in the database.  A user is allowed access to the levels of data in accordance with the user's role.  This means that the entire student record is not available to the user; rather, the user may only access the elements in the record that are relevant to the user's authorized activity.  While there is still a need for a mechanism to preclude statistical disclosure, states that use this system maintain that the levels are designed to maximize use by educators without risking additional inappropriate disclosures to the state or public.

In such a system, for example, every data element might be assigned an access level between 1 and 3.  In this example, level 1 data is the most protected and would include personally identifiable information.  The level 1 data would only be accessible at the local school level.  This would allow school administrators to accurately verify a USI, correct, change or make additions

---

[244]  Arizona, Florida, Maine, Maryland, Massachusetts, Minnesota, Mississippi, Nebraska, Nevada, New Jersey, Pennsylvania, Tennessee, Virginia, West Virginia, and Wyoming do not have any information on a separate database for USI, see *infra* app H.  However, some of these states have contracts with vendors who design and implement USI systems.  It is unclear whether the USI is generated separately and then input into the single database, or if there are multiple databases that we were unable to find during our research.

AR 1014

to the student's record, and share the record among all of the students' teachers. Level 2 data would be all data that needs to be aggregated for reporting. This would include race, gender, and assessment scores, but not personal information, like telephone numbers, that is only needed at the local level. The level 2 data would be available to a small number of administrators at the state department of education and access would be limited for "audit and accreditation" purposes only. While it would be possible in certain instances to identify a student by analyzing a combination of these data elements, the USI would ordinarily be the only personally identifiable information accessible to the state administrators. Level 3 data would not include any personally identifiable information and would be accessible to all officials at the state level in addition to parents and other educators.

In our review of states using unified database architectures, it was unclear who defines the access levels. In general, the detailed functioning of these systems was not disclosed in publicly available information. It often appeared that the access levels were defined by the state department of education, but it was unclear whether access permissions were authorized for each user by the state or by a local educational agency employee. It was also unclear what types of uses were granted to each access level. Importantly, in many instances, permissible use of the data did not appear to be addressed in the definitions of the access levels.

States using this approach, nevertheless, have their own variants. For example, Nebraska uses a unified database system with access controls.[245] Nebraska assigns every data element in the system an access level between 1 and 3, with level 1 being the most protected data. Level 1 data is likely to include the entire school record including personally identifiable information and assessment data. In Nebraska, Level 1 access is given to the state department of education staff where "a minimal number of staff will be given access to all the information in the database."[246] State access to this personally identifiable information seems counterintuitive and problematic under FERPA. It would seem that access for the personally identified data should be found at the local level rather than at the state level. Nebraska uses their Level 2 access for "audit and accreditation" and states that only some state department of education staff will have access to a limited set of data. The Level 3 access in Nebraska is reserved for district and school personnel and limits their access to individual records. Although we could not find specific details regarding these limits, they are probably determined by a role based system.

2.  Other Key Privacy Protections

There are a number of ways, in addition to database structure, that states are attempting to protect the privacy of students' records. Good privacy protections at both the local and state level include defining users and specified, legitimate purposes of use, requiring confidentiality agreements for individuals who handle student records, developing specific data retention policies, and making information about FERPA rights and obligations available and accessible to parents.

---

[245] *See generally* Nebraska Data Access and Management Policy, *available at* http://www.nde.state.ne.us/nssrs/Docs/NE_Data_Access_and_Management_Policy505.doc (last visited Mar. 4, 2009).
[246] *Id*. South Carolina, Kansas, and Iowa have similar language regarding who at their respective DOE has access to the database, see *infra* app H.

AR 1015

---

**Data Summary Chart - 5**

*EXISTENCE OF KEY PRIVACY PROTECTIONS*

- *Only 18 states have detailed access and use restrictions*

- *Only 18 states require database users to enter into confidentiality agreements*

- *Only 10 states have data retention policies*

- *49 states make FERPA information accessible on the Internet, but for many the information is hard to find, vague or incomprehensible.*

---

a.   *Defined users and specified, legitimate purposes of use*

Eighteen states[247] have some type of detailed access restrictions outlined in their materials.  The remaining 24 states that we reviewed merely make a generalized reference to FERPA when discussing who can access records and for what purposes.  Defining users and specifying the permissible uses of the database are essential to protect privacy in both dual and unified database architectures.  Access can be assigned based on a user's role, a student's enrollment, or may be assigned after an application process.  The failure to include access and use restrictions puts children's privacy at risk.

Users should be school officials with a legitimate educational interest.  A "school official with a legitimate educational interest" is defined by the NCES as: (i)"a person employed by the agency or school in an administrative, counseling, supervisory, academic, student support services or research position, or a support person to these positions[;]" and (ii) "[a] person employed by or under contract to the agency or school to perform a special task."[248]  Interestingly, the NCES also stated that "protection of privacy and data accuracy are essential to any data coordination efforts.  However, these protections do not have to be absolute barriers to data coordination . . ."[249]

Role based access typically allows a user to access children's records when the user has a legitimate educational interest in the records.  Some states use these restrictions to protect children's privacy in addition to having a separate USI database.[250]  Specifically, a superintendent

---

[247]  Arkansas, California, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Mississippi, New Hampshire, Ohio, Pennsylvania, Rhode Island, South Carolina, South Dakota, and Virginia.
[248]  NATIONAL CENTER FOR EDUCATION STATISTICS, PROTECTING THE PRIVACY OF STUDENT RECORDS: GUIDELINES FOR EDUCATION AGENCIES 58  (1997), http://nces.ed.gov/pubs97/97527.pdf.
[249]  *Id*.
[250]  California, Iowa, Illinois, Kansas, Montana, New York, and South Carolina, *see infra* app H.

AR 1016

may see all of the data collected about any of the students in the school district; a principal may see all of the data collected from students in the principal's school; and a teacher may see all of the data related to the teacher's students.   For example, in New York, the state defines four levels for data set elements and access depends on the nature of the data and ranges from school-based to statewide.[251]

Similarly, Illinois has different access levels for the "general user" and the "administrator."  The general user can place online requests for new student identifiers for an individual student and search for existing student identifiers and student enrollment records.[252] The administrator has access to all the functions of the general user plus the ability to change student demographic, enrollment/exiting, and participation indicator data after a student identifier has been assigned.[253]

Enrollment access allows a user to access data of those students who are enrolled in the user's class, school, or district.  Although these enrollment and role-based access systems are similar, enrollment access appears to be more specific and ensures that access to an individual record will be prohibited when a student transfers out of a class, school, or district.

Application based access is assigned after a user submits an application to access the database.  States will often require an authorized official to control access.[254]  That person will give permission by providing a username and password to access the database.  Information about the typical application process and approval authority was not generally available.  In four of the states that use this process, the applicant must sign a confidentiality agreement in addition to receiving the approval of a school official.[255]  However, we could not find specific information on what factors the school officials use to approve an applicant or the eligibility criteria for applications.  This safeguard appears to be problematic because the descriptions of access and use limitations are very general.   For example, some states merely declare that only appropriate users will have access, while other states indicate that access will be granted in accordance with FERPA.[256]   The vagueness of these policies suggests that application based access is a weak protection for children's privacy.

In addition to defined users, processes need to be in place for approving uses beyond the original purposes of the database.  There are two ways that agencies can release data to researchers in compliance with FERPA:  (i) a local school district can grant specific research rights; or (ii) the state can release non-personally identifiable information.  The majority of states either do not have detailed processes for approving researchers' use of data or do not make that information easily available.   A few states, however, have developed detailed processes for granting specific research rights when third party researchers or other users want to access data.  For example, before disclosure in New Mexico, parental consent must be given and the parents must specify the records to be released, the reason to release them, and identify the groups or

---

[251] *See* New York State Student Information Repository System (SIRS) Manual—Reporting Data for the 2008-2009 School Year 24-25 (2008), *available at* http://www.emsc.nysed.gov/irts/SIRS/2008-09/2008-09SIRS-MANUAL-4-1.pdf.

[252] ISBE Student Information System User Manual, http://www.isbe.state.il.us/sis/html/user_manual.htm (last visited Oct. 22, 2009).

[253] *Id*.

[254] Arkansas, Illinois, Mississippi, South Carolina, (superintendent controls access), California (requests for access reviewed by LEA and CDE staff in a "procedure"), Kansas (requires district approval), Massachusetts (applications managed by Directory Administrators), Virginia (local account manager grants access), see *infra* app H.

[255] Illinois, Kansas, Mississippi, and South Carolina, see *infra* app H.

[256] *See* Kansas, New Mexico, New Hampshire, New Jersey, Pennsylvania (in accordance with FERPA), Iowa, Michigan, Pennsylvania, Rhode Island, South Dakota (only authorized users will have access), see *infra* app H.

40

AR 1017

individuals who will receive the records.[257]  Likewise, Kansas has a very detailed policy for disclosure to researchers that includes review by a "data request review board." of a researcher's proposal.  Additionally, if a proposal is accepted, the researcher must sign a confidentiality agreement.[258]

### b.  Confidentiality Agreements

Eighteen states explicitly mention that they require confidentiality agreements to be executed by users of the state database.[259]  For example, in Iowa, system users must sign an assurance statement covering system usage before they are given access to the system.[260]  The Illinois vendor contract with IBM states that all third parties to whom information is disclosed must sign confidentiality agreements and all employees and subcontractors with access to student record information must sign confidentiality agreements as well.[261]  Additionally, when the Kansas Department of Education discloses personally identifiable information of students to organizations for research and analysis purposes, the recipient organization must sign an Acknowledgment of Confidentiality Requirements.[262]

In some of these states, the confidentiality agreements are mandated by statute.[263]  For example, Ohio users are bonded against unauthorized use and release pursuant to state law.[264]  The confidentiality agreements, however, are typically directed at personally identifiable information and do not necessarily pertain to the USI linking key.[265]  Throughout the course of our research we found that only New Hampshire and Ohio assert that the USI linking key is protected and will never be released to the state level education agency.[266]  These are the only two states explicitly adhering to the first and third prong of the FPCO guidance regarding an USI linking key.  If there are specific confidentiality agreements for those with access to linking keys in any other states, agreements do not appear to be publicly available.

---

[257]  Student – Teacher Accountability Reporting System Volume 2 Reference Materials 2007-2008, *available at* http://www.ped.state.nm.us/stars/dl09/SY2009%20STARS%20MANUAL-VOLUME%202.pdf (last visited Mar. 4, 2009).

[258]  *See* KSDE Data Access and Use Policy—Personally Identifiable Student Information (2006), http://www.ksde.org/LinkClick.aspx?fileticket=ndfZ%2bqai7vQ%3d&tabid=2508&mid=6013 (last visited May 24, 2009).

[259]  Illinois, Iowa, Kansas, Louisiana, Michigan, Mississippi, Montana, New Hampshire, New Jersey, North Carolina, Ohio, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, West Virginia, and Wisconsin, see *infra* app H.

[260]  *See* State ID Policy Assurance Statement, *available at* http://www.iowa.gov/educate/index.php?option=com_content&task=view&id=1&Itemid=1264 (last visited Mar. 6, 2009) (follow the links to download the statement).

[261]  Contractual Agreement Between Illinois State Board of Education and International Business Machines Corporation (on file with CLIP).

[262]  Kansas Individual Data on Students - Answers to Parents' Questions (Apr. 2005) (on file with CLIP) [hereinafter Kansas Answers to Parents' Questions].

[263]  *See* Ohio, Minnesota, Montana.

[264]  *See* OHIO REV. CODE ANN. § 3301.0714(k) (2008), *available at* http://codes.ohio.gov/orc/3301.0714.

[265]  Kansas, Louisiana, Michigan, Mississippi, Montana, New Jersey, Pennsylvania, South Carolina, South Dakota, and Wisconsin have general confidentiality agreements for individuals accessing school records; Iowa, New Hampshire, North Carolina, Ohio, Texas, and West Virginia have more specific confidentiality agreements relating to users of the ID database, see *infra* app H.

[266]  Only Ohio and New Hampshire have this information publicly accessible. *See* FY2003 EMIS Guide, Appendix L—Student Identifier (SID), http://www.ode.state.oh.us/GD/DocumentManagement/DocumentDownload.aspx?DocumentID=12603 (last visited May 26, 2009).  California and Kansas may also have this policy, but it was not clear from publicly available materials, see *infra* app H.

41

AR 1018

*c.  Data Retention Policies*

Only ten states provide a detailed data retention policy for the state database.[267]  This small number is significant because student information could potentially be held in these data warehouses indefinitely.  A data retention policy should limit the duration of storage of educational records and inform students, parents, and data warehouse users how long data will be kept.  For example, North Carolina states that data is kept for two years after the graduation or withdrawal of a particular student.[268]  North Dakota recommends the retention of data for four years.[269]  In addition, Connecticut maintains a detailed records retention schedule but does not clearly require the purging of historical information.  Instead, the policy requires certain records to be kept for a minimum of six years.[270]  Montana's data retention policy is required by statute.[271]  In Montana, the school district is obligated to inform parents when personally identifiable information is no longer needed to provide educational services to the student.  Following this notification, parents may request the information be destroyed, but a permanent record of the student's enrollment must be maintained.[272]

Thirty-two states had no data retention policy listed, or described very generally when data would no longer be stored.[273]  For example, when describing record retention, Kansas broadly states that "information will be destroyed in a manner that protects confidentiality when information is no longer needed."[274]  In West Virginia, directory and grade information are kept in perpetuity.[275]

The many beneficial reasons for maintaining detailed historical databases are beyond the scope of this study.  However, it is important to note that, while the retention of historical data can be beneficial, the legitimacy of the state retaining personally identifiable information is highly doubtful.[276]  Accordingly, all personally identifiable information, including USI's, should be cleansed from databases as early as graduation or the termination of education or when no longer needed for legitimate educational purposes.

---

[267] Colorado, Connecticut, Michigan (authorizes deletion but does not require), Minnesota, Missouri, Montana, North Carolina, North Dakota, South Carolina, and Texas, see *infra* app H.

[268]

[269] *See* STATE OF NORTH DAKOTA DEPARTMENT OF PUBLIC INSTRUCTION, 2008-2009 LEA AND SCHOOL FALL REPORTS AND DIRECTORIES 2 (2008), http://www.dpi.state.nd.us/resource/ORS/mis/mis01_02_instr.pdf.

[270] *See* Bob Lichtenstein, *FERPA & Record Keeping Powerpoint Presentation*, Oct. 2005 (on file with CLIP).

[271] MONT. CODE ANN. § 20-2-212 (2007); Montana Local Government Retention and Disposition Schedules X, XIII (on file with CLIP).

[272] *See* 34 C.F.R. § 300.573 (2000); MONT. CODE ANN. § 20-1-213 (2007).

[273] Arizona, Florida, Georgia, Kansas, Nebraska, New Hampshire, New Mexico, West Virginia (general or undefined retention schedule); Arkansas, California, Delaware, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maine, Massachusetts, Mississippi, New Jersey, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Vermont, Virginia, Washington, and Wisconsin (no retention policy publicly available), see *infra* app H.

[274] Kansas Answers to Parents' Questions, *supra* note 262.  Nebraska and New Mexico also utilize this broad "no longer needed" language.

[275] W.V. State Board of Education Policies, Article 1 Policy 4350 §126-94-11 (on file with CLIP).

[276] There are an increasing number of states that are attempting to maintain a longitudinal database through the completion of post-secondary education.  These states may contend that personally identifiable information should be retained indefinitely because some students do not pursue higher education immediately after the completion of high school (Arizona, California, Delaware, Florida, Indiana, Louisiana, New Hampshire, North Carolina, Rhode Island, and Vermont).

AR 1019

d. *Availability of information related to FERPA rights and obligations*

FERPA requires that educational agencies provide information to parents regarding their rights under FERPA and give information to parents regarding the parents' right to review and correct errors in their child's educational records.  This notification requirement gives parents greater control over the disclosure of their children's educational records.  Since state departments of education are gathering and holding student educational records, we examined how they complied with this notice requirement.  We specifically looked at the state education department websites, since that is often where information regarding the state database is found and that is where many parents are likely to turn if they have questions regarding the database and their rights.

Forty-nine states had FERPA information accessible on their websites.  Alabama was the only state that did not seem to have any FERPA information available.  In both Montana and Nebraska, FERPA is consistently referenced on the websites, and these states explain how their data warehousing policy is in compliance with FERPA.  In Montana, the policy states that parents are to be told of their rights under FERPA whenever relevant.[277]  In Nebraska, specific sections of FERPA are cited extensively throughout the website.[278]  Similarly, Florida has detailed protections listed in their website materials of how they protect student information in accordance with FERPA.[279]

While most states do provide FERPA information to parents, some are more accessible than others.  For example, Kansas offers, via their website, a conspicuous notice to parents of FERPA rights.[280]  Similarly, Montana constantly compares the state's policies to the FERPA requirements.[281]  Other states provide the FERPA notices on their websites, but the information can only be found if one is specifically looking for it.   For instance, on the Rhode Island website, the information could only be located by typing "FERPA" into a search field because it was buried in a legal section on the website that would not be an obvious place for parents to look.[282]

## C.  Third Party Vendors

### 1.  Vendor Contracts

Most states appear to use third party vendors ("vendor") for some portion of their longitudinal data collecting and reporting needs.  Some vendors market packages primarily for consulting services and assistance in data driven decision making, while others supply software and hardware for a state's entire data collection and analysis program.  The range of vendors included: Big 5 Data Centers, Claraview, Inc., Cognos Business Solutions, Controltec, Inc., Deloitte Metadata Solutions, Education Statistics System Workbench, My Consulting Group, Regional Information Centers, Public Consulting Group, SAS Institute, Inc., Third Day Solutions, Wen-GAGE, and X-Wave.  However, Infinite Campus, Computer Power Solutions of Illinois (CPSI), eScholar, IBM, and ESP Solutions Group were used with a notable frequency among the states and will be discussed below in greater detail.

---

[277] *See* Montana Office of Public Instruction, http://opi.mt.gov (last visited May 26, 2009).

[278] *See* http://www.nde.state.ne.us/ (last visited May 26, 2009).

[279] *See* Florida Depatment of Education, FERPA, http://www.fldoe.org/ese/ferphome.asp (last visited May 26, 2009).

[280] *See* Kansas State Department of Education, Data Access and Use Policy, *available at* http://www.ksde.org/Default.aspx?tabid=83 (last visited Oct. 20, 2009).

[281] *See* Montana Office of Public Instruction, Student Records Confidentiality Policy, *available at* http://www.opi.state.mt.us/ (last visited May 26, 2009).

[282] *See* http://www.ride.ri.gov/commissioner/legal/ferpa_ppra.aspx (last visited Oct. 20, 2009).

43

AR 1020

While some states use a single vendor for a specific task, others use a combination of vendors to satisfy the scope of their needs.  The vendors' services are marketed separately to both local and state educational agencies.  Our review, however, is focused primarily on statewide vendor agreements. Such agreements are required under FERPA to be between the vendor and the state department of education and to provide that the vendor is under the direct control of the department of education for the specific purposes of providing audit and evaluation services.[283] Additionally, most vendors offer customizable service packages and options to suit the needs of any education entity.  As a result, two service contracts are rarely identical, even when the same vendor is involved.

Below, we have highlighted the general privacy or security provisions found in the contracts between six states and their respective vendors.   These six states are representative of the statewide development contracts that we were able to identify from publicly available information.  When it appeared from the publicly available information that a state department of education used a third party vendor to provide full statewide database development services, we requested a copy of the vendor contract from the department of education.  Requests were sent to several states, but only the contracts received from the six states below appeared to be full statewide development agreements.  Additional states may have statewide development agreements, but such information either was not publicly available or the state's response to our inquiry did not produce such an agreement.

### a.   Illinois State Board of Education (ISBE)

ISBE contracted with IBM for the development of a statewide longitudinal data system to satisfy NCLB requirements.[284]  The contract states that ISBE retains IBM "as contractor" to "design, develop, implement, and document" the system and co-manage it with ISBE.[285] Although we were not provided with the contractual exhibits setting forth the database specifications, it appears from the contract and its amendments that IBM develops the system's operational software and stores the database on its servers.  Employees at each local school district send student information to the database via a web application. IBM then produces anonymous state IDs and provides assessment data to state level employees.  Details regarding access and use restrictions or storage duration were not available in the documents we reviewed.

The agreement recognizes that IBM will come in contact with confidential student information and acknowledges the need for compliance with "the relevant requirements [of FERPA].[286]  To further protect privacy, the contract requires IBM to "limit access to student education records to those employees who reasonably need access to them in order to perform their responsibilities" and also requires each employee execute a confidentiality agreement.[287]  In order to ensure compliance with this confidentiality clause, the agreement also requires IBM to keep an access record of all of its employees that access the database.[288]

---

[283]  *See*  Memorandum from William D. Hansen, Deputy Secretary of Education to Chief State School Officers, Additional Guidance on the Application of the Family Education Rights and Privacy Act (Jan. 30, 2003), *available at* http://www.ed.gov/policy/gen/guid/secletter/030130.html; California 2004 FPCO letter, *supra* note 17.

[284]  Contractual Agreement No. my05211 by and between Illinois State Department of Education and International Business Machines Corporation, dated July 14, 2004, as amended, p.1 [hereinafter the Illinois-IBM Agreement No. my05211] (on file with CLIP).

[285]  *Id.*

[286]  *Id.* at 8.

[287]  *Id.*

[288]  *Id.*

AR 1021

### b.   *Kentucky Department of Education (KDE)*

The KDE provides an example of a state dividing some of the processing functions for its database across multiple vendors.  KDE contracted with Infinite Campus to furnish hardware and software for the statewide student information system.[289]  Separately, KDE contracted with Claraview, Inc. to develop a web interface that would provide general assessment information to the public.[290]

Under the Infinite Campus contract, Infinite Campus provides servers to store the database and develops the software for the system.[291]  Infinite Campus also supplies the data dictionary and the training for staff that is needed to implement the project.[292]  The agreement and attachments do not specify obligations for Infinite Campus to apply particular security, access or use restrictions to the database.

Under the contract between KDE and Claraview, Claraview agreed to develop a web application for the display of student reports.  The terms of the agreement require that Claraview's web interface be "accessible by a variety of different system stakeholders including parents, teachers, [and] school administrators."[293]  While the detailed specifications of this project were not provided, it appears that the Claraview application will interface with the database stored by Infinite Campus and take data from the database to generate assessment reports for the general public.  The only clause related to privacy in the agreement itself states that "[a]ll Federal and State Regulations and Statutes related to confidentiality shall be applicable to the Contractor."[294]

### c.   *Montana Office of Public Instruction (MOPI)*

MOPI also contracted with Infinite Campus for the development of "a state-level Data Warehouse, Student Information System and Special Education Records Information Management System that would be accessible to the State Education Agency and all Local Education Agencies within the State of Montana."[295]  Like the Kentucky system, it appears that the database would be located on Infinite Campus servers.  The contract does not set forth precise specifications for the database system.  Notably, the agreement does not include any specific privacy or security clauses.

### d.   *Maine Department of Education (MDOE)*

MDOE contracted with Xwave to develop a state level database, the Maine Education Data Management System (MEDMS), in order to receive student records from each local school district's student information system.[296]  The contract provides that MEDMS and the local

---

[289]  Master Agreement No. MA 758 S-06137527 by and between Kentucky Department of Education and Infinite Campus, dated Dec. 1, 2006 [hereinafter the Kentucky Infinite Campus Agreement] (on file with CLIP).

[290]  Master Agreement No. MA 758 0700001487 by and between Kentucky Department of Education and Claraview, Inc., dated June 1, 2007 [hereinafter the Kentucky Claraview Agreement] (on file with CLIP).

[291]  Kentucky Infinite Campus Agreement, *supra* note 289, at ¶ 4.

[292]  *Id.* at attachment A.

[293]  Kentucky Claraview Agreement, *supra* note 290, at 1.

[294]  *Id* at 8.

[295]  Contract No. OPI-1203O by and between Montana Office of Public Instruction and Infinite Campus, as amended, 5 [hereinafter the Montana Infinite Campus Agreement] (on file with CLIP).

[296]  State of Maine, Department of Education Agreement to Purchase Services, Agreement No. 1202270, by and between the State of Maine, Department of Education and Xwave New England Corp., dated Mar. 18, 2003, 3 [hereinafter the Maine-Xwave Agreement No. 1202270] (on file with CLIP).

AR 1022

systems that furnish the student records are required to use the SIF data formats.[297]  Under the contract, Xwave agrees to develop a database system in accordance with specifications set forth by MDOE.  The agreement was unclear with respect to the location of the data warehouse, namely whether Xwave servers would store the data and provide access to the MDOE through an internet connection or whether Xwave would develop the system to reside on MDOE servers.[298]  The development agreement did not specify any time limitations on data storage.

The agreement does set forth some general and specific privacy, security, and access guidelines to be incorporated into the database.  The general clause states that MEDMS security and confidentiality protocols shall comply with Maine Department of Education Regulations, Chapter 125.[299]  Section 12.01 of Chapter 125 provides generally that a school board shall develop policies in accordance with FERPA, that "records shall be entrusted to designated personnel who shall be knowledgeable about the confidentiality provisions applicable to the records," and that "all records shall be safeguarded from unauthorized access."[300]  The database must also generally comply with the State of Maine's Information Technology Security Policy.[301]

The contract also sets forth more specific access and security measures that must be included to protect the database.  First, the database must have role-based access restrictions for state level employees, such as "Organizational Administrator, Administrator, and System Administrator."[302]  Each access role type must be limited to perform tasks only within segmented areas of the database.  For example, a specific role type may have read only access to some data elements, read and modification access to another set of data elements and no access other data elements.[303]  Second, the database must also be structured to have role-based access restrictions implemented for employees at the local level, including teachers, school administrators, and superintendants.[304]  Both the access and actions permitted to these groups will depend upon their role (e.g. teachers will have the ability to enter and change information but can only see records of their specific students, a superintendent will have access to numerous records, but may only be permitted to view certain records).  The contract requires that a system log record the access and use restrictions granted to users.[305]  Additionally, the contract contemplates that these access levels will change based on a student's enrollment.  For example, if a student has multiple teachers, each would be able to access that student's records.  If the student then moves to a new school, only the teachers at the school in which the student is presently enrolled would have access to the student's records.[306]

### e.  New Jersey Department of Education (NJDOE)

New Jersey has outsourced the development of its data warehouse program.  In January 2005, the New Jersey Division of Purchase and Property entered into an agreement with Public Consulting Group ("PCG") for consulting services related to its Special Education Medicaid Initiative ("SEMI") and Medicaid Administrative Claiming ("MAC").[307]  This agreement with

---

[297]  *Id.*

[298]  The specifications provide that the database is to be made accessible through a web connection, but it is not clear whether the database itself would be stored locally on the MDOE servers or offsite on the Xwave servers., see The Maine-Xwave Agreement No. 1202270, *supra* note 296.

[299]  The Maine-Xwave Agreement No. 1202270, *supra* note 296, at 4.

[300]  Maine Department of Education Regulations Chapter 125, § 12.01 (on file with CLIP).

[301]  Maine-Xwave Agreement No. 1202270, *supra* note 296, at 4.

[302]  *Id.* at 5.

[303]  *Id.*

[304]  *Id.* at 6.

[305]  *Id.* at 5.

[306]  *Id.* at 7.

[307]  Contract No. A61236, dated Jan. 5, 2005.  This original contract was not provided to us.

AR 1023

PCG was later amended by the Division of Purchase and Property on behalf of the Department of Treasury and the Department of Education[308] to include development of a data warehouse and special education record system.[309]  Because FERPA requires that agreements related to data processing for program audit and evaluation purposes be under the control of the state department of education, New Jersey's contractual arrangements appear to violate FERPA.  In addition, New Jersey's agreement claims that the statewide longitudinal database would "enhance the SEMI and MAC projects."[310]   With this assertion, the contract provides that the costs of developing the data warehouse will billed to the SEMI and MAC reimbursement programs.[311]  In other words, New Jersey is funding the statewide database with a diversion of federal medicaid funds designed to assist special needs children.

The PCG contract provides that the database will be stored on PCG servers and will use 75 data elements and 300 assessment elements.[312]  The database will be accessible via a secure web-browser with different reports available to "several levels of users."[313]  Specific access restrictions and security measures, however, were not set forth in the contract amendment or any of the accompanying documentation.  PCG claims to have "invested hundreds of thousands of dollars to ensure top notch security"[314] and to "ensure[s] that all client information remains confidential,"[315] but more detailed security provisions are absent from the contract.

### f.   Tennessee Department of Education (TDOE)

TDOE contracted with SAS Institute, Inc. (SAS) to conduct analyses for student assessment and to assist in satisfying the state's reporting needs.[316]  SAS was chosen to "conduct analyses of raw test scores" and "provide electronic reporting . . . of schooling effects resulting from analyses of tests."[317]  Under the terms of the contract, TDOE will provide test results to SAS each year for analysis and report generation.[318]  SAS will host the assessment reports on their servers and the reports will be available to the public and TDOE employees via a web interface on the TDOE website.[319]  Reports "which are required by state statute" will be publicly available, however, "other analytical results useful for diagnostic purposes" will be made available "on a restricted access basis."[320]   The agreement specifies that the Commissioner of Education will determine who is permitted to have restricted access.  This limited group granted special access will be able to review reports on projections regarding whether students are on track with state

---

[308]   While the Department of Purchase and Property entered this contract on behalf of the Department of Education, the contractual party with control over PCG is the Department of Purchase.  This contractual situation may not be in compliance with FERPA.  *See supra* notes 63-65 and accompanying text.

[309]   Amendment No. 1 to Contract A61236 by and between Public Consulting Group and The New Jersey Division of Purchase and Property on behalf of the Department of Treasury and Department of Education, Aug. 31, 2005 [hereinafter the PCG Agreement Amendment] (on file with CLIP).

[310]   *Id.* at 1.

[311]   *Id.* at 3.

[312]   Memorandum on EDSmart.EasyIEP Scope of Work (June 6, 2005) (on file with CLIP).

[313]   *Id.*

[314]   Public Consulting Group, *EasyIEP Background*, 2 (on file with CLIP).

[315]   *Id.* at 17.

[316]   Contract No. FA-05-16315-01 by and between the State of Tennessee, Department of Education and SAS Institute, Inc., dated Jan. 1, 2005, as amended [hereinafter the Tennessee SAS Agreement] (on file with CLIP).

[317]   Amendment No. 1 to Tennessee SAS Agreement at 1 [hereinafter SAS Amendment] (on file with CLIP).

[318]   *Id.*

[319]   *Id.* at 2.

[320]   *Id.*

AR 1024

goals or on individual student test results.  The agreement states that "contractor agrees to act reasonably to prevent unauthorized access but makes no warranty or guarantee regarding impenetrability of the server(s)."[321]

2.  <u>Prominent Vendors</u>

The vendors most frequently used throughout the states include:  Infinite Campus, CPSI, eScholar, IBM, and ESP Solutions Group.  With the exception of IBM, all of these vendors participate in the SIF certification program.[322]  This means that the data sets developed by these vendors will be interoperable.

Infinite Campus, CPSI, and eScholar each offer systems that assist in data collection and offer services for data analysis.  IBM is primarily used for data collection and storage services, while ESP specializes in data analysis and SIF compliance.   Below is a summary of these major vendors and the products they are currently offering.

a.  *Infinite Campus*

Infinite Campus has been developing internet-based student information systems since its inception in 1993.[323]  Infinite Campus is SIF certified,[324] and its products are used in many districts around the country at the local level for data collection and are used by four states to fully integrate state and local tracking.[325]  The company manages records on more than 3 million students.[326]  Infinite Campus's business model is based on the goal of streamlining administrative tasks in order to allow more school resources to be devoted toward "planning and instruction."  For example, a student's performance data is only entered into the database at the school level once.   The information then automatically populates the fields made available to both district and state agencies responsible for reporting that data.  All entities that need the data have the ability to access it as soon as it is first entered into the database, and teachers and schools do not have to input the data multiple times or separately send it to various reporting units.[327]

Infinite Campus recently announced the development of a National Records Exchange (NRE) that will "route student data records between K-12 customer districts."[328]  This exchange will be able to take place "between two Infinite Campus districts regardless of location."[329]  This means that the company is actively striving to link state databases together to form a national database of children or regional databases of children.  The founder and CEO of Infinite Campus

---

[321] *Id.*

[322]  SIF Certification—Certification Register, http://certification.sifinfo.org/cert_prodlist.tpl (last visited May 26, 2009) [hereinafter SIF Certification Register].

[323]  History: Infinite Campus, Inc., http://www.infinitecampus.com/pages/company_menu/history.php (last visited May 26, 2009).

[324]  *See* SIF Certification Register, *supra* note 322.

[325]  Company: Infinite Campus, Inc., http://www.infinitecampus.com/pages/top_menu1/company.php (last visited May 26, 2009).  States using the fully integrated State Edition are: Kentucky, Maine, Montana, and South Dakota. *Id.*

[326]  *Id.*

[327]  Mission, Vision and Goals: Infinite Campus, Inc., http://www.infinitecampus.com/pages/company_menu/mission-vision-goals.php (last visited May 26, 2009).

[328]  Press Release, Infinite Campus, Infinite Campus Announces Nationwide District-to-District Student Data Transfers (June 9, 2008), *available at* http://www.infinitecampus.com/media/PDF%20News/20080609%20PR%20National%20Records%20Exchange%202009%201%20Announcement.pdf.

[329]  *Id.*

AR 1025

says the National Records Exchange results in "streamlining administrative processes . . . on a national level," by reducing the time spent enrolling new students.[330]  The program advertising makes no mention of privacy protections, a silence that reflects at least inadequate transparency and at worst the absence of any adequate protections.  Data transfers, however, must be requested by the student's new school, and that request must be approved by the former school before the transfer takes place.[331]  Participation in the program is voluntary and it will be available to all customers in the 2009 release.[332]

      *b.   Computer Powers Solutions of Illinois*

      Computer Powers Solutions of Illinois (CPSI) claims to be the "leading K-12 data integrator in the country" and the "leading provider of SIF solutions in the US and Canada."[333]  For more than 20 years, CPSI has helped districts develop, deploy and manage their data networks.[334]  The company's clients include the state departments of education of Oklahoma and South Carolina, as well as "hundreds of school district clients in nearly every state and province in the US and Canada" providing student data accounting for over four million students.[335]  CPSI is SIF certified and is committed to "make it easier for teachers to teach."[336]

      *c.   eScholar*

      eScholar was founded in 1997 and provides services associated with "collecting, cleansing, identifying, analyzing and reporting" the data needed to improve education.[337]  The products are SIF certified and eScholar serves on SIF Boards.[338]  Eleven states and 3,400 districts use eScholar's student identification solution, Uniq-ID.[339]  The Uniq-ID system is a web-based application that randomly assigns a unique identifier and uses directory information to match students to their assigned numbers.[340]  When an administrator registers a student, the administrator enters that student's directory information into the Uniq-ID system.  If the student's directory information is similar to a student already in the database, then a list of those registered students with similar attributes will be provided to the system administrator.  The system administrator then must review the preexisting registered student's information and either match the new student with an existing ID or have a new ID assigned.[341]  This provides the state with a

---

[330] *Id.*

[331] *Id.*

[332] *Id.*

[333] *See* CPSI, Ltd.—Home, http://www.vcasel.com/ (last visited Mar. 3, 2009).

[334] *Id.*

[335] *Id.*

[336] *See* CPSI, Ltd., About Us, http://www.vcasel.com/Company/AboutUs/tabid/85/Default.aspx (last visited Mar. 3, 2009); SIF Certification Register, *supra* note 322.

[337] *See* What eScholar Is, http://www.escholar.com/what/what.php (last visited Mar. 3, 2009).

[338] SIF Certification Register, *supra* note 322.

[339] eScholar: Where it is used—States, *available at* http://www.escholar.com/where/where_states.php (last visited May 26, 2009).  The following states use the Uniq-ID system: Georgia, Iowa, Kansas, Kentucky, Missouri, Nebraska, New Mexico,  New York, Pennsylvania, South Carolina, Wyoming. *Id.*

[340] eScholar Uniq-ID for Students Version 6.0, http://www.escholar.com/files/Student%20Uniq-ID%206.0%20080331.pdf  (last visited Mar. 3, 2009).

[341] *Id.*

AR 1026

"comprehensive and unified view of a student's multiple records" and eliminates the possibility of multiple IDs for individual students.[342]

eScholar is also the subcontractor for a program developed by the the U.S. Department of Education called the Migrant Student Information Exchange (MSIX) that allows states to "exchange migrant student records nationally."[343]  MSIX is designed to "reduce the educational disruption and other problems that result from repeated moves"[344] when migrant students change schools in a single year.  The system avoids the need to transfer records by hard copy.

### d.   IBM

IBM offers both hardware and software as well as management services.  IBM has a product called a "state reporting toolkit" that is designed to "streamline data collection and storage."[345]  The IBM product creates a statewide student ID that allows districts to assign and access a unique identifier for each student in the district.  It also provides a state level student data repository which is called a "state student data model."   The toolkit helps state education departments develop data reports and implement data reporting requirements.  Lastly, this product includes a completely automated system that states can use for "extracting, approving and automatically moving data from the district [data warehouse] to the state's [data warehouse]."[346]

IBM has also worked extensively on anonymizing student record data.   For example, the Ohio Department of Education (ODE) contracted with IBM to develop a Statewide Student Identifier (SSID) that would give them "the ability to track personally unidentifiable student progress across time and schools, and to determine the impact of Ohio public school programs on student success."[347]  One of the key objectives of this system was to maintain the confidentiality of personal data.[348]  IBM and ODE developed a system where all personally identifiable information was separated at the district level from the data the state needed to satisfy federal reporting requirements.   The system was structured to exclude users without special security privileges from entering personally identifiable data at the school or district level via a website connected to the SSID database.  The "stand-alone" SSID database is maintained by Pricewaterhouse Cooper and is separated from other ODE databases.  Authorized users access the SSID database through a website and enter "a few data elements" at which point the system generates a SSID.  The minimal information required to generate the SSID "will not be accessible by ODE or any other entity or individual."[349]  It is only used to validate or request new student IDs and share enrollment and withdrawal information across school districts. The remainder of student information is then collected in a database on an IBM server and is tied only to the unique anonymous student ID.  Before information is released from the database to the ODE for analysis and data-driven decision making, all personally identifiable information is removed from the

---

[342] Press Release, eScholar, eScholar Technology to be Foundation of US Education Department's Migrant Student Information Exchange (Oct. 30, 2006), *available at* http://www.escholar.com/news/news_MSIX.php.
[343] *Id.*
[344]

[345] *See* IBM Education Solutions, http://www-03.ibm.com/industries/education/doc/content/solution/1059989210.html (last visited Mar. 3, 2009).
[346] *Id.*
[347] *Id.*
[348] *Id.*
[349] FY2003 EMIS Guide, Appendix L—Student Identifier (SID), http://www.ode.state.oh.us/GD/DocumentManagement/DocumentDownload.aspx?DocumentID=12603 (last visited May 26, 2009).

AR 1027

student file.  This purge includes a procedure to eliminate statistical disclosure.[350]  This system allows for longitudinal reporting data to be stored at the state level without any personally identifiable information leaving the district.[351]  Additionally, ODE has implemented a "secure user authentication" system that provides and controls secure access to data.[352]

IBM's SSID project with Ohio illustrates the existence of vendor products that build anonymity and confidentiality of personally identifiable student records into the database systems.  IBM is currently implementing similar systems in Illinois and California.[353]  However, it is unclear whether other states have or are adopting the Ohio SSID product model.  For example, North Carolina contracted with IBM to manage "detailed information for 1.3 million active students enrolled in the public schools" and "maintain historical records . . . if a student returns for adult continuing education."[354]  The system connects 2,250 public schools and records basic demographics, immunizations, extracurricular activities, special accommodations of standardized tests, discipline and suspension records, and performance data.[355]  Information regarding the privacy protections specifically afforded to this system are not clear from the North Carolina Board of Education website, but they do reference a statewide information security policy.[356]

   *e.  ESP Solutions Group*

ESP Solutions Group advertises that it developed the "concept of 'data driven-decision making'" 30 years ago and now assists states in those data-driven decisions.[357]  ESP is an adviser to the U.S. Department of Education and works to document the states' ability to report data for the U.S. Department of Education's Education Data Exchange Network (EDEN).[358]  EDEN is the set of educational statistical reports gathered from state agencies by the U.S. Department of Education.[359]  ESP helps states identify "gaps between their data standards and the federal requirements."[360]  ESP currently helps the states calculate and evaluate academic year progress

---

[350] *See* SSID Project RPF, *available at* http://www.ode.state.oh.us/GD/Templates/Pages/ODE/ODEDetail.aspx?page=3&TopicRelationID=3&ContentID=11215&Content=50913 (follow the links to download the file).

[351] Ohio SLDS Application Profile (June 28, 2005), *available at* http://nces.ed.gov/Programs/SLDS/pdf/Ohio.pdf  ( "at no time shall a district release the crosswalk that matches the SID [permanent unique identification number] with other student level data (e.g., name, address, social security number)").

[352] *Id.*

[353] Press Release, IBM, State Schools Chief Jack O'Connell Announces Selection of IBM to Develop Student Achievement Data System (Jan. 2, 2008), *available at* http://www.espsolutionsgroup.com/news/IBM_CA_010208.pdf.

[354] *See* IBM Education Solutions, http://www-03.ibm.com/industries/education/doc/content/solution/1059989110.html (last visited May 26, 2009).

[355] *Id.*

[356] *See* Statewide Information Security Manual, http://www.scio.state.nc.us/SITPoliciesAndStandards/Statewide_Information_Security_Manual.asp (last visited May 6, 2009).

[357] About ESP Solutions Group, http://www.espsolutionsgroup.com/aboutus.php (last visited Mar. 3, 2009).

[358] This program was formerly known as the Performance Based Data Management Initiative (PBDMI).

[359] ESP Client Map, http://www.espsolutionsgroup.com/clients.php (last visited Mar. 3, 2009).

[360] *Id.*

AR 1028

reports as well as performance benchmarks.[361]  ESP also offers services to design and deploy SSIDs.[362]

      ESP recently partnered with IBM to develop a new system for the California Department of Education (CDE).  This system, the California Longitudinal Pupil Achievement Data System (CALPADS), includes a non-personally identifiable SSID.[363]  The California Department of Education is currently developing a privacy policy for CALPADS to address FERPA requirements.  It will be "a comprehensive policy for privacy, confidentiality and information security."[364]  SIFA has certified ESP application products and the management team "strongly supports the SIF initiative by serving on their board of directors, co-chairing their technical board, and leading innovative statewide SIF integration projects."[365]  ESP is currently providing SIF consulting to Wyoming and Ohio.[366]

[361]  *See* Education Technology Consulting Services, http://www.espsolutionsgroup.com/solutions_dataanal.php#calculate (last visited Mar. 3, 2009).
[362]  *Id.*
[363]  *See supra* note 347.
[364]  *See* California SLDS Application Profile, *available at* http://nces.ed.gov/Programs/SLDS/pdf/California.pdf (last visited Mar. 3, 2009).
[365]  *See*  Education Technology Consulting Services, *supra* note 361.
[366]  ESP Client Map, *supra* note 359.

AR 1029

# IV.   RECOMMENDATIONS

In this section, we provide some recommendations for best practices and for legislative reform related to the collection, use, and maintenance of children's educational records.  These recommendations reflect the principles of *privacy*, *transparency*, and *accountability*.   These principles, taken together, address the needs and concerns of students and parents while allowing teachers and state and local school officials to access necessary information.

◆   *Privacy* means maintaining the confidence of all personally identifiable information; restricting access to and use of student information; and limiting information collection to necessary categories of information.

◆   *Transparency* means disclosing publicly the information collected, its use and the protections afford to it; making information easy to find and navigate; and providing clear information about legal rights and duties.

◆   *Accountability* means maintaining accurate records of access to and use of personally identifiable information; establishing formal procedures for granting third party access to student information; and publicly disclosing mechanisms for change or complaint.

## A.  Best Practices

The recommendations set forth below are designed to establish minimum baseline standards.  Stronger and more specialized privacy protections can always be added and are advisable.

Recommendation 1 – States should implement Dual Database Architecture.  We strongly recommend the use of the dual database structure with clear distinctions made between the local level database and the state level database.  For this mechanism to be effective, a third party should maintain the linking key between the local database and the state database.  Teachers and local school officials may have a legitimate educational interest in personally identifiable information, but such individualized information is not generally needed at the state level.  The dual database structure permits local access to needed information while minimizing the privacy risks that arise when personally identifiable information is further distributed to individuals at the state level.

From the research, we identified two major purposes for state level collection and review of children's educational records:  (i) compliance with NCLB reporting requirements, and (ii) performance evaluation of schools.  Neither of these justifications for data collection requires that personally identifiable information be provided at the state level.  NCLB's reporting requirements expressly prohibit the public disclosure of personal information, and performance evaluations can usually be done by examining general trends rather than information pertaining to any specific student.  Privacy is easiest to maintain when disclosure is limited to a small number of people.  Since we find that state information uses do not require the disclosure by local school districts of personally identifiable information, we would advise that a dual database system be used to limit disclosure of such information.

53

AR 1030

One significant way to limit the disclosure of personally identifiable information is the anonymization of student data records so that they are not traceable to an individual child.  The first step in this process is the creation of a unique non-personally identifiable ID that can be used to transmit general information without transmitting identifiable information.  Such unique IDs, however, are only effective if they cannot be linked to a specific student by the party using the information.  For this reason, a third party should be used to generate the unique ID numbers, redact the personally identifiable information and pass the redacted information onto the state level officials.  Use of a third party is most effective because third parties may be placed under contractual obligation to maintain the privacy of the linking key, thereby ensuring that personally identifiable information is not passed to state officials.

The second step to ensure anonymity is to prevent the ability to re-identify or statistically disclose a child's identity in the state level database.  As we saw in states such as Ohio, having a third party buffer zone between local and state level databases is necessary in order to remove any information that may inadvertently identify a specific student.  Like the linking key, this process is probably best done by a third party who can be placed under contractual obligation to prevent statistical disclosure to the best of their ability.  A third party will likely have more resources and technological expertise to ensure such disclosure does not occur.

Recommendation 2- States that outsource data processing should have comprehensive agreements that explicitly address privacy obligations.  When states outsource the collection or management of children's educational records to vendors, FERPA requires that the processing take place under contract with the state department of education.  In order to assure that children's privacy is adequately protected when outside vendors are handling the data, states should include explicit clauses in vendor contracts that impose restrictions on access and use, set out the obligations of confidentiality, require physical and access security, and define the duration of data storage.  The contractual provisions should also specify the standards to be applied for each of these obligations (e.g. level or type of encryption, etc.)

Recommendation 3 – States should limit data collection to necessary information.  The data that is collected in a longitudinal database should be limited.   Each state must carefully review the data that it collects and match the collection to a clear and necessary purpose.  Much of the information found in the longitudinal databases we reviewed was not required to be collected by law.  Information that is highly personal or sensitive, or that may become sensitive in the future, should only be collected if the purpose is compelling and narrowly tailored.  While many states suggest that large data collection is necessary to improve individual instruction, we would strongly suggest that information of a highly private nature be withheld from state electronic databases.  The risk of security breaches and misuse is too large to justify the collection of sensitive information in an electronic record.

Recommendation 4 – States should have specific data retention policies and procedures.  In order to prevent misuse of data, there should be a clear policy in place for the deletion of personally identifiable student records after students exit the system or after the records are no longer necessary for the purpose giving rise to the initial data collection.  We recommend that data other than student transcripts be deleted or anonymized no later than five years after graduation or five years after withdrawal, whichever comes first.  Student data may be useful after graduation or withdrawal in order evaluate teaching methods, but it also poses a risk of misuse and unauthorized distribution.  As the length of time from graduation increases, the data's usefulness for research likely decreases, while the risks stay the same or increase.   In order to ensure the privacy of student information, the data should be deleted from the system.   At a minimum it is suggested that all personally identifiable information other than student transcript

AR 1031

data be deleted from the local level database, but as a precaution we would also recommend that the student data be deleted from the state level database as well.

Recommendation 5 – States should explicitly provide for limited access and use.  Access to and use of both the local level database and the state level database should be limited by clear rules and technological measures.  Rules should articulate which classes of state and school personnel will have access to the database, what information each class may access, when they may access information, and how the information may be used.  These rules should be enforced against each user by requiring the execution of confidentiality agreements that clearly outline permitted access and use.  Technological measures, such as access codes and firewalls, then need to be used to ensure that the rules are implemented.

At both the local and state level, rules about when information may be accessed and how it may be used should be clear and precise.  Currently, most states use the "legitimate educational interest" test to determine when access is permissible.  While this is the broad standard articulated in FERPA, we recommend that states create clearer guidelines about what constitutes a legitimate educational interest so that this rule is not abused.  Providing specific guidelines about what constitutes a legitimate educational interest will eliminate doubt and help hold administrators accountable when new uses of information are proposed.

At the local level, where personally identifiable information is stored and used, access rules need to be clearly articulated.  There are generally two classes of individuals who will need access to information in the database.  The standards for what each class of user may view and do within the database should be different.  The first group, school administrators, likely needs the broadest range of access to information, since they have an educational interest in all of the students under their supervision.  The second group, teachers, only needs access to the records of the students currently enrolled in their classes.  The system should incorporate technological measures that distinguish between these two groups and limit access accordingly.

At the state level, access and use rules should also be clearly defined.  Although the dual database structure should limit the disclosure of personally identifiable information, it is recommended that access be granted only to a small working group at the state level.  There should be clear use restrictions in place for this group, such as NCLB reporting or evaluation of a specified educational program or school during a specified time.  Clear purposes and timelines for use of the data will enable better accountability at the state level.

Recommendation 6 – States should maintain audit logs that track system use.   We recommend implementing an audit log system to track use of the database and access to student information.  Maintaining adequate records of system use is an important step in preventing data misuse.  If records of past use can be stored and reviewed upon an allegation of improper access or use, state and local educational agencies will be able to provide remedies for informational harm.

Our first recommendation is that internal use be tracked.  We would suggest implementing a technological mechanism that would create audit trails for each user, storing both when they accessed the database and what information was reviewed.  Such trails will allow administrators to more easily detect improper access.

Second, we would recommend maintaining records of all third party use of student data.  State and local educational agencies should have clear procedures in place for third parties to apply for permission to access information.  Records should be kept of the application and review process and, if access is granted, the release of information and eventual deletion of such information in compliance with FERPA following the completion of the permitted use.

Recommendation 7 – States should provide public notice and user friendly systems.  The policies and procedures regarding the longitudinal database should be easy for parents and

AR 1032

students to find, understand, and use.  We would recommend an easy to navigate website that provides all necessary information about information collection and use.  At a minimum the website should include the following:  (i) an easy to read summary of the collection system, including how it works; (ii) a privacy policy explaining the rights of parents and students and how those rights are protected at the local and state levels; (iii) a copy of the data dictionary so that parents are aware of exactly what information is collected; (iv) an electronic record review and change procedure so that parents can easily stay up-to-date on what information is in their child's record; and (v) a clearly stated policy about third party use of the information and details on the application process for such use.

Recommendation 8-  States should appoint a Chief Privacy Officer within the state's Department of Education to assure the respect for children's privacy in educational records and to oversee compliance with federal and state privacy laws.  We strongly recommend the appointment of a Chief Privacy Officer in each state's department of education to assure the protection of children's privacy in state database programs.  The Chief Privacy Officer should have the authority and responsibility to review and approve programs, proposals, and contracts with respect to their impact on privacy and compliance with existing legal privacy obligations.  To accomplish these tasks, the Chief Privacy Officer should be charged with preparing and making publicly available a Privacy Impact Assessment for each state program, proposal, and vendor contract associated with statewide longitudinal databases of educational records.  This will enable states to comply more effectively with their FERPA obligations and to assure more effectively that children's privacy is protected.   Indeed, many of the privacy weaknesses and compliance failures at the state level could be avoided if a Chief Privacy Officer were in place.

## B.  Legislative Reform

In this section we provide some recommendations for legislative reform.  While the recommended best practices are good practical guidance for those entities and institutions responsible for implementing the longitudinal databases, they do not create the level of accountability that can be obtained with regulation.  Because we are concerned about children as a vulnerable population, we would recommend that critical privacy protections be required by statute or regulation.  FERPA sets forth broad guidelines and restrictions, but the recent development of longitudinal databases has highlighted a number of more specific privacy protections that we believe should be mandatory.

First, we would recommend that the permissible reasons for data collection be more clearly defined.  Specifically, we would suggest that state departments of education be required to articulate justifications for their collection of information.  Under FERPA, state departments of education may simply indicate that information collection is necessary for "audit and evaluation," and we would suggest that they should be required to articulate why specific types of information aid an audit or evaluation.  Such a requirement would help to limit the excessive data collection that we identified in states such as Florida, New Jersey, and Louisiana.  One of the best ways to ensure states are acting in good faith is to require that they articulate their legitimate uses.

Second, we would recommend specific data retention limitations.  FERPA currently requires under both the audit and evaluation exception and the research use exception that disclosed information should be deleted when the audit or research purpose is concluded.  This general requirement, however, provides state departments of education and third parties with broad leeway.  Arguably, a state could take the position that it needs to hold information indefinitely in order to monitor academic changes over time.  We believe this vague standard allows too much flexibility and would recommend that state legislatures provide well defined time limits on data retention.  Legislatures should investigate what type of evaluation is most valuable, the information required for such evaluation, and the risks of lengthy retention, and then

AR 1033

set appropriate caps on data retention time.  We would suggest that time periods in excess of five years are unnecessary and overly risky.

Lastly, we would recommend that an oversight mechanism for privacy at the state level be mandatory in connection with the collection and use of children's educational data.   To this end, we recommend the statutory creation of a Chief Privacy Officer at the state department of education.  The Chief Privacy Officer should have the authority and responsibility to review and approve programs, proposals, and contracts with respect to their impact on privacy and compliance with existing privacy law and should be required to report privacy impact assessments to the public.  This institutional mechanism would serve a critical oversight need.


# V.   CONCLUSION

Data collection is on the rise in the K-12 educational systems across the nation, as well as in post-secondary educational systems.  This trend is likely to continue in the future.  While there are certainly some strong reasons for data collection, such as improving teaching methods and tracking school improvement, it is important to recognize the privacy risks inherent in these data collection systems.  Our goal has been to identify privacy risks in the existing state systems as currently deployed and to provide some suggestions on how these problems can be addressed.  Implementing best practices for privacy protection while these projects are still developing will help to create a foundation for privacy protections that can be built upon as collection continues.

AR 1034

**APPENDIX A**
**Table of Directory Information**

| State | Name | Address | Date of Birth | Home School | Attending School | Enrollment Type | Entry Date | Exit Date | County of Birth | Country of Birth |
|---|---|---|---|---|---|---|---|---|---|---|
| AL† | | | | | | | | | | |
| AK | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| AZ | Y | | | | Y | Y | | | Y | Y |
| AR† | | | | | | | | | | |
| CA | Y | Y | Y | | Y | Y | Y | Y | Y | Y |
| CO | Y | Y | Y | Y | Y | Y | | | | |
| CT* | Y | Y | Y | Y | Y | | | | | |
| DE* | | | | | | | | | | |
| FL | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| GA | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| HI* | | | | | | | | | | |
| ID† | | | | | | | | | | |
| IL | Y | | Y | Y | Y | Y | Y | Y | Y | Y |
| IN* | | | | | | | | | | |
| IA | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| KS | Y | Y | Y | Y | Y | | Y | Y | | |
| KY | Y | Y | Y | | | Y | Y | Y | | Y |
| LA | Y | Y | Y | Y | Y | | Y | Y | | Y |
| ME | Y | Y | Y | | | | | | Y | Y |
| MD† | | | | | | | | | | |
| MA | Y | Y | Y | | Y | Y | Y | Y | Y | Y |
| MI | Y | Y | Y | Y | Y | | Y | Y | Y | Y |
| MN | Y | | Y | Y | Y | | Y | Y | | |
| MS‡ | Y | Y | Y | | | | Y | Y | Y | Y |
| MO | Y | | Y | Y | Y | Y | | | | |
| MT | Y | | Y | | | | Y | Y | | |
| NE | Y | | Y | Y | Y | | Y | Y | | |
| NV† | | | | | | | | | | |
| NH | Y | | Y | Y | Y | Y | Y | Y | Y | |
| NJ | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| NM | Y | | Y | | Y | Y | | | | |
| NY | Y | Y | Y | Y | Y | | Y | Y | Y | Y |
| NC | Y | Y | Y | | Y | | Y | Y | | Y |
| ND | Y | Y | Y | Y | Y | Y | | | | Y |
| OH | Y | | Y | Y | | Y | | Y | Y | |
| OK‡ | | | | | | | | | | |
| OR | Y | | Y | | Y | | | Y | | |
| PA | Y | | Y | Y | Y | Y | Y | Y | Y | Y |
| RI | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| SC* | Y | | Y | | | Y | Y | Y | | |
| SD | Y | | Y | Y | Y | Y | Y | Y | | |
| TN | Y | | Y | Y | Y | Y | Y | Y | | |
| TX | Y | | Y | Y | Y | Y | | Y | | |
| UT† | | | | | | | | | | |
| VA | Y | Y | Y | | Y | Y | Y | Y | | Y |
| VT | Y | | Y | Y | Y | Y | | Y | | |
| WA | Y | Y | Y | Y | Y | Y | Y | Y | | Y |
| WV† | | | | | | | | | | |

AR 1035

| WI | Y | | Y | Y | Y | | Y | Y | | Y |
|----|---|---|---|---|---|---|---|---|---|---|
| WY | Y | | Y | Y | Y | | Y | Y | | |

† Indicates a state that may have a longitudinal database, but detailed information was not publicly available.

* Indicates a state database that is still in the development phase.

‡ Indicates a state that does have a longitudinal database, but we were unable to find a data dictionary.

AR 1036

**APPENDIX B**
**Table of Personal Identifiers**

| State | Personal ID # | Social Security Number |
|---|---|---|
| AL† | | |
| AK | Y | Y |
| AZ | Y | |
| AR† | | |
| CA | Y | |
| CO | Y | |
| CT* | Y | |
| DE* | Y | |
| FL | Y | Y |
| GA | Y – Either SS# or Personal ID used | Y – Either SS# or Personal ID used |
| HI* | | |
| ID† | | |
| IL | Y | |
| IN* | | |
| IA | Y | Optional |
| KS | Y | Optional |
| KY | Y | Y |
| LA | Y (usually SS#) | Y |
| ME | Y | |
| MD† | | |
| MA | Y | |
| MI | Y | |
| MN | | Y |
| MS‡ | | |
| MO | Y | Y |
| MT | Y | |
| NE | Y | |
| NV† | | |
| NH | Y | |
| NJ | Y | |
| NM | Y | |
| NY | Y | |
| NC | Y | Optional |
| ND | | |
| OH | Y | |
| OK‡ | | |
| OR | | Y |
| PA | Y | Y |
| RI | Y | |
| SC* | Y | Y |
| SD | Y | Y |
| TN | Y | Y |
| TX | Y | |
| UT† | | |
| VA | Y | |
| VT | Y | |
| WA | Y | Optional |
| WV† | | |

B-1

| WI | Y | |
|----|---|---|
| WY | Y | |

† Indicates a state that may have a longitudinal database, but detailed information was not publicly available.

* Indicates a state database that is still in the development phase.

‡ Indicates a state that does have a longitudinal database, but we were unable to find a data dictionary.

AR 1038

**APPENDIX C**
**Table of Demographic Information**

| State | Gender | Race | Ethnicity | Immigration Status | LEP Status | Native Language | Migrant Status | Single Parent |
|---|---|---|---|---|---|---|---|---|
| AL† | | | | | | | | |
| AK | Y | Y | Y | Y | Y | Y | Y | Y |
| AZ | Y | Y | Y | Y | Y | Y | Y | |
| AR† | | | | | | | | |
| CA | Y | Y | Y | | Y | Y | Y | |
| CO | Y | | Y | Y | Y | Y | Y | |
| CT* | Y | Y | Y | | | Y | Y | |
| DE* | | | | | | | | |
| FL | Y | Y | Y | Y | Y | Y | Y | Y |
| GA | Y | Y | Y | Y | Y | Y | Y | Y |
| HI* | | | | | | | | |
| ID† | | | | | | | | |
| IL | Y | Y | Y | Y | Y | Y | Y | |
| IN* | | | | | | | | |
| IA | Y | Y | Y | Y | Y | Y | Y | |
| KS | Y | Y | Y | Y | Y | Y | Y | |
| KY | Y | Y | | Y | Y | Y | Y | |
| LA | Y | | Y | Y | Y | Y | | |
| ME | Y | Y | Y | Y | Y | Y | Y | |
| MD† | | | | | | | | |
| MA | Y | Y | Y | | Y | Y | | |
| MI | Y | Y | Y | | Y | Y | Y | |
| MN | Y | Y | Y | | Y | Y | Y | |
| MS‡ | | | | | | | | |
| MO | Y | Y | Y | | Y | | Y | |
| MT | Y | Y | Y | Y | Y | Y | | Y |
| NE | Y | Y | Y | Y | Y | Y | Y | Y |
| NV† | | | | | | | | |
| NH | Y | Y | Y | | Y | | Y | |
| NJ | Y | Y | Y | | Y | | Y | |
| NM | Y | Y | Y | | Y | Y | | Y |
| NY | Y | Y | Y | Y | Y | Y | Y | Y |
| NC | Y | Y | Y | Y | Y | Y | Y | |
| ND | Y | Y | Y | Y | Y | | Y | |
| OH | Y | Y | Y | | Y | Y | Y | |
| OK‡ | Y | Y | | | Y | | Y | |
| OR | Y | | Y | | Y | | | Y |
| PA | Y | Y | Y | Y | Y | Y | Y | Y |
| RI | Y | Y | Y | Y | Y | Y | | Y |
| SC* | Y | Y | Y | Y | Y | Y | Y | |
| SD | Y | Y | Y | Y | Y | Y | Y | |
| TN | Y | Y | Y | Y | | Y | | |
| TX | Y | | Y | Y | Y | Y | Y | |
| UT† | | | | | | | | |
| VA | Y | Y | Y | Y | Y | Y | Y | |
| VT | Y | Y | Y | | | | | |
| WA | Y | Y | Y | | Y | Y | Y | |
| WV† | | | | | | | | |

AR 1039

| WI | Y | Y | Y | Y | Y | Y | Y | |
| WY | Y | Y | Y | Y | | | Y | |

† Indicates a state that may have a longitudinal database, but detailed information was not publicly available.

* Indicates a state database that is still in the development phase.

‡ Indicates a state that does have a longitudinal database, but we were unable to find a data dictionary.

**APPENDIX D**
**Table of Academic Information**

| State | Standardized Test Scores | Special Ed Status | Sec. 504 Testing Accommodation | Extra/ Tutoring Services | Gifted/ Talented | Post-Grad Plans | AP Courses | ACT & SAT Scores |
|---|---|---|---|---|---|---|---|---|
| AL† | | | | | | | | |
| AK | Y | Y | Y | Y | | Y | | |
| AZ | Y | Y | Y | Y | Y | | | |
| AR† | | | | | | | | |
| CA | Y | Y | | | Y | | | |
| CO | Y | Y | Y | Y | Y | | Y | Y |
| CT* | Y | | | | | | | Y |
| DE* | Y | | | | | | | |
| FL | Y | Y | Y | Y | Y | Y | | |
| GA | Y | Y^ | Y | Y | Y | | | |
| HI* | | | | | | | | |
| ID† | | | | | | | | |
| IL | Y[367] | | Y | Y | | | | |
| IN* | | | | | | | | |
| IA | Y | | Y | Y | Y | Y | | Y |
| KS | Y | Y | | Y | Y | Y | | |
| KY | Y | Y^ | | Y | Y | Y | Y | |
| LA | Y | Y | | | | | | |
| ME | Y | Y | Y | | | | | |
| MD† | | | | | | | | |
| MA | Y | Y | | | | | Y | Y |
| MI | Y | Y | | | | | Y | |
| MN | Y | Y | | Y | Y | | | |
| MS‡ | Y | | | | | | | |
| MO | Y | Y^ | | | Y | Y | | |
| MT | Y | Y | Y | Y | Y | Y | | |
| NE | Y | Y | Y | | Y | | | |
| NV† | | | | | | | | |
| NH | Y | Y | Y | Y | | Y | Y | |
| NJ | Y | Y^ | | | | | | |
| NM | Y | Y^ | | Y | | Y | | |
| NY | Y | Y | Y | | | Y | | |
| NC | Y | Y | | | Y | | | |
| ND | Y | Y | Y | | | | | |
| OH | Y | Y | Y | | Y | | Y | |
| OK‡ | Y | Y | | Y | | | | |
| OR | Y | Y | | | Y | | | |
| PA | Y | Y | Y | | Y | Y | | |
| RI | Y | Y | | | | Y | | |
| SC* | Y | Y | | | | | | |
| SD | Y | Y | | | | | | |
| TN | Y | | | | | | | |
| TX | Y | Y | | | Y | Y | | |

---

[367] Includes reasons for not testing.  Codes include: jail, homebound exempt and medically exempt.
^ Includes type of disability

AR 1041

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **UT†** | | | | | | | | |
| **VA** | Y | Y | | Y | Y | Y | Y | |
| **VT** | Y | | Y | | | | | |
| **WA** | Y | Y^ | Y | | Y | | Y | |
| **WV†** | | | | | | | | |
| **WI** | Y | | Y | | | | | |
| **WY** | Y | | Y | | Y | | | |

† Indicates a state that may have a longitudinal database, but detailed information was not publicly available.

\* Indicates a state database that is still in the development phase.

‡ Indicates a state that does have a longitudinal database, but we were unable to find a data dictionary.

D-2

AR 1042

**APPENDIX E**
**Table of Disciplinary Information**

| State | Withdraw Reason | Coded Reasons Includes: Jail, Illness, Drop Out, or Mental Health | Disciplinary Action Date | Disciplinary Reason | Weapon Type | # of Absences | # of Suspensions |
|---|---|---|---|---|---|---|---|
| AL† | | | | | | | |
| AK | Y | Y | Y | Y | Y | Y | Y |
| AZ | Y | Y[368] | | | | Y | |
| AR† | | | | | | | |
| CA | Y | Y | Y | | | | |
| CO | | | | | | | |
| CT* | | | Y | Y | | | |
| DE* | | | | | | | |
| FL | Y | Y | Y | Y[369] | Y | Y | Y |
| GA | Y | Y[370] | Y | Y | Y | Y | Y |
| HI* | | | | | | | |
| ID† | | | | | | | |
| IL | Y | | Y | Y | | | |
| IN* | | | | | | | |
| IA | Y | Y | Y | Y | Y | Y | |
| KS | Y | Y | | | | Y | |
| KY | Y | | Y | Y | | Y | |
| LA | Y | Y[371] | Y | Y | Y | Y | |
| ME | | | | | | | |
| MD† | | | | | | | |
| MA | | | | | | | Y |
| MI | Y | Y | Y | Y | Y | Y | |
| MN | Y | Y | | | | | |
| MS‡ | | | | | | | |
| MO | Y | Y | Y | Y | Y | | Y |
| MT | Y | Y | | | | Y | |
| NE | | | | | | Y | |
| NV† | | | | | | | |
| NH | Y | Y | | | | Y | Y |
| NJ | Y | Y | | | | | |
| NM | Y | Y | | Y | Y | | |
| NY | | | | | | | |
| NC | Y | Y | Y | Y | Y | Y | Y |
| ND | Y | | | | | Y | |
| OH | Y | Y | Y | Y | | Y | |
| OK‡ | | | | | | | |
| OR | Y | | | | | | |
| PA | Y | Y[372] | | | | Y | |
| RI | Y | Y | Y | Y | Y | Y | |
| SC* | Y | | | | | | |

---

[368]  Reasons also include pregnancy and victim of a crime.
[369]  Coded reasons include hate crimes and gang-related violence.
[370]  Reasons also include pregnancy and financial hardship.
[371]  Reasons also include pregnancy.
[372]  Reasons also include pregnancy.

AR 1043

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **SD** | Y | Y | | | | Y | |
| **TN** | Y | Y | Y | Y | Y | Y | |
| **TX** | Y | | | Y | | Y | |
| **UT†** | | | | | | | |
| **VA** | Y | Y | | | | Y | |
| **VT** | Y | | | | | | |
| **WA** | Y | Y[373] | | | | Y | |
| **WV†** | | | | | | | |
| **WI** | Y | | Y | Y | | | |
| **WY** | | | | | | | |

† Indicates a state that may have a longitudinal database, but detailed information was not publicly available.

* Indicates a state database that is still in the development phase.

‡ Indicates a state that does have a longitudinal database, but we were unable to find a data dictionary.

---

[373] Reasons also include pregnancy.

**APPENDIX F**
**Table of Economic Information**

| State | Free/ Reduced Lunch | Homeless Status | Homeless Living Place |
|---|---|---|---|
| AL† | | | |
| AK | | Y | Y |
| AZ | Y | Y | |
| AR† | | | |
| CA | Y | | |
| CO | Y | Y | Y |
| CT* | Y | Y | |
| DE* | | | |
| FL | Y | Y | Y |
| GA | Y | Y | Y |
| HI* | | | |
| ID† | | | |
| IL | Y | Y | |
| IN* | | | |
| IA | Y | Y | |
| KS | Y | | Y |
| KY | Y | Y | Y |
| LA | Y | Y | Y |
| ME | Y | Y | |
| MD† | | | |
| MA | | | |
| MI | Y | Y | Y |
| MN | Y | Y | |
| MS‡ | | | |
| MO | Y | Y | Y |
| MT | Y | Y | Y |
| NE | Y | Y | Y |
| NV† | | | |
| NH | Y | Y | Y |
| NJ | Y | | |
| NM | Y | Y | |
| NY | Y | Y | Y |
| NC | Y | Y | |
| ND | Y | | |
| OH | Y | Y | Y |
| OK‡ | Y | | |
| OR | Y | | |
| PA | Y | Y | |
| RI | Y | Y | |
| SC* | Y | Y | |
| SD | Y | Y | Y |
| TN | | | |
| TX | | | |
| UT† | | | |
| VA | | Y | |
| VT | Y | | |
| WA | Y | Y | |

F-1

| | | | |
|---|---|---|---|
| **WV†** | | | |
| **WI** | | Y | |
| **WY** | Y | Y | |

†  Indicates a state that may have a longitudinal database, but detailed information was not publicly available.

**\*** Indicates a state database that is still in the development phase.

‡ Indicates a state that does have a longitudinal database, but we were unable to find a data dictionary.

F-2

**APPENDIX G**
**Table of Health-Related Info**

| State | Insurance Status | Medicaid Number | Date of Last Medical Exam | Date of Last Lead Test | Lead Level | Immunization Status |
|---|---|---|---|---|---|---|
| AL† | | | | | | |
| AK | | | | | | |
| AZ | | | | | | |
| AR† | | | | | | |
| CA | | | | | | |
| CO | | | | | | |
| CT* | | | | | | |
| DE* | | | | | | |
| FL | | | Y | | | Y |
| GA | | | | | | |
| HI* | | | | | | |
| ID† | | | | | | |
| IL | | | | | | |
| IN* | | | | | | |
| IA | | | | | | |
| KS | | | | | | |
| KY | | | Y | | | Y |
| LA | | | | | | |
| ME | | Y | | | | |
| MD† | | | | | | |
| MA | | | | | | |
| MI | | | | | | |
| MN | | | | | | |
| MS‡ | | | | | | |
| MO | | | | | | |
| MT | | | | | | |
| NE | | | | | | |
| NV† | | | | | | |
| NH | | | | | | |
| NJ | Y | | Y | Y | Y | Y |
| NM | | | | | | |
| NY | | | | | | Y |
| NC | Y | Y | Y | | | |
| ND | | | | | | |
| OH | | | | | | |
| OK‡ | | | | | | |
| OR | | | | | | |
| PA | | | | | | |
| RI | | Y | | | | |
| SC* | | Y | | | | |
| SD | | | | | | |
| TN | | | | | | |
| TX | | | | | | |
| UT† | | | | | | |
| VA | | | | | | |
| VT | | | | | | |
| WA† | | | | | | |

AR 1047

| | | | | | |
|---|---|---|---|---|---|
| **WV†** | | | | | |
| **WI** | | | | | |
| **WY** | | | | | |

† Indicates a state that may have a longitudinal database, but detailed information was not publicly available.
* Indicates a state database that is still in the development phase.
‡ Indicates a state that does have a longitudinal database, but we were unable to find a data dictionary.

G-2

AR 1048

APPENDIX H

**Bibliography of State Materials**
Set forth below is a list of the most substantial state reference materials we collected and used in the preparation of this report.  All URLs were last visited on February 18, 2009.

| State | Materials |
|-------|-----------|
| **AL†** | |
| **AK** | Alaska Student ID System Information Brochure, *available at* http://www.eed.state.ak.us/oasis/asidsbrochure.pdf.<br><br>Design Document for the Alaska Student ID System (Revision 1.04b), *available at* http://www.eed.state.ak.us/oasis/alaskadesigndocument.pdf. |
| **AZ** | Code Values (Version 4.8), *available at* http://azed.gov/sais/codevalues/DataTransactionCodeValues.pdf.<br><br>FY 2009 – SAIS Changes Overview, *available at* http://www.azed.gov/sais/Downloads/FY-09_SAIS_Overview.pdf.<br><br>SAIS Data Retention Guidelines, *available at* http://www.azed.gov/sais/downloads/SAISDataRetentionGuidelines.doc.<br><br>ARIZ. REV. STAT. ANN. § 15-1042 (2009), *available at* http://www.azleg.state.az.us/FormatDocument.asp?inDoc=/ars/15/01042.htm&Title=15&DocType=ARS. |
| **AR†** | |
| **CA** | California School Information Services, http://www.cde.ca.gov/ds/sd/cs/.<br><br>California Longitudinal Pupil Achievement Data System, http://www.cde.ca.gov/ds/sp/cl/index.asp.<br><br>CSIS Frequently Asked Questions about Statewide Student Identifiers, http://www.csis.k12.ca.us/faq/si-faq.asp.<br><br>Statewide Student Identifier User Guide (Version 2.2), *available at* http://www.csis.k12.ca.us/library/statewide-identifier/SSID-User-Guide-for-SB1453-v2-2-20080929.pdf. |
| **CO** | Student Identifier Management Unit Index, http://www.cde.state.co.us/cdesim/index.htm.<br><br>RITS Web Application User Guide (Version 1.2), *available at* http://www.cde.state.co.us/cdesim/downloads/pdf/RITSUserGuide.pdf.<br><br>RITS Web Application School User Packet (Version 1.4), *available at* http://www.cde.state.co.us/cdesim/downloads/pdf/RITSUserPacket.pdf. |

AR 1049

| | |
|---|---|
| **CT\*** | Project Abstract, http://www.csde.state.ct.us/public/cedar/slds/data_dictionary.htm. |
| **DE\*** | |
| **FL** | Data Elements and Definitions, http://edwapp.doe.state.fl.us/bsn_subjects/SubjectsFacetsList.aspx.<br><br>Education Data Warehouse – Functional Rules (Version 5.1), *available at* http://edwapp.doe.state.fl.us/Documents/functional_spec.pdf.<br><br>Student & Public Records: An Overview of Legal Issues (June 19, 2008) (on file with author).<br><br>Education Records of Pupils and Adult Students, FLA. ADMIN. CODE ANN. R. 6A-1.0955 (2008), *available at* http://www.doh.state.fl.us/Family/School/legislative/6A-10955.pdf. |
| **GA** | |
| **HI\*** | IT Projects – Milestones, http://doe.k12.hi.us/technology/projects/milestones.htm (referencing the development of the student database eSIS). |
| **ID†** | Idaho State Department of Education—Data Collection, http://www.sde.idaho.gov/site/data_collection.htm. |
| **IL** | ISBE Student Information Systems User Manual, *available at* http://www.isbe.state.il.us/sis/html/user_manual.htm (follow the link to download the manual as a pdf or word document).<br><br>ISBE SIS Data Elements, *available at* http://www.isbe.state.il.us/sis/html/data_elements.htm (follow the links to download pdf versions of the various data elements).<br><br>ISBE SIS Frequently Asked Questions, *available at* http://www.isbe.state.il.us/sis/pdf/qa_20060525.pdf<br><br>Contractual Agreement by and between the Illinois State Board of Education and International Business Machines (on file with author). |
| **IN\*** | |
| **IA** | Project EASIER — Iowa Department of Education, http://www.iowa.gov/educate/index.php?option=com_content&task=view&id=44&Itemid=12 (follow the links to download the Data Dictionary 2008-2009 (Version 2009.1)).<br><br>Project EASIER Supplement, Sept. 2007, *available at* http://www.iowa.gov/educate/index.php?option=com_docman&task=doc_download&gid=3998.<br><br>Downloads – State ID – Data Collections – Iowa Department of Education,, http://www.iowa.gov/educate/index.php?option=com_docman&task=cat_view&gid=321&Itemid=1563 (follow the links to download State ID User Manuals and Policy |

AR 1050

|    |    |
|----|----|
|    | Statements). |
|    | Project EASIER, 2007-2008 Fall Data Reporting Requirements, *available at* http://www.iowa.gov/educate/index.php?option=com_docman&task=doc_download&gid=4465. |
|    | Fall 2008 Checklist, *available at* http://www.iowa.gov/educate/index.php?option=com_docman&task=doc_download&gid=5707. |
|    | EdInsight – Data Warehouse – Iowa Department of Education, http://www.iowa.gov/educate/index.php?option=com_content&task=view&id=1691&Itemid=2490 |
| **KS** | KIDS 2008-2009 Collection System File Specifications, *available at* http://www.ksde.org/LinkClick.aspx?fileticket=CfXC6hszkis%3d&tabid=2508&mid=6013. |
|    | KIDS Collection Field Requirement by Record Type, *available at* http://www.ksde.org/LinkClick.aspx?fileticket=RnEl1Sl%2biXA%3d&tabid=2508&mid=6013. |
|    | KIDS 2008-2009 User Guide, *available at* http://www.ksde.org/LinkClick.aspx?fileticket=J2w5%2bp5dWfY%3d&tabid=2508&mid=6013. |
|    | KSDE Data Access and Use Policy, *available at* http://www.ksde.org/LinkClick.aspx?fileticket=ndfZ%2bqai7vQ%3d&tabid=2508&mid=6013. |
|    | SIS Vendor Info, http://www.ksde.org/Default.aspx?tabid=2516. |
|    | Answers to Parents' Questions (Apr. 2005) (on file with author). |
|    | Kansas Application for Grants, *available at* http://nces.ed.gov/Programs/SLDS/pdf/Kansas.pdf. |
| **KY** | 2008-2009 Final Data Standards, *available at* http://education.ky.gov/NR/rdonlyres/E74F4406-2806-4362-BEFD-D489D32B0BDB/0/200809_DataStandards11708FINAL2.pdf. |
|    | STIHealth v. 11 Data Standards, *available at* http://education.ky.gov/NR/rdonlyres/1C57DCBC-2320-43AD-859C-0ED359232413/0/STIHealthStandardsV11.pdf. |
|    | New Student Information System Initiative—About the Infinite Campus SIS Initiative, http://education.ky.gov/KDE/Administrative+Resources/Data+and+Research/Student+Information+System/New+Student+Information+System+Initiative/. |
|    | Agreement by and between Kentucky Department of Education and Infinite Campus, |

AR 1051

| | |
|---|---|
| | dated Nov. 20, 2006.<br><br>Agreement by and between Kentucky Department of Education and Claraview, Inc., dated June 1, 2007. |
| **LA** | SIS User Guide (ver. 8.6), *available at* http://www.doe.state.la.us/lde/uploads/7706.pdf.<br><br>STS User Guide 2008-2009, *available at* http://www.doe.state.la.us/lde/uploads/1337.pdf.<br><br>SER User Guide, *available at* http://www.doe.state.la.us/lde/uploads/11236.pdf.<br><br>Guidance for the Family Educational Rights and Privacy Act, *available at* http://www.doe.state.la.us/lde/uploads/3312.pdf.<br><br>Security and Confidentiality Statement for the LEAPweb Reporting System, *available at* https://www.leapweb.org/LEAPweb_system_oath_form.pdf.<br><br>Louisiana Educational Accountability Data System 2007-2008 LEADS User Guide Draft (on file with author). |
| **ME** | MEDMS On-line User Manual, https://www.medms.maine.gov/MEDMS/usermanual/unit1.htm.<br><br>Agreement to Purchase Services, by and between the State of Maine, Department of Education and Xwave New England Corp., dated Mar. 13, 2003 (on file with author). |
| **MD†** | |
| **MA** | SIMS Version 2.1 Data Handbook, *available at* http://www.doe.mass.edu/infoservices/data/sims/DataHandbook.doc.<br><br>SIMS User Guide Version 2.0, *available at* http://www.doe.mass.edu/infoservices/data/sims/UserGuide.doc.<br><br>Introduction to SIMS, *available at* http://www.doe.mass.edu/infoservices/data/sims/intro_sims.pdf. |
| **MI** | Michigan Education Information System Single Record Student Database Data Field Description (Spring/End of Year 2008), *available at* http://www.michigan.gov/documents/cepi/spr2009_SRSD_field_descriptions_258932_7.pdf.<br><br>New to SRDS? Information Packet, *available at* http://www.michigan.gov/documents/NewToSRSD1004_106632_7.pdf.<br><br>CEP—SRSD/UIC Security Agreements, http://www.michigan.gov/cepi/0,1607,7-113-986_10481-3831--,00.html. |
| **MN** | MARSS Manual, *available at* http://education.state.mn.us/mdeprod/groups/Finance/documents/Manual/002857.pdf. |

AR 1052

| | |
|---|---|
| | Data Element Definitions, *available at* http://education.state.mn.us/MDE/Accountability_Programs/Program_Finance/MARSS_Student_Accounting/MARSS_Instruction_Manual/Data_Elements-Definitions/index.html (offering downloadable versions of each element and the entire data dictionary).<br><br>List of Software Vendors Certified for Reporting, http://education.state.mn.us/MDE/Accountability_Programs/Program_Finance/MARSS_Student_Accounting/index.html. |
| **MS‡** | MSIS 1 and 2 - Oath of Confidentiality, *available at* http://www.mde.k12.ms.us/msis/documents/msis_sec_022006.pdf.<br><br>MSIS 4 – Oath of Confidentiality, *available at* http://www.mde.k12.ms.us/msis/documents/updated_msis_mde_sec_012009.pdf.<br><br>MSIS Frequently Asked Questions, http://www.mde.k12.ms.us/msis/faq.html.<br><br>The History of MSIS, http://www.mde.k12.ms.us/msis/history.html. |
| **MO** | Core Data Collection System Manual (ver. 19), *available at* http://dese.mo.gov/divimprove/coredata/Manual%202008.doc.<br><br>MOSIS Code Sets (July 24, 2008), http://dese.mo.gov/MOSIS/CodeSetExcelDocument.html#Discipline_Removal_Codes.<br><br>MOSIS Project Overview, http://dese.mo.gov/MOSIS/overview.html. |
| **MT** | Achievement in Montana Data Dictionary (ver. 2008.2.5), *available at* http://opi.mt.gov/Pub/AIM/DTA%20Dictionary/AIM%20Data%20Dictionary%20v1.08.pdf.<br><br>Student Records Confidentiality Policy, (Feb. 1, 2008), *available at* http://opi.mt.gov/pub/AIM/AIM%20Policies/Student_record_confidentiality%20Policy.pdf.<br><br>MONT.CODE. ANN. § 20-2-212 (2007).<br><br>2MONT.CODE. ANN. § 20-1-213 (2007).<br><br>Montana Local Government Retention and Disposition Schedules X, XIII (on file with author).<br><br>Contract for Achievement in Montana, by and between State of Montana, Montana Office of Public Instruction and Infinite Campus, as amended (on file with author). |
| **NE** | Student Template Instruction Manual, *available at* http://www.nde.state.ne.us/nssrs/Docs/STUDENT_MANUAL_3_0_0.pdf. |

H-5

AR 1053

| | |
|---|---|
| | Assessment Template Instruction Manual, *available at* http://www.nde.state.ne.us/nssrs/Docs/ASSESSMENT_MANUAL_3_0_0.pdf.<br><br>Title I Programs Template Instruction Manual, *available at* http://www.nde.state.ne.us/nssrs/Docs/TITLE_I_PROGRAMS_MANUAL_3_0_0.pdf.<br><br>Programs Fact Template Instruction Manual, *available at* http://www.nde.state.ne.us/nssrs/Docs/PROGRAMS_FACT_MANUAL_3_0_0.pdf.<br><br>NSSRS Uniq-Id Step-by-Step Guide, *available at* http://www.nde.state.ne.us/nssrs/Docs/NSSRS_Steps_Uniqid.pdf.<br><br>Nebraska Data Access and Management Policy, *available at* http://www.nde.state.ne.us/nssrs/Docs/NE_Data_Access_and_Management_Policy505.doc. |
| **NV†** | |
| **NH** | Data Dictionary, https://ww4.ed.state.nh.us/datadictionary/.<br><br>Policy and Procedures Manual for i4see and Related Data, *available at* http://www.ed.state.nh.us/education/datacollection/i4see/NH%20i4see%20Policy%20Manual%20v080220.doc.<br><br>A Guide to How Data Improves Student Achievement, *available at* http://www.ed.state.nh.us/education/News/DataInitiativeFactSheet.pdf. |
| **NJ** | NJ SMART Background, http://www.state.nj.us/education/njsmart/background/.<br><br>Student Data Handbook, *available at* http://www.state.nj.us/education/njsmart/download/SIDManagementStudentDataHandbook.pdf.<br><br>Special Education Student Data Handbook, *available at* http://www.state.nj.us/education/njsmart/download/SpecialEducationStudentDataHandbook.pdf.<br><br>State Submission Student Data Handbook, *available at* http://www.state.nj.us/education/njsmart/download/StateSubmissionStudentDataHandbook.pdf.<br><br>Official Communications regarding NJ SMART, *available at* http://www.state.nj.us/education/njsmart/download/ (follow the links to find the official communications).<br><br>Agreement by and between Public Consulting Group and the New Jersey Division of Purchase and Property, on behalf of the Department of Treasury and the Department of Education, as amended (on file with author). |
| **NM** | Student Identification System Application User Guide (ver. 5.0), *available at* |

AR 1054

| | http://www.ped.state.nm.us/stars/documents/User_Guide_v5.0.pdf. |
|---|---|
| | STARS Manual Volume 1 – User Guide, *available at* http://www.ped.state.nm.us/stars/dl09/SY2009%20STARS%20MANUAL-VOLUME%201.pdf. |
| | STARS Manual Volume 2 – Reference Materials, *available at* http://www.ped.state.nm.us/stars/dl09/SY2009%20STARS%20MANUAL-VOLUME%202.pdf. |
| | STARS User Authorization Form, *available at* http://www.ped.state.nm.us/stars/documents/STARS_Username_Form_3.pdf. |
| **NY** | SIRS Policy Manual (ver. 3.1) (on file with author). |
| | SIRS Dictionary of Reporting Data Elements (ver. 3.1) (on file with author). |
| | SIRS Users Guide (ver. 5.4) (on file with author). |
| | The above mentioned documents are now combined into one guidebook, *available at* http://www.emsc.nysed.gov/irts/SIRS/2008-09/2008-09SIRS-MANUAL-4-1.pdf. |
| **NC** | Training eSIS Documents Home, http://www.ncwise.org/TRAINING/ncwise_training_documents/training_pg_esis_home.html (collecting NC WISE eSIS Data Element Definitions). |
| | What's NC WISE, *available at* http://www.ncwise.org/documents/ncwise/What_Is_NC%20WISE.pdf. |
| | Introduction to Student Demographics (last updated Nov. 20, 2007) (on file with author). |
| **ND** | STARS User Manual, http://www.dpi.state.nd.us/resource/STARS/Reports/manual.shtm. |
| | Data Dictionary, http://www.dpi.state.nd.us/resource/STARS/layouts/index.shtm. |
| | Online Reporting System General Information, http://www.dpi.state.nd.us/resource/ORS/general/index.shtm. N.D. CENT. CODE § 15-10-17 (2007), *available at* http://www.legis.nd.gov/cencode/t15c10.pdf. |
| **OH** | ODE—2008 EMIS Manual, http://www.ode.state.oh.us/GD/Templates/Pages/ODE/ODEDetail.aspx?page=3&TopicRelationID=1102&ContentID=25338&Content=60675. |
| | ODE—EMIS Handbook, http://www.ode.state.oh.us/GD/Templates/Pages/ODE/ODEDetail.aspx?page=3&TopicRelationID=367&ContentID=38908&Content=60686 (follow the links to EMIS handbooks for 2008 and 2009). |

AR 1055

| | |
|---|---|
| | ODE—Statewide Student Identifier Manuals, http://www.ode.state.oh.us/GD/Templates/Pages/ODE/ODEDetail.aspx?page=3&TopicRelationID=1102&ContentID=11215&Content=60670.<br><br>ODE—Presentations—EMIS, http://www.ode.state.oh.us/GD/Templates/Pages/ODE/ODEDetail.aspx?page=3&TopicRelationID=1577&ContentID=23201&Content=61537.<br><br>ODE—2003 EMIS Manual, http://www.ode.state.oh.us/GD/Templates/Pages/ODE/ODEDetail.aspx?page=3&TopicRelationID=1101&ContentID=12084&Content=50921.<br><br>Ohio SLDS Application Profile, *available at* http://nces.ed.gov/Programs/SLDS/pdf/Ohio.pdf. |
| **OK**‡ | Press Release, CPSI Ltd., Oklahoma Deploys the Nation's First Fully Implemented Statewide SIF-Based Data Collection Model (Aug. 8, 2005), *available at* http://vcasel.com/Company/NewsReleases/tabid/116/Default.aspx.<br><br>70 OKLA. STAT. tit. 70, § 3-161 (2007), *available at* http://webserver1.lsb.state.ok.us/OK_Statutes/CompleteTitles/os70.rtf (Student Tracking and Reporting (STAR) Pilot Program). |
| **OR** | Data Dictionary, http://www.ode.state.or.us/data/kids/datadictionary/.<br><br>Data Project Governance Plan (ver. 1.1), *available at* http://www.oregondataproject.org/system/files/DATAProject_GovernancePlan_v1.1.pdf.<br><br>Progress Reviews—The Oregon DATA Project, http://www.oregondataproject.org/content/progress-reviews.<br><br>Data Project Overview, *available at* http://www.oregondataproject.org/system/files/DATAProjectOverview_2209-0123.ppt#256,1,Slide 1. |
| **PA** | PIMS User Manual Volume 1, *available at* http://www.edportal.ed.state.pa.us/portal/server.pt/gateway/PTARGS_0_2_319297_0_0_18/PIMS%20Manual%20-%20Volume%201_v1.7.1.pdf.<br><br>PIMS User Manual Volume 2, *available at* http://www.edportal.ed.state.pa.us/portal/server.pt/gateway/PTARGS_0_2_319298_0_0_18/PIMS%20Manual%20-%20Volume%202_v1.7.1.pdf.<br><br>Student Data Access and Use Policy, *available at* http://www.edportal.ed.state.pa.us/portal/server.pt/gateway/PTARGS_0_2_335984_0_0_18/PDE_Data_Access_Policy.pdf.<br><br>PIMS Voluntary Vendor Participation Program, http://www.edportal.ed.state.pa.us/portal/server.pt?open=512&objID=1839&&PageID=299313&level=2&css=L2&mode=2&in_hi_userid=2&cached=true. |

AR 1056

| RI | Common Core Data Elements, https://www.eride.ri.gov/dataElements/CCDataBook.asp (state data dictionary).<br><br>RIDE Data Warehouse, http://www.ride.ri.gov/onis/DW/DataWarehouse.aspx. |
|---|---|
| SC* | Data Collection Manual (2007-2008), *available at* http://ed.sc.gov/agency/Accountability/Technology-Services/old/dts/documents/07-08datacollectionmanual.doc.<br><br>Data Collection Spreadsheet, *available at* http://ed.sc.gov/agency/Accountability/Technology-Services/old/dts/documents/datacollectionspreadsheet_001.xls.<br><br>Data Access and Management Policy, *available at* http://ed.sc.gov/agency/Accountability/Technology-Services/Documents/5-3DraftDataAccessPolicy.pdf.<br><br>SASI Data Guidelines, *available at* http://ed.sc.gov/agency/Accountability/Technology-Services/Documents/5-3SASIDataGuidelines.pdf.<br><br>SUNS District User Guide, *available at* http://ed.sc.gov/agency/Accountability/Technology-Services/Documents/SCSUNSDistrictUserGuide.pdf. |
| SD | List of Data Elements, *available at* http://doe.sd.gov/ofm/sims/pdf/Data%20Elements%202-2005.pdf.<br><br>Special Education Data Elements, *available at* http://doe.sd.gov/oess/specialed/docs/SIMSManual8-08.pdf.<br><br>South Dakota SIMS Net Instruction Manual (on file with author).<br><br>Protecting the Privacy of Student Education Records, http://doe.sd.gov/ofm/sims/Privacy.asp.<br><br>South Dakota Department of Education and Cultural Affairs, http://doe.sd.gov/ofm/sims/POLICY1.HTM (displaying a policy statement concerning student records – data confidentiality). |
| TN | TN Department of Education: K-12, http://www.tennessee.gov/education/eis/index.shtml (follow the links to download the Education Information System User Manual).<br><br>Complete Data Dictionary, *available at* http://www.tennessee.gov/education/eis/doc/manual_dictionary.pdf.<br><br>Data Dictionary, *available at* http://www.tennessee.gov/education/eis/doc/datadict01.pdf.<br><br>Next Generation Data Collection Tools Logical Diagram, *available at* |

AR 1057

| | |
|---|---|
| | http://www.tennessee.gov/education/eis/doc/data_tools_diagram.pdf. |
| **TX** | TREx Data Standards (2008-2009), http://ritter.tea.state.tx.us/trex/datastds/datastds_08-09_33.html. |
| | Letter to the Administrator Addressed (Sept. 4, 2008), *available at* http://ritter.tea.state.tx.us/taa/comm090408.html. |
| | TEA—PEIMS Data Standards, http://ritter.tea.state.tx.us/peims/standards/index.html. |
| | PEIMS EDIT+ User Reference and Training Manual, *available at* http://ritter.tea.state.tx.us/peims/editplus/documents/RG_User09F.pdf. |
| | What is EDIT+?, http://ritter.tea.state.tx.us/peims/editplus/whatis.html. |
| | EDIT+ Frequently Asked Questions, http://ritter.tea.state.tx.us/peims/editplus/faq.html#GEN1. |
| **UT†** | |
| **VA** | Procedures for Data Collecting and Reporting, *available at* http://www.doe.virginia.gov/VDOE/Publications/ProceduresPDF.pdf. |
| | Education Information Management User Guide, *available at* https://p1pe.doe.virginia.gov/ssws/sswswebapp/jsp/common/SSWS_User_Guide.pdf. |
| | SRC Page, http://www.doe.virginia.gov/VDOE/Publications/student-coll/codes.html (follow the links to data codes and definitions). |
| | Data Elements for Student Record Collection, *available at* http://www.doe.virginia.gov/VDOE/Publications/student-coll/08-09/data-elements.pdf. |
| | Specifications for Collecting the Student Record Collection, *available at* http://www.doe.virginia.gov/VDOE/Publications/student-coll/08-09/specifications-document.pdf. |
| **VT** | Data Reporting Instructions, *available at* http://education.vermont.gov/new/pdfdoc/pgm_IT/collections/fall_census_09_report.pdf. |
| | Vermont Student Census – Online Software Instructions, *available at* http://education.vermont.gov/new/pdfdoc/pgm_IT/collections/fall_census_09_software.pdf. |
| | Collecting and Reporting Quality Data: The Best Practices Guide for Completing the Vermont Department of Education Core Data Collection, *available at* http://education.vermont.gov/new/pdfdoc/pgm_IT/training_materials/best_practices_guide.pdf. |
| **WA†** | Annual Data Collection Manual, *available at* |

AR 1058

| | |
|---|---|
| | http://www.k12.wa.us/DataAdmin/pubdocs/FormsSch/DataCollectionPln200809.pdf.<br><br>CEDARS Data Manual, January 2009 – Version 2.0, *available at* http://www.k12.wa.us/DataAdmin/pubdocs/CEDARSDataManualv20January2009.doc. |
| **WV†** | |
| **WI** | Individual Student Enrollment System (ISES) User Manual, http://dpi.state.wi.us/lbstat/isesmanual.html.<br><br>ISES CODES, http://dpi.state.wi.us/lbstat/isescodes.html (collecting ISES data codes and definitions).<br><br>ISES Discipline Data Collection and Reporting, http://dpi.state.wi.us/lbstat/isesdiscip.html.<br><br>ISES Guiding Principles, http://dpi.state.wi.us/lbstat/isesprinc.html.<br><br>ESEA Report Card, http://dpi.state.wi.us/lbstat/isesfaq1.html.<br><br>Wisconsin's Individual Student Enrollment System, http://dpi.state.wi.us/lbstat/isesfaq2.html.<br><br>Protecting Student Privacy in Wisconsin, http://dpi.state.wi.us/lbstat/dataprivacy.html.<br><br>Wisconsin Pupils Records Law 118.125 Pupils Records (on file with author). |
| **WY** | Data Elements and Rules, *available at* http://www.k12.wy.us/WISE/Documents/Library/DataElements/2008/WY-2008602_DataElementsAndRules-v0p5.pdf.<br><br>Staffing Manual and Data Collection Guidebook, *available at* http://www.k12.wy.us/WISE/Documents/Library/TrainingMaterials/2008/Oct_2008_WDE602_DCG_and_Staff_Manual_09042008.pdf.<br><br>Professional Service Contract for WSN, by and between the Wyoming Department of Education and ESP Solutions Group (on file with author).<br><br>Professional Services Contract for WISE, by and between the Wyoming Department of Education and ESP Solutions Group (on file with author). |

† Indicates a state that may have a longitudinal database, but detailed information was not publicly available.
**\*** Indicates a state database that is still in the development phase.
‡ Indicates a state that does have a longitudinal database, but we were unable to find a data dictionary.

AR 1059

## Campbell, Ellen

| | |
|---|---|
| **From:** | Modzeleski, Bill |
| **Sent:** | Wednesday, February 11, 2009 12:29 PM |
| **To:** | Campbell, Ellen |
| **Subject:** | ID's |
| **Attachments:** | Feb 11 2009 Student IDs.docx |

Here is what our Chiefs of School Safety and Security are telling us re. IDs

William Modzeleski
Associate Assistant Deputy Secretary
Office of Safe and Drug Free Schools
550 12th Street, SW
Washington, DC 20202
████████



-----Original Message-----
From: SCHLSecurity [mailto:SCHLSECURITY@LISTSERV.ED.GOV] On Behalf Of Durbak,
Andres
Sent: Saturday, February 07, 2009 2:19 PM
To: SCHLSECURITY@LISTSERV.ED.GOV
Subject: Re: Student IDs

In Chicago Public Schools, student IDs are used primarily in high schools.  The
IDs themselves serve as a very important school building access control
instrument, contain the student's photo, class schedule, and often are color
coded, so that school staff can tell if a given student belongs in the lunch room
or is just hanging out.  The IDs contain a data strip, which is used for swiping
in upon entering the building, at which time staff can see on handy monitors if
the ID really belongs to the entering student, and if the student may be on
suspension or may need to see an administrator.  The entry swipes are recorded
into our Student Information System, by which attendance is verified, and in some
schools, swipes throughout the day tracks attendance in class.


Andres Durbak
Officer, Safety and Security

From: James Golden [mailto:███████████████]
Sent: Tuesday, February 03, 2009 5:33 PM
To: 'SCHLSecurity'
Subject: RE: [SCHLSECURITY] Student IDs


We use the student IDs with their picture for security reasons and for attendance
tracking.  We have implemented in the high schools and two middle schools.  The
ID card contains the student's picture, student ID, and school name he is
enrolled in.  The ID card contains a computer chip that shows what his schedule
is (roster) and will allow the student to swipe in to track that the student is
in the building and classroom and allow for the student to be kept out if he has
been suspended from the school.

James B. Golden, Jr.
Chief Safety Executive
School District of Philadelphia


-----Original Message-----
From: SCHLSecurity [mailto:SCHLSECURITY@LISTSERV.ED.GOV] On Behalf Of
███████████████
Sent: Thursday, February 05, 2009 11:50 AM
To: SCHLSECURITY@LISTSERV.ED.GOV
Subject: Re: Student IDs

Knowing who is on your campus is a main ingredient in keeping your campus safe - we endorse student ID badges but do not mandate at this time -- most of our schools, however, do mandate that students and staff wear badges , as well as all visitors. I do not see any FERPA violation since we are using at our sites -- badges are also tied in to lunch,media and in the future, bus passes.

-----Original Message-----
From: SCHLSecurity [mailto:SCHLSECURITY@LISTSERV.ED.GOV] On Behalf Of Larry Borland
Sent: Tuesday, February 03, 2009 11:29 AM
To: SCHLSECURITY@LISTSERV.ED.GOV
Subject: Re: Student IDs

On the contrary, it is my belief that student identification cards promote school safety by allowing a readily available means of determining if an individual belongs in a school building or on a school bus.  I would think that if the identification card is displayed within a school building or on a school bus, and contains only a picture and name, that would be only directory information and would only be displayed in the educational environment for legitimate educational purposes.  I think that is similar to requiring students to put their name on their test papers.  Best regards all.

-----Original Message-----
From: SCHLSecurity [mailto:SCHLSECURITY@LISTSERV.ED.GOV] On Behalf Of Konstan Elayna
Sent: Tuesday, February 03, 2009 11:40 AM
To: SCHLSECURITY@LISTSERV.ED.GOV
Subject: Re: Student IDs

In our high schools, we do recommend that students wear IDs.

-----Original Message-----
From: SCHLSecurity [mailto:SCHLSECURITY@LISTSERV.ED.GOV] On Behalf Of John Blackburn
Sent: Tuesday, February 03, 2009 11:41 AM
To: SCHLSECURITY@LISTSERV.ED.GOV
Subject: Re: Student IDs

In Dallas, we require students to wear IDs and see them as a great safety measure.

-----Original Message-----
From: SCHLSecurity [mailto:SCHLSECURITY@LISTSERV.ED.GOV] On Behalf Of Yatsuk, Robert A

Sent: Tuesday, February 03, 2009 11:46 AM
To: SCHLSECURITY@LISTSERV.ED.GOV
Subject: Re: Student IDs

Currently we do not use student IDs in Anne Arundel County Public Schools,
however, I would like to go to them eventually in the high schools and then the
middle schools; probably not in elementary schools.  They provide another layer
of security in the ability to quickly identify students from non-students who may
be on campus.  However, I think they need to be tied to the school library,
cafeteria, athletic events, etc. as an incentive to be effective.  For the
students, the photo and name would be critical for staff use.  I'm not sure the
student ID number would be necessary. We have finally gone to IDs for all of our
staff and it is difficult to ensure they are being worn at all times while on
school property.  We conduct spot inspections to give principals feedback to
encourage their use.

Robert A. Yatsuk
Supervisor of School Security
Anne Arundel County Public Schools
2644 Riva Road
Annapolis, MD 21401

-----Original Message-----
From: SCHLSecurity [mailto:SCHLSECURITY@LISTSERV.ED.GOV] On Behalf Of Herrington,
Michael M.
Sent: Tuesday, February 03, 2009 12:09 PM
To: SCHLSECURITY@LISTSERV.ED.GOV
Subject: Re: Student IDs

Sara,
    Our  students wear ID cards in Duval County. It is my opinion that not having
this information would be the impediment.

Michael M. Herrington, Chief
Duval County School Police

-----Original Message-----
From: SCHLSecurity [mailto:SCHLSECURITY@LISTSERV.ED.GOV] On Behalf Of Ray, Ed
Sent: Tuesday, February 03, 2009 12:46 PM
To: SCHLSECURITY@LISTSERV.ED.GOV
Subject: Re: Student IDs

Student ID's are essential to maintaining control over who is a student at a particular school and who is not. This information is directly related to school safety. The ID's provide the ability to immediately identify the student.

The information on student ID is directory information ( name, school, and student ID) . The student ID #  allow us to confirm the students school, and that students schedule and status.

Edward Ray, Chief
Department of Safety and Security
Denver Public Schools

-----Original Message-----
From: SCHLSecurity [mailto:SCHLSECURITY@LISTSERV.ED.GOV] On Behalf Of Steve Garner
Sent: Tuesday, February 03, 2009 12:56 PM
To: SCHLSECURITY@LISTSERV.ED.GOV
Subject: Re: Student IDs

We have high school students wear them in Indy.

Steve Garner, Chief
IPS Police Dept.
1129 E. 16th St.
Indpls., IN 46202
███████

-----Original Message-----
From: SCHLSecurity [mailto:SCHLSECURITY@LISTSERV.ED.GOV] On Behalf Of Ward, Jeff
Sent: Tuesday, February 03, 2009 1:14 PM
To: SCHLSECURITY@LISTSERV.ED.GOV
Subject: Re: Student IDs

We do not issue cards to students yet.

-----Original Message-----
From: SCHLSecurity [mailto:SCHLSECURITY@LISTSERV.ED.GOV] On Behalf Of Freeman, Willie
Sent: Tuesday, February 03, 2009 11:58 AM
To: SCHLSECURITY@LISTSERV.ED.GOV
Subject: Re: Student IDs

In Newark Public Schools we do utilize student identification cards. It is definitely an important security measure because it provides an immediate ID(picture) for us to determine if  the student belongs to a specific school.  In most urban schools one of the biggest problems is intruders and not having this resource will hurt our operations. The removal of the ID number or imbedding it into the bar code is fine the picture is essential. We are not sharing this with outsiders just the immediate school community on site. This process has been used throughout history especially in the lower grades Pre-K and K. They are used on class trips and school buses to transport these students. Parent mark up the younger students clothing to help identify them. W.Freeman

-----Original Message-----
From: SCHLSecurity [mailto:SCHLSECURITY@LISTSERV.ED.GOV] On Behalf Of Donald Mercer
Sent: Tuesday, February 03, 2009 1:56 PM
To: SCHLSECURITY@LISTSERV.ED.GOV
Subject: Re: Student IDs

Currently, we do not provide student id's; however, if we did I feel it important to have access to the student number.

Don Mercer
Director, Risk Management & Security Services Prince William County Public Schools P.O. Box 389 Manassas, Virginia 20108

███████████

-----Original Message-----
From: SCHLSecurity [mailto:SCHLSECURITY@LISTSERV.ED.GOV] On Behalf Of McEvoy, Pegi
Sent: Tuesday, February 03, 2009 2:34 PM
To: SCHLSECURITY@LISTSERV.ED.GOV
Subject: Re: Student IDs

In Seattle, the student picture, name and ID is embedded in our Safety and Security Information System that is remotely accessible to staff. I agree that being able to identify who is currently assigned at school (and not currently on suspension/expulsion) is important. Because this system is in place and contains "real time" data, we do not require ID cards.

Pegi

-----Original Message-----
From: SCHLSecurity [mailto:SCHLSECURITY@LISTSERV.ED.GOV] On Behalf Of Ellis, Fred (Safety & Security)
Sent: Tuesday, February 03, 2009 3:10 PM
To: SCHLSECURITY@LISTSERV.ED.GOV
Subject: Re: Student IDs

We do not utilize student ID cards. I generally don't see any safety issues with them being worn...In the case of young (elementary age) students wearing them to/from school, someone could suggest that a "bad guy" could see and use their name to entice them to come w/them.....I don't know how much of an argument that could be, but the only one I can think of.

Fred Ellis
Director, Office of Safety and Security
Fairfax County Public Schools
6800-B Industrial Road

Springfield, VA 22151

███████████████████████████████

---

This is the first one...several more to follow

-----Original Message-----
From: SCHLSecurity [mailto:SCHLSECURITY@LISTSERV.ED.GOV] On Behalf Of Larry
Hill/Admin/Avery/MCS
Sent: Tuesday, February 03, 2009 2:44 PM
To: SCHLSECURITY@LISTSERV.ED.GOV
Subject: Re: Student IDs

Memphis City Schools ID badges only has the students name and school.  The
student ID is embedded in the bar code.

---



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF PLANNING, EVALUATION AND POLICY DEVELOPMENT

Dr. Gregory Maass                                    JUL 23 2010
Superintendent
Green Bay Area School District
200 S. Broadway
Green Bay, Wisconsin 54303

███████████████████
Family Educational Rights
and Privacy Act

Dear Dr. Maass:

This is in regard to the complaint filed by ████████████████ (Parent) against the Green
Bay Area School District (District) under the Family Educational Rights and Privacy Act
(FERPA). By letter dated April 3, 2009, this Office informed you of the Parent's allegation that
the District violated § 99.30 of the FERPA regulations by improperly disclosing personally
identifiable information from his ██████████ (Student) education records.

Specifically, the Parent alleged that the District policy on Student Identification Cards required
that students "openly display their student identification card on a breakaway lanyard around
their neck. The Student's ID contained a student photo, name and ID number along with barcode
identification." Although the Student no longer attends the District, the Parent informed this
Office of his allegation by letter dated April 21, 2008. The Parent stated that students were
required to wear the ID cards in a manner that publicly discloses the student ID numbers
although, after a review of the District's policy on Student Identification Cards, it was not clear
from the information provided whether the student ID numbers were hidden or otherwise
embedded in barcodes so that only school officials with legitimate educational interest could
gain access to them.

By letters dated May 7, 2009, and July 30, 2009, Geoffrey A. Lacy, attorney for the District
responded to the Parent's allegation. In his May 7 letter, Mr. Lacy stated that students were
required to wear the ID badges at all times in the school and that the ID numbers and photos of
the students were visible to anyone who saw the students. Mr. Lacy further explained that the ID
number cannot be used to gain access to any student record information without a password and
access to the student system. The directory information notice that the District posted for the
2007-2008 school year, the notice in place at the time of the alleged improper disclosure, does
not list student ID numbers as a directory information item.

400 MARYLAND AVE. S.W., WASHINGTON, DC 20202
www.ed.gov


EXHIBIT
B

Page 2 – Dr. Gregory Maass

Section 99.30 of the FERPA regulations states:

> [A]n educational agency or institution shall obtain a signed and dated written consent . . . before it discloses personally identifiable information from the student's education records.

Section 99.31(a)(11) of the FERPA regulations states that an educational agency or institution may disclose personally identifiable information from an education record of a student without the consent required by § 99.30 if the disclosure is information the educational agency or institution has designated as "directory information" under the conditions described in § 99.37.

Section 99.3 of the FERPA regulations states: "'Directory information' means information contained in an education record of a student that would not generally be considered harmful or an invasion of privacy if disclosed." That provision continues in describing the type of information that may be designated as "directory information" –

> (a) Directory information includes, but is not limited to, the student's name; address; telephone listing; electronic mail address; photograph; date and place of birth; major field of study; grade level; enrollment status (e.g., undergraduate or graduate, full-time or part-time); dates of attendance; participation in officially recognized activities and sports; weight and height of members of athletic teams; degrees, honors and awards received; and the most recent educational agency or institution attended.

> (b) Directory information does not include a student's –

> (1) Social security number; or

> (2) Student identification (ID) number, except as provided in paragraph (c) of this section.

> (c) Directory information includes a student ID number, user ID, or other unique personal identifier used by the student for purposes of accessing or communicating in electronic systems, but only if the identifier cannot be used to gain access to education records except when used in conjunction with one or more factors that authenticate the user's identity, such as a personal identification number (PIN), password, or other factor known or possessed only by the authorized user. (See 34 CFR § 99.3 "Directory information.")

Section 99.37 of the regulations outlines what conditions apply to disclosing directory information as follows:

> (a) An educational agency or institution may disclose directory information if it

Page 3 – Dr. Gregory Maass

has given public notice to parents of students in attendance and eligible students in attendance at the agency or institution of:

(1)The types of personally identifiable information that the agency or institution has designated as directory information;

(2) A parent's or eligible student's right to refuse to let the agency or institution designate any or all of those types of information about the student designated as directory information; and

(3) The period of time within which a parent or eligible student has to notify the agency or institution in writing that he or she does not want any or all of those types of information about the student designated as directory information.

(b) An educational agency or institution may disclose directory information about former students without complying with the notice and opt out conditions in paragraph (a) of this section. However, the agency or institution must continue to honor any valid request to opt out of the disclosure of directory information made while a student was in attendance unless the student rescinds the opt out request.

(c) A parent or eligible student may not use the right under paragraph (a)(2) of this section to opt out of directory information disclosures to prevent an educational agency or institution from disclosing or requiring a student to disclose the student's name, identifier, or institutional e-mail address in a class in which the student is enrolled.

(d) An educational agency or institution may not disclose or confirm directory information without meeting the written consent requirements in § 99.30 if a student's social security number or other non-directory information is used alone or combined with other data elements to identify or help identify the student or the student's records.

The preamble to the 2008 final regulations, that made changes to the directory information provisions in the FERPA regulations, contains the following discussion relative to student ID numbers:

With regard to student ID numbers in particular, an agency or institution may print an ID number on a student's ID card whether or not the number is treated as directory information because under FERPA simply printing the ID number on a card, without more, is not a disclosure and, therefore, is not prohibited. See 20 U.S.C. 1232g(b)(2). If the student ID number is not designated as directory information, then the agency or institution may not disclose the card, or require the student to disclose the card, except in accordance with one of the exceptions to the consent requirement, such as to school officials with legitimate educational interests. If the student ID number is designated as

Page 4 – Dr. Gregory Maass

      directory information in accordance with these regulations, then it may be disclosed.
      However, the agency or institution may still decide against making a directory of student
      ID numbers available to the general public. 73 FR at 74808 (Dec. 9, 2008).

As Mr. Lacy explained, the ID number that the District was using was being used as a directory
information item that could not be used to gain access to any student record information without
a password and access to the student system as outlined above under § 99.37(d). In order for the
District to disclose the ID number in this manner, that is, as a directory information item, the
District must include the term ID number in its directory information policy. A review of the
District's information policy does not indicate that student ID numbers were a directory
information item. Accordingly, we find that the District did not comply with FERPA in this
regard.

Subsequent to the District receiving this complaint, Mr. Lacy advised by letter dated
July 30, 2009, that the District no longer requires the disclosure of student ID numbers on the ID
card. Accordingly, we are closing this complaint and will notify the Parent by copy of this letter.

Thank you for your cooperation with regard to this matter.

                    Sincerely,

                    Ellen Campbell
                    Acting Director
                    Family Policy Compliance Office

cc:    Parent

## FERPA

**From:**

**Sent:** October 23, 2008 7:04 PM

**To:** FERPA

**Subject:** Follow Up

I am following up on a complaint that I filed last spring regarding Green Bay Area Public School Districts violation of FERPA in that they require students to involuntarily provide privacy information to persons who have no reasonable educational purpose. This violation is perpetrated through the requirement that all students display their ID with personal non-directory information exposed at all times on school grounds. I have relocated since filing the complaint; however I believe accountability to the written law should not be taken lightly regardless of the agency or status of the perpetrator. I find it very concerning that the USDOE has not taken a more direct and authoritative approach to ensure compliance to the laws that they are entrusted to enforce. My new contact information is listed below. Please reply with an update to the status of my complaint.

Regards,



April 21, 2008

Family Policy Compliance Office
U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202-5920



Dear Compliance Office:

I am writing this letter as a formal request for action regarding what I believe to be violations of FERPA (20 U.S.C. § 1232g; 34 CFR Part 99) by the Green Bay Area (State of Wisconsin) Public School District. Unfortunately the repeated efforts to resolve this ongoing violation by ███████████ at West High School, and myself have not yielded what we believe to be a lawful resolution from the school district. As a result of his efforts to educate officials at Green Bay West High School regarding this law, ████ has been harassed, disciplined and faces suspension or expulsion for refusing to disclose privacy information.

The desired action from this request is primarily that the U.S. Secretary of Education will compel the Green Bay Area Public School District to comply with FERPA laws. Secondarily I would like to request that the U.S. Department of Education will assist ████ in having disciplinary measures associated with his efforts to bring the School District into compliance with FERPA Laws, permanently removed from his education records. Given the fact that the School District violations of FERPA continue to occur on a daily basis affecting several thousands of students in the district combined with the rhetoric regarding the degree of discipline that will be handed out by the administration at Green Bay West High School regarding ████ for not openly disclosing personally identifiable information; I would like to request the U.S. Department of Education expedite their investigation and resolution of this matter.

The following chronology of events describes what actions have been taken to try resolving this incident locally.

**January 2nd, 2008** – Students notified of new "security" policy to be enacted requiring that they openly display their student identification card on a breakaway lanyard around their neck. The Student ID contains a student photo, name and ID number along with barcode identification. Although "Student Name" is listed in their advisory of "directory information" the student "ID Number" is not. Additionally, this is compounded by the fact that no right of refusal is granted relative to having this information openly displayed. ████ expressed concern at this time to his history teacher, several other students and to me that this policy is a violation of privacy rights as well as morally repugnant.

**January 3rd through January 22nd, 2008** – During this time, ████ was repeatedly warned by school staff that he is required to display his ID and the personally identifiable information that it contains. Each time ████ is confronted he contends that enforcement of this policy is a violation of his privacy rights. Each time he complies with the policy for a short period, to get past the harassment and to be allowed to attend class.

**January 23rd, 2008** – ████ is again harassed to comply with this unlawful policy; this time he refused to display the ID and his personally identifiable information and is sent to the Principals office. ████ discussed the policy with Mr. Josh Chudacoff, Associate Principal and is told that it is being enforced as directed by the Green Bay Area Public School District. Mr. Chudacoff explains to ████ that if he wishes to change the policy, he will need to speak to the school board.

**January 28th, 2008** – ████ addresses the Green Bay Public School Board in opposition to the implementation of this policy. ████ explained the reasons he opposes such a policy and touches on the fact that it does not comply with the law. The School Board President, Jean Marsch, tells ████ that Dr. Nerad, Green Bay Area Public School District Superintendent, will review the policy and discuss it with ████ within the next couple weeks.

**February 13th, 2008** – ████ and I meet with Green Bay Area Public School District personnel, Al Behnke, Director of Security and Barbara Dorff, Director of Student Services regarding this policy. ████ and I expressed legal questions regarding the policy as well as why we felt the policy was immoral relative to the restrictions placed on personal liberty. Both Al and Barbara agreed with our moral arguments, however expressed their

opinion that they disagreed with our legal assessment of the policy. They stated that the School District lawyer had insisted upon its legality, basing that opinion relating the policy to a dress code issue. ▮▮▮requested a copy of the policy to review further. They said that they didn't have a copy on hand but that they would get him a copy. We left the meeting saying that after receiving the written policy, we would contact them with further concerns.

**March 2008 (do not recall specific date)** – ▮▮▮ received a written copy of the policy from Barbara Dorff following a further inquiry at to whether they were going to get him a copy. The copy that was provided to ▮▮▮ was stamped "Draft".

**March 13, 2008** – After review of the written policy as it was provided, we determined that the enforcement was "during normal school hours" as stated. ▮▮▮ again was being harassed before the school day started by West High School Staff insisting upon the unlawful application of this policy.▮▮▮ again explained his position to the staff and refused to display his personally identifiable information for everyone to see. Associate Principal Sandra Beyer was brought into the discussion. ▮▮▮ started to explain his legal stance again and Mrs. Beyer refused to listen to him and told▮▮▮ he was being insubordinate by not displaying his personally identifiable information. At this point▮▮▮allowed his frustration to show and in his exasperation he replied to her insubordination comment with "If you were to take it any other way, you'd be a fool." At this point he was sent to Mrs. Beyer's office and was assigned detentions. As such, it is our contention that he was being punished by the school for his insistence that the school follow the law. As a result of this particular incident, he was also required to meet with the West High School Activities Director, Todd Sobrilsky regarding this "Insubordination case".

I was notified by▮▮▮ Track Coach; Lloyd Nell that ▮▮▮ would be having the subsequent meeting with Mr. Sobrilsky. I expressed to Mr. Sobrilsky that he needed to take into consideration that▮▮▮was still trying to work through the legality of this policy with the district and any actions taken against ▮▮▮for standing should be withheld pending resolution at that level. ▮▮▮ was issued an official warning as a result of the hearing, based on Mr. Sobrilsky saying that Mrs. Beyer's request was reasonable.

**March 13, 2008** – After speaking with ▮▮▮, we decided that this unlawful policy needed to be put to rest and that I would take the lead in further actions with the district and beyond, if necessary.

**March 31, 2008** – I sent a certified letter to Dr. Nerad and each member of the Green Bay Public School Board regarding the illegality of their policy. I have attached these letters for your review. In them I referenced the FERPA law and explained to them that, in my evaluation, failure to appropriately respond would place federal funding for the district at risk pursuant to 20 U.S.C. § 1232g. I presented Friday April 11, 2008 as a deadline to contact me to further discuss or for appropriate action regarding this issue.

**April 3, 2008** – I placed a call to the U.S. Department of Education, Family Policy Compliance Office to confirm my interpretation of the FERPA law. I spoke with Ingrid Brault and explained the policy and information that is being exposed. She said that in her estimation, given only the facts as I presented them, that this was indeed a violation of FERPA. I asked if the School District had questions, whether I could have them contact her for clarification and she agreed. I did not disclose what district was in violation at that time; because I had hoped that a resolution would be found, prior to the U.S. Department of Education needing to get involved.

**April 8, 2008** – I met with Dr. Daniel Nerad, Green Bay Area Public School District to discuss the policy in question. Dr. Nerad stated that the "policy" is classified as a "directive" and was never meant to be written. He emphasized that the School District views this action as a security measure. I explained to Dr. Nerad that if the ID card did not expose the student's name and identification number (which is used for accessing student accounts), it would not violate FERPA as it is currently written. At the conclusion of our meeting Dr. Nerad requested that I give him until April 16, 2008 to discuss my assertions and the documentation I provided (i.e. the FERPA Law and Wisconsin State Statute 118.125 which mirrors FERPA) with the school district lawyer. I agreed to this request.

**April 16, 2008** - Dr. Nerad left a message at my home stating that he had not heard back from the district's legal counsel regarding this matter and he was requesting for an extension until April 18, 2008 before I submit this request for action. I agreed to provide him this time prior to submitting this request for action.

● Page 3                                                                      April 21, 2008

**April 18, 2008** – Dr. Nerad stated that he could not get an appointment until Monday April 21, to discuss this issue with the school district lawyer, I conceded to wait until they could meet before submitting this letter.

**April 21, 2008** – Dr. Nerad left a message and stated that the school district lawyer was given the information that I had provided him during our meeting (i.e. FERPA Law and State Statute 118.125). He said he asked for her to make this issue a priority.

To this date, the Green Bay Area Public School district has not responded in an appropriate manner to address the legal issues of the policy that they are enforcing. The repeated failure of the school district staff to address the issue with urgency leads me to believe that they are trying to delay until the school year is completed and hoping that this issue is dropped. Since this issue is continuing to expose the private information of several thousand students each day, I ask that the U.S. Department of Education act in an expedient manner to compel the Green Bay Area Public School District to comply with 20 U.S.C. § 1232g; 34 CFR Part 99.

Students are unjustly being disciplined for being legally correct and having "insubordinate" notations placed in their permanent disciplinary records. I had hoped that, upon reviewing the law, of which they were made aware, the Green Bay Area Public School District would have chosen to comply with FERPA. This has not been the case, hence I am requesting your immediate intervention to compel them to comply with the law using the authority given through 20 U.S.C. § 1232g and 20 U.S.C. § 1232i. Additionally, if your office is capable of having the disciplinary notations removed from student records specifically related to their overzealous enforcement of this unlawful policy, I would request that be done as well.

Sincerely,





## Student Identification Cards

An increased awareness of school safety and security has dictated a change at the high schools in the Green Bay School District. It is everyone's goal to ensure the safety of all our students and staff while continuing to have Green Bay Schools be welcoming to all parents and community members. It is the Board of Education and Administration's belief that it is necessary to implement the use of student, staff, and visitor ID's in order to maintain a safe educational environment for all individuals who attend, visit, or work at any of the Green Bay high schools. All individuals who attend, visit, and/or work at a Green Bay high school are expected to abide by all rules of behavior outlined by established School Board policies, school rules, and administrative practices.

### Expectations:

1. Students are expected to wear school issued ID's at all times during the school day on a break-away lanyard (which follows "dress code" rules) in a visible (unobstructed picture showing) position on the front upper torso above the belt line. (Student may remove ID's if given direct permission by school personnel under special circumstances (i.e.: Classes or activities that would require the removal of the ID's for safety reasons).

2. Students will wear their own ID's (*This includes temporary ID's) in an appropriate visible fashion at all times while on school grounds throughout each designated school day. Students will have their school ID easily accessible during all school activities (academic, extra-curricular, co-curricular). Students who allow other students and/or non-students to wear their ID's on school grounds will be subject to disciplinary action. **Student who Blatantly Refuses to Wear Required ID OR Student who Refuses to Wear ID in a Visibly Appropriate Fashion will be Considered Insubordinate and Dealt with According to Procedures Outlined in the High Schools Expectations Book.** (School Board Policy KDAT)

3. It is the responsibility of each student who forgets his or her ID to immediately report to the Security desk or designated location to obtain a temporary ID for the day.

4. There will be a $5.00 charge to replace lost ID's

7/19/2007

███████████

March 30, 2008

Dan Nerad
Green Bay Area Public School District
Superintendent
200 S. Broadway
Green Bay, WI 54303

Dear Mr. Nerad:

On Monday, January 28, 2008, ███████████ at Green Bay West High School addressed the School Board relative to the "policy" requiring students to openly display personally identifiable information while on school grounds. ███ briefly touched on some legal barriers that this school district action faced. Since this time members of your staff have met with ███ and I to discuss his concerns, however the district has refused to comply with the law (34 CFR Part 99 - FERPA) regarding this issue.

To this point, Green Bay Public School District personnel have failed to adequately respond to ███ concerns. Additionally, certain members of the West High School staff have acted in a condescending manner regarding the enforcement of this illegal policy. The time has come where I will be taking the lead in this matter from ███ and pressing all further actions. Here are the unacceptable actions from the district up to this point that are the cause of my reactions.

- Al Behnke and Barbara Dorff assured ███ that this was a written policy and would provide him with a copy of the policy. The written policy that was provided to ███ several weeks later upon his further inquiry was stamped as a "DRAFT". Yet this policy was being enacted. I have included a copy of this policy with this letter as I'm sure you will find many statements included in it that are problematic at best.

- During the conversation with Al and Barbara, their premise was that it provides a layer of security as a deterrent, and admitted that it was inadequate to prevent a tragedy such as the plot at East High School. Yet when it was explained that according to the Supreme Court decision Tinker v. Des Moines School District, this concern was not an adequate reason to institute such a policy, they said district counsel assured them the policy was acceptable as a dress code.

- When complying with the policy as it was provided to ███ (stating that this policy was only in effect during normal school hours), ███ was consistently harassed by West High School staff to comply with this policy prior to the first bell signifying the start of normal school hours. This harassment resulted in one of the associate principles (Sandra Beyer) recording him as being insubordinate. A call was placed to our house saying an immediate conference was needed with us parents. We returned the call but did not hear back from Sandra for over a week, and during the phone conversation I had with her, she stated that it did not matter what that written policy stated because it was only a draft and "the administration could enforce it however they saw fit". When I contended

that was not the case, she stated that we didn't need a conference because "it wouldn't do any good".

As a parent of students in the Green Bay Area Public School District there are a few issues, besides the legal aspects of this policy, that give me cause for concern. First is that if the only written depiction of this policy is in DRAFT status, how is the district ensuring that the School Board approves of its enacting. Second, how is the district ensuring that the application of the policy is consistent among all that are affected? Third, who at the district level is responsible for ensuring that this policy is clearly understood among administration and parents/students? Finally, how is it that an administrator at the level of Associate Principal believes that regardless of what the district may state as the policy, they are given the freedom to interpret and enforce policies as they see fit?

I am appealing to you as a final step to bring resolution to this matter, before it is relegated to the judicial system, costing the taxpayers thousands of dollars to defend an illegal action being enforced by the school district. A failure to comply with the law will also place the district in jeopardy of losing federal funding in accordance with 20 U.S.C. § 1232g. The school district has been placed at a significant financial risk through the implementation of this unlawful policy and I would sincerely like to resolve this matter before all of our children's education is impacted.

Please call me for any additional information I can provide about this situation or to negotiate a compromise that would be acceptable: ███████████████████████. If I do not hear from you by April 11th, I will assume that you have selected to defend this policy in the courts and will proceed accordingly.

Sincerely,



cc:



March 30, 2008

Green Bay Area Public School District
School Board Members

Re: School District Disclosure of Personally Identifiable Information

Dear Board Members of the Green Bay Area Public School District:

Enclosed with this letter addressed to you, is a letter that I am sending to Dan Nerad. As ▮▮▮▮
▮▮▮ elicited to you on January 28, 2008 at the School Board Meeting, the issue of making
personally identifiable information available without proper consent is a very serious matter. To
this point I believe that the district has not taken this matter serious and am prepared to take
whatever measures are legally necessary to have this issue resolved, although it is my preference
that this is resolved satisfactorily outside of the courtroom, I am confident that the district will be
found to be guilty of enforcing an unlawful policy.

I strongly urge you to fully review the laws regarding disclosure of privacy information relative
to school districts and the potential consequences to the district for failing to comply with the
law. Below I have enclosed excerpts of the relevant laws for your review. However to fully
understand the matter, I suggest you fully review them beyond these excerpts.

## *Federal Law - Code of Federal Regulations: Title 34, Part 99*

### *Excerpt from Part 99.3*
Personally identifiable information includes, but is not limited to:
**(a) The student's name;**
(b) The name of the student's parent or other family member;
(c) The address of the student or student's family;
(d) A personal identifier, such as the student's social security number or student number;
(e) A list of personal characteristics that would make the student's identity easily traceable; or
(f) Other information that would make the student's identity easily traceable.
Note: Clearly school ID would be considered as personally identifiable information as they
contain 2 qualifying pieces of information (student name and student number)

### *Excerpt from Part 99.30*
(a) The parent or eligible student shall provide a signed and dated written consent before an educational agency or institution
discloses personally identifiable information from the student's education records, except as provided in §99.31.
(b) The written consent must:
(1) Specify the records that may be disclosed;
(2) State the purpose of the disclosure; and
(3) Identify the party or class of parties to whom the disclosure may be made.
Note: This "policy" was enacted at the start of the 2nd semester without parental consent being
granted, making the School Districts enforcement of the policy a violation of the law.

### *Excerpt from Part 99.31*
(a) An educational agency or institution may disclose personally identifiable information from an education record of a student
without the consent required by §99.30 if the disclosure meets one or more of the following conditions:
(1) The disclosure is to other school officials, including teachers, within the agency or institution whom the agency or institution has
determined to have legitimate educational interests.

(2) The disclosure is, subject to the requirements of §99.34, to officials of another school, school system, or institution of postsecondary education where the student seeks or intends to enroll.

(3) The disclosure is, subject to the requirements of §99.35, to authorized representatives of—

(i) The Comptroller General of the United States;

(ii) The Attorney General of the United States;

(iii) The Secretary; or

(iv) State and local educational authorities.

(4)(i) The disclosure is in connection with financial aid for which the student has applied or which the student has received, if the information is necessary for such purposes as to: ...

**Note:** I am very confident that fellow students, school visitors, contractors and other peripheral staff members do not meet the conditions outlined in this exception to consent as their knowledge of this personal information does NOT serve a legitimate "educational" interest.

## *Federal Law – United States Code: Title 20, Chapter 31, SubChapter III, Part 4*

### *Excerpt from § 1232g*

(b) *Release of education records; parental consent requirement*; exceptions; compliance with judicial orders and subpoenas; audit and evaluation of federally-supported education programs; recordkeeping

(1) *No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein other than directory information, as defined in paragraph (5) of subsection (a) of this section) of students without the written consent of their parents to any individual, agency, or organization, other than to the following— ...*

**Note:** The policy goes on to explain exceptions which are equal to Part 99.31 above. Hence the reasonable assumption can be drawn that this policy may jeopardize federal funding from the Department of Education.

I have appealed to Dr. Nerad in order to prevent this issue from reaching the courts and jeopardizing this unlawful policy from significantly impacting the Green Bay Public School District. As I can understand the good intentions surrounding the enacting of this requirement that students display their ID for all to see, it is clearly an infringement on their rights and those of their parents. Again, I urge you as a member of the School Board to review and understand the law in this matter and act as you deem appropriate. If this matter is not settled, the School Board will be named as the defendant in this matter along with the District Administration.

As I offered Dr. Nerad, please call me for any additional information I can provide about this situation or to negotiate a compromise that would be acceptable: ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮. If I do not hear from you by April 11th, I will assume that you have selected to defend this policy in the courts and will proceed accordingly.

Sincerely,

▮▮▮▮▮▮▮▮▮▮▮

cc: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮

# Brault, Ingrid

| | |
|---|---|
| **From:** | FERPA |
| **Sent:** | May 02, 2008 1:23 PM |
| **To:** | Brault, Ingrid |
| **Subject:** | FW: Stop School Districts Unlawful Policy (GBAPS) |

-----Original Message-----
**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Thursday, May 01, 2008 7:50 PM
**To:** Luke Valitchka; dnerad@greenbay.k12.wi.us; FERPA
**Cc:**

**Subject:** Stop School Districts Unlawful Policy (GBAPS)

Mr. Valitchka and Dr. Nerad,

Following my conversation with Dr. Nerad today, I wanted to inform you that, effective immediately, ▮▮▮▮▮▮▮ ▮▮▮▮▮▮ will not continue to conform to your unlawful policy requiring them to display personally identifiable information. They will present their ID upon request to school authorities; however they will not display them continually on a lanyard around their necks. As Dr. Nerad stated in our conversation, I am going to do what I have to do and in doing so will force you to make your decision on how far you choose to push your unlawful actions. ▮▮▮▮▮▮▮▮ I choose to stand on the side of the law, because we still believe that laws are made for a reason. I have scanned and attached a copy of the districts notification of "directory information" and it does not include the student's ID number, so you cannot hide behind saying that the exposed information is covered by that notification.

As Dr. Nerad expressed that the Green Bay Area Public School District will be changing the ID for the next school year to remove the student ID number demonstrates that the school district recognizes that requiring student to display this information is in violation of State Statute 118.125 and Federal FERPA Law (20 U.S.C. §1232g; 34 CFR Part 99). I find it unacceptable that the district will then continue to impose a directive, knowing that it violates state and federal privacy laws. Obviously as "educators" both of you must realize the impact that this decision is to have on students. The district re-wrote the co-curricular handbook this past year to emphasize character and accountability; however actions speak much louder than words. I am sure that either of you would have no problem suspending a student from extracurricular activities if they were to violate the law or established rules, yet you choose to place yourselves above the law with the decision to continue enforcing an unlawful policy.

As another point to cover, the fact that next years ID will contain the Students name, which will be noted as "directory information", I implore you to realize that according to the law, a parent may request that this information is not dispersed and require the school to find alternatives for those students. I will work to educate the parents and students of this fact so that their private information is not continually placed in jeopardy of being disclosed to persons that are not appropriate. I provided the school district with a contact Ingrid Brault at the Family Compliance Office (U.S. Department of Education - 1-800-877-8339 – feel free to call and clarify if you

05/05/2008

doubt my assertions regarding federal FERPA law) so that they could call and make sure that they resolve this situation in an acceptable manner, however it is obvious that the school district has failed to follow through.

In closing, I will say that ▮▮▮▮▮ I have worked with West High School and the School District through the channels provided since January of this year. We paid extreme caution to ensure that our assertions were true and provided specific information for the district to investigate, which was obviously correct or the ID cards would not be getting changed for next year. However at this point we are sadly disappointed that we must now publicly expose the fact that the district apparently believes that they are above the laws of the land. To all who are copied on this email, feel free to forward it to anyone who has a stake and would be interested in knowing about the districts violation of state and federal laws.

Best Regards,

Green Bay Area Public Schools



About Our District    About Our Schools    For Parents and Students    Student Art
Strategic Plan    Education News    Alumni    District Staff    Employment

*About Our Schools*

Search WWW
Search this site



### Directory Data

The Green Bay Area Public School District designates as directory data
a student's name, date and place of birth, address, telephone listing,
major field of study, participation in officially recognized activities and
sports, weight and height of members of athletic teams, dates of
attendance, photographs, degrees and awards received and the name
of the school most recently previously attended by the student. This
directory data shall be considered public information and may be
released to appropriate persons and media including the Wisconsin
Student Number Locator System unless parents or adult students
refuse the release, in writing, of their own initiation. Refusal of such
release must be made no later than 14 days after the opening of school
or of enrolling in school in the case of those entering the Green Bay
Area Public School District after the school year has started.

*PARENTS MAY CHOOSE NOT TO ALLOW RELEASE OF THIS INFO!*

Upon request by military recruiters or higher education institutions, a
school district shall provide access to student names, addresses, and
telephone numbers. Parents/guardians and adult students may request
that the school district not provide this information without prior consent.
To exercise this right, please contact the building principal of your
school.

Join our district newsletter
mailing list.
Your e-mail address:
[                    ] Go

Last updated: 01/25/2007

200 S. Broadway, Green Bay, WI 54303 Phone: 920-448-2000 E-mail: webmaster@greenbay.k12.wi.us

## Brault, Ingrid

**From:** FERPA
**Sent:** April 28, 2008 9:52 AM
**To:** Brault, Ingrid
**Subject:** FW: Attn: Ingrid Brault

If you answer him via email, please do it from Customer

-----Original Message-----
**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Sunday, April 27, 2008 1:30 PM
**To:** FERPA
**Subject:** Attn: Ingrid Brault

Hello Ingrid,

I am inquiring as to whether my letter regarding the Green Bay Public School District was received via mail as of yet. I have attached copies to this email in case it has not yet arrived. Please let me know if there is anything I can do to help resolve this matter as there are approximately 7,000 students each day who are being subjected to showing their personal information and I believe that they are stalling in changing their direction, hoping that opposition goes away or the school year ends and a new Superintendent takes over.

Thank You for your assistance,



04/30/2008

## Brault, Ingrid

| | |
|---|---|
| **From:** | FERPA |
| **Sent:** | May 05, 2008 9:03 AM |
| **To:** | Brault, Ingrid |
| **Subject:** | FW: Stop School Districts Unlawful Policy (GBAPS) |

Yours, right?

-----Original Message-----
From:
Sent: Friday, May 02, 2008 3:53 PM
To: Valitchka, Luke;                          FERPA; dnerad@greenbay.k12.wi.us;

Subject: Stop School Districts Unlawful Policy (GBAPS)

Everyone,

I received a copy of the email from the [             ] regarding lanyards.

I would first like to express my gratitude to the Green Bay School District and to administration at West High School for their daily efforts to keep my student safe.  I am fully aware that because of unsettling incidents around us steps are taken in the best interest of our students.  Although these measures may not always be easy or convenient, they are an unfortunate sign of the times.

I would be surprised to find that any significant number of students or parents are in agreement with the [          ] to such an extreme.  As an involved parent at West, I do not feel this has been a "hotbed" issue or has been the subject of conversation or parent gossip lines.  Just because we share attendance at meetings or events does not put us in support of this position.

I regret should this attempt for attention on this matter reflect negatively on West High School.  I would like to specifically thank Dan Nerad, Luke Valitchka, Sandra Beyer, Josh Chudacoff and all other administrative and supporting personnel for their daily dedication to making West High a safe environment and top notch, quality educational facility.  Your efforts should not be diminished by the negative reflections of a few.

Sometimes rules need to be enforced that we don't agree with or may be inconvenienced by, but if it is being done in an effort to protect us and if it is for the greater good, then we need to respect that and adjust.  Unfortunately, it just isn't a perfect world.

Thanks everyone for your time,



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF PLANNING, EVALUATON AND POLICY DEVELOPMENT

Dr. Gregory Maass
Superintendent
Green Bay Area School District
200 S. Broadway
Green Bay, Wisconsin 54303

**APR – 3 2009**

Family Educational Rights
and Privacy Act

Dear Dr. Maass:

█████████████ has filed a complaint with the Department of Education alleging that the
Green Bay Area School District (District) violated rights afforded parents by the Family
Educational Rights and Privacy Act (FERPA). This Office, under authority of § 99.60 of the
FERPA regulations (copy enclosed), investigates complaints in accordance with the procedures
outlined in § 99.65. The section states in summary:

- The Office notifies the complainant and the educational agency or institution against
  which the violation has been alleged, in writing, if it initiates an investigation of a
  complaint.

- The notification to the agency or institution under this section includes the substance of
  the alleged violation and asks the agency or institution to submit a written response to the
  complaint.

This letter serves to notify you of the allegation and to provide you the opportunity to submit a
written response.

By letter dated April 21, 2008, the Parent alleges that the District violated § 99.30 of the FERPA
regulations by improperly disclosing information from student education records including from
█████████ (Student) education records. Section 99.30 states:

> [A]n educational agency or institution shall obtain a signed and dated written consent . . .
> before it discloses personally identifiable information from the student's education
> records.

Specifically, the Parent alleges that the District policy on Student Identification Cards (copy
enclosed) requires that students "openly display their student identification card on a breakaway
lanyard around their neck. The Student ID contains a student photo, name and ID number along
with barcode identification." Although the Student no longer attends the District, the Parent
informed this Office of his allegation by letter dated April 21, 2008. The Parent explained that

Our mission is to ensure equal access to education and to promote educational excellence throughout the nation.

Page 2 – Dr. Gregory Maass

the District notified parents of this new policy (see attached) on January 2, 2008. The Parent stated that the former superintendent, Dr. Daniel Nerad, told him on April 8, 2008, that this policy is a "security measure" taken by the District. The Parent states that students are required to wear the ID card in a manner that publicly discloses the student ID number although, after a review of the District's policy on Student Identification Cards (copy enclosed), it is not clear whether this is the case or whether the student ID number is hidden or somehow imbedded in a barcode so that only school officials with legitimate educational interest can gain access.

In order to complete the procedure outlined in § 99.65(a)(2) of the FERPA regulations, please investigate the Parent's allegation and provide this Office a written response within four weeks after you receive this letter. When responding please provide the following information:

- Does the District require students to wear the ID card on their person with the ID number showing in a manner that makes the ID number available to any person on campus?
- What is the student ID number? For example, does it allow school officials access to the student education records maintained by the District such as a transcript, attendance, health or disciplinary records? Or, is the number a way to identify the student numerically with out connecting the number to education records maintained at the District?
- Is the ID number on the student ID card hidden in any manner so that only school officials with legitimate educational interest can have access? If so, in what manner is the student ID number maintained on the student ID card?

Please refer to ▮▮▮▮▮▮▮▮▮▮ in any correspondence regarding this complaint. If you have any questions concerning the Act, the Department of Education's role in its administration, or the complaint procedure, you may contact Ms. Ingrid Brault of my staff. The name, address, and telephone number of this Office are:

> Family Policy Compliance Office
> U.S. Department of Education
> 400 Maryland Avenue, SW
> Washington, D.C. 20202-8520
> (202) 260-3887

> Sincerely,
>
> Paul Gammill
> Director
> Family Policy Compliance Office

Enclosures

cc:    Parent



# DAVIS | KUELTHAU
attorneys at law

RECEIVED
AUG - 5 2009
By

July 30, 2009

Frances Moran
Family Policy Compliance Office
United States Department of Education
400 Maryland Avenue, SW
Washington D.C. 20202-8520

Re:  ███████████  Family Educational Rights and Privacy Act
Green Bay Area Public School District

Dear Ms. Moran:

Thank you for taking the opportunity to speak with me earlier this week regarding the above-referenced matter. I have conferred with District officials regarding the planning for next school year as we discussed.

I can confirm that the student identification numbers will no longer be used on the identification badges. Rather, the badges will contain the student's name, photograph, and a barcode with encrypted data. The badges have been and will continue to be worn by both middle school and high school students in the District.

I look forward to the Department's guidance regarding the opt-out provisions under FERPA and the affect those provisions may have on this important security-related measure. I would encourage the Department to balance the minimal impact the use of ID badges has on student privacy issues with the significant benefit it can have on security and safety issues within the schools. The students are required to wear the badges in school where they would be displaying directory data, however, the vast majority of those viewing that directory data are other students or school officials. The incidence of access to pupil record information by the general public from use of the ID badges is limited by the nature of the forum itself. Likewise, this is akin to some respects to the Department's position that students cannot use the opt-out provisions to remain anonymous in the classroom. While not in the classroom, they are still in the school facilities and under the care and supervision of school authorities. The same considerations apply in the broader school environment context as apply in the classroom itself, both as to

Phone 920.435.9378  Direct 920.431.2225  Fax 920.431.2265
318 S. Washington Street, Suite 300, Green Bay, WI 54301
glacy@dkattorneys.com

BROOKFIELD | GREEN BAY | MADISON | MILWAUKEE | OSHKOSH | SHEBOYGAN
www.dkattorneys.com

Frances Moran
July 30, 2009
Page 2

maintaining an environment conclusive to educational and to protect the safety and security of all of the students and staff.

Again, I appreciate your interaction on this issue and look forward to your response.

Very truly yours,

Davis & Kuelthau, s.c.

Geoffrey A. Lacy

GAL:kjh
cc:     Ms. Barbara Dorff
        Attorney Ann Patteson



**DAVIS|KUELTHAU**
attorneys at law



RECEIVED
MAY 1 2 2009
By

May 7, 2009

Regina Miles
Family Policy Compliance Office
United States Department of Education
400 Maryland Avenue, SW
Washington D.C.  20202-8520

Re: _____, Family Educational Rights and Privacy Act
          Green Bay Area Public School District

Dear Ms Miles:

Our office represents the Green Bay Area Public School District.  We are submitting this letter in response to the complaint filed with your office concerning the use of student ID numbers on mandatory student identification cards.  The students in the schools, as ultimately determined by the building administrator, are required to wear an ID badge at all times in the school.  The ID has the student's name and student identification number located on it, as well as a bar code and a photo.  The ID number and name are visible to anyone that sees an individual student.  The purpose is to allow faculty and others to be able to identify individual students in the building without getting some or similar names confused.  This is for security purposes primarily.

The complaint alleges (though neither the complaint nor any of the referenced enclosures were actually attached to the Department's letter) that the schools' use of the student identification number is a violation of FERPA.  For this to in fact be a violation, the student identification number would have to provide access to student education or behavioral records.  In other words, the identification number would have to constitute personally identifiable information which, in conjunction with a student's name or other generally accessible information would permit a user to gain access to student record information.

The student ID cannot be used to gain access to any student record information without a password and access to the student system.  Likewise, protected information is not provided over the phone based only on the student name and identification number.  Accordingly, placement of the student identification number on the badges does not constitute a disclosure of personally

---

Phone 920.435.9378  Direct 920.431.2225  Fax 920.431.2265
318 S. Washington Street, Suite 300, Green Bay, WI 54301
glacy@dkattorneys.com

BROOKFIELD | GREEN BAY | MADISON | MILWAUKEE | OSHKOSH | SHEBOYGAN
www.dkattorneys.com

Regina Miles
May 7, 2009
Page 2

identifiable student information, nor does it constitute directory data either as identified by the FERPA regulations or by District policy.

I should also note that the District intends to modify this practice for the following school year. In the future, the plan is to embed all information in the barcode on the ID badges.  The schools may still require students to wear them but the student identification number will not be on the badge.  This does not, however, indicate that the District has in any fashion violated FERPA.

Please feel free to contact me if you require any further information.

Very truly yours,

Davis & Kuelthau, s.c.

Geoffrey A. Lacy

GAL:kjh
cc:    Ms. Barbara Dorff